**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Chief Judge Marcia S. Krieger**

Civil Action No. 13-cv-01300-MSK-MJW

**JOHN B. COOKE, Sheriff of Weld County, Colorado;
TERRY MAKETA, Sheriff of El Paso County, Colorado;
JUSTIN SMITH, Sheriff of Larimer County, Colorado;
DAVID A. WEAVER, Sheriff of Douglas County, Colorado:
BRUCE W. HARTMAN, Sheriff of Gilpin County, Colorado;
KEN PUTNAM, Sheriff of Cheyenne County, Colorado;
DENNIS SPRUELL, Sheriff of Montezuma County, Colorado;
TIM JANTZ, Sheriff of Moffat County, Colorado;
JERRY MARTIN, Sheriff of Dolores County, Colorado;
MIKE ENSMINGER, Sheriff of Teller County, Colorado;
SHAYNE HEAP, Sheriff of Elbert County, Colorado;
CHAD DAY, Sheriff of Yuma County, Colorado;
FRED D. MCKEE, Sheriff of Delta County, Colorado;
LOU VALLARIO, Sheriff of Garfield County, Colorado;
FRED HOSSELKUS, Sheriff of Mineral County, Colorado;
BRETT L. POWELL, Sheriff of Logan County, Colorado;
JAMES FAULL, Sheriff of Prowers County, Colorado;
LARRY KUNTZ, Sheriff of Washington County, Colorado;
BRIAN E. NORTON, Sheriff of Rio Grande County, Colorado;
DUKE SCHIRARD, Sheriff of La Plata County, Colorado;
JIM BEICKER, Sheriff of Fremont County, Colorado;
RONALD BRUCE, Sheriff of Hinsdale County, Colorado;
CHRIS S. JOHNSON, Sheriff of Otero County, Colorado;
FRED JOBE, Sheriff of Custer County, Colorado;
DONALD KRUEGER, Sheriff of Clear Creek County, Colorado;
JAMES CRONE, Sheriff of Morgan County, Colorado;
SI WOODRUFF, Sheriff of Rio Blanco County, Colorado;
TOM RIDNOUR, Sheriff of Kit Carson County, Colorado;
TOM NESTOR, Sheriff of Lincoln County, Colorado;
STAN HILKEY, Sheriff of Mesa County, Colorado;
FORREST FRAZEE, Sheriff of Kiowa County, Colorado;
RICK DUNLAP, Sheriff of Montrose County, Colorado;
TED B. MINK, Sheriff of Jefferson County, Colorado;
DAVE STONG, Sheriff of Alamosa County, Colorado;
FRED WEGENER, Sheriff of Park County, Colorado;
BRUCE NEWMAN, Sheriff of Huerfano County, Colorado;
RANDY PECK, Sheriff of Sedgwick County, Colorado;
DOMINIC MATTIVI, JR., Sheriff of Ouray County, Colorado;
JOHN MINOR, Sheriff of Summit County, Colorado;
SCOTT FISCHER, Sheriff of Jackson County, Colorado;**

**PETER GONZALEZ, Sheriff of Archuleta County, Colorado;**
**RICK BESECKER, Sheriff of Gunnison County, Colorado;**
**CHARLES "ROB' URBACH, Sheriff of Phillips County, Colorado;**
**ROD FENSKE, Sheriff of Lake County, Colorado;**
**GRAYSON ROBINSON, Sheriff of Arapahoe County, Colorado;**
**DAVID D. CAMPBELL, Sheriff of Baca County, Colorado;**
**MIKE NORRIS, Sheriff of Saguache County, Colorado;**
**AMOS MEDINA, Sheriff of Costilla County, Colorado;**
**MILES CLARK, Sheriff of Crowley County, Colorado;**
**DAVID ENCINIAS, Sheriff of Bent County, Colorado;**
**SUE KURTZ, Sheriff of San Juan County, Colorado;**
**JAMES (JIM) CASIAS, Sheriff of Las Animas County, Colorado;**
**GARRETT WIGGINS, Sheriff of Routt County, Colorado;**
**DOUGLAS N. DARR, Sheriff of Adams County, Colorado;**
**COLORADO OUTFITTERS ASSOCIATION;**
**COLORADO FARM BUREAU;**
**NATIONAL SHOOTING SPORTS FOUNDATION;**
**MAGPUL INDUSTRIES;**
**USA LIBERTY ARMS;**
**OUTDOOR BUDDIES, INC.;**
**WOMEN FOR CONCEALED CARRY;**
**COLORADO STATE SHOOTING ASSOCIATION;**
**HAMILTON FAMILY ENTERPRISES, INC., d/b/a FAMILY SHOOTING CENTER AT**
**CHERRY CREEK STATE PARK;**
**DAVID STRUMILLO;**
**DAVID BAYNE;**
**DYLAN HARRELL;**
**ROCKY MOUNTAIN SHOOTERS SUPPLY;**
**2ND AMENDMENT GUNSMITH & SHOOTER SUPPLY, LLC;**
**BURRUD ARMS INC. D/B/A JENSEN ARMS;**
**GREEN MOUNTAIN GUNS;**
**JERRY'S OUTDOOR SPORTS;**
**GRAND PRIX GUNS;**
**SPECIALTY SPORTS & SUPPLY; and**
**GOODS FOR THE WOODS;**

      **Plaintiffs,**

**v.**

**JOHN W. HICKENLOOPER, Governor of the State of Colorado,**

      **Defendant.**

---

## OPINION AND ORDER GRANTING IN PART
## AND DENYING IN PART
## DEFENDANT'S MOTION TO DISMISS

---

**THIS MATTER** comes before the Court on the Defendant Governor John W. Hickenlooper's (hereafter referred to as "the State") Motion to Dismiss **(#64)**.  The Plaintiffs filed two Responses[1] to the motion **(#69, 70)**, and the State replied **(#75)**.

## I.  Background

The Colorado General Assembly recently enacted new gun regulations.  At issue in this lawsuit are two statutes — C.R.S. §§ 18-12-112 and 18-12-302.

The first statute, § 18-12-112, imposes mandatory background checks for the transfer of guns in private transactions, subject to certain exceptions.  The law mandates that before a person (who is not a gun dealer) can transfer ownership of a gun to someone else, the transferor must require that the transferee obtain a background check by a licensed gun dealer, and the transferor must obtain approval of the transfer from the Colorado Bureau of Investigation. § 18-12-112(1).  An individual who violates the law is guilty of a crime.  § 18-12-112(9). Although challenged in this lawsuit, § 18-12-112 is not the subject of the State's instant motion to dismiss.

The second statute, § 18-12-302, prohibits the possession, sale, or transfer of large-capacity ammunition magazines.  Section 18-12-301(2) defines "large-capacity magazine" to

---

[1] The Response found at Docket #69 was filed by Colorado Outfitters Association, Colorado Farm Bureau, National Shooting Sports Foundation, Magpul Industries, USA Liberty Arms, Outdoor Buddies, Inc., Women for Concealed Carry, Colorado State Shooting Association, Hamilton Family Enterprises, Inc., David Strumillo, David Bayne, Dylan Harrell, Rocky Mountain Shooters Supply, 2nd Amendment Gunsmith & Shooter Supply, LLC, Burrud Arms Inc., Green Mountain Guns, Jerry's Outdoor Sports, Grand Prix Guns, Specialty Sports & Supply, and Goods for the Woods.  The remaining Plaintiffs, county Sheriffs from across Colorado, joined in the first response and also filed a separate Response at Docket #70.

1

include magazines that are capable of accepting, or are "designed to be readily converted to accept," more than fifteen rounds of ammunition.  Under the statute, a person who sells, transfers, or possesses a large-capacity magazine is guilty of a crime.  § 18-12-302(1).  However, the statute contains a grandfather clause that allows a person to possess a large-capacity magazine if he or she (1) owned the magazine as of July 1, 2013 (the effective date of the statute), and (2) has maintained "continuous possession" of the magazine thereafter.       § 18-12-302(2).  Only §§ 18-12-301 and -302 are at issue in the context of this motion.  Since these statutes were enacted, a number of relevant events have occurred.  The facts with regard to these events are undisputed and are recounted generally here.  To the extent further detail is required, the Court will elaborate in its analysis.

On May 16, 2013, the Colorado Attorney General, at the request of Governor Hickenlooper, sent a "Technical Guidance" letter to the Executive Director of the Colorado Department of Public Safety.  The letter was intended to assist Colorado law enforcement agencies in understanding and applying portions of the statute prohibiting large-capacity magazines.  The Technical Guidance addressed the scope of the phrase "designed to be readily converted to accept more than fifteen rounds of ammunition," and set forth the Attorney General's interpretation of the "continuous possession" requirement of the grandfather clause.

Soon after the Technical Guidance was issued, the Plaintiffs initiated this action. Their claims are currently stated in a Second Amended Complaint (**#62**).  They assert six claims, five of which challenge the constitutionality of various provisions of the new statutes.

The Plaintiffs assert that:

(1) the prohibition on the sale, transfer, or possession of magazines with a capacity larger than fifteen rounds of ammunition, §§ 18-12-301 and -302, violates the Second Amendment of the United States Constitution;[2]

(2) the prohibition on the sale, transfer, or possession of magazines that are "designed to be readily converted" to accept more than fifteen rounds of ammunition, §§ 18-12-301 and -302, violates the Second Amendment of the United States Constitution;[3]

(3) the phrase "designed to be readily converted," found in § 18-12-301(2)(a)(I), is unconstitutionally vague under the Due Process Clause of the Fourteenth Amendment;

(4) the phrase "continuous possession," found in the grandfather clause of § 18-12-302(2)(a)(II), is unconstitutionally vague under the Due Process Clause of the Fourteenth Amendment;

(5) §§ 18-12-301 *et seq.* and § 18-12-112 violate Title II of the Americans with Disabilities Act (ADA), 42 U.S.C. § 12132, because they discriminate against disabled persons; and

(6) the restrictions imposed on the transfer of firearms between private individuals under § 18-12-112 violates the Second Amendment of the United States Constitution.

A month after filing their initial Complaint (and just two weeks before the statute prohibiting large-capacity magazines was set to go into effect), the Plaintiffs requested a preliminary injunction to stop the statute from taking effect.  The parties were able to resolve

---

[2] The provisions of the Second Amendment to the United States Constitution are made applicable to state laws by virtue of the Fourteenth Amendment to the United States Constitution.  *See McDonald v. City of Chicago*, 130 S.Ct. 3020 (2010).

[3] Although the Plaintiffs' first two claims appear to present separate challenges, the Court understands these two claims to actually be one claim challenging the constitutionality of §§ 18-12-301 *et seq.*, as a whole, under the Second Amendment.

such motion without the Court's involvement due, in part, to the State's agreement to issue further guidance on the statutes. The Colorado Attorney General issued a second Technical Guidance letter, providing additional guidance with regard to the definition of "large-capacity magazine" and as to the "continuous possession" requirement of the grandfather clause.

Citing to Fed. R. Civ. P. 12(b)(1),[4] the State now moves to dismiss particular claims in the Second Amended Complaint. The State requests that the Court dismiss the Plaintiffs' claims that the language found in §§ 18-12-301(2)(a)(I) and -302(2)(a)(II) is unconstitutionally vague and all claims asserted by the Sheriffs[5] in their official capacity. The State contends that the Court lacks subject matter jurisdiction over these claims because the Plaintiffs do not have standing to assert them.

---

[4] Rule 12(b)(1) motions to dismiss for lack of subject matter jurisdiction generally take one of two forms. The moving party may (1) facially attack the complaint's allegations as to the existence of jurisdiction, or (2) go beyond the allegations contained in the complaint by presenting evidence to challenge the factual basis upon which subject matter jurisdiction rests. *Maestas v. Lujan*, 351 F.3d 1001, 1013 (10th Cir. 2003).

Under a facial attack, the movant merely challenges the sufficiency of the complaint, requiring the Court to accept the allegations in the complaint as true. *Holt v. United States*, 46 F.3d 1000, 1002 (10th Cir. 1995). On the other hand, in a factual attack, the movant goes beyond the allegations in the complaint and challenges the facts upon which subject matter jurisdiction depends. In such situations, the Court must look beyond the complaint and has wide discretion to allow documentary and even testimonial evidence to resolve disputed jurisdictional facts. *Id.* In the course of a factual attack under Rule 12(b)(1), the Court's reference to evidence outside the pleadings does not convert the motion into a motion for summary judgment under Rule 56. *Id.*

The State presents both kinds of challenges under Rule 12(b)(1) — a factual attack as to the Plaintiffs' ability to establish standing to assert their vagueness claims and a facial attack as to the standing of the Sheriffs to bring claims in their official capacities.

[5] For the sake of clarity in identifying various groups of Plaintiffs, the Court notes that it uses the term "Plaintiffs" only when collectively referring to all of the Plaintiffs involved in this lawsuit. The group of Plaintiffs comprised of individuals identified as county Sheriffs is referred to as "the Sheriffs." The remaining non-sheriff Plaintiffs (including individuals and entities) are referred to by name where appropriate.

## II. Jurisdiction

The issues presented in the State's motion to dismiss concern whether the Court has subject matter jurisdiction over certain claims.  The Court may exercise jurisdiction over this matter so that it may determine its own jurisdiction.  *See Dennis Garberg & Associates, Inc. v. Pack-Tech Intern. Corp.*, 115 F.3d 767, 773 (10th Cir. 1997).

## III. Analysis

Before beginning its legal analysis, the Court pauses to address a preliminary matter. Recognizing that this case is one of great public concern and interest, it is important to identify what the Court is *not* doing and *not* considering.

Determination of this motion to dismiss has nothing to do with the merits of the Plaintiffs' claims.  The Court is  not be determining whether the new laws are good, bad, wise, unsound, or whether they are the subject of legitimate concern.  Indeed, at this juncture, the Court is not even considering whether the challenged portions of the laws are constitutional. This ruling determines only whether the Court *can* consider particular claims (that is, the Court's jurisdiction ).

A court's "jurisdiction" is a broad concept.  For purposes of the matters addressed herein, jurisdiction  means a court's power or authority to interpret and apply the law.

All federal courts are courts of "limited jurisdiction," meaning that they possess only that power given to them by the United States Constitution and federal statutes.[6]  *Kokkonen v. Guardian Life Ins. Co. of America*, 511 U.S. 375, 377 (1994).  Article III of the United States Constitution restricts the authority of federal courts to adjudicating actual "cases" and

---

[6] This is in contrast to the state courts.  Typically courts of general jurisdiction, state courts are presumed to have the power to hear virtually any claim arising under federal or state law, except those which Congress or the United States Constitution  specifies can be heard only by federal courts.

"controversies."  U.S. Const. art. III, § 2, cl.1; *Sprint Commc'ns Co. v. APCC Servs., Inc.*, 554 U.S. 269 (2008).  Limitation of the jurisdiction of federal courts to cases and controversies is crucial to maintaining the "tripartite allocation of power" set forth in the United States Constitution.  Indeed, no principle is more fundamental to the judiciary's proper role in our system of government.  *See Valley Forget Christian College v. Americans United for Separation of Church and State, Inc.*, 454 U.S. 464, 474 (1982); *Raines v. Byrd*, 521 U.S. 811, 818 (1997).

A case or controversy can only be brought by a person with "standing" to sue.  This means that a plaintiff must have a right or interest that has been, is being, or will be affected by the challenged act or statute.  *See Allen v. Wright*, 468 U.S. 737, 750-51 (1984).  In other words, to invoke federal court jurisdiction, a plaintiff must demonstrate that he or she "has a stake" in the outcome at the time the suit is filed.  Thus, unlike doctrines which restrain federal courts from exercising jurisdiction based on the characteristics of the claims themselves (*e.g.* doctrines of abstention or grants of exclusive jurisdiction), the question of standing focuses on the *party* who seeks relief rather than on the issues that he or she wants adjudicated.  *See Flast v. Cohen*, 392 U.S. 83, 95 (1968).  In addition, a plaintiff must demonstrate standing for each claim he or she asserts and for each form of relief that is sought.  *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 352 (2006).

If there is no plaintiff with standing to assert a particular claim, federal courts lack jurisdiction to consider it.  *Summers v. Earth Island Inst.*, 555 U.S. 488, 492-93 (2009).  Parties who invoke federal jurisdiction, here the Plaintiffs, bear the burden of establishing a court's jurisdiction.  *Steel Co. v. Citizens for a Better Environment*, 523 U.S. 83, 104 (1998).   Thus, it is the Plaintiffs who must establish their standing to proceed with the claims in the Second Amended Complaint.

To establish standing, a plaintiff must show that: (1) he or she has suffered an "injury in fact" that is concrete and particularized, and actual or imminent (not merely conjectural or hypothetical); (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by the relief requested. *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs., Inc.*, 528 U.S. 167, 180-81 (2000); *Tandy v. City of Wichita*, 380 F.3d 1277, 1283 (10th Cir. 2004).

The "injury in fact" requirement is satisfied differently depending on what kind of relief a plaintiff seeks.  A plaintiff may seek retrospective relief (typically in the form of an award of money damages) when he or she wants to be compensated for a past injury.  In contrast, a plaintiff may seek prospective relief (usually in the form of a declaratory judgment or an injunction) when he or she believes that he or she will be injured in the future and wants to prevent the injury from happening.  Here, the Plaintiffs do not claim that they have suffered any past injuries due to prior enforcement of the new statutes.  Instead, they seek prospective relief by asking the Court to enjoin the State from enforcing the statutes in the future.

To have standing to seek prospective relief, a plaintiff must establish that he or she is suffering a continuing injury from the challenged act, or that he or she is under a real and immediate threat of being injured by that act in the future.  *City of Los Angeles v. Lyons*, 461 U.S. 95, 101-02 (1983).  The threatened injury must be "certainly impending" and not merely speculative.  *Laidlaw*, 528 U.S. at 190.  When, as here, the constitutionality of a criminal statute is challenged based on the prospect of future enforcement, a plaintiff must show that "there exists a credible threat of [future] prosecution" of the plaintiff under the statute.  *Ward v. Utah*, 321 F.3d 1263, 1267 (10th Cir. 2003).

7

**B.  Do any of the Plaintiffs have standing to assert that §§ 18-12-301 and -302 are unconstitutionally vague?**

The Plaintiffs claim that certain language found in §§ 18-12-301 and -302 is unconstitutionally vague under the Due Process clause of the 14th Amendment to the United States Constitution.  The State argues that these claims must be dismissed because no Plaintiff has, or can, show a "credible threat" that he, she, or it will be prosecuted under the statutes because the Technical Guidance letters have adequately clarified the statutory terms.  This is a factual challenge to the Plaintiffs' standing.  Accordingly, the Court does not presume the truthfulness of the factual allegations in the Second Amended Complaint and has wide discretion to consider affidavits, other documents, and evidence.  *Holt v. United States*, 46 F.3d 1000, 1002-03 (10th Cir. 1995).

As noted above, to have standing, a plaintiff who challenges the prospective enforcement of a criminal statute must show a "real and immediate threat" of future prosecution under the statute.  *Bronson v. Swensen*, 500 F.3d 1099, 1107 (10th Cir. 2007).  This requirement has been characterized as a "credible" threat of prosecution, meaning that is arises from an "objectively justified fear of real consequences."  *Id*. (quoting *D.L.S. v. Utah*, 374 F.3d 971, 975 (10th Cir. 2004)).  In *Bronson*, the Tenth Circuit explained that the credible threat test operates as a continuum, along which the degree of likelihood of enforcement must be assessed.  At the "credible threat" end of the spectrum are cases in which the plaintiff has been explicitly threatened with arrest or prosecution.  *See, e.g., Doctor John's, Inc. v. City of Roy*, 465 F.3d 1150, 1156 (10th Cir. 2006).  At the "no credible threat" end of the spectrum are cases in which there was an affirmative assurance by a government actor responsible for enforcing the challenged statute that there will be no prosecution.  *Bronson*, 500 F.3d at 1108.  Such

assurances prevent a "threat" of prosecution from maturing into a "credible" one. *See, e.g., Mink v. Suthers*, 482 F.3d 1244, 1253-55 (10th Cir. 2007); *Winsness v. Yocom*, 433 F.3d 727, 732 (10th Cir. 2006); *Faustin v. City & County of Denver*, 268 F.3d 942, 948 (10th Cir. 2001).

Here, the Colorado Attorney General's two Technical Guidance letters specify how the statutes should be interpreted and enforced. The State argues that the Technical Guidance letters act as assurances that there will be no prosecution contrary to their terms. The Plaintiffs argue that the Technical Guidance letters are insufficient to act as "assurances" of non-prosecution because they are not binding on state or local law enforcement and they do not explicitly state that there will be no prosecution.

The Court rejects the Plaintiffs' argument. Although the letters do not explicitly state that these Plaintiffs will not be prosecuted under the statutes, the Technical Guidance letters advise the Plaintiffs of the conduct that is permissible (for example, possession of magazines accepting fewer than fifteen rounds but with removable base plates), and therefore the Plaintiffs are assured that they will not be prosecuted for such conduct. Indeed, C.R.S. § 18-1-504(2)(c) provides an affirmative defense to criminal liability if a defendant engages in conduct under a mistaken belief that the conduct is permitted by "[a]n official written interpretation of the statute or law relating to the offense." In addition, the question is whether there is a credible threat of *prosecution*, not simply *arrest*. The Plaintiffs have not provided any evidence to suggest that any District Attorney will prosecute in variance to the directive of the Attorney General. The idea that a rogue District Attorney might choose to prosecute a Plaintiff for conduct explicitly permitted under the terms of the Technical Guidance is purely speculative.

Recognizing a spectrum of likelihood of prosecution, the Tenth Circuit has also held that the "possibility" of future enforcement need not be "reduced to zero" to defeat standing. *Mink*,

482 F.3d at 1255 (quoting *Winsness*, 433 F.3d at 733).   Thus, a defendant need not contend or show that there is no possibility of prosecution.   Instead, a plaintiff must demonstrate an "actual or imminent, not conjectural or hypothetical" threat that the statute will be enforced against him, her, or it.   *Winsness*, 433 F.3d at 733.   Accordingly, the Court finds that the Technical Guidance letters are sufficient to act as assurances by the State that prosecution will be subject to the clarifications provided by the Technical Guidance letters.

In light of the Technical Guidance letters, to show a credible threat of prosecution, a Plaintiff must show that his, her or its intended behavior falls afoul of *both* the statute(s) *and* the Technical Guidance letters.   It is not necessary for every Plaintiff to show a credible threat of prosecution for the claims to proceed.   If any Plaintiff can show standing, the claim may proceed (albeit only as to that Plaintiff).   *See American Atheists, Inc. v. Davenport*, 637 F.3d 1095, 1114 (10th Cir. 2010) (citing *Watt v. Energy Action Educ. Found.*, 454 U.S. 151, 160 (1981)).

The Court notes that the Plaintiffs have brought separate vagueness claims as to specific phrases found in §§ 18-12-301 and -302.   Thus framed, the Court focuses on *each challenged phrase* as interpreted by the Technical Guidance.   To recap, the Plaintiffs claim that the phrases "designed to be readily converted," found in § 18-12-301(2)(a)(I), and "continuous possession," found in § 18-12-302(2)(a)(II), are unconstitutionally vague.   In determining whether any Plaintiff has standing to assert these claims, the Court has considered all of the pleadings and factual showings made by the Plaintiffs as to how the new statutes might affect them.

1.  "designed to be readily converted"

Section 18-12-302 prohibits the possession, sale, or transfer of large-capacity ammunition magazines.   Section 18-12-301(2) defines "large-capacity magazine" as including "a fixed or detachable magazine, box, drum, feed strip, or similar device capable of accepting, or that is

designed to be readily converted to accept, more than fifteen rounds of ammunition."  The first Technical Guidance letter set forth guidance as to how this phrase should be interpreted and enforced:

> [t]he term "designed," when used as a modifier, denotes a feature that meets a specific function.  This suggests that design features that fulfill more than one function, and whose function is not specifically to increase the capacity of a magazine, do not fall under the definition.  The features of a magazine must be judged objectively to determine whether they were "designed to be readily converted to accept more than fifteen rounds."
>
> Under this reading of the definition, a magazine that accepts fifteen or fewer rounds is not a 'large capacity magazine simply because it includes a removable baseplate which may be replaced with one that allows the magazine to accept additional rounds.  On many magazines, that design feature is included specifically to permit cleaning and maintenance.  Of course, a magazine whose baseplate is replaced with one that does, in fact, allow the magazine to accept more than fifteen rounds would be a "large capacity magazine" under House Bill 1224.

The second Technical Guidance letter provided additional guidance with regard to magazines with removable base plates:

> [m]agazines with a capacity of 15 or fewer rounds are not large capacity magazines as defined in [§ 18-12-301] whether or not they have removable base plates.  The baseplates themselves do not enable the magazines to be expanded and they serve functions aside from expansion — notably, they allow the magazines to be cleaned and repaired.  To actually convert them to higher capacity, one must purchase additional equipment or permanently alter their operation mechanically.  Unless so altered, they are not prohibited.

Thus, to establish standing to challenge the phrase "designed to be readily converted," at least one Plaintiff must show that he, she, or it intends to sell, transfer, or possess a magazine that accepts fifteen rounds or less, but which has a design feature other than a removable base plate that makes it capable of accepting more than fifteen rounds.

Nothing in the Second Amended Complaint or elsewhere in the record to establishes that any Plaintiff is under a credible threat of prosecution under § 18-12-302 for selling, transferring, or possessing a magazine that is "designed to be readily converted" to accept more than fifteen rounds of ammunition.  Several firearm dealer Plaintiffs, including 2nd Amendment Gunsmith & Shooter Supply, LLC; Green Mountain Guns; Jerry's Outdoor Sports; and Magpul Industries, indicate that they own and intend to sell magazines that have removable "floor plates" or "end caps" (which the Court understands to be equivalent to the "base plates" mentioned in the Technical Guidance letters).  However, in accordance with the Technical Guidance, possession or transfer of magazines that could potentially accept more than 15 rounds by virtue of removable floor plates or end caps alone is not precluded.  The letters expressly state that such magazines are not considered to be "designed to be readily converted" into large-capacity magazines for purposes of enforcement of the statute.

No other Plaintiff has alleged that they intend to sell, transfer, or possess magazines that have a design feature, other than a removable base plate, that allows the magazine to accept more than fifteen rounds.[7]  Accordingly, the Court finds that no Plaintiff has alleged sufficient facts to show a credible threat of prosecution for violation of § 18-12-301 based on the possession, sale, or transfer of a magazine that is "designed to be readily converted" to accept more than 15 rounds.  The State's motion to dismiss this claim is therefore GRANTED, and the claim that this portion of the statute is unconstitutionally vague is dismissed.

---

[7] Several Plaintiffs who are organizations and associations, including the National Shooting Sports Foundation, Colorado State Shooting Association, Outdoor Buddies, Colorado Outfitters Association, and Women for Concealed Carry, assert that they are suing on behalf of their members.  However, these Plaintiffs have not asserted that their individual members intend to sell, possess, or transfer a magazine that is designed to be readily converted to accept more than fifteen rounds by virtue of something other than a removable base plate.  Because these Plaintiffs have not established that their members would have standing to sue in their own right, they have not established their standing to sue on behalf of their members.  *See Friends of the Earth, Inc. v. Laidlaw Environmental Services, Inc.*, 528 U.S. 167, 181 (2000).

2.  "continuous possession"

As noted, section 18-12-302 prohibits the possession, sale, or transfer of large-capacity magazines, subject to a grandfather clause.  The grandfather clause protects a person who possesses a large-capacity magazine if he, she, or it (1) owned the magazine as of July 1, 2013 (the effective date of the statute), and (2) maintains "continuous possession" of the magazine thereafter.  § 18-12-302(2).

The first Technical Guidance letter explains:

> Responsible maintenance, handling, and gun safety practices, as well as constitutional principles, dictate that [§ 18-12-302(2)(a)(II)] cannot be reasonably construed as barring the temporary transfer of a large-capacity magazine by an individual who remains in the continual physical presence of the temporary transferee, unless that temporary transfer is otherwise prohibited by law.  For example, an owner should not be considered to have "transferred" a large-capacity magazine or lost "continuous possession" of it simply by handing it to a gunsmith, hunting partner, or an acquaintance at a shooting range with the expectation that it will be promptly returned.  Likewise, a gunsmith, hunting partner, or acquaintance at a shooting range who acquires temporary physical custody of a large-capacity magazine from its owner should not be considered in "possession" of the magazine so long as he or she remains in the owner's physical presence.  However, it would be unreasonable to construe the bill or this guidance to exempt a temporary transfer of a large-capacity magazine in connection with criminal activity.

> For similar reasons, the bill's requirement that an owner must maintain "continuous possession" in order to ensure the application of the grandfather clause cannot reasonably be read to require continuous physical possession. . . .

The second Technical Guidance letter provides additional explanation:

> The phrase "continuous possession" in [§ 18-12-302(2)] shall be afforded its reasonable, every-day interpretation, which is the fact of having or holding property in one's power or the exercise of dominion over property, that is uninterrupted in time, sequence, substance, or extent.  "Continuous possession" does not require a large-capacity magazine owner to maintain literally continuous

13

physical possession of the magazine.  "Continuous possession" is
only lost by a voluntary relinquishment of dominion and control.

In light of the Technical Guidance, to establish standing with regard to the phrase
"continuous possession," a Plaintiff must establish that he, she, or it is subject to a credible threat
of prosecution for possessing a large-capacity magazine and is not protected by the grandfather
clause.  In other words, a Plaintiff must show that he, she or it acquired a large-capacity
magazine before July 1, 2013, but that he, she, or it does not fall within the grandfather clause
because he, she, or it intends to give up "continuous possession" of the magazine.

Plaintiff David Strumillo, a retired police officer, submitted a declaration in which he
states that he owns firearms that use large-capacity magazines.  He asserts that under the new
statute, he will be "prevented from lending [his] firearms containing [the large-capacity
magazines] to [his] family members."

The Court finds that Mr. Strumillo's intended conduct of "lending" his large-capacity
magazines to family members subjects him to a credible threat of criminal prosecution under
§ 18-12-302.  The second Technical Guidance letter states that "continuous possession" is lost
only by a "voluntary relinquishment of dominion and control."  A reasonable interpretation of
Mr. Strumillo's use of the word "lending" suggests that Mr. Strumillo intends to give up his
dominion and control over the magazines for a period of time, and that the magazine will later be
returned to him.  Thus, although Mr. Strumillo owned his magazines as of July 1, 2013, the
grandfathering clause does not protect him because he intends to give up "continuous
possession" of the magazines.

The State further contends that even if there is a Plaintiff who establishes a potential
injury, that such Plaintiff lacks standing because the relief sought (an injunction against
enforcement) will not redress the injury.  It argues that because the Plaintiffs sued the Governor,

14

any injunction against enforcement of the statute or declaratory relief deeming the statute unconstitutional would not bind the local District Attorneys who carry out the actual enforcement of the statute.

The Court is not persuaded.  The Colorado Constitution states that the "supreme executive power of the state shall be vested in the governor, who shall take care that the laws be faithfully executed."  Colo. Const. Art. IV, § 2.  Colorado has long recognized the practice of naming the governor, in his *official role as the state's chief executive*, as the proper Defendant in cases where a party seeks to enjoin state enforcement of a statute, regulation, ordinance, or policy.  *See Developmental Pathways v. Ritter*, 178 P.3d 524, 529 (Colo. 2008).  The Court finds that the Governor, in his official capacity, possesses sufficient authority to enforce (and control the enforcement of) the complained-of statute.  Thus, the relief sought is against the Governor in his official capacity, and therefore would redress injury to Mr. Strumillo.

Accordingly, the Court finds that at least one Plaintiff has established standing to assert a claim that the phrase "continuous possession," § 18-12-302(2), is unconstitutionally vague.  The State's motion to dismiss this claim is therefore DENIED.

### C.  Do the Sheriffs have standing to sue the State of Colorado?

The State also request dismissal of all claims brought by Plaintiffs who are county sheriffs because they have no standing to sue the State in their "official capacity".  The State relies upon the political subdivision doctrine which teaches that a political subdivision of a state may not sue its parent state under certain provisions of the United States Constitution.

To understand the State's argument, it is important to distinguish between claims brought by a person in an "official capacity" and those brought in a personal/individual capacity.

Generally, a government official (whether elected or appointed) can assert rights in two different capacities. One pertains to the office in which the official serves. In that capacity, the official acts on behalf of, and is the representative of, the office that he or she holds. That role continues until the person no longer serves in the office, at which point, the official's successor assumes that role. An "official capacity" claim is one that is brought by or against the person acting as the representative of, or as substitute for, the office or agency. In other words, in an official capacity claim, one can readily replace the named individual with the name of the office itself. For example, an official capacity claim brought by "John Cooke, Sheriff of Weld County," is actually a claim being brought by the Weld County Sheriff's Office.[8] *See Hafer v. Melo*, 502 U.S. 21, 25 (1991).

A government official can also assert rights that he or she has as an ordinary, private citizen. Following the prior example, a claim brought by Sheriff Cooke in an individual capacity is actually one by Mr. Cooke as a private citizen.

A government official can be involved in a lawsuit either in his or her official capacity (that is, as a representative of the office itself) or as an individual, or both.[9] Here, the Court understands the parties to agree that the claims asserted by the Sheriffs in the Second Amended Complaint are all intended to be brought as official capacity claims. *See generally* Docket # 70 (repeatedly arguing that the "Sheriffs have standing, in their official capacity," in various

---

[8] It is in this same sense that the Court has referred to the Defendant in this case — nominally, Mr. Hickenlooper — as simply "the State," as all claims are brought against Mr. Hickenlooper in his official capacity as the Governor of Colorado.

[9] The issue presented here is the relatively unusual question of whether *plaintiffs* are bringing claims in their official or individual capacities. The more common question — whether a claim is brought against a *defendant* in an official or individual capacity — is not at issue here. *See generally Watson v. Polland*, 2009 WL 1328316 (D. Colo. May 8, 2009) (slip op.) (discussing the difference between official and individual capacity claims brought against a defendant).

respects, but never contending that the Sheriffs have standing "in their individual capacity").

Thus, these are claims brought by the Sheriffs' offices of each of the respective county.

The State argues that under the doctrine of political subdivision standing, the Sheriff's

Offices in each county are barred from suing the State because a county Sheriff's Office is a

political subdivision of the State of Colorado.  Consideration of this argument requires

application of both federal and state law.

Turning first to federal law, political subdivisions of states, such as cities and counties,

are recognized as subordinate governmental instrumentalities created by a state to assist in

carrying out state governmental functions.  *See Reynolds v. Sims*, 377 U.S. 533, 575 (1964).

Under the doctrine of political subdivision standing, a political subdivision of a state cannot sue

its parent state for alleged violations of the Fourteenth Amendment.  This is because that

amendment was written to protect individual rights, as opposed to protecting collective or

structural rights.[10]  *Branson Sch. Dist. RE-82 v. Romer*, 161 F.3d 628 (10th Cir. 1998).  Indeed,

the Tenth Circuit has observed that there is not "a single case in which the Supreme Court or a

court of appeals has allowed a political subdivision to sue its parent state under a substantive

provision of the Constitution."  *City of Hugo v. Nichols*, 656 F.3d 1251, 1253-54 (10th Cir.

2011).

This doctrine is an important limitation on the power of the federal government.  It

guarantees that a federal court will not resolve certain disputes between a state and local

government.  A political subdivision may seek redress against its parent state for violation of a

---

[10] The Tenth Circuit has expressed some doubt as to whether the issue of a political subdivision
suing its parent state is properly regarded as a question of standing or a substantive determination
that the Constitution does not afford rights to political subdivisions as against their states.  *See
City of Hugo v. Nichols*, 656 F.3d 1251, 1255 n.4 (19th Cir. 2011).  Nevertheless, in an earlier
decision, *Branson Sch. Dist. RE-82 v. Romer*, 161 F.3d 628 (10th Cir. 1998), the Tenth Circuit
cast the issue as one of jurisdictional standing.  Thus, this Court treats it as such.

state Constitution, but the political subdivision cannot invoke (nor can a federal court impose) the protections of the United States Constitution for individuals against a state. *See Williams v. Mayor & City Council of Balt.*, 289 U.S. 36, 40 (1933). With regard to its own subdivisions, the power of the state is unrestrained by the Fourteenth Amendment. *City of Trenton v. New Jersey*, 262 U.S. 182, 188 (1923).

Turning to Colorado law, a county in Colorado is undisputedly a political subdivision of the State of Colorado. *See Bd. of Cnty. Com'rs of Douglas Cnty. v. Bainbridge, Inc.*, 929 P.2d 691, 699 (Colo. 1996). The Colorado Constitution creates an office of Sheriff for each county and lists the Sheriff as a county officer. Colo. Const. Art. XIV, § 8. The Sheriff's Office functions as a department of the county, charged with enforcing State laws within the county limits. As such, it is an extension of the county in which it is situated. Thus, an official capacity claim asserted by a county Sheriff's Office is a claim asserted by a political subdivision of the State.

The Sheriffs argue that they are not a political subdivision of the State because the Office of Sheriff was created by the People of Colorado, through the Colorado Constitution, rather than being created by state law. This argument is not persuasive. The Sheriffs are correct that that the People of Colorado acted through the Colorado Constitution, but in doing so they created and empowered the State of Colorado and its subdivisions. Colo. Const. Art. II, § 1 ("[a]ll political power is vested in and derived from the people; all government, of right, originates from the people . . . ."); Colo. Const. Art. II, § 2 ("The people of this state have the sole and exclusive right of governing themselves, as a free, sovereign and independent state . . . ."). In the Colorado Constitution, the People of the State of Colorado created the structure of the state government,

making counties and county Sheriff's Offices part of it – a political subdivision of the State of Colorado.

Alternatively, the Sheriffs argue that the Supreme Court in *Board of Education v. Allen*, 392 U.S. 236 (1968), carved out an exception to the political subdivision doctrine if the plaintiff has a "personal stake in the outcome" of the litigation.  In *Allen*, a local Board of Education sued to stop enforcement of a New York statute requiring public school authorities to lend free textbooks to students at parochial schools.  In a footnote, the Supreme Court noted that the Board's standing had not been challenged.  However, the Court went on to observe that the "[plaintiffs] have taken an oath to support the United States Constitution.  Believing [the statute] to be unconstitutional, they are in the position of having to choose between violating their oath and taking a step — refusal to comply with [the statute] — that would be likely to bring their expulsion from office and also a reduction in state funds for their school districts.  There can be no doubt that [the plaintiffs] thus has a 'personal stake in the outcome' of this litigation."  *Allen*, 392 U.S. at 241 n.5 (quoting *Baker v. Carr*, 369 U.S. 186, 204 (1962)).  The Sheriffs argue that, like the members of the Board of Education, they are compelled by their oath to enforce both the U.S. Constitution and state law, yet believe that the state law they are required to enforce violates the U.S. Constitution, giving them the same "personal stake" in the outcome.

The Tenth Circuit addressed this aspect of *Allen* in *City of Hugo v. Nichols*, 656 F.3d 1251 (10th Cir. 2011).  In that case, the Tenth Circuit specifically considered *Allen* in the context of the political subdivision doctrine.  The Tenth Circuit explained that in *Allen*, standing was based on the *individual* board members' personal stake in losing their jobs.  656 F.3d at 1260.  In other words, the board members were asserting individual claims, rather than "official capacity" claims.  Thus, even if members of the Board of Education in *Allen* did not have standing to bring

an official capacity claim, its members could bring a claim as individuals who were at risk of losing their jobs if they adhered to the oath they took. .

The same is true in this case.  If individual sheriffs wish to protect individual rights or interests they may do so.  In the Second Amended Complaint, however, the Sheriffs have confused their individual rights and interests with those of the county Sheriff's Office.  They each assert that they have a  stake in the outcome of this litigation because (1) they desire to adhere to their oath of office, (2) must preserve their ability to use *posse comitatus*,[11] (3) it would be burdensome to do background checks before transferring weapons in the routine execution of Sheriff duties (*e.g.* issuing Sheriff's Office-owned firearms to deputies, collecting and maintaining firearms seized as evidence, etc.), and (4) it would compromise the performance  of their office by diverting time and financial resources away from higher law-enforcement priorities.

The latter three interests are all incident to the functioning of a Sheriff's Office, but are not individual rights of the person who serves as Sheriff.  In other words, Mr. Cooke does not have an individual ability to invoke *posse comitatus* or to issue Sheriff's Office firearms to deputies or to direct use of Sheriff Office resources.  Thus, any injuries affecting these rights are suffered by the Sheriff's Office, not Mr. Cooke.  Because such injury is to a political subdivision of the State, they are not the type of injury  to the individual interests of a government official as contemplated in *Allen* and *Hugo*.

The remaining injury identified by the Sheriffs — the duty to avoid violating their oath of office — is a type of "personal stake" or potential injury that is acknowledged in *Allen.*

---

[11] Essentially, the power of law enforcement authorities to call upon the general citizenry for assistance in keeping the peace. Black's Law Dictionary, 7th Ed. at 1183.  The Sheriffs' argument is thus that a citizenry dispossessed of certain weapons due to the operation of the statutes offers the Sheriffs a less effective "posse."

However, in *Allen*, the Supreme Court characterized this "personal stake" as the dilemma of "choos[ing] between violating their oath and taking a step . . . that would be likely to bring their expulsion from office." 392 U.S. at 241 n. 5.  Similarly, the Court in *Hugo* understood standing under *Allen* to be "based on the individual board members' personal stake in losing their jobs." 656 F.3d at 1260.  Perhaps there are individual Sheriffs who desire to bring claims in their individual capacities like that asserted in *Allen*.  But no individual claims have been asserted in the Second Amended Complaint.[12]

Finally, the Sheriffs contend that they have third-party standing on behalf of (1) the Colorado mounted rangers and their *posse comitatus*, (2) sheriffs and deputies who wish to purchase large-capacity magazines, and (3) current and former Sheriffs who are disabled under the ADA.  This argument presents many problems.

First, the Second Amended Complaint makes no mention of the third parties whose rights the Sheriffs seek to vindicate.  Third-party standing is asserted for the first time in the Sheriffs' response to the motion to dismiss.  Second, for the reasons discussed above, the Sheriff's Office cannot sue the State under substantive provisions of the United States Constitution.  And finally, "third-party standing" requires not only an injury in fact and a close relation to the third-party, but also a hindrance or inability of the third-party to pursue his or her own claims." *Terrell v. INS*, 157 F.3d 806, 809 (10th Cir. 1998).  The Sheriffs have not explained why the third-parties did not, or cannot, raise the claims on their own.

Accordingly, the Court finds the doctrine of political subdivision standing applies to the Sheriffs' claims in their official capacity.  The Sheriffs, in their official capacities, cannot sue the

---

[12] The Court offers no opinion as to whether the Sheriffs could rejoin the lawsuit by seeking to amend the Second Amended Complaint to assert individual capacity claims, nor what specific facts they must assert to successfully state a claim in which they would have such individual standing.

State under the Fourteenth Amendment to the United States Constitution.  With regard to the

ADA claims asserted in this case, the Court also finds that the Sheriffs cannot assert them in an

official capacity.  The statutory provisions under which the claims are asserted  protect

individual rights, and do not specifically provide rights to political subdivisions.  *See City of

Hugo*, 656 F.3d at 1257 (the Supreme Court and courts of appeals have allowed a political

subdivision to sue its parent state only when Congress has enacted statutory law specifically

providing rights to municipalities).

Accordingly, all claims asserted by the Sheriffs in the Second Amended Complaint are

DISMISSED for lack of standing.

## IV.  Conclusion

For the forgoing reasons, the Defendant's Motion to Dismiss is **GRANTED IN PART

AND DENIED IN PART**.  The motion is **GRANTED** with respect to all claims asserted by the

Sheriffs.  The claims are **DISMISSED** without prejudice.  Any Sheriff shall have 14 days from

the date of this Order in which to seek to join the action in an individual capacity.

The motion is **GRANTED** with respect to the Plaintiffs' claim that the phrase "designed

to be readily converted," found in § 18-12-301(2)(a)(I), is unconstitutionally vague, and the

claim is **DISMISSED**.

The claims proceeding in this case are (1) Second Amendment challenges to §§ 18-12-301 *et seq.* and § 18-12-112; (2) a claim for unconstitutional vagueness as to the phrase "continuous possession," § 18-12-302(2)(a)(II); and (3) the ADA claims.

Dated this 27th day of November, 2013.

**BY THE COURT:**

Marcia S. Krieger
Chief United States District Judge

23