## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a true and correct copy of this Appendix was served via ECF on the following:

| | |
|---|---|
| Matthew Grove | matt.grove@state.co.us |
| Kathleen Spalding | kit.spalding@state.co.us |
| Daniel D. Domenico | dan.domenico@state.co.us |
| Stephanie Scoville | stephanie.scoville@state.co.us |
| LeeAnn Morrill | leeann.morrill@state.co.us |
| David B. Kopel | david@i2i.org |
| Douglas Abbott | dabbott@hollandhart.com |
| Marc F. Colin | mcolin@bcjlpc.com |
| Anthony J. Fabian | fabianlaw@qwestoffice.net |

Virus scan certification:  the digital form of this pleading submitted to the Court was scanned for viruses using Symantec Endpoint Protection software, version 12.0.1001.95 (most recent virus definition created on January 16, 2015), and according to the program, the document is virus free.

ECF Submission: undersigned certifies that this ECF submission is an exact duplicate of the copy delivered to the clerk's officer pursuant to 10th Cir. R. 30.1(A).

Privacy redactions: privacy redactions were required at pages 870, and 937-38 in volume 4 of the Joint Appendix.

s/Peter Krumholz
Peter Krumholz

**Colorado Outfitters Association,** *et al.***,**
**v.**
**John W. Hickenlooper, Governor of the State of Colorado**
**14-1290**

**and**

**Jim Beicker, Sheriff of Fremont County,** *et al.***,**
**v.**
**John W. Hickenlooper, Governor of the State of Colorado**
**14-1292**

## Appendix Table of Contents

Volume 1

| Document | Page |
|---|---|
| Docket Sheet – Full | 1 |
| Complaint for Declaratory and Injunctive Relief, 05/17/2013 | 43 |
| First Amended Complaint for Declaratory and Injunctive Relief, 05/31/2013 | 98 |
| Answer to First Amended Complaint for Declaratory and Injunctive Relief, 06/07/2013 | 156 |
| Governor's Motion for Certification of Questions of Law to the Colorado Supreme Court, 06/10/2013 | 212 |
| Attachment 1 to Governor's Motion for Certification of Questions of Law to the Colorado Supreme Court, 06/10/2013 | 220 |
| Attachment 2 to Governor's Motion for Certification of Questions of Law to the Colorado Supreme Court, 06/10/2013 | 224 |
| Motion for Temporary Restraining Order and for Preliminary Injunction, 06/12/2013 | 227 |
| Exhibit A to Motion for Temporary Restraining Order and for Preliminary Injunction, 06/12/2013 | 254 |
| Exhibit B to Motion for Temporary Restraining Order and for Preliminary Injunction, 06/12/2013 | 259 |
| Order Setting Hearing, 06/13/2013 | 262 |
| Plaintiffs' Response to Defendant's Motion for Certification of Questions of Law to the Colorado Supreme Court, 06/14/2013 | 264 |

Volume 2

| Document | Page |
|---|---|
| Docket Sheet – Abridged | 279 |
| Civil Scheduling Order, 06/18/2013 | 293A |
| Supplemental Brief Regarding Plaintiff's Standing and Other Issues Raised by | 294 |

| the Court, 06/20/2013 | |
|---|---|
| Governor's Reply in Support of Motion to Certify Questions to the Colorado Supreme Court, 06/21/2013 | 333 |
| Governor's Brief in Opposition to Plaintiffs' Motion for Temporary Restraining Order and Preliminary Injunction, 06/24/2013 | 341 |
| Exhibit A to Governor's Brief in Opposition to Plaintiffs' Motion for Temporary Restraining Order and Preliminary Injunction, 06/24/2013 | 380 |
| Exhibit B to Governor's Brief in Opposition to Plaintiffs' Motion for Temporary Restraining Order and Preliminary Injunction, 06/24/2013 | 381 |
| Exhibit C to Governor's Brief in Opposition to Plaintiffs' Motion for Temporary Restraining Order and Preliminary Injunction, 06/24/2013 | 384 |
| Exhibit D to Governor's Brief in Opposition to Plaintiffs' Motion for Temporary Restraining Order and Preliminary Injunction, 06/24/2013 | 390 |
| Exhibit E to Governor's Brief in Opposition to Plaintiffs' Motion for Temporary Restraining Order and Preliminary Injunction, 06/24/2013 | 408 |
| Exhibit F to Governor's Brief in Opposition to Plaintiffs' Motion for Temporary Restraining Order and Preliminary Injunction, 06/24/2013 | 410 |
| Exhibit G to Governor's Brief in Opposition to Plaintiffs' Motion for Temporary Restraining Order and Preliminary Injunction, 06/24/2013 | 412 |
| Exhibit H to Governor's Brief in Opposition to Plaintiffs' Motion for Temporary Restraining Order and Preliminary Injunction, 06/24/2013 | 419 |

## Volume 3

| **Document** | **Page** |
|---|---|
| Docket Sheet – Abridged | 420 |
| Plaintiffs' Reply in Support of Motion for Preliminary Injunction and Temporary Restraining Order, 06/27/2013 | 437 |
| Exhibit A to Plaintiffs' Reply in Support of Motion for Preliminary Injunction and Temporary Restraining Order, 06/27/2013 | 465 |
| Exhibit B to Plaintiffs' Reply in Support of Motion for Preliminary Injunction and Temporary Restraining Order, 06/27/2013 | 469 |
| Exhibit C to Plaintiffs' Reply in Support of Motion for Preliminary Injunction and Temporary Restraining Order, 06/27/2013 | 474 |
| Exhibit D to Plaintiffs' Reply in Support of Motion for Preliminary Injunction and Temporary Restraining Order, 06/27/2013 | 478 |
| Order of Court re Preliminary Injunction, 07/01/2013 | 480 |
| Plaintiffs' Unopposed Motion for Leave to File an Amended Complaint, 07/01/2013 | 482 |
| Proposed Second Amended Complaint for Declaratory and Injunctive Relief, 07/01/2013 | 488 |
| Stipulation of Undisputed Facts, 07/08/2013 | 546 |
| Stipulated Motion to Enter Preliminary Injunction and Withdraw Plaintiffs' Motion for Preliminary Injunction, 07/09/2013 | 553 |
| Proposed Stipulated Preliminary Injunction, 07/09/2013 | 556 |
| Attachment 1 to Stipulated Motion to Enter Preliminary Injunction and | 559 |

| | |
|---|---|
| Withdraw Plaintiffs' Motion for Preliminary Injunction, 07/09/2013 | |
| Courtroom Minutes, 07/10/2013 | 562 |
| Order Granting Motion to Amend Complaint, 07/10/2013 | 566 |
| Unopposed Motion to Withdraw Plaintiffs' Motion for Preliminary Injunction, 07/11/2013 | 568 |
| Exhibit to Unopposed Motion to Withdraw Plaintiffs' Motion for Preliminary Injunction, 07/11/2013 | 575 |
| Order Granting Motion to Withdraw Document, 07/12/2013 | 577 |
| Order Denying Motion for Order for Certification of Questions to the Colorado Supreme Court, 07/17/2013 | 579 |
| Second Amended Complaint for Declaratory and Injunctive Relief, 07/18/2013 | 581 |
| Motion to Dismiss Plaintiffs' Claims Two, Three and Four, and to Dismiss Sheriffs as Plaintiffs Acting in Their Official Capacity, 08/01/2013 | 639 |
| Exhibit A to Motion to Dismiss Plaintiffs' Claims Two, Three and Four, and to Dismiss Sheriffs as Plaintiffs Acting in Their Official Capacity, 08/01/2013 | 656 |

## Volume 4

| **Document** | **Page** |
|---|---|
| Docket Sheet – Abridged | 658 |
| Answer to Second Amended Complaint for Declaratory and Injunctive Relief, 08/01/2013 | 674 |
| Plaintiffs' Response to Defendant's Motion to Dismiss, 08/22/2013 | 732 |
| Exhibit A to Plaintiffs' Response to Defendant's Motion to Dismiss, 08/22/2013 | 760 |
| Exhibit B to Plaintiffs' Response to Defendant's Motion to Dismiss, 08/22/2013 | 763 |
| Fifty-Five Colorado Sheriffs' Response Brief to Defendant's Motion to Dismiss Them in Their Official Capacities, 08/22/2013 | 785 |
| Exhibit A to Sheriffs' Response Brief to Defendant's Motion to Dismiss Them in Their Official Capacities, 08/22/2013 | 835 |
| Exhibit B to Sheriffs' Response Brief to Defendant's Motion to Dismiss Them in Their Official Capacities, 08/22/2013 | 843 |
| Exhibit C to Sheriffs' Response Brief to Defendant's Motion to Dismiss Them in Their Official Capacities, 08/22/2013 | 851 |
| Exhibit D to Sheriffs' Response Brief to Defendant's Motion to Dismiss Them in Their Official Capacities, 08/22/2013 | 861 |
| Exhibit E to Sheriffs' Response Brief to Defendant's Motion to Dismiss Them in Their Official Capacities, 08/22/2013 | 868 |
| Exhibit F to Sheriffs' Response Brief to Defendant's Motion to Dismiss Them in Their Official Capacities, 08/22/2013 | 876 |
| Exhibit G to Sheriffs' Response Brief to Defendant's Motion to Dismiss Them in Their Official Capacities, 08/22/2013 | 884 |
| Exhibit H to Sheriffs' Response Brief to Defendant's Motion to Dismiss Them in Their Official Capacities, 08/22/2013 | 892 |
| Exhibit I to Sheriffs' Response Brief to Defendant's Motion to Dismiss Them | 899 |

| Document | Page |
|---|---|
| in Their Official Capacities, 08/22/2013 | |
| Exhibit J to Sheriffs' Response Brief to Defendant's Motion to Dismiss Them in Their Official Capacities, 08/22/2013 | 908 |
| Exhibit K to Sheriffs' Response Brief to Defendant's Motion to Dismiss Them in Their Official Capacities, 08/22/2013 | 915 |
| Exhibit L to Sheriffs' Response Brief to Defendant's Motion to Dismiss Them in Their Official Capacities, 08/22/2013 | 927 |
| Exhibit M to Sheriffs' Response Brief to Defendant's Motion to Dismiss Them in Their Official Capacities, 08/22/2013 | 934 |
| Exhibit N to Sheriffs' Response Brief to Defendant's Motion to Dismiss Them in Their Official Capacities, 08/22/2013 | 943 |

## Volume 5

| Document | Page |
|---|---|
| Docket Sheet – Abridged | 951 |
| Exhibit O to Sheriffs' Response Brief to Defendant's Motion to Dismiss Them in Their Official Capacities, 08/22/2013 | 968 |
| Exhibit P to Sheriffs' Response Brief to Defendant's Motion to Dismiss Them in Their Official Capacities, 08/22/2013 | 976 |
| Exhibit Q to Sheriffs' Response Brief to Defendant's Motion to Dismiss Them in Their Official Capacities, 08/22/2013 | 984 |
| Reply in Support of Motion to Dismiss Plaintiffs' Claims Two, Three and Four, and to Dismiss Sheriffs as Plaintiffs Acting in Their Official Capacities, 09/05/2013 | 1001 |
| Governor's Reply to *Amicus* Brief of Board of County Commissioners of Mesa County, 11/01/2013 | 1023 |
| Opinion and Order Granting in Part and Denying in Part Defendant's Motion to Dismiss, 11/27/2013 | 1032 |
| Plaintiffs' Unopposed Motion to Alter or Amend Order (#96) on Motion to Dismiss, 12/09/2013 | 1057 |
| Motion for Joinder and for Leave to File Amended Complaint, 12/11/2013 | 1065 |
| Proposed Third Amended Complaint, 12/11/2013 | 1071 |
| Exhibit C to Third Amended Complaint, 12/11/2013 | 1151 |
| Exhibit D to Third Amended Complaint, 12/11/2013 | 1171 |
| Exhibit E to Third Amended Complaint, 12/11/2013 | 1198 |
| Exhibit F to Third Amended Complaint, 12/11/2013 | 1214 |
| Exhibit G to Third Amended Complaint, 12/11/2013 | 1225 |
| Exhibit H to Third Amended Complaint, 12/11/2013 | 1230 |
| Exhibit I to Third Amended Complaint, 12/11/2013 | 1238 |
| Exhibits in Support of Third Amended Complaint (Public Entry for Restricted Document), 12/11/2013 | 1249 |

## Volume 6

| Document | Page |
|---|---|

| Docket Sheet – Abridged | 1251 |
|---|---|
| Order Denying Motion to Amend Complaint, 12/12/2013 | 1267 |
| Defendant's Response to Motion for Joinder and for Leave to File Amended Complaint, 12/18/2013 | 1269 |
| Reply to Response re Motion for Joinder and for Leave to File Amended Complaint, and Motion for Leave to File Substitute Third Amended Complaint, 12/18/2013 | 1284 |
| Proposed Substitute Third Amended Complaint, 12/18/2013 | 1291 |
| Courtroom Minutes, 12/19/2013 | 1362 |
| Fourth Amended Complaint for Declaratory and Injunctive Relief, 12/23/2013 | 1365 |
| Answer and Objections to Fourth Amended Complaint for Declaratory and Injunctive Relief, 01/03/2014 | 1423 |
| Joint Fed.R.Evid. 702 Motion to Strike Expert Opinions, 01/15/2014 | 1467 |
| Proposed Final Pretrial Order, 01/31/2014 | 1483 |
| Addendum A to Proposed Final Pretrial Order – Joint Witness List, 01/31/2014 | 1514 |
| Addendum B to Proposed Final Pretrial Order – Joint Exhibit List, 01/31/2014 | 1517 |

## Volume 7

| Document | Page |
|---|---|
| Docket Sheet – Abridged | 1528 |
| Governor's Motion to Dismiss Count I and Certain Plaintiffs for Lack of Standing, 03/07/2014 | 1544 |
| Exhibit A to Governor's Motion to Dismiss Count I and Certain Plaintiffs for Lack of Standing, 03/07/2014 | 1563 |
| Exhibit B to Governor's Motion to Dismiss Count I and Certain Plaintiffs for Lack of Standing, 03/07/2014 | 1565 |
| Exhibit C to Governor's Motion to Dismiss Count I and Certain Plaintiffs for Lack of Standing, 03/07/2014 | 1567 |
| Exhibit D to Governor's Motion to Dismiss Count I and Certain Plaintiffs for Lack of Standing, 03/07/2014 | 1570 |
| Exhibit E to Governor's Motion to Dismiss Count I and Certain Plaintiffs for Lack of Standing, 03/07/2014 | 1581 |
| Exhibit F to Governor's Motion to Dismiss Count I and Certain Plaintiffs for Lack of Standing, 03/07/2014 | 1583 |
| Exhibit G to Governor's Motion to Dismiss Count I and Certain Plaintiffs for Lack of Standing, 03/07/2014 | 1586 |
| Exhibit H to Governor's Motion to Dismiss Count I and Certain Plaintiffs for Lack of Standing, 03/07/2014 | 1589 |
| Plaintiffs' Response to Defendant's Motion to Dismiss Count 1 and Certain Plaintiffs for Lack of Standing; 03/14/2014 | 1592 |
| Governor's Trial Brief, 03/14/2014 | 1610 |
| Plaintiffs' Trial Brief, 03/14/2014 | 1654 |
| Defendant's Motion in Limine or in the Alternative Forthwith Motion for Bifurcation and Continuance with respect to Plaintiffs' Fifth Claim for Relief, 03/19/2014 | 1720 |

| | |
|---|---|
| Plaintiffs' Response to Defendant's Motion in Limine or in the Alternative Forthwith Motion for Bifurcation and Continuance with Respect to Plaintiffs' Fifth Claim for Relief, 03/21/2014 | 1730 |
| Defendant's Reply in Support of Motion in Limine or in the Alternative Forthwith Motion for Bifurcation and Continuance with Respect to Plaintiffs' Fifth Claim for Relief, 03/21/2014 | 1736 |
| Order Granting Defendant's Motion in Limine, 03/21/2014 | 1741 |
| Plaintiffs' Motion in Limine to Exclude Untimely Disclosed Expert Opinion Testimony, 04/07/2014 | 1743 |
| Findings of Fact, Conclusions of Law, and Order, 06/26/2014 | 1750 |
| Judgment, 06/26/2014 | 1800 |
| Plaintiffs' Notice of Appeal, 07/28/2014 | 1802 |
| Plaintiff Sheriffs and David Strumillo Notice of Appeal, 07/28/2014 | 1806 |
| Plaintiffs' Amended Notice of Appeal, 07/28/2014 | 1810 |

## Volume 8

| **Document** | **Page** |
|---|---|
| Docket Sheet – Abridged | 1814 |
| Transcript of Motion for Preliminary Injunction Hearing Held 07/10/2013 (Docket Entry), 10/06/2014 | 1832 |
| Transcript of Law and Motion Hearing Held 12/19/2013 (Docket Entry), 10/06/2014 | 1834 |
| Transcript of Final Pretrial Conference Held 02/20/2014 (Docket Entry), 10/06/2014 | 1836 |
| Transcript of Trial to Court – Day 1 Held 03/31/2014 (Docket Entry), 10/06/2014 | 1838 |
| Transcript of Trial to Court – Day 2 Held 04/01/2014 (Docket Entry), 10/06/2014 | 1840 |
| Transcript of Trial to Court – Day 3 Held 04/02/2014 (Docket Entry), 10/06/2014 | 1842 |
| Transcript of Trial to Court – Day 4 Held 04/03/2014 (Docket Entry), 10/06/2014 | 1844 |
| Transcript of Trial to Court – Day 5 Held 04/04/2014 (Docket Entry), 10/06/2014 | 1846 |
| Transcript of Trial to Court – Day 6 Held 04/07/2014 (Docket Entry), 10/06/2014 | 1848 |
| Transcript of Trial to Court – Day 7 Held 04/08/2014 (Docket Entry), 10/06/2014 | 1850 |
| Transcript of Trial to Court – Day 8 Held 04/09/2014 (Docket Entry), 10/06/2014 | 1852 |
| Transcript of Trial to Court – Day 9 Held 04/10/2014 (Docket Entry), 10/06/2014 | 1854 |

Volume 9

| Document | Page |
|---|---|
| Transcript of Preliminary Injunction Hearing, 07/10/2013 | (1) 1856 |
| Transcript of Law and Motion Hearing, 12/19/2013 | (1) 1876 |
| Transcript of Final Pretrial Conference, 02/20/2014 | (1) 1911 |

Volume 10

| Document | Page |
|---|---|
| Trial Transcript – Day 1, 03/31/2014 | (1) 1932 |

Volume 11

| Document | Page |
|---|---|
| Trial Transcript – Day 2, 04/01/2014 | (240) 2171 |

Volume 12

| Document | Page |
|---|---|
| Trial Transcript – Day 3, 04/02/2014 | (477) 2408 |

Volume 13

| Document | Page |
|---|---|
| Trial Transcript – Day 4, 04/03/2014 | (677) 2608 |

Volume 14

| Document | Page |
|---|---|
| Trial Transcript – Day 5, 04/04/2014 | (929) 2860 |

Volume 15

| Document | Page |
|---|---|
| Trial Transcript – Day 6, 04/07/2014 | (1158) 3089 |

Volume 16

| Document | Page |
|---|---|
| Trial Transcript – Day 7, 04/08/2014 | (1380) 3311 |

Volume 17

| Document | Page |
|---|---|
| Trial Transcript – Day 8, 04/09/2014 | (1598) 3529 |

## Volume 18

| Document | Page |
|---|---|
| Trial Transcript – Day 9, 04/10/2014 | (1826) 3757 |


## Volume 19

| Document | Page |
|---|---|
| Trial Exhibit 1, pt. 1 – HB13-1224 Legislative History | 3919 |


## Volume 20

| Document | Page |
|---|---|
| Trial Exhibit 1, pt. 2 – HB13-1224 Legislative History | 4155 |


## Volume 21

| Document | Page |
|---|---|
| Trial Exhibit 2, pt. 1 – HB13-1229 Legislative History | 4391 |


## Volume 22

| Document | Page |
|---|---|
| Trial Exhibit 2, pt. 2 – HB13-1229 Legislative History | 4665 |


## Volume 23

| Document | Page |
|---|---|
| Trial Exhibit 3 – HB13-1224 Final Act | 4940 |
| Trial Exhibit 4 – HB13-1229 Final Act | 4945 |
| Trial Exhibit 5 – May 16, 2013 Technical Guidance | 4964 |
| Trial Exhibit 6 – July 10, 2013 Technical Guidance | 4967 |
| Trial Exhibit 7 – Koper article: Report to National Institute of Justice June 2004 | 4969 |
| Trial Exhibit 8 – Koper article: America's Experience with the Federal Assault Weapons Ban, 1994-2007 | 5083 |


## Volume 24

| Document | Page |
|---|---|
| Trial Exhibit 20 – Private Background Checks | 5101 |
| Trial Exhibit 22 – ATF Procedure 2013-1 | 5102 |
| Trial Exhibit 23 – CBI InstaCheck Private Sales July 2013-February 2014 | 5106 |
| Trial Exhibit 24 – CBI InstaCheck Unit – Private Firearm Transaction Data as Reported by Colorado FFLs | 5107 |
| Trial Exhibit 25 – CBI Private Sales Transactions | 5108 |
| Trial Exhibit 26 – List of Colorado Federal Firearms Licensees | 5123 |
| Trial Exhibit 27 – Governor's Cumulative Denial Report – December | 5189 |
| Trial Exhibit 28 – Reasons for Denial | 5194 |

| Trial Exhibit 31 – Letter from Stephanie Donner to Mayor of Loveland and Loveland City Council dated July 10, 2003 | 5197 |
| Trial Exhibit 37 – Firearms Transaction Record | 5199 |
| Trial Exhibit 39 – Hamilton Family Ent. Inc. | 5205 |

## Volume 25

| Document | Page |
| --- | --- |
| Trial Exhibit 40 – Family Shooting Center – Home Page | 5262 |
| Trial Exhibit 41 – Colorado Youth Outdoors Website | 5265 |
| Trial Exhibit 42 – Armed Resistance to Crime: The Prevalence and Nature of Self-Defense with a Gun | 5272 |
| Trial Exhibit 43 – Kleck Survey Questions | 5311 |
| Trial Exhibit 44 – Pages from Kleck Suppl. Expert Report | 5326 |
| Trial Exhibit 45 – Mortality by Year | 5354 |
| Trial Exhibit 49 – Audio Clip – Aurora Theater 911 | 5355 |
| Trial Exhibit 51 – Graph – Share of Crime Guns | 5356 |
| Trial Exhibit 52 – Graph – Sources of Traced Crime Guns | 5357 |
| Trial Exhibit 53 – Graph – Percentage Change in the Number of IL Traced Guns | 5358 |
| Trial Exhibit 54 – Graph – Murder Rates per 100,000 | 5359 |
| Trial Exhibit 55 – Graph – Change in Age-Adjusted Homicide | 5360 |
| Trial Exhibit 56 – Graph – Percentage Change in Age-Adjusted Firearm Homicide | 5361 |
| Trial Exhibit 57 – Graph – Percentage Change in Firearm Homicide MO Counties | 5362 |
| Trial Exhibit 59 – Home Invasions in Plaintiff Counties | 5363 |
| Trial Exhibit 60 – Traffic Fatalities in Colorado | 5364 |
| Trial Exhibit 61 – Traffic Fatalities with Driver BAC at .08 or Above | 5365 |
| Trial Exhibit 62 – Home Invasions in Plaintiff Counties in Which Perpetrators Displayed Firearms | 5366 |
| Trial Exhibit 63 – Home Invasions in Plaintiff Counties in Which Perpetrators Discharged Firearms | 5367 |
| Trial Exhibit 65 – Home Invasions in Plaintiff Counties in Which Victims Displayed Firearms | 5368 |
| Trial Exhibit 66 – Large-Capacity Magazines in the VA Firearms Clearinghouse | 5369 |
| Trial Exhibit 67 – Regression Table | 5370 |
| Trial Exhibit 68 – Large-Capacity Magazines in the VA Firearms Clearinghouse | 5371 |
| Trial Exhibit 69 – Large-Capacity Magazines in the VA Firearms Clearinghouse | 5372 |
| Trial Exhibit 70 – Large-Capacity Magazines in the VA Firearms Clearinghouse | 5373 |
| Trial Exhibit 73 – Prevalence and Incidence of Civilian Defensive Gun Use | 5374 |
| Trial Exhibit 78 – Legal Status of Reported DGUs | 5375 |

| Trial Exhibit 83 – Bass Pro Outdoor World Production | 5376 |
|---|---|
| Trial Exhibit 88 – Jensen Arms Inventory of Magazines with Capacity of 16+ Rounds as of 7-1-13 | 5399 |

## Volume 26

| Document | Page |
|---|---|
| Trial Exhibit 101 – Tech Worker Charged in 7 Deaths at Mass. Firm | 5408 |
| Trial Exhibit 102 – Factory Feud is Cited in Shooting in Indiana | 5410 |
| Trial Exhibit 103 – Police Detail Shooting Inside Elgin Tavern | 5413 |
| Trial Exhibit 104 – Man Suspected in Killings of 7 Turns Self In | 5415 |
| Trial Exhibit 105 – Dispute is Cited in Wisconsin Shooting | 5417 |
| Trial Exhibit 106 – Denver Shooter Pleads Guilty | 5418 |
| Trial Exhibit 107 – Man Gets Life Sentence in Church Shooting | 5419 |
| Trial Exhibit 108 – Gunman in Portland, Ore., Shooting Spree Dies | 5421 |
| Trial Exhibit 109 – Jose Bonilla-Ortiz Convicted of Murder | 5423 |
| Trial Exhibit 110 – Argument at Md Bar Leads to Multiple Shooting | 5424 |
| Trial Exhibit 111 – Police Search for Gunmen in Block Party Shooting | 5425 |
| Trial Exhibit 112 – Philly Bar Shooting Kills 1, Injures 6 | 5426 |
| Trial Exhibit 113 – July 6 Mass Shooting at Overtown Party was Retaliation, Warrant Shows | 5427 |
| Trial Exhibit 114 – LA Fitness Reopens to Public after Shootings | 5429 |
| Trial Exhibit 115 – Details Emerge on St. Louis Shooting, but Motive Unclear | 5431 |
| Trial Exhibit 116 – Teen Killed at Graduation Party in Tuscaloosa Called Friend of Accused | 5433 |
| Trial Exhibit 117 – Cupertino: One Year After the Lehigh Cement Shootings | 5434 |
| Trial Exhibit 118 – 8 Wounded in Rival-Gang Confrontation at Dallas Rap Competition | 5437 |
| Trial Exhibit 119 – Charges in Deadly Church's Shooting | 5438 |
| Trial Exhibit 120 – Gunman Kills Self, 5 Others at Texas Rink | 5440 |
| Trial Exhibit 121 – Ohio Woman: I Tried to Hide Boy, 11, from Gunman | 5442 |
| Trial Exhibit 122 – No Suspects Identified in Mass Jacksonville Shooting | 5443 |
| Trial Exhibit 123 – 2 Killed, 10 Injured in Nightclub Shootings | 5446 |
| Trial Exhibit 124 – 2 Dead, 22 Wounded in Manatee Co. Shooting | 5447 |
| Trial Exhibit 125 – Shooting at Nightclub Leaves 1 Dead, 6 Injured | 5449 |
| Trial Exhibit 126 – Brief: Spa Shooter's Wife Died of Multiple Gunshots, Report Says | 5450 |
| Trial Exhibit 127 – Jury Finds Travis Steed Guilty of Second-Degree Murder in Shooting at Karma Lounge | 5452 |
| Trial Exhibit 128 – Death at a Funeral Home | 5453 |
| Trial Exhibit 129 – Shooting Victim Discusses Gunman's Tuscaloosa Spree | 5455 |
| Trial Exhibit 130 – Rates of Fire in Mass Shooting | 5458 |
| Trial Exhibit 132 – UCR All Homicides 1999-2012 | 5459 |
| Trial Exhibit 133 – Nongun AA Homicide Rate 1990-2010 | 5475 |
| Trial Exhibit 134 – Gun Homicide Rates State 1999-2010 | 5487 |
| Trial Exhibit 135 – All Homicide | 5499 |

| Trial Exhibit 136 – Webster Expert Report | 5513 |
|---|---|

### Volume 27

| Document | Page |
|---|---|
| Trial Exhibit 140 – Department of the Treasury | 5530 |
| Trial Exhibit 141 – Summarized History for Bill Number HB13-1224 | 5531 |
| Trial Exhibit 142 – Summarized History for Bill Number HB13-1224 | 5552 |
| Trial Exhibit 143 – House Committee of Reference Report HB13-1224 | 5574 |

### Volume 28

| Document | Page |
|---|---|
| Trial Exhibit 144 – House Committee of Reference Report HB13-1229 | 5576 |
| Trial Exhibit 145 – HB13-1224 State and Local Fiscal Impact | 5589 |
| Trial Exhibit 146 – HB13-1229 State and Local Fiscal Impact | 5601 |
| Trial Exhibit 147 – HB13-122 Revised JBC Staff Fiscal Analysis | 5629 |

ALLMTN,APPEAL,TERMED

# U.S. District Court
## District of Colorado (Denver)
## CIVIL DOCKET FOR CASE #: 1:13–cv–01300–MSK–MJW

Colorado Outfitters Association et al v. Hickenlooper

Assigned to: Chief Judge Marcia S. Krieger

Referred to: Magistrate Judge Michael J. Watanabe

 Case in other court:  USCA, 14–01290

USCA, 14–01292

Cause: 28:1331 Federal Question: Other Civil Rights

Date Filed: 05/17/2013

Date Terminated: 06/26/2014

Jury Demand: None

Nature of Suit: 950 Constitutional – State Statute

Jurisdiction: Federal Question

**Defendant**

| | | |
|---|---|---|
| **Mesa County, Board of County Commissioners** | represented by | **David Robert Frankel**<br>Mesa County Attorney's Office<br>P.O. Box 20000<br>544 Rood Avenue<br>2nd Floor Annex<br>Grand Junction, CO 81502–5004<br>970–244–1612<br>Fax: 970–255–7196<br>Email: david.frankel@mesacounty.us<br>*ATTORNEY TO BE NOTICED* |

**Plaintiff**

| | | |
|---|---|---|
| **Colorado Outfitters Association** | represented by | **Peter J. Krumholz**<br>Hale Westfall, LLP<br>1600 Stout Street<br>Suite 500<br>Denver, CO 80202<br>720–904–6007<br>Fax: 720–904–6006<br>Email: pkrumholz@halewestfall.com<br>*ATTORNEY TO BE NOTICED* |
| | | **Richard A. Westfall**<br>Hale Westfall, LLP<br>1600 Stout Street<br>Suite 500<br>Denver, CO 80202<br>720–904–6010<br>Fax: 720–904–6020<br>Email: rwestfall@halewestfall.com<br>*ATTORNEY TO BE NOTICED* |

**Plaintiff**

| | | |
|---|---|---|
| **Colorado Farm Bureau** | represented by | **Peter J. Krumholz**<br>(See above for address)<br>*ATTORNEY TO BE NOTICED* |

1

**Richard A. Westfall**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**National Shooting Sports Foundation**          represented by          **Jonathan Michael Anderson**
Holland &Hart, LLP–Denver
P.O. Box 8749
555 17th Street
Suite 3200
Denver, CO 80201–8749
303–295–8566
Fax: 303–672–6508
Email: jmanderson@hollandhart.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Douglas L. Abbott**
Holland &Hart, LLP–Denver
P.O. Box 8749
555 17th Street
#3200
Denver, CO 80201–8749
303–295–8000
Fax: 295–8261
Email: dabbott@hollandhart.com
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Magpul Industries**          represented by          **Jonathan Michael Anderson**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Douglas L. Abbott**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Colorado Youth Outdoors**          represented by          **Peter J. Krumholz**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**USA Liberty Arms**          represented by          **Jonathon Michael Watson**
Sherman &Howard, L.L.C.–Denver
633 17th Street
Suite 3000
Denver, CO 80202–3622

2

303–297–2900
Fax: 303–298–0940
Email: jwatson@shermanhoward.com
*TERMINATED: 02/12/2014*

**Marc F. Colin**
Bruno Colin &Lowe, P.C.
1999 Broadway
Suite 3100
Denver, CO 80202
303–831–1099
Fax: 303–831–1088
Email: mcolin@brunolawyers.com
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Outdoor Buddies, Inc.**                   represented by   **Peter J. Krumholz**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Richard A. Westfall**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Women for Concealed Carry**               represented by   **Peter J. Krumholz**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Richard A. Westfall**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Colorado State Shooting Association**     represented by   **Anthony John Fabian**
Anthony J. Fabian, P.C.
510 Wilcox Street
# C
Castle Rock, CO 80104
303–663–9339
Email: fabianlaw@qwestoffice.net
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Hamilton Family Enterprises, Inc.**       represented by   **Anthony John Fabian**
*doing business as*                                          (See above for address)
Family Shooting Center at Cherry Creek                       *ATTORNEY TO BE NOTICED*
State Park

**Plaintiff**

3

| | | |
|---|---|---|
| **David Strumillo** | represented by | **David Benjamin Kopel**<br>Independence Institute<br>727 East 16th Avenue<br>Denver, CO 80203<br>303–279–6536<br>Fax: 303–279–4176<br>Email: <u>david@i2i.org</u><br>*LEAD ATTORNEY*<br>*ATTORNEY TO BE NOTICED* |

<u>**Plaintiff**</u>

| | | |
|---|---|---|
| **David Bayne** | represented by | **Peter J. Krumholz**<br>(See above for address)<br>*ATTORNEY TO BE NOTICED*<br><br>**Richard A. Westfall**<br>(See above for address)<br>*ATTORNEY TO BE NOTICED* |

<u>**Plaintiff**</u>

| | | |
|---|---|---|
| **Dylan Harrell** | represented by | **Peter J. Krumholz**<br>(See above for address)<br>*ATTORNEY TO BE NOTICED*<br><br>**Richard A. Westfall**<br>(See above for address)<br>*ATTORNEY TO BE NOTICED* |

<u>**Plaintiff**</u>

| | | |
|---|---|---|
| **Rocky Mountain Shooters Supply** | represented by | **Jonathon Michael Watson**<br>(See above for address)<br>*TERMINATED: 02/12/2014*<br><br>**Marc F. Colin**<br>(See above for address)<br>*ATTORNEY TO BE NOTICED* |

<u>**Plaintiff**</u>

| | | |
|---|---|---|
| **2nd Amendment Gunsmith &Shooter Supply, LLC** | represented by | **Jonathon Michael Watson**<br>(See above for address)<br>*TERMINATED: 02/12/2014*<br><br>**Marc F. Colin**<br>(See above for address)<br>*ATTORNEY TO BE NOTICED* |

<u>**Plaintiff**</u>

| | | |
|---|---|---|
| **Burrud Arms Inc.**<br>*doing business as*<br>Jensen Arms | represented by | **Jonathon Michael Watson**<br>(See above for address)<br>*TERMINATED: 02/12/2014* |

**Marc F. Colin**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Green Mountain Guns**                 represented by  **Jonathon Michael Watson**
(See above for address)
*TERMINATED: 02/12/2014*

**Marc F. Colin**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Jerry's Outdoor Sports**              represented by  **Jonathon Michael Watson**
(See above for address)
*TERMINATED: 02/12/2014*

**Marc F. Colin**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Specialty Sports &Supply**            represented by  **Jonathon Michael Watson**
(See above for address)
*TERMINATED: 02/12/2014*

**Marc F. Colin**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Goods for the Woods**                 represented by  **Jonathon Michael Watson**
(See above for address)
*TERMINATED: 02/12/2014*

**Marc F. Colin**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**John B. Cooke**                       represented by  **David Benjamin Kopel**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Ken Putnam**                          represented by  **David Benjamin Kopel**
(See above for address)

5

*ATTORNEY TO BE NOTICED*

**Plaintiff**

**James Faull**                                    represented by **David Benjamin Kopel**
                                                   (See above for address)
                                                   *ATTORNEY TO BE NOTICED*

**Plaintiff**

**Larry Kuntz**                                    represented by **David Benjamin Kopel**
                                                   (See above for address)
                                                   *ATTORNEY TO BE NOTICED*

**Plaintiff**

**Fred Jobe**                                      represented by **David Benjamin Kopel**
                                                   (See above for address)
                                                   *ATTORNEY TO BE NOTICED*

**Plaintiff**

**Donald Krueger**                                 represented by **David Benjamin Kopel**
                                                   (See above for address)
                                                   *ATTORNEY TO BE NOTICED*

**Plaintiff**

**Stan Hilkey**                                    represented by **David Benjamin Kopel**
*TERMINATED: 05/08/2014*                           (See above for address)
                                                   *ATTORNEY TO BE NOTICED*

**Plaintiff**

**Dave Stong**                                     represented by **David Benjamin Kopel**
                                                   (See above for address)
                                                   *ATTORNEY TO BE NOTICED*

**Plaintiff**

**Peter Gonzalez**                                 represented by **David Benjamin Kopel**
                                                   (See above for address)
                                                   *ATTORNEY TO BE NOTICED*

**Plaintiff**

**Sue Kurtz**                                      represented by **David Benjamin Kopel**
                                                   (See above for address)
                                                   *ATTORNEY TO BE NOTICED*

**Plaintiff**

**Douglas N. Darr**                                represented by **David Benjamin Kopel**
                                                   (See above for address)
                                                   *ATTORNEY TO BE NOTICED*

V.

**Defendant**

| | | |
|---|---|---|
| **John W. Hickenlooper**<br>*Govenor of the State of Colorado* | represented by | **Daniel D. Domenico**<br>Colorado Attorney General's Office<br>Ralph L. Carr Colorado Judicial Center<br>1300 Broadway<br>Denver, CO 80203<br>720–508–6000<br>Fax: 720–508–6032<br>Email: dan.domenico@state.co.us<br>*ATTORNEY TO BE NOTICED* |

**David Christopher Blake**
Colorado Attorney General's Office
Ralph L. Carr Colorado Judicial Center
1300 Broadway
Denver, CO 80203
720–508–6000
Fax: 720–508–6032
Email: david.blake@state.co.us
*ATTORNEY TO BE NOTICED*

**John Tien Yau Lee**
Colorado Attorney General's Office
Ralph L. Carr Colorado Judicial Center
1300 Broadway
Denver, CO 80203
720–508–6000
Fax: 720–508–6032
Email: jtlee@state.co.us
*ATTORNEY TO BE NOTICED*

**Jonathan Patrick Fero**
Colorado Attorney General's Office
Ralph L. Carr Colorado Judicial Center
1300 Broadway
Denver, CO 80203
720–508–6000
Fax: 720–508–6032
Email: jon.fero@state.co.us
*ATTORNEY TO BE NOTICED*

**Kathleen L. Spalding**
Colorado Attorney General's Office
Ralph L. Carr Colorado Judicial Center
1300 Broadway
Denver, CO 80203
720–508–6000
Fax: 720–508–6032
Email: kit.spalding@state.co.us

*ATTORNEY TO BE NOTICED*

**LeeAnn Morrill**
Colorado Attorney General's Office
Ralph L. Carr Colorado Judicial Center
1300 Broadway
Denver, CO 80203
720–508–6000
Fax: 720–508–6032
Email: leeann.morrill@state.co.us
*ATTORNEY TO BE NOTICED*

**Matthew David Grove**
Colorado Attorney General's Office
Ralph L. Carr Colorado Judicial Center
1300 Broadway
Denver, CO 80203
720–508–6000
Fax: 720–508–6032
Email: matt.grove@state.co.us
*ATTORNEY TO BE NOTICED*

**Molly Allen Moats**
Colorado Attorney General's Office
Ralph L. Carr Colorado Judicial Center
1300 Broadway
Denver, CO 80203
720–508–6000
Fax: 720–508–6032
Email: molly.moats@state.co.us
*ATTORNEY TO BE NOTICED*

**Stephanie Lindquist Scoville**
Colorado Attorney General's Office
Ralph L. Carr Colorado Judicial Center
1300 Broadway
Denver, CO 80203
720–508–6000
Fax: 720–508–6032
Email: stephanie.scoville@state.co.us
*ATTORNEY TO BE NOTICED*

**Interested Party**

**Board of County Commissioners for Mesa County Colorado**

represented by **David Robert Frankel**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Maurice L. Dechant**
Maurice L. Dechant, Attorney at Law
1940 10 Road
Mack, CO 81525
970–216–0941

8

Email: lyledechant@gmail.com
*TERMINATED: 03/03/2014*

**Plaintiff**

**John B. Cooke**                                         represented by **David Benjamin Kopel**
*Sheriff of Weld County, Colordo*                          (See above for address)
*TERMINATED: 11/27/2013*                                   *LEAD ATTORNEY*
                                                           *ATTORNEY TO BE NOTICED*

**Plaintiff**

**Terry Maketa**                                         represented by **David Benjamin Kopel**
*Sheriff of El Paso County, Colorado*                      (See above for address)
*TERMINATED: 11/27/2013*                                   *LEAD ATTORNEY*
                                                           *ATTORNEY TO BE NOTICED*

**Plaintiff**

**Justin Smith**                                         represented by **David Benjamin Kopel**
*Sheriff of Larimer County, Colorado*                      (See above for address)
*TERMINATED: 11/27/2013*                                   *LEAD ATTORNEY*
                                                           *ATTORNEY TO BE NOTICED*

**Plaintiff**

**David A. Weaver**                                      represented by **David Benjamin Kopel**
*Sheriff of Douglas County, Colorado*                      (See above for address)
*TERMINATED: 11/27/2013*                                   *LEAD ATTORNEY*
                                                           *ATTORNEY TO BE NOTICED*

**Plaintiff**

**Bruce W. Hartman**                                     represented by **David Benjamin Kopel**
*Sheriff of Gilpin County, Colorado*                       (See above for address)
*TERMINATED: 11/27/2013*                                   *LEAD ATTORNEY*
                                                           *ATTORNEY TO BE NOTICED*

**Plaintiff**

**Dennis Spruell**                                       represented by **David Benjamin Kopel**
*Sheriff of Montezuma County, Colorado*                    (See above for address)
*TERMINATED: 11/27/2013*                                   *LEAD ATTORNEY*
                                                           *ATTORNEY TO BE NOTICED*

**Plaintiff**

**Tim Jantz**                                            represented by **David Benjamin Kopel**
*Sheriff of Moffat County, Colorado*                       (See above for address)
*TERMINATED: 11/27/2013*                                   *LEAD ATTORNEY*
                                                           *ATTORNEY TO BE NOTICED*

**Plaintiff**

**Jerry Martin**                                         represented by **David Benjamin Kopel**
*Sheriff of Dolores County, Colorado*                      (See above for address)

9

TERMINATED: 11/27/2013

*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Mike Ensminger**
*Sheriff of Teller County, Colorado*
*TERMINATED: 11/27/2013*

represented by **David Benjamin Kopel**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Shayne Heap**
*Sheriff of Elbert County, Colorado*
*TERMINATED: 11/27/2013*

represented by **David Benjamin Kopel**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Chad Day**
*Sheriff of Yuma County, Colorado*
*TERMINATED: 11/27/2013*

represented by **David Benjamin Kopel**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Fred D. McKee**
*Sheriff of Delta County, Colorado*
*TERMINATED: 11/27/2013*

represented by **David Benjamin Kopel**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Lou Vallario**
*Sheriff of Garfield County, Colorado*
*TERMINATED: 11/27/2013*

represented by **David Benjamin Kopel**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Fred Hosselkus**
*Sheriff of Mineral County, Colorado*
*TERMINATED: 11/27/2013*

represented by **David Benjamin Kopel**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Brett L. Powell**
*Sheriff of Logan County, Colorado*
*TERMINATED: 11/27/2013*

represented by **David Benjamin Kopel**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Brian E. Norton**
*Sheriff of Rio Grande County, Colorado*

represented by **David Benjamin Kopel**
(See above for address)

*TERMINATED: 11/27/2013*

                                        *LEAD ATTORNEY*
                                        *ATTORNEY TO BE NOTICED*

**Plaintiff**

**Duke Schirard**                       represented by **David Benjamin Kopel**
*Sheriff of La Plata County, Colorado*                  (See above for address)
*TERMINATED: 11/27/2013*                                *LEAD ATTORNEY*
                                                        *ATTORNEY TO BE NOTICED*

**Plaintiff**

**Jim Beicker**                         represented by **David Benjamin Kopel**
*Sheriff of Fremont County, Colorado*                   (See above for address)
*TERMINATED: 11/27/2013*                                *LEAD ATTORNEY*
                                                        *ATTORNEY TO BE NOTICED*

**Plaintiff**

**Ronald Bruce**                        represented by **David Benjamin Kopel**
*Sheriff of Hinsdale County, Colorado*                  (See above for address)
*TERMINATED: 11/27/2013*                                *LEAD ATTORNEY*
                                                        *ATTORNEY TO BE NOTICED*

**Plaintiff**

**Chris S. Johnson**                    represented by **David Benjamin Kopel**
*Sheriff of Otero County, Colorado*                     (See above for address)
*TERMINATED: 11/27/2013*                                *LEAD ATTORNEY*
                                                        *ATTORNEY TO BE NOTICED*

**Plaintiff**

**James Crone**                         represented by **David Benjamin Kopel**
*Sheriff of Morgan County, Colorado*                    (See above for address)
*TERMINATED: 11/27/2013*                                *LEAD ATTORNEY*
                                                        *ATTORNEY TO BE NOTICED*

**Plaintiff**

**Si Woodruff**                         represented by **David Benjamin Kopel**
*Sheriff of Rio Blanco County, Colorado*                (See above for address)
*TERMINATED: 11/27/2013*                                *LEAD ATTORNEY*
                                                        *ATTORNEY TO BE NOTICED*

**Plaintiff**

**Tom Ridnour**                         represented by **David Benjamin Kopel**
*Sheriff of Kit Carson County, Colorado*                (See above for address)
*TERMINATED: 11/27/2013*                                *LEAD ATTORNEY*
                                                        *ATTORNEY TO BE NOTICED*

**Plaintiff**

**Tom Nestor**                          represented by **David Benjamin Kopel**
*Sheriff of Lincoln County, Colorado*                   (See above for address)

11

*TERMINATED: 11/27/2013*                         *LEAD ATTORNEY*
                                                 *ATTORNEY TO BE NOTICED*

**Plaintiff**

**Forrest Frazee**                  represented by   **David Benjamin Kopel**
*Sheriff of Kiowa County, Colorado*                  (See above for address)
*TERMINATED: 11/27/2013*                             *LEAD ATTORNEY*
                                                     *ATTORNEY TO BE NOTICED*

**Plaintiff**

**Rick Dunlap**                     represented by   **David Benjamin Kopel**
*Sheriff of Montrose County, Colorado*               (See above for address)
*TERMINATED: 11/27/2013*                             *LEAD ATTORNEY*
                                                     *ATTORNEY TO BE NOTICED*

**Plaintiff**

**Ted B. Mink**                     represented by   **David Benjamin Kopel**
*Sheriff of Jefferson County, Colorado*              (See above for address)
*TERMINATED: 11/27/2013*                             *LEAD ATTORNEY*
                                                     *ATTORNEY TO BE NOTICED*

**Plaintiff**

**Fred Wegener**                    represented by   **David Benjamin Kopel**
*Sheriff of Park County, Colorado*                   (See above for address)
*TERMINATED: 11/27/2013*                             *LEAD ATTORNEY*
                                                     *ATTORNEY TO BE NOTICED*

**Plaintiff**

**Bruce Newman**                    represented by   **David Benjamin Kopel**
*Sheriff of Huerfano County, Colorado*               (See above for address)
*TERMINATED: 11/27/2013*                             *LEAD ATTORNEY*
                                                     *ATTORNEY TO BE NOTICED*

**Plaintiff**

**Randy Peck**                      represented by   **David Benjamin Kopel**
*Sheriff of Sedgwick County, Colorado*               (See above for address)
*TERMINATED: 11/27/2013*                             *LEAD ATTORNEY*
                                                     *ATTORNEY TO BE NOTICED*

**Plaintiff**

**Dominic Mattivi, Jr.**            represented by   **David Benjamin Kopel**
*Sheriff of Ouray County, Colorado*                  (See above for address)
*TERMINATED: 11/27/2013*                             *LEAD ATTORNEY*
                                                     *ATTORNEY TO BE NOTICED*

**Plaintiff**

**John Minor**                      represented by   **David Benjamin Kopel**
*Sheriff of Summit County, Colorado*                 (See above for address)

12

*TERMINATED: 11/27/2013*

*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Scott Fischer**
*Sheriff of Jackson County, Colorado*
*TERMINATED: 11/27/2013*

represented by **David Benjamin Kopel**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Rick Besecker**
*Sheriff of Gunnison County, Colorado*
*TERMINATED: 11/27/2013*

represented by **David Benjamin Kopel**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Charles "Rob" Urbach**
*Sheriff of Phillips County, Colorado*
*TERMINATED: 11/27/2013*

represented by **David Benjamin Kopel**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Rod Fenske**
*Sheriff of Lake County, Colorado*
*TERMINATED: 11/27/2013*

represented by **David Benjamin Kopel**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Grayson Robinson**
*Sheriff of Arapahoe County, Colorado*
*TERMINATED: 11/27/2013*

represented by **David Benjamin Kopel**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**David Campbell**
*Sheriff of Baca County, Colorado*
*TERMINATED: 11/27/2013*

represented by **David Benjamin Kopel**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Mike Norris**
*Sheriff of Saguache County, Colorado*
*TERMINATED: 11/27/2013*

represented by **David Benjamin Kopel**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Amos Medina**
*Sheriff of Costilla County, Colorado*

represented by **David Benjamin Kopel**
(See above for address)

13

TERMINATED: 11/27/2013 | *LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Miles Clark**
*Sheriff of Crowley County, Colorado*
*TERMINATED: 11/27/2013*

represented by **David Benjamin Kopel**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**David Encinias**
*Sheriff of Bent County, Colorado*
*TERMINATED: 11/27/2013*

represented by **David Benjamin Kopel**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**James (Jim) Casias**
*Sheriff of Las Animas County, Colorado*
*TERMINATED: 11/27/2013*

represented by **David Benjamin Kopel**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Garrett Wiggins**
*Sheriff of Routt County, Colorado*
*TERMINATED: 11/27/2013*

represented by **David Benjamin Kopel**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Grand Prix Guns**
*TERMINATED: 12/23/2013*

represented by **Jonathon Michael Watson**
(See above for address)
*TERMINATED: 02/12/2014*

**Marc F. Colin**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Rodney Johnson**
*Sheriff of Grand County, Colorado*
*TERMINATED: 12/12/2013*

represented by **David Benjamin Kopel**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Page | Docket Text |
|---|---|---|---|
| 05/17/2013 | 1 | 43 | COMPLAINT *for Injunctive and Declaratory Relief* against John W. Hickenlooper (Filing fee $ 400, Receipt Number 1082–3366625), filed by Ted Mink, Rick Dunlap, Hamilton Family Enterprises Inc., DBA Family Shooting Center at Cherry Creek State Park, JIM BEICKER, Jerry's Outdoor Sports, Dennis Spruell, James Crone, Larry Kuntz, Grand Prix Guns, Brett |

| | | | |
|---|---|---|---|
| | | | Powell, Rod Fenske, Colorado Outfitters Association, Si Woodruff, Goods for the Woods, National Shooting Sports Foundation, Women for Concealed Carry, Duke Schirard, Mike Ensminger, Forrest Frazee, Fred Wegener, Shayne Heap, Amos Medina, Tom Nestor, David Bayne, David Encinias, John Minor, David Strumillo, Magpul Industries Corporation, CHAD DAY, Peter Gonzalez, Fred Hosselkus, James Casias, Outdoor Buddies, Inc., Colorado Farm Bureau, Specialty Sports &Supply, Grayson Robinson, Dylan Harrell, Brian Norton, Colorado State Shooting Association, Douglas Darr, Rocky Mountain Shooters Supply, Green Mountain Guns, 2nd Amendment Gunsmith &Shooter Supply, LLC, James Faull, Terry Maketa, John B. Cooke, Stan Hilkey, Donald Krueger, ridnour, Scott Fischer, Lou Vallario, USA Liberty Arms, Burrud Arms Inc. DBA Jensen Arms, Miles Clark, Fred Jobe, Garrett Wiggins, Rick Besecker, Ronald Bruce, David Campbell, Chris Johnson, Fred McKee, KEN PUTNAM, Bruce Newman, Justin Smith, Sue Kurtz, Jerry Martin, Mike Norris, Tim Jantz, Dominic Mattivi, Jr, David Weaver, Dave Stong, Randy Peck, Charles ("Rob") Urbach, Bruce Hartman.(Westfall, Richard) (Entered: 05/17/2013) |
| 05/17/2013 | 2 | | Case assigned to Chief Judge Marcia S. Krieger and drawn to Magistrate Judge Michael J. Watanabe. Text Only Entry (dbera, ) (Entered: 05/17/2013) |
| 05/17/2013 | 3 | | Magistrate Judge Consent Form issued. (dbera, ) (Entered: 05/17/2013) |
| 05/21/2013 | 4 | | WAIVER OF SERVICE Returned Executed by Colorado Outfitters Association, Women for Concealed Carry, David Bayne, Outdoor Buddies, Inc., Colorado Farm Bureau, Dylan Harrell. John W. Hickenlooper waiver sent on 5/17/2013, answer due 7/16/2013. (Westfall, Richard) (Entered: 05/21/2013) |
| 05/22/2013 | 5 | | NOTICE of Entry of Appearance by Matthew David Grove on behalf of John W. Hickenlooper (Grove, Matthew) (Entered: 05/22/2013) |
| 05/22/2013 | 6 | | NOTICE of Entry of Appearance by David Christopher Blake on behalf of John W. Hickenlooper (Blake, David) (Entered: 05/22/2013) |
| 05/22/2013 | 7 | | NOTICE of Entry of Appearance by Daniel D. Domenico on behalf of John W. Hickenlooper (Domenico, Daniel) (Entered: 05/22/2013) |
| 05/22/2013 | 8 | | NOTICE of Entry of Appearance by Jonathan Patrick Fero on behalf of John W. Hickenlooper (Fero, Jonathan) (Entered: 05/22/2013) |
| 05/22/2013 | 9 | | ORDER REFERRING CASE to Magistrate Judge Michael J. Watanabe: **IT IS ORDERED** that pursuant to 28 U.S.C. § 636(b)(1)(A) and (B) and Fed. R. Civ. P. 72(a) and (b), this matter is referred to the assigned United States Magistrate Judge to:(1)Convene a scheduling conference under Fed. Civ. P. 16(b), enter a Scheduling Order meeting the requirements of D.C.COLO.LCivR 16.2, enter such orders as appropriate to enforce the Scheduling Order, and resolve discovery matters;(2)ADR: Court sponsored alternative dispute resolution is governed by D.C.COLO.LCivR 16.6. On the recommendation or informal request of the magistrate judge or on the request of the parties by motion, the Court may direct the parties to engage in an early neutral evaluation, a settlement conference, or another alternative dispute resolution proceeding;(3)Hear and determine referred matters in accordance with 28 U.S.C. § 636(b)(1)(A) and (B). by Chief Judge Marcia S. Krieger on 5/22/13. Text Only Entry (msksec, ) (Entered: 05/22/2013) |

15

| 05/22/2013 | 10 | | MINUTE ORDER Status Conference set for 5/30/2013 10:00 AM in Courtroom A 502 before Magistrate Judge Michael J. Watanabe, by Magistrate Judge Michael J. Watanabe on 5/22/2013. (mjwcd) (Entered: 05/22/2013) |
| --- | --- | --- | --- |
| 05/22/2013 | 11 | | NOTICE AND DISCLOSURE on 5/22/13 (msksec, ) (Entered: 05/22/2013) |
| 05/23/2013 | 12 | | NOTICE of Entry of Appearance by Peter J. Krumholz on behalf of David Bayne, Colorado Farm Bureau, Colorado Outfitters Association, Dylan Harrell, Outdoor Buddies, Inc., Women for Concealed Carry (Krumholz, Peter) (Entered: 05/23/2013) |
| 05/23/2013 | 13 | | NOTICE of Entry of Appearance by Marc F. Colin on behalf of 2nd Amendment Gunsmith &Shooter Supply, LLC, Burrud Arms Inc., Goods for the Woods, Grand Prix Guns, Green Mountain Guns, Jerry's Outdoor Sports, Rocky Mountain Shooters Supply, Specialty Sports &Supply, USA Liberty Arms (Colin, Marc) (Entered: 05/23/2013) |
| 05/23/2013 | 14 | | NOTICE of Entry of Appearance *Amended* by Marc F. Colin on behalf of 2nd Amendment Gunsmith &Shooter Supply, LLC, Burrud Arms Inc., Goods for the Woods, Grand Prix Guns, Green Mountain Guns, Jerry's Outdoor Sports, Rocky Mountain Shooters Supply, Specialty Sports &Supply, USA Liberty Arms (Colin, Marc) (Entered: 05/23/2013) |
| 05/23/2013 | 15 | | NOTICE of Entry of Appearance by Anthony John Fabian on behalf of Colorado State Shooting Association (Fabian, Anthony) (Entered: 05/23/2013) |
| 05/23/2013 | 16 | | NOTICE of Entry of Appearance by Anthony John Fabian on behalf of Hamilton Family Enterprises, Inc. (Fabian, Anthony) (Entered: 05/23/2013) |
| 05/28/2013 | 17 | | NOTICE of Entry of Appearance *Second Amended* by Marc F. Colin on behalf of 2nd Amendment Gunsmith &Shooter Supply, LLC, Burrud Arms Inc., Goods for the Woods, Grand Prix Guns, Green Mountain Guns, Jerry's Outdoor Sports, Rocky Mountain Shooters Supply, Specialty Sports &Supply, USA Liberty Arms (Colin, Marc) (Entered: 05/28/2013) |
| 05/28/2013 | 18 | | ORDER REGARDING CUSTODY OF EXHIBITS AND DEPOSITIONS USED IN EVIDENTIARY HEARINGS AND TRIALS: Any exhibits and depositions used during evidentiary hearings or trials, counsel for the parties shall retrieve the originals of such exhibits and depositions from the Court following the evidentiary hearing or trial, and shall retain same for 60 days beyond the later of the time to appeal or conclusion of any appellate proceedings. The Court will retain its copy of the exhibits for the same time period after which the documents will be destroyed. by Chief Judge Marcia S. Krieger on 5/28/13. Text Only Entry (mskcd) (Entered: 05/28/2013) |
| 05/28/2013 | 19 | | NOTICE of Entry of Appearance *by Jonathan M. Anderson and* by Douglas L. Abbott on behalf of Magpul Industries, National Shooting Sports Foundation (Abbott, Douglas) (Entered: 05/28/2013) |
| 05/30/2013 | 20 | | COURTROOM MINUTES/MINUTE ORDER for proceedings held before Magistrate Judge Michael J. Watanabe: Status Conference held on 5/30/2013. Plaintiffs shall file their Amended Complaint on or before 5/31/2013. Defendant John W. Hickenlooper answer due 6/7/2013. |

| | | | |
|---|---|---|---|
| | | | Scheduling Conference set for 6/7/2013 01:30 PM in Courtroom A 502 before Magistrate Judge Michael J. Watanabe. Deadline to file proposed Scheduling Order is 9:00 AM 6/7/2013. Court Reporter: FTR – Ellen E. Miller. FTR: Courtroom A502. (mjwcd) (Entered: 05/30/2013) |
| 05/30/2013 | 21 | | MINUTE ORDER: Due to a conflict, the Scheduling Conference 6/7/2013 1:30 PM is vacated. Scheduling Conference reset for 6/10/2013 10:30 AM in Courtroom A 502 before Magistrate Judge Michael J. Watanabe. By Magistrate Judge Michael J. Watanabe on 5/30/2013. (mjwcd) (Entered: 05/30/2013) |
| 05/30/2013 | 45 | | AMENDED COURTROOM MINUTES/MINUTE ORDER for proceedings held before Magistrate Judge Michael J. Watanabe: Amended re 20 Status Conference. Amended to add date and location of hearing only. Court Reporter: FTR – Ellen E. Miller. FTR: Courtroom A502. (mjwcd) (Entered: 07/02/2013) |
| 05/31/2013 | 22 | 98 | AMENDED COMPLAINT against All Defendants, filed by All Plaintiffs.(Westfall, Richard) Modified on 6/3/2013 to correct filers(mnfsl, ). (Entered: 05/31/2013) |
| 06/06/2013 | 23 | | NOTICE of Entry of Appearance by Kathleen L. Spalding on behalf of John W. Hickenlooper (Spalding, Kathleen) (Entered: 06/06/2013) |
| 06/07/2013 | 24 | | Proposed Scheduling Order by Plaintiff Magpul Industries. (Abbott, Douglas) (Entered: 06/07/2013) |
| 06/07/2013 | 25 | 156 | ANSWER to 22 Amended Complaint *FOR DECLARATORY AND INJUNCTIVE RELIEF* by John W. Hickenlooper.(Grove, Matthew) (Entered: 06/07/2013) |
| 06/10/2013 | 26 | 212 | MOTION for Order to *Certify Questions to Colorado Supreme Court* by Defendant John W. Hickenlooper. (Attachments: # 1 Proposed Order (PDF Only) Proposed preliminary injunction and order certifying questions to Colorado Supreme Court, # 2 Exhibit Attachment 1 (Technical Guidance))(Grove, Matthew) (Entered: 06/10/2013) |
| 06/10/2013 | 27 | | COURTROOM MINUTES/MINUTE ORDER for proceedings held before Magistrate Judge Michael J. Watanabe: Scheduling Conference held on 6/10/2013. Discovery Motions due by 11/1/2013. Dispositive Motions due by 12/2/2013. Parties shall file Scheduling Order in its final form for the Court's signature on or before 6/17/2013 *nunc pro tunc* 6/10/2013. Court Reporter: FTR – Ellen E. Miller. FTR: Courtroom A502. (mjwcd) (Entered: 06/10/2013) |
| 06/10/2013 | 44 | | AMENDED COURTROOM MINUTES/MINUTE ORDER for proceedings held before Magistrate Judge Michael J. Watanabe: Amended re 27 Scheduling Conference. Amended to add date and location information only. Court Reporter: FTR – Ellen E. Miller. FTR: Courtroom A502. (mjwcd) Modified on 7/2/2013 to show Courtroom Minutes/Minute Order as document being amended (mjwcd). (Entered: 07/02/2013) |
| 06/11/2013 | 28 | | MINUTE ORDER Telephonic Status Conference set for 6/13/2013 01:30 PM before Magistrate Judge Michael J. Watanabe, by Magistrate Judge Michael J. Watanabe on 6/11/2013. (mjwcd) (Entered: 06/11/2013) |

| 06/12/2013 | 29 | 227 | WITHDRAWN – MOTION for Preliminary Injunction by Plaintiffs David Bayne, Colorado Farm Bureau, Colorado Outfitters Association, Colorado Youth Outdoors, Dylan Harrell, Outdoor Buddies, Inc., Women for Concealed Carry. (Attachments: #_1 Exhibit, #_2 Exhibit)(Krumholz, Peter) Modified on 7/15/2013 to withdraw pursuant to Order dated 7/12/2013 (klyon, ). (Entered: 06/12/2013) |
| --- | --- | --- | --- |
| 06/13/2013 | 30 | | COURTROOM MINUTES/MINUTE ORDER for proceedings held before Magistrate Judge Michael J. Watanabe: Telephonic Status Conference held on 6/13/2013. Court Reporter: FTR – Ellen E. Miller. FTR: Courtroom A502. (mjwcd) (Entered: 06/13/2013) |
| 06/13/2013 | 31 | 262 | ORDER SETTING HEARING: The Court will conduct a non–evidentiary law and motion hearing on the Plaintiffs' Motion for Temporary Restraining Order and Preliminary Injunction_29 on 6/17/2013 at 04:30 PM. The parties shall be prepared to address: (i) whether determination of any provisional injunctive relief should be consolidated with an expedited trial on the merits pursuant to Fed. R. Civ. P 65(a)(2); (ii) what factual issues relevant to the applicable preliminary injunction factors are in dispute, such that an evidentiary hearing is necessary; and (iii) to the extent an evidentiary hearing is necessary, how much time is necessary for that hearing. By Chief Judge Marcia S. Krieger on 6/13/13. Text Only Entry (msklc2, ) (Entered: 06/13/2013) |
| 06/13/2013 | 46 | | AMENDED COURTROOM MINUTES/MINUTE ORDER for proceedings held before Magistrate Judge Michael J. Watanabe: Amended re_30 Status Conference. Amended to add date and location information for hearing only. Court Reporter: FTR – Ellen E. Miller. FTR: Courtroom A–502. (mjwcd) (Entered: 07/02/2013) |
| 06/14/2013 | 32 | 264 | RESPONSE to_26 MOTION for Order to *Certify Questions to Colorado Supreme Court* filed by Plaintiffs David Bayne, Colorado Farm Bureau, Colorado Outfitters Association, Dylan Harrell, Outdoor Buddies, Inc., Women for Concealed Carry. (Krumholz, Peter) (Entered: 06/14/2013) |
| 06/17/2013 | 33 | | Proposed Scheduling Order by Plaintiffs Magpul Industries, National Shooting Sports Foundation. (Abbott, Douglas) (Entered: 06/17/2013) |
| 06/17/2013 | 34 | | MINUTE ENTRY for Law and Motion Hearing held before Chief Judge Marcia S. Krieger on 6/17/2013. One day Evidentiary Hearing set for 7/10/2013 09:00 AM in Courtroom A 901 before Chief Judge Marcia S. Krieger. Other matters addressed and deadlines imposed are set forth in the Minutes. Court Reporter: Terri Lindblom. (mskcd) (Entered: 06/18/2013) |
| 06/18/2013 | 35 | | Proposed Scheduling Order by Plaintiffs Magpul Industries, National Shooting Sports Foundation. (Abbott, Douglas) (Entered: 06/18/2013) |
| 06/18/2013 | 36 | | SCHEDULING ORDER: Discovery due by 11/1/2013. Dispositive Motions due by 12/2/2013. By Magistrate Judge Michael J. Watanabe on 6/18/2013. (klyon, ) (Entered: 06/18/2013) |
| 06/20/2013 | 37 | | BRIEF in Support of_29 MOTION for Preliminary Injunction filed by Plaintiffs 2nd Amendment Gunsmith &Shooter Supply, LLC, David Bayne, Jim Beicker, Rick Besecker, Ronald Bruce, Burrud Arms Inc., David Campbell, James (Jim) Casias, Miles Clark, Colorado Farm Bureau, |

18

| | | | |
|---|---|---|---|
| | | | Colorado Outfitters Association, Colorado State Shooting Association, Colorado Youth Outdoors, John B. Cooke, James Crone, Douglas Darr, Chad Day, Rick Dunlap, David Encinias, Mike Ensminger, James Faull, Rod Fenske, Scott Fischer, Forrest Frazee, Peter Gonzalez, Goods for the Woods, Grand Prix Guns, Green Mountain Guns, Hamilton Family Enterprises, Inc., Dylan Harrell, Bruce W. Hartman, Shayne Heap, Stan Hilkey, Fred Hosselkus, Tim Jantz, Jerry's Outdoor Sports, Fred Jobe, Chris S. Johnson, Donald Krueger, Larry Kuntz, Sue Kurtz, Magpul Industries, Terry Maketa, Jerry Martin, Dominic Mattivi, Jr, Fred D. McKee, Amos Medina, Ted B. Mink, John Minor, National Shooting Sports Foundation, Tom Nestor, Bruce Newman, Mike Norris, Brian E. Norton, Outdoor Buddies, Inc., Randy Peck, Brett L. Powell, Ken Putnam, Tom Ridnour, Grayson Robinson, Rocky Mountain Shooters Supply, Duke Schirard, Justin Smith, Specialty Sports &Supply, Dennis Spruell, Dave Stong, David Strumillo, USA Liberty Arms, Charles "Rob" Urbach, Lou Vallario, David A. Weaver, Fred Wegener, Garrett Wiggins, Women for Concealed Carry, Si Woodruff. (Colin, Marc) (Entered: 06/20/2013) |
| 06/20/2013 | 38 | | CERTIFICATE *of Service* re: 37 Brief in Support of Motion,,,,, by Plaintiffs 2nd Amendment Gunsmith &Shooter Supply, LLC, David Bayne, Jim Beicker, Rick Besecker, Ronald Bruce, Burrud Arms Inc., David Campbell, James (Jim) Casias, Miles Clark, Colorado Farm Bureau, Colorado Outfitters Association, Colorado State Shooting Association, Colorado Youth Outdoors, John B. Cooke, James Crone, Douglas Darr, Chad Day, Rick Dunlap, David Encinias, Mike Ensminger, James Faull, Rod Fenske, Scott Fischer, Forrest Frazee, Peter Gonzalez, Goods for the Woods, Grand Prix Guns, Green Mountain Guns, Hamilton Family Enterprises, Inc., Dylan Harrell, Bruce W. Hartman, Shayne Heap, Stan Hilkey, Fred Hosselkus, Tim Jantz, Jerry's Outdoor Sports, Fred Jobe, Chris S. Johnson, Donald Krueger, Larry Kuntz, Sue Kurtz, Magpul Industries, Terry Maketa, Jerry Martin, Dominic Mattivi, Jr, Fred D. McKee, Amos Medina, Ted B. Mink, John Minor, National Shooting Sports Foundation, Tom Nestor, Bruce Newman, Mike Norris, Brian E. Norton, Outdoor Buddies, Inc., Randy Peck, Brett L. Powell, Ken Putnam, Tom Ridnour, Grayson Robinson, Rocky Mountain Shooters Supply, Duke Schirard, Justin Smith, Specialty Sports &Supply, Dennis Spruell, Dave Stong, David Strumillo, USA Liberty Arms, Charles "Rob" Urbach, Lou Vallario, David A. Weaver, Fred Wegener, Garrett Wiggins, Women for Concealed Carry, Si Woodruff. (Colin, Marc) (Entered: 06/20/2013) |
| 06/21/2013 | 39 | | REPLY to Response to 26 MOTION for Order to *Certify Questions to Colorado Supreme Court* filed by Defendant John W. Hickenlooper. (Domenico, Daniel) (Entered: 06/21/2013) |
| 06/24/2013 | 40 | | BRIEF in Opposition to 29 MOTION for Preliminary Injunction filed by Defendant John W. Hickenlooper. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D, # 5 Exhibit E, # 6 Exhibit F, # 7 Exhibit G, # 8 Exhibit H)(Fero, Jonathan) (Entered: 06/24/2013) |
| 06/27/2013 | 41 | | REPLY to Response to 29 MOTION for Preliminary Injunction *on behalf of all Plaintiffs* filed by Plaintiffs David Bayne, Colorado Farm Bureau, Colorado Outfitters Association, Colorado Youth Outdoors, Dylan Harrell, Outdoor Buddies, Inc., Women for Concealed Carry. (Attachments: # 1 |

| | | |
|---|---|---|
| | | Affidavit Exhibit A to Reply, #2 Affidavit Exhibit B to Reply, #3 Affidavit Exhibit C to Reply, #4 Affidavit Exhibit D to Reply)(Krumholz, Peter) (Entered: 06/27/2013) |
| 07/01/2013 | 42 | ORDER: Having reviewed the briefing found at 29, 37, 40, and 41, and upon the current showing, the Court declines to impose an injunction until the parties have an opportunity to present evidence at the hearing scheduled for July 10, 2013. By Chief Judge Marcia S. Krieger on 07/01/2013. Text Only Entry (msklc3, ) (Entered: 07/01/2013) |
| 07/01/2013 | 43 | Unopposed MOTION to Amend/Correct/Modify *Amended Complaint* by Plaintiffs Jim Beicker, Rick Besecker, Ronald Bruce, David Campbell, James (Jim) Casias, Miles Clark, John B. Cooke, James Crone, Douglas Darr, Chad Day, Rick Dunlap, David Encinias, Mike Ensminger, James Faull, Rod Fenske, Scott Fischer, Forrest Frazee, Peter Gonzalez, Bruce W. Hartman, Shayne Heap, Stan Hilkey, Fred Hosselkus, Tim Jantz, Fred Jobe, Chris S. Johnson, Donald Krueger, Larry Kuntz, Sue Kurtz, Terry Maketa, Jerry Martin, Dominic Mattivi, Jr, Fred D. McKee, Amos Medina, Ted B. Mink, John Minor, Tom Nestor, Bruce Newman, Mike Norris, Brian E. Norton, Randy Peck, Brett L. Powell, Ken Putnam, Tom Ridnour, Grayson Robinson, Duke Schirard, Justin Smith, Dennis Spruell, Dave Stong, David Strumillo, Charles "Rob" Urbach, Lou Vallario, David A. Weaver, Fred Wegener, Garrett Wiggins, Si Woodruff. (Attachments: #1 Proposed Document Second Amended Complaint)(Kopel, David) (Entered: 07/01/2013) |
| 07/05/2013 | 47 | Joint MOTION for Protective Order by Plaintiffs 2nd Amendment Gunsmith &Shooter Supply, LLC, David Bayne, Jim Beicker, Rick Besecker, Ronald Bruce, Burrud Arms Inc., David Campbell, James (Jim) Casias, Miles Clark, Colorado Farm Bureau, Colorado Outfitters Association, Colorado State Shooting Association, Colorado Youth Outdoors, John B. Cooke, James Crone, Douglas Darr, Chad Day, Rick Dunlap, David Encinias, Mike Ensminger, James Faull, Rod Fenske, Scott Fischer, Forrest Frazee, Peter Gonzalez, Goods for the Woods, Grand Prix Guns, Green Mountain Guns, Hamilton Family Enterprises, Inc., Dylan Harrell, Bruce W. Hartman, Shayne Heap, Stan Hilkey, Fred Hosselkus, Tim Jantz, Jerry's Outdoor Sports, Fred Jobe, Chris S. Johnson, Donald Krueger, Larry Kuntz, Sue Kurtz, Magpul Industries, Terry Maketa, Jerry Martin, Dominic Mattivi, Jr, Fred D. McKee, Amos Medina, Ted B. Mink, John Minor, National Shooting Sports Foundation, Tom Nestor, Bruce Newman, Mike Norris, Brian E. Norton, Outdoor Buddies, Inc., Randy Peck, Brett L. Powell, Ken Putnam, Tom Ridnour, Grayson Robinson, Rocky Mountain Shooters Supply, Duke Schirard, Justin Smith, Specialty Sports &Supply, Dennis Spruell, Dave Stong, David Strumillo, USA Liberty Arms, Charles "Rob" Urbach, Lou Vallario, David A. Weaver, Fred Wegener, Garrett Wiggins, Women for Concealed Carry, Si Woodruff, Defendant John W. Hickenlooper. (Attachments: #1 Exhibit A)(Colin, Marc) (Entered: 07/05/2013) |
| 07/08/2013 | 48 | MEMORANDUM regarding 47 Joint MOTION for Protective Order filed by 2nd Amendment Gunsmith &Shooter Supply, LLC, David Campbell, John Minor, Colorado Farm Bureau, Bruce Newman, Ronald Bruce, Dominic Mattivi, Jr., David Strumillo, Burrud Arms Inc., Tim Jantz, Chad |

Day, David Encinias, John B. Cooke, Grand Prix Guns, Larry Kuntz, Mike Norris, Colorado Youth Outdoors, Bruce W. Hartman, Randy Peck, Chris S. Johnson, Outdoor Buddies, Inc., Mike Ensminger, Stan Hilkey, Colorado Outfitters Association, Rocky Mountain Shooters Supply, Peter Gonzalez, Donald Krueger, Scott Fischer, Grayson Robinson, Specialty Sports &Supply, David Bayne, Justin Smith, Fred Hosselkus, Jim Beicker, Brett L. Powell, Colorado State Shooting Association, Goods for the Woods, Dave Stong, Charles "Rob" Urbach, Rod Fenske, Ted B. Mink, Garrett Wiggins, Fred Jobe, Ken Putnam, Women for Concealed Carry, Tom Ridnour, Si Woodruff, Jerry Martin, Hamilton Family Enterprises, Inc., John W. Hickenlooper, Brian E. Norton, Rick Dunlap, James (Jim) Casias, Rick Besecker, James Crone, Miles Clark, National Shooting Sports Foundation, Sue Kurtz, Amos Medina, Douglas Darr, Green Mountain Guns, Duke Schirard, Lou Vallario, Jerry's Outdoor Sports, Dylan Harrell, USA Liberty Arms, Forrest Frazee, Magpul Industries, Fred D. McKee, Fred Wegener, Dennis Spruell, James Faull, Terry Maketa, David A. Weaver, Shayne Heap, Tom Nestor. Motions referred to Magistrate Judge Michael J. Watanabe by Chief Judge Marcia S. Krieger on 7/8/13. Text Only Entry (msksec, ) (Entered: 07/08/2013)

| | | | |
|---|---|---|---|
| 07/08/2013 | 49 | | MINUTE ORDER granting 47 Joint Motion for Protective Order. The written Stipulated Protective Order (47–1) is approved as amended in paragraphs k., l., and p. and made an Order of Court. By Magistrate Judge Michael J. Watanabe on 7/8/2013.(mjwcd) (Entered: 07/08/2013) |
| 07/08/2013 | 50 | | STIPULATED PROTECTIVE ORDER entered by Magistrate Judge Michael J. Watanabe on 7/8/2013. (mjwcd) (Entered: 07/08/2013) |
| 07/08/2013 | 51 | | Witness List by Plaintiffs David Bayne, Colorado Farm Bureau, Colorado Outfitters Association, Dylan Harrell, Outdoor Buddies, Inc., Women for Concealed Carry. (Krumholz, Peter) (Entered: 07/08/2013) |
| 07/08/2013 | 52 | | Exhibit List by Plaintiffs David Bayne, Colorado Farm Bureau, Colorado Outfitters Association, Dylan Harrell, Outdoor Buddies, Inc., Women for Concealed Carry. (Krumholz, Peter) (Entered: 07/08/2013) |
| 07/08/2013 | 53 | | STIPULATION *of Undisputed Facts* by Plaintiffs David Bayne, Colorado Farm Bureau, Colorado Outfitters Association, Colorado Youth Outdoors, Dylan Harrell, Outdoor Buddies, Inc., Women for Concealed Carry. (Krumholz, Peter) (Entered: 07/08/2013) |
| 07/09/2013 | 54 | | ORDER WITH REGARD TO HEARING ON PRELIMINARY INJUNCTION MOTION SCHEDULED FOR JULY 11: The hearing will begin at 9:00 a.m. and conclude on or before 5:00 p.m. For purposes of the presentation at this hearing, the Movant(s), collectively, will be deemed a party and should coordinate their presentation. The Movant(s), on one hand, and the Respondent, on the other hand, shall each have three hours for presentation, including opening statements, presentation of evidence (direct, cross and re–direct examination), and closing arguments. The allocation of such time is entirely within the discretion of the party. If more than one attorney for a Movant wishes to examine a witness, the examination will be limited to questions not already asked by an attorney for another Movant. The time utilized for any evidentiary objections will be attributed to the party making them. The time used for any rulings will be divided equally |

| | | | |
|---|---|---|---|
| | | | between the parties. Time will be calculated on a chess clock by the Courtroom Deputy. Parties may confer with the Courtroom Deputy as to how much time they have consumed or have remaining. At the close of the hearing, the Court anticipates taking the matter under advisement and issuing a written ruling. by Chief Judge Marcia S. Krieger on 7/9/13. Text Only Entry (msksec, ) (Entered: 07/09/2013) |
| 07/09/2013 | 55 | | ORDER CORRECTING 54 Order: The hearing date cited is incorrect. The hearing remains set for July 10, 2013, at 9:00 a.m. by Chief Judge Marcia S. Krieger on 7/9/13. Text Only Entry (msksec, ) (Entered: 07/09/2013) |
| 07/09/2013 | 56 | | WITHDRAWN – Stipulated MOTION for Preliminary Injunction *and Withdrawal of Plaintiffs' Motion for Preliminary Injunction* by Plaintiffs 2nd Amendment Gunsmith &Shooter Supply, LLC, David Bayne, Jim Beicker, Rick Besecker, Ronald Bruce, Burrud Arms Inc., David Campbell, James (Jim) Casias, Miles Clark, Colorado Farm Bureau, Colorado Outfitters Association, Colorado State Shooting Association, Colorado Youth Outdoors, John B. Cooke, James Crone, Douglas Darr, Chad Day, Rick Dunlap, David Encinias, Mike Ensminger, James Faull, Rod Fenske, Scott Fischer, Forrest Frazee, Peter Gonzalez, Goods for the Woods, Grand Prix Guns, Green Mountain Guns, Hamilton Family Enterprises, Inc., Dylan Harrell, Bruce W. Hartman, Shayne Heap, Stan Hilkey, Fred Hosselkus, Tim Jantz, Jerry's Outdoor Sports, Fred Jobe, Chris S. Johnson, Donald Krueger, Larry Kuntz, Sue Kurtz, Magpul Industries, Terry Maketa, Jerry Martin, Dominic Mattivi, Jr, Fred D. McKee, Amos Medina, Ted B. Mink, John Minor, National Shooting Sports Foundation, Tom Nestor, Bruce Newman, Mike Norris, Brian E. Norton, Outdoor Buddies, Inc., Randy Peck, Brett L. Powell, Ken Putnam, Tom Ridnour, Grayson Robinson, Rocky Mountain Shooters Supply, Duke Schirard, Justin Smith, Specialty Sports &Supply, Dennis Spruell, Dave Stong, David Strumillo, USA Liberty Arms, Charles "Rob" Urbach, Lou Vallario, David A. Weaver, Fred Wegener, Garrett Wiggins, Women for Concealed Carry, Si Woodruff, Defendant John W. Hickenlooper. (Attachments: # 1 Proposed Order (PDF Only), # 2 Exhibit Attachment 1)(Fero, Jonathan) Modified on 7/11/2013 to withdraw pursuant to Minutes dated 7/10/2013 (klyon, ). (Entered: 07/09/2013) |
| 07/10/2013 | 57 | | MINUTE ENTRY for hearing held before Chief Judge Marcia S. Krieger on 7/10/2013. 56 Stipulated Motion for Preliminary Injunction is WITHDRAWN. For the reasons stated on the record, there will be no hearing on the Motion for Preliminary Injunction (Doc. #29). Court Reporter: Terri Lindblom. (mskcd) (Entered: 07/10/2013) |
| 07/10/2013 | 58 | | ORDER granting 43 Motion to Amend/Correct/Modify Amended Complaint. By Chief Judge Marcia S. Krieger on 07/10/2013. Text Only Entry(msklc3, ) (Entered: 07/10/2013) |
| 07/11/2013 | 59 | | MOTION to Withdraw Document re 29 MOTION for Preliminary Injunction by Plaintiffs Magpul Industries, National Shooting Sports Foundation. (Attachments: # 1 Exhibit)(Abbott, Douglas) (Entered: 07/11/2013) |
| 07/12/2013 | 60 | | ORDER granting 59 Motion to Withdraw Document. The Motion to Withdraw is GRANTED, and 29 Motion for Preliminary Injunction is hereby WITHDRAWN. The Clerk of Court shall amend the docket |

| | | |
|---|---|---|
| | | accordingly. By Chief Judge Marcia S. Krieger on 07/12/2013. Text Only Entry(msklc3, ) (Entered: 07/12/2013) |
| 07/17/2013 | 61 | ORDER denying 26 Motion for Order for Certification of Questions to the Colorado Supreme Court. The Defendant requests that two questions be certified to the Colorado Supreme Court, seeking an interpretation of HB–1224: (1) does the bills definition of large–capacity magazine amount to a ban on functional magazines for most handguns and many rifles, or does it apply only to magazines that are principally used with extensions or devices that increase the combined capacity to more than 15 rounds, and (2) does the grandfather clause contained in HB 13–1224, which applies when an owner maintains continuous possession of a large capacity magazine after July 1, 2013, apply when the owner allows another person to temporarily hold, use, or share it for lawful purposes? This Court may, in its discretion, certify questions to the Colorado Supreme Court under Colorado Appellate Rule 21.1. The rule permits certification if there is involved in any proceeding before it questions of law of this state which may be determinative of the cause then pending in the certifying court and as to which it appears to the certifying court there is no controlling precedent in the decisions of the Supreme Court. Colo.R.App.P. 21.1. The Court recognizes that there are unsettled questions of law at issue in this case. However, the Court declines to certify these questions. In light of the nature of the challenges brought and the context of the case as a whole, the Court finds that clarification by the Colorado Supreme Court on the specific questions posed will not be outcome–determinative of the case. Accordingly, 26 Motion for Certification of Questions of Law to the Colorado Supreme Court is DENIED. by Chief Judge Marcia S. Krieger on 7/17/2013. Text Only Entry(msk, ) (Entered: 07/17/2013) |
| 07/18/2013 | 62 | Second AMENDED COMPLAINT for Declaratory and Injunctive Relief against John W. Hickenlooper, filed by Ted B. Mink, Rick Dunlap, Hamilton Family Enterprises, Inc., Jim Beicker, Jerry's Outdoor Sports, Dennis Spruell, James Crone, Larry Kuntz, Grand Prix Guns, Brett L. Powell, Rod Fenske, Colorado Outfitters Association, Si Woodruff, Goods for the Woods, National Shooting Sports Foundation, Women for Concealed Carry, Duke Schirard, Mike Ensminger, Forrest Frazee, Fred Wegener, Shayne Heap, Amos Medina, Tom Nestor, David Bayne, David Encinias, John Minor, David Strumillo, Magpul Industries, Chad Day, Peter Gonzalez, Fred Hosselkus, James (Jim) Casias, Outdoor Buddies, Inc., Colorado Farm Bureau, Specialty Sports &Supply, Grayson Robinson, Dylan Harrell, Brian E. Norton, Colorado State Shooting Association, Douglas Darr, Rocky Mountain Shooters Supply, Green Mountain Guns, 2nd Amendment Gunsmith &Shooter Supply, LLC, James Faull, Terry Maketa, John B. Cooke, Stan Hilkey, Donald Krueger, Tom Ridnour, Scott Fischer, Colorado Youth Outdoors, Lou Vallario, USA Liberty Arms, Burrud Arms Inc., Miles Clark, Fred Jobe, Garrett Wiggins, Rick Besecker, Ronald Bruce, David Campbell, Chris S. Johnson, Fred D. McKee, Ken Putnam, Bruce Newman, Justin Smith, Sue Kurtz, Jerry Martin, Mike Norris, Tim Jantz, Dominic Mattivi, Jr, David A. Weaver, Dave Stong, Randy Peck, Charles "Rob" Urbach, Bruce W. Hartman.(klyon, ) (Entered: 07/18/2013) |
| 07/24/2013 | 63 | NOTICE of Entry of Appearance by John Tien Yau Lee on behalf of All Defendants (Lee, John) (Entered: 07/24/2013) |

| 08/01/2013 | 64 | MOTION to Dismiss *Claims Two, Three, and Four, and to Dismiss Sheriffs as Plaintiffs Acting in their Official Capacities* by Defendant John W. Hickenlooper. (Attachments: # 1 Exhibit A)(Grove, Matthew) (Entered: 08/01/2013) |
| 08/01/2013 | 65 | ANSWER to 62 Amended Complaint,,,,, by John W. Hickenlooper.(Grove, Matthew) (Entered: 08/01/2013) |
| 08/02/2013 | 66 | Expert Witness Designation *of Gary Kleck, Massad Ayoob, Michael Shain, and Kevin Davis* by Plaintiffs 2nd Amendment Gunsmith &Shooter Supply, LLC, David Bayne, Jim Beicker, Rick Besecker, Ronald Bruce, Burrud Arms Inc., David Campbell, James (Jim) Casias, Miles Clark, Colorado Farm Bureau, Colorado Outfitters Association, Colorado State Shooting Association, Colorado Youth Outdoors, John B. Cooke, James Crone, Douglas Darr, Chad Day, Rick Dunlap, David Encinias, Mike Ensminger, James Faull, Rod Fenske, Scott Fischer, Forrest Frazee, Peter Gonzalez, Goods for the Woods, Grand Prix Guns, Green Mountain Guns, Hamilton Family Enterprises, Inc., Dylan Harrell, Bruce W. Hartman, Shayne Heap, Stan Hilkey, Fred Hosselkus, Tim Jantz, Jerry's Outdoor Sports, Fred Jobe, Chris S. Johnson, Rodney Johnson, Donald Krueger, Larry Kuntz, Sue Kurtz, Magpul Industries, Terry Maketa, Jerry Martin, Dominic Mattivi, Jr, Fred D. McKee, Amos Medina, Ted B. Mink, John Minor, National Shooting Sports Foundation, Tom Nestor, Bruce Newman, Mike Norris, Brian E. Norton, Outdoor Buddies, Inc., Randy Peck, Brett L. Powell, Ken Putnam, Tom Ridnour, Grayson Robinson, Rocky Mountain Shooters Supply, Duke Schirard, Justin Smith, Specialty Sports &Supply, Dennis Spruell, Dave Stong, David Strumillo, USA Liberty Arms, Charles "Rob" Urbach, Lou Vallario, David A. Weaver, Fred Wegener, Garrett Wiggins, Women for Concealed Carry, Si Woodruff. (Kopel, David) (Entered: 08/02/2013) |
| 08/09/2013 | 67 | NOTICE of Entry of Appearance by Jonathon Michael Watson on behalf of 2nd Amendment Gunsmith &Shooter Supply, LLC, Burrud Arms Inc., Goods for the Woods, Grand Prix Guns, Green Mountain Guns, Jerry's Outdoor Sports, Rocky Mountain Shooters Supply, Specialty Sports &Supply, USA Liberty Arms (Watson, Jonathon) (Entered: 08/09/2013) |
| 08/22/2013 | 68 | MOTION for Leave to *Motion To File Amicus Curiae Brief In Opposition To Defendant's Motion to Dismiss Sheriff's As Plaintiffs Acting in Their Official Capacity* by Interested Party Board of County Commissioners for Mesa County Colorado. (Attachments: # 1 Proposed Document Amicus Brief)(Dechant, Maurice) (Entered: 08/22/2013) |
| 08/22/2013 | 69 | RESPONSE to 64 MOTION to Dismiss *Claims Two, Three, and Four, and to Dismiss Sheriffs as Plaintiffs Acting in their Official Capacities* filed by Plaintiffs 2nd Amendment Gunsmith &Shooter Supply, LLC, David Bayne, Burrud Arms Inc., Colorado Farm Bureau, Colorado Outfitters Association, Colorado State Shooting Association, Colorado Youth Outdoors, Goods for the Woods, Grand Prix Guns, Green Mountain Guns, Hamilton Family Enterprises, Inc., Dylan Harrell, Jerry's Outdoor Sports, Magpul Industries, National Shooting Sports Foundation, Outdoor Buddies, Inc., Rocky Mountain Shooters Supply, Specialty Sports &Supply, USA Liberty Arms, Women for Concealed Carry. (Attachments: # 1 Exhibit Exhibit A to |

| | | | |
|---|---|---|---|
| | | | Response, #2 Exhibit Exhibit B to Response)(Krumholz, Peter) (Entered: 08/22/2013) |
| 08/22/2013 | 70 | | BRIEF in Opposition to 64 MOTION to Dismiss *Claims Two, Three, and Four, and to Dismiss Sheriffs as Plaintiffs Acting in their Official Capacities* filed by Plaintiffs Jim Beicker, Rick Besecker, Ronald Bruce, David Campbell, James (Jim) Casias, Miles Clark, John B. Cooke, James Crone, Douglas Darr, Chad Day, Rick Dunlap, David Encinias, Mike Ensminger, James Faull, Rod Fenske, Scott Fischer, Forrest Frazee, Peter Gonzalez, Bruce W. Hartman, Shayne Heap, Stan Hilkey, Fred Hosselkus, Tim Jantz, Fred Jobe, Chris S. Johnson, Rodney Johnson, Donald Krueger, Larry Kuntz, Sue Kurtz, Terry Maketa, Jerry Martin, Dominic Mattivi, Jr, Fred D. McKee, Amos Medina, Ted B. Mink, John Minor, Tom Nestor, Bruce Newman, Mike Norris, Brian E. Norton, Randy Peck, Brett L. Powell, Ken Putnam, Tom Ridnour, Grayson Robinson, Duke Schirard, Justin Smith, Dennis Spruell, Dave Stong, David Strumillo, Charles "Rob" Urbach, Lou Vallario, David A. Weaver, Fred Wegener, Garrett Wiggins, Si Woodruff. (Attachments: #1 Exhibit Sheriff Bruce interrogatory, #2 Exhibit Sheriff Woodruff interrogatory, #3 Exhibit Sheriff Crone interrogatory, #4 Exhibit Sheriff Stong interrogatory, #5 Exhibit Sheriff Campbell interrogatory, #6 Exhibit Sheriff Jobe interrogatory, #7 Exhibit Sheriff Nestor interrogatory, #8 Exhibit Sheriff Logan interrogatory, #9 Exhibit Sheriff Spruell interrogatory, #10 Exhibit Sheriff Faull interrogatory, #11 Exhibit Sheriff Smith interrogatory, #12 Exhibit Sheriff McKee interrogatory, #13 Exhibit Sheriff Weaver interrogatory, #14 Exhibit Sheriff Casias interrogatory, #15 Exhibit Sheriff Beicker interrogatory, #16 Exhibit Legislative testimony, #17 Exhibit Ayoob expert report)(Kopel, David) (Entered: 08/22/2013) |
| 08/27/2013 | 71 | | Unopposed MOTION for Extension of Time to *Amend Scheduling Order with Respect to Deadline for Rebuttal Expert Reports* by Defendant John W. Hickenlooper. (Fero, Jonathan) (Entered: 08/27/2013) |
| 08/28/2013 | 72 | | MEMORANDUM regarding 71 Unopposed MOTION for Extension of Time to *Amend Scheduling Order with Respect to Deadline for Rebuttal Expert Reports* filed by John W. Hickenlooper. Motions referred to Magistrate Judge Michael J. Watanabe by Chief Judge Marcia S. Krieger on 8/28/13. Text Only Entry (msksec, ) (Entered: 08/28/2013) |
| 08/28/2013 | 73 | | NOTICE of Entry of Appearance by Molly Allen Moats on behalf of John W. Hickenlooper (Moats, Molly) (Entered: 08/28/2013) |
| 08/28/2013 | 74 | | MINUTE ORDER granting 71 Unopposed Motion to Amend Scheduling Order With Respect to Deadline for Rebuttal Expert Reports. The Scheduling Order (Docket No. 36 ) is thus amended such that the deadline for designation of all rebuttal experts and for providing opposing counsel and any pro se party with all information specified in Fed. R. Civ. P. 26(a)(2) is extended from 9/3/2013, up to and including 9/13/2013. By Magistrate Judge Michael J. Watanabe on 8/28/2013.(klyon, ) (Entered: 08/28/2013) |
| 09/05/2013 | 75 | | REPLY to Response to 64 MOTION to Dismiss *Claims Two, Three, and Four, and to Dismiss Sheriffs as Plaintiffs Acting in their Official Capacities* filed by Defendant John W. Hickenlooper. (Lee, John) (Entered: 09/05/2013) |

25

| 09/17/2013 | 76 | | Unopposed MOTION for Hearing/Conference by Defendant John W. Hickenlooper. (Fero, Jonathan) (Entered: 09/17/2013) |
| 09/17/2013 | 77 | | MEMORANDUM regarding 76 Unopposed MOTION for Hearing/Conference filed by John W. Hickenlooper. Motions referred to Magistrate Judge Michael J. Watanabe by Chief Judge Marcia S. Krieger on 9/17/13. Text Only Entry (msksec, ) (Entered: 09/17/2013) |
| 09/17/2013 | 78 | | MINUTE ORDER granting 76 Unopposed Motion for Discovery Status Conference With Magistrate Judge. A Discovery StatusConference shall be held on Monday, 9/23/2013, at 2:30 p.m. beforeMagistrate Judge Watanabe in Courtroom A–502, Fifth Floor, Alfred A. Arraj U.S.Courthouse, 901 19th Street, Denver, Colorado 80294. By Magistrate Judge Michael J. Watanabe on 9/17/2013.(klyon, ) (Entered: 09/17/2013) |
| 09/20/2013 | 79 | | RESPONSE to 76 Unopposed MOTION for Hearing/Conference *with Magistrate Judge* filed by Plaintiffs David Bayne, Colorado Farm Bureau, Colorado Outfitters Association, Dylan Harrell, Outdoor Buddies, Inc., Women for Concealed Carry. (Attachments: # 1 Exhibit Attachment A, # 2 Exhibit Attachment B)(Krumholz, Peter) (Entered: 09/20/2013) |
| 09/23/2013 | 80 | | MINUTE ORDER Due to an unexpected conflict, Status Conference 9/23/2013 02:30 PM is vacated. Status Conference reset for 9/26/2013 09:00 AM in Courtroom A 502 before Magistrate Judge Michael J. Watanabe. By Magistrate Judge Michael J. Watanabe on 9/23/2013. (mjwcd) (Entered: 09/23/2013) |
| 09/25/2013 | 81 | | TRIAL PREPARATION ORDER – CIVIL by Chief Judge Marcia S. Krieger on 9/25/13. (msksec, ) (Entered: 09/25/2013) |
| 09/25/2013 | 82 | | MOTION for Protective Order by Defendant John W. Hickenlooper. (Attachments: # 1 Exhibit)(Grove, Matthew) (Entered: 09/25/2013) |
| 09/25/2013 | 83 | | NOTICE of Entry of Appearance by Stephanie Lindquist Scoville on behalf of John W. Hickenlooper (Scoville, Stephanie) (Entered: 09/25/2013) |
| 09/25/2013 | 84 | | MEMORANDUM regarding 82 MOTION for Protective Order filed by John W. Hickenlooper. Motions referred to Magistrate Judge Michael J. Watanabe by Chief Judge Marcia S. Krieger on 9/25/13. Text Only Entry (msksec, ) (Entered: 09/25/2013) |
| 09/26/2013 | 85 | | COURTROOM MINUTES/MINUTE ORDER for proceedings held before Magistrate Judge Michael J. Watanabe: Status Conference held on 9/26/2013. Scheduling Order 36 is amended. Dispositive Motions due by 12/12/2013. Plaintiffs shall have up to and including 10/4/2013 to respond to 82 Defendant's Motion for Protective order. Court Reporter: FTR – Ellen E. Miller. FTR: Courtroom A502. (mjwcd) (Entered: 09/26/2013) |
| 10/04/2013 | 86 | | RESPONSE to 82 MOTION for Protective Order filed by Plaintiffs David Bayne, Colorado Farm Bureau, Colorado Outfitters Association, Dylan Harrell, Outdoor Buddies, Inc., Women for Concealed Carry. (Attachments: # 1 Exhibit)(Westfall, Richard) (Entered: 10/04/2013) |
| 10/08/2013 | 87 | | REPLY to Response to 82 MOTION for Protective Order filed by Defendant John W. Hickenlooper. (Grove, Matthew) (Entered: 10/08/2013) |

| 10/10/2013 | 88 | | ORDER granting 68 Motion for Leave to File an Amicus Brief. No opposition having been interposed, the Motion is GRANTED. The Defendant shall have 14 days in which to supplement its Reply to address this Brief. by Chief Judge Marcia S. Krieger on 10/10/2013. Text Only Entry(msk, ) (Entered: 10/10/2013) |
|---|---|---|---|
| 10/24/2013 | 89 | | Unopposed MOTION for Extension of Time to *respond to Mesa County Commissioners' amicus brief* by Defendant John W. Hickenlooper. (Attachments: # 1 Proposed Order (PDF Only))(Spalding, Kathleen) (Entered: 10/24/2013) |
| 10/25/2013 | 90 | | ORDER granting 89 Unopposed Motion for Extension of Time to Respond to Mesa County Commissioners' Amicus Brief. Extension granted up to and including November 1, 2013. by Chief Judge Marcia S. Krieger on 10/25/13. Text Only Entry(msksec, ) (Entered: 10/25/2013) |
| 10/28/2013 | 91 | | ORDER granting 82 Defendant Hickenlooper's Motion for Protective Order. Plaintiffs are not permitted to take the deposition of Defendant Governor John W. Hickenlooper; each party shall pay their own attorney fees and costs for this motion, by Magistrate Judge Michael J. Watanabe on 10/28/2013.(mjwcd) (Entered: 10/28/2013) |
| 11/01/2013 | 92 | | SURREPLY re 64 MOTION to Dismiss *Claims Two, Three, and Four, and to Dismiss Sheriffs as Plaintiffs Acting in their Official Capacities* filed by Defendant John W. Hickenlooper. (Lee, John) (Entered: 11/01/2013) |
| 11/07/2013 | 93 | | Unopposed MOTION for Discovery *Cutoff Extension* by Defendant John W. Hickenlooper. (Attachments: # 1 Proposed Order (PDF Only))(Grove, Matthew) (Entered: 11/07/2013) |
| 11/08/2013 | 94 | | MEMORANDUM regarding 93 Unopposed MOTION for Discovery *Cutoff Extension* filed by John W. Hickenlooper. Motions referred to Magistrate Judge Michael J. Watanabe by Chief Judge Marcia S. Krieger on 11/8/13. Text Only Entry (msksec, ) (Entered: 11/08/2013) |
| 11/12/2013 | 95 | | MINUTE ORDER granting 93 defendant's Unopposed Motion for Extension of Discovery Deadline. Scheduling Order 36 is amended. Discovery due by 11/13/2013. By Magistrate Judge Michael J. Watanabe on 11/12/2013.(mjwcd) (Entered: 11/12/2013) |
| 11/27/2013 | 96 | | Opinon and ORDER granting in part and denying in part Defendant's 64 Motion to Dismiss. The Defendant's Motion to Dismiss is GRANTED IN PART AND DENIED IN PART. The motion is GRANTED with respect to all claims asserted by the Sheriffs. The claims are DISMISSED without prejudice. Any Sheriff shall have 14 days from the date of this Order in which to seek to join the action in an individual capacity. The motion is GRANTED with respect to the Plaintiffs' claim that the phrase "designed to be readily converted," found in § 18–12–301(2)(a)(I), is unconstitutionally vague, and the claim is DISMISSED. The claims proceeding in this case are (1) Second Amendment challenges to §§ 18–12–301 et seq. and § 18–12–112; (2) a claim for unconstitutional vagueness as to the phrase "continuous possession," § 18–12–302(2)(a)(II); and (3) the ADA claims. By Chief Judge Marcia S. Krieger on 11/27/2013.(klyon, ) (Entered: 11/27/2013) |

| 12/04/2013 | 97 | | MOTION for Extension of Time to *File Dispositive Motions* by Defendant John W. Hickenlooper. (Attachments: #_1 Proposed Order (PDF Only))(Spalding, Kathleen) (Entered: 12/04/2013) |
| --- | --- | --- | --- |
| 12/06/2013 | 98 | | RESPONSE to_97 MOTION for Extension of Time to *File Dispositive Motions* filed by Plaintiffs David Bayne, Colorado Farm Bureau, Colorado Outfitters Association, Colorado Youth Outdoors, Dylan Harrell, Outdoor Buddies, Inc., Women for Concealed Carry. (Krumholz, Peter) (Entered: 12/06/2013) |
| 12/09/2013 | 99 | | ORDER AND NOTICE OF LAW AND MOTION HEARING: The following matter is set for a non–evidentiary hearing on the law and motion calendar for **12/19/2013 at 03:00 PM** in Courtroom A 901 before Chief Judge Marcia S. Krieger. Counsel shall bring their calendars and be prepared to address the_97 MOTION for Extension of Time to *File Dispositive Motions* filed by John W. Hickenlooper. by Chief Judge Marcia S. Krieger on 12/9/13. Text Only Entry (msksec, ) (Entered: 12/09/2013) |
| 12/09/2013 | 100 | | ORDER AMENDING 99 Order: Pursuant to Fed. R. Civ. P. 16(a) and (c), the parties shall be prepared to address (1) whether any (and if so, what) matter is appropriate for consideration under Rule 56, (2) how summary adjudication under Rule 56 would streamline or avoid trial, (3) what issues or claims should be tried, (4) whether a separate trial under Rule 42(b) is appropriate for any claim, (5) when a proposed final pretrial order should be submitted and a final pretrial conference held, and (6) any other way the just, speedy, and inexpensive disposition of the action may be accomplished. by Chief Judge Marcia S. Krieger on 12/9/13. Text Only Entry (msksec, ) (Entered: 12/09/2013) |
| 12/09/2013 | 101 | | ORDER granting_97 Motion for Extension of Time. The motion is GRANTED until a date to be determined at the law and motion hearing set for 12/19/2013. By Chief Judge Marcia S. Krieger on 12/09/13. Text Only Entry(msklc3, ) (Entered: 12/09/2013) |
| 12/09/2013 | 102 | | Unopposed MOTION to Amend/Correct/Modify_96 Order on Motion to Dismiss,,, by Plaintiffs 2nd Amendment Gunsmith &Shooter Supply, LLC, David Bayne, Jim Beicker, Rick Besecker, Ronald Bruce, Burrud Arms Inc., David Campbell, James (Jim) Casias, Miles Clark, Colorado Farm Bureau, Colorado Outfitters Association, Colorado State Shooting Association, Colorado Youth Outdoors, John B. Cooke, James Crone, Douglas Darr, Chad Day, Rick Dunlap, David Encinias, Mike Ensminger, James Faull, Rod Fenske, Scott Fischer, Forrest Frazee, Peter Gonzalez, Goods for the Woods, Grand Prix Guns, Green Mountain Guns, Hamilton Family Enterprises, Inc., Dylan Harrell, Bruce W. Hartman, Shayne Heap, Stan Hilkey, Fred Hosselkus, Tim Jantz, Jerry's Outdoor Sports, Fred Jobe, Chris S. Johnson, Rodney Johnson, Donald Krueger, Larry Kuntz, Sue Kurtz, Magpul Industries, Terry Maketa, Jerry Martin, Dominic Mattivi, Jr, Fred D. McKee, Amos Medina, Ted B. Mink, John Minor, National Shooting Sports Foundation, Tom Nestor, Bruce Newman, Mike Norris, Brian E. Norton, Outdoor Buddies, Inc., Randy Peck, Brett L. Powell, Ken Putnam, Tom Ridnour, Grayson Robinson, Rocky Mountain Shooters Supply, Duke Schirard, Justin Smith, Specialty Sports &Supply, Dennis Spruell, Dave Stong, David Strumillo, USA Liberty Arms, Charles "Rob" Urbach, Lou |

| | | |
|---|---|---|
| | | Vallario, David A. Weaver, Fred Wegener, Garrett Wiggins, Women for Concealed Carry, Si Woodruff. (Krumholz, Peter) (Entered: 12/09/2013) |
| 12/10/2013 | 103 | NOTICE re 99 Order, *Concerning Unavailability of Counsel* by Plaintiffs David Bayne, Colorado Farm Bureau, Colorado Outfitters Association, Colorado Youth Outdoors, Dylan Harrell, Outdoor Buddies, Inc., Women for Concealed Carry (Krumholz, Peter) (Entered: 12/10/2013) |
| 12/11/2013 | 104 | MOTION for Joinder , MOTION for Leave to *File 3d Amended Complaint* by Plaintiffs Jim Beicker, Rick Besecker, Ronald Bruce, David Campbell, James (Jim) Casias, Miles Clark, John B. Cooke, James Crone, Douglas Darr, Chad Day, Rick Dunlap, David Encinias, Mike Ensminger, James Faull, Rod Fenske, Scott Fischer, Forrest Frazee, Peter Gonzalez, Bruce W. Hartman, Shayne Heap, Stan Hilkey, Fred Hosselkus, Tim Jantz, Fred Jobe, Chris S. Johnson, Rodney Johnson, Donald Krueger, Larry Kuntz, Sue Kurtz, Terry Maketa, Jerry Martin, Dominic Mattivi, Jr, Fred D. McKee, Amos Medina, Ted B. Mink, John Minor, Tom Nestor, Bruce Newman, Mike Norris, Brian E. Norton, Randy Peck, Brett L. Powell, Ken Putnam, Tom Ridnour, Grayson Robinson, Duke Schirard, Justin Smith, Dennis Spruell, Dave Stong, David Strumillo, Charles "Rob" Urbach, Lou Vallario, David A. Weaver, Fred Wegener, Garrett Wiggins, Si Woodruff. (Attachments: # 1 Exhibit 3d Am. Complaint, with strikethroughs, # 2 Deposition Excerpts Exhibit C. Wagner deposition, # 3 Exhibit Exhibit D. AG response to FFL discovery, # 4 Exhibit Exhibit E. AG response to Sheriffs discovery, # 5 Exhibit Exhibit F. CBI documents, # 6 Deposition Excerpts Exhibit G. Sloan deposition, # 7 Exhibit Exhibit H. AG response to 2d non–profit discovery, # 8 Exhibit Exhibit I. AG response to 1st non–profit discovery)(Kopel, David) (Entered: 12/11/2013) |
| 12/11/2013 | 105 | Unopposed MOTION for Leave to Restrict Document as to docket entry # *106 (Exhibits A to 3d Am. Complaint* by Plaintiffs Jim Beicker, Rick Besecker, Ronald Bruce, David Campbell, James (Jim) Casias, Miles Clark, John B. Cooke, James Crone, Douglas Darr, Chad Day, Rick Dunlap, David Encinias, Mike Ensminger, James Faull, Rod Fenske, Scott Fischer, Forrest Frazee, Peter Gonzalez, Bruce W. Hartman, Shayne Heap, Stan Hilkey, Fred Hosselkus, Tim Jantz, Fred Jobe, Chris S. Johnson, Rodney Johnson, Donald Krueger, Larry Kuntz, Sue Kurtz, Terry Maketa, Jerry Martin, Dominic Mattivi, Jr, Fred D. McKee, Amos Medina, Ted B. Mink, John Minor, Tom Nestor, Bruce Newman, Mike Norris, Brian E. Norton, Randy Peck, Brett L. Powell, Ken Putnam, Tom Ridnour, Grayson Robinson, Duke Schirard, Justin Smith, Dennis Spruell, Dave Stong, David Strumillo, Charles "Rob" Urbach, Lou Vallario, David A. Weaver, Fred Wegener, Garrett Wiggins, Si Woodruff. (Kopel, David) Modified on 12/12/2013 to correct linkage(klyon, ). (Entered: 12/11/2013) |
| 12/11/2013 | 106 | RESTRICTED DOCUMENT – Level 1: by Plaintiffs Jim Beicker, Rick Besecker, Ronald Bruce, David Campbell, James (Jim) Casias, Miles Clark, John B. Cooke, James Crone, Douglas Darr, Chad Day, Rick Dunlap, David Encinias, Mike Ensminger, James Faull, Rod Fenske, Scott Fischer, Forrest Frazee, Peter Gonzalez, Bruce W. Hartman, Shayne Heap, Stan Hilkey, Fred Hosselkus, Tim Jantz, Fred Jobe, Chris S. Johnson, Rodney Johnson, Donald Krueger, Larry Kuntz, Sue Kurtz, Terry Maketa, Jerry Martin, Dominic Mattivi, Jr, Fred D. McKee, Amos Medina, Ted B. Mink, John Minor, Tom |

|  |  | Nestor, Bruce Newman, Mike Norris, Brian E. Norton, Randy Peck, Brett L. Powell, Ken Putnam, Tom Ridnour, Grayson Robinson, Duke Schirard, Justin Smith, Dennis Spruell, Dave Stong, David Strumillo, Charles "Rob" Urbach, Lou Vallario, David A. Weaver, Fred Wegener, Garrett Wiggins, Si Woodruff.. Motions due by 12/30/2013. (Attachments: # 1 Exhibit Exhibit B. Sheriff Declarations)(Kopel, David) (Entered: 12/11/2013) |
|---|---|---|
| 12/11/2013 | 109 | Exhibits in Support of 62 Amended Complaint, by Plaintiffs 2nd Amendment Gunsmith &Shooter Supply, LLC, David Bayne, Burrud Arms Inc., Colorado Farm Bureau, Colorado Outfitters Association, Colorado State Shooting Association, Colorado Youth Outdoors, Goods for the Woods, Grand Prix Guns, Green Mountain Guns, Hamilton Family Enterprises, Inc., Dylan Harrell, Jerry's Outdoor Sports, Magpul Industries, National Shooting Sports Foundation, Outdoor Buddies, Inc., Rocky Mountain Shooters Supply, Specialty Sports &Supply, David Strumillo, USA Liberty Arms, Women for Concealed Carry. (Public Entry for 106 Restricted Document – Level 1) (Text only entry) (klyon, ) (Entered: 12/12/2013) |
| 12/12/2013 | 107 | ORDER denying 102 Motion to Amend/Correct/Modify. Having reviewed the Second Amended Complaint, the Court finds that under the standards of Ashcroft v. Iqbal, 556 U.S. 663 (2009), and Bell Atlantic Corp. v. Twombly, 550 U.S. 544 (2007), there is no plausible claim stated by any individual currently serving as sheriff. Therefore, no further clarification or modification of the Courts November 27, 2013, Order 96 on the Motion to Dismiss is appropriate. The motion is DENIED. By Chief Judge Marcia S. Krieger on 12/12/2013. Text Only Entry(msklc3, ) (Entered: 12/12/2013) |
| 12/12/2013 | 108 | ORDER: The motions filed at 104 and 105 will be heard at the Law and Motion hearing set for 12/19/2013 at 03:00 PM in Courtroom A 901 before Chief Judge Marcia S. Krieger. By Chief Judge Marcia S. Krieger on 12/12/2013. Text Only Entry (msklc3, ) (Entered: 12/12/2013) |
| 12/12/2013 | 110 | NOTICE *Concerning Unavailability for December 19 Non−Evidentiary Hearing* by Plaintiffs 2nd Amendment Gunsmith &Shooter Supply, LLC, Burrud Arms Inc., Goods for the Woods, Grand Prix Guns, Green Mountain Guns, Jerry's Outdoor Sports, Rocky Mountain Shooters Supply, Specialty Sports &Supply, USA Liberty Arms (Colin, Marc) (Entered: 12/12/2013) |
| 12/17/2013 | 111 | NOTICE re 106 Restricted Document – Level 1,,, 105 Unopposed MOTION for Leave to Restrict Document as to docket entry # 104 *(Exhibits A to 3d Am. Complaint* by Plaintiffs Jim Beicker, Rick Besecker, Ronald Bruce, David Campbell, James (Jim) Casias, Miles Clark, John B. Cooke, James Crone, Douglas Darr, Chad Day, Rick Dunlap, David Encinias, Mike Ensminger, James Faull, Rod Fenske, Scott Fischer, Forrest Frazee, Peter Gonzalez, Bruce W. Hartman, Shayne Heap, Stan Hilkey, Fred Hosselkus, Tim Jantz, Fred Jobe, Chris S. Johnson, Rodney Johnson, Donald Krueger, Larry Kuntz, Sue Kurtz, Terry Maketa, Jerry Martin, Dominic Mattivi, Jr, Fred D. McKee, Amos Medina, Ted B. Mink, John Minor, Tom Nestor, Bruce Newman, Mike Norris, Brian E. Norton, Randy Peck, Brett L. Powell, Ken Putnam, Tom Ridnour, Grayson Robinson, Duke Schirard, Justin Smith, Dennis Spruell, Dave Stong, David Strumillo, Charles "Rob" Urbach, Lou Vallario, David A. Weaver, Fred Wegener, Garrett Wiggins, Si |

| | | | |
|---|---|---|---|
| | | | Woodruff (Kopel, David) (Entered: 12/17/2013) |
| 12/18/2013 | 112 | | RESPONSE to 104 MOTION for Joinder MOTION for Leave to *File 3d Amended Complaint* filed by Defendant John W. Hickenlooper. (Grove, Matthew) (Entered: 12/18/2013) |
| 12/18/2013 | 113 | | REPLY to Response to 104 MOTION for Joinder MOTION for Leave to *File 3d Amended Complaint and Motion for Leave to File Substitute Third Amended Complaint* filed by Plaintiffs Jim Beicker, Rick Besecker, Ronald Bruce, David Campbell, James (Jim) Casias, Miles Clark, John B. Cooke, James Crone, Douglas Darr, Chad Day, Rick Dunlap, David Encinias, Mike Ensminger, James Faull, Rod Fenske, Scott Fischer, Forrest Frazee, Peter Gonzalez, Bruce W. Hartman, Shayne Heap, Stan Hilkey, Fred Hosselkus, Tim Jantz, Fred Jobe, Chris S. Johnson, Rodney Johnson, Donald Krueger, Larry Kuntz, Sue Kurtz, Terry Maketa, Jerry Martin, Dominic Mattivi, Jr, Fred D. McKee, Amos Medina, Ted B. Mink, John Minor, Tom Nestor, Bruce Newman, Mike Norris, Brian E. Norton, Randy Peck, Brett L. Powell, Ken Putnam, Tom Ridnour, Grayson Robinson, Duke Schirard, Justin Smith, Dennis Spruell, Dave Stong, David Strumillo, Charles "Rob" Urbach, Lou Vallario, David A. Weaver, Fred Wegener, Garrett Wiggins, Si Woodruff. (Attachments: # 1 Exhibit Substitute 3d Amended Complaint)(Kopel, David) (Entered: 12/18/2013) |
| 12/19/2013 | 114 | | NOTICE of Change of Address/Contact Information by Richard A. Westfall (Westfall, Richard) (Entered: 12/19/2013) |
| 12/19/2013 | 115 | | MINUTE ENTRY for Law and Motion Hearing held before Chief Judge Marcia S. Krieger on 12/19/2013. 104 Motion for Joinder is GRANTED in part and DENIED in part; 105 Motion for Leave to Restrict is DENIED, but the exhibits will remain under restriction. Proposed Pretrial Order due by 1/31/2014; Final Pretrial Conference set for 2/20/2014 03:00 PM; Bench Trial (10 days) set for 3/31/2014 – o4/04/14 and 04/07/2014 – 04/11/2014 at 08:30 AM in Courtroom A 901 before Chief Judge Marcia S. Krieger. Other matters addressed or deadlines imposed are set forth in the Minutes. Court Reporter: Terri Lindblom. (mskcd) (Entered: 12/20/2013) |
| 12/23/2013 | 116 | | AMENDED COMPLAINT *(Fourth)* against All Defendants, filed by Hamilton Family Enterprises, Inc., Jerry's Outdoor Sports, Larry Kuntz, Colorado Outfitters Association, Goods for the Woods, National Shooting Sports Foundation, Women for Concealed Carry, David Bayne, David Strumillo, Peter Gonzalez, Magpul Industries, Outdoor Buddies, Inc., Colorado Farm Bureau, Dylan Harrell, Specialty Sports &Supply, Colorado State Shooting Association, Douglas Darr, Rocky Mountain Shooters Supply, Green Mountain Guns, 2nd Amendment Gunsmith &Shooter Supply, LLC, James Faull, John B. Cooke, Stan Hilkey, Donald Krueger, Colorado Youth Outdoors, Burrud Arms Inc., USA Liberty Arms, Fred Jobe, Ken Putnam, Sue Kurtz, Dave Stong.(Kopel, David) (Entered: 12/23/2013) |
| 01/03/2014 | 117 | | *Objections and* ANSWER to 116 Amended Complaint,, by John W. Hickenlooper.(Grove, Matthew) (Entered: 01/03/2014) |
| 01/15/2014 | 118 | | Joint MOTION to Strike *Expert Opinions Per FRE 702* by Plaintiffs 2nd Amendment Gunsmith &Shooter Supply, LLC, David Bayne, Burrud Arms Inc., Colorado Farm Bureau, Colorado Outfitters Association, Colorado |

31

| | | | |
|---|---|---|---|
| | | | State Shooting Association, Colorado Youth Outdoors, John B. Cooke, Douglas N. Darr, James Faull, Peter Gonzalez, Goods for the Woods, Green Mountain Guns, Hamilton Family Enterprises, Inc., Dylan Harrell, Stan Hilkey, Jerry's Outdoor Sports, Fred Jobe, Donald Krueger, Larry Kuntz, Sue Kurtz, Magpul Industries, National Shooting Sports Foundation, Outdoor Buddies, Inc., Ken Putnam, Rocky Mountain Shooters Supply, Specialty Sports &Supply, Dave Stong, David Strumillo, USA Liberty Arms, Women for Concealed Carry, Interested Party Board of County Commissioners for Mesa County Colorado. (Watson, Jonathon) (Entered: 01/15/2014) |
| 01/31/2014 | 119 | | Proposed Pretrial Order *filed jointly by all parties* by Plaintiffs John B. Cooke, Douglas N. Darr, James Faull, Peter Gonzalez, Stan Hilkey, Fred Jobe, Donald Krueger, Larry Kuntz, Sue Kurtz, Ken Putnam, Dave Stong, David Strumillo. (Attachments: # 1 Exhibit Addendum A. Witness list, # 2 Exhibit Addendum B. Exhibit list)(Kopel, David) (Entered: 01/31/2014) |
| 02/11/2014 | 120 | | Unopposed MOTION to Withdraw as Attorney by Plaintiffs 2nd Amendment Gunsmith &Shooter Supply, LLC, Burrud Arms Inc., Goods for the Woods, Green Mountain Guns, Jerry's Outdoor Sports, Rocky Mountain Shooters Supply, Specialty Sports &Supply, USA Liberty Arms. (Watson, Jonathon) (Entered: 02/11/2014) |
| 02/12/2014 | 121 | | MEMORANDUM regarding 120 Unopposed MOTION to Withdraw as Attorney filed by 2nd Amendment Gunsmith &Shooter Supply, LLC, Green Mountain Guns, Goods for the Woods, Specialty Sports &Supply, Jerry's Outdoor Sports, USA Liberty Arms, Rocky Mountain Shooters Supply, Burrud Arms Inc.Motions referred to Magistrate Judge Michael J. Watanabe by Chief Judge Marcia S. Krieger on 2/12/14. Text Only Entry (msksec, ) (Entered: 02/12/2014) |
| 02/12/2014 | 122 | | MINUTE ORDER granting 120 Motion to Withdraw as Attorney. Attorney Jonathon Michael Watson terminated, by Magistrate Judge Michael J. Watanabe on 2/12/2014. Text Only Entry(mjwcd) (Entered: 02/12/2014) |
| 02/14/2014 | 123 | | WITHDRAWN – Unopposed MOTION for Order to *Close Courtroom during Portions of Testimony by Aurora Police Chief Daniel Oates* by Defendant John W. Hickenlooper. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C)(Grove, Matthew) Modified on 4/8/2014 to withdraw pursuant to Minute Entry dated 4/7/2014. (klyon, ). (Entered: 02/14/2014) |
| 02/14/2014 | 124 | | WITHDRAWN – Unopposed MOTION for Leave to Restrict by Plaintiffs John B. Cooke, Douglas N. Darr, James Faull, Peter Gonzalez, Stan Hilkey, Fred Jobe, Donald Krueger, Larry Kuntz, Sue Kurtz, Ken Putnam, Dave Stong, David Strumillo. (Kopel, David) Modified on 2/21/2014 to withdraw pursuant to Minute Entry dated 2/20/2014 (klyon, ). (Entered: 02/14/2014) |
| 02/20/2014 | 125 | | Exhibit List *Amended* by Defendant John W. Hickenlooper. (Grove, Matthew) (Entered: 02/20/2014) |
| 02/20/2014 | 126 | | NOTICE of Entry of Appearance by LeeAnn Morrill on behalf of John W. HickenlooperAttorney LeeAnn Morrill added to party John W. Hickenlooper(pty:dft) (Morrill, LeeAnn) (Entered: 02/20/2014) |
| 02/20/2014 | 127 | | |

| | | | |
|---|---|---|---|
| | | | MINUTE ENTRY for Final Pretrial Conference held before Chief Judge Marcia S. Krieger on 2/20/2014. 124 Motion for Leave to Restrict is WITHDRAWN. Other matters addressed, including deadlines, if any, are set forth in the Minutes. Court Reporter: Terri Lindblom. (pglov) (Entered: 02/20/2014) |
| 02/26/2014 | 128 | | NOTICE of Entry of Appearance by David Robert Frankel on behalf of Board of County Commissioners for Mesa County ColoradoAttorney David Robert Frankel added to party Board of County Commissioners for Mesa County Colorado(pty:ip) (Frankel, David) (Entered: 02/26/2014) |
| 02/28/2014 | 129 | | Witness List *Amended Joint Witness List* by Plaintiffs 2nd Amendment Gunsmith &Shooter Supply, LLC, David Bayne, Jim Beicker, Rick Besecker, Ronald Bruce, Burrud Arms Inc., David Campbell, James (Jim) Casias, Miles Clark, Colorado Farm Bureau, Colorado Outfitters Association, Colorado State Shooting Association, Colorado Youth Outdoors, John B. Cooke, John B. Cooke, James Crone, Douglas N. Darr, Chad Day, Rick Dunlap, David Encinias, Mike Ensminger, James Faull, Rod Fenske, Scott Fischer, Forrest Frazee, Peter Gonzalez, Goods for the Woods, Grand Prix Guns, Green Mountain Guns, Hamilton Family Enterprises, Inc., Dylan Harrell, Bruce W. Hartman, Shayne Heap, Stan Hilkey, Fred Hosselkus, Tim Jantz, Jerry's Outdoor Sports, Fred Jobe, Chris S. Johnson, Rodney Johnson, Donald Krueger, Larry Kuntz, Sue Kurtz, Magpul Industries, Terry Maketa, Jerry Martin, Dominic Mattivi, Jr, Fred D. McKee, Amos Medina, Ted B. Mink, John Minor, National Shooting Sports Foundation, Tom Nestor, Bruce Newman, Mike Norris, Brian E. Norton, Outdoor Buddies, Inc., Randy Peck, Brett L. Powell, Ken Putnam, Tom Ridnour, Grayson Robinson, Rocky Mountain Shooters Supply, Duke Schirard, Justin Smith, Specialty Sports &Supply, Dennis Spruell, Dave Stong, David Strumillo, USA Liberty Arms, Charles "Rob" Urbach, Lou Vallario, David A. Weaver, Fred Wegener, Garrett Wiggins, Women for Concealed Carry, Si Woodruff. (Krumholz, Peter) (Entered: 02/28/2014) |
| 03/03/2014 | 130 | | First MOTION to Withdraw as Attorney by Defendant Mesa County, Board of County Commissioners. (Attachments: # 1 Proposed Order (PDF Only))(Frankel, David) (Entered: 03/03/2014) |
| 03/03/2014 | 131 | | MEMORANDUM regarding 130 First MOTION to Withdraw as Attorney filed by Mesa County, Board of County Commissioners. Motions referred to Magistrate Judge Michael J. Watanabe by Chief Judge Marcia S. Krieger on 3/3/14. Text Only Entry (msksec, ) (Entered: 03/03/2014) |
| 03/03/2014 | 132 | | MINUTE ORDER granting 130 Motion to Withdraw as Attorney. Attorney Maurice L. Dechant terminated. By Magistrate Judge Michael J. Watanabe on 3/3/2014. Text Only Entry(mjwcd) (Entered: 03/03/2014) |
| 03/07/2014 | 133 | | MOTION to Dismiss *Count I and Certain Plaintiffs for Lack of Standing* by Defendant John W. Hickenlooper. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D, # 5 Exhibit E, # 6 Exhibit F, # 7 Exhibit G, # 8 Exhibit H)(Grove, Matthew) (Entered: 03/07/2014) |
| 03/14/2014 | 134 | | RESPONSE to 133 MOTION to Dismiss *Count I and Certain Plaintiffs for Lack of Standing* filed by Plaintiffs David Bayne, Colorado Farm Bureau, Colorado Outfitters Association, Dylan Harrell, Outdoor Buddies, Inc., |

| | | | |
|---|---|---|---|
| | | | Women for Concealed Carry. (Westfall, Richard) (Entered: 03/14/2014) |
| 03/14/2014 | 135 | | TRIAL BRIEF by Defendant John W. Hickenlooper. (Grove, Matthew) (Entered: 03/14/2014) |
| 03/14/2014 | 136 | | TRIAL BRIEF by Plaintiffs John B. Cooke, Douglas N. Darr, James Faull, Peter Gonzalez, Stan Hilkey, Fred Jobe, Donald Krueger, Larry Kuntz, Sue Kurtz, Ken Putnam, Dave Stong, David Strumillo. (Kopel, David) (Entered: 03/14/2014) |
| 03/19/2014 | 137 | | MOTION in Limine *or, in the Alternative, Forthwith Motion for Bifurcation and Continuance With Respect to Plaintiffs' Fifth Claim for Relief* by Defendant John W. Hickenlooper. (Grove, Matthew) (Entered: 03/19/2014) |
| 03/21/2014 | 138 | | RESPONSE to 137 MOTION in Limine *or, in the Alternative, Forthwith Motion for Bifurcation and Continuance With Respect to Plaintiffs' Fifth Claim for Relief* filed by Plaintiffs David Bayne, Colorado Farm Bureau, Colorado Outfitters Association, Dylan Harrell, Outdoor Buddies, Inc., Women for Concealed Carry. (Westfall, Richard) (Entered: 03/21/2014) |
| 03/21/2014 | 139 | | REPLY to Response to 137 MOTION in Limine *or, in the Alternative, Forthwith Motion for Bifurcation and Continuance With Respect to Plaintiffs' Fifth Claim for Relief* filed by Defendant John W. Hickenlooper. (Grove, Matthew) (Entered: 03/21/2014) |
| 03/21/2014 | 140 | | ORDER on 137 Motion in Limine, the Plaintiffs' Response, and the Defendant's Reply. Having considered the parties' joint final pretrial order, and the Plaintiffs' trial brief, specifically footnote 5 and pages 18–20, the Court finds that the trial brief asserts a new contention that C.R.S.§ 18–12–112 is unconstitutional. The new contention pertains to Colorado citizens aged 18–20 years old, and the interplay of §18–12–112 with applicable federal law. Such contention was not disclosed in any of the five versions of the Plaintiffs' complaint, nor was it disclosed in the final pretrial order found at Docket #119, which was approved by this Court. Whether such contention is construed as a claim or theory, it exceeds the scope of the arguments and evidence to be tried beginning March 31, 2014. In the exercise of the Court's discretion, see Hullman v. Bd. of Trustees, 950 F.2d 665, 668 (10th Cir. 1999), the Court GRANTS the Defendant's Motion in Limine and excludes all evidence pertinent thereto. By Chief Judge Marcia S. Krieger on 3/21/2014. Text Only Entry(msklc3, ) (Entered: 03/21/2014) |
| 03/25/2014 | 141 | | Joint MOTION for Order to *Use or Display Firearms Magazines at Trial* by Defendant John W. Hickenlooper. (Spalding, Kathleen) (Entered: 03/25/2014) |
| 03/26/2014 | 142 | | ORDER granting 141 Joint Motion Concerning the Use or Display of Firearms Magazines at Trial. Failure to follow the issued protocol will result in the denial of any firearm and/or magazine being permitted into the courthouse for purposes of use at trial. by Chief Judge Marcia S. Krieger on 3/26/14.(msksec, ) (Entered: 03/26/2014) |
| 03/31/2014 | 143 | | MINUTE ENTRY for Bench Trial Day One held before Chief Judge Marcia S. Krieger on 3/31/2014. Oral motion for sequestration of non–party lay witnesses for remainder of trial is GRANTED. Opening statements. Witness testimony, exhbits received/refused and other matters addressed are set forth |

34

| | | | |
|---|---|---|---|
| | | | in the Minutes. Trial continues. Court Reporter: Terri Lindblom. (pglov) (Entered: 03/31/2014) |
| 04/01/2014 | 144 | | WITHDRAWN – MOTION in Limine *to Exclude Evidence Related to Three Plaintiffs at Trial* by Defendant John W. Hickenlooper. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D, # 5 Exhibit E, # 6 Exhibit F)(Morrill, LeeAnn) Modified on 4/8/2014 to withdraw pursuant to Minute Entry dated 4/7/2014 (klyon, ). (Entered: 04/01/2014) |
| 04/01/2014 | 145 | | MINUTE ENTRY for Bench Trial Day Two held before Chief Judge Marcia S. Krieger on 4/1/2014. Witness testimony, exhibits received/refused and other matters addressed are set forth in the Minutes. Trial continues. Court Reporter: Terri Lindblom. (rkeec) Modified on 4/3/2014 to reflect date of 4/1/2014(rkeec). (Entered: 04/03/2014) |
| 04/01/2014 | 146 | | MINUTE ENTRY for proceedings held before Chief Judge Marcia S. Krieger: Amended re 145 Bench Trial – Held. Amended to reflect correct Magistrate Judge in case caption. Court Reporter: Terri Lindblom. (rkeec) (Entered: 04/03/2014) |
| 04/02/2014 | 147 | | MINUTE ENTRY for Bench Trial Day Three held before Chief Judge Marcia S. Krieger on 4/2/2014. Witness testimony, exhibits received/refused and other matters addressed are set forth in the Minutes. Court Reporter: Terri Lindblom. (rkeec) (Entered: 04/03/2014) |
| 04/03/2014 | 151 | | MINUTE ENTRY for Bench Trial Day Four held before Chief Judge Marcia S. Krieger held on 4/3/2014. Defendant's oral Rule 52 motion as to Plaintiffs' claim under the Americans With Disabilities Act is DEFERRED UNTIL THE CLOSE OF THE PRESENTATION OF THE EVIDENCE. Witness testimony, exhibits received/refused and other matters addressed are set forth in the Minutes. Trial continues. Court Reporter: Terri Lindblom. (rkeec) (Entered: 04/07/2014) |
| 04/04/2014 | 152 | | MINUTE ENTRY for Bench Trial Day Five held before Chief Judge Marcia S. Krieger held on 4/4/2014. Witness testimony, exhibits received/refused and other matters addressed are set forth in the Minutes. Trial continues. Court Reporter: Terri Lindblom. (rkeec) (Entered: 04/07/2014) |
| 04/06/2014 | 148 | | WITHDRAWN – MOTION in Limine *to Exclude Certain Trial Exibits* by Plaintiffs David Bayne, Dylan Harrell, Outdoor Buddies, Inc., Women for Concealed Carry. (Westfall, Richard) Modified on 4/10/2014 to withdraw pursuant to Minute Entry dated 4/9/2014 (klyon, ). (Entered: 04/06/2014) |
| 04/06/2014 | 149 | | SUPPLEMENT/AMENDMENT to 148 MOTION in Limine *to Exclude Certain Trial Exibits* by Plaintiffs David Bayne, Colorado Farm Bureau, Colorado Outfitters Association, Dylan Harrell, Outdoor Buddies, Inc., Women for Concealed Carry. (Westfall, Richard) (Entered: 04/06/2014) |
| 04/07/2014 | 150 | | MOTION in Limine *to Exclude Untimely Disclosed Expert Opinion Testimony* by Plaintiffs David Bayne, Colorado Farm Bureau, Colorado Outfitters Association, Dylan Harrell, Outdoor Buddies, Inc., Women for Concealed Carry. (Westfall, Richard) (Entered: 04/07/2014) |
| 04/07/2014 | 153 | | MINUTE ENTRY for Bench Trial Day Six held before Chief Judge Marcia S. Krieger on 4/7/2014. Witness testimony, exhibits |

| | | |
|---|---|---|
| | | received/refused/withdrawn or ruling reserved and other matters addressed are set forth in the Minutes. Oral motion in limine is DENIED as set forth in the record. 123 Motion for Order and 144 Motion in Limine are both WITHDRAWN. Trial continues. Court Reporter: Terri Lindblom. (pglov) (Entered: 04/08/2014) |
| 04/08/2014 | 154 | MINUTE ENTRY for Bench Trial Day 7 held before Chief Judge Marcia S. Krieger on 4/8/2014. Witness testimony, exhibits received/refused/withdrawn and other matters addressed are set forth in the Minutes. Trial continues. Court Reporter: Teri Lindblom. (pglov) (Entered: 04/09/2014) |
| 04/09/2014 | 155 | MINUTE ENTRY for Bench Trial Day 8 held before Chief Judge Marcia S. Krieger on 4/9/2014. Witness testimony, exhibits received/refused/withdrawn and other matters addressed are set forth in the Minutes. 148 Motion in Limine is WITHDRAWN; 150 Motion in Limine is DENIED. Trial continues. Court Reporter: Terri Lindblom. (pglov) (Entered: 04/10/2014) |
| 04/10/2014 | 156 | MINUTE ENTRY for Bench Trial Day 9 held before Chief Judge Marcia S. Krieger completed on 4/10/2014. Evidence concluded, closing and rebuttal arguments. The Court takes the matter under advisement. Bench Trial completed. Court Reporter: Terri Lindblom. (pglov) (Entered: 04/11/2014) |
| 05/06/2014 | 157 | Unopposed MOTION to Dismiss Party *Stan Hilkey* by Plaintiff Stan Hilkey. (Kopel, David) (Entered: 05/06/2014) |
| 05/08/2014 | 158 | ORDER granting 157 Motion to Dismiss Party. Party Stan Hilkey terminated. by Chief Judge Marcia S. Krieger on 5/8/14. Text Only Entry(msksec, ) (Entered: 05/08/2014) |
| 06/26/2014 | 159 | Findings of Fact, Conclusions of Law, and Order by Chief Judge Marcia S. Krieger on 6/26/14: 133 Motion to Dismiss is denied, 118 Joint Motion to Strike Expert Opinions Per FRE 702 is granted in part and denied in part, and Colorado Revised Statutes § 18–12–112 and § 18–12–302 are compliant with the provisions of the Second and Fourteenth Amendments to the United States Constitution. (dkals, ) (Entered: 06/26/2014) |
| 06/26/2014 | 160 | JUDGMENT in favor of Defendant John W. Hickenlooper and against all Plaintiffs with costs, pursuant to 159 Findings of Fact, Conclusions of Law, and Order, by Chief Judge Marcia S. Krieger on 6/26/14. (dkals, ) (Entered: 06/26/2014) |
| 06/27/2014 | 161 | Unopposed MOTION for Extension of Time to *Extend Fed.R.Civ.P. 54 Filing Deadline* by Defendant John W. Hickenlooper. (Attachments: # 1 Proposed Order (PDF Only))(Spalding, Kathleen) (Entered: 06/27/2014) |
| 06/30/2014 | 162 | ORDER granting 161 Unopposed Motion for Extension of Time. Extension granted up to and including July 24, 2014. by Chief Judge Marcia S. Krieger on 6/30/14. Text Only Entry(msksec, ) (Entered: 06/30/2014) |
| 07/24/2014 | 163 | Proposed Bill of Costs by Defendant John W. Hickenlooper. (Attachments: # 1 Exhibit A, # 2 Appendix 1, # 3 Appendix 2, # 4 Appendix 3, # 5 Appendix 4)(Spalding, Kathleen) (Entered: 07/24/2014) |
| 07/28/2014 | 164 | |

| | | |
|---|---|---|
| | | NOTICE OF APPEAL as to 159 Order on Motion to Strike,, Order on Motion to Dismiss, 160 Judgment by Plaintiffs David Bayne, Colorado Farm Bureau, Colorado Outfitters Association, Dylan Harrell, Outdoor Buddies, Inc., Women for Concealed Carry (Filing fee $ 505, Receipt Number 1082–3976471) (Westfall, Richard) (Entered: 07/28/2014) |
| 07/28/2014 | 165 | NOTICE OF APPEAL as to 127 Order on Motion for Leave to Restrict,, Pretrial Conference – Final, 96 Order on Motion to Dismiss,,, 159 Order on Motion to Strike,, Order on Motion to Dismiss, 107 Order on Motion to Amend/Correct/Modify,, 160 Judgment, 115 Order on Motion for Joinder,,, Order on Motion for Leave,,, Order on Motion for Leave to Restrict,,, Motion Hearing,,, Set/Reset Deadlines/Hearings,, by Plaintiffs Jim Beicker, Rick Besecker, Ronald Bruce, David Campbell, James (Jim) Casias, Miles Clark, John B. Cooke, John B. Cooke, James Crone, Douglas N. Darr, Chad Day, Rick Dunlap, David Encinias, Mike Ensminger, James Faull, Rod Fenske, Scott Fischer, Forrest Frazee, Peter Gonzalez, Bruce W. Hartman, Shayne Heap, Fred Hosselkus, Tim Jantz, Fred Jobe, Chris S. Johnson, Rodney Johnson, Donald Krueger, Larry Kuntz, Sue Kurtz, Terry Maketa, Jerry Martin, Dominic Mattivi, Jr, Fred D. McKee, Amos Medina, Ted B. Mink, John Minor, Tom Nestor, Bruce Newman, Mike Norris, Brian E. Norton, Randy Peck, Brett L. Powell, Ken Putnam, Tom Ridnour, Grayson Robinson, Duke Schirard, Justin Smith, Dennis Spruell, Dave Stong, David Strumillo, Charles "Rob" Urbach, Lou Vallario, David A. Weaver, Fred Wegener, Garrett Wiggins, Si Woodruff (Filing fee $ 505, Receipt Number 1082–3975866) (Kopel, David) (Entered: 07/28/2014) |
| 07/28/2014 | 166 | Amended NOTICE OF APPEAL as to 96 Opinon and Order, 159 Order on Motion to Strike,, Order on Motion to Dismiss, 160 Judgment by Plaintiffs David Bayne, Colorado Farm Bureau, Colorado Outfitters Association, Dylan Harrell, Outdoor Buddies, Inc., Women for Concealed Carry (Westfall, Richard) Modified on 7/29/2014 to add text (dkals, ). (Entered: 07/28/2014) |
| 07/29/2014 | 167 | LETTER Transmitting Notice of Appeal to all counsel advising of the transmittal of the 164 Notice of Appeal, 166 Amended Notice of Appeal filed by Dylan Harrell, Colorado Outfitters Association, David Bayne, Colorado Farm Bureau, Women for Concealed Carry, Outdoor Buddies, Inc. to the U.S. Court of Appeals. ( Retained Counsel, Fee paid,) (Attachments: # 1 Docket Sheet, # 2 Preliminary Record)(dkals, ) (Entered: 07/29/2014) |
| 07/29/2014 | 168 | LETTER Transmitting Notice of Appeal to all counsel advising of the transmittal of the 165 Notice of Appeal filed by David Campbell, John Minor, Dave Stong, Charles "Rob" Urbach, Rod Fenske, Bruce Newman, Ted B. Mink, Garrett Wiggins, Ronald Bruce, Dominic Mattivi, Jr., Fred Jobe, David Strumillo, Ken Putnam, Tim Jantz, Chad Day, Tom Ridnour, David Encinias, Si Woodruff, Jerry Martin, John B. Cooke, Larry Kuntz, Mike Norris, Brian E. Norton, Rick Dunlap, James (Jim) Casias, Bruce W. Hartman, Rick Besecker, Miles Clark, James Crone, Randy Peck, Chris S. Johnson, Sue Kurtz, Amos Medina, Mike Ensminger, Duke Schirard, Lou Vallario, Forrest Frazee, Fred D. McKee, Peter Gonzalez, Donald Krueger, Scott Fischer, Grayson Robinson, Dennis Spruell, Fred Wegener, Justin Smith, James Faull, Terry Maketa, Douglas N. Darr, Fred Hosselkus, Jim Beicker, David A. Weaver, Tom Nestor, Brett L. Powell, Shayne Heap, |

| | | | |
|---|---|---|---|
| | | | Rodney Johnson to the U.S. Court of Appeals. ( Retained Counsel, Fee paid,) (Attachments: #_1 Docket Sheet, #_2 Preliminary Record)(dkals, ) (Entered: 07/29/2014) |
| 07/29/2014 | 169 | | USCA Case Number 14–1290 for 164 Notice of Appeal, filed by Dylan Harrell, Colorado Outfitters Association, David Bayne, Colorado Farm Bureau, Women for Concealed Carry, Outdoor Buddies, Inc.. (dbrow, ) (Entered: 07/29/2014) |
| 07/29/2014 | 170 | | USCA Case Number 14–1292 for 165 Notice of Appeal,,,,, filed by David Campbell, John Minor, Dave Stong, Charles "Rob" Urbach, Rod Fenske, Bruce Newman, Ted B. Mink, Garrett Wiggins, Ronald Bruce, Dominic Mattivi, Jr., Fred Jobe, David Strumillo, Ken Putnam, Tim Jantz, Chad Day, Tom Ridnour, David Encinias, Si Woodruff, Jerry Martin, John B. Cooke, Larry Kuntz, Mike Norris, Brian E. Norton, Rick Dunlap, James (Jim) Casias, Bruce W. Hartman, Rick Besecker, Miles Clark, James Crone, Randy Peck, Chris S. Johnson, Sue Kurtz, Amos Medina, Mike Ensminger, Duke Schirard, Lou Vallario, Forrest Frazee, Fred D. McKee, Peter Gonzalez, Donald Krueger, Scott Fischer, Grayson Robinson, Dennis Spruell, Fred Wegener, Justin Smith, James Faull, Terry Maketa, Douglas N. Darr, Fred Hosselkus, Jim Beicker, David A. Weaver, Tom Nestor, Brett L. Powell, Shayne Heap, Rodney Johnson. (dbrow, ) (Entered: 07/29/2014) |
| 08/08/2014 | 171 | | TRANSCRIPT ORDER FORM re 165 Notice of Appeal,,,,, 164 Notice of Appeal, by Plaintiffs David Bayne, Colorado Farm Bureau, Colorado Outfitters Association, Colorado Youth Outdoors, Dylan Harrell, Outdoor Buddies, Inc., Women for Concealed Carry (Krumholz, Peter) (Entered: 08/08/2014) |
| 08/19/2014 | 172 | | REPORTER TRANSCRIPT ORDER FORM filed by Terri Lindblom re: 165 Notice of Appeal, 166 Amended Notice of Appeal, 164 Notice of Appeal. Transcript due by 9/30/2014. (nrich) (Entered: 08/19/2014) |
| 09/02/2014 | 173 | | NOTICE *of Compliance with D.C. COLO. LCivR 54.1 Regarding Bill of Costs* by Defendant John W. Hickenlooper (Spalding, Kathleen) (Entered: 09/02/2014) |
| 09/04/2014 | 174 | | RESPONSE to 173 Notice (Other) *Certificate* by Plaintiffs Ted B. Mink, John Minor, National Shooting Sports Foundation, Tom Nestor, Bruce Newman, Mike Norris, Brian E. Norton, Outdoor Buddies, Inc., Randy Peck, Brett L. Powell, Ken Putnam, Tom Ridnour, Grayson Robinson, Rocky Mountain Shooters Supply, Duke Schirard, Justin Smith, Specialty Sports &Supply, Dennis Spruell, Dave Stong, David Strumillo, USA Liberty Arms, Charles "Rob" Urbach, Lou Vallario, David A. Weaver, Fred Wegener, Garrett Wiggins, Women for Concealed Carry, Si Woodruff. (Attachments: #_1 Exhibit)(Colin, Marc) (Entered: 09/04/2014) |
| 09/04/2014 | 175 | | Costs Taxed in amount of $ 37287.51 against Plaintiffs (dkals, ) (Entered: 09/04/2014) |
| 10/06/2014 | 176 | | TRANSCRIPT of Motion for Preliminary Injunction held on 7/10/13 before Chief Judge Krieger. Pages: 1–20. <br> **NOTICE – REDACTION OF TRANSCRIPTS: Within seven calendar days of this filing, each party shall inform the Court, by filing a Notice of Intent to Redact, of the party's intent to redact personal identifiers from the electronic** |

| | | |
|---|---|---|
| | | transcript of the court proceeding. If a Notice of Intent to Redact is not filed within the allotted time, this transcript will be made electronically available after 90 days. Please see the Notice of Electronic Availability of Transcripts document at www.cod.uscourts.gov.<br> Transcript may only be viewed at the court public terminal or purchased through the Court Reporter/Transcriber prior to the 90 day deadline for electronic posting on PACER. Release of Transcript Restriction set for 1/8/2015. (tlind, ) (Entered: 10/06/2014) |
| 10/06/2014 | 177 | TRANSCRIPT of Law and Motion Hearing held on 12/19/13 before Chief Judge Krieger. Pages: 1–35. <br> NOTICE – REDACTION OF TRANSCRIPTS: Within seven calendar days of this filing, each party shall inform the Court, by filing a Notice of Intent to Redact, of the party's intent to redact personal identifiers from the electronic transcript of the court proceeding. If a Notice of Intent to Redact is not filed within the allotted time, this transcript will be made electronically available after 90 days. Please see the Notice of Electronic Availability of Transcripts document at www.cod.uscourts.gov.<br> Transcript may only be viewed at the court public terminal or purchased through the Court Reporter/Transcriber prior to the 90 day deadline for electronic posting on PACER. Release of Transcript Restriction set for 1/8/2015. (tlind, ) (Entered: 10/06/2014) |
| 10/06/2014 | 178 | TRANSCRIPT of Final Pretrial Conference held on 2/20/14 before Chief Judge Krieger. Pages: 1–21. <br> NOTICE – REDACTION OF TRANSCRIPTS: Within seven calendar days of this filing, each party shall inform the Court, by filing a Notice of Intent to Redact, of the party's intent to redact personal identifiers from the electronic transcript of the court proceeding. If a Notice of Intent to Redact is not filed within the allotted time, this transcript will be made electronically available after 90 days. Please see the Notice of Electronic Availability of Transcripts document at www.cod.uscourts.gov.<br> Transcript may only be viewed at the court public terminal or purchased through the Court Reporter/Transcriber prior to the 90 day deadline for electronic posting on PACER. Release of Transcript Restriction set for 1/8/2015. (tlind, ) (Entered: 10/06/2014) |
| 10/06/2014 | 179 | TRANSCRIPT of Trial to Court – Day 1 held on 3/31/14 before Chief Judge Krieger. Pages: 1–239. <br> NOTICE – REDACTION OF TRANSCRIPTS: Within seven calendar days of this filing, each party shall inform the Court, by filing a Notice of Intent to Redact, of the party's intent to redact personal identifiers from the electronic transcript of the court proceeding. If a Notice of Intent to Redact is not filed within the allotted time, this transcript will be made electronically available after 90 days. Please see the Notice of Electronic Availability of Transcripts document at www.cod.uscourts.gov.<br> Transcript may only be viewed at the court public terminal or purchased through the Court Reporter/Transcriber prior to the 90 day deadline for electronic posting on PACER. Release of Transcript Restriction set for 1/8/2015. (tlind, ) (Entered: 10/06/2014) |
| 10/06/2014 | 180 | TRANSCRIPT of Trial to Court – Day 2 held on 4/01/14 before Chief Judge Krieger. Pages: 240–476. <br> NOTICE – REDACTION OF |

|  |  |  |  |
|---|---|---|---|
|  |  |  | **TRANSCRIPTS: Within seven calendar days of this filing, each party shall inform the Court, by filing a Notice of Intent to Redact, of the party's intent to redact personal identifiers from the electronic transcript of the court proceeding. If a Notice of Intent to Redact is not filed within the allotted time, this transcript will be made electronically available after 90 days. Please see the Notice of Electronic Availability of Transcripts document at www.cod.uscourts.gov.<br>** Transcript may only be viewed at the court public terminal or purchased through the Court Reporter/Transcriber prior to the 90 day deadline for electronic posting on PACER. Release of Transcript Restriction set for 1/8/2015. (tlind, ) (Entered: 10/06/2014) |
| 10/06/2014 | 181 |  | TRANSCRIPT of Trial to Court – Day 3 held on 4/2/14 before Chief Judge Krieger. Pages: 477–676. <br> **NOTICE – REDACTION OF TRANSCRIPTS: Within seven calendar days of this filing, each party shall inform the Court, by filing a Notice of Intent to Redact, of the party's intent to redact personal identifiers from the electronic transcript of the court proceeding. If a Notice of Intent to Redact is not filed within the allotted time, this transcript will be made electronically available after 90 days. Please see the Notice of Electronic Availability of Transcripts document at www.cod.uscourts.gov.<br>** Transcript may only be viewed at the court public terminal or purchased through the Court Reporter/Transcriber prior to the 90 day deadline for electronic posting on PACER. Release of Transcript Restriction set for 1/8/2015. (tlind, ) (Entered: 10/06/2014) |
| 10/06/2014 | 182 |  | TRANSCRIPT of Trial to Court – Day 4 held on 4/3/14 before Chief Judge Krieger. Pages: 677–928. <br> **NOTICE – REDACTION OF TRANSCRIPTS: Within seven calendar days of this filing, each party shall inform the Court, by filing a Notice of Intent to Redact, of the party's intent to redact personal identifiers from the electronic transcript of the court proceeding. If a Notice of Intent to Redact is not filed within the allotted time, this transcript will be made electronically available after 90 days. Please see the Notice of Electronic Availability of Transcripts document at www.cod.uscourts.gov.<br>** Transcript may only be viewed at the court public terminal or purchased through the Court Reporter/Transcriber prior to the 90 day deadline for electronic posting on PACER. Release of Transcript Restriction set for 1/8/2015. (tlind, ) (Entered: 10/06/2014) |
| 10/06/2014 | 183 |  | TRANSCRIPT of Trial to Court – Day 5 held on 4/4/14 before Chief Judge Krieger. Pages: 929–1157. <br> **NOTICE – REDACTION OF TRANSCRIPTS: Within seven calendar days of this filing, each party shall inform the Court, by filing a Notice of Intent to Redact, of the party's intent to redact personal identifiers from the electronic transcript of the court proceeding. If a Notice of Intent to Redact is not filed within the allotted time, this transcript will be made electronically available after 90 days. Please see the Notice of Electronic Availability of Transcripts document at www.cod.uscourts.gov.<br>** Transcript may only be viewed at the court public terminal or purchased through the Court Reporter/Transcriber prior to the 90 day deadline for electronic posting on PACER. Release of Transcript Restriction set for 1/8/2015. (tlind, ) (Entered: 10/06/2014) |

| 10/06/2014 | 184 | TRANSCRIPT of Trial to Court – Day 6 held on 4/7/14 before Chief Judge Krieger. Pages: 1158–1379. <br> **NOTICE – REDACTION OF TRANSCRIPTS: Within seven calendar days of this filing, each party shall inform the Court, by filing a Notice of Intent to Redact, of the party's intent to redact personal identifiers from the electronic transcript of the court proceeding. If a Notice of Intent to Redact is not filed within the allotted time, this transcript will be made electronically available after 90 days. Please see the Notice of Electronic Availability of Transcripts document at www.cod.uscourts.gov.<br>** Transcript may only be viewed at the court public terminal or purchased through the Court Reporter/Transcriber prior to the 90 day deadline for electronic posting on PACER. Release of Transcript Restriction set for 1/8/2015. (tlind, ) (Entered: 10/06/2014) |
| 10/06/2014 | 185 | TRANSCRIPT of Trial to Court – Day 7 held on 4/8/14 before Chief Judge Krieger. Pages: 1380–1597. <br> **NOTICE – REDACTION OF TRANSCRIPTS: Within seven calendar days of this filing, each party shall inform the Court, by filing a Notice of Intent to Redact, of the party's intent to redact personal identifiers from the electronic transcript of the court proceeding. If a Notice of Intent to Redact is not filed within the allotted time, this transcript will be made electronically available after 90 days. Please see the Notice of Electronic Availability of Transcripts document at www.cod.uscourts.gov.<br>** Transcript may only be viewed at the court public terminal or purchased through the Court Reporter/Transcriber prior to the 90 day deadline for electronic posting on PACER. Release of Transcript Restriction set for 1/8/2015. (tlind, ) (Entered: 10/06/2014) |
| 10/06/2014 | 186 | TRANSCRIPT of Trial to Court – Day 8 held on 4/9/14 before Chief Judge Krieger. Pages: 1598–1825. <br> **NOTICE – REDACTION OF TRANSCRIPTS: Within seven calendar days of this filing, each party shall inform the Court, by filing a Notice of Intent to Redact, of the party's intent to redact personal identifiers from the electronic transcript of the court proceeding. If a Notice of Intent to Redact is not filed within the allotted time, this transcript will be made electronically available after 90 days. Please see the Notice of Electronic Availability of Transcripts document at www.cod.uscourts.gov.<br>** Transcript may only be viewed at the court public terminal or purchased through the Court Reporter/Transcriber prior to the 90 day deadline for electronic posting on PACER. Release of Transcript Restriction set for 1/8/2015. (tlind, ) (Entered: 10/06/2014) |
| 10/07/2014 | 187 | TRANSCRIPT of Trial to Court – Day 9 held on 4/10/14 before Chief Judge Krieger. Pages: 1826–1987. <br> **NOTICE – REDACTION OF TRANSCRIPTS: Within seven calendar days of this filing, each party shall inform the Court, by filing a Notice of Intent to Redact, of the party's intent to redact personal identifiers from the electronic transcript of the court proceeding. If a Notice of Intent to Redact is not filed within the allotted time, this transcript will be made electronically available after 90 days. Please see the Notice of Electronic Availability of Transcripts document at www.cod.uscourts.gov.<br>** Transcript may only be viewed at the court public terminal or purchased through the Court Reporter/Transcriber prior to the 90 day deadline for electronic posting on |

41

| | | | PACER. Release of Transcript Restriction set for 1/8/2015. (tlind, ) (Entered: 10/07/2014) |
| 10/07/2014 | 188 | | LETTER TO USCA and all counsel certifying the record is complete as to 166 Amended Notice of Appeal, filed by Dylan Harrell, Colorado Outfitters Association, David Bayne, Colorado Farm Bureau, Women for Concealed Carry, Outdoor Buddies, Inc. All transcripts ordered are now on file as of 10/7/2014. ( Appeal No. 14–1290) Text Only Entry (dkals, ) (Entered: 10/07/2014) |

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. _____

54 SHERIFFS:
    JOHN B. COOKE, Sheriff of Weld County, Colorado;
    TERRY MAKETA, Sheriff of El Paso County, Colorado;
    JUSTIN SMITH, Sheriff of Larimer County, Colorado;
    DAVID A. WEAVER, Sheriff of Douglas County, Colorado;
    BRUCE W. HARTMAN, Sheriff of Gilpin County, Colorado;
    KEN PUTNAM, Sheriff of Cheyenne County, Colorado;
    DENNIS SPRUELL, Sheriff of Montezuma County, Colorado;
    TIM JANTZ, Sheriff of Moffat County, Colorado;
    JERRY MARTIN, Sheriff of Dolores County, Colorado;
    MIKE ENSMINGER, Sheriff of Teller County, Colorado;
    SHAYNE HEAP, Sheriff of Elbert County, Colorado;
    CHAD DAY, Sheriff of Yuma County, Colorado;
    FRED D. MCKEE, Sheriff of Delta County, Colorado;
    LOU VALLARIO, Sheriff of Garfield County, Colorado;
    FRED HOSSELKUS, Sheriff of Mineral County, Colorado;
    BRETT L. POWELL, Sheriff of Logan County, Colorado;
    JAMES FAULL, Sheriff of Prowers County, Colorado;
    LARRY KUNTZ, Sheriff of Washington County, Colorado;
    BRIAN E. NORTON, Sheriff of Rio Grande County, Colorado;
    DUKE SCHIRARD, Sheriff of La Plata County, Colorado;
    JIM BEICKER, Sheriff of Fremont County, Colorado;
    RONALD BRUCE, Sheriff of Hinsdale County, Colorado;
    CHRIS S. JOHNSON, Sheriff of Otero County, Colorado;
    FRED JOBE, Sheriff of Custer County, Colorado;
    DONALD KRUEGER, Sheriff of Clear Creek County, Colorado;
    JAMES CRONE, Sheriff of Morgan County, Colorado;
    SI WOODRUFF, Sheriff of Rio Blanco County, Colorado;
    TOM RIDNOUR, Sheriff of Kit Carson County, Colorado;
    TOM NESTOR, Sheriff of Lincoln County, Colorado;
    STAN HILKEY, Sheriff of Mesa County, Colorado;
    FORREST FRAZEE, Sheriff of Kiowa County, Colorado;
    RICK DUNLAP, Sheriff of Montrose County, Colorado;
    TED B. MINK, Sheriff of Jefferson County, Colorado;
    DAVE STONG, Sheriff of Alamosa County, Colorado;
    FRED WEGENER, Sheriff of Park County, Colorado;
    BRUCE NEWMAN, Sheriff of Huerfano County, Colorado;
    RANDY PECK, Sheriff of Sedgwick County, Colorado;

DOMINIC MATTIVI, JR., Sheriff of Ouray County, Colorado;
JOHN MINOR, Sheriff of Summit County, Colorado;
SCOTT FISCHER, Sheriff of Jackson County, Colorado;
PETER GONZALEZ, Sheriff of Archuleta County, Colorado;
RICK BESECKER, Sheriff of Gunnison County, Colorado;
CHARLES "ROB" URBACH , Sheriff of Phillips County, Colorado;
ROD FENSKE, Sheriff of Lake County, Colorado;
GRAYSON ROBINSON, Sheriff of Arapahoe County, Colorado;
DAVID D. CAMPBELL, Sheriff of Baca County, Colorado;
MIKE NORRIS, Sheriff of Saguache County, Colorado;
AMOS MEDINA, Sheriff of Costilla County, Colorado;
MILES CLARK, Sheriff of Crowley County, Colorado;
DAVID ENCINIAS, Sheriff of Bent County, Colorado;
SUE KURTZ, Sheriff of San Juan County, Colorado;
JAMES (JIM) CASIAS, Sheriff of Las Animas County, Colorado;
GARRETT WIGGINS, Sheriff of Routt County, Colorado;
DOUGLAS N. DARR , Sheriff of Adams County, Colorado;
COLORADO OUTFITTERS ASSOCIATION;
COLORADO FARM BUREAU;
NATIONAL SHOOTING SPORTS FOUNDATION;
MAGPUL INDUSTRIES;
USA LIBERTY ARMS;
OUTDOOR BUDDIES, INC.;
WOMEN FOR CONCEALED CARRY;
COLORADO STATE SHOOTING ASSOCIATION;
HAMILTON FAMILY ENTERPRISES, INC., d/b/a FAMILY SHOOTING CENTER
AT CHERRY CREEK STATE PARK;
DAVID STRUMILLO;
DAVID BAYNE;
DYLAN HARRELL;
ROCKY MOUNTAIN SHOOTERS SUPPLY;
2ND AMENDMENT GUNSMITH & SHOOTER SUPPLY, LLC;
BURRUD ARMS INC. D/B/A JENSEN ARMS;
GREEN MOUNTAIN GUNS;
JERRY'S OUTDOOR SPORTS;
GRAND PRIX GUNS;
SPECIALTY SPORTS & SUPPLY;
GOODS FOR THE WOODS;

Plaintiffs,

vs.

JOHN W. HICKENLOOPER, Governor of the State of Colorado,

Defendant.

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

Peace officers and peaceable citizens join together to bring this action in defense of public safety, the Second and Fourteenth Amendments of the Constitution of the United States, and the Americans with Disabilities Act. Plaintiffs are 54 Colorado elected sheriffs, retired law enforcement officers, disabled individuals, civil rights and disability rights organizations, licensed firearms dealers, associations of law-abiding gun owners, hunting outfitters, and the firearms industry, and a manufacturer of firearm accessories.

### I.   OVERVIEW

1.   On March 20, 2013, Colorado Governor John Hickenlooper signed two measures that severely restrict citizens' rights to own, use, manufacture, sell, or transfer firearms and firearms accessories.

### HB 1224

2.   House Bill 13-1224 ("HB 1224") bans outright all ammunition magazines sold or acquired after July 1, 2013 that hold more than 15 rounds of ammunition. HB 1224 also bans most other magazines of any size because it prohibits smaller magazines that are "designed to be readily converted" to hold more than 15 rounds of ammunition.

3.     The magazines for most handguns and for many rifles are detachable box magazines. The very large majority of magazines contain a removable floor plate. The removable floor plate allows the user to clear ammunition jams, clean the inside of the magazine, and perform maintenance on the internal mechanics of the magazine.

4.     The fact that a magazine floor plate can be removed inherently creates the possibility that the magazine can be extended through commercially available extension products or readily fabricated extensions. As a result, nearly every magazine can be readily converted to exceed the capacity limit set by HB 1224.

5.     Some rifles have fixed box magazines, which are permanently attached to the rifle. Many of these also have removable floor plates.

6.     Instead of a box magazine, some rifles have fixed tube magazines, which lie underneath the rifle barrel. Many tube magazines have removable end caps for cleaning to which extenders can be added. A ban on certain types of fixed magazines is necessarily a ban on the rifles to which they are fixed.

7.     The Appendix to this Complaint contains diagrams showing the parts of a detachable box magazine and a fixed tube magazine.

8.     Magazine capacity can be increased in many other ways, such as snipping the spring inside the magazine so that there is more space to accommodate additional rounds, using a coupler so that a second box magazine is attached (upside down) to the bottom of another, or simply using duct tape instead of a coupler.

9.      The chief sponsor of HB 1224 and Governor Hickenlooper have both publicly confirmed that HB 1224 bans all magazines with removable floor plates.

10.     By outlawing most box and tube magazines, HB 1224 outlaws an essential component of many common firearms. Eighty-two percent of handguns and at least one-third of rifles currently manufactured in the United States are semi-automatic, which means that most of them store their ammunition in detachable box magazines. Rifles which use box or tube magazines are not limited to semi-automatics, but also include pump action, bolt action, and lever action rifles. (HB 1224 exempts lever action guns which use tube magazines, but not lever action guns which use box magazines; the bill also exempts rimfire rifles which use tube magazines, but does not exempt such rifles that use box magazines.)

11.     Thus, the magazine ban amounts to a ban on having a functional, operating unit for most handguns and a very large fraction of rifles – a patent violation of the Second and Fourteenth Amendments under *District of Columbia v. Heller*, 554 U.S. 570 (2008) and *McDonald v. Chicago*, 130 S. Ct. 3020 (2010).

12.     As detailed *infra*, HB 1224 allows the possession of grandfathered magazines only if two separate requirements are satisfied: First, they must be owned on July 1, 2013. Second, the owner must maintain "continuous possession" of the magazine.

13.     The requirement for "continuous possession" makes it impossible for firearms to be used or shared in ordinary and innocent ways, such as a gun owner loaning his or her firearm with the magazine to a spouse, family member, or friend;

entrusting it to a gunsmith for repair; a military reservist leaving firearms and their associated magazines with a spouse when he or she is called into service away from home; or even temporarily handing a firearm with its magazine to a firearms safety instructor so that the owner can be shown by the instructor how to better grip, aim, or otherwise use the firearm.

14.    The requirement of "continuous possession" prohibits the grandfathered owner from ever allowing anyone to hold or use his firearm if the firearm is in a functional state (with a magazine inserted) – an extreme infringement of Second Amendment rights.

15.    In *Heller*, the Supreme Court adopted a rule enforcing the Second Amendment that prohibited the banning of arms "typically possessed by law-abiding citizens for lawful purposes." The ban against all magazines holding more than 15 rounds violates this rule. Rifles with magazines larger than 15 rounds are so commonplace that many models are supplied in a *standard* 30-round configuration. Indeed, one such rifle is the AR-15 and its many variants, which has for years been one of the best-selling types of firearms in the United States and of which there are at least four million in the United States today. The number of other models of Modern Sporting Rifles is likewise in the millions, which are also often sold with magazines holding more than 15 rounds.

16.    Similarly, many popular handguns are sold with magazines with 16 to 20-round capacities. Many gun owners own several magazines for each firearm. The

number of magazines in the United States which are of the size directly outlawed by HB 1224 is in the tens of millions.

17.     Disabled citizens, whose disabilities often make it difficult to change magazines quickly, are acutely harmed by HB 1224. This is a particularly grave violation of their Second Amendment rights, especially their right to self-defense in the home.

18.     HB 1224 also violates Title II of the Americans with Disabilities Act ("ADA"). Even assuming that HB 1224 is constitutional, all persons with relevant disabilities are entitled to an accommodation under the ADA so that they may possess and acquire the magazine in the sizes they need.

19.     The effect of HB 1224's various provisions is the widespread ban on functional firearms. The prohibition of so many box and tube magazines of any size, and the prohibition of magazines greater than 15 rounds, directly and gravely harm the ability of law-abiding citizens to use firearms for lawful purposes, especially self-defense.

## HB 1229

20.     House Bill 13-1229 ("HB 1229") requires "universal" background checks before any sale or transfer of a firearm can occur, with some exceptions. HB 1229, even considering the exceptions, prohibits a wide range of common, temporary, or permanent transfers or loans of firearms between law-abiding citizens in violation of the Second Amendment.

21.     As a practical matter, it will be impossible for citizens to comply with HB 1229. The bill requires that when one individual sells or loans a firearm to another, that "transfer" must be conducted through a Federal Firearms Licensee ("FFL," a licensed gun dealer). The FFL is required to process the transfer as if he or she is selling a firearm out of his or her own inventory. HB 1229 allows the FFL to charge a fee of no more than $10 for conducting the transfer.

22.     Many FFLs in Colorado, including FFL Plaintiffs, are unwilling to conduct the transfer under such conditions. Accordingly, it will be extremely difficult, if not impossible, for many Coloradans to find a FFL to conduct the transfers, even if the buyer and seller are both willing and able to drive long distances to do so.

23.     To conduct the transfer pursuant to HB 1229, the FFL must complete the same paperwork as if he or she were selling from his or her own inventory. This means that for each firearm transferred, a three-page federal form (ATF Form 4473) must be filled out. Some parts of the form are filled out by the customer, and some by the FFL. FFLs are liable for errors on a Form 4473 and subject to license revocation and even federal felony charges.

24.     FFLs must monitor the transferor and transferee for as long as it takes to complete the transaction. The "instant check" which is conducted by the Colorado Bureau of Investigation often takes hours, and sometimes days, to complete.

25.     Currently, when FFLs are asked to conduct a background check for a firearm, not involving a profitable sale from the FFL's actual inventory, the fee

charged may be $50. A fee cap of $10 will likely result in very few, if any, FFLs being willing to perform the services which are necessary for transfers under HB 1229, making compliance with HB 1229 next to impossible in many private transfer situations.

26.     Moreover, setting aside the myriad problems with compliance with HB 1229, the scope of HB 1229's regulation, which impacts a vast array of innocent and lawful temporary transfers among friends and members of various hunting and shooting organizations, unconstitutionally infringes the Second Amendment rights of tens of thousands of Coloradans.

### The Supreme Court's Landmark Decisions: *Heller* and *McDonald*

27.     There are certain indisputable legal principles announced by the United States Supreme Court against which HB 1224 and HB 1229 must be judged.

28.     Under *Heller*, the Second Amendment to the United States Constitution guarantees the right of individual citizens to keep and bear commonly-used firearms for all lawful purposes.

29.     The individual right to employ commonly-used firearms for self-defense is "the central component" of the Second Amendment guarantee.

30.     An individual's Second Amendment rights, including the right to self-defense, are fundamental rights.

31.     Under *McDonald*, the rights protected by the Second Amendment apply equally to the states, including Colorado, through the Fourteenth Amendment to the United States Constitution.

32.     HB 1224 and HB 1229 violate these principles.

## II.     JURISDICTION AND VENUE

33.     This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1331 because the claims arise under the Constitution and statutes of the United States.

34.     This Court has jurisdiction to grant the declaratory relief sought pursuant to 18 U.S.C. § 2201, and additional relief pursuant to 18 U.S.C. § 2202.

35.     This Court also has jurisdiction under 28 U.S.C. § 1343(a)(3) and 42 U.S.C. § 1983 because this action involves a deprivation of federal constitutional rights by those acting under color of state law.

36.     Venue is proper in this district pursuant to 28 U.S.C. § 1391.

## III.     PARTIES

A.     **Plaintiffs**

1.     **The Sheriffs of 54 Colorado Counties**

37.     Each of the following Sheriffs of 54 Colorado counties ("the Sheriffs") has the primary obligation to obey the Constitution of the United States of America. The Sheriffs bring this case pursuant to this primary obligation, which is supreme over any other purported enactment.

38.     John B. Cooke is the Sheriff of Weld County, Colorado.

39.     Terry Maketa is the Sheriff of El Paso County, Colorado.

40.     Justin Smith is the Sheriff of Larimer County, Colorado.

41.     David A. Weaver is the Sheriff of Douglas County, Colorado.

42.     Bruce W. Hartman is the Sheriff of Gilpin County, Colorado.

43.     Ken Putnam is the Sheriff of Cheyenne County, Colorado.

44.     Dennis Spruell is the Sheriff of Montezuma County, Colorado.

45.     Tim Jantz is the Sheriff of Moffat County, Colorado.

46.     Jerry Martin is the Sheriff of Dolores County, Colorado.

47.     Mike Ensminger is the Sheriff of Teller County, Colorado.

48.     Shayne Heap is the Sheriff of Elbert County, Colorado.

49.     Chad Day is the Sheriff of Yuma County, Colorado.

50.     Fred D. McKee is the Sheriff of Delta County, Colorado.

51.     Lou Vallario is the Sheriff of Garfield County, Colorado.

52.     Fred Hosselkus is the Sheriff of Mineral County, Colorado.

53.     Brett L. Powell is the Sheriff of Logan County, Colorado.

54.     James Faull is the Sheriff of Prowers County, Colorado.

55.     Larry Kuntz is the Sheriff of Washington County, Colorado.

56.     Brian E. Norton is the Sheriff of Rio Grande County, Colorado.

57.     Duke Schirard is the Sheriff of La Plata County, Colorado.

58.     Jim Beicker is the Sheriff of Fremont County, Colorado.

59.     Ronald Bruce is the Sheriff of Hinsdale County, Colorado.

60.     Chris S. Johnson is the Sheriff of Otero County, Colorado.

61.     Fred Jobe is the Sheriff of Custer County, Colorado.

62.     Donald Krueger is the Sheriff of Clear Creek County, Colorado.

63.     James Crone is the Sheriff of Morgan County, Colorado.

64.     Si Woodruff is the Sheriff of Rio Blanco County, Colorado.

65.     Tom Ridnour is the Sheriff of Kit Carson County, Colorado.

66.     Tom Nestor is the Sheriff of Lincoln County, Colorado.

67.     Stan Hilkey is the Sheriff of Mesa County, Colorado.

68.     Forrest Frazee is the Sheriff of Kiowa County, Colorado.

69.     Rick Dunlap is the Sheriff of Montrose County, Colorado.

70.     Ted B. Mink is the Sheriff of Jefferson County, Colorado.

71.     Dave Stong is the Sheriff of Alamosa County, Colorado.

72.     Fred Wegener is the Sheriff of Park County, Colorado.

73.     Bruce Newman is the Sheriff of Huerfano County, Colorado.

74.     Randy Peck is the Sheriff of Sedgwick County, Colorado.

75.     Dominic Mattivi, Jr., is the Sheriff of Ouray County, Colorado.

76.     John Minor is the Sheriff of Summit County, Colorado.

77.     Scott Fischer is the Sheriff of Jackson County, Colorado.

78.     Peter Gonzalez is the Sheriff of Archuleta County, Colorado.

79.     Rick Besecker is the Sheriff of Gunnison County, Colorado.

80.     Charles "Rob" Urbach is the Sheriff of Phillips County, Colorado.

81.     Rod Fenske is the Sheriff of Lake County, Colorado.

82.     Grayson Robinson is the Sheriff of Arapahoe County, Colorado.

83.     David D. Campbell is the Sheriff of Baca County, Colorado.

84.     Mike Norris is the Sheriff of Saguache County, Colorado.

85.     Amos Medina is the Sheriff of Costilla County, Colorado.

86.     Miles Clark is the Sheriff of Crowley County, Colorado.

87.     David Encinias is the Sheriff of Bent County, Colorado.

88.     Sue Kurtz is the Sheriff of San Juan County, Colorado.

89.     James (Jim) Casias is the Sheriff of Las Animas County, Colorado.

90.     Garrett Wiggins is the Sheriff of Routt County, Colorado.

91.     Douglas N. Darr is the Sheriff of Adams County, Colorado.

92.     HB 1224 and 1229 violate the Constitution of the United States. The Sheriffs cannot enforce a statute that violates the fundamental constitutional rights of the citizens of Colorado.

93.     For reasons detailed *supra* and *infra*, HB 1224 and 1229 are utterly unenforceable, even if the Sheriffs wished to violate the U.S. Constitution.

94.     After HB 1229 becomes effective, every citizen of Colorado can legally possess a "large capacity" magazine that holds more than 15 rounds so long as they owned it prior to the effective date and maintain "continuous possession" of it after the effective date. This includes both magazines that hold more than 15 rounds, and smaller magazines with removable floor plates or end caps. At least hundreds of thousands of Colorado citizens, including the individual Plaintiffs and members of Plaintiff associations, will lawfully own hundreds of thousands (or more) of such magazines.

95.     The Sheriffs have limited resources and limited public funds to spend on investigations. They cannot expend those resources to conduct investigations that would be necessary to monitor compliance with the new magazine restrictions. No documentation has ever been required for the retail or private purchase of

magazines, making it a practical impossibility for the Sheriffs to determine whether one of the many magazines already in existence was obtained after the effective date.

96. It would be similarly impossible to determine whether a magazine was in the "continuous possession" of its owner after July 1, 2013.

97. With very few exceptions, magazines manufactured in other states are not required to bear date stamps, making it impossible to determine their date of manufacture. The Sheriffs will have no means to determine whether a magazine possessed by an individual in Colorado was manufactured before or after July 1, 2013, with the exception of those manufactured in Colorado after July 1, 2013 that are required by the bill to bear a date stamp.

98. The foregoing presumes that it is clear what the bill prohibits. But the Sheriffs' enforcement obstacles become insurmountable if they must also resolve ambiguities in the bill. If the bill does not prohibit every magazine with a removable floor plate and end cap, but only those that were intentionally "designed" for the purpose of expanding capacity, the Sheriffs are given no tools to make that determination. They cannot know the intent of the designer.

99. Likewise, each Sheriff will have to determine what constitutes "continuous possession," since the statute provides no guidance. They will have to make individual decisions whether continuous possession allows for temporary loans to others and, if so, for what duration.

14

100.    In addition to the core infringement on a fundamental right inherent in any enforcement of these provisions, the result of the many ambiguities will be varying individual decisions and inconsistent enforcement across jurisdictions. Effective law enforcement depends on close and supportive relations between the public and law enforcement. Unconstitutional, vague laws which are inconsistently enforced poison that relationship, and make it significantly more difficult for the Sheriffs to receive the witness cooperation, tips, and other forms of public support which are necessary to effective law enforcement in a free society.

101.    Sheriffs have the common law power to request the armed assistance of able-bodied adults in their County. This is known as the "posse comitatus." One well-known use of the posse in Colorado was in June 1977, when Pitkin County citizens with their own guns responded to a request to help with the search for escaped mass murderer Theodore Bundy.

102.    Sheriffs also have the authority to appoint deputies who are not certified peace officers. The "non-certified" deputies may be appointed for a limited period of time, or for specific tasks. C.R.S. §§ 16-2.5-103(2); 30-10-506. Particularly in rural parts of Colorado, Sheriffs utilize the authority to deputize individuals to augment law enforcement efforts in times of disturbances and natural disasters.

103.    When those Sheriffs deputize, they do not have a cache of firearms to issue. Moreover, a person who is deputized in an emergency will be safer and more effective using his or her personal firearm, with which he or she is already familiar.

104.    HB 1224 seriously impedes the ability of Sheriffs to call upon armed citizen assistance during emergencies and natural disasters because it prevents citizens from having the types of magazines which the Sheriffs and their ordinary deputies have determined to be most effective for the preservation of public safety.

### 2.    Colorado Farm Bureau

105.    Colorado Farm Bureau is a Colorado nonprofit corporation. It was founded in 1919 by a group of Colorado farmers, ranchers, veterinarians, rural doctors, shopkeepers and tradesmen. The Farm Bureau's mission includes enhancing Colorado's agricultural industry; promoting, protecting, and representing the interests of farmers, ranchers, and their communities; and protecting individual freedom and opportunity.

106.    Colorado Farm Bureau's membership now comprises 23,000 Coloradans, including Colorado farmers, ranchers, and other Colorado families and residents who have an interest in maintaining a strong agricultural industry in this State and in promoting and advancing the interests of Colorado farmers and ranchers.

107.    Section (1)(b) of HB 1229 requires that if a transferee of a firearm is not a natural person, "then each natural person who is authorized by the transferee to possess the firearm after the transfer shall undergo a background check . . . before taking possession of the firearm."

108.    The vast majority of Colorado farms, including family farms, operate as incorporated businesses. Thus, when most Colorado farmers acquire firearms in

connection with their farming or ranching operations, they do not acquire them as "natural persons."

109.    Colorado farmers and ranchers often operate their businesses in rural and remote areas of the State. Firearms are a necessity for farming and ranching for protecting crops and livestock, as well as for self-defense.

110.    HB 1229 places substantial burdens on the Second Amendment rights of Colorado farmers and ranchers because:

a.    it will often be very difficult to identify each and every natural person associated with the farm or ranch who may possess the firearm;

b.    it will be very difficult to find FFLs able and willing to perform the necessary checks in many, if not most, of the rural areas in which farms and ranches are located;

c.    even when FFLs are available, able, and willing to perform the necessary checks, paying a fee for each check for each natural person who may possess a firearm places a significant financial burden on the farm or ranch acquiring the firearm.

111.    Setting aside problems with initial acquisitions of firearms, HB 1229 places an enormous burden on farmers and ranchers to police firearm possession as time passes. If farms or ranches do not routinely "audit" new farm and ranch hands, they face significant criminal exposure (and being prohibited from owning any firearm for at least two years) if a new hand obtains possession without a check

being performed first, as well as joint and several civil liability if an accident or misuse involving the firearm occurs.

### 3.  Firearms Industry Trade Association.

112.    The National Shooting Sports Foundation ("NSSF") is a national trade association for the firearms, ammunition, and hunting and shooting sports industry based in Newtown, Connecticut.

113.    As a non-profit, tax-exempt corporation, NSSF has a membership of over 9,500 federally licensed firearms manufacturers, distributors and retailers; companies manufacturing, distributing and selling shooting and hunting related goods and services; sportsmen's organizations; public and private shooting ranges; gun clubs; publishers and individuals.  More than 300 of these members reside and conduct business in Colorado.

114.    The NSSF's members in Colorado  provide lawful commerce in firearms to law-abiding Coloradans.  Each of these members' business interests and livelihoods will be adversely and unconstitutionally affected by HB 1224 and HB 1229.

### 4.  Retired Law Enforcement Officers

115.    David Strumillo resides in Colorado Springs, Colorado, and is a citizen of the United States. Mr. Strumillo served as a police officer in the Parker, Colorado Police Department from 1994 through 1999, when he was medically retired following an injury in the line of duty.

116.     Mr. Strumillo is authorized to carry a concealed firearm in all states and U.S. territories pursuant to the Law Enforcement Officers Safety Act, 18 U.S.C. § 926B, 926C. In order to comply with federal law, Mr. Strumillo is required to re-qualify each year using the firearms he carries.

117.     Mr. Strumillo also carries firearms for his personal safety to respond to threats made against himself and his family. The firearms Mr. Strumillo carries use magazines larger than 15 rounds. The members of the Plaintiff Associations also include retired law enforcement officers.

### 5.   Disabled Citizens

118.     David Bayne is a resident of Thornton, Colorado, and a citizen of the United States. Mr. Bayne is paralyzed from the chest down and confined to a wheelchair. He holds a concealed carry permit issued by the Adams County Sheriff's Office, which is valid in the State of Colorado. He owns several firearms, several of which accept magazines capable of holding more than 15 rounds. Mr. Bayne uses these firearms for target shooting, shooting competitions, and the defense of his home.

119.     Dylan Harrell is a resident of Frederick, Colorado, and a citizen of the United States. Mr. Harrell is paralyzed from the chest down and confined to a wheelchair. He holds a concealed carry permit issued by the Adams County Sheriff's Office, which is valid in the State of Colorado. He owns several firearms which will accept magazines capable of holding more than 15 rounds. He uses these firearms for hunting, target shooting, and defense of his home.

120.     Messrs. Bayne and Harrell ("the Disabled Plaintiffs") are deprived of their fundamental right of self-defense in multiple ways.

121.     First, because firearms that use magazines larger than 15 rounds and those with removable floor plates or end caps are in common use, their Second Amendment right to self-defense pursuant to *Heller* is violated regardless of any disability because they may be unable to purchase replacement magazines of any size, and particularly of the standard 30-round size, which are essential to a disabled person.

122.     Second, disabilities make it difficult to quickly change magazines under the stress of a home invasion. For example, Plaintiff Dylan Harrell is wheelchair bound and has two small children in his home. The wheelchair limits Mr. Harrell's mobility and  severely restricts his ability to quickly place himself in the best position to repel a home invasion, as well as his ability to place himself behind barriers or use objects in his home as a means to steady his firearm. Thus, he is even more dependent on immediate firearms defense than able-bodied people, who might be able to flee the house or buy time by running to another room. The limits on Mr. Harrell's ability to quickly re-position himself also severely limit his ability to retreat quickly and effectively in order to allow him the time necessary to change magazines. Eliminating his ability to use magazines with a capacity larger than 15 rounds has a corresponding impact on his ability to exercise his constitutional right to defend himself, his home, and his children.

123.     Like Mr. Harrell, Plaintiff David Bayne is confined to a wheelchair and faces the same challenges. Mr. Bayne has limited ability to retreat or re-position himself effectively or safely during a home invasion in order to most effectively aim and discharge his firearm, or to safely change magazines.

124.     If the ban on smaller magazines that can be readily converted is not a total prohibition, but applies only after a determination of the intent of the designer, the Disabled Plaintiffs have no ability to resolve that ambiguity and cannot discern what magazines are allowed and what magazines may subject them to criminal penalties.

### 6.     Licensed Firearms Dealers

125.     USA Liberty Arms is a Colorado corporation with its principal place of business in Fort Collins, Colorado.

126.     Rocky Mountain Shooters Supply is a Colorado corporation with its principal place of business in Fort Collins, Colorado.

127.     2nd Amendment Gunsmith & Shooter Supply, LLC ("2nd Amendment"), is a Colorado corporation with its principal place of business in Loveland, Colorado. 2nd Amendment has expended significant resources on inventory in firearms and magazines that will be rendered illegal on July 1, 2013. 2nd Amendment will suffer significant losses in its overall sales if it cannot sell firearms or magazines over 15 rounds or with removable floor plates or end caps if HB 1224 becomes effective.

128.     Burrud Arms Inc. d/b/a Jensen Arms is a Colorado corporation with its principal place of business in Loveland, Colorado. Jensen Arms is a retail firearms dealer in business since 1994 that serves customers throughout much of Colorado. To serve its customers, Jensen Arms has invested millions of dollars in magazines and firearms inventory that utilizes magazines that will be prohibited under HB 1224. Customers have already expressed confusion about what magazines will be legal, and Jensen Arms will suffer significant losses in sales.

129.     Green Mountain Guns is a Colorado corporation with its principal place of business in Lakewood, Colorado. Green Mountain Guns has been in business for 35 years, and will lose approximately $2 million in sales after HB 1224 becomes effective because the majority of firearms and magazines that it sells will be rendered illegal on July 1, 2013, including many smaller magazines that have removable floor plates or end caps.

130.     Smith & Wesson has already informed Green Mountain Guns that it will no longer ship merchandise to Green Mountain Guns because of the uncertainty caused by HB 1224 and confusion about what firearms and firearm accessories will be illegal after HB 1224 goes into effect.

131.     Jerry's Outdoor Sports is a Colorado corporation with its principal place of business in Grand Junction, Colorado. Jerry's Outdoor Sports has been in business for 28 years, and will lose the majority of its sales if HB 1224 becomes effective because the majority of firearms and magazines that it sells will be

rendered illegal on July 1, 2013, including many smaller magazines that have removable floor plates or end caps.

132. Grand Prix Guns is a Colorado corporation with its principal place of business in Littleton, Colorado. Grand Prix Guns anticipates that it may suffer as much as an 80% loss in revenue if HB 1224 renders the majority of the firearms and magazines it sells illegal.

133. Specialty Sports & Supply is a Colorado corporation with its principal place of business in Colorado Springs, Colorado. Specialty Sports & Supply anticipates that it will lose more than $1 million annually in firearms sales. The store currently has 4,000 to 5,000 magazines in stock which it will not be able to sell after July 1, 2013, and it will be unable to order and sell additional supplies.

134. Goods for the Woods is a Colorado corporation with its principal place of business in Durango, Colorado. Goods for the Woods has a current inventory of firearms and magazines that will be rendered illegal as of July 1, 2013, and it will also be unable to sell existing and future orders, significantly reducing revenue.

135. The Plaintiff firearms dealers have invested significant money in existing inventories of firearms with standard magazines larger than 15 rounds and in magazines of all sizes with removable floor plates and end caps. That investment will be lost without compensation if that inventory cannot be sold. In some cases, the continued existence of the business may be threatened.

136. The licensed dealers face the same conundrum as all Plaintiffs if they are forced to guess at the unknown intent of designers of smaller magazines, and

are subject to the whims of local law enforcement as they try to enforce an ambiguous statute.

137.   In addition, in light of the fee caps described in Paragraph 21 above, each of the Licensed Firearms Dealers will be unwilling or financially unable to provide the services necessary for transfers under HB 1229, making compliance with HB 1229 impossible in many private transfer situations.

### 7.   Shooting Association and Shooting Ranges and Clubs

138.   The Colorado State Shooting Association ("CSSA") is the oldest statewide shooting and firearms organization in Colorado, established in 1926.

139.   CSSA has nearly 1,500 individual dues-paying members, and over 20 business and club members that collectively add more than 20,000 associated members. These members include hunters, competitive shooters, recreational shooters, firearms instructors, active and retired law enforcement officers, crime prevention advocates, firearms and equipment dealers and wholesalers, and people interested in preserving Second Amendment rights. The membership includes many who have physical disabilities.

140.   Many CSSA members own and use firearms with a capacity exceeding 15 rounds, and many of the CSSA sanctioned events require the use of such firearms. Many CSSA members also own magazines (and associated firearms) with removable floor plates or end caps.

141.   The CSSA provides shooting opportunities for law-abiding Colorado residents by uniting shooters, hunters, sportsmen and collectors, as well as all other

types of law-abiding firearms enthusiasts, to promote the safe and responsible use of firearms.

142.     CSSA promotes the development of shooting sports and related facilities and speaks on behalf of its membership to defend shooting sports, hunting rights, and firearms ownership.

143.     CSSA also promotes and organizes firearms safety programs and hunter safety education, supports the training of NRA-certified firearms instructors, and organizes and supports state regional competitive matches.

144.     CSSA is the official NRA-delegated sanctioning body for all state and regional competitive firearms matches in Colorado, and CSSA membership is required for Colorado shooters to participate in any such matches. CSSA is also the official state association for the Civilian Marksmanship Program, a congressionally-created program that fosters firearms marksmanship through competitive matches and clinics.

145.     The members of the Colorado State Shooting Association engage in every form of lawful activity with firearms and magazines, including each and every activity mentioned in this Complaint.

146.     Hamilton Family Enterprises, Inc. d/b/a Family Shooting Center at Cherry Creek State Park ("FSC") is a Colorado corporation that is designated as the Cherry Creek State Park concessionaire for operating recreational shooting facilities located at the Cherry Creek State Park in Arapahoe County, Colorado.

147.     FSC is a multi-discipline shooting facility covering approximately 120 acres of Cherry Creek State Park and includes a rifle range, a pistol range, a law-enforcement range, a sporting clays and five-stand range, a trap range using both electric and hand launching stations, a shotgun patterning board, and an archery range.  FSC is currently adding a "move-and-shoot" pistol range which will double the number of pistol shooting positions available to the public.

148.     FSC is the largest public outdoor shooting facility on the Front Range in Colorado.  The usage of these facilities has increased each year since FSC began concession operations in 2004, and over 64,000 shooters used the facilities at FSC in 2012.

149.     In addition to the operation, supervision and maintenance of the shooting facilities at Cherry Creek State Park, FSC also makes available for use by qualified members of the public firearms that are equipped with standard magazines having capacities of more than 15 rounds or are equipped with smaller magazines that are readily convertible to more than 15 rounds.

150.     Moreover, FSC sells firearms equipment and accessories, which include magazines with capacities exceeding 15 rounds or are otherwise readily-covertible to more than 15 rounds.

151.     Approximately fifty percent of FSC's gross revenue currently derives from the sale of firearms equipment, accessories, and ammunition.

152.     FSC's patrons have already expressed concerns over the impact that HB 1224 and HB 1229 will have on their ability to legally utilize FSC's facilities or

purchase goods and equipment from FSC, and many have signified their intent that they will not return to FSC after July 1, 2013 for fear of running afoul of the new laws. Thus, both proposed laws have already adversely impacted FSC's business and income and will continue to do so in the future.

153.    Approximately six percent of all of FSC's revenue, not including Colorado sales taxes, are remitted to the State and Colorado's state park system. The significant and inevitable decline in revenue that will result from the implementation of HB 1224 and HB 1229 will significantly impact the already handicapped budget of Colorado's state park system.

### 8.    Firearms Accessories Manufacturer

154.    Plaintiff Magpul Industries is a Colorado corporation founded in 1999 with its principal place of business in Erie, Colorado. Magpul manufactures and sells a wide variety of firearms accessories, including firearm magazines in a variety of sizes.

155.    Magpul has approximately 200 employees in Colorado, and approximately 90% of its magazine suppliers are located in Colorado. Magpul will be unable to distribute magazines with capacities more than 15 rounds to its network of Colorado retailers and faces uncertainly as to whether it can continue to distribute any magazines to Colorado retailers based on the vague provisions of HB 1224.

156.    Magpul manufactures magazines in 10, 20, and 30 round sizes for sale to the public. Magpul has existing commitments to sell magazines through its

distribution network to retailers in Colorado. Magpul may have to modify those commitments for magazines larger than 15 rounds, and lose the value of those sales.

157.     For magazines smaller than 15 rounds, Magpul faces the same uncertainty as all of the Plaintiffs in determining which, if any, magazines with a removable floor plate can be sold. If all smaller magazines with removable floor plates are banned by HB 1224, then Magpul effectively cannot sell any magazines in Colorado.

158.     If the prohibition of smaller magazines is resolved only by law enforcement's interpretation of each designer's intent, Magpul cannot predict how each of the Colorado law enforcement jurisdictions will resolve the ambiguity in the statute, and faces the uncertain prospect of criminal prosecution in jurisdictions that interpret the statute as a complete ban on magazines with a removable floor plate.

### 9.     Nonprofit Representing Disabled Outdoor Enthusiasts

159.     Outdoor Buddies, Inc. ("Outdoor Buddies"), which was founded in 1984, is an all-volunteer non-profit organization based in Colorado. Its mission is to provide opportunities to enjoy the outdoors to those who have been deprived of it, regardless of race, creed, religion, or sex, and with no fees to the participant. Outdoor experiences provided through Outdoor Buddies include hunting, target shooting, fishing, boating, camping, and education in the use of the outdoors for recreational activities.

160.    There are approximately 760 individual members of Outdoor Buddies. Approximately two-thirds of the membership is composed of mobility-disabled members of the community who need special assistance to experience the outdoors. Approximately one-third of the membership is composed of able-bodied members of the community who serve as volunteers. The membership includes many wounded warriors and other disabled veterans from World War II through the most recent military conflicts in Iraq and Afghanistan.

161.    The Disabled Plaintiffs, David Bayne and Dylan Harrell, are members of Outdoor Buddies.

**10.    Nonprofit Representing Colorado's Outfitters**

162.    The Colorado Outfitters Association is an organization dedicated to improving the Colorado outfitting industry's standards and the quality of services provided by professional outfitters in Colorado. The Association represents approximately 790 professional hunting, fishing, and camping outfitters and guides based in Colorado. Colorado's outfitters are registered, bonded, and insured to operate in Colorado and have permits to operate on public lands. The Association represents Colorado's outfitters in a wide range of policy areas affecting Colorado outfitters and their clients.

163.    The chilling effect of the potential legal perils for non-resident hunters caused by HB 1224 and 1229 has led many non-resident hunters to shun Colorado, which will cost the outfitters, local businesses which cater to hunters (e.g., restaurants and stores), the State, and various local taxing jurisdictions tens of

millions of dollars in the next few years. Moreover, HB 1229's requirements for background checks for transfers could significantly impact the ability of outfitters and their clients to share weapons in the field given the narrowness of HB 1229's exceptions and the unavailability of FFL's to perform the necessary background checks.

### 11.   Nonprofit Representing Women's Right to Self-Defense

164.   Women for Concealed Carry is a 26 U.S.C. § 501(c)(4) nonprofit organization registered in the State of Colorado. Women for Concealed Carry supports women's rights to effective self-defense against physical harm by protecting women's rights to carry concealed firearms, and the organization conducts outreach and education to support policies that defend that right. Members of the organization use and carry magazines which would be banned under HB 1224.

### B.   Defendant

165.   Defendant John Hickenlooper is the Governor of the State of Colorado, and is required to ensure that all laws of the state are faithfully executed. COLO. CONST. art. IV § 2. As Colorado's Chief Executive, Governor Hickenlooper is the proper defendant to actions to enjoin or invalidate a state statute. *Developmental Pathways v. Ritter,* 178 P.3d 524, 529 (Colo. 2008).

## IV.   ADDITIONAL SUPPORT FOR ALLEGATIONS

### A.   The Restrictions on Firearms Use in the Bills Is Greater Than That Already Determined to Violate the Second Amendment

166.   The effects of these bills on commonly-used firearms are far more overreaching than laws in other locations that have already been determined to be unconstitutional. In *District of Columbia v. Heller,* the Supreme Court addressed a prohibition on the possession of handguns in the District of Columbia.

167.   Significantly for this case, the *Heller* Court concluded that the "inherent right of self-defense has been central to the Second Amendment right." 554 U.S. at 628.

168.   The individual right to keep and bear arms and to use those arms for self-defense extends to all firearms that are "in common use at the time." *Id.* at 627. The Court emphasized that the Second Amendment does protect firearms which are "typically possessed by law-abiding citizens for lawful purposes." Firearms which do not meet this standard may be banned if they are "dangerous and unusual weapons." The paradigmatic examples of the latter category are sawed-off shotguns and machine guns. *Id.* at 625, 627.

169.   The Court noted that like all constitutional rights, the Second Amendment is not absolute in every respect. The Court described three particular types of gun controls as "presumptively constitutional": First, the long-standing prohibitions against possession of firearms by felons and the mentally ill. Second, laws forbidding the carrying of firearms in "sensitive places such as schools and

government buildings." Third, "laws imposing conditions and qualifications on the *commercial* sale of firearms." *Id.* at 626-27 (emphasis added).

170.    HB 1224 and 1229 do not fit within any of the "presumptively constitutional" gun control categories described by the *Heller* Court. The bills do not amend Colorado's long-standing laws forbidding gun possession by various categories of persons who have proven themselves to be dangerous. They do not affect the carrying of guns in "sensitive places." They do not set "conditions or qualifications" on the "commercial sale" of arms. HB 1229 applies only to non-commercial transfers, and to short term-transfers which do not involve any type of sale.

171.    In *McDonald v. Chicago*, the Supreme Court addressed a ban similar to that in *Heller* that was in place in Chicago and the suburb of Oak Park. The *McDonald* Court held that the Second Amendment right enunciated in *Heller* applies with equal force to the States through the Fourteenth Amendment.

172.    The *McDonald* Court reiterated that the right to self-defense is "deeply rooted in this nation's history and tradition," and that the "ratifiers of the Fourteenth Amendment counted the right to keep and bear arms among those fundamental rights necessary to our system of ordered liberty." 130 S. Ct. at 3036, 3042. The *McDonald* Court reiterated the holding in *Heller* that "the Second Amendment protects a personal right to keep and bear arms for lawful purposes, most notably for self-defense within the home," and held that "the Fourteenth

Amendment incorporates the Second Amendment right recognized in *Heller*." *Id.* at 3044, 3050.

173.    By outlawing the larger and smaller magazines which are necessary components of the large majority of handguns and of a very large number of  rifles, HB 1224 is a gun ban even more sweeping than the handgun-only ban which was ruled unconstitutional in *Heller*.

174.    The *Heller* Court pointed out that the D.C. handgun ban was "a prohibition of an entire class of 'arms' that is overwhelmingly chosen by American society for that lawful purpose" of self-defense. 554 U.S. at 628. The prohibition was so facially unconstitutional that the *Heller* Court found it unnecessary to use the traditional three-tiered system of scrutiny. Responding to Justice Breyer's attempt to apply a balancing test to the D.C. ban, the *Heller* Court stated that the handgun ban failed "any of the standards of scrutiny the Court has applied to enumerated constitutional rights." 554 U.S. at 571. Thus, the handgun ban would have failed both strict scrutiny and intermediate scrutiny, and the result was so obvious that the *Heller* Court did not need to discuss the prongs of the two tests.

175.    The HB 1224 ban on most handguns and many rifles (accomplished by banning the large majority of magazines) is thus even more obviously unconstitutional.

176.    Magazines of 16-20 rounds for handguns, and 16-30 rounds for rifles, easily satisfy the "common use" and "typically possessed" standards in *Heller*. Under *Heller*, their prohibition is thus *per se* unconstitutional. The Constitution is

clear, and the balancing has already been done by the enactment of the Second and Fourteenth Amendments themselves. Firearms and accessories which are typically owned by law-abiding citizens for lawful purposes may not be prohibited.

177.   Even if it were proper to apply strict or intermediate scrutiny (which it is not), the fact that a handgun ban cannot even pass intermediate scrutiny resolves the instant case. Handguns are used in the majority of homicides in the United States, and in over two hundred thousand violent crimes annually. The number of crimes (including multiple victim homicides) in which handguns are used dwarfs the number of such crimes involving magazines that hold more than 15 rounds. Because a handgun ban cannot survive intermediate scrutiny, the HB 1224 magazine ban cannot survive strict scrutiny.

178.   The banned magazines and associated firearms are also lawful in Colorado for hunting. While many states specify no magazine limitations for hunting, Colorado is among the group that has some limitations. These are as follows: Rifles or handguns of any type for small game, no limit; centerfire semi-automatic rifles for big game, six rounds; centerfire rifles of other types (e.g., bolt action, pump action, lever action) for big game, no limit; handguns for big game, no limit; shotguns for migratory bird hunting, three rounds – otherwise, no limit.

179.   Regardless of limits while in the field, hunters at their hunting camp in isolated areas, or who are driving to or from a hunting trip, may wish to have a fully functioning defensive firearm with a fully loaded magazine. This defensive arm might be their hunting gun, or it might be another firearm.

180.    In certain types of big game hunting (e.g., elk or deer) it would be rare for a hunter to get more than two shots at an animal. In other types of hunting (e.g., prairie dogs or a pack of coyotes) a significant number of consecutive shots at different animals in a group would be common. When Colorado hunters take their guns and magazines to go hunting in other states (as many Plaintiffs do, especially the members of the Colorado Outfitters Association and the members of the Colorado State Shooting Association), hunters may fire a significant number of quick shots at game such as wild boars, which are notoriously hardy and ferocious. Even the big game hunter who only plans one or two shots for the trophy deer may want a firearm with larger capacity in case of attack by bears, mountain lions, other large predators, or criminals.

181.    The requirement of "continuous possession" for grandfathered magazines prevents owners of affected firearms from engaging in safety training, repair, temporary loans for sporting purposes, and temporary loans for lawful self-defense. This self-defense prohibition flatly contradicts *Heller* and *McDonald*.

182.    The ban on repair and the crippling of defensive instruction violates *McDonald*, which quoted with approval the Tennessee case of *Andrews v. State*, 50 Tenn. 165 (1871), which in turn affirmed that the right to keep and bear arms includes the right to have firearms repaired and to practice their safe use. A law which impedes safe instruction and practice in the use of firearms (as HB 1224 and HB 1229 do) is subject to a heightened level of scrutiny which the Defendant cannot meet in this case. *See Ezell v. Chicago*, 651 F.3d 684, 708 (7th Cir. 2011) (enjoining

35

municipal ban on gun ranges, the use of which are ancillary to the exercise of core Second Amendment rights).

183.  HB 1224 is facially unconstitutional as a ban on common arms and accessories and as a ban on temporary transfers for self-defense.

184.  Putting aside the facial unconstitutionality, if heightened scrutiny were to be applied, HB 1224 does not serve any legitimate governmental purpose, let alone the "important" or "compelling" purpose which is necessary under heightened scrutiny. To the contrary, the chief House sponsor and the chief Senate sponsor of HB 1224 both stated, repeatedly, that the "only" purpose of magazines of more than 15 rounds was to kill a large number of people quickly. The fact that tens of millions of such magazines are owned by peaceable citizens – and that such magazines are chosen by many of the Plaintiff Sheriffs and their Deputies for saving lives and for the lawful defense of self and others – demonstrates beyond any doubt the falsity of the sponsors' assertions.

185.  Based on the statements of the sponsors themselves, HB 1224 is the product of animus – the invidious prejudice that is the quintessence of an *illegitimate* purpose. *Romer v. Evans*, 517 U.S. 620 (1996); *Lawrence v. Texas*, 539 U.S. 558 (2003).

186.  HB 1224's ban on the very magazines which a vast number of Sheriffs, other law enforcement, and law-abiding citizens choose as the best tools for the lawful defense of self and others substantially harms public safety. The ban is

therefore the opposite of a "necessary" or "substantial" relation to enhancing public safety.

187.    HB 1229 is unconstitutionally overbroad. The 1971 Colorado Supreme Court case *City of Lakewood v. Pillow*, 501 P.2d 744 (Colo. 1972), addressed a similarly sweeping gun control ordinance. Citing United States Supreme Court precedent, the *Pillow* Court held that a law is unconstitutional if there are "activities . . . entirely free of any criminal culpability yet the ordinance in question effectively includes them within its prohibitions." 501 P.2d at 745 (citing *Shuttlesworth v. Birmingham*, 382 U.S. 87 (1965); *Winters v. New York*, 333 U.S. 507 (1948)).

188.    Under *Pillow*: "A governmental purpose to control or prevent certain activities, which may be constitutionally subject to state or municipal regulation under the police power, may not be achieved by means which sweep unnecessarily broadly and thereby invade the area of protected freedoms." *Id.* at 745 (citing *Zwickler v. Koota*, 389 U.S. 241 (1967); *Aptheker v. Secretary of State*, 378 U.S. 500 (1963); *NAACP v. Alabama*, 377 U.S. 288 (1964)).

189.    Moreover: "Even though the governmental purpose may be legitimate and substantial, that purpose cannot be pursued by means that broadly stifle fundamental personal liberties when the end can be more narrowly achieved." *Id.* (citing *Aptheker*, 378 U.S. 500; *Shelton v. Tucker*, 364 U.S. 479 (1960)).

190.    *Pillow* has been followed by several other courts, including in cases analyzing excessively intrusive gun control statutes. *E.g.*, *Benjamin v. Bailey*, 662

A.2d 1226, 1234 (Conn. 1995); *Junction City v. Mevis*, 601 P.2d 1145, 1150 (Kan. 1979); *State ex rel. City of Princeton v. Buckner*, 377 S.E.2d 139, 143 (W. Va. 1988).

191.    If strict or intermediate scrutiny are applicable, Defendant must prove that HB 1224 and 1229 are "necessary" or have a "substantial" relation to a "compelling" or "important" government purpose. HB 1229, which in practice may be nearly impossible to comply with, has no necessary or substantial relation to anything. It bans temporary transfers for replacement guns for people whose guns are being repaired for a week at the gunsmith, for hunters who go on a trip of more than 72 hours, for some persons who are being instructed in gun safety, and for some other persons who temporarily need guns for self-defense. This ban harms public safety rather than furthering it.

192.    Sections 2-7 of HB 1229 contain various provisions for providing existing data to the FBI's National Instant Criminal Background Check System, and revisions of related laws. Section 2-7 is severable from Section 1 of HB 1229, which discusses private temporary transfers and private sales. Section 1 is void *in toto*. To be even arguably constitutional, Section 1 of HB 1229 would have to contain temporary transfer exceptions which were deliberately excluded from the bill and would also have to set up a functional system of background checks for private sales which private individuals could reasonably use. Such language might be created by the legislature, but cannot be created by a court. A law covering the same subject as Section 1 of HB 1229 might be constitutional in some applications, but Section 1 of HB 1229 as written is unconstitutional.

B.    **The Bills Are Unconstitutionally Vague**

193.    The Due Process Clause of the Fourteenth Amendment prohibits statutes that are so vague that ordinary persons cannot readily determine whether their conduct might expose them to criminal penalties.

194.    The long-established rule is that "the terms of a penal statue creating a new offense must be sufficiently explicit to inform those who are subject to it what conduct on their part will render them liable to its penalties is a well-recognized requirement . . . and a statute which either forbids or requires the doing of an act in terms so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application violates the first essential of due process of law." *Connally v. General Const. Co.*, 269 U.S. 385, 391 (1926). What conduct is lawful cannot be left to conjecture. "The crime, and the elements constituting it, must be so clearly expressed that the ordinary person can intelligently choose, in advance, what course it is lawful for him to pursue." *Id.* at 393.

195.    A statute is also unconstitutionally vague if it may result in arbitrary enforcement based on the personal predilections of individual law enforcement officers or jurisdictions. Vague statutes are subject to particularly rigorous scrutiny when they impact the exercise of constitutional rights.

196.    The "continuous possession" and "designed to be readily convertible" provisions of HB 1224 are both vague, and both severable.

197.    Any contention that HB 1224's ban on all magazines "designed to be readily converted" somehow does not prohibit smaller magazines with a removable floor plate or end cap only highlights the defects in the bill. HB 1224 provides no

definition of "readily converted," and the fact is that the large majority of magazines can be converted to hold more than 15 rounds.

198.   Conversions to magazines using aftermarket extenders are particularly easy to accomplish. Ordinary gun owners cannot be expected to monitor the vast world of aftermarket products in order to know whether an extender is currently commercially available for their magazines.

199.   If the "designed to be readily converted" language does not mean what the sponsor and the Governor said it did (a ban on all magazines with removable floor plates), the language is unconstitutionally vague. If the ban is somehow limited by the intent behind how the magazine was "designed," then HB 1224 is unconstitutionally vague because citizens have no means to discern how a product was designed. Neither gun owners nor licensed firearms dealers nor law enforcement officers have a clear guide as to which small magazines are legal and which are not, and local law enforcement interpretations will inevitably vary.

200.   HB 1224's unconstitutional requirement that a grandfathered magazine be in "continuous possession" of the owner mirrors similar language in HB 1229. Both bills had the same House of Representatives sponsor. HB 1229 exempts from the background check requirement "(g) any temporary transfer that occurs while in the continuous presence of the owner of the firearm." Obviously, this means that the owner of the firearm must be present at all times in the exact place where the transferee is holding the gun. The requirement of "continuous presence" would obviously not be satisfied if the owner left for half an hour or for a few days.

Accordingly, "continuous possession" is likewise broken if it is interrupted for half an hour or for a few days.

201.    For the reasons stated in paragraphs 13-14, this is a direct violation of the Second Amendment. If any argument is offered that "continuous possession" means something else, the argument demonstrates that "continuous possession" is void for vagueness.

202.    Governor Hickenlooper, when signing HB 1224 and 1229, promised that "guidance" would be created for their implementation. Such "guidance" is not legally binding on all state and local law enforcement officers and prosecutors throughout Colorado. Nor can there be any assurance that "guidance" which is written in one year will not be changed in a future year. To the extent that the guidance suggests that law enforcement refrain from enforcing the actual statutory language of HB 1224 and 1229 in certain situations, the guidance would amount to an admission that the actual text of those bills is an unconstitutional infringement of Second or Fourteenth Amendment rights.

### FIRST CLAIM FOR RELIEF

### (HB 13-1224 – Violation of Second and Fourteenth Amendments Based on Prohibition of Magazines Larger Than 15 Rounds)

203.    Paragraphs 1 through 202 are re-alleged and incorporated herein.

204.    HB 1224 was signed by Governor Hickenlooper on March 20, 2013. It explicitly prohibits all magazines with a capacity of larger than 15 rounds that are bought, sold or transferred after July 1, 2013.

205.    Many common and popular firearms come standard with magazines with a capacity larger than 15 rounds.

206.    Firearms with magazines larger than 15 rounds are in common use for exercising the fundamental right of self-defense, the "central component" of Plaintiffs' Second Amendment rights.

207.    Disabled persons, including the Disabled Plaintiffs, are at a particular disadvantage in exercising their right of self-defense because their physical infirmities or confinement to a wheelchair means they can less effectively defend themselves or their families with fewer available rounds of ammunition, and are unable to quickly and safely change magazines.

208.    Firearms with magazines larger than 15 rounds are commonly used for other lawful purposes, including sport shooting and target shooting.

209.    Plaintiffs will be unable to legally replace magazines that they owned prior to the effective date of HB 1224, as those magazines wear out, break, or are damaged.

210.    The Plaintiffs Federal Firearm Licensees and Magpul will be unable to sell many popular magazines or sell firearms in their standard configuration as supplied by the manufacturers.

211.    Prohibition on a class of firearms or their accessories that are in common use for self-defense and other lawful purposes is specifically prohibited by the Second Amendment pursuant to *Heller*, and the incorporation of the Second Amendment right into the Fourteenth Amendment under *McDonald*.

## SECOND CLAIM FOR RELIEF

### (HB 13-1224 – Violation of Second and Fourteenth Amendments Based on Prohibition of Magazines "Designed to Be Readily Converted")

212.   Paragraphs 1 through 211 are re-alleged and incorporated herein.

213.   In addition to the explicit prohibition on all magazines larger than 15 rounds, HB 1224 prohibits magazines of any size that are "designed to be readily converted" to hold more than 15 rounds.

214.   Most magazines 15 rounds or smaller are manufactured with a removable floor plate (box magazines) or end cap (tube magazines) to facilitate maintenance and cleaning.

215.   Magazines with a removable floor plate or end cap can be readily converted to hold more than 15 rounds. Even box magazines whose floor plate cannot be removed can be converted to hold more than 15 rounds, simply by duct taping two such magazines end to end.

216.   HB 1224 bans magazines regardless of whether they actually have been converted to hold more than 15 rounds. A ten-round magazine is prohibited by HB 1224 even when it is used only by itself.

217.   Tens of millions of rifles and handguns in common use for self-defense and other lawful purposes use magazines of various sizes that contain removable floor plates or end caps.

218.   Many common rifles and handguns will be rendered effectively useless by the magazine prohibition. Replacing a magazine after the effective date of the

statue will be prohibited, even where an individual wishes to change to a smaller magazine. Especially for firearms that are not in current production, it may be impossible for citizens to obtain a replacement magazine that complies with HB 1224.

219.    The prohibition on most magazines puts disabled individuals, including the Disabled Plaintiffs, at particular risk because they will have far less ability to meaningfully defend themselves and their families, and far fewer firearms from which to choose.

220.    A ban on the possession of a broad class of functional firearms, as specifically addressed by the Supreme Court in *Heller,* violates the Second Amendment as incorporated in the Fourteenth Amendment.

### THIRD CLAIM FOR RELIEF

**(HB 12-1224 – Violation of Fourteenth Amendment Right to Due Process Based on Ambiguity of Language Regarding Magazines 15 Rounds or Smaller)**

221.    Paragraphs 1 through 220 are re-alleged and incorporated herein.

222.    HB 1224 is unconstitutionally vague in violation of the Fourteenth Amendment right to Due Process.

223.    Plaintiffs cannot determine whether a magazine with a removable floor plate or end cap to facilitate maintenance and cleaning was "designed to be readily convertible" to hold more than 15 rounds. Plaintiffs cannot possibly know the intent of the designers of all the magazines for the firearms which Plaintiffs own.

224.    Law enforcement officers, including the Plaintiff Sheriffs, likewise have no means to determine the intent of magazine designers. Enforcement of the provision will be difficult, if not impossible, and will result in differing interpretations of the meaning of HB 1224 in different jurisdictions.

225.    Licensed firearms retailers are likewise unable to ascertain design intent, and therefore do not know which magazines can be sold without risk of criminal prosecution.

226.    Because of the ambiguity in the language and the likelihood of inconsistent interpretation and enforcement, individuals are chilled in the exercise of their Second Amendment rights.

227.    A statute that is so vague that a person cannot clearly determine what conduct may result in criminal prosecution, or that will result in inconsistent application, thereby chilling the exercise of another constitutional right, violates the Fourteenth Amendment guarantee of Due Process of law.

## FOURTH CLAIM FOR RELIEF

### (HB 12-1224 – Violation of the Second and Fourteenth Amendments; Requirement for "Continuous Possession" of Magazines Owned on the Effective Date)

228.    Paragraphs 1 through 227 are re-alleged and incorporated herein.

229.    HB 1224 permits an individual to retain a magazine larger than 15 rounds or any prohibited smaller magazine that was owned prior to the effective date of July 1, 2013, so long as the magazine remains in that individual's "continuous possession." The statute thus explicitly prohibits the sale or temporary transfer of such magazines.

230. The term "continuous possession" is undefined.

231. Most magazines are essential to the operation of a firearm. HB 1224 prohibits any loan, even for a short period of time, of a firearm using a grandfathered magazine, including temporary loans among family members (such as allowing one's spouse to use a firearm for self-defense – either while the owner is home, or while the owner is away from home), or loaning a magazine and the associated firearm to disabled neighbors or friends.

232. "Continuous possession" would also prohibit innocuous, routine bailments or breaks in the chain of custody of a grandfathered magazine, including leaving a magazine with neighbors or friends for safe storage while the owner is out of town, or sharing the magazine with another person who is also engaged in a shooting event in which the owner was participating.

233. "Continuous possession" is undefined and vague, and owners of a magazine cannot clearly determine what is required of them to maintain "continuous possession" and what conduct may subject them to criminal penalties.

234. Law enforcement officials will and do find it impossible to enforce this provision because it is impossible to determine whether a magazine was in possession of the owner on the statute's effective date. Law enforcement offices have limited resources, and no reasonable investigation can determine the chain of custody for every magazine.

235.   Because the term "continuous possession" is undefined and vague, enforcement will be inconsistent and subject to local interpretation and the predilections of individual officers or offices.

236.   HB 1224's "continuous possession" requirement chills individuals' Second Amendment rights by subjecting them to the threat of criminal prosecution for routine, lawful sharing of firearms with covered magazines arising from varying interpretations of HB 1224 and inconsistent enforcement.

## FIFTH CLAIM FOR RELIEF

### (HB 1224 and 1229 – Violation of the Americans With Disabilities Act)

237.   Paragraphs 1 through 236 are re-alleged and incorporated herein.

238.   Title II of the Americans With Disabilities Act ("ADA") prohibits public entities from subjecting persons with disabilities to discrimination because of their disabilities. 42 U.S.C. § 12132.

239.   States, including the State of Colorado, are included within the ADA definition of public entity. 42 U.S.C. § 12131(1)(A).

240.   Disabled individuals, including the Disabled Plaintiffs, are subject to discrimination by the prohibition on magazines in HB 1224 because they have far less ability to defend themselves than do able-bodied persons. Specifically, they are unable to change magazines as quickly, and unable to retreat to positions of safety where a magazine can be changed.

241.   HB 1224 puts disabled persons in acute danger in the event of a home invasion or other confrontation requiring them to exercise their fundamental right to self-defense.

242.    Persons with disabilities also routinely temporarily transfer firearms to one another and to and from persons who aid them in participation in shooting sports and self-defense.

243.    HB 1229's restrictions of such temporary transfers restrain persons with disabilities from engaging in conduct that is essential to the exercise of their Second Amendment rights.

244.    The right to self-defense is a fundamental right under the Second Amendment, and is applied to the states through the Fourteenth Amendment. The ADA prohibits states from engaging in such discrimination against disabled persons, particularly where it prevents the meaningful exercise of a fundamental right.

## SIXTH CLAIM FOR RELIEF

### (HB 13-12-1229 – Violation of the Second and Fourteenth Amendments Based on Restrictions of Firearms Sales and Temporary Transfers - Individuals)

245.    Paragraphs 1 through 244 are re-alleged and incorporated herein.

246.    HB 1229 requires background checks prior to many temporary and non-commercial transfers of firearms between private individuals.

247.    For example, the statute allows gifts or loans between some family members, but excludes many common family relationships, such as former spouses, other partners, stepchildren, and second cousins. Therefore, a person may not loan or give a firearm to a former spouse, even when the former spouse has temporary or permanent custody of the couple's children and needs the firearm for protection of the children.

248.    Similarly,    many    temporary    transfers    are    limited    to    72 hours. Therefore, no person may loan a gun for legitimate purposes for longer than three days, such as for a disabled person to use while participating in a hunting or a sanctioned shooting event; or for a week-long loan to an individual to keep in her home when she is criminally threatened but has not yet had time to go to a gun store and begin the process of waiting three days (or sometimes longer) for the Colorado Bureau of Investigation to approve her purchase of a retail gun.

249.    The    prohibition    of    non-commercial,    temporary    transfers    is    an infringement of the Second Amendment.

250.    Because of the reluctance of home-based Federal Firearms Licensees to do business with strangers, and the reluctance of storefront FFLs to perform a $50 service for the statutory maximum fee of $10, individuals who wish to sell or temporarily transfer firearms will find it impossible, or nearly so, to comply with HB 1229's requirement to obtain the services of a FFL.

251.    In practice, therefore, HB 1229 amounts to a prohibition, rather than a regulation, of the covered sales and temporary transfers. As such, it is a violation of the Second Amendment right to bear arms, which includes the right to sell or temporarily transfer such arms.

## RELIEF REQUESTED

Plaintiffs pray that this Court:

A.    Enter a declaratory judgment that the provisions of House Bill 13-1224, to be codified at C.R.S. § 18-12-301, that prohibit the sale, transfer or possession of magazines with larger than a 15-round capacity are a violation of the

Second and Fourteenth Amendments of the United States Constitution, and are therefore void.

B.     Enter a declaratory judgment that the provisions of House Bill 13-1224, to be codified at C.R.S. §§ 18-12-301 *et. seq.,* that ban the sale, transfer or possession of magazines of less than a 15-round capacity violates the Second and Fourteenth Amendments to the United States Constitution, and are therefore void.

C.     Enter a declaratory judgment that the provision of House Bill 13-1224, to be codified at C.R.S. § 18-12-302, that requires continuous possession of magazines acquired before the effective date of the provision violates the Second and Fourteenth Amendments to the United States Constitution, and is therefore void.

D.     Enter a declaratory judgment that the provision of House Bill 13-1224, to be codified at C.R.S. § 18-12-302, prohibiting the sale, transfer, or possession of magazines smaller than 15 rounds that are "designed to be readily converted to accept more than 15 rounds" is vague, fails to give adequate notice of the conduct that may result in criminal penalties, may result in inconsistent enforcement, and prevents free exercise of Second Amendment rights in violation of Plaintiffs' rights to Due Process of Law under the Fourteenth Amendment to the United States Constitution.

E.     Enter a declaratory judgment that HB 1224 and HB 1229 violate Title II of the Americans With Disabilities Act.

F.    Enter a declaratory judgment that HB 1229 violates the Second and Fourteenth Amendments to the United States Constitution, and is therefore void.

G.    Issue preliminary and permanent injunctions enjoining Defendant John Hickenlooper and any officers, agents, and employees of the State of Colorado from administering or enforcing any provisions of HB 1224 and 1229 found to violate the United States Constitution or the Americans With Disabilities Act.

H.    Award Plaintiffs attorneys' fees and costs and grant other such relief as the Court deems proper.

Dated this 17th day of May, 2013.

Respectfully submitted,


s/David B. Kopel
INDEPENDENCE INSTITUTE
727 E. 16th Avenue
Denver, CO 80203
Phone: (303) 279-6536
Fax: (303) 279-4176
david@i2i.org

**ATTORNEY FOR SHERIFFS AND DAVID STRUMILLO**

Jonathan M. Anderson
HOLLAND & HART LLP
Post Office Box 8749
Denver, CO 80201-8749
Phone: (303) 295-8566
Fax: (303) 672-6508
jmanderson@hollandhart.com

**ATTORNEYS FOR MAGPUL INDUSTRIES AND THE NATIONAL SHOOTING SPORTS FOUNDATION**

Richard A. Westfall
Peter J. Krumholz
HALE WESTFALL LLP
1445 Market Street, Suite 300
Denver, CO 80202
Phone: (720) 904-6022
Fax: (720) 904-6020
rwestfall@halewestfall.com

ATTORNEYS FOR DISABLED CITIZENS,
OUTDOOR BUDDIES, INC. THE COLORADO
OUTFITTERS ASSOCIATION, COLORADO FARM
BUREAU, AND WOMEN FOR CONCEALED CARRY

Marc F. Colin
BRUNO COLIN JEWELL & LOWE PC
1999 Broadway, Suite 3100
Denver, CO 80202-5731
Phone: (303) 831-1099
Fax: (303) 831-1088
mcolin@bcjlpc.com

ATTORNEY FOR LICENSED FIREARMS DEALERS

Anthony J. Fabian
LAW OFFICES OF ANTHONY J. FABIAN PC
501 Wilcox Street, Suite C
Castle Rock, CO 80104
Phone: (303) 663-9339
Fax: (303) 713-0785
fabianlaw@qwestoffice.net

ATTORNEY FOR COLORADO STATE SHOOTING
ASSOCIATION AND HAMILTON FAMILY
ENTERPRISES, INC. D/B/A FAMILY SHOOTING
CENTER AT CHERRY CREEK STATE PARK

52

94

# Appendix

Diagram A. Detachable box magazine



This is a detachable box magazine for the Ruger Mini-14 rifle. Parts are as follows:

32 = the shell. This is the box in which the ammunition is contained.

28 = floor plate. Sometimes called the "magazine bottom," "base plate," or "foot plate". This Complaint uses "floor plate."

29 = floor plate retainer. The retainer (29) holds the floor plate (28) onto the shell (32). There are many other ways to attach the floor plate to the magazine shell. For example, a pin might hold the floor plate in place; or the floor plate might fit into slots on the magazine shell.

30 = spring. When the magazine is fully loaded, the spring is fully compressed. When the firing chamber in the gun is empty, the spring pushes upward, so that the top round of ammunition in the magazine is pushed into the firing chamber.

31 = follower. The follower sits on top of the spring, and underneath the ammunition. It provides a solid base for seating of the ammunition. When the magazine is loaded, several rounds of ammunition sit in a vertical stack on top of follower. The follower is on top of the spring, and the spring sits on the floor plate.

Diagram B. Tube magazine.



This is a schematic for the Remington Model 14. It is a pump-action rifle, first produced in 1912. The magazine parts are highlighted with color.

49 = magazine tube, which contains the ammunition.

44 = end cap. May also be called "magazine plug" or "removable plug." Similar in function to the floor plate in the detachable box magazine. Can be removed for disassembly and cleaning of the magazine. Can be replaced by an extender, which increases the ammunition capacity of the magazine.

45 = end cap screw (a/k/a "magazine plug screw"). Holds the end cap onto the magazine tube, and holds the front of the assembled magazine onto the front of the rifle barrel.

48 = spring. As ammunition is loaded into the magazine, the spring compresses. The spring is firmly seated on the end cap. After the shooter has fired a round by pressing the trigger, the user pumps the fore-end (35) forward and then back. This cycles the "action" of the pump-action gun, so that the empty shell is ejected from the firing chamber; then a fresh shell is pushed by the spring from the magazine and into the firing chamber.

43 = magazine follower. Same function as the follower in the box magazine. The ammunition is stacked in a horizontal line, with one round of ammunition touching the follower. The spring pushes the follower, which pushes the ammunition.

46 = magazine ring. Holds the middle of the magazine onto the middle of the rifle barrel.

The back of the magazine tube has threads so that the tube can be screwed into connection with the action bar (1), which fits inside the "receiver" (9).

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 13-CV-1300-MSK-MJW

JOHN B. COOKE, Sheriff of Weld County, Colorado;
TERRY MAKETA, Sheriff of El Paso County, Colorado;
JUSTIN SMITH, Sheriff of Larimer County, Colorado;
DAVID A. WEAVER, Sheriff of Douglas County, Colorado;
BRUCE W. HARTMAN, Sheriff of Gilpin County, Colorado;
KEN PUTNAM, Sheriff of Cheyenne County, Colorado;
DENNIS SPRUELL, Sheriff of Montezuma County, Colorado;
TIM JANTZ, Sheriff of Moffat County, Colorado;
JERRY MARTIN, Sheriff of Dolores County, Colorado;
MIKE ENSMINGER, Sheriff of Teller County, Colorado;
SHAYNE HEAP, Sheriff of Elbert County, Colorado;
CHAD DAY, Sheriff of Yuma County, Colorado;
FRED D. MCKEE, Sheriff of Delta County, Colorado;
LOU VALLARIO, Sheriff of Garfield County, Colorado;
FRED HOSSELKUS, Sheriff of Mineral County, Colorado;
BRETT L. POWELL, Sheriff of Logan County, Colorado;
JAMES FAULL, Sheriff of Prowers County, Colorado;
LARRY KUNTZ, Sheriff of Washington County, Colorado;
BRIAN E. NORTON, Sheriff of Rio Grande County, Colorado;
DUKE SCHIRARD, Sheriff of La Plata County, Colorado;
JIM BEICKER, Sheriff of Fremont County, Colorado;
RONALD BRUCE, Sheriff of Hinsdale County, Colorado;
CHRIS S. JOHNSON, Sheriff of Otero County, Colorado;
FRED JOBE, Sheriff of Custer County, Colorado;
DONALD KRUEGER, Sheriff of Clear Creek County, Colorado;
JAMES CRONE, Sheriff of Morgan County, Colorado;
SI WOODRUFF, Sheriff of Rio Blanco County, Colorado;
TOM RIDNOUR, Sheriff of Kit Carson County, Colorado;
TOM NESTOR, Sheriff of Lincoln County, Colorado;
STAN HILKEY, Sheriff of Mesa County, Colorado;
FORREST FRAZEE, Sheriff of Kiowa County, Colorado;
RICK DUNLAP, Sheriff of Montrose County, Colorado;
TED B. MINK, Sheriff of Jefferson County, Colorado;
DAVE STONG, Sheriff of Alamosa County, Colorado;
FRED WEGENER, Sheriff of Park County, Colorado;
BRUCE NEWMAN, Sheriff of Huerfano County, Colorado;
RANDY PECK, Sheriff of Sedgwick County, Colorado;
DOMINIC MATTIVI, JR., Sheriff of Ouray County, Colorado;
JOHN MINOR, Sheriff of Summit County, Colorado;

SCOTT FISCHER, Sheriff of Jackson County, Colorado;
PETER GONZALEZ, Sheriff of Archuleta County, Colorado;
RICK BESECKER, Sheriff of Gunnison County, Colorado;
CHARLES "ROB" URBACH , Sheriff of Phillips County, Colorado;
ROD FENSKE, Sheriff of Lake County, Colorado;
GRAYSON ROBINSON, Sheriff of Arapahoe County, Colorado;
DAVID D. CAMPBELL, Sheriff of Baca County, Colorado;
MIKE NORRIS, Sheriff of Saguache County, Colorado;
AMOS MEDINA, Sheriff of Costilla County, Colorado;
MILES CLARK, Sheriff of Crowley County, Colorado;
DAVID ENCINIAS, Sheriff of Bent County, Colorado;
SUE KURTZ, Sheriff of San Juan County, Colorado;
JAMES (JIM) CASIAS, Sheriff of Las Animas County, Colorado;
GARRETT WIGGINS, Sheriff of Routt County, Colorado;
DOUGLAS N. DARR , Sheriff of Adams County, Colorado;
RODNEY JOHNSON, Sheriff of Grand County, Colorado;
COLORADO OUTFITTERS ASSOCIATION;
COLORADO FARM BUREAU;
NATIONAL SHOOTING SPORTS FOUNDATION;
MAGPUL INDUSTRIES;
COLORADO YOUTH OUTDOORS;
USA LIBERTY ARMS;
OUTDOOR BUDDIES, INC.;
WOMEN FOR CONCEALED CARRY;
COLORADO STATE SHOOTING ASSOCIATION;
HAMILTON FAMILY ENTERPRISES, INC., d/b/a FAMILY SHOOTING CENTER
AT CHERRY CREEK STATE PARK;
DAVID STRUMILLO;
DAVID BAYNE;
DYLAN HARRELL;
ROCKY MOUNTAIN SHOOTERS SUPPLY;
2ND AMENDMENT GUNSMITH & SHOOTER SUPPLY, LLC;
BURRUD ARMS INC. D/B/A JENSEN ARMS;
GREEN MOUNTAIN GUNS;
JERRY'S OUTDOOR SPORTS;
GRAND PRIX GUNS;
SPECIALTY SPORTS & SUPPLY;
GOODS FOR THE WOODS;

  Plaintiffs,

vs.

JOHN W. HICKENLOOPER, Governor of the State of Colorado,

Defendant.

## FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

Peace officers and peaceable citizens join together to bring this action in defense of public safety, the Second and Fourteenth Amendments of the Constitution of the United States, and the Americans with Disabilities Act. Plaintiffs are 55 Colorado elected sheriffs, retired law enforcement officers, disabled individuals, civil rights and disability rights organizations, licensed firearms dealers, associations of law-abiding gun owners, hunting outfitters, and the firearms industry, and a manufacturer of firearm accessories.

## I.   OVERVIEW

1.   On March 20, 2013, Colorado Governor John Hickenlooper signed two measures that severely restrict citizens' rights to own, use, manufacture, sell, or transfer firearms and firearms accessories.

### HB 1224

2.   House Bill 13-1224 ("HB 1224") bans outright all ammunition magazines sold or acquired after July 1, 2013 that hold more than 15 rounds of ammunition. HB 1224 also bans most other magazines of any size because it prohibits smaller magazines that are "designed to be readily converted" to hold more than 15 rounds of ammunition.

3

100

3.     The magazines for most handguns and for many rifles are detachable box magazines. The very large majority of magazines contain a removable floor plate. The removable floor plate allows the user to clear ammunition jams, clean the inside of the magazine, and perform maintenance on the internal mechanics of the magazine.

4.     The fact that a magazine floor plate can be removed inherently creates the possibility that the magazine can be extended through commercially available extension products or readily fabricated extensions. As a result, nearly every magazine can be readily converted to exceed the capacity limit set by HB 1224.

5.     Some rifles have fixed box magazines, which are permanently attached to the rifle. Many of these also have removable floor plates.

6.     Instead of a box magazine, some rifles have fixed tube magazines, which lie underneath the rifle barrel. Many tube magazines have removable end caps for cleaning to which extenders can be added. A ban on certain types of fixed magazines is necessarily a ban on the rifles to which they are fixed.

7.     The Appendix to this Complaint contains diagrams showing the parts of a detachable box magazine and a fixed tube magazine.

8.     Magazine capacity can be increased in many other ways, such as snipping the spring inside the magazine so that there is more space to accommodate additional rounds, using a coupler so that a second box magazine is attached (upside down) to the bottom of another, or simply using duct tape instead of a coupler.

9.     The chief sponsor of HB 1224 and Governor Hickenlooper have both publicly confirmed that HB 1224 bans all magazines with removable floor plates.

10.     By outlawing most box and tube magazines, HB 1224 outlaws an essential component of many common firearms. Eighty-two percent of handguns and at least one-third of rifles currently manufactured in the United States are semi-automatic, which means that most of them store their ammunition in detachable box magazines. Rifles which use box or tube magazines are not limited to semi-automatics, but also include pump action, bolt action, and lever action rifles. (HB 1224 exempts lever action guns which use tube magazines, but not lever action guns which use box magazines; the bill also exempts rimfire rifles which use tube magazines, but does not exempt such rifles that use box magazines.)

11.     Thus, the magazine ban amounts to a ban on having a functional, operating unit for most handguns and a very large fraction of rifles – a patent violation of the Second and Fourteenth Amendments under *District of Columbia v. Heller*, 554 U.S. 570 (2008) and *McDonald v. Chicago*, 130 S. Ct. 3020 (2010).

12.     As detailed *infra*, HB 1224 allows the possession of grandfathered magazines only if two separate requirements are satisfied: First, they must be owned on July 1, 2013. Second, the owner must maintain "continuous possession" of the magazine.

13.     The requirement for "continuous possession" makes it impossible for firearms to be used or shared in ordinary and innocent ways, such as a gun owner loaning his or her firearm with the magazine to a spouse, family member, or friend;

entrusting it to a gunsmith for repair; a military reservist leaving firearms and their associated magazines with a spouse when he or she is called into service away from home; or even temporarily handing a firearm with its magazine to a firearms safety instructor so that the owner can be shown by the instructor how to better grip, aim, or otherwise use the firearm.

14.   The requirement of "continuous possession" prohibits the grandfathered owner from ever allowing anyone to hold or use his firearm if the firearm is in a functional state (with a magazine inserted) – an extreme infringement of Second Amendment rights.

15.   In *Heller*, the Supreme Court adopted a rule enforcing the Second Amendment that prohibited the banning of arms "typically possessed by law-abiding citizens for lawful purposes." The ban against all magazines holding more than 15 rounds violates this rule. Rifles with magazines larger than 15 rounds are so commonplace that many models are supplied in a *standard* 30-round configuration. Indeed, one such rifle is the AR-15 and its many variants, which has for years been one of the best-selling types of firearms in the United States and of which there are at least four million in the United States today. The number of other models of Modern Sporting Rifles is likewise in the millions, which are also often sold with magazines holding more than 15 rounds.

16.   Similarly, many popular handguns are sold with magazines with 16 to 20-round capacities. Many gun owners own several magazines for each firearm. The

number of magazines in the United States which are of the size directly outlawed by HB 1224 is in the tens of millions.

17.    Disabled citizens, whose disabilities often make it difficult to change magazines quickly, are acutely harmed by HB 1224. This is a particularly grave violation of their Second Amendment rights, especially their right to self-defense in the home.

18.    HB 1224 also violates Title II of the Americans with Disabilities Act ("ADA"). Even assuming that HB 1224 is constitutional, all persons with relevant disabilities are entitled to an accommodation under the ADA so that they may possess and acquire the magazine in the sizes they need.

19.    The effect of HB 1224's various provisions is the widespread ban on functional firearms. The prohibition of so many box and tube magazines of any size, and the prohibition of magazines greater than 15 rounds, directly and gravely harm the ability of law-abiding citizens to use firearms for lawful purposes, especially self-defense.

### HB 1229

20.    House Bill 13-1229 ("HB 1229") requires "universal" background checks before any sale or transfer of a firearm can occur, with some exceptions. HB 1229, even considering the exceptions, prohibits a wide range of common, temporary, or permanent transfers or loans of firearms between law-abiding citizens in violation of the Second Amendment.

21.     As a practical matter, it will be impossible for citizens to comply with HB 1229. The bill requires that when one individual sells or loans a firearm to another, that "transfer" must be conducted through a Federal Firearms Licensee ("FFL," a licensed gun dealer). The FFL is required to process the transfer as if he or she is selling a firearm out of his or her own inventory. HB 1229 allows the FFL to charge a fee of no more than $10 for conducting the transfer.

22.     Many FFLs in Colorado, including FFL Plaintiffs, are unwilling to conduct the transfer under such conditions. Accordingly, it will be extremely difficult, if not impossible, for many Coloradans to find a FFL to conduct the transfers, even if the buyer and seller are both willing and able to drive long distances to do so.

23.     To conduct the transfer pursuant to HB 1229, the FFL must complete the same paperwork as if he or she were selling from his or her own inventory. This means that for each firearm transferred, a three-page federal form (ATF Form 4473) must be filled out. Some parts of the form are filled out by the customer, and some by the FFL. FFLs are liable for errors on a Form 4473 and subject to license revocation and even federal felony charges.

24.     FFLs must monitor the transferor and transferee for as long as it takes to complete the transaction. The "instant check" which is conducted by the Colorado Bureau of Investigation often takes hours, and sometimes days, to complete.

25.     Currently, when FFLs are asked to conduct a background check for a firearm, not involving a profitable sale from the FFL's actual inventory, the fee

charged may be $50. A fee cap of $10 will likely result in very few, if any, FFLs being willing to perform the services which are necessary for transfers under HB 1229, making compliance with HB 1229 next to impossible in many private transfer situations.

26.    Moreover, setting aside the myriad problems with compliance with HB 1229, the scope of HB 1229's regulation, which impacts a vast array of innocent and lawful temporary transfers among friends and members of various hunting and shooting organizations, unconstitutionally infringes the Second Amendment rights of tens of thousands of Coloradans.

### The Supreme Court's Landmark Decisions: *Heller* and *McDonald*

27.    There are certain indisputable legal principles announced by the United States Supreme Court against which HB 1224 and HB 1229 must be judged.

28.    Under *Heller*, the Second Amendment to the United States Constitution guarantees the right of individual citizens to keep and bear commonly-used firearms for all lawful purposes.

29.    The individual right to employ commonly-used firearms for self-defense is "the central component" of the Second Amendment guarantee.

30.    An individual's Second Amendment rights, including the right to self-defense, are fundamental rights.

31.    Under *McDonald*, the rights protected by the Second Amendment apply equally to the states, including Colorado, through the Fourteenth Amendment to the United States Constitution.

32.      HB 1224 and HB 1229 violate these principles.

## II.      JURISDICTION AND VENUE

33.      This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1331 because the claims arise under the Constitution and statutes of the United States.

34.      This Court has jurisdiction to grant the declaratory relief sought pursuant to 18 U.S.C. § 2201, and additional relief pursuant to 18 U.S.C. § 2202.

35.      This Court also has jurisdiction under 28 U.S.C. § 1343(a)(3) and 42 U.S.C. § 1983 because this action involves a deprivation of federal constitutional rights by those acting under color of state law.

36.      Venue is proper in this district pursuant to 28 U.S.C. § 1391.

## III.      PARTIES

A.      **Plaintiffs**

1.      **The Sheriffs of 55 Colorado Counties**

37.      Each of the following Sheriffs of 55 Colorado counties ("the Sheriffs") has the primary obligation to obey the Constitution of the United States of America. The Sheriffs bring this case pursuant to this primary obligation, which is supreme over any other purported enactment.

38.      John B. Cooke is the Sheriff of Weld County, Colorado.

39.      Terry Maketa is the Sheriff of El Paso County, Colorado.

40.      Justin Smith is the Sheriff of Larimer County, Colorado.

41.      David A. Weaver is the Sheriff of Douglas County, Colorado.

42.      Bruce W. Hartman is the Sheriff of Gilpin County, Colorado.

43.     Ken Putnam is the Sheriff of Cheyenne County, Colorado.

44.     Dennis Spruell is the Sheriff of Montezuma County, Colorado.

45.     Tim Jantz is the Sheriff of Moffat County, Colorado.

46.     Jerry Martin is the Sheriff of Dolores County, Colorado.

47.     Mike Ensminger is the Sheriff of Teller County, Colorado.

48.     Shayne Heap is the Sheriff of Elbert County, Colorado.

49.     Chad Day is the Sheriff of Yuma County, Colorado.

50.     Fred D. McKee is the Sheriff of Delta County, Colorado.

51.     Lou Vallario is the Sheriff of Garfield County, Colorado.

52.     Fred Hosselkus is the Sheriff of Mineral County, Colorado.

53.     Brett L. Powell is the Sheriff of Logan County, Colorado.

54.     James Faull is the Sheriff of Prowers County, Colorado.

55.     Larry Kuntz is the Sheriff of Washington County, Colorado.

56.     Brian E. Norton is the Sheriff of Rio Grande County, Colorado.

57.     Duke Schirard is the Sheriff of La Plata County, Colorado.

58.     Jim Beicker is the Sheriff of Fremont County, Colorado.

59.     Ronald Bruce is the Sheriff of Hinsdale County, Colorado.

60.     Chris S. Johnson is the Sheriff of Otero County, Colorado.

61.     Fred Jobe is the Sheriff of Custer County, Colorado.

62.     Donald Krueger is the Sheriff of Clear Creek County, Colorado.

63.     James Crone is the Sheriff of Morgan County, Colorado.

64.     Si Woodruff is the Sheriff of Rio Blanco County, Colorado.

65.     Tom Ridnour is the Sheriff of Kit Carson County, Colorado.

66.     Tom Nestor is the Sheriff of Lincoln County, Colorado.

67.     Stan Hilkey is the Sheriff of Mesa County, Colorado.

68.     Forrest Frazee is the Sheriff of Kiowa County, Colorado.

69.     Rick Dunlap is the Sheriff of Montrose County, Colorado.

70.     Ted B. Mink is the Sheriff of Jefferson County, Colorado.

71.     Dave Stong is the Sheriff of Alamosa County, Colorado.

72.     Fred Wegener is the Sheriff of Park County, Colorado.

73.     Bruce Newman is the Sheriff of Huerfano County, Colorado.

74.     Randy Peck is the Sheriff of Sedgwick County, Colorado.

75.     Dominic Mattivi, Jr., is the Sheriff of Ouray County, Colorado.

76.     John Minor is the Sheriff of Summit County, Colorado.

77.     Scott Fischer is the Sheriff of Jackson County, Colorado.

78.     Peter Gonzalez is the Sheriff of Archuleta County, Colorado.

79.     Rick Besecker is the Sheriff of Gunnison County, Colorado.

80.     Charles "Rob" Urbach is the Sheriff of Phillips County, Colorado.

81.     Rod Fenske is the Sheriff of Lake County, Colorado.

82.     Grayson Robinson is the Sheriff of Arapahoe County, Colorado.

83.     David D. Campbell is the Sheriff of Baca County, Colorado.

84.     Mike Norris is the Sheriff of Saguache County, Colorado.

85.     Amos Medina is the Sheriff of Costilla County, Colorado.

86.     Miles Clark is the Sheriff of Crowley County, Colorado.

87.     David Encinias is the Sheriff of Bent County, Colorado.

88.     Sue Kurtz is the Sheriff of San Juan County, Colorado.

89.     James (Jim) Casias is the Sheriff of Las Animas County, Colorado.

90.     Garrett Wiggins is the Sheriff of Routt County, Colorado.

91.     Douglas N. Darr is the Sheriff of Adams County, Colorado.

92.     Rodney Johnson is the Sheriff of Grand County, Colorado.

93.     HB 1224 and 1229 violate the Constitution of the United States. The Sheriffs cannot enforce a statute that violates the fundamental constitutional rights of the citizens of Colorado.

94.     For reasons detailed *supra* and *infra*, HB 1224 and 1229 are utterly unenforceable, even if the Sheriffs wished to violate the U.S. Constitution.

95.     After HB 1229 becomes effective, every citizen of Colorado can legally possess a "large capacity" magazine that holds more than 15 rounds so long as they owned it prior to the effective date and maintain "continuous possession" of it after the effective date. This includes both magazines that hold more than 15 rounds, and smaller magazines with removable floor plates or end caps. At least hundreds of thousands of Colorado citizens, including the individual Plaintiffs and members of Plaintiff associations, will lawfully own hundreds of thousands (or more) of such magazines.

96.     The Sheriffs have limited resources and limited public funds to spend on investigations. They cannot expend those resources to conduct investigations that would be necessary to monitor compliance with the new magazine restrictions.

No documentation has ever been required for the retail or private purchase of magazines, making it a practical impossibility for the Sheriffs to determine whether one of the many magazines already in existence was obtained after the effective date.

97.     It would be similarly impossible to determine whether a magazine was in the "continuous possession" of its owner after July 1, 2013.

98.     With very few exceptions, magazines manufactured in other states are not required to bear date stamps, making it impossible to determine their date of manufacture. The Sheriffs will have no means to determine whether a magazine possessed by an individual in Colorado was manufactured before or after July 1, 2013, with the exception of those manufactured in Colorado after July 1, 2013 that are required by the bill to bear a date stamp.

99.     The foregoing presumes that it is clear what the bill prohibits. But the Sheriffs' enforcement obstacles become insurmountable if they must also resolve ambiguities in the bill. If the bill does not prohibit every magazine with a removable floor plate and end cap, but only those that were intentionally "designed" for the purpose of expanding capacity, the Sheriffs are given no tools to make that determination. They cannot know the intent of the designer.

100.     Likewise, each Sheriff will have to determine what constitutes "continuous possession," since the statute provides no guidance. They will have to make individual decisions whether continuous possession allows for temporary loans to others and, if so, for what duration.

101.    In addition to the core infringement on a fundamental right inherent in any enforcement of these provisions, the result of the many ambiguities will be varying individual decisions and inconsistent enforcement across jurisdictions. Effective law enforcement depends on close and supportive relations between the public and law enforcement. Unconstitutional, vague laws which are inconsistently enforced poison that relationship, and make it significantly more difficult for the Sheriffs to receive the witness cooperation, tips, and other forms of public support which are necessary to effective law enforcement in a free society.

102.    Sheriffs have the common law power to request the armed assistance of able-bodied adults in their County. This is known as the "posse comitatus." One well-known use of the posse in Colorado was in June 1977, when Pitkin County citizens with their own guns responded to a request to help with the search for escaped mass murderer Theodore Bundy.

103.    Sheriffs also have the authority to appoint deputies who are not certified peace officers. The "non-certified" deputies may be appointed for a limited period of time, or for specific tasks. C.R.S. §§ 16-2.5-103(2); 30-10-506. Particularly in rural parts of Colorado, Sheriffs utilize the authority to deputize individuals to augment law enforcement efforts in times of disturbances and natural disasters.

104.    When those Sheriffs deputize, they do not have a cache of firearms to issue. Moreover, a person who is deputized in an emergency will be safer and more effective using his or her personal firearm, with which he or she is already familiar.

105.    HB 1224 seriously impedes the ability of Sheriffs to call upon armed citizen assistance during emergencies and natural disasters because it prevents citizens from having the types of magazines which the Sheriffs and their ordinary deputies have determined to be most effective for the preservation of public safety.

### 2.    Colorado Farm Bureau

106.    Colorado Farm Bureau is a Colorado nonprofit corporation. It was founded in 1919 by a group of Colorado farmers, ranchers, veterinarians, rural doctors, shopkeepers and tradesmen. The Farm Bureau's mission includes enhancing Colorado's agricultural industry; promoting, protecting, and representing the interests of farmers, ranchers, and their communities; and protecting individual freedom and opportunity.

107.    Colorado Farm Bureau's membership now comprises 23,000 Coloradans, including Colorado farmers, ranchers, and other Colorado families and residents who have an interest in maintaining a strong agricultural industry in this State and in promoting and advancing the interests of Colorado farmers and ranchers.

108.    Section (1)(b) of HB 1229 requires that if a transferee of a firearm is not a natural person, "then each natural person who is authorized by the transferee to possess the firearm after the transfer shall undergo a background check . . . before taking possession of the firearm."

109.    The vast majority of Colorado farms, including family farms, operate as incorporated businesses. Thus, when most Colorado farmers acquire firearms in

16

Appellate Case: 14-1290  Document: 01019371743  Date Filed: 01/16/2015  Page: 126

connection with their farming or ranching operations, they do not acquire them as "natural persons."

110.  Colorado farmers and ranchers often operate their businesses in rural and remote areas of the State. Firearms are a necessity for farming and ranching for protecting crops and livestock, as well as for self-defense.

111.  HB 1229 places substantial burdens on the Second Amendment rights of Colorado farmers and ranchers because:

a.  it will often be very difficult to identify each and every natural person associated with the farm or ranch who may possess the firearm;

b.  it will be very difficult to find FFLs able and willing to perform the necessary checks in many, if not most, of the rural areas in which farms and ranches are located;

c.  even when FFLs are available, able, and willing to perform the necessary checks, paying a fee for each check for each natural person who may possess a firearm places a significant financial burden on the farm or ranch acquiring the firearm.

112.  Setting aside problems with initial acquisitions of firearms, HB 1229 places an enormous burden on farmers and ranchers to police firearm possession as time passes. If farms or ranches do not routinely "audit" new farm and ranch hands, they face significant criminal exposure (and being prohibited from owning any firearm for at least two years) if a new hand obtains possession without a check

being performed first, as well as joint and several civil liability if an accident or misuse involving the firearm occurs.

### 3.    Firearms Industry Trade Association

113.    The National Shooting Sports Foundation ("NSSF") is a national trade association for the firearms, ammunition, and hunting and shooting sports industry based in Newtown, Connecticut.

114.    As a non-profit, tax-exempt corporation, NSSF has a membership of over 9,500 federally licensed firearms manufacturers, distributors and retailers; companies manufacturing, distributing and selling shooting and hunting related goods and services; sportsmen's organizations; public and private shooting ranges; gun clubs; publishers and individuals.  More than 300 of these members reside and conduct business in Colorado.

115.    The NSSF's members in Colorado  provide lawful commerce in firearms to law-abiding Coloradans.  Each of these members' business interests and livelihoods will be adversely and unconstitutionally affected by HB 1224 and HB 1229.

### 4.    Retired Law Enforcement Officers

116.    David Strumillo resides in Colorado Springs, Colorado, and is a citizen of the United States. Mr. Strumillo served as a police officer in the Parker, Colorado Police Department from 1994 through 1999, when he was medically retired following an injury in the line of duty.

117.    Mr. Strumillo is authorized to carry a concealed firearm in all states and U.S. territories pursuant to the Law Enforcement Officers Safety Act, 18 U.S.C. § 926B, 926C. In order to comply with federal law, Mr. Strumillo is required to re-qualify each year using the firearms he carries.

118.    Mr. Strumillo also carries firearms for his personal safety to respond to threats made against himself and his family. The firearms Mr. Strumillo carries use magazines larger than 15 rounds. The members of the Plaintiff Associations also include retired law enforcement officers.

### 5.    Disabled Citizens

119.    David Bayne is a resident of Thornton, Colorado, and a citizen of the United States. Mr. Bayne is paralyzed from the chest down and confined to a wheelchair. He holds a concealed carry permit issued by the Adams County Sheriff's Office, which is valid in the State of Colorado. He owns several firearms, several of which accept magazines capable of holding more than 15 rounds. Mr. Bayne uses these firearms for target shooting, shooting competitions, and the defense of his home.

120.    Dylan Harrell is a resident of Frederick, Colorado, and a citizen of the United States. Mr. Harrell is paralyzed from the chest down and confined to a wheelchair. He holds a concealed carry permit issued by the Adams County Sheriff's Office, which is valid in the State of Colorado. He owns several firearms which will accept magazines capable of holding more than 15 rounds. He uses these firearms for hunting, target shooting, and defense of his home.

121.    Messrs. Bayne and Harrell ("the Disabled Plaintiffs") are deprived of their fundamental right of self-defense in multiple ways.

122.    First, because firearms that use magazines larger than 15 rounds and those with removable floor plates or end caps are in common use, their Second Amendment right to self-defense pursuant to *Heller* is violated regardless of any disability because they may be unable to purchase replacement magazines of any size, and particularly of the standard 30-round size, which are essential to a disabled person.

123.    Second, disabilities make it difficult to quickly change magazines under the stress of a home invasion. For example, Plaintiff Dylan Harrell is wheelchair bound and has two small children in his home. The wheelchair limits Mr. Harrell's mobility and  severely restricts his ability to quickly place himself in the best position to repel a home invasion, as well as his ability to place himself behind barriers or use objects in his home as a means to steady his firearm. Thus, he is even more dependent on immediate firearms defense than able-bodied people, who might be able to flee the house or buy time by running to another room. The limits on Mr. Harrell's ability to quickly re-position himself also severely limit his ability to retreat quickly and effectively in order to allow him the time necessary to change magazines. Eliminating his ability to use magazines with a capacity larger than 15 rounds has a corresponding impact on his ability to exercise his constitutional right to defend himself, his home, and his children.

124.    Like Mr. Harrell, Plaintiff David Bayne is confined to a wheelchair and faces the same challenges. Mr. Bayne has limited ability to retreat or reposition himself effectively or safely during a home invasion in order to most effectively aim and discharge his firearm, or to safely change magazines.

125.    If the ban on smaller magazines that can be readily converted is not a total prohibition, but applies only after a determination of the intent of the designer, the Disabled Plaintiffs have no ability to resolve that ambiguity and cannot discern what magazines are allowed and what magazines may subject them to criminal penalties.

### 6.    Licensed Firearms Dealers

126.    USA Liberty Arms is a Colorado corporation with its principal place of business in Fort Collins, Colorado.

127.    Rocky Mountain Shooters Supply is a Colorado corporation with its principal place of business in Fort Collins, Colorado.

128.    2nd Amendment Gunsmith & Shooter Supply, LLC ("2nd Amendment"), is a Colorado corporation with its principal place of business in Loveland, Colorado. 2nd Amendment has expended significant resources on inventory in firearms and magazines that will be rendered illegal on July 1, 2013. 2nd Amendment will suffer significant losses in its overall sales if it cannot sell firearms or magazines over 15 rounds or with removable floor plates or end caps if HB 1224 becomes effective.

129.    Burrud Arms Inc. d/b/a Jensen Arms is a Colorado corporation with its principal place of business in Loveland, Colorado. Jensen Arms is a retail firearms dealer in business since 1994 that serves customers throughout much of Colorado. To serve its customers, Jensen Arms has invested millions of dollars in magazines and firearms inventory that utilizes magazines that will be prohibited under HB 1224. Customers have already expressed confusion about what magazines will be legal, and Jensen Arms will suffer significant losses in sales.

130.    Green Mountain Guns is a Colorado corporation with its principal place of business in Lakewood, Colorado. Green Mountain Guns has been in business for 35 years, and will lose approximately $2 million in sales after HB 1224 becomes effective because the majority of firearms and magazines that it sells will be rendered illegal on July 1, 2013, including many smaller magazines that have removable floor plates or end caps.

131.    Smith & Wesson has already informed Green Mountain Guns that it will no longer ship merchandise to Green Mountain Guns because of the uncertainty caused by HB 1224 and confusion about what firearms and firearm accessories will be illegal after HB 1224 goes into effect.

132.    Jerry's Outdoor Sports is a Colorado corporation with its principal place of business in Grand Junction, Colorado. Jerry's Outdoor Sports has been in business for 28 years, and will lose the majority of its sales if HB 1224 becomes effective because the majority of firearms and magazines that it sells will be

rendered illegal on July 1, 2013, including many smaller magazines that have removable floor plates or end caps.

133.    Grand Prix Guns is a Colorado corporation with its principal place of business in Littleton, Colorado. Grand Prix Guns anticipates that it may suffer as much as an 80% loss in revenue if HB 1224 renders the majority of the firearms and magazines it sells illegal.

134.    Specialty Sports & Supply is a Colorado corporation with its principal place of business in Colorado Springs, Colorado. Specialty Sports & Supply anticipates that it will lose more than $1 million annually in firearms sales. The store currently has 4,000 to 5,000 magazines in stock which it will not be able to sell after July 1, 2013, and it will be unable to order and sell additional supplies.

135.    Goods for the Woods is a Colorado corporation with its principal place of business in Durango, Colorado. Goods for the Woods has a current inventory of firearms and magazines that will be rendered illegal as of July 1, 2013, and it will also be unable to sell existing and future orders, significantly reducing revenue.

136.    The Plaintiff firearms dealers have invested significant money in existing inventories of firearms with standard magazines larger than 15 rounds and in magazines of all sizes with removable floor plates and end caps. That investment will be lost without compensation if that inventory cannot be sold. In some cases, the continued existence of the business may be threatened.

137.    The licensed dealers face the same conundrum as all Plaintiffs if they are forced to guess at the unknown intent of designers of smaller magazines, and

are subject to the whims of local law enforcement as they try to enforce an ambiguous statute.

138.    In addition, in light of the fee caps described in Paragraph 21 above, each of the Licensed Firearms Dealers will be unwilling or financially unable to provide the services necessary for transfers under HB 1229, making compliance with HB 1229 impossible in many private transfer situations.

### 7.    Shooting Association and Shooting Ranges and Clubs

139.    The Colorado State Shooting Association ("CSSA") is the oldest statewide shooting and firearms organization in Colorado, established in 1926.

140.    CSSA has nearly 1,500 individual dues-paying members, and over 20 business and club members that collectively add more than 20,000 associated members. These members include hunters, competitive shooters, recreational shooters, firearms instructors, active and retired law enforcement officers, crime prevention advocates, firearms and equipment dealers and wholesalers, and people interested in preserving Second Amendment rights. The membership includes many who have physical disabilities.

141.    Many CSSA members own and use firearms with a capacity exceeding 15 rounds, and many of the CSSA sanctioned events require the use of such firearms. Many CSSA members also own magazines (and associated firearms) with removable floor plates or end caps.

142.    The CSSA provides shooting opportunities for law-abiding Colorado residents by uniting shooters, hunters, sportsmen and collectors, as well as all other

types of law-abiding firearms enthusiasts, to promote the safe and responsible use of firearms.

143.    CSSA promotes the development of shooting sports and related facilities and speaks on behalf of its membership to defend shooting sports, hunting rights, and firearms ownership.

144.    CSSA also promotes and organizes firearms safety programs and hunter safety education, supports the training of NRA-certified firearms instructors, and organizes and supports state regional competitive matches.

145.    CSSA is the official NRA-delegated sanctioning body for all state and regional competitive firearms matches in Colorado, and CSSA membership is required for Colorado shooters to participate in any such matches. CSSA is also the official state association for the Civilian Marksmanship Program, a congressionally-created program that fosters firearms marksmanship through competitive matches and clinics.

146.    The members of the Colorado State Shooting Association engage in every form of lawful activity with firearms and magazines, including each and every activity mentioned in this Complaint.

147.    Hamilton Family Enterprises, Inc. d/b/a Family Shooting Center at Cherry Creek State Park ("FSC") is a Colorado corporation that is designated as the Cherry Creek State Park concessionaire for operating recreational shooting facilities located at the Cherry Creek State Park in Arapahoe County, Colorado.

148.    FSC is a multi-discipline shooting facility covering approximately 120 acres of Cherry Creek State Park and includes a rifle range, a pistol range, a law-enforcement range, a sporting clays and five-stand range, a trap range using both electric and hand launching stations, a shotgun patterning board, and an archery range. FSC is currently adding a "move-and-shoot" pistol range which will double the number of pistol shooting positions available to the public.

149.    FSC is the largest public outdoor shooting facility on the Front Range in Colorado. The usage of these facilities has increased each year since FSC began concession operations in 2004, and over 64,000 shooters used the facilities at FSC in 2012.

150.    In addition to the operation, supervision and maintenance of the shooting facilities at Cherry Creek State Park, FSC also makes available for use by qualified members of the public firearms that are equipped with standard magazines having capacities of more than 15 rounds or are equipped with smaller magazines that are readily convertible to more than 15 rounds.

151.    Moreover, FSC sells firearms equipment and accessories, which include magazines with capacities exceeding 15 rounds or are otherwise readily-convertible to more than 15 rounds.

152.    Approximately fifty percent of FSC's gross revenue currently derives from the sale of firearms equipment, accessories, and ammunition.

153.    FSC's patrons have already expressed concerns over the impact that HB 1224 and HB 1229 will have on their ability to legally utilize FSC's facilities or

purchase goods and equipment from FSC, and many have signified their intent that they will not return to FSC after July 1, 2013 for fear of running afoul of the new laws. Thus, both proposed laws have already adversely impacted FSC's business and income and will continue to do so in the future.

154.    Approximately six percent of all of FSC's revenue, not including Colorado sales taxes, are remitted to the State and Colorado's state park system. The significant and inevitable decline in revenue that will result from the implementation of HB 1224 and HB 1229 will significantly impact the already handicapped budget of Colorado's state park system.

### 8.    Firearms Accessories Manufacturer

155.    Plaintiff Magpul Industries is a Colorado corporation founded in 1999 with its principal place of business in Erie, Colorado. Magpul manufactures and sells a wide variety of firearms accessories, including firearm magazines in a variety of sizes.

156.    Magpul has approximately 200 employees in Colorado, and approximately 90% of its magazine suppliers are located in Colorado. Magpul will be unable to distribute magazines with capacities more than 15 rounds to its network of Colorado retailers and faces uncertainly as to whether it can continue to distribute any magazines to Colorado retailers based on the vague provisions of HB 1224.

157.    Magpul manufactures magazines in 10, 20, and 30 round sizes for sale to the public. Magpul has existing commitments to sell magazines through its

distribution network to retailers in Colorado. Magpul may have to modify those commitments for magazines larger than 15 rounds, and lose the value of those sales.

158. For magazines smaller than 15 rounds, Magpul faces the same uncertainty as all of the Plaintiffs in determining which, if any, magazines with a removable floor plate can be sold. If all smaller magazines with removable floor plates are banned by HB 1224, then Magpul effectively cannot sell any magazines in Colorado.

159. If the prohibition of smaller magazines is resolved only by law enforcement's interpretation of each designer's intent, Magpul cannot predict how each of the Colorado law enforcement jurisdictions will resolve the ambiguity in the statute, and faces the uncertain prospect of criminal prosecution in jurisdictions that interpret the statute as a complete ban on magazines with a removable floor plate.

### 9. Nonprofit Representing Disabled Outdoor Enthusiasts

160. Outdoor Buddies, Inc. ("Outdoor Buddies"), which was founded in 1984, is an all-volunteer non-profit organization based in Colorado. Its mission is to provide opportunities to enjoy the outdoors to those who have been deprived of it, regardless of race, creed, religion, or sex, and with no fees to the participant. Outdoor experiences provided through Outdoor Buddies include hunting, target shooting, fishing, boating, camping, and education in the use of the outdoors for recreational activities.

161.    There are approximately 760 individual members of Outdoor Buddies. Approximately two-thirds of the membership is composed of mobility-disabled members of the community who need special assistance to experience the outdoors. Approximately one-third of the membership is composed of able-bodied members of the community who serve as volunteers. The membership includes many wounded warriors and other disabled veterans from World War II through the most recent military conflicts in Iraq and Afghanistan.

162.    The Disabled Plaintiffs, David Bayne and Dylan Harrell, are members of Outdoor Buddies.

**10.  Nonprofit Representing Colorado's Outfitters**

163.    The Colorado Outfitters Association is an organization dedicated to improving the Colorado outfitting industry's standards and the quality of services provided by professional outfitters in Colorado. The Association represents approximately 790 professional hunting, fishing, and camping outfitters and guides based in Colorado. Colorado's outfitters are registered, bonded, and insured to operate in Colorado and have permits to operate on public lands. The Association represents Colorado's outfitters in a wide range of policy areas affecting Colorado outfitters and their clients.

164.    The chilling effect of the potential legal perils for non-resident hunters caused by HB 1224 and 1229 has led many non-resident hunters to shun Colorado, which will cost the outfitters, local businesses which cater to hunters (e.g., restaurants and stores), the State, and various local taxing jurisdictions tens of

millions of dollars in the next few years.  Moreover, HB 1229's requirements for background checks for transfers could significantly impact the ability of outfitters and their clients to share weapons in the field given the narrowness of HB 1229's exceptions and the unavailability of FFL's to perform the necessary background checks.

### 11.    Nonprofit Representing Women's Right to Self-Defense

165.    Women for Concealed Carry is a 26 U.S.C. § 501(c)(4) nonprofit organization registered in the State of Colorado. Women for Concealed Carry supports women's rights to effective self-defense against physical harm by protecting women's rights to carry concealed firearms, and the organization conducts outreach and education to support policies that defend that right. Members of the organization use and carry magazines which would be banned under HB 1224.

### 12.    Nonprofit Representing Colorado Families and Communities

166.    Colorado Youth Outdoors ("CYO") is a nonprofit organization whose mission is to serve Colorado communities by providing families with opportunities to build healthy relationships through traditional outdoor recreation. One of the many disciplines in CYO's program is shooting sports.

167.    As part of its programming, CYO provides a curriculum for firearm safety, as well as a program to introduce families to sport shooting, including wildlife management through hunting. These programs stress the lawful, responsible and safe use of firearms.

168.   Fundraising is an extremely important aspect of CYO's ongoing mission to serve Colorado communities and families. Its most successful fundraiser each year is a weekend event involving target shooting.

169.   Because most of the participants in CYO's programs are new to shooting sports, CYO frequently loans hunting and sporting firearms to participants, sometimes for periods exceeding 72 hours. HB 1229 will render this aspect of CYO's programming illegal. Similarly, CYO loans firearms to participants at its annual fundraiser, which is held at a for-profit "dude ranch" specializing in hosting private events. HB 1229 will have a significant impact on this important fundraiser and consequently on CYO's ability to pursue its mission.

170.   CYO makes additional firearm loans to other qualified non-profits who do not have the resources to own firearms but who occasionally have special programs or events requiring the use of firearms. These loans sometimes exceed 72 hours. Loaning resources and collaboration between non-profits is critical in non-profit business operations.

171.   Constraining laws with narrowing margins for lawful use make it more difficult to find qualified board members willing to navigate through vague and uncertain firearm legislation. HB 1229 adds another burden to those in leadership roles of organizations which own firearms, which will have devastating effects on CYO's board membership.

**B.    Defendant**

172.    Defendant John Hickenlooper is the Governor of the State of Colorado, and is required to ensure that all laws of the state are faithfully executed. COLO. CONST. art. IV § 2. As Colorado's Chief Executive, Governor Hickenlooper is the proper defendant to actions to enjoin or invalidate a state statute. *Developmental Pathways v. Ritter,* 178 P.3d 524, 529 (Colo. 2008).

## IV.    ADDITIONAL SUPPORT FOR ALLEGATIONS

**A.    The Restrictions on Firearms Use in the Bills Is Greater Than That Already Determined to Violate the Second Amendment**

173.    The effects of these bills on commonly-used firearms are far more overreaching than laws in other locations that have already been determined to be unconstitutional. In *District of Columbia v. Heller,* the Supreme Court addressed a prohibition on the possession of handguns in the District of Columbia.

174.    Significantly for this case, the *Heller* Court concluded that the "inherent right of self-defense has been central to the Second Amendment right." 554 U.S. at 628.

175.    The individual right to keep and bear arms and to use those arms for self-defense extends to all firearms that are "in common use at the time." *Id.* at 627. The Court emphasized that the Second Amendment does protect firearms which are "typically possessed by law-abiding citizens for lawful purposes." Firearms which do not meet this standard may be banned if they are "dangerous and unusual weapons." The paradigmatic examples of the latter category are sawed-off shotguns and machine guns. *Id.* at 625, 627.

176.   The Court noted that like all constitutional rights, the Second Amendment is not absolute in every respect. The Court described three particular types of gun controls as "presumptively constitutional": First, the long-standing prohibitions against possession of firearms by felons and the mentally ill. Second, laws forbidding the carrying of firearms in "sensitive places such as schools and government buildings." Third, "laws imposing conditions and qualifications on the *commercial* sale of firearms." *Id.* at 626-27 (emphasis added).

177.   HB 1224 and 1229 do not fit within any of the "presumptively constitutional" gun control categories described by the *Heller* Court. The bills do not amend Colorado's long-standing laws forbidding gun possession by various categories of persons who have proven themselves to be dangerous. They do not affect the carrying of guns in "sensitive places." They do not set "conditions or qualifications" on the "commercial sale" of arms. HB 1229 applies only to non-commercial transfers, and to short term-transfers which do not involve any type of sale.

178.   In *McDonald v. Chicago*, the Supreme Court addressed a ban similar to that in *Heller* that was in place in Chicago and the suburb of Oak Park. The *McDonald* Court held that the Second Amendment right enunciated in *Heller* applies with equal force to the States through the Fourteenth Amendment.

179.   The *McDonald* Court reiterated that the right to self-defense is "deeply rooted in this nation's history and tradition," and that the "ratifiers of the Fourteenth Amendment counted the right to keep and bear arms among those

fundamental rights necessary to our system of ordered liberty." 130 S. Ct. at 3036, 3042. The *McDonald* Court reiterated the holding in *Heller* that "the Second Amendment protects a personal right to keep and bear arms for lawful purposes, most notably for self-defense within the home," and held that "the Fourteenth Amendment incorporates the Second Amendment right recognized in *Heller*." *Id.* at 3044, 3050.

180. By outlawing the larger and smaller magazines which are necessary components of the large majority of handguns and of a very large number of rifles, HB 1224 is a gun ban even more sweeping than the handgun-only ban which was ruled unconstitutional in *Heller*.

181. The *Heller* Court pointed out that the D.C. handgun ban was "a prohibition of an entire class of 'arms' that is overwhelmingly chosen by American society for that lawful purpose" of self-defense. 554 U.S. at 628. The prohibition was so facially unconstitutional that the *Heller* Court found it unnecessary to use the traditional three-tiered system of scrutiny. Responding to Justice Breyer's attempt to apply a balancing test to the D.C. ban, the *Heller* Court stated that the handgun ban failed "any of the standards of scrutiny the Court has applied to enumerated constitutional rights." 554 U.S. at 571. Thus, the handgun ban would have failed both strict scrutiny and intermediate scrutiny, and the result was so obvious that the *Heller* Court did not need to discuss the prongs of the two tests.

182.   The HB 1224 ban on most handguns and many rifles (accomplished by banning the large majority of magazines) is thus even more obviously unconstitutional.

183.   Magazines of 16-20 rounds for handguns, and 16-30 rounds for rifles, easily satisfy the "common use" and "typically possessed" standards in *Heller*. Under *Heller*, their prohibition is thus *per se* unconstitutional. The Constitution is clear, and the balancing has already been done by the enactment of the Second and Fourteenth Amendments themselves. Firearms and accessories which are typically owned by law-abiding citizens for lawful purposes may not be prohibited.

184.   Even if it were proper to apply strict or intermediate scrutiny (which it is not), the fact that a handgun ban cannot even pass intermediate scrutiny resolves the instant case. Handguns are used in the majority of homicides in the United States, and in over two hundred thousand violent crimes annually. The number of crimes (including multiple victim homicides) in which handguns are used dwarfs the number of such crimes involving magazines that hold more than 15 rounds. Because a handgun ban cannot survive intermediate scrutiny, the HB 1224 magazine ban cannot survive strict scrutiny.

185.   The banned magazines and associated firearms are also lawful in Colorado for hunting. While many states specify no magazine limitations for hunting, Colorado is among the group that has some limitations. These are as follows: Rifles or handguns of any type for small game, no limit; centerfire semi-automatic rifles for big game, six rounds; centerfire rifles of other types (e.g., bolt

action, pump action, lever action) for big game, no limit; handguns for big game, no limit; shotguns for migratory bird hunting, three rounds – otherwise, no limit.

186.    Regardless of limits while in the field, hunters at their hunting camp in isolated areas, or who are driving to or from a hunting trip, may wish to have a fully functioning defensive firearm with a fully loaded magazine. This defensive arm might be their hunting gun, or it might be another firearm.

187.    In certain types of big game hunting (e.g., elk or deer) it would be rare for a hunter to get more than two shots at an animal. In other types of hunting (e.g., prairie dogs or a pack of coyotes) a significant number of consecutive shots at different animals in a group would be common. When Colorado hunters take their guns and magazines to go hunting in other states (as many Plaintiffs do, especially the members of the Colorado Outfitters Association and the members of the Colorado State Shooting Association), hunters may fire a significant number of quick shots at game such as wild boars, which are notoriously hardy and ferocious. Even the big game hunter who only plans one or two shots for the trophy deer may want a firearm with larger capacity in case of attack by bears, mountain lions, other large predators, or criminals.

188.    The requirement of "continuous possession" for grandfathered magazines prevents owners of affected firearms from engaging in safety training, repair, temporary loans for sporting purposes, and temporary loans for lawful self-defense. This self-defense prohibition flatly contradicts *Heller* and *McDonald*.

189.    The ban on repair and the crippling of defensive instruction violates *McDonald*, which quoted with approval the Tennessee case of *Andrews v. State*, 50 Tenn. 165 (1871), which in turn affirmed that the right to keep and bear arms includes the right to have firearms repaired and to practice their safe use. A law which impedes safe instruction and practice in the use of firearms (as HB 1224 and HB 1229 do) is subject to a heightened level of scrutiny which the Defendant cannot meet in this case. *See Ezell v. Chicago*, 651 F.3d 684, 708 (7th Cir. 2011) (enjoining municipal ban on gun ranges, the use of which are ancillary to the exercise of core Second Amendment rights).

190.    HB 1224 is facially unconstitutional as a ban on common arms and accessories and as a ban on temporary transfers for self-defense.

191.    Putting aside the facial unconstitutionality, if heightened scrutiny were to be applied, HB 1224 does not serve any legitimate governmental purpose, let alone the "important" or "compelling" purpose which is necessary under heightened scrutiny. To the contrary, the chief House sponsor and the chief Senate sponsor of HB 1224 both stated, repeatedly, that the "only" purpose of magazines of more than 15 rounds was to kill a large number of people quickly. The fact that tens of millions of such magazines are owned by peaceable citizens – and that such magazines are chosen by many of the Plaintiff Sheriffs and their Deputies for saving lives and for the lawful defense of self and others – demonstrates beyond any doubt the falsity of the sponsors' assertions.

192.    Based on the statements of the sponsors themselves, HB 1224 is the product of animus – the invidious prejudice that is the quintessence of an *illegitimate* purpose. *Romer v. Evans,* 517 U.S. 620 (1996); *Lawrence v. Texas,* 539 U.S. 558 (2003).

193.    HB 1224's ban on the very magazines which a vast number of Sheriffs, other law enforcement, and law-abiding citizens choose as the best tools for the lawful defense of self and others substantially harms public safety. The ban is therefore the opposite of a "necessary" or "substantial" relation to enhancing public safety.

194.    HB 1229 is unconstitutionally overbroad. The 1971 Colorado Supreme Court case *City of Lakewood v. Pillow*, 501 P.2d 744 (Colo. 1972), addressed a similarly sweeping gun control ordinance. Citing United States Supreme Court precedent, the *Pillow* Court held that a law is unconstitutional if there are "activities . . . entirely free of any criminal culpability yet the ordinance in question effectively includes them within its prohibitions." 501 P.2d at 745 (citing *Shuttlesworth v. Birmingham*, 382 U.S. 87 (1965); *Winters v. New York*, 333 U.S. 507 (1948)).

195.    Under *Pillow*: "A governmental purpose to control or prevent certain activities, which may be constitutionally subject to state or municipal regulation under the police power, may not be achieved by means which sweep unnecessarily broadly and thereby invade the area of protected freedoms." *Id.* at 745 (citing

*Zwickler v. Koota*, 389 U.S. 241 (1967); *Aptheker v. Secretary of State*, 378 U.S. 500 (1963); *NAACP v. Alabama*, 377 U.S. 288 (1964)).

196. Moreover: "Even though the governmental purpose may be legitimate and substantial, that purpose cannot be pursued by means that broadly stifle fundamental personal liberties when the end can be more narrowly achieved." *Id.* (citing *Aptheker*, 378 U.S. 500; *Shelton v. Tucker*, 364 U.S. 479 (1960)).

197. *Pillow* has been followed by several other courts, including in cases analyzing excessively intrusive gun control statutes. *E.g.*, *Benjamin v. Bailey*, 662 A.2d 1226, 1234 (Conn. 1995); *Junction City v. Mevis*, 601 P.2d 1145, 1150 (Kan. 1979); *State ex rel. City of Princeton v. Buckner*, 377 S.E.2d 139, 143 (W. Va. 1988).

198. If strict or intermediate scrutiny are applicable, Defendant must prove that HB 1224 and 1229 are "necessary" or have a "substantial" relation to a "compelling" or "important" government purpose. HB 1229, which in practice may be nearly impossible to comply with, has no necessary or substantial relation to anything. It bans temporary transfers for replacement guns for people whose guns are being repaired for a week at the gunsmith, for hunters who go on a trip of more than 72 hours, for some persons who are being instructed in gun safety, and for some other persons who temporarily need guns for self-defense. This ban harms public safety rather than furthering it.

199. Sections 2-7 of HB 1229 contain various provisions for providing existing data to the FBI's National Instant Criminal Background Check System, and revisions of related laws. Section 2-7 is severable from Section 1 of HB 1229,

which discusses private temporary transfers and private sales. Section 1 is void *in toto*. To be even arguably constitutional, Section 1 of HB 1229 would have to contain temporary transfer exceptions which were deliberately excluded from the bill and would also have to set up a functional system of background checks for private sales which private individuals could reasonably use. Such language might be created by the legislature, but cannot be created by a court. A law covering the same subject as Section 1 of HB 1229 might be constitutional in some applications, but Section 1 of HB 1229 as written is unconstitutional.

## B.    The Bills Are Unconstitutionally Vague

200.    The Due Process Clause of the Fourteenth Amendment prohibits statutes that are so vague that ordinary persons cannot readily determine whether their conduct might expose them to criminal penalties.

201.    The long-established rule is that "the terms of a penal statue creating a new offense must be sufficiently explicit to inform those who are subject to it what conduct on their part will render them liable to its penalties is a well-recognized requirement . . . and a statute which either forbids or requires the doing of an act in terms so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application violates the first essential of due process of law." *Connally v. General Const. Co.*, 269 U.S. 385, 391 (1926). What conduct is lawful cannot be left to conjecture. "The crime, and the elements constituting it, must be so clearly expressed that the ordinary person can intelligently choose, in advance, what course it is lawful for him to pursue." *Id.* at 393.

202.    A statute is also unconstitutionally vague if it may result in arbitrary enforcement based on the personal predilections of individual law enforcement officers or jurisdictions. Vague statutes are subject to particularly rigorous scrutiny when they impact the exercise of constitutional rights.

203.    The "continuous possession" and "designed to be readily convertible" provisions of HB 1224 are both vague, and both severable.

204.    Any contention that HB 1224's ban on all magazines "designed to be readily converted" somehow does not prohibit smaller magazines with a removable floor plate or end cap only highlights the defects in the bill. HB 1224 provides no definition of "readily converted," and the fact is that the large majority of magazines can be converted to hold more than 15 rounds.

205.    Conversions to magazines using aftermarket extenders are particularly easy to accomplish. Ordinary gun owners cannot be expected to monitor the vast world of aftermarket products in order to know whether an extender is currently commercially available for their magazines.

206.    If the "designed to be readily converted" language does not mean what the sponsor and the Governor said it did (a ban on all magazines with removable floor plates), the language is unconstitutionally vague. If the ban is somehow limited by the intent behind how the magazine was "designed," then HB 1224 is unconstitutionally vague because citizens have no means to discern how a product was designed. Neither gun owners nor licensed firearms dealers nor law

enforcement officers have a clear guide as to which small magazines are legal and which are not, and local law enforcement interpretations will inevitably vary.

207.    HB 1224 is also vague in its ban on anything "capable of accepting . . . more than fifteen rounds of ammunition. Rifle cartridges of a particular diameter have varying lengths. For example, the .22 LR (long rifle) cartridge has a total length of .975 inches. The .22LR is the most popular cartridge in the United States. The .22 Short cartridge is .686 inches long. Many rifles with tube magazines can fire either the .22LR or the .22 Short. Thus, a tube magazine which could accommodate 12 cartridges of .22LR could also accommodate 17 cartridges of .22 Short. A rifle owner who only owns .22LR, and who is not even aware that .22 Short exists, may think that his 12-round rifle magazine is not outlawed by HB 1224; but in fact, such a rifle could be illegal under HB 1224. The ordinary gun owner plaintiffs, as well as plaintiffs involved in the firearms business, cannot tell whether such rifles are legal to sell or transfer after July 1, 2003.

208.    HB 1224's unconstitutional requirement that a grandfathered magazine be in "continuous possession" of the owner mirrors similar language in HB 1229. Both bills had the same House of Representatives sponsor. HB 1229 exempts from the background check requirement "(g) any temporary transfer that occurs while in the continuous presence of the owner of the firearm." Obviously, this means that the owner of the firearm must be present at all times in the exact place where the transferee is holding the gun. The requirement of "continuous presence" would obviously not be satisfied if the owner left for half an hour or for a few days.

Accordingly, "continuous possession" is likewise broken if it is interrupted for half an hour or for a few days.

209.    For the reasons stated in paragraphs 13-14, this is a direct violation of the Second Amendment. If any argument is offered that "continuous possession" means something else, the argument demonstrates that "continuous possession" is void for vagueness.

210.    Governor Hickenlooper, when signing HB 1224 and 1229, promised that "guidance" would be created for their implementation. Such "guidance" is not legally binding on all state and local law enforcement officers and prosecutors throughout Colorado. Nor can there be any assurance that "guidance" which is written in one year will not be changed in a future year. To the extent that the guidance suggests that law enforcement refrain from enforcing the actual statutory language of HB 1224 and 1229 in certain situations, the guidance would amount to an admission that the actual text of those bills is an unconstitutional infringement of Second or Fourteenth Amendment rights.

## FIRST CLAIM FOR RELIEF

### (HB 13-1224 – Violation of Second and Fourteenth Amendments Based on Prohibition of Magazines Larger Than 15 Rounds)

211.    Paragraphs 1 through 202 are re-alleged and incorporated herein.

212.    HB 1224 was signed by Governor Hickenlooper on March 20, 2013. It explicitly prohibits all magazines with a capacity of larger than 15 rounds that are bought, sold or transferred after July 1, 2013.

213.    Many common and popular firearms come standard with magazines with a capacity larger than 15 rounds.

214.    Firearms with magazines larger than 15 rounds are in common use for exercising the fundamental right of self-defense, the "central component" of Plaintiffs' Second Amendment rights.

215.    Disabled persons, including the Disabled Plaintiffs, are at a particular disadvantage in exercising their right of self-defense because their physical infirmities or confinement to a wheelchair means they can less effectively defend themselves or their families with fewer available rounds of ammunition, and are unable to quickly and safely change magazines.

216.    Firearms with magazines larger than 15 rounds are commonly used for other lawful purposes, including sport shooting and target shooting.

217.    Plaintiffs will be unable to legally replace magazines that they owned prior to the effective date of HB 1224, as those magazines wear out, break, or are damaged.

218.    The Plaintiffs Federal Firearm Licensees and Magpul will be unable to sell many popular magazines or sell firearms in their standard configuration as supplied by the manufacturers.

219.    Prohibition on a class of firearms or their accessories that are in common use for self-defense and other lawful purposes is specifically prohibited by the Second Amendment pursuant to *Heller*, and the incorporation of the Second Amendment right into the Fourteenth Amendment under *McDonald*.

## SECOND CLAIM FOR RELIEF

### (HB 13-1224 – Violation of Second and Fourteenth Amendments Based on Prohibition of Magazines "Designed to Be Readily Converted")

220.   Paragraphs 1 through 211 are re-alleged and incorporated herein.

221.   In addition to the explicit prohibition on all magazines larger than 15 rounds, HB 1224 prohibits magazines of any size that are "designed to be readily converted" to hold more than 15 rounds.

222.   Most magazines 15 rounds or smaller are manufactured with a removable floor plate (box magazines) or end cap (tube magazines) to facilitate maintenance and cleaning.

223.   Magazines with a removable floor plate or end cap can be readily converted to hold more than 15 rounds. Even box magazines whose floor plate cannot be removed can be converted to hold more than 15 rounds, simply by duct taping two such magazines end to end.

224.   HB 1224 bans magazines regardless of whether they actually have been converted to hold more than 15 rounds. A ten-round magazine is prohibited by HB 1224 even when it is used only by itself.

225.   Tens of millions of rifles and handguns in common use for self-defense and other lawful purposes use magazines of various sizes that contain removable floor plates or end caps.

226.   Many common rifles and handguns will be rendered effectively useless by the magazine prohibition. Replacing a magazine after the effective date of the

statue will be prohibited, even where an individual wishes to change to a smaller magazine. Especially for firearms that are not in current production, it may be impossible for citizens to obtain a replacement magazine that complies with HB 1224.

227.   The prohibition on most magazines puts disabled individuals, including the Disabled Plaintiffs, at particular risk because they will have far less ability to meaningfully defend themselves and their families, and far fewer firearms from which to choose.

228.   A ban on the possession of a broad class of functional firearms, as specifically addressed by the Supreme Court in *Heller,* violates the Second Amendment as incorporated in the Fourteenth Amendment.

## THIRD CLAIM FOR RELIEF

### (HB 12-1224 – Violation of Fourteenth Amendment Right to Due Process Based on Ambiguity of Language Regarding Magazines 15 Rounds or Smaller)

229.   Paragraphs 1 through 220 are re-alleged and incorporated herein.

230.   HB 1224 is unconstitutionally vague in violation of the Fourteenth Amendment right to Due Process.

231.   Plaintiffs cannot determine whether a magazine with a removable floor plate or end cap to facilitate maintenance and cleaning was "designed to be readily convertible" to hold more than 15 rounds. Plaintiffs cannot possibly know the intent of the designers of all the magazines for the firearms which Plaintiffs own.

232.    Law enforcement officers, including the Plaintiff Sheriffs, likewise have no means to determine the intent of magazine designers. Enforcement of the provision will be difficult, if not impossible, and will result in differing interpretations of the meaning of HB 1224 in different jurisdictions.

233.    Licensed firearms retailers are likewise unable to ascertain design intent, and therefore do not know which magazines can be sold without risk of criminal prosecution.

234.    Because of the ambiguity in the language and the likelihood of inconsistent interpretation and enforcement, individuals are chilled in the exercise of their Second Amendment rights.

235.    A statute that is so vague that a person cannot clearly determine what conduct may result in criminal prosecution, or that will result in inconsistent application, thereby chilling the exercise of another constitutional right, violates the Fourteenth Amendment guarantee of Due Process of law.

## FOURTH CLAIM FOR RELIEF

### (HB 12-1224 – Violation of the Second and Fourteenth Amendments; Requirement for "Continuous Possession" of Magazines Owned on the Effective Date)

236.    Paragraphs 1 through 227 are re-alleged and incorporated herein.

237.    HB 1224 permits an individual to retain a magazine larger than 15 rounds or any prohibited smaller magazine that was owned prior to the effective date of July 1, 2013, so long as the magazine remains in that individual's "continuous possession." The statute thus explicitly prohibits the sale or temporary transfer of such magazines.

238.   The term "continuous possession" is undefined.

239.   Most magazines are essential to the operation of a firearm. HB 1224 prohibits any loan, even for a short period of time, of a firearm using a grandfathered magazine, including temporary loans among family members (such as allowing one's spouse to use a firearm for self-defense – either while the owner is home, or while the owner is away from home), or loaning a magazine and the associated firearm to disabled neighbors or friends.

240.   "Continuous possession" would also prohibit innocuous, routine bailments or breaks in the chain of custody of a grandfathered magazine, including leaving a magazine with neighbors or friends for safe storage while the owner is out of town, or sharing the magazine with another person who is also engaged in a shooting event in which the owner was participating.

241.   "Continuous possession" is undefined and vague, and owners of a magazine cannot clearly determine what is required of them to maintain "continuous possession" and what conduct may subject them to criminal penalties.

242.   Law enforcement officials will and do find it impossible to enforce this provision because it is impossible to determine whether a magazine was in possession of the owner on the statute's effective date. Law enforcement offices have limited resources, and no reasonable investigation can determine the chain of custody for every magazine.

243. Because the term "continuous possession" is undefined and vague, enforcement will be inconsistent and subject to local interpretation and the predilections of individual officers or offices.

244. HB 1224's "continuous possession" requirement chills individuals' Second Amendment rights by subjecting them to the threat of criminal prosecution for routine, lawful sharing of firearms with covered magazines arising from varying interpretations of HB 1224 and inconsistent enforcement.

### FIFTH CLAIM FOR RELIEF

### (HB 1224 and 1229 – Violation of the Americans With Disabilities Act)

245. Paragraphs 1 through 236 are re-alleged and incorporated herein.

246. Title II of the Americans With Disabilities Act ("ADA") prohibits public entities from subjecting persons with disabilities to discrimination because of their disabilities. 42 U.S.C. § 12132.

247. States, including the State of Colorado, are included within the ADA definition of public entity. 42 U.S.C. § 12131(1)(A).

248. Disabled individuals, including the Disabled Plaintiffs, are subject to discrimination by the prohibition on magazines in HB 1224 because they have far less ability to defend themselves than do able-bodied persons. Specifically, they are unable to change magazines as quickly, and unable to retreat to positions of safety where a magazine can be changed.

249. HB 1224 puts disabled persons in acute danger in the event of a home invasion or other confrontation requiring them to exercise their fundamental right to self-defense.

250.    Persons with disabilities also routinely temporarily transfer firearms to one another and to and from persons who aid them in participation in shooting sports and self-defense.

251.    HB 1229's restrictions of such temporary transfers restrain persons with disabilities from engaging in conduct that is essential to the exercise of their Second Amendment rights.

252.    The right to self-defense is a fundamental right under the Second Amendment, and is applied to the states through the Fourteenth Amendment. The ADA prohibits states from engaging in such discrimination against disabled persons, particularly where it prevents the meaningful exercise of a fundamental right.

## SIXTH CLAIM FOR RELIEF

### (HB 13-12-1229 – Violation of the Second and Fourteenth Amendments Based on Restrictions of Firearms Sales and Temporary Transfers - Individuals)

253.    Paragraphs 1 through 244 are re-alleged and incorporated herein.

254.    HB 1229 requires background checks prior to many temporary and non-commercial transfers of firearms between private individuals.

255.    For example, the statute allows gifts or loans between some family members, but excludes many common family relationships, such as former spouses, other partners, stepchildren, and second cousins. Therefore, a person may not loan or give a firearm to a former spouse, even when the former spouse has temporary or permanent custody of the couple's children and needs the firearm for protection of the children.

50

147

256.   Similarly, many temporary transfers are limited to 72 hours. Therefore, no person may loan a gun for legitimate purposes for longer than three days, such as for a disabled person to use while participating in a hunting or a sanctioned shooting event; or for a week-long loan to an individual to keep in her home when she is criminally threatened but has not yet had time to go to a gun store and begin the process of waiting three days (or sometimes longer) for the Colorado Bureau of Investigation to approve her purchase of a retail gun.

257.   The prohibition of non-commercial, temporary transfers is an infringement of the Second Amendment.

258.   Because of the reluctance of home-based Federal Firearms Licensees to do business with strangers, and the reluctance of storefront FFLs to perform a $50 service for the statutory maximum fee of $10, individuals who wish to sell or temporarily transfer firearms will find it impossible, or nearly so, to comply with HB 1229's requirement to obtain the services of a FFL.

259.   In practice, therefore, HB 1229 amounts to a prohibition, rather than a regulation, of the covered sales and temporary transfers. As such, it is a violation of the Second Amendment right to bear arms, which includes the right to sell or temporarily transfer such arms.

## RELIEF REQUESTED

Plaintiffs pray that this Court:

A.   Enter a declaratory judgment that the provisions of House Bill 13-1224, to be codified at C.R.S. § 18-12-301, that prohibit the sale, transfer or possession of magazines with larger than a 15-round capacity are a violation of the

Second and Fourteenth Amendments of the United States Constitution, and are therefore void.

B.    Enter a declaratory judgment that the provisions of House Bill 13-1224, to be codified at C.R.S. §§ 18-12-301 *et. seq.,* that ban the sale, transfer or possession of magazines of less than a 15-round capacity violates the Second and Fourteenth Amendments to the United States Constitution, and are therefore void.

C.    Enter a declaratory judgment that the provision of House Bill 13-1224, to be codified at C.R.S. § 18-12-302, that requires continuous possession of magazines acquired before the effective date of the provision violates the Second and Fourteenth Amendments to the United States Constitution, and is therefore void.

D.    Enter a declaratory judgment that the provision of House Bill 13-1224, to be codified at C.R.S. § 18-12-302, prohibiting the sale, transfer, or possession of magazines smaller than 15 rounds that are "designed to be readily converted to accept more than 15 rounds" is vague, fails to give adequate notice of the conduct that may result in criminal penalties, may result in inconsistent enforcement, and prevents free exercise of Second Amendment rights in violation of Plaintiffs' rights to Due Process of Law under the Fourteenth Amendment to the United States Constitution.

E.    Enter a declaratory judgment that HB 1224 and HB 1229 violate Title II of the Americans With Disabilities Act.

F.    Enter a declaratory judgment that HB 1229 violates the Second and Fourteenth Amendments to the United States Constitution, and is therefore void.

G.    Issue preliminary and permanent injunctions enjoining Defendant John Hickenlooper and any officers, agents, and employees of the State of Colorado from administering or enforcing any provisions of HB 1224 and 1229 found to violate the United States Constitution or the Americans With Disabilities Act.

H.    Award Plaintiffs attorneys' fees and costs and grant other such relief as the Court deems proper.

Dated this 31st day of May, 2013.

Respectfully submitted,

s/David B. Kopel
INDEPENDENCE INSTITUTE
727 E. 16th Avenue
Denver, CO 80203
Phone: (303) 279-6536
Fax: (303) 279-4176
david@i2i.org

**ATTORNEY FOR SHERIFFS AND DAVID STRUMILLO**


s/Jonathan M. Anderson
Jonathan M. Anderson
Douglas L. Abbott
HOLLAND & HART LLP
Post Office Box 8749
Denver, CO 80201-8749
Phone: (303) 295-8566
Fax: (303) 672-6508
jmanderson@hollandhart.com

**ATTORNEYS FOR MAGPUL INDUSTRIES AND THE NATIONAL SHOOTING SPORTS FOUNDATION**


s/Richard A. Westfall
Richard A. Westfall
Peter J. Krumholz
HALE WESTFALL LLP
1445 Market Street, Suite 300
Denver, CO 80202
Phone: (720) 904-6022
Fax: (720) 904-6020
rwestfall@halewestfall.com

**ATTORNEYS FOR DISABLED CITIZENS, OUTDOOR BUDDIES, INC., THE COLORADO OUTFITTERS ASSOCIATION, COLORADO FARM BUREAU, WOMEN FOR CONCEALED CARRY, AND COLORADO YOUTH OUTDOORS**

s/Marc. F. Colin
Marc F. Colin
BRUNO COLIN JEWELL & LOWE PC
1999 Broadway, Suite 3100
Denver, CO 80202-5731
Phone: (303) 831-1099
Fax: (303) 831-1088
mcolin@bcjlpc.com

ATTORNEY FOR LICENSED FIREARMS DEALERS


s/Anthony J. Fabian
Anthony J. Fabian
LAW OFFICES OF ANTHONY J. FABIAN PC
501 Wilcox Street, Suite C
Castle Rock, CO 80104
Phone: (303) 663-9339
Fax: (303) 713-0785
fabianlaw@qwestoffice.net

ATTORNEY FOR COLORADO STATE SHOOTING
ASSOCIATION AND HAMILTON FAMILY
ENTERPRISES, INC. D/B/A FAMILY SHOOTING
CENTER AT CHERRY CREEK STATE PARK

# Appendix

Diagram A. Detachable box magazine



This is a detachable box magazine for the Ruger Mini-14 rifle. Parts are as follows:

32 = the shell. This is the box in which the ammunition is contained.

28 = floor plate. Sometimes called the "magazine bottom," "base plate," or "foot plate". This Complaint uses "floor plate."

29 = floor plate retainer. The retainer (29) holds the floor plate (28) onto the shell (32). There are many other ways to attach the floor plate to the magazine shell. For example, a pin might hold the floor plate in place; or the floor plate might fit into slots on the magazine shell.

30 = spring. When the magazine is fully loaded, the spring is fully compressed. When the firing chamber in the gun is empty, the spring pushes upward, so that the top round of ammunition in the magazine is pushed into the firing chamber.

31 = follower. The follower sits on top of the spring, and underneath the ammunition. It provides a solid base for seating of the ammunition. When the magazine is loaded, several rounds of ammunition sit in a vertical stack on top of follower. The follower is on top of the spring, and the spring sits on the floor plate.

Diagram B. Tube magazine.



This is a schematic for the Remington Model 14. It is a pump-action rifle, first produced in 1912. The magazine parts are highlighted with color.

49 = magazine tube, which contains the ammunition.

44 = end cap. May also be called "magazine plug" or "removable plug." Similar in function to the floor plate in the detachable box magazine. Can be removed for disassembly and cleaning of the magazine. Can be replaced by an extender, which increases the ammunition capacity of the magazine.

45 = end cap screw (a/k/a "magazine plug screw"). Holds the end cap onto the magazine tube, and holds the front of the assembled magazine onto the front of the rifle barrel.

48 = spring. As ammunition is loaded into the magazine, the spring compresses. The spring is firmly seated on the end cap. After the shooter has fired a round by pressing the trigger, the user pumps the fore-end (35) forward and then back. This cycles the "action" of the pump-action gun, so that the empty shell is ejected from the firing chamber; then a fresh shell is pushed by the spring from the magazine and into the firing chamber.

43 = magazine follower. Same function as the follower in the box magazine. The ammunition is stacked in a horizontal line, with one round of ammunition touching the follower. The spring pushes the follower, which pushes the ammunition.

46 = magazine ring. Holds the middle of the magazine onto the middle of the rifle barrel.

The back of the magazine tube has threads so that the tube can be screwed into connection with the action bar (1), which fits inside the "receiver" (9).

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 13-cv-01300-MSK-MJW

JOHN B. COOKE, Sheriff of Weld County, Colorado
TERRY MAKETA, Sheriff of El Paso County, Colorado
JUSTIN SMITH, Sheriff of Larimer County, Colorado
DAVID A. WEAVER, Sheriff of Douglas County, Colorado
BRUCE W. HARTMAN, Sheriff of Gilpin County, Colorado
KEN PUTNAM, Sheriff of Cheyenne County, Colorado
DENNIS SPRUELL, Sheriff of Montezuma County, Colorado
TIM JANTZ, Sheriff of Moffat County, Colorado
JERRY MARTIN, Sheriff of Dolores County, Colorado
MIKE ENSMINGER, Sheriff of Teller County, Colorado
SHAYNE HEAP, Sheriff of Elbert County, Colorado
CHAD DAY, Sheriff of Yuma County, Colorado
FRED D. McKEE, Sheriff of Delta County, Colorado
LOU VALLARIO, Sheriff of Garfield County, Colorado
FRED HOSSELKUS, Sheriff of Mineral County, Colorado
BRETT L. POWELL, Sheriff of Logan County, Colorado
JAMES FAULL, Sheriff of Prowers County, Colorado
LARRY KUNTZ, Sheriff of Washington County, Colorado
BRIAN E. NORTON, Sheriff of Rio Grande County, Colorado
DUKE SCHIRARD, Sheriff of La Plata County, Colorado
JIM BEICKER, Sheriff of Fremont County, Colorado
RONALD BRUCE, Sheriff of Hinsdale County, Colorado
CHRIS S. JOHNSON, Sheriff of Otero County, Colorado
FRED JOBE, Sheriff of Custer County, Colorado
DONALD KRUEGER, Sheriff of Clear Creek County, Colorado
JAMES CRONE, Sheriff of Morgan County, Colorado
SI WOODRUFF, Sheriff of Rio Blanco County, Colorado
TOM RIDENOUR, Sheriff of Kit Carson County, Colorado
TOM NESTOR, Sheriff of Lincoln County, Colorado
STAN HILKEY, Sheriff of Mesa County, Colorado
FORREST FRAZEE, Sheriff of Kiowa County, Colorado
RICK DUNLAP, Sheriff of Montrose County, Colorado
TED B. MINK, Sheriff of Jefferson County, Colorado
DAVE STRONG, Sheriff of Alamosa County, Colorado
FRED WEGENER, Sheriff of Park County, Colorado
BRUCE NEWMAN, Sheriff of Huerfano County, Colorado
RANDY PECK, Sheriff of Sedgwick County, Colorado
DOMINIC MATTIVI JR., Sheriff of Ouray County, Colorado
JOHN MINOR, Sheriff of Summit County, Colorado

SCOTT FISCHER, Sheriff of Jackson County, Colorado
PETER GONZALEZ, Sheriff of Archuleta County, Colorado
RICK BESECKER, Sheriff of Gunnison County, Colorado
CHARLES "ROB" URBACH, Sheriff of Phillips County, Colorado
ROD FENSKE, Sheriff of Lake County, Colorado
GRAYSON ROBINSON, Sheriff of Arapahoe County, Colorado
DAVID D. CAMPBELL, Sheriff of Baca County, Colorado
MIKE NORRIS, Sheriff of Saguache County, Colorado
AMOS MEDINA, Sheriff of Costilla County, Colorado
MILES CLARK, Sheriff of Crowley County, Colorado
DAVID ENCINIAS, Sheriff of Bent County, Colorado
SUE KURTZ, Sheriff of San Juan County, Colorado
JAMES (JIM) CASIAS, Sheriff of Las Animas County, Colorado
GARRETT WIGGINS, Sheriff of Routt County, Colorado
DOUGLAS N. DARR, Sheriff of Adams County, Colorado
RODNEY JOHNSON, Sheriff of Grand County, Colorado
COLORADO OUTFITTERS ASSOCIATION;
COLORADO FARM BUREAU;
NATIONAL SHOOTING SPORTS FOUNDATION;
MAGPUL INDUSTRIES;
COLORADO YOUTH OUTDOORS;
USA LIBERTY ARMS;
OUTDOOR BUDDIES, INC.;
WOMEN FOR CONCEALED CARRY;
COLORADO STATE SHOOTING ASSOCIATION;
HAMILTON FAMILY ENTERPRISES, INC. d/b/a FAMILY SHOOTING
CENTER AT CHERRY CREEK STATE PARK;
DAVID STRUMILLO;
DAVID BAYNE;
DYLAN HARRELL;
ROCKY MOUNTAIN SHOOTERS SUPPLY;
2ND AMENDMENT GUNSMITH & SHOOTER SUPPLY, LLC;
BURRUD ARMS INC. d/b/a JENSEN ARMS;
GREEN MOUNTAIN GUNS;
JERRY'S OUTDOOR SPORTS;
GRAND PRIX GUNS;
SPECIALTY SPORTS & SUPPLY;
GOODS FOR THE WOODS;

Plaintiffs,

v.

JOHN W. HICKENLOOPER, Governor of the State of Colorado,

   Defendant.

---

### ANSWER TO FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

---

JOHN W. HICKENLOOPER, Governor of the State of Colorado ("the Governor"), hereby submits the following Answer to the "FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF" ("Complaint"):

## I.  OVERVIEW

1. The Governor denies the allegation in paragraph number one (1).

2. With respect to the allegations of paragraph number two (2) of the Complaint, the Governor affirmatively states that allegations in the first sentence call for legal conclusions to which no response is required; but insofar as a response is required, the Governor denies the allegations.  The Governor denies allegations in the second sentence of paragraph two.

3. With respect to the allegations of paragraph number three (3) of the Complaint, the Governor is without knowledge or information sufficient to form a belief as to the truth of the allegations and therefore the Governor denies them.

3

4.  With respect to the allegations of paragraph number four (4) of the Complaint, the Governor affirmatively states that the allegations call for legal conclusions to which no response is required; but insofar as a response is required, the Governor is without knowledge or information sufficient to form a belief as to the truth of the allegations and therefore the Governor denies them.

5.  With respect to the allegations of paragraph number five (5) of the Complaint, the Governor is without knowledge or information sufficient to form a belief as to the truth of the allegations and therefore the Governor denies them.

6.  With respect to the allegations of paragraph number six (6) of the Complaint, the Governor affirmatively states that allegations call for legal conclusions to which no response is required; but insofar as a response is required, the Governor is without knowledge or information sufficient to form a belief as to the truth of the allegations and therefore the Governor denies them.

7.  The Governor admits that an appendix attached to the complaint contains diagrams of firearms magazines.

8.  With respect to the allegations of paragraph number eight (8) of the Complaint, the Governor is without knowledge or information sufficient

to form a belief as to the truth of the allegations and therefore the Governor denies them.

9.  With respect to the allegations paragraph number nine (9) of the Complaint the Governor is without knowledge or information sufficient as to form a belief as to the truth of the allegations concerning "the chief sponsor of HB 1224." The Governor denies the remaining allegations in paragraph nine.

10. With respect to the allegations of paragraph number ten (10) of the Complaint, the Governor affirmatively states that allegations call for legal conclusions to which no response is required; but insofar as a response is required, the Governor is without knowledge or information sufficient to form a belief as to the truth of the allegations and therefore the Governor denies them.

11. With respect to the allegations of paragraph eleven (11), the Governor affirmatively states that allegations call for legal conclusions to which no response is required; but insofar as a response is required, the Governor denies the allegations.

12. With respect to the allegations of paragraph number twelve (12) of the Complaint, the Governor affirmatively states that House Bill 13-1224 is a writing that speaks for itself.

5

13. With respect to the allegations of paragraph number thirteen (13) of the Complaint, the Governor affirmatively states that allegations call for legal conclusions to which no response is required; but insofar as a response is required, the Governor denies the allegations.

14. With respect to the allegations of paragraph number fourteen (14) of the Complaint, the Governor affirmatively states that allegations call for legal conclusions to which no response is required; but insofar as a response is required, the Governor denies the allegations.

15. With respect to the allegations of paragraph number fifteen (15) of the Complaint, the Governor affirmatively states that allegations call for legal conclusions to which no response is required; but insofar as a response is required, the Governor is without knowledge or information sufficient to form a belief as to the truth of the allegations, and therefore the Governor denies them.

16. With respect to the allegations of paragraph number sixteen (16) of the Complaint, the Governor is without knowledge or information sufficient to form a belief as to the truth of the allegations, and therefore the Governor denies them.

17. With respect to the allegations of paragraph number seventeen (17) of the Complaint, the Governor is without knowledge or information sufficient to form a belief as to the truth of the allegations in the first

sentence of the paragraph, and therefore the Governor denies them. The allegations in the second sentence of paragraph seventeen call for legal conclusions to which no response is required; but insofar as a response is required, the Governor denies the allegations.

18. With respect to the allegations of paragraph number eighteen (18) of the Complaint, the Governor affirmatively states that allegations call for legal conclusions to which no response is required; but insofar as a response is required, the Governor denies the allegations.

19. The Governor denies the allegations in paragraph nineteen (19). To the extent the allegations of paragraph number nineteen (19) of the Complaint call for legal conclusions, no response is required; but insofar as a response is required, the Governor denies the allegations.

20. With respect to the allegations of paragraph number twenty (20) of the Complaint, the Governor affirmatively states that allegations call for legal conclusions to which no response is required; but insofar as a response is required, the Governor denies the allegations.

21. With respect to the allegations of paragraph number twenty-one (21) of the Complaint, the Governor affirmatively states that allegations call for legal conclusions to which no response is required; but insofar as a response is required, the Governor is without knowledge or information sufficient to form a belief as to the truth of the allegations and therefore

7

the Governor denies them.  The Governor affirmatively states that House Bill 13-1224 is a writing that speaks for itself.

22. With respect to the allegations of paragraph number twenty-two (22) of the Complaint, the Governor is without knowledge or information sufficient to form a belief as to the truth of the allegations and therefore the Governor denies them.

23. With respect to the allegations of paragraph number twenty-three (23) of the Complaint, the Governor affirmatively states that allegations call for legal conclusions to which no response is required; but insofar as a response is required, the Governor denies the allegations.

24. With respect to the allegations of paragraph number twenty-four (24) of the Complaint, the Governor is without knowledge or information sufficient to form a belief as to the truth of the allegations and therefore the Governor denies them.

25. With respect to the allegations of paragraph number twenty-five (25) of the Complaint, the Governor is without knowledge or information sufficient to form a belief as to the truth of the allegations and therefore the Governor denies them.

26. With respect to the allegations of paragraph number twenty-six (26) of the Complaint, the Governor affirmatively states that the allegations

call for legal conclusions to which no response is required; but insofar as a response is required, the Governor denies the allegations.

27. With respect to the allegations of paragraph number twenty-seven (27) of the Complaint, the Governor affirmatively states that allegations call for legal conclusions to which no response is required; but insofar as a response is required, the Governor denies the allegations.

28. With respect to the allegations of paragraph number twenty-eight (28) of the Complaint, the Governor affirmatively states that allegations call for legal conclusions to which no response is required; but insofar as a response is required, the Governor denies the allegations.

29. With respect to the allegations of paragraph number twenty-nine (29) of the Complaint, the Governor affirmatively states that the allegations call for legal conclusions to which no response is required; but insofar as a response is required, the Governor denies the allegations.

30. With respect to the allegations of paragraph number thirty (30) of the Complaint, the Governor affirmatively states that the allegations call for legal conclusions to which no response is required; but insofar as a response is required, the Governor denies the allegations.

31. With respect to the allegations of paragraph number thirty-one (31) of the Complaint, the Governor affirmatively states that the allegations

call for legal conclusions to which no response is required; but insofar as a response is required, the Governor denies the allegations.

32. With respect to the allegations of paragraph number thirty-two (32) of the Complaint, the Governor affirmatively states that the allegations call for legal conclusions to which no response is required; but insofar as a response is required, the Governor denies the allegations.

## II.   JURISDICTION AND VENUE

33. With respect to the allegations of paragraph number thirty-three (33) of the Complaint, the Governor denies the allegations.

34. With respect to the allegations of paragraph number thirty-four (34) of the Complaint, the Governor denies the allegations.

35. The Governor denies the allegations in paragraph number thirty-five (35).

36. With respect to the allegations of paragraph number thirty-six (36) of the Complaint, the Governor admits the allegations.

## III.   PARTIES

37. With respect to the allegations of paragraph number thirty-seven (37) of the Complaint, the Governor affirmatively states that the allegations call for legal conclusions to which no response is required; but insofar as a response is required, the Governor denies the allegations.

10

38. The Governor admits the allegations described in paragraph thirty-eight (38) of the Complaint.

39. The Governor admits the allegation described in paragraph thirty-nine (39) of the Complaint.

40. The Governor admits the allegation described in paragraph forty (40) of the Complaint.

41. The Governor admits the allegation described in paragraph forty-one (41) of the Complaint.

42. The Governor admits the allegation described in paragraph forty-two (42) of the Complaint.

43. The Governor admits the allegation described in paragraph forty-three (43) of the Complaint.

44. The Governor admits the allegation described in paragraph forty-four (44) of the Complaint.

45. The Governor admits the allegation described in paragraph forty-five (45) of the Complaint.

46. The Governor admits the allegation described in paragraph forty-six (46) of the Complaint.

47. The Governor admits the allegation described in paragraph forty-seven (47) of the Complaint.

48. The Governor admits the allegation described in paragraph forty-eight (48) of the Complaint.

49. The Governor admits the allegation described in paragraph forty-nine (49) of the Complaint.

50. The Governor admits the allegation described in paragraph fifty (50) of the Complaint.

51. The Governor admits the allegation described in paragraph fifty-one (51) of the Complaint.

52. The Governor admits the allegation described in paragraph fifty-two (52) of the Complaint.

53. The Governor admits the allegation described in paragraph fifty-three (53) of the Complaint.

54. The Governor admits the allegation described in paragraph fifty-four (54) of the Complaint.

55. The Governor admits the allegation described in paragraph fifty-five (55) of the Complaint.

56. The Governor admits the allegation described in paragraph fifty-six (56) of the Complaint.

57. The Governor admits the allegation described in paragraph fifty-seven (57) of the Complaint.

58. The Governor admits the allegation described in paragraph fifty-eight (58) of the Complaint.

59. The Governor admits the allegation described in paragraph fifty-nine (59) of the Complaint.

60. The Governor admits the allegation described in paragraph sixty (60) of the Complaint.

61. The Governor admits the allegation described in paragraph sixty-one (61) of the Complaint.

62. The Governor admits the allegation described in paragraph sixty-two (62) of the Complaint.

63. The Governor admits the allegation described in paragraph sixty-three (63) of the Complaint.

64. The Governor admits the allegation described in paragraph sixty-four (64) of the Complaint.

65. The Governor admits the allegation described in paragraph sixty-five (65) of the Complaint.

66. The Governor admits the allegation described in paragraph sixty-six (66) of the Complaint.

67. The Governor admits the allegation described in paragraph sixty-seven (67) of the Complaint.

68. The Governor admits the allegation described in paragraph sixty-eight (68) of the Complaint.

69. The Governor admits the allegation described in paragraph sixty-nine (69) of the Complaint.

70. The Governor admits the allegation described in paragraph seventy (70) of the Complaint.

71. The Governor admits the allegation described in paragraph seventy-one (71) of the Complaint.

72. The Governor admits the allegation described in paragraph seventy-two (72) of the Complaint.

73. The Governor admits the allegation described in paragraph seventy-three (73) of the Complaint.

74. The Governor admits the allegation described in paragraph seventy-four (74) of the Complaint.

75. The Governor admits the allegation described in paragraph seventy-five (75) of the Complaint.

76. The Governor admits the allegation described in paragraph seventy-six (76) of the Complaint.

77. The Governor admits the allegation described in paragraph seventy-seven (77) of the Complaint.

14

78. The Governor admits the allegation described in paragraph seventy-eight (78) of the Complaint.

79. The Governor admits the allegation described in paragraph seventy-nine (79) of the Complaint.

80. The Governor admits the allegation described in paragraph eighty (80) of the Complaint.

81. The Governor admits the allegation described in paragraph eighty-one (81) of the Complaint.

82. The Governor admits the allegation described in paragraph eighty-two (82) of the Complaint.

83. The Governor admits the allegation described in paragraph eighty-three (83) of the Complaint.

84. The Governor admits the allegation described in paragraph eighty-four (84) of the Complaint.

85. The Governor admits the allegation described in paragraph eighty-five (85) of the Complaint.

86. The Governor admits the allegation described in paragraph eighty-six (86) of the Complaint.

87. The Governor admits the allegation described in paragraph eighty-seven (87) of the Complaint.

88. The Governor admits the allegation described in paragraph eighty-eight (88) of the Complaint.

89. The Governor admits the allegation described in paragraph eighty-nine (89) of the Complaint.

90. The Governor admits the allegation described in paragraph ninety (90) of the Complaint.

91. The Governor admits the allegation described in paragraph ninety-one (91) of the Complaint.

92. The Governor admits the allegation described in paragraph ninety-two (92) of the Complaint.

93. With respect to the allegations of paragraph number ninety-three (93) of the Complaint, the Governor affirmatively states that the allegations call for legal conclusions to which no response is required; but insofar as a response is required, the Governor denies the allegations.

94. With respect to the allegations of paragraph number ninety-four (94) of the Complaint, the Governor affirmatively states that the allegations call for legal conclusions to which no response is required; but insofar as a response is required, the Governor denies the allegations.

95. With respect to the allegations of the first two sentence of paragraph number ninety-five (95) of the Complaint, the Governor affirmatively states that the allegations call for legal conclusions to which no response

16

is required; but insofar as a response is required, the Governor denies the allegations. With respect to the allegations of the last sentence of paragraph number ninety-five (95) of the Complaint, the Governor is without knowledge or information sufficient to form a belief as to the truth of the allegations and therefore the Governor denies them.

96. With respect to the allegations of paragraph number ninety-six (96) of the Complaint, the Governor is without knowledge or information sufficient to form a belief as to the truth of the allegations and therefore the Governor denies them.

97. With respect to the allegations of paragraph number ninety-seven (97) of the Complaint, the Governor is without knowledge or information sufficient to form a belief as to the truth of the allegations and therefore the Governor denies them.

98. With respect to the allegations of paragraph number ninety-eight (98) of the Complaint, the Governor is without knowledge or information sufficient to form a belief as to the truth of the allegations and therefore the Governor denies them.

99. With respect to the allegations of paragraph number ninety-nine (99) of the Complaint, the Governor affirmatively states that the allegations call for legal conclusions to which no response is required, and contains factual allegations that the Governor lacks sufficient knowledge to

answer and therefore denies; insofar as a response is required, the Governor denies the allegations.

100.   With respect to the allegations of paragraph number one hundred (100) of the Complaint, the Governor affirmatively states that the allegations call for legal conclusions to which no response is required; but insofar as a response is required, the Governor denies the allegations.

101.   With respect to the allegations of paragraph number one hundred-one (101) of the Complaint, the Governor affirmatively states that allegations call for legal conclusions to which no response is required; but insofar as a response is required, the Governor is without knowledge or information sufficient to form a belief as to the truth of the allegations and therefore the Governor denies them.

102.   With respect to the allegations of paragraph number one hundred-two (102) of the Complaint, the Governor affirmatively states that allegations call for legal conclusions to which no response is required; but insofar as a response is required, the Governor is without knowledge or information sufficient to form a belief as to the truth of the allegations and therefore the Governor denies them.

103.   With respect to the allegations of paragraph number one hundred-three (103) of the Complaint, the Governor affirmatively states that

C.R.S. 16-2.5-101, et seq. and C.R.S. 30-10-501, et seq. are writings that speak for themselves. With respect to all other allegations of paragraph number one hundred-three (103) of the Complaint, the Governor is without knowledge or information sufficient to form a belief as to the truth of the allegations and therefore the Governor denies them.

104.   With respect to the allegations of paragraph number one hundred-four (104) of the Complaint, the Governor is without knowledge or information sufficient to form a belief as to the truth of the allegations and therefore the Governor denies them.

105.   With respect to the allegations of paragraph number one hundred-five (105) of the Complaint, the Governor affirmatively states that the allegations call for legal conclusions to which no response is required; but insofar as a response is required, the Governor is without knowledge or information sufficient to form a belief as to the truth of the allegations and therefore the Governor denies them.

106.   With respect to the allegations of paragraph number one hundred-six (106) of the Complaint, the Governor is without knowledge or information sufficient to form a belief as to the truth of the allegations and therefore the Governor denies them.

107.   With respect to the allegations of paragraph number one hundred-seven (107) of the Complaint, the Governor is without knowledge or

19

information sufficient to form a belief as to the truth of the allegations and therefore the Governor denies them.

108.     With respect to the allegations of paragraph number one hundred-eight (108) of the Complaint, the Governor affirmatively states that House Bill 13-1229 is a writing that speaks for itself.

109.     With respect to the allegations of paragraph number one hundred-nine (109) of the Complaint, the Governor is without knowledge or information sufficient to form a belief as to the truth of the allegations and therefore the Governor denies them.

110.     With respect to the allegations of paragraph number one hundred-ten (110) of the Complaint, the Governor is without knowledge or information sufficient to form a belief as to the truth of the allegations and therefore the Governor denies them.

111.     With respect to the allegations of all parts of paragraph number one hundred-eleven (111) of the Complaint, the Governor affirmatively states that allegations call for legal conclusions to which no response is required; but insofar as a response is required, the Governor is without knowledge or information sufficient to form a belief as to the truth of the allegations and therefore the Governor denies them.

112.     With respect to the allegations of paragraph number one hundred-twelve (112) of the Complaint, the Governor affirmatively states that

allegations call for legal conclusions to which no response is required; but insofar as a response is required, the Governor is without knowledge or information sufficient to form a belief as to the truth of the allegations and therefore the Governor denies them.

113.    With respect to the allegations of paragraph number one hundred-thirteen (113) of the Complaint, the Governor is without knowledge or information sufficient to form a belief as to the truth of the allegations and therefore the Governor denies them.

114.    With respect to the allegations of paragraph number one hundred-fourteen (114) of the Complaint, the Governor is without knowledge or information sufficient to form a belief as to the truth of the allegations and therefore the Governor denies them.

115.    With respect to the allegations of paragraph number one hundred-fifteen (115) of the Complaint, the Governor affirmatively states that the allegations call for legal conclusions to which no response is required; but insofar as a response is required, the Governor is without knowledge or information sufficient to form a belief as to the truth of the allegations and therefore the Governor denies them.

116.    With respect to the allegations of paragraph number one hundred-sixteen (116) of the Complaint, the Governor is without knowledge or

information sufficient to form a belief as to the truth of the allegations and therefore the Governor denies them.

117.    With respect to the allegations of paragraph number one hundred-seventeen (117) of the Complaint, the Governor affirmatively states that allegations call for legal conclusions to which no response is required; but insofar as a response is required, the Governor is without knowledge or information sufficient to form a belief as to the truth of the allegations and therefore the Governor denies them.

118.    With respect to the allegations of paragraph number one hundred-eighteen (118) of the Complaint, the Governor is without knowledge or information sufficient to form a belief as to the truth of the allegations and therefore the Governor denies them.

119.    With respect to the allegations of paragraph number one hundred-nineteen (119) of the Complaint, the Governor is without knowledge or information sufficient to form a belief as to the truth of the allegations and therefore the Governor denies them.

120.    With respect to the allegations of paragraph number one hundred-twenty (120) of the Complaint, the Governor is without knowledge or information sufficient to form a belief as to the truth of the allegations and therefore the Governor denies them.

121.    With respect to the allegations of paragraph number one hundred-twenty-one (121) of the Complaint, the Governor denies the allegations.

122.    With respect to the allegations of paragraph number one hundred-twenty-two (122) of the Complaint, the Governor denies the allegations.

123.    With respect to the allegations of paragraph number one hundred-twenty-three (123) of the Complaint, the Governor affirmatively states that allegations call for legal conclusions to which no response is required; but insofar as a response is required, the Governor is without knowledge or information sufficient to form a belief as to the truth of the allegations and therefore the Governor denies them.

124.    With respect to the allegations of paragraph number one hundred-twenty-four (124) of the Complaint, the Governor is without knowledge or information sufficient to form a belief as to the truth of the allegations and therefore the Governor denies them.

125.    With respect to the allegations of paragraph number one hundred-twenty-five (125) of the Complaint, the Governor affirmatively states that allegations call for legal conclusions to which no response is required; but insofar as a response is required, the Governor is without knowledge or information sufficient to form a belief as to the truth of the allegations and therefore the Governor denies them.

126.     With respect to the allegations of paragraph number one hundred-twenty-six (126) of the Complaint, the Governor is without knowledge or information sufficient to form a belief as to the truth of the allegations and therefore the Governor denies them.

127.     With respect to the allegations of paragraph number one hundred-twenty-seven (127) of the Complaint, the Governor is without knowledge or information sufficient to form a belief as to the truth of the allegations and therefore the Governor denies them.

128.     With respect to the allegations of paragraph number one hundred-twenty-eight (128) of the Complaint, the Governor is without knowledge or information sufficient to form a belief as to the truth of the allegations and therefore the Governor denies them.

129.     With respect to the allegations of paragraph number one hundred-twenty-nine (129) of the Complaint, the Governor is without knowledge or information sufficient to form a belief as to the truth of the allegations and therefore the Governor denies them.

130.     With respect to the allegations of paragraph number one hundred-thirty 130) of the Complaint, the Governor is without knowledge or information sufficient to form a belief as to the truth of the allegations and therefore the Governor denies them.

131.    With respect to the allegations of paragraph number one hundred-thirty-one (131) of the Complaint, the Governor is without knowledge or information sufficient to form a belief as to the truth of the allegations and therefore the Governor denies them.

132.    With respect to the allegations of paragraph number one hundred-thirty-two (132) of the Complaint, the Governor is without knowledge or information sufficient to form a belief as to the truth of the allegations and therefore the Governor denies them.

133.    With respect to the allegations of paragraph number one hundred-thirty-three (133) of the Complaint, the Governor is without knowledge or information sufficient to form a belief as to the truth of the allegations and therefore the Governor denies them.

134.    With respect to the allegations of paragraph number one hundred-thirty-four (134) of the Complaint, the Governor is without knowledge or information sufficient to form a belief as to the truth of the allegations and therefore the Governor denies them.

135.    With respect to the allegations of paragraph number one hundred-thirty-five (135) of the Complaint, the Governor is without knowledge or information sufficient to form a belief as to the truth of the allegations and therefore the Governor denies them.

136.    With respect to the allegations of paragraph number one hundred-thirty-six (136) of the Complaint, the Governor is without knowledge or information sufficient to form a belief as to the truth of the allegations and therefore the Governor denies them.

137.    With respect to the allegations of paragraph number one hundred-thirty-seven (137) of the Complaint, the Governor affirmatively states that the allegations call for legal conclusions to which no response is required; but insofar as a response is required, the Governor is without knowledge or information sufficient to form a belief as to the truth of the allegations and therefore the Governor denies them.

138.    With respect to the allegations of paragraph number one hundred-thirty-eight (138) of the Complaint, the Governor affirmatively states that the allegations call for legal conclusions to which no response is required; but insofar as a response is required, the Governor is without knowledge or information sufficient to form a belief as to the truth of the allegations and therefore the Governor denies them.

139.    With respect to the allegations of paragraph number one hundred-thirty-nine (139) of the Complaint, the Governor is without knowledge or information sufficient to form a belief as to the truth of the allegations and therefore the Governor denies them.

140.   With respect to the allegations of paragraph number one hundred-forty (140) of the Complaint, the Governor is without knowledge or information sufficient to form a belief as to the truth of the allegations and therefore the Governor denies them.

141.   With respect to the allegations of paragraph number one hundred-forty-one (141) of the Complaint, the Governor is without knowledge or information sufficient to form a belief as to the truth of the allegations and therefore the Governor denies them.

142.   With respect to the allegations of paragraph number one hundred-forty-two (142) of the Complaint, the Governor is without knowledge or information sufficient to form a belief as to the truth of the allegations and therefore the Governor denies them.

143.   With respect to the allegations of paragraph number one hundred-forty-three (143) of the Complaint, the Governor is without knowledge or information sufficient to form a belief as to the truth of the allegations and therefore the Governor denies them.

144.   With respect to the allegations of paragraph number one hundred-forty-four (144) of the Complaint, the Governor is without knowledge or information sufficient to form a belief as to the truth of the allegations and therefore the Governor denies them.

145.     With respect to the allegations of paragraph number one hundred-forty-five (145) of the Complaint, the Governor is without knowledge or information sufficient to form a belief as to the truth of the allegations and therefore the Governor denies them.

146.     With respect to the allegations of paragraph number one hundred-forty-six (146) of the Complaint, the Governor is without knowledge or information sufficient to form a belief as to the truth of the allegations and therefore the Governor denies them.

147.     With respect to the allegations of paragraph number one hundred-forty-seven (147) of the Complaint, the Governor is without knowledge or information sufficient to form a belief as to the truth of the allegations and therefore the Governor denies them.

148.     With respect to the allegations of paragraph number one hundred-forty-eight (148) of the Complaint, the Governor is without knowledge or information sufficient to form a belief as to the truth of the allegations and therefore the Governor denies them.

149.     With respect to the allegations of paragraph number one hundred-forty-nine (149) of the Complaint, the Governor is without knowledge or information sufficient to form a belief as to the truth of the allegations and therefore the Governor denies them.

150.    With respect to the allegations of paragraph number one hundred-fifty (150) of the Complaint, the Governor is without knowledge or information sufficient to form a belief as to the truth of the allegations and therefore the Governor denies them.

151.    With respect to the allegations of paragraph number one hundred-fifty-one (151) of the Complaint, the Governor is without knowledge or information sufficient to form a belief as to the truth of the allegations and therefore the Governor denies them.

152.    With respect to the allegations of paragraph number one hundred-fifty-two (152) of the Complaint, the Governor is without knowledge or information sufficient to form a belief as to the truth of the allegations and therefore the Governor denies them.

153.    With respect to the allegations of paragraph number one hundred-fifty-three (153) of the Complaint, the Governor is without knowledge or information sufficient to form a belief as to the truth of the allegations and therefore the Governor denies them.

154.    With respect to the allegations of paragraph number one hundred-fifty-four (154) of the Complaint, the Governor is without knowledge or information sufficient to form a belief as to the truth of the allegations and therefore the Governor denies them.

155.    With respect to the allegations of paragraph number one hundred-fifty-five (155) of the Complaint, the Governor is without knowledge or information sufficient to form a belief as to the truth of the allegations and therefore the Governor denies them.

156.    With respect to the allegations of paragraph number one hundred-fifty-six (156) of the Complaint, the Governor is without knowledge or information sufficient to form a belief as to the truth of the allegations and therefore the Governor denies them.

157.    With respect to the allegations of paragraph number one hundred-fifty-seven (157) of the Complaint, the Governor is without knowledge or information sufficient to form a belief as to the truth of the allegations and therefore the Governor denies them.

158.    With respect to the allegations of paragraph number one hundred-fifty-eight (158) of the Complaint, the Governor is without knowledge or information sufficient to form a belief as to the truth of the allegations and therefore the Governor denies them.

159.    With respect to the allegations of paragraph number one hundred-fifty-nine (159) of the Complaint, the Governor affirmatively states that allegations call for legal conclusions to which no response is required; but insofar as a response is required, the Governor is without knowledge

or information sufficient to form a belief as to the truth of the

allegations and therefore the Governor denies them.

160.     With respect to the allegations of paragraph number one hundred-

sixty (160) of the Complaint, the Governor is without knowledge or

information sufficient to form a belief as to the truth of the allegations

and therefore the Governor denies them.

161.     With respect to the allegations of paragraph number one hundred-

sixty-one (161) of the Complaint, the Governor is without knowledge or

information sufficient to form a belief as to the truth of the allegations

and therefore the Governor denies them.

162.     With respect to the allegations of paragraph number one hundred-

sixty-two (162) of the Complaint, the Governor is without knowledge or

information sufficient to form a belief as to the truth of the allegations

and therefore the Governor denies them.

163.     With respect to the allegations of paragraph number one hundred-

sixty-three (163) of the Complaint, the Governor is without knowledge

or information sufficient to form a belief as to the truth of the

allegations and therefore the Governor denies them.

164.     With respect to the allegations of paragraph number one hundred-

sixty-four (164) of the Complaint, the Governor affirmatively states that

the allegations call for legal conclusions to which no response is

required; but insofar as a response is required, the Governor is without

knowledge or information sufficient to form a belief as to the truth of the

allegations and therefore the Governor denies them.

165.   With respect to the allegations of paragraph number one hundred-

sixty-five (165) of the Complaint, the Governor affirmatively states that

allegations call for legal conclusions to which no response is required;

but insofar as a response is required, the Governor is without knowledge

or information sufficient to form a belief as to the truth of the

allegations and therefore the Governor denies them.

166.   With respect to the allegations of paragraph number one hundred-

sixty-six (166) of the Complaint, the Governor is without knowledge or

information sufficient to form a belief as to the truth of the allegations

and therefore the Governor denies them.

167.   With respect to the allegations of paragraph number one hundred-

sixty-seven (167) of the Complaint, the Governor is without knowledge

or information sufficient to form a belief as to the truth of the

allegations and therefore the Governor denies them.

168.   With respect to the allegations of paragraph number one hundred-

sixty-eight (168) of the Complaint, the Governor is without knowledge or

information sufficient to form a belief as to the truth of the allegations

and therefore the Governor denies them.

169.   With respect to the allegations of paragraph number one hundred-sixty-nine (169) of the Complaint, the Governor affirmatively states that allegations call for legal conclusions to which no response is required; but insofar as a response is required, the Governor is without knowledge or information sufficient to form a belief as to the truth of the allegations and therefore the Governor denies them.

170.   With respect to the allegations of paragraph number one hundred-seventy (170) of the Complaint, the Governor is without knowledge or information sufficient to form a belief as to the truth of the allegations and therefore the Governor denies them.

171.   With respect to the allegations of paragraph number one hundred-seventy-one (171) of the Complaint, the Governor affirmatively states that the allegations call for legal conclusions to which no response is required; but insofar as a response is required, the Governor is without knowledge or information sufficient to form a belief as to the truth of the allegations and therefore the Governor denies them.

172.   With respect to the allegations in paragraph one-hundred seventy-two (172) the Governor admits that he is the Governor of the State of Colorado. To the extent a response is required, Colo. Const. art. IV, § 2, speaks for itself.  To the extent a response is required to the last sentence of paragraph 172, the Governor denies the allegations.

173.   With respect to the allegations of paragraph number one hundred-seventy-three (173) of the Complaint, the Governor affirmatively states that the allegations call for legal conclusions to which no response is required; but insofar as a response is required, the Governor denies the allegations.

174.   With respect to the allegations of paragraph number one hundred-seventy-four (174) of the Complaint, the Governor affirmatively states that the allegations call for legal conclusions to which no response is required; but insofar as a response is required, the Governor denies the allegations.

175.   With respect to the allegations of paragraph number one hundred-seventy-five (175) of the Complaint, the Governor affirmatively states that the allegations call for legal conclusions to which no response is required; but insofar as a response is required, the Governor denies the allegations.

176.   With respect to the allegations of paragraph number one hundred-seventy-six (176) of the Complaint, the Governor affirmatively states that the allegations call for legal conclusions to which no response is required; but insofar as a response is required, the Governor denies the allegations.

177.   With respect to the allegations of paragraph number one hundred-seventy-seven (177) of the Complaint, the Governor affirmatively states that the allegations call for legal conclusions to which no response is required; but insofar as a response is required, the Governor denies the allegations.

178.   With respect to the allegations of paragraph number one hundred-seventy-eight (178) of the Complaint, the Governor affirmatively states that the allegations call for legal conclusions to which no response is required; but insofar as a response is required, the Governor denies the allegations.

179.   With respect to the allegations of paragraph number one hundred-seventy-nine (179) of the Complaint, the Governor affirmatively states that the allegations call for legal conclusions to which no response is required; but insofar as a response is required, the Governor denies the allegations.

180.   With respect to the allegations of paragraph number one hundred-eighty (180) of the Complaint, the Governor affirmatively states that the allegations call for legal conclusions to which no response is required; but insofar as a response is required, the Governor denies the allegations.

181.    With respect to the allegations of paragraph number one hundred-eighty-one (181) of the Complaint, the Governor affirmatively states that the allegations call for legal conclusions to which no response is required; but insofar as a response is required, the Governor denies the allegations.

182.    With respect to the allegations of paragraph number one hundred-eighty-two (182) of the Complaint, the Governor affirmatively states that the allegations call for legal conclusions to which no response is required; but insofar as a response is required, the Governor denies the allegations.

183.    With respect to the allegations of paragraph number one hundred-eighty-three (183) of the Complaint, the Governor affirmatively states that the allegations call for legal conclusions to which no response is required; but insofar as a response is required, the Governor denies the allegations.

184.    With respect to the allegations of paragraph number one hundred-eighty-four (184) of the Complaint, the Governor lacks knowledge sufficient to admit or deny that that handguns are used in the majority of homicides in the United States, but with respect to the remainder of the allegations of paragraph number one hundred-eighty-four (184) of the Complaint, the Governor affirmatively states that the allegations

36

call for legal conclusions to which no response is required; but insofar as a response is required, the Governor is without knowledge or information sufficient to form a belief as to the truth of the allegations and therefore the Governor denies them.

185.    With respect to the allegations of paragraph number one hundred-eighty-five (185) of the Complaint, the Governor affirmatively states that the allegations call for legal conclusions to which no response is required; but insofar as a response is required, the Governor is without knowledge or information sufficient to form a belief as to the truth of the allegations and therefore the Governor denies them.

186.    With respect to the allegations of paragraph number one hundred-eighty-six (186) of the Complaint, the Governor affirmatively states that the allegations call for legal conclusions to which no response is required; but insofar as a response is required, the Governor is without knowledge or information sufficient to form a belief as to the truth of the allegations and therefore the Governor denies them.

187.    The Governor lacks knowledge sufficient to admit or deny the allegations of paragraph one hundred-eighty-seven (187), and therefore denies them.

188.    With respect to the allegations of paragraph number one hundred-eighty-eight (188) of the Complaint, the Governor affirmatively states

that allegations call for legal conclusions to which no response is required; but insofar as a response is required, the Governor is without knowledge or information sufficient to form a belief as to the truth of the allegations and therefore the Governor denies them.

189.    With respect to the allegations of paragraph number one hundred-eighty-nine (189) of the Complaint, the Governor affirmatively states that the allegations call for legal conclusions to which no response is required; but insofar as a response is required, the Governor denies the allegations.

190.    The Governor denies the allegations in paragraph number one hundred-ninety (190) of the Complaint.

191.    With respect to the allegations of paragraph number one hundred-ninety-one (191) of the Complaint, the Governor affirmatively states that allegations call for legal conclusions to which no response is required; but insofar as a response is required, the Governor is without knowledge or information sufficient to form a belief as to the truth of the allegations and therefore the Governor denies them.

192.    The Governor denies the allegations in paragraph number one hundred-ninety-two (192) of the Complaint.

193.    The Governor denies the allegations in paragraph one hundred-ninety-three (193) of the Complaint.

38

193

194.    The Governor denies the allegations in the first sentence of

paragraph one hundred ninety-four (194) of the Complaint.  With

respect to the remaining allegations of paragraph number one hundred-

ninety-four (194) of the Complaint, the Governor affirmatively states

that allegations call for legal conclusions to which no response is

required; but insofar as a response is required, the Governor denies the

allegations.

195.    With respect to the allegations of paragraph number one hundred-

ninety-five (195) of the Complaint, the Governor affirmatively states

that allegations call for legal conclusions to which no response is

required; but insofar as a response is required, the Governor denies the

allegations.

196.    With respect to the allegations of paragraph number one hundred-

ninety-six (196) of the Complaint, the Governor affirmatively states that

allegations call for legal conclusions to which no response is required;

but insofar as a response is required, the Governor denies the

allegations.

197.    With respect to the allegations of paragraph number one hundred-

ninety-seven (197) of the Complaint, the Governor affirmatively states

that allegations call for legal conclusions to which no response is

required; but insofar as a response is required, the Governor denies the
allegations.

198.    With respect to the allegations of paragraph number one hundred-
ninety-eight (198) of the Complaint, the Governor affirmatively states
that the allegations call for legal conclusions to which no response is
required; but insofar as a response is required, the Governor denies the
allegations.

199.    With respect to the allegations of paragraph number one hundred-
ninety-nine (199) of the Complaint, the Governor affirmatively states
that House Bill 13-1229 is a writing that speaks for itself.  With respect
to the remainder of the allegations of paragraph number one hundred-
ninety-nine (199) of the Complaint, the Governor affirmatively states
that the allegations call for legal conclusions to which no response is
required; but insofar as a response is required, the Governor denies the
allegations.

200.    With respect to the allegations of paragraph number two hundred
(200) of the Complaint, the Governor affirmatively states that the
allegations call for legal conclusions to which no response is required;
but insofar as a response is required, the Governor denies the
allegations.

201.    With respect to the allegations of paragraph number two hundred-one (201) of the Complaint, the Governor affirmatively states that the allegations call for legal conclusions to which no response is required; but insofar as a response is required, the Governor denies the allegations.

202.    With respect to the allegations of paragraph number two hundred-two (202) of the Complaint, the Governor affirmatively states that the allegations call for legal conclusions to which no response is required; but insofar as a response is required, the Governor denies the allegations.

203.    With respect to the allegations of paragraph number two hundred-three (203) of the Complaint, the Governor affirmatively states that the allegations call for legal conclusions to which no response is required; but insofar as a response is required, the Governor denies the allegations.

204.    With respect to the allegations of paragraph number two hundred-four (204) of the Complaint, the Governor affirmatively states that the allegations call for legal conclusions to which no response is required; but insofar as a response is required, the Governor denies the allegations.

205.   With respect to the allegations of paragraph number two hundred-five (205) of the Complaint, the Governor lacks knowledge sufficient to admit or deny the allegations, and therefore denies them.

206.   With respect to the allegations of paragraph number two-hundred-six (206) of the Complaint, the Governor affirmatively states that the allegations call for legal conclusions to which no response is required; but insofar as a response is required, the Governor denies them.

207.   With respect to the allegations of paragraph number two hundred-seven (207) of the Complaint, the Governor affirmatively states that the allegations call for legal conclusions to which no response is required; but insofar as a response is required, the Governor is without knowledge or information sufficient to form a belief as to the truth of the allegations and therefore the Governor denies them.

208.   With respect to the allegations of paragraph number two hundred-eight (208) of the Complaint, the Governor affirmatively states that the allegations call for legal conclusions to which no response is required; but insofar as a response is required, the Governor denies the allegations.

209.   The Governor denies the allegations in paragraph number two hundred-nine (209) of the Complaint.

210.    With respect to the allegations of paragraph number two hundred-ten (210) of the Complaint, the Governor admits that he issued a signing statement requiring interpretive guidance regarding House Bill 13-1224 and House Bill 13-1229 be issued, that the Department of Law issued such guidance on May 16, 2013, and that the guidance has been made publicly available.  With respect to the remaining allegations of paragraph number two hundred-ten (210) of the Complaint, the Governor affirmatively states that the allegations call for legal conclusions to which no response is required; but insofar as a response is required, the Governor denies the allegations.

## FIRST CLAIM FOR RELIEF

211.    With respect to the allegations of paragraph number two hundred-eleven (211), the Governor responds as if the answers set forth in paragraphs numbers one (1) through two hundred-ten (210) of this answer were set forth in full in this paragraph.

212.    With respect to paragraph number two hundred-twelve (212) of the Complaint, the Governor admits that he signed HB 1224 on or about March 20, 2013.  With respect to the remaining allegations, the Governor affirmatively states that the statute speaks for itself.

213.     The Governor lacks information sufficient to admit or deny the

allegations in paragraph 213, and therefore denies them.

214.     With respect to the allegations of paragraph number two hundred-

fourteen (214) of the Complaint, the Governor affirmatively states that

the allegations call for legal conclusions to which no response is

required; but insofar as a response is required, the Governor is without

knowledge or information sufficient to form a belief as to the truth of the

allegations and therefore the Governor denies them.

215.     With respect to the allegations of paragraph number two hundred-

fifteen (215) of the Complaint, the Governor lacks information sufficient

to admit or deny the allegations, and therefore denies them.

216.     With respect to the allegations of paragraph number two hundred-

sixteen (216) of the Complaint, the Governor is without knowledge or

information sufficient to form a belief as to the truth of the allegations

and therefore the Governor denies them.

217.     With respect to the allegations of paragraph number two hundred-

seventeen (217) of the Complaint, the Governor affirmatively states that

the allegations call for legal conclusions to which no response is

required; but insofar as a response is required, the Governor denies the

allegations.

218.    With respect to the allegations of paragraph number two hundred-eighteen (218) of the Complaint, the Governor is without knowledge or information sufficient to form a belief as to the truth of the allegations and therefore the Governor denies them.

219.    With respect to the allegations of paragraph number two hundred-nineteen (219) of the Complaint, the Governor affirmatively states that the allegations call for legal conclusions to which no response is required; but insofar as a response is required, the Governor denies the allegations.

### SECOND CLAIM FOR RELEIF

220.    With respect to the allegations of paragraph number two hundred-twenty (220) of the Complaint, the Governor responds as if the answers set forth in paragraphs numbers one (1) through two hundred-nineteen of this answer were set forth in full in this paragraph.

221.    With respect to the allegations of paragraph number two hundred-twenty (221) of the Complaint, the Governor affirmatively states that the allegations call for legal conclusions to which no response is required; but insofar as a response is required, the statute speaks for itself.

222.    With respect to the allegations of paragraph number two hundred-twenty-two (222) of the Complaint, the Governor is without knowledge

45

or information sufficient to form a belief as to the truth of the allegations and therefore the Governor denies them.

223.     With respect to the allegations of paragraph number two hundred-twenty-three (223) of the Complaint, the Governor affirmatively states that the allegations call for legal conclusions to which no response is required; but insofar as a response is required, the Governor is without knowledge or information sufficient to form a belief as to the truth of the allegations and therefore the Governor denies them.

224.     The Governor denies the allegations in paragraph number two hundred-twenty-four (224) of the Complaint.

225.     With respect to the allegations of paragraph number two hundred-twenty-five (225) of the Complaint, the Governor is without knowledge or information sufficient to form a belief as to the truth of the allegations and therefore the Governor denies them.

226.     With respect to the allegations of paragraph number two hundred-twenty-six (226) of the Complaint, the Governor affirmatively states that the allegations call for legal conclusions to which no response is required; but insofar as a response is required, the Governor is without knowledge or information sufficient to form a belief as to the truth of the allegations and therefore the Governor denies them.

227.   With respect to the allegations of paragraph number two hundred-twenty-seven (227) of the Complaint, the Governor is without knowledge or information sufficient to form a belief as to the truth of the allegations and therefore the Governor denies them.

228.   The Governor denies the allegations in paragraph number two hundred-twenty-eight (228) of the Complaint.

### THRID CLAIM FOR RELIEF

229.   With respect to the allegations of paragraph number two hundred twenty-nine (229) of the Complaint, the Governor responds as if the answers set forth in paragraphs numbers one (1) through two hundred twenty-eight (228) of this answer were set forth in full in this paragraph.

230.   The Governor denies the allegations in paragraph number two hundred-thirty (230) of the Complaint.

231.   With respect to the allegations of paragraph number two hundred-thirty-one (231) of the Complaint, the Governor is without knowledge or information sufficient to form a belief as to the truth of the allegations and therefore the Governor denies them.

232.   With respect to the allegations of paragraph number two hundred-thirty-two (232) of the Complaint, the Governor is without knowledge or

information sufficient to form a belief as to the truth of the allegations and therefore the Governor denies them.

233. With respect to the allegations of paragraph number two hundred-thirty-three (233) of the Complaint, the Governor is without knowledge or information sufficient to form a belief as to the truth of the allegations and therefore the Governor denies them.

234. With respect to the allegations of paragraph number two hundred-thirty-four (234) of the Complaint, the Governor affirmatively states that the allegations call for legal conclusions to which no response is required; but insofar as a response is required, the Governor denies the allegations.

235. With respect to the allegations of paragraph number two hundred-thirty-five (235) of the Complaint, the Governor affirmatively states that the allegations call for legal conclusions to which no response is required; but insofar as a response is required, the Governor denies the allegations.

**FOURTH CLAIM FOR RELIEF**

236. With respect to the allegations of paragraph number two hundred thirty-six (236) of the Complaint, the Governor responds as if the answers set forth in paragraphs numbers one (1) through two hundred thirty-five (235) of this answer were set forth in full in this paragraph.

237.   With respect to the allegations of paragraph two hundred thirty-seven (237), the Governor affirmatively states that House Bill 13-1224 is a writing that speaks for itself.  With respect to the remaining allegations of paragraph 237, the Governor affirmatively states that the allegations call for legal conclusions to which no response is required; but insofar as a response is required, the Governor affirmatively states that the statute speaks for itself.

238.   With respect to the allegations of paragraph two hundred thirty-eight (238), the Governor affirmatively states that House Bill 13-1224 is a writing that speaks for itself.

239.   With respect to the allegations of in the first sentence of paragraph number two hundred-thirty-nine (239) of the Complaint, the Governor is without knowledge or information sufficient to form a belief as to the truth of the allegations and therefore the Governor denies them.  The remaining allegations in paragraph 239 call of legal conclusions to which no response is required; but insofar as a response is required, the Governor affirmatively states that the statute speaks for itself.

240.   With respect to the allegations of paragraph number two hundred-forty (240) of the Complaint, the Governor affirmatively states that the allegations call for legal conclusions to which no response is required;

49

but insofar as a response is required, the Governor lacks knowledge sufficient to admit or deny the allegations, and therefore denies them.

241.    The Governor denies the allegations in paragraph number two hundred-forty-one (241) of the Complaint.

242.    With respect to the allegations of paragraph number two hundred-forty-two (242) of the Complaint, the Governor is without knowledge or information sufficient to form a belief as to the truth of the allegations and therefore the Governor denies them.

243.    With respect to the allegations of paragraph number two hundred-forty-three (243) of the Complaint, the Governor is without knowledge or information sufficient to form a belief as to the truth of the allegations and therefore the Governor denies them.

244.    With respect to the allegations of paragraph number two hundred-forty-four (244) of the Complaint, the Governor affirmatively states that the allegations call for legal conclusions to which no response is required; but insofar as a response is required, the Governor denies the allegations.

**FIFTH CLAIM FOR RELIEF**

245.    With respect to the allegations of paragraph number two hundred forty-five (245) of the Complaint, the Governor responds as if the

answers set forth in paragraphs numbers one (1) through two hundred forty-four (244) of this answer were set forth in full in this paragraph.

246.   With respect to the allegations of paragraph two hundred forty-six (246), the Governor affirmatively states that Title II of the Americans with Disabilities Act (ADA) is a writing that speaks for itself.

247.   With respect to the allegations of paragraph two hundred forty-seven (247), the Governor affirmatively states that definitions contained within the ADA are writings that speak for themselves.

248.   With respect to the allegations of paragraph number two hundred-forty-eight (248) of the Complaint, the Governor affirmatively states that the allegations call for legal conclusions to which no response is required; but insofar as a response is required, the Governor lacks knowledge sufficient to admit or deny the allegations, and therefore denies them.

249.   With respect to the allegations of paragraph number two hundred-forty-nine (249) of the Complaint, the Governor is without knowledge or information sufficient to form a belief as to the truth of the allegations and therefore the Governor denies them.

250.   With respect to the allegations of paragraph number two hundred-fifty (250) of the Complaint, the Governor is without knowledge or

information sufficient to form a belief as to the truth of the allegations and therefore the Governor denies them.

251.   The Governor denies the allegations in paragraph number two hundred-fifty-one (251) of the Complaint.

252.   With respect to the allegations of paragraph number two hundred-fifty-two (252) of the Complaint, the Governor affirmatively states that the allegations call for legal conclusions to which no response is required; but insofar as a response is required, the Governor denies the allegations.

### SIXTH CLAIM FOR RELIEF

253.   With respect to the allegations of paragraph number two hundred fifty-three (253) of the Complaint, the Governor responds as if the answers set forth in paragraphs numbers one (1) through two hundred fifty-two (252) of this answer were set forth in full in this paragraph.

254.   With respect to the allegations of paragraph two hundred fifty-four (254), the Governor affirmatively states that HB 1229 is a writing that speaks for itself.

255.   With respect to the allegations of paragraph number two hundred-fifty-five (255) of the Complaint, the Governor affirmatively states that the allegations call for legal conclusions to which no response is

required; but insofar as a response is required, the Governor denies the allegations.

256.   With respect to the allegations of paragraph number two hundred-fifty-six (256) of the Complaint, the Governor affirmatively states that the allegations call for legal conclusions to which no response is required; but insofar as a response is required, the Governor denies the allegations.

257.   With respect to the allegations of paragraph number two hundred-fifty-seven (257) of the Complaint, the Governor affirmatively states that the allegations call for legal conclusions to which no response is required; but insofar as a response is required, the Governor denies the allegations.

258.   With respect to the allegations of paragraph number two hundred-fifty-eight (258) of the Complaint, the Governor is without knowledge or information sufficient to form a belief as to the truth of the allegations and therefore the Governor denies them.

259.   The Governor denies the allegations in paragraph number two hundred-fifty-nine (259) of the Complaint.

260.   The Governor denies all allegations contained in the Complaint not specifically admitted in this answer.

## RELIEF REQUESTED

261.    The Governor denies that Plaintiffs are entitled to the relief they

request, including their requests for declaratory relief, injunctive relief,

and attorney fees and costs.

## AFFIRMATIVE DEFENSES

1.    Plaintiffs have failed to state claims for relief.

2.    Plaintiffs' claims may be barred because Plaintiffs lack a private

right of action.

3.    Plaintiffs' claims may be barred by Eleventh Amendment immunity.

4.    Plaintiffs' claims may be barred because some or all Plaintiffs lack

the standing to assert them.

5.    Plaintiffs have been afforded all the rights, privileges, and

immunities granted by the United States Constitution, the Colorado

Constitution, and state and federal law.

6.    The Governor is not a proper party to some or all of Plaintiffs'

claims.

7.    This court lacks subject matter jurisdiction over Plaintiffs' claims.

8.    Plaintiffs have not been excluded from participation in the benefits

and programs of a public entity.

9.     The Governor reserves the right to assert additional affirmative

defenses or rescind affirmative defenses after further investigation and

discovery.

Wherefore, the Governor requests this Court to enter judgment in their

favor and additionally request attorney fees and any other relief this Court

deems just and proper.

JOHN W. SUTHERS
Attorney General


s/ *Kathleen Spalding*
**Daniel D. Domenico***
Solicitor General
**David C. Blake***
Deputy Attorney General
**Kathleen Spalding***
Senior Assistant Attorney General
**Jonathan P. Fero***
Assistant Solicitor General
**Matthew D. Grove***
Assistant Attorney General
*Counsel of Record

## CERTIFICATE OF SERVICE

   I hereby certify that on _June 7_____, 2013 I served a true and complete copy of the foregoing ANSWER TO FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF upon all counsel of record listed below via the CM/ECF system for the United States District Court for the District of Colorado:

David B. Kopel        david@i2i.org

Jonathan M. Anderson    jmanderson@hollandhart.com

Richard A. Westfall     rwestfall@halewestfall.com
Peter J. Krumholz      pkrumholz@halewestfall.com

Marc F. Colin        mcolin@bcjlpc.com

Anthony J. Fabian      fabianlaw@qwestoffice.net


         _s/ Debbie Bendell_____

56

211

Appellate Case: 14-1290   Document: 01019371743   Date Filed: 01/16/2015   Page: 224

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No. 13-cv-01300-MSK-MJW

JOHN B. COOKE, Sheriff of Weld County, Colorado, *et al.,*

Plaintiffs,

v.

JOHN W. HICKENLOOPER
in his official capacity as Governor of the State of Colorado,

Defendant.

---

## GOVERNOR'S MOTION FOR CERTIFICATION OF QUESTIONS OF LAW TO THE COLORADO SUPREME COURT

---

Defendant, Governor John W. Hickenlooper, by and through undersigned counsel, hereby moves for the certification of the following questions of law pertaining to Counts II, III, and IV of the First Amended Complaint.  As outlined below, Plaintiffs' complaint presents novel and uncertain constitutional questions; clear guidance from the Colorado Supreme Court as to the scope and meaning of these challenged provisions as a matter of state law will potentially be determinative of several of the questions presented in Plaintiffs' federal lawsuit.  In addition, the Governor will not object to the entry of a preliminary injunction in the form of the proposed order attached hereto as Exhibit A, during the pendency of any certification proceeding.

As grounds for this motion, the Governor states as follows:

### *Duty to confer*

1.      Pursuant to D.C.Colo.L.CivR. 7.1A, undersigned counsel

conferred with counsel for the Plaintiffs concerning this motion during a

phone conference on June 6, 2013.  Plaintiffs object to this motion and the

relief requested herein.

### *Standards for certification of questions to the Colorado Supreme Court*

2.      Colorado Appellate Rule 21.1 permits the Colorado Supreme

Court to answer a question of law certified to it by a United States District

Court if the question "may be determinative of the cause then pending in

the certifying court and as to which it appears to the certifying court there

is no controlling precedent in the decisions of the [Colorado] Supreme

Court."  Colo. App. R. 21.1(a).

3.      Federal courts do not certify questions to "sister state courts

every time an arguably unsettled question of state law comes across

[their] desks." *Pino v. United States*, 507 F.3d 1233, 1236 (10th Cir. 2007).

However, courts will certify questions "in circumstances where the

question... (1) may be determinative of the case at hand and (2) is

sufficiently novel that we feel uncomfortable attempting to decide it

without further guidance." *Id.*

4.      Certification of questions of law to a state supreme court is

particularly appropriate when a lawsuit filed in federal court alleges that

a challenged state law is unconstitutionally vague.  While a federal court

2

may of course rely on the doctrine of avoidance in order to avoid reaching

unnecessary constitutional conclusions, *see, e.g., Ashwander v. Tennessee*

*Valley Authority,* 297 U.S. 288, 346-48 (1936) (Brandeis, J., concurring), it

is well-settled that federal courts should abstain from – or at least defer –

deciding challenges to state law that involve unsettled questions in a

"sensitive area of social policy" involving "substantial constitutional

issue[s]." *R.R. Comm'n of Tex. v. Pullman Co.,* 312 U.S. 496, 498 (1941).

This is particularly true in situations where the constitutional issue could

be "avoided if a definitive ruling on the state issue would terminate the

controversy." *Id., see also Growe v. Emison,* 507 U.S 25, 32 n.1 (1993).

5.     The advent of state-court certification procedures, which the

United States Supreme Court has urged the lower federal courts to utilize,

has reduced reliance on *Pullman* abstention over the past several decades.

*See Arizonans for Official English v. Arizona,* 520 U.S. 43, 75-76 (1997)

(noting that "[c]ertification today covers territory once dominated by a

deferral device called '*Pullman*' abstention").

6.     In cases involving an allegation that a challenged statute is

void-for-vagueness, the Supreme Court has encouraged the utilization of

state-court certification procedures not only as a matter of comity, but also

because of the greater interpretive flexibility inherent in a state supreme

court's consideration of its own state law.  *See, e.g., Arizonans for Official*

*English,* 520 U.S. at 75-77; *Babbit v. Farm Workers,* 442 U.S. 289 (1979).

7.     Of course, the Supreme Court has held that certification or abstention is inappropriate in cases involving a challenged provision that is not "fairly subject to an interpretation which will render unnecessary or substantially modify the federal constitutional question." *Bd. of Airport Comm'rs v. Jews for Jesus, Inc.,* 482 U.S. 569, 575-76 (1989).  But H.B. 13-1224 suffers from neither of these problems.  Indeed, even assuming with conceding that the challenged statute does suffer from vagueness problems, the Colorado Supreme Court is well-equipped to address those questions.  Indeed, it has done so before in a similar context, albeit through a case that reached it through a direct appeal.  *See Robertson v. City and County of Denver,* 874 P.2d 325, 334-35 (Colo. 1994) (addressing void-for-vagueness challenge to Denver ordinance banning "assault weapons," and severing constitutionally vague portion to preserve ordinance's constitutionality).

8.     The Tenth Circuit has recognized that certification is warranted where the question presented is "close, important, novel, and determinative." *Larrieu v. Best Buy Stores, L.P.* 491 Fed.Appx. 864, 866 (10th Cir. 2012) (unpublished disposition).  Plaintiffs' Counts II, III, and IV, satisfy all of these criteria.

a.  First, H.B. 13-1224 is subject to a range of interpretations. Some of these might raise vagueness concerns, and others may not.  But what is clear is that the vagueness question is

close enough that a definitive interpretation of the law from the Colorado Supreme Court may well obviate the Plaintiffs' vagueness challenges altogether.  Such an outcome is not only plausible, it is the likely outcome of a certification procedure.

b.  Second, questions of social policy and public safety, not to mention the constitutionality of a duly enacted state law, are obviously important.

c.  Third, virtually any questions raised under the Second Amendment are novel at this state.  Litigation in the wake of *District of Columbia v. Heller,* 554 U.S. 570 (2008), remains a "vast *terra incognita*" that federal and state courts are only beginning to explore.  *United States v. Masciandaro,* 638 F.3d 458, 475 (4th Cir. 2011).

9.  Due in part to the uncertain nature of Second Amendment litigation so soon after *Heller*, certification is the best course for this Court to follow in order to ensure that its eventual constitutional decision is either narrowed substantially via a definitive ruling from the Colorado Supreme Court, or, at a minimum, based on an accurate and enforceable interpretation of Colorado state law.

10.  To ensure that the Plaintiffs' concerns about vagueness are obviated during the pendency of any certification proceedings, the Governor is amenable to the entry of a preliminary injunction, in the form

of Exhibit A, that would remain in place until judgment on the merits is entered.

*<u>Questions to be certified</u>*

Accordingly, the Governor respectfully requests that this Court certify the following questions to the Colorado Supreme Court pursuant to Colorado Appellate Rule 21.1:

a. Effective July 1, 2013, HB 12-1224 generally bars new acquisitions and transfers of "large-capacity magazines" in Colorado.  Does the bill's definition of "large-capacity magazine" amount to a ban on functional magazines for most handguns and many rifles, or does it apply only to magazines that are principally used with extensions or devices that increase the combined capacity to more than 15 rounds?

b. Does the grandfather clause contained in HB 13-1224, which applies when an owner "maintains continuous possession" of a large capacity magazine after July 1, 2013, apply when the owner allows another person to temporarily hold, use, or share it for lawful purposes?

A draft order outlining the terms of the proposed preliminary injunction and order of certification is submitted herewith.

Respectfully submitted this 10th day of June, 2013.

6

JOHN W. SUTHERS
Attorney General


s/ *Daniel D. Domenico*
_____

**Daniel D. Domenico***
Solicitor General
**David C. Blake***
Deputy Attorney General
**Kathleen Spalding***
Senior Assistant Attorney General
**Jonathan P. Fero***
Assistant Solicitor General
**Matthew D. Grove***
Assistant Attorney General
*Counsel of Record

## CERTIFICATE OF SERVICE

I hereby certify that on ___June 10_____, 2013 I served a true and complete copy of the foregoing **MOTION FOR CERTIFICATION OF QUESTIONS OF LAW TO THE COLORADO SUPREME COURT** upon all counsel of record listed below via the CM/ECF system for the United States District Court for the District of Colorado:

David B. Kopel                          david@i2i.org

Jonathan M. Anderson                    jmanderson@hollandhart.com

Richard A. Westfall                     rwestfall@halewestfall.com
Peter J. Krumholz                       pkrumholz@halewestfall.com

Marc F. Colin                           mcolin@bcjlpc.com

Anthony J. Fabian                       fabianlaw@qwestoffice.net


                                        _s/ Debbie Bendell_____

8

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 13-cv-01300-MSK-MJW

JOHN B. COOKE, Sheriff of Weld County, Colorado, *et al.*

 Plaintiffs,

v.

JOHN W. HICKENLOOPER, Governor of the State of Colorado,

 Defendant.

---

## PRELIMINARY INJUNCTION AND ORDER CERTIFYING QUESTIONS TO THE COLORADO SUPREME COURT UNDER COLORADO APPELLATE RULE 21.1

---

 On consideration of the Defendant's motion for certification of questions of law to the Colorado Supreme Court, and being fully advised in the premises, the Court hereby grants the motion, orders the questions herein certified, and issues a preliminary injunction against enforcement of H.B. 13-1224 beyond the scope outlined below.  The Court finds and orders as follows:

1. This case involves challenges to two recently enacted Colorado laws, HB 13-1224 and HB 13-1229.  This order and preliminary injunction pertains only to HB 13-1224.

2. Subject to some exceptions, HB 13-1224 prohibits the sale, transfer, or possession of "large-capacity magazines" in the state of Colorado on or after July 1, 2013.

3. In pertinent part, the statute defines a "large-capacity magazine" as "[a] fixed or detachable magazine, box, drum, feedstrip, or similar device capable of accepting, or that is designed to be readily converted to accept, more than fifteen rounds of ammunition.

4. The statute also contains a grandfather clause that permits possession of a large-capacity magazine on or after July 1, 2013 provided that the possessor: a) owned the magazine on the statute's effective date; and b) "maintains continuous possession" of it thereafter.

5. Counts II, III, and IV of the of the Plaintiffs' First Amended Complaint allege that the statute's definition of "large-capacity magazine" and its requirement of "continuous possession" are unconstitutionally vague.

6. Counts II, III, and IV of the First Amended Complaint raise sensitive issues of social policy involving substantial constitutional issues.

7. It appears that the statutory references to "large-capacity magazine" and "continuous possession" are "fairly subject to an interpretation that will render unnecessary or substantially modify the federal constitutional question[s]" presented in Counts II, III, and IV of the First Amended Complaint. *Bd. of Airport Comm'rs v. Jews for Jesus, Inc.,* 482 U.S. 569, 575-76 (1989).

8. Only the Colorado Supreme Court may definitively interpret the challenged provisions as a matter of Colorado state law, and it appears that such an interpretation may well obviate or substantially modify the Plaintiffs' concerns about vagueness.

## **Certification pursuant to Colorado Appellate Rule 21.1**

9. Accordingly, the Court hereby certifies the following questions to the Colorado Supreme Court:

   a. Effective July 1, 2013, HB 12-1224 generally bars new acquisitions and transfers of "large-capacity magazines" in Colorado.  Does the bill's definition of "large-capacity magazine" amount to a ban on functional magazines for most handguns and many rifles, or does it apply only to magazines that are principally used with extensions or devices that increase the combined capacity to more than 15 rounds?

   b. Does the grandfather clause contained in HB 13-1224, which applies when an owner "maintains continuous possession" of a large capacity magazine after July 1, 2013, apply when the owner allows another person to temporarily hold, use, or share it for lawful purposes?

2

## **Preliminary injunction**

10. Upon signing HB 13-1224 into law, the Governor requested the Colorado Attorney General and the Colorado Department of Public Safety to provide to all law enforcement agencies in the State of Colorado official written guidance on how HB 13-1224 is to be interpreted and applied in Colorado. That official guidance is attached to this Order as Attachment 1 ("Technical Guidance").

11. The Governor is the chief executive of the State of Colorado, and the Attorney General is the chief legal officer and law enforcement official of the state. *See* Colo. Const., art. IV § 2 ("The supreme executive power of the state shall be vested in the governor, who shall take care that the laws be faithfully executed."); Colo. Rev. Stat. § 24-31-101(1)(a) ("The attorney general of the state shall be the legal counsel and advisor of each department, division, board, bureau, and agency of the state government other than the legislative branch. . . . He . . . shall appear for the state and prosecute and defend all actions and proceedings, civil and criminal, in which the state is a party or is interested when required to do so by the governor . . . .").

12. The Technical Guidance is an "official written interpretation" of HB13-1224. It has been adopted by the Governor and the Colorado Department of Public Safety. Official written interpretations of criminal laws are binding and create an affirmative defense for individuals charged under those laws. *See* Colo. Rev. Stat. § 18-1-504(2)(c) (providing an affirmative defense to criminal prosecutions contrary to "official written interpretation of the statute or law relating to the offense, made or issued by a public servant, agency, or body legally charged or empowered with the responsibility of administering, enforcing, or interpreting" it).

13. Pursuant to Fed. R. Civ. P. 65(d), the Court hereby issues a preliminary injunction binding the Governor, and any of his officers, agents, servants, employees, and attorneys, to the conclusions of the Technical Guidance as the official interpretation of the chief executive and chief legal officers of the State of Colorado.

14. Specifically, for example, consistent with the Technical Guidance, for the duration of this preliminary injunction, a magazine that accepts fifteen or

fewer rounds may not be considered a "large capacity magazine" simply because it includes a removable baseplate which may be replaced with one that allows the magazine to accept additional rounds.

15. In addition, for the duration of this injunction the grandfather clause in HB 13-1224 may not be construed as barring the temporary transfer of a large-capacity magazine by an individual who remains in the continual physical presence of the temporary transferee, unless that temporary transfer is otherwise prohibited by law.

16. This preliminary injunction shall remain in force until this Court reaches a decision on the merits in this case, whether or not the Colorado Supreme Court accepts the questions certified pursuant to Colorado Appellate Rule 21.1.

DATED this _____ day of June, 2013.


_____
United States District Judge

4

John W. Suthers
Attorney General

Cynthia H. Coffman
Chief Deputy Attorney General

Daniel D. Domenico
Solicitor General

**STATE OF COLORADO**
**DEPARTMENT OF LAW**

Office of the Attorney General

Ralph L. Carr
**Colorado Judicial Center**
1300 Broadway, 10th Floor
Denver, Colorado 80203
Phone (720) 508-6000

May 16, 2013

Colorado Department of Public Safety
Executive Director James H. Davis
700 Kipling Street, 3rd Floor
Denver CO 80215

RE:   Technical Guidance on the Interpretation and Application of House Bill 13-
1224, Large-Capacity Magazine Ban

Dear Executive Director Davis:

House Bill 13-1224, which was passed during this year's legislative session and
becomes effective July 1, 2013, prohibits the sale, transfer, and possession of "large-
capacity ammunition magazines." On March 20, 2013, in a statement issued at the
time he signed HB 13-1224 into law, Governor Hickenlooper instructed "the
Colorado Department of Public Safety to consult with the Office of the Attorney
General and others, as necessary . . . and then to draft and issue, to law
enforcement agencies in the State of Colorado, technical guidance on how the law
should be interpreted and enforced."

This letter sets forth the technical guidance requested by the Governor.

**Introduction**

This technical guidance, issued at the request of the Governor, is meant to assist
Colorado law enforcement agencies in understanding and applying portions of
House Bill 13-1224, which regulates the sale, transfer, and possession of "large
capacity magazines." Although this guidance is not binding on the courts, it is based
upon existing legal principles and represents a fair and accurate reading of the
legislation.

**Definition of "Large Capacity Magazine"**

Under House Bill 1224, the term "large capacity magazine" is defined, in part, as
follows: "a fixed or detachable magazine, box, drum, feed strip, or similar device
capable of accepting, or that is designed to be readily converted to accept, more than
fifteen rounds of ammunition."

The phrase "designed to be readily converted to accept more than fifteen rounds of ammunition" has prompted questions regarding the scope of the definition, particularly because some ammunition magazines include features, such as removable baseplates, that can be removed and replaced, or otherwise altered, so that the magazine accepts more than fifteen rounds.

The term "designed," when used as a modifier, denotes a feature that meets a specific function. This suggests that design features that fulfill more than one function, and whose function is not specifically to increase the capacity of a magazine, do not fall under the definition. The features of a magazine must be judged objectively to determine whether they were "designed to be readily converted to accept more than fifteen rounds."

Under this reading of the definition, a magazine that accepts fifteen or fewer rounds is not a "large capacity magazine" simply because it includes a removable baseplate which may be replaced with one that allows the magazine to accept additional rounds. On many magazines, that design feature is included specifically to permit cleaning and maintenance. Of course, a magazine whose baseplate is replaced with one that does, in fact, allow the magazine to accept more than fifteen rounds would be a "large capacity magazine" under House Bill 1224.

### "Possession" of Large-Capacity Magazines and Application of the Grandfather Clause of House Bill 1224

House Bill 1224 also places limitations on when and how a large-capacity magazine may be sold, transferred, or possessed. In particular, the bill's grandfather clause permits possession of a large-capacity magazine on or after July 1, 2013 by an individual who "owns" such a magazine on that date and "maintains continuous possession" of it thereafter. However, the bill prohibits the owner of a large-capacity magazine from selling or transferring it after July 1, 2013, and also prohibits an individual who as of July 1 did not own and since then has not continuously possessed a particular large-capacity magazine to possess it after July 1, 2013.

Responsible maintenance, handling, and gun safety practices, as well as constitutional principles, dictate that these provisions cannot be reasonably construed as barring the temporary transfer of a large-capacity magazine by an individual who remains in the continual physical presence of the temporary transferee, unless that temporary transfer is otherwise prohibited by law. For example, an owner should not be considered to have "transferred" a large-capacity magazine or lost "continuous possession" of it simply by handing it to a gunsmith, hunting partner, or an acquaintance at a shooting range with the expectation that it will be promptly returned. Likewise, a gunsmith, hunting partner, or acquaintance at a shooting range who acquires temporary physical custody of a large-capacity magazine from its owner should not be considered in "possession" of the magazine

so long as he or she remains in the owner's physical presence. However, it would be unreasonable to construe the bill or this guidance to exempt a temporary transfer of a large-capacity magazine in connection with criminal activity.

For similar reasons, the bill's requirement that an owner must maintain "continuous possession" in order to ensure the application of the grandfather clause cannot reasonably be read to require continuous physical possession. Proper storage of a large-capacity magazine, such as in a gun safe in the owner's home or in a secure carrying case in the trunk of an automobile, is entirely consistent with the bill's intent of limiting the acquisition and permanent transfer of large-capacity magazines after the effective date of July 1, 2013.

Sincerely,

JOHN W. SUTHERS
Colorado Attorney General


cc:     Governor John Hickenlooper
        Jack Finlaw, Chief Legal Counsel to Governor Hickenlooper

226

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 13-CV-1300-MSK-MJW

JOHN B. COOKE, Sheriff of Weld County, *et al.*,

    Plaintiffs

v.

JOHN W. HICKENLOOPER, Governor of the State of Colorado,

    Defendant.

---

## MOTION FOR TEMPORARY RESTRAINING ORDER
## AND FOR PRELIMINARY INJUNCTION

Pursuant to FED. R. CIV. P. 65, Plaintiffs respectfully request that the Court issue a temporary restraining order and preliminary injunction to enjoin enforcement of two clauses and one word in House Bill 13-1224 ("HB 1224"), which is scheduled to take effect on July 1, 2013, until there is a resolution on the merits of Plaintiffs' claims.

### I.    D.C.COLO.LCIVR 7.1(A) CERTIFICATION.

Plaintiffs' counsel has conferred with counsel for the Governor regarding the subject matter of this motion, and the Governor opposes the relief sought.

### II.    INTRODUCTION AND SUMMARY OF ARGUMENT.

HB 1224 is widely known as a ban on so-called "large capacity" ammunition magazines. Its central feature is a general prohibition on the ownership and sale of ammunition magazines that hold more than 15 rounds of ammunition after it becomes effective on July 1, 2013. Although Plaintiffs challenge that core provision in this lawsuit, it is not the subject of this motion. Rather, this motion seeks only to preserve the status quo with respect to two ancillary provisions of HB

1

1224 on the grounds that they are unconstitutionally vague and, to the extent they are not vague, are facial violations of the Second Amendment. Simply put, these portions of HB 1224 sweep so broadly that people are left to guess what they mean, including those who are in the business of selling these magazines and those who are charged with enforcing them. Rather than risk criminal sanctions for an incorrect guess, Plaintiffs and others will choose to forgo otherwise constitutionally protected conduct. The Court should delay the effectiveness of these limited provisions until it can consider all the facts and assess their constitutionality.

First, HB 1224's definition of "Large-capacity magazines" includes not only those that actually hold more than fifteen rounds, but also those that are "designed to be readily converted" to hold more than fifteen rounds. This motion is directed only at the "designed to be readily converted" language because it is unconstitutionally vague. Magazines are made in sizes less than fifteen rounds. However, the majority of such box and tube magazines contain removable base plates and end caps, and thus can be "readily converted" to magazines exceeding 15 rounds via both commercially-available and readily-fabricated methods. The bill as written has the effect of banning most magazines of any size. Moreover, a person who wants to sell or purchase a magazine that holds fewer rounds may not be able to determine if the magazine can be converted, much less whether it was "designed" for that purpose. A criminal statute which creates such inherent uncertainty is vague, unenforceable, and a violation of the Fourteenth Amendment of the United States Constitution.

Second, HB 1224 contains provisions that "grandfather" magazines of more than 15 rounds that are owned as of July 1, 2013, but only if the owner maintains "continuous possession" of the magazines thereafter. The "continuous possession" requirement is unconstitutionally vague

because it could reasonably be interpreted as prohibiting permanent or long-term transfers of magazines of more than 15 rounds, or it could criminalize even the most innocent and constitutionally protected types of temporary transfers of magazines and firearms, such as lending the firearm and magazine to a family member for self-defense or leaving the firearm and magazine with a licensed firearms dealer for repairs.

The Colorado Attorney General issued a "Technical Guidance" letter setting forth the State's current, non-binding position on how it believes both provisions should be interpreted. Setting aside that the letter is non-binding, it does nothing to resolve the problems with either provision. The Attorney General's position is that "continuous possession" is maintained so long as the magazine remains in the "continual physical presence" of the owner and is transferred to another with the "expectation that it will be promptly returned." This nearly useless "clarification" nonetheless violates the Second Amendment because it bans any routine, lawful sharing of firearms with affected magazines between family members, safety instructors, and firearms dealers, which chills fundamental Second Amendment rights. Indeed, despite the Attorney General's opinion, the plain language of HB 1224 itself does not permit *any* transfers of otherwise-grandfathered magazines.

Accordingly, Plaintiffs ask this Court to enjoin enforcement of both the "designed to be readily converted" and "continuous possession" requirements within HB 1224. Neither the Defendant nor the public interest will be harmed by the requested relief because Plaintiffs merely seek to preserve the status quo while the Court determines the constitutionality of these provisions.

### III.    ARGUMENT.

#### A.    Legal Standards.

Plaintiffs seek a temporary restraining order and preliminary injunction against the Defendant pursuant to FED. R. CIV. P. 65. The decision to grant such relief is within the Court's sound discretion. *See, e.g., Kikumura v. Hurley,* 242 F.3d 950, 955 (10th Cir. 2001) (reviewing district court's decision on preliminary injunction for abuse of discretion). The object of such relief is to preserve the status quo, so that the rights of the parties at final hearing may be determined without injury to either. *See Resolution Trust Corp. v. Cruce*, 972 F.2d 1195, 1198 (10th Cir. 1992) ("The primary function of a preliminary injunction is to preserve the status quo pending a final determination of the rights of the parties . . . in order to preserve the power to render a meaningful decision on the merits.").

To obtain a preliminary injunction, the moving party must establish:

> (1) the moving party will suffer irreparable injury unless the injunction issues; (2) the threatened injury to the moving party outweighs whatever damage the proposed injunction may cause the opposing party; (3) the injunction, if issued, would not be adverse to the public interest; and (4) there is a substantial likelihood that the moving party will eventually prevail on the merits.

*Id*.

"When a party seeking a preliminary injunction satisfies the first three requirements, the standard for meeting the fourth 'probability of success' prerequisite becomes more lenient." *Id*. "The movant need only show questions going to the merits so serious, substantial, difficult and doubtful, as to make them a fair ground for litigation." *Id*. In the instant case, the first three requirements are clearly satisfied, making a preliminary injunction proper if Plaintiffs' arguments on the constitutional merits are serious enough to be "fair ground for litigation."

### B.     H.B. 13-1224.

HB 1224 (Attachment A) criminally punishes any person "who sells, transfers, or possesses" what the bill calls a "large-capacity magazine." The maximum sentence is twelve months imprisonment, or a one thousand dollar fine, or both. Attachment A at 2; *see* Colo. Rev. Stat. § 18-1.3-501(1)(a). The bill defines "large-capacity magazine" as any fixed or detachable magazine, box, drum, feed strip, or "similar device capable of accepting, or that is ***designed to be readily converted*** to accept, more than fifteen rounds of ammunition." *Id.* at 1-2 (emphasis added).

HB 1224 purports to "grandfather" currently-owned magazines which actually hold more than fifteen rounds or which are "designed to be readily convertible" to do so. The "grandfathered" owner may "possess" magazines, but temporary "transfers" are forbidden. In order to maintain the highly restrictive "grandfathered" status afforded by HB 1224, the owner must maintain "continuous possession of the large-capacity magazine." *Id.* at 3. The bill does not define "continuous possession."

### C.     The Attorney General's Technical Guidance Letter.

On May 16, 2013, Attorney General John Suthers issued a "Technical Guidance" letter ("the Letter," Attachment B) at the Governor's request which purports to resolve some of the vagueness and ambiguity problems identified in Plaintiffs' Complaint.  While the Letter provides the Attorney General's opinion on how HB 1224 should be interpreted and enforced, this guidance is not legally binding and has no effect on the actual provisions of HB 1224 itself.  *See Colorado Min. Ass'n v. Board of County Com'rs of Summit County*, 199 P.3d 718, 731 (Colo. 2009) (courts may consult and take into account an agency's guidance, rules, and determinations,

but they do not bind the courts' construction of the applicable law); Attachment B at 1 ("this guidance is not binding on the courts").

### ("Designed to Be Readily Converted")

In the Letter, the Attorney General states that the bill's definition of a "large capacity magazine" does not include every magazine that could conceivably be converted to a "large capacity magazine" "simply because" the magazine has a removable base plate or other similar features.  Attachment B at 2. Rather than providing any bright-line test, the Letter concludes that a magazine's "features" "must be judged objectively to determine whether they were 'designed to be readily converted to accept more than fifteen rounds.'" The Letter does not further define what "judged objectively" means nor does it define who or what does the judging or what process would be employed to make the necessary determinations.

### ("Continuous Possession")

The Letter also states that only "temporary transfers" of "grandfathered" magazines are permissible, and only so long as the magazine remains in the "continual physical presence" of the owner. Furthermore, any "temporary transfer" must also be done with the "expectation that it will be promptly returned." *Id.*

### D.    The Plaintiffs Will Suffer Immediate and Irreparable Harm in the Absence of Injunctive Relief.

#### 1.    The Harm That Plaintiffs Will Suffer Is Irreparable.

The Plaintiffs will suffer irreparable harm in the absence of immediate injunctive relief. "Although there is no black letter definition for what constitutes irreparable injury, the essence of the concept requires a substantial threat of harm to the movant that cannot be compensated by money." *Harvey Barnett, Inc. v. Shidler*, 143 F. Supp. 2d 1247, 1255 (D. Colo. 2001); *see also*

*Mountain Medical Equipment, Inc. v. Healthdyne, Inc*., 582 F. Supp. 846, 848 (D. Colo. 1984). The threat encompasses actions that are "about to occur." *Id* at 848. "The notion of irreparable injury thus only refers to harm that might occur *pendent lite* if the preliminary injunction is not granted." *Id.*

Violations of enumerated constitutional rights are *per se* "irreparable injury" in the Tenth Circuit. *Pinson v. Pacheco*, 397 Fed. Appx. 488, 491-92 (10th Cir. 2010) (Eighth Amendment); *Edmisten v. Werholtz*, 287 Fed. Appx. 728 (10th Cir. 2008) (Eighth Amendment); *Kikumura v. Hurley*, 242 F. 3d 950, 963 (10th Cir. 2001) (First and Fifth Amendments).

As detailed throughout this motion, if HB 1224's "designed to be readily converted" and "continuous possession" elements are permitted to be enforced as-written, the Plaintiffs and the public at large will suffer direct and irreparable infringements of their constitutional rights, as well as an unconstitutional chilling effect on the exercise of these constitutional rights.

HB 1224's prohibition of magazines "designed to be readily" converted to prohibited larger magazines will cause irreparable harm to citizens, business owners, and law enforcement officials because it plainly violates the Second and Fourteenth Amendments. Due to its vagueness, the language of the statute has the potential to criminalize the ordinary use of a huge range of commonly-used firearms in Colorado because nearly all magazines may be considered illegal. Apart from the obvious incalculable financial burdens this will place on firearms dealers and recreational facilities, this prohibition directly impacts the fundamental rights of ordinary citizens to own and use common firearms and firearm magazines for their intended lawful purposes, such as self-defense.

Additionally, HB 1224's prohibition of simple transfers of "grandfathered" magazines in the most harmless of contexts (such as loans between family and friends, or transfers for purposes of repair, maintenance, or training) is a patent violation of fundamental Second and Fourteenth Amendment rights that cannot be redressed by financial compensation, which would be impossible to calculate and may be unavailable in any event due to the Eleventh Amendment. Even as interpreted by the Attorney General, HB 1224 prohibits many "temporary transfers" of "grandfathered" magazines for innocent purposes (such as loans between family and friends, or transfers for purposes of repair, maintenance, or training). Such a prohibition is an immediate and patent violation of fundamental Second and Fourteenth Amendment rights that cannot be redressed by financial compensation.

The *per se* irreparable injury of the violation of constitutional rights is aggravated by irreparable harm to law enforcement and licensed firearm dealers. Neither the Attorney General, licensed firearms dealers, nor the Sheriffs have any way to know which magazines are "designed" by their manufacturers to be readily converted to prohibited larger magazines. It will be impossible for the Sheriffs or any other law enforcement officers to enforce "designed to be readily converted" in a consistent and non-arbitrary way. Similarly, lawfully licensed firearms dealers are forced to speculate as to which magazines can be lawfully sold or transferred after July 1, 2013. Should they guess incorrectly, the affirmative defense offered by the Technical Guidance will provide little comfort in the face of a criminal prosecution.

Similarly, if the Sheriffs attempt to enforce the ban on the transfer of "grandfathered" magazines and the "continuous possession" mandate, the Sheriffs will have to commit facially

unconstitutional acts, such as arresting someone who has left a magazine at a gunsmith for repair or cleaning.

### 2.   The Harm that Plaintiffs Will Suffer Is Imminent.

The irreparable harm is imminent. HB 1224 is scheduled to take effect on July 1, 2013. The irreparable violation of the Plaintiffs' constitutional rights will take place the moment HB 1224 goes into effect.

In the context of a constitutional injury, the Tenth Circuit distinguishes between injuries which take place, and injuries which might or might not occur at some future time. *See Pinson v. Pacheco*, 397 Fed. Appx. 488, 491-92 (10th Cir. 2010) (Eighth Amendment) (prisoner's speculation that he might some day be attacked by gangsters was not an imminent injury); *Edmisten v. Werholtz*, 287 Fed. Appx. 728 (10th Cir. 2008) (denial of medical treatment, causing chronic pain and inability to eat solid foods was obviously imminent); *Kikumura v. Hurley*, 242 F. 3d 950, 963 (10th Cir. 2001) (denial of pastoral visit for prisoner).

Unlike in *Pinson*, Plaintiffs are not speculating that they may suffer an injury sometime in the future. As in *Edmisten* and *Kikumura*, Plaintiffs have detailed specific injuries that are certain to occur on July 1.  After July 1, Plaintiffs will immediately be chilled from exercising their Second Amendment rights to buy, sell, and use magazines by the uncertainty as to what magazines are illegal because of HB 1224's unconstitutionally vague "designed to be readily converted" language. Based on HB 1224's "continuous possession" requirement, Plaintiffs will also be forbidden from lending otherwise legal "grandfathered" magazines and associated firearms with a gunsmith for repair or maintenance, or temporarily transferring their magazines and associated firearms to family members.

These imminent and irreparable constitutional injuries are all the more aggravated for some of the Plaintiffs. Sheriffs are required to enforce "all laws of the State of Colorado." COLO. REV. STAT. § 16-2.5-103. But the Colorado Constitution, which is superior to any state legislature bill, requires that Sheriffs, as civil officers, "subscribe an oath or affirmation to support the constitution of the United States." COLO. CONST., art. XII, § 8. Under the Colorado Constitution, Sheriffs are elected directly by the People. COLO. CONST., art. XIV, § 8. The Sheriffs face the dilemma of a statutory requirement to enforce the facially unconstitutional provisions of HB 1224 while also being constitutionally compelled to comply with the United States Constitution. Licensed firearms dealers are faced with a similar dilemma: stop selling all magazines and associated firearms that may potentially fall into the "designed to be readily converted" category and risk bankruptcy and business failure, or be subjected to potential criminal prosecution under HB 1224.

Consistent enforcement of HB 1224 as written will be impossible and will result in unlawful arrests, discordant legal opinions, and a massive burden to both the public and law enforcement. Sheriffs and licensed firearms dealers will be compelled to ascertain whether some magazines of 15 rounds or less are "designed to be readily converted" to prohibited larger magazines—an impossible task that is prone to all manner of mistakes and inconsistencies. Further, all or many simple temporary transfers of one "grandfathered" magazine to another person will be a potential crime based on the "continuous possession" requirement, and Sheriffs will be required to enforce these vague and facially unconstitutional laws. Even if the Attorney General's Technical Guidance letter constitutes binding law (which it does not), Sheriffs will still be forced to

determine whether a particular "temporarily transferred" magazine was in the owner's "continual physical presence" and was loaned with the "expectation that it will be promptly returned."

### E.   The Certain Injury to the Plaintiffs Outweighs any Potential Damage that the Proposed Injunction Would Cause the Defendant.

The Plaintiffs seek only to preserve the status quo so that a trial can be held without either the Plaintiffs or the Defendant having been injured. *See Resolution Trust Corp. v. Cruce*, 972 F.2d 1195, 1198 (10th Cir. 1992). An injunction would protect the Plaintiffs because, among other things, it would 1) allow for the Sheriffs to continue with their duties without being compelled to make arrests or otherwise investigate possible crimes based on vague or facially unconstitutional language; 2) permit licensed firearms dealers, gunsmiths, shooting ranges, and other persons engaged in lawful businesses to continue to do so without fear of criminal prosecution; and, 3) permit lawful firearm owners to continue to own, operate, leave for repair/maintenance, and lend legal firearms and magazines to others for lawful purposes.

An injunction will not harm the Defendant. Defendant will simply continue to enforce all of the many Colorado gun control laws which *are* constitutional, while the Court determines the constitutionality of HB 1224.

Significantly, granting the motion does not in any way impinge Defendant's desire to freeze the number of so-called "large capacity magazines" in Colorado. Plaintiffs are not seeking a preliminary injunction on HB 1224's ban on sales. Granting the motion would merely allow the owners of "grandfathered" magazines to continue with the ordinary and constitutionally-protected activities such as having magazines repaired for safety, or allowing a family member to use an owner's firearm and its associated magazine. Granting the motion would likewise allow

the continuing sale and use of magazines of fifteen rounds or less without fear of criminal prosecution or civil lawsuits.

**F.     The Proposed Injunctive Relief Will Not Be Adverse to the Public Interest.**

The public interest is served by the requested injunction. Indeed, an injunction will *benefit* the public interest because it will temporarily prevent the enforcement of laws that potentially infringe on the public's fundamental constitutional rights. *See Awad v. Ziriax*, 670 F.3d 1111, 1132 (10th Cir. 2012) ("[I]t is always in the public interest to prevent the violation of a party's constitutional rights." (citation omitted)). If the Court permits the most-plainly unconstitutional language of HB 1224 to take effect on July 1, 2013, the infringements of constitutional rights will, as a matter of law, inflict irreparable injury on the Plaintiffs and the firearm-owning or firearm-using public at large. Conversely, awarding injunctive relief will simply preserve the status quo until the Court determines the constitutionality of HB 1224.

**G.     Plaintiffs Are Likely to Prevail on the Merits Because the Challenged Language of HB 1224 Is Unconstitutionally Vague.**

Vague statutes such as HB 1224 violate the Due Process Clause of the Fourteenth Amendment to the Constitution. "[T]he terms of a penal statute creating a new offense must be sufficiently explicit to inform those who are subject to it what conduct on their part will render them liable to its penalties. . . and a statute which either forbids or requires the doing of an act in terms so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application violates the first essential of due process of law." *Connally v. General Const. Co.*, 269 U.S. 385, 391 (1926). "The crime, and the elements constituting it, must be so clearly expressed that the ordinary person can intelligently choose, in advance, what course it is lawful for him to pursue." *Id.* at 393. A statute may be unlawful if it either fails to give fair warning of

prohibited conduct or if it "allows for arbitrary enforcement." *United States v. Forbes*, 806 F. Supp. 232, 237 (D. Colo. 1992).

### 1.    "Designed to be readily converted."

"Designed to be readily converted" is a term that does not exist in Colorado statutes, or in the statutes of any other State. Yet HB 1224 provides no hint about what the term means. A statute may be unconstitutionally vague if it is silent on an issue that would be expected to be within its scope, or is otherwise susceptible to more than one reasonable interpretation. *People v. Carrillo*, 297 P.3d 1028, 1032 (Colo. App. 2013); *Apodaca v. Allstate Ins. Co.*, 232 P.3d 253, 256 (Colo. App. 2009).

Moreover, because HB 1224 contains no scienter requirement, it is "little more than 'a trap for those who act in good faith.'" *Colautti v. Franklin*, 439 U.S. 379, 395 (1979) (quoting *United States v. Ragen*, 314 U.S. 513, 524 (1942)). As the Colorado Supreme Court wrote, in striking down a clause in a gun control law as void for vagueness, "ascertaining the design history and action design of a pistol is not something that can be expected of a person of common intelligence." *Robertson v. City & County of Denver*, 874 P.2d 325, 335 (Colo. 1994).

The Sixth Circuit came to a similar conclusion in striking down a provision of an ordinance banning semiautomatic handguns that are a "modification" of an automatic handgun. The Sixth Circuit ruled that the ordinance did not provide sufficient information "to enable a person of average intelligence to determine whether a weapon they wish to purchase has a design history of the sort which would bring it within this ordinance's coverage." *Peoples Rights Org., Inc. v. City of Columbus*, 152 F.3d 522, 537 (6th Cir. 1998). Plaintiffs and all citizens are faced with the

same conundrum in trying to determine if their magazines were "designed" to be readily converted.

The crux of HB 1224's vagueness is that it requires ordinary citizens and Sheriffs to know the intent of a magazine's designer—persons both unknown and unknowable in most cases.  HB 1224 declares that some magazines of 15 rounds or less are illegal, but provides no hint about what physical features of a such magazines make it illegal. The ban on whatever is "designed to be readily converted" necessarily requires firearm owners, firearms dealers and law enforcement officials to make a judgment about the magazine designer's intent—an impossible task which will inevitably lead to arbitrary enforcement based on varying guesses about what the magazine designer was thinking.

Like ordinary gun-owning citizens, the Plaintiff Sheriffs and firearms dealers have no way to know with certainty whether any particular magazine is lawful or contraband. Thus the Sheriffs are unable to uniformly enforce HB 1224. Similarly, the Plaintiff firearms dealers, owners, and trade associations do not know whether selling, acquiring, or temporarily transferring various magazines of less than 15 rounds starting on July 1 will subject them to criminal prosecution. The chilling effect on the exercise of constitutional rights is severe.

> ### a.    The Technical Guidance Confirms the Vagueness of "Designed to Be Readily Converted."

Even if the Attorney General's non-binding, readily-changeable guidance Letter were legally enforceable, the vagueness problem would be aggravated. The Letter purports to offer safe harbor for some magazines of 15 rounds or less if two conditions are met: the magazine has "design features that fulfill more than one function, *and* whose function is not specifically to increase the capacity of a magazine." Attachment B (emphasis added). When one considers that

the statute applies to ordinary consumers, the problems created by this "clarification" are self-evident.

The first condition is fulfilled by every magazine with a removable base plate or end cap because the removability fulfills both the function of repair/cleaning and the function of extendability. But a person may not be aware of the second function, particularly if they are only interested in owning one magazine.

The second condition requires law enforcement, sellers and users to determine if the magazine designer also "specifically" designed the magazine for convertibility, notwithstanding the fact that the particular design feature serves other purposes, such as cleaning and maintenance. One small capacity magazine designer might never have considered extendability when designing his magazine, while another designer may have been fully aware that his magazine was extendable, but may have been neutral or adverse to the possibility that a third party would produce aftermarket extenders for his magazine. Yet another designer might have fully intended that the removable base plate would facilitate expansion of his magazine. These designers were "specifically" thinking about the "function" of their base plates in opposite ways. Yet all of the magazines are equally "readily convertible" since the base plate comes off easily and there are extenders manufactured by third parties available for all three. Neither the gun-owning public nor law enforcement have any means of discerning the designer's specific intent and, therefore, the Attorney General's guidance on this matter does nothing to resolve HB 1224's inherent vagueness and unenforceability.

### 2.      "Continuous possession"

After July 1, 2013, the "grandfathered" owner of a magazine exceeding 15 rounds may continue to "possess" the magazine if she owns the magazine on HB 1224's effective date and maintains "continuous possession" of the magazine going forward. Attachment A at 3. Notably, while HB 1224 allows a person to "possess" "grandfathered" magazines after July 1, 2013, it says nothing about the possibility of "transfers." *Id.*

As discussed, the term "continuous possession" is not defined anywhere in HB 1224. Whether an owner's possession is "continuous" is the key issue in determining whether the owner and temporary transferee of the magazine is committing a crime under HB 1224. As written, the phrase could ostensibly require owners of "grandfathered" magazines to keep them in their possession at all times, or it could simply prohibit ownership transfers or long-term loans.

Other statutes and common law concepts interpreting the phrase "continuous possession" suggest the latter interpretation.  For example, Colorado's sales tax statutes state that if a lease or contract which gives a person the "right to continuous possession or use for more than three years of any article of tangible personal property," the lease or contract is taxed the same as the sale of that property. COLO. REV. STAT. § 39-26-102. Conversely, if the person only acquires the "right to continuous possession or use for three years or less of any article of tangible personal property under a lease or contract" no sales tax is due (as long as the lessor himself paid the sales tax when buying the property). COLO. REV. STAT. § 39-26-713(1)(a).  The statutes do not require the lessor to maintain literally continuous possession of the property; nor do the statutes forbid the lessee to lend the property to persons who are not in the "continual physical presence" of the

lessee. *See Colorado Dep't of Rev. v. City of Aurora*, 32 P.3d 590, 593 (Colo. App. 2001) (City of Aurora liable for unpaid sales tax when it failed to either pay sales tax upon acquiring golf carts or paying sales tax *when it rented the golf carts to others*). Similarly, the "continuous possession" requirement to establish a prescriptive easement does not require the person claiming the easement to "physically possess[] the land every moment of every day." *Martini v. Smith*, 18 P.3d 776, 781 (Colo. App. 2000). Nor does common law "continuous possession" for a prescriptive easement or adverse possession forbid the possessor from inviting other people to use the real property, even when the possessor is not present.

However, these reasonable, every-day interpretations are inapplicable given the plain language of HB 1224, which allows "grandfathered" owners only to "possess" magazines after July 1, 2013, only if they maintain "continuous possession" after that date. This language, especially as interpreted by the Attorney General, more likely than not means that transfers of *any kind* are illegal, or that merely leaving the house without the grandfathered magazine breaks the chain of "continuous possession."

Can a magazine owner who goes on vacation store the magazine at a neighbor's home? Only if the neighbor never touches the magazine? When, if ever, can an owner who must maintain "continuous possession" allow someone else to hold the magazine? When the owner is being instructed in safe firearms handling by someone else? When a competitor at a target shooting competition loans a magazine to a fellow competitor whose own magazine is malfunctioning? What if the owner leaves the firing line for 20 minutes, to go to the bathroom at the range's indoor clubhouse? These are just a handful of scenarios implicated by HB 1224's complete lack of guidance as to what constitutes "continuous possession."

Because HB 1224 provides absolutely no guidance as to what "continuous possession" actually *does* mean, the phrase is unconstitutionally vague and ambiguous.  *See Carrillo*, 297 P.3d at 1032 (a statute is ambiguous if is silent on an issue that would be expected to be within its scope).  Further, because "continuous possession" is undefined, and because whatever it means is not what the same phrase means within other Colorado statutes or in the common law, law enforcement officers—including the 55 Plaintiff Sheriffs—will inevitably have varying and inconsistent interpretations of the term. *See Apodaca*, 232 P.3d at 253 (terms are ambiguous when it is possible to interpret them in more than one way); *Forbes*, 806 F. Supp. at 237 (statute is unconstitutional when it will result in arbitrary enforcement).

Therefore, the Plaintiffs are likely to prevail on the merits because HB 1224 is unconstitutionally vague and violates the Due Process Clause of the Fourteenth Amendment.

### H. Plaintiffs Are Likely to Prevail on the Merits Because the Challenged Language of HB 1224 Is Vague Under the Fourteenth Amendment and Violates the Second Amendment.

#### 1. The Second Amendment Forbids Bans on Small Magazines.

Plaintiffs will demonstrate at trial that the "designed to be readily converted language" of HB 1224 is unconstitutionally ambiguous in violation of the Fourteenth Amendment for all the reason stated above. A person of average intelligence will be unable to discern what conduct is forbidden, and that uncertainly will lead to inconsistent enforcement and a chilling effect on the exercise of a constitutional right. HB 1224 may be stricken for vagueness alone, but the underlying constitutional right will also be established at trial.

As detailed above, the phrase "designed to be readily converted" potentially outlaws a (currently unknowable) group of magazines of 15 rounds or less which in fact have not been

converted to hold more than fifteen rounds. This prohibition expressly violates the Second Amendment.

The Second Amendment is not solely about firearms. The Amendment protects the right to keep and bear "arms." Arms are anything which are useful for offense or defense. *District of Columbia v. Heller*, 554 U.S. 570, 581 (2008). The arms which the Second Amendment protects are those typically possessed by law-abiding citizens for lawful purposes. *Id.* at 626-29.

The Second Amendment is not limited to firearms only; it necessarily covers everything which is necessary to the proper function of a firearm—such as ammunition. *See United States v. Pruess*, 703 F.3d 242, 245 n.1 (4th Cir. 2012) (treating Supreme Court legal rule about guns as having the same meaning for ammunition); *see also Ezell v. City of Chicago*, 651 F.3d 684, 704 (7th Cir. 2011) ("The right to possess firearms for protection implies a corresponding right to acquire and maintain proficiency in their use; the core right wouldn't mean much without the training and practice that make it effective.").

Magazines are necessary to the function of a firearm. All tube magazines and some box magazines are integral to the gun itself. They are removable only to the extent that any firearm can be disassembled. Whether removable or not, the box magazines is necessary to the function of a firearm. After all, ammunition too is removable, and it too is necessary to firearm function.

The Supreme Court in *Heller* taught that handguns are "overwhelmingly chosen by American society for [the] lawful purpose" of self-defense. *Heller*, 554 U.S. at 628. Most handguns made presently use magazines. As of 2011 (the latest year for which data are available), 82% of

handguns manufactured in the United States are semi-automatic.[1]  Accordingly, magazines of 15 rounds or fewer are the sort of "arms" "typically possessed by law-abiding citizens for lawful purposes" and are therefore within the protections of the Second Amendment.  *See Heller*, 554 U.S. at 625.

Whether by vague chilling or outright prohibition, "designed to be readily converted" casts into grave doubt the ownership, sale, acquisition, and temporary transfer of an enormous class of arms. Whereas the unconstitutional ordinance in *Heller* banned all handguns, HB 1224 is even more sweeping.  It effectively outlaws or disables 82% of currently-manufactured handguns and a large fraction of rifles. This is a straightforward violation of *Heller*'s holdings that widespread handgun bans and bans against fully functional firearms in the home are unconstitutional. *See Heller*, 554 U.S. at 630 (ordinance requiring disassembly of a firearm while the firearm is in the owner's home is unconstitutional because the ordinance made it impossible for citizens to use legal firearms for the core Second Amendment purpose of self-defense).

Thus, for the reasons detailed above, a prohibition on some or most magazines of 15 rounds or fewer imposes an unconstitutional burden on Second Amendment rights.  Therefore, even if the phrase "designed to be readily converted" is not unconstitutionally vague, the Plaintiffs are nonetheless likely to prevail on the merits because the "designed to be readily converted" prohibition expressly violates constitutional protections under the Second Amendment.

---

[1]  Bureau of Alcohol, Tobacco, Manufacturing and Explosives, Annual Firearms Manufacturing and Export Report 2011 (2,598,133 "pistols"; 572,867 "revolvers"), https://www.atf.gov/files/statistics/download/afmer/2011-final-firearms-manufacturing-export-report.pdf.

### I.   Plaintiffs Are Likely to Prevail on the Merits Because HB 1224's "Continuous Possession" Requirement Are Unconstitutional under the Second Amendment.

A citizen's right to "keep" arms includes the right to "take them to have them repaired." *Andrews v. State*, 50 Tenn. 165, 1871 WL 3579 at *2 (1871). *Andrews* is favorably cited in *Heller*. *Heller*, 554 U.S. at 608, 629. More generally, the Second Amendment protects all "lawful purposes" of keeping and bearing arms. *See id.* at 625.

HB 1224 criminally punishes anyone who "transfers" a "large capacity magazine." HB 1224 allows "grandfathered" owners to "possess" (but not to engage in "transfers" of) such a magazine if the owner maintains "continuous possession" of the "grandfathered" magazine.  The Attorney General's Technical Guidance purports to interpret "continuous possession" as allowing "temporary transfers" if the transferee is in the "continual physical presence" of the owner. Attachment B. Even if the Attorney General's interpretation is construed as binding throughout the State, the following scenarios will become crimes in Colorado on July 1, unless the Plaintiffs' requested preliminary relief is granted:

- The owner leaves the house for several hours. The spouse and all family members are specifically authorized by the owner to use a firearm and its magazine for lawful self-defense in case of home invasion. While the owner is gone, the wife or other family member holds the firearm (which contains the magazine) for a moment, or for a longer period, or picks it up to move it from one room to another.

- With the owner's permission, a family member or friend takes the firearm and its magazine to a target range. While the owner remains at home, the transferee practices gun safety at the target range.

- A reserve member of the Armed Forces is called to duty for several months. While the serviceperson is away from home, his or her family members are authorized to use the magazine and its associated firearm for lawful self-defense, target practice, and other lawful activities. The family members do so.

- A woman has a Concealed Carry Permit issued by her local Sheriff, pursuant to Colorado's Concealed Carry Act. COLO. REV. STAT. §§ 18-12-201 et seq. She sometimes leaves her home unaccompanied by her husband, and therefore not in his "continual physical presence." Outside the home, the woman sometimes carries her husband's gun and its associated magazine in various public places, in full compliance with the Concealed Carry Act and all other laws related to the carrying of firearms.

- A magazine needs to be repaired. The owner brings the magazine to a licensed gunsmith. (A person who is engaged in the business of repairing firearms is required to have a Federal Firearms License, similar to a person who is engaged in the business of selling firearms. 27 C.F.R. § 478.11.) The owner leaves the magazine with the gunsmith for several weeks. After the magazine is repaired, the owner picks up the magazine from the gunsmith and pays for it.

- The owner's firearm is not functioning properly. The gunsmith explains to the owner that in order for the gunsmith to test the firearm's function, before and after repair, the gunsmith needs to use the firearm's magazine. The owner leaves the firearm and its magazine with the gunsmith. Four days later, the gunsmith has completed the repair work on the firearm, and has used the magazine to test the firearm for proper function when feeding ammunition. The owner picks up the firearm from the gunsmith and brings it home.

- The Technical Guidance protects gunsmiths who provide while-you-wait service. Some such gunsmiths might immediately test fire the gun and magazine, have all the replacement parts on hand, and instantly begin repair immediately of a gun or magazine. The owner patiently waits in the store, in the "continual physical presence" of the gunsmith. But  during the gunsmith's several hours of work, the owner steps outside the gunsmith's shop in order to take a phone call, smoke a cigarette, or run errands.

- The owner's neighbor is being threatened by a violent stalker, who is the subject of a protective order. The owner lends the firearm to his neighbor for 48 hours. The neighbor wears the firearm and its magazine in a holster at her home when she is awake, and keeps the firearm and the magazine nearby when she is asleep.

- The owner is about to go on a month-long vacation. She wants to make sure that the magazine is not stolen. She gives the magazine to her neighbor, who stores the magazine in a locked safe.

- The owner is going to visit a relative who lives in Salt Lake City. The owner drives to Denver International Airport. In compliance with all federal laws involving the transportation of firearms, the owner checks the firearm and the unloaded magazine (which is outside the firearm) in a locked case. Airline personnel take possession of the case and of the firearm and magazine therein. The airline employees place the case in the baggage compartment of the airplane. After the airplane lands, the owner retrieves the case, firearm, and magazine at Salt Lake City International Airport. The owner's possession and transportation of the firearm and the magazine are fully compliant with all Utah laws.

In every one of the above scenarios, every person is guilty of a crime punishable by a year in jail unless preliminary relief is granted against HB 1224.

HB 1224's broad ban on legitimate activities with firearms and their associated magazines burdens the exercise of Second Amendment rights, including "the core lawful purpose of self-defense." *Heller*, 554 U.S. at 630. Some of what is banned is parallel to two of the provisions which were held unconstitutional in *Heller*. The District Council in *Heller* banned functional firearms in the home by requiring that arms always be disassembled or locked. *Id.* at 630. HB 1224 does the same by allowing a husband to let his wife use his gun for self-defense in the home, but forbidding the wife to use the magazine, which is necessary for the firearm to be functional. This makes it "impossible for citizens to use them for the core lawful purpose of self-defense." *Id*.

Thus, in the absence of injunctive relief, the practical effect of HB 1224's "continuous possession" requirement will be the widespread criminalization of the most innocuous and otherwise lawful transfers and uses of ordinary firearms and firearm magazines. "Under any of the standards of scrutiny that we have applied to enumerated constitutional rights," the prohibition of ordinary uses of ordinary guns and associated magazines "would fail constitutional

23

muster." *See Heller*, 554 U.S. at 628. Therefore, Plaintiffs are likely to succeed on the merits because HB 1224's "continuous possession" requirement for existing owners infringes the right to keep and bear arms.

**CONCLUSION**

Plaintiffs request that this Court grant a temporary restraining order and preliminary injunction against the enforcement of several provisions of HB 1224 until the Court makes its determination as to whether HB 1224, as written, violates the Second and Fourteenth Amendments of the United States Constitution. Those provisions are:

- "or that is designed to be readily converted to accept"

- "and (II) maintains continuous possession of the large-capacity magazine."

In addition, Plaintiffs request that this Court grant a temporary restraining order and preliminary injunction against the enforcement of the word "transfers" as used in the paragraph of HB 1224 to be codified at Colo. Rev. Stat. § 18-12-302(1)(a).

Dated this 12th day of June, 2013.

Respectfully submitted,


s/David B. Kopel
INDEPENDENCE INSTITUTE
727 E. 16th Avenue
Denver, CO 80203
Phone: (303) 279-6536
Fax: (303) 279-4176
david@i2i.org

ATTORNEY FOR SHERIFFS AND DAVID STRUMILLO


Richard A. Westfall
Peter J. Krumholz
HALE WESTFALL LLP
1445 Market Street, Suite 300
Denver, CO 80202
Phone: (720) 904-6022
Fax: (720) 904-6020
rwestfall@halewestfall.com

ATTORNEYS FOR DISABLED CITIZENS, OUTDOOR
BUDDIES, INC. THE COLORADO OUTFITTERS
ASSOCIATION, COLORADO FARM BUREAU, AND
WOMEN FOR CONCEALED CARRY


Jonathan M. Anderson
HOLLAND & HART LLP
Post Office Box 8749
Denver, CO 80201-8749
Phone: (303) 295-8566
Fax: (303) 672-6508
jmanderson@hollandhart.com

ATTORNEYS FOR MAGPUL INDUSTRIES AND THE
NATIONAL SHOOTING SPORTS FOUNDATION

Marc F. Colin
BRUNO, COLIN & LOWE PC
1999 Broadway, Suite 3100
Denver, CO 80202-5731
Phone: (303) 831-1099
Fax: (303) 831-1088
mcolin@brunolawyers.com

**ATTORNEY FOR LICENSED FIREARMS DEALERS**

Anthony J. Fabian
LAW OFFICES OF ANTHONY J. FABIAN PC
510 Wilcox Street, Suite C
Castle Rock, CO 80104
Phone: (303) 663-9339
Fax: (303) 713-0785
fabianlaw@qwestoffice.net

**ATTORNEY FOR COLORADO STATE SHOOTING ASSOCIATION AND HAMILTON FAMILY ENTERPRISES, INC. D/B/A FAMILY SHOOTING CENTER AT CHERRY CREEK STATE PARK**

**CERTIFICATE OF SERVICE**

I hereby certify that on June 12, 2013, I have caused to be presented the foregoing to the Clerk of Court for filing and uploading to the CM/ECF system which will send notification of such filing to the following e-mail address:

| | |
|---|---|
| David B. Kopel | david@i2i.org |
| Jonathan M. Anderson | jmanderson@hollandhart.com |
| Douglas Abbott | dabbott@hollandhart.com |
| Marc F. Colin | mcolin@bcjlpc.com |
| Anthony J. Fabian | fabianlaw@qwestoffice.net |
| Matthew Groves | matt.grove@state.co.us |
| Kathleen Spalding | kit.spalding@state.co.us |
| Jonathan Fero | jon.fero@state.co.us |
| David Blake | david.blake@state.co.us |
| Daniel D. Domenico | dan.domenico@state.co.us |

/s/ Peter J. Krumholz
HALE WESTFALL LLP
1445 Market Street, Suite 300
Denver, CO 80202
Phone: (720) 904-6022
Fax: (720) 904-6020
rwestfall@halewestfall.com

Case 1:13-cv-01300-MSK-MJW   Document 29-1   Filed 06/12/13   Page 1 of 5
NOTE: The governor signed this measure on 3/20/2013.
Appellate Case: 14-1290    Document: 01019371743    Date Filed: 01/16/2015    Page: 266



HOUSE BILL 13-1224

BY REPRESENTATIVE(S) Fields, Court, Fischer, Hullinghorst, Labuda, Levy, Melton, Pabon, Rosenthal, Schafer, Williams, Young, Buckner, Ferrandino;
also SENATOR(S) Hodge, Aguilar, Guzman, Heath, Nicholson, Ulibarri, Morse.

CONCERNING PROHIBITING LARGE-CAPACITY AMMUNITION MAGAZINES.

*Be it enacted by the General Assembly of the State of Colorado:*

**SECTION 1.** In Colorado Revised Statutes, **add** part 3 to article 12 of title 18 as follows:

PART 3
LARGE-CAPACITY AMMUNITION MAGAZINES

**18-12-301. Definitions.** AS USED IN THIS PART 3, UNLESS THE CONTEXT OTHERWISE REQUIRES:

(1) "BUREAU" MEANS THE COLORADO BUREAU OF INVESTIGATION CREATED AND EXISTING PURSUANT TO SECTION 24-33.5-401, C.R.S.

(2) (a) "LARGE-CAPACITY MAGAZINE MEANS:

Exhibit A

---

*Capital letters indicate new material added to existing statutes; dashes through words indicate deletions from existing statutes and such material not part of act.*

(I)  A FIXED OR DETACHABLE MAGAZINE, BOX, DRUM, FEED STRIP, OR SIMILAR DEVICE CAPABLE OF ACCEPTING, OR THAT IS DESIGNED TO BE READILY CONVERTED TO ACCEPT, MORE THAN FIFTEEN ROUNDS OF AMMUNITION;

(II)  A FIXED, TUBULAR SHOTGUN MAGAZINE THAT HOLDS MORE THAN TWENTY-EIGHT INCHES OF SHOTGUN SHELLS, INCLUDING ANY EXTENSION DEVICE THAT IS ATTACHED TO THE MAGAZINE AND HOLDS ADDITIONAL SHOTGUN SHELLS; OR

(III)  A NONTUBULAR, DETACHABLE MAGAZINE, BOX, DRUM, FEED STRIP, OR SIMILAR DEVICE THAT IS CAPABLE OF ACCEPTING MORE THAN EIGHT SHOTGUN SHELLS WHEN COMBINED WITH A FIXED MAGAZINE.

(b)  "LARGE-CAPACITY MAGAZINE" DOES NOT MEAN:

(I)  A FEEDING DEVICE THAT HAS BEEN PERMANENTLY ALTERED SO THAT IT CANNOT ACCOMMODATE MORE THAN FIFTEEN ROUNDS OF AMMUNITION;

(II)  AN ATTACHED TUBULAR DEVICE DESIGNED TO ACCEPT, AND CAPABLE OF OPERATING ONLY WITH, .22 CALIBER RIMFIRE AMMUNITION; OR

(III)  A TUBULAR MAGAZINE THAT IS CONTAINED IN A LEVER-ACTION FIREARM.

**18-12-302.  Large-capacity magazines prohibited - penalties - exceptions.** (1) (a)  EXCEPT AS OTHERWISE PROVIDED IN THIS SECTION, ON AND AFTER JULY 1, 2013, A PERSON WHO SELLS, TRANSFERS, OR POSSESSES A LARGE-CAPACITY MAGAZINE COMMITS A CLASS 2 MISDEMEANOR.

(b)  ANY PERSON WHO VIOLATES SUBSECTION (1) OF THIS SECTION AFTER HAVING BEEN CONVICTED OF A PRIOR VIOLATION OF SAID SUBSECTION (1) COMMITS A CLASS 1 MISDEMEANOR.

(c)  ANY PERSON WHO VIOLATES SUBSECTION (1) OF THIS SECTION COMMITS A CLASS 6 FELONY IF THE PERSON POSSESSED A LARGE-CAPACITY MAGAZINE DURING THE COMMISSION OF A FELONY OR ANY CRIME OF VIOLENCE, AS DEFINED IN SECTION 18-1.3-406.

PAGE 2-HOUSE BILL 13-1224

Appellate Case: 14-1290   Document: 01019371743   Date Filed: 01/16/2015   Page: 268

(2) (a)  A PERSON MAY POSSESS A LARGE-CAPACITY MAGAZINE IF HE OR SHE:

(I)  OWNS THE LARGE-CAPACITY MAGAZINE ON THE EFFECTIVE DATE OF THIS SECTION; AND

(II)  MAINTAINS CONTINUOUS POSSESSION OF THE LARGE-CAPACITY MAGAZINE.

(b)  IF A PERSON WHO IS ALLEGED TO HAVE VIOLATED SUBSECTION (1) OF THIS SECTION ASSERTS THAT HE OR SHE IS PERMITTED TO LEGALLY POSSESS A LARGE-CAPACITY MAGAZINE PURSUANT TO PARAGRAPH (a) OF THIS SUBSECTION (2), THE PROSECUTION HAS THE BURDEN OF PROOF TO REFUTE THE ASSERTION.

(3)  THE OFFENSE DESCRIBED IN SUBSECTION (1) OF THIS SECTION SHALL NOT APPLY TO:

(a)  AN ENTITY, OR ANY EMPLOYEE THEREOF ENGAGED IN HIS OR HER EMPLOYMENT DUTIES, THAT MANUFACTURES LARGE-CAPACITY MAGAZINES WITHIN COLORADO EXCLUSIVELY FOR TRANSFER TO, OR ANY LICENSED GUN DEALER, AS DEFINED IN SECTION 12-26.1-106 (6), C.R.S., OR ANY EMPLOYEE THEREOF ENGAGED IN HIS OR HER OFFICIAL EMPLOYMENT DUTIES, THAT SELLS LARGE-CAPACITY MAGAZINES EXCLUSIVELY TO:

(I)  A BRANCH OF THE ARMED FORCES OF THE UNITED STATES;

(II)  A DEPARTMENT, AGENCY, OR POLITICAL SUBDIVISION OF THE STATE OF COLORADO, OR OF ANY OTHER STATE, OR OF THE UNITED STATES GOVERNMENT;

(III)  A FIREARMS RETAILER FOR THE PURPOSE OF FIREARMS SALES CONDUCTED OUTSIDE THE STATE;

(IV)  A FOREIGN NATIONAL GOVERNMENT THAT HAS BEEN APPROVED FOR SUCH TRANSFERS BY THE UNITED STATES GOVERNMENT; OR

(V)  AN OUT-OF-STATE TRANSFEREE WHO MAY LEGALLY POSSESS A LARGE-CAPACITY MAGAZINE; OR

PAGE 3-HOUSE BILL 13-1224

(b) AN EMPLOYEE OF ANY OF THE FOLLOWING AGENCIES WHO BEARS A FIREARM IN THE COURSE OF HIS OR HER OFFICIAL DUTIES:

(I) A BRANCH OF THE ARMED FORCES OF THE UNITED STATES; OR

(II) A DEPARTMENT, AGENCY, OR POLITICAL SUBDIVISION OF THE STATE OF COLORADO, OR OF ANY OTHER STATE, OR OF THE UNITED STATES GOVERNMENT; OR

(c) A PERSON WHO POSSESSES THE MAGAZINE FOR THE SOLE PURPOSE OF TRANSPORTING THE MAGAZINE TO AN OUT-OF-STATE ENTITY ON BEHALF OF A MANUFACTURER OF LARGE-CAPACITY MAGAZINES WITHIN COLORADO.

**18-12-303.  Identification markings for large-capacity magazines - rules.** (1)  A LARGE-CAPACITY MAGAZINE THAT IS MANUFACTURED IN COLORADO ON OR AFTER THE EFFECTIVE DATE OF THIS SECTION MUST INCLUDE A PERMANENT STAMP OR MARKING INDICATING THAT THE LARGE-CAPACITY MAGAZINE WAS MANUFACTURED OR ASSEMBLED AFTER THE EFFECTIVE DATE OF THIS SECTION. THE STAMP OR MARKING MUST BE LEGIBLY AND CONSPICUOUSLY ENGRAVED OR CAST UPON THE OUTER SURFACE OF THE LARGE-CAPACITY MAGAZINE.

(2)  THE BUREAU MAY PROMULGATE SUCH RULES AS MAY BE NECESSARY FOR THE IMPLEMENTATION OF THIS SECTION, INCLUDING BUT NOT LIMITED TO RULES REQUIRING A LARGE-CAPACITY MAGAZINE THAT IS MANUFACTURED ON OR AFTER THE EFFECTIVE DATE OF THIS SECTION TO BEAR IDENTIFYING INFORMATION IN ADDITION TO THE IDENTIFYING INFORMATION DESCRIBED IN SUBSECTION (1) OF THIS SECTION.

(3)  A PERSON WHO MANUFACTURES A LARGE-CAPACITY MAGAZINE IN COLORADO IN VIOLATION OF SUBSECTION (1) OF THIS SECTION COMMITS A CLASS 2 MISDEMEANOR AND SHALL BE PUNISHED IN ACCORDANCE WITH SECTION 18-1.3-501.

**SECTION 2.  Effective date.** This act takes effect July 1, 2013.

**SECTION 3.  Safety clause.** The general assembly hereby finds,

determines, and declares that this act is necessary for the immediate preservation of the public peace, health, and safety.

_____          _____
Mark Ferrandino                                                     John P. Morse
SPEAKER OF THE HOUSE                               PRESIDENT OF
OF REPRESENTATIVES                                   THE SENATE

_____          _____
Marilyn Eddins                                               Cindi L. Markwell
CHIEF CLERK OF THE HOUSE                     SECRETARY OF
OF REPRESENTATIVES                                   THE SENATE

      APPROVED_____

_____
John W. Hickenlooper
GOVERNOR OF THE STATE OF COLORADO

PAGE 5-HOUSE BILL 13-1224

John W. Suthers
Attorney General

Cynthia H. Coffman
Chief Deputy Attorney General

Daniel D. Domenico
Solicitor General

**STATE OF COLORADO**
**DEPARTMENT OF LAW**

Office of the Attorney General

Ralph L. Carr
**Colorado Judicial Center**
1300 Broadway, 10th Floor
Denver, Colorado 80203
Phone (720) 508-6000

May 16, 2013

Colorado Department of Public Safety
Executive Director James H. Davis
700 Kipling Street, 3rd Floor
Denver CO 80215

RE:   Technical Guidance on the Interpretation and Application of House Bill 13-
        1224, Large-Capacity Magazine Ban

Dear Executive Director Davis:

House Bill 13-1224, which was passed during this year's legislative session and
becomes effective July 1, 2013, prohibits the sale, transfer, and possession of "large-
capacity ammunition magazines." On March 20, 2013, in a statement issued at the
time he signed HB 13-1224 into law, Governor Hickenlooper instructed "the
Colorado Department of Public Safety to consult with the Office of the Attorney
General and others, as necessary . . . and then to draft and issue, to law
enforcement agencies in the State of Colorado, technical guidance on how the law
should be interpreted and enforced."

This letter sets forth the technical guidance requested by the Governor.

**Introduction**

This technical guidance, issued at the request of the Governor, is meant to assist
Colorado law enforcement agencies in understanding and applying portions of House
Bill 13-1224, which regulates the sale, transfer, and possession of "large
capacity magazines." Although this guidance is not binding on the courts, it is based
upon existing legal principles and represents a fair and accurate reading of the
legislation.

**Definition of "Large Capacity Magazine"**

Under House Bill 1224, the term "large capacity magazine" is defined, in part, as
follows: "a fixed or detachable magazine, box, drum, feed strip, or similar device
capable of accepting, or that is designed to be readily converted to accept, more than
fifteen rounds of ammunition."

Exhibit B

Page 2

The phrase "designed to be readily converted to accept more than fifteen rounds of ammunition" has prompted questions regarding the scope of the definition, particularly because some ammunition magazines include features, such as removable baseplates, that can be removed and replaced, or otherwise altered, so that the magazine accepts more than fifteen rounds.

The term "designed," when used as a modifier, denotes a feature that meets a specific function. This suggests that design features that fulfill more than one function, and whose function is not specifically to increase the capacity of a magazine, do not fall under the definition. The features of a magazine must be judged objectively to determine whether they were "designed to be readily converted to accept more than fifteen rounds."

Under this reading of the definition, a magazine that accepts fifteen or fewer rounds is not a "large capacity magazine" simply because it includes a removable baseplate which may be replaced with one that allows the magazine to accept additional rounds. On many magazines, that design feature is included specifically to permit cleaning and maintenance. Of course, a magazine whose baseplate is replaced with one that does, in fact, allow the magazine to accept more than fifteen rounds would be a "large capacity magazine" under House Bill 1224.

**"Possession" of Large-Capacity Magazines and Application of the Grandfather Clause of House Bill 1224**

House Bill 1224 also places limitations on when and how a large-capacity magazine may be sold, transferred, or possessed. In particular, the bill's grandfather clause permits possession of a large-capacity magazine on or after July 1, 2013 by an individual who "owns" such a magazine on that date and "maintains continuous possession" of it thereafter. However, the bill prohibits the owner of a large-capacity magazine from selling or transferring it after July 1, 2013, and also prohibits an individual who as of July 1 did not own and since then has not continuously possessed a particular large-capacity magazine to possess it after July 1, 2013.

Responsible maintenance, handling, and gun safety practices, as well as constitutional principles, dictate that these provisions cannot be reasonably construed as barring the temporary transfer of a large-capacity magazine by an individual who remains in the continual physical presence of the temporary transferee, unless that temporary transfer is otherwise prohibited by law. For example, an owner should not be considered to have "transferred" a large-capacity magazine or lost "continuous possession" of it simply by handing it to a gunsmith, hunting partner, or an acquaintance at a shooting range with the expectation that it will be promptly returned. Likewise, a gunsmith, hunting partner, or acquaintance at a shooting range who acquires temporary physical custody of a large-capacity magazine from its owner should not be considered in "possession" of the magazine

Page 3

so long as he or she remains in the owner's physical presence. However, it would be unreasonable to construe the bill or this guidance to exempt a temporary transfer of a large-capacity magazine in connection with criminal activity.

For similar reasons, the bill's requirement that an owner must maintain "continuous possession" in order to ensure the application of the grandfather clause cannot reasonably be read to require continuous physical possession. Proper storage of a large-capacity magazine, such as in a gun safe in the owner's home or in a secure carrying case in the trunk of an automobile, is entirely consistent with the bill's intent of limiting the acquisition and permanent transfer of large-capacity magazines after the effective date of July 1, 2013.

Sincerely,

JOHN W. SUTHERS
Colorado Attorney General


cc:   Governor John Hickenlooper
      Jack Finlaw, Chief Legal Counsel to Governor Hickenlooper

```
MIME-Version:1.0
From:COD_ENotice@cod.uscourts.gov
To:COD_NEF@coddb.cod.circl0.dcn
Message-Id:4053396@cod.uscourts.gov
Subject:Activity in Case 1:13-cv-01300-MSK-MJW Cooke et al v. Hickenlooper Order
```
Content–Type: text/html

## U.S. District Court

## District of Colorado

**Notice of Electronic Filing**

The following transaction was entered on 6/13/2013 at 4:15 PM MDT and filed on 6/13/2013

| | |
|---|---|
| **Case Name:** | Cooke et al v. Hickenlooper |
| **Case Number:** | 1:13–cv–01300–MSK–MJW |
| **Filer:** | |
| **Document Number:** | 31(No document attached) |

**Docket Text:**
**ORDER SETTING HEARING: The Court will conduct a non–evidentiary law and motion hearing on the Plaintiffs' Motion for Temporary Restraining Order and Preliminary Injunction [29] on 6/17/2013 at 04:30 PM. The parties shall be prepared to address: (i) whether determination of any provisional injunctive relief should be consolidated with an expedited trial on the merits pursuant to Fed. R. Civ. P 65(a)(2); (ii) what factual issues relevant to the applicable preliminary injunction factors are in dispute, such that an evidentiary hearing is necessary; and (iii) to the extent an evidentiary hearing is necessary, how much time is necessary for that hearing. By Chief Judge Marcia S. Krieger on 6/13/13. Text Only Entry (msklc2, )**

**1:13–cv–01300–MSK–MJW Notice has been electronically mailed to:**

Marc F. Colin mcolin@brunolawyers.com, cmaulin@brunolawyers.com, mbrock@brunolawyers.com, slarson@brunolawyers.com

Kathleen L. Spalding kit.spalding@state.co.us, mary.brown@state.co.us, terrie.sandoval@state.co.us

Richard A. Westfall rwestfall@halewestfall.com, cmcnicholas@halewestfall.com

David Benjamin Kopel david@i2i.org

Douglas L. Abbott dabbott@hollandhart.com, IntakeTeam@HollandHart.com, jmarsh@hollandhart.com, mmarrow@hollandhart.com

Peter J. Krumholz pkrumholz@halewestfall.com, cmcnicholas@halewestfall.com

Anthony John Fabian fabianlaw@qwestoffice.net

Matthew David Grove matt.grove@state.co.us, bernie.buescher@state.co.us, debbie.bendell@state.co.us, fred.yarger@state.co.us, leeann.morrill@state.co.us

Daniel D. Domenico dan.domenico@state.co.us, laura–jane.weimer@state.co.us

Jonathan Patrick Fero jon.fero@state.co.us

David Christopher Blake david.blake@state.co.us, carol.gall@state.co.us, laura–jane.weimer@state.co.us

**1:13–cv–01300–MSK–MJW Notice has been mailed by the filer to:**

Jonathan Michael Anderson
Hale Westfall, LLP
1445 Market Street
Suite 300
Denver, CO 80202

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 13-CV-1300-MSK-MJW

JOHN B. COOKE, Sheriff of Weld County, *et al.*,

     Plaintiffs

v.

JOHN W. HICKENLOOPER, Governor of the State of Colorado,

     Defendant.

---

**PLAINTIFFS' RESPONSE TO DEFENDANT'S MOTION FOR CERTIFICATION
OF QUESTIONS OF LAW TO THE COLORADO SUPREME COURT**

---

Plaintiffs submit this Response to Defendant's Motion for Certification of Questions of Law to the Colorado Supreme Court.  For the reasons set forth below, the motion should be denied.

**I.**     <u>**INTRODUCTION**</u>

Certification in this case is not only unnecessary, but completely unhelpful given the vagueness problems with HB 1224.  Applicable case law directs that where, as here, challenged legislation suffers from vagueness, it is not subject to a limiting interpretation by the state court because the legislation is open to an indefinite number of interpretations, and nothing less than extensive adjudications in a variety of factual situations would bring the legislation within the bounds of constitutional certainty.  Certification of the two questions posed by Defendant therefore would not be dispositive, nor would it serve to narrow the constitutional issues facing this Court.

1

HB 1224 was introduced on February 7, 2013, and signed by the Governor on March 20, 2013 – a total of 41 days.  The Governor has now had three months working with his lawyers to define: (a) which magazines that presently use 15 rounds or less are "designed to be readily converted" to 16 rounds or more and are therefore illegal under HB 1224; and (b) what "possession" constitutes "continuous possession" allowing a present owner of a magazine to avail himself or herself of HB 1224's facially highly restrictive "grandfather clause."  After May 16's "Technical Guidance," Plaintiffs' highly detailed complaint filed on May 17 pointing out the problems with both clauses, and now the questions posed to be certified to the Colorado Supreme Court (filed on June 12), there remains no definition, or even a suggested definition, of either of the terms "designed to be readily converted" or "continuous possession" that would allow citizens to know which magazines and what possession are legal – and that law enforcement can use to enforce them.  For these reasons and those detailed below, certification is particularly inappropriate in this case.

## II.    <u>QUESTIONS FOR WHICH CERTIFICATION IS SOUGHT</u>

At issue in Plaintiffs' motion for preliminary injunction and the two questions for which certification is sought are two aspects of HB 1224 that everyone agrees are vague and capable of multiple interpretations.  Upon signing HB 1224 on March 20, 2013, the Governor issued a "signing statement" wherein he effectively conceded that there were interpretation problems attendant to HB 1224's "designed to be readily converted" language as well as what would constitute "continuous possession," and asked that the Attorney General follow up on trying to better define what these terms meant.  The Attorney General then issued a "Technical Guidance"

addressing these two problem areas of HB 1224 and noted at the beginning that it was issuing the "Technical Guidance" at the request of the Governor.

In the "Technical Guidance," the Attorney General states that the bill's definition of a "large capacity magazine" does not include every magazine that could conceivably be converted to a "large capacity magazine" "simply because" the magazine has a removable base plate or other similar features. "Technical Guidance" at 2. Rather than providing any bright-line test, the "Technical Guidance" concludes that a magazine's "features" "must be judged objectively to determine whether they were 'designed to be readily converted to accept more than fifteen rounds.'" The "Technical Guidance" does not further define what "judged objectively" means, nor does it define who or what does the judging, or what process would be employed to make the necessary determinations.

Regarding "continuous presence," the "Technical Guidance" states that only "temporary transfers" of "grandfathered" magazines are permissible, but only so long as the magazine remains in the "continual physical presence" of the owner. Furthermore, any "temporary transfer" must also be done with the "expectation that it will be promptly returned." *Id*. Accordingly, all "temporary transfers" where the "grandfathered" magazine leaves the "physical presence" of the owner destroys "grandfather" status and any possession after such transfer is illegal.

The questions Defendant proposes to certify not only deviate from the "Technical Guidance" but any answer to them would not add any clarity to the uncertainty surrounding these two aspects of HB 1224. As for the first question proposed by Defendant, it does not even reference the language of the statute: "designed to be readily converted." While it is not entirely

clear what exactly is being asked of the Colorado Supreme Court, it appears that what is being sought is a legal conclusion that irrespective of the language of HB 1224 and its "designed to be readily converted" language, the intent of HB 1224 is that it not "***amount to*** a ban on functional magazines for most handguns and many rifles."   (Emphasis added.)   This question, even if answered, would not provide guidance on what exactly "designed to be readily converted" means, which is the focus of the motion for a temporary restraining order or preliminary injunction.

The lack of any certainty arising from the first question is underscored by the question's last clause: "or does it apply only to magazines that are ***principally*** used with ***extensions*** or ***devices*** that increase the combined capacity to more than 15 rounds."   (Emphasis added.)   This too deviates from the "Technical Guidance."   The "Technical Guidance" specifically addressed "designed to be readily converted" and said magazines with removable base plates would not be deemed prohibited by this language "simply because" of such a feature and stated that each magazine would then be subject to an "objective test" to see whether the magazine was "designed to be readily converted."   By contrast, Defendant's first proposed question indicates that some test will still need to be applied on a magazine-by-magazine basis to determine whether it is "only" one of those magazines that is "principally used" with an "extender or device."   The question suggests no definition for what would constitute "principally," or what is an "extender," or, especially, what is a "device."   It is also silent on what type of test or process should be used to make the determination.

In short, the first question is designed to obtain from the Colorado Supreme Court an answer based upon a false choice: does HB 1224's definition of "large capacity magazine" either

(a) "amount[] to a ban on functional magazines for most handguns and many rifles" (which would make it patently unconstitutional) *or* (b) encompass "only" some limited subset of magazines that are "principally used" with an "extender or a device"?  In a variation on begging the question, the only answer could be HB 1224's intent is not to be patently unconstitutional, but rather, it should be read as applying to some more limited but still undefined subset of magazines.  The question appears designed to avoid providing any real definition of what "designed to be readily converted" actually means, but rather to shift the focus to one of empirical effects.

The second question also deviates from the "Technical Guidance."  There, "continuous possession" means "continual physical presence" of the owner, with certain "temporary transfers" being allowed so long as "continual physical presence" was maintained and that the "temporary transfer" must also be done with the "expectation that it will be promptly returned."  In Defendant's second question, he substitutes an allowance for "another person to temporarily hold, use, or share [a magazine] for lawful purposes."  There is no definition of what constitutes "temporarily," "hold," "use," or, especially, "share."  The second question, even if answered yes (as Defendant intends), would provide far less – not more – clarity than that offered in the "Technical Guidance."

### III.   **LEGAL ANALYIS**

#### A.   **Certification Should Not Be Routinely Granted, But Only Where the State Law Questions Are "Dispositive" or Would Avoid or Substantially Modify the Federal Constitutional Challenge to the Statute**

The Tenth Circuit has held that certification should not be routinely invoked.  *Armijo v. Ex Cam, Inc.*, 843 F.2d 406, 407 (10th Cir. 1988) ("Certification is not to be routinely invoked whenever a federal court is presented with an unsettled question of state law.").   Other Tenth Circuit cases stand for a similar proposition.   For example, in *Pino v. United States*, 507 F.3d 1233 (10th Cir. 2007), the Tenth Circuit declared that "we will not trouble our sister state courts every time an arguably unsettled question of state law comes across our desks.   When we see a reasonably clear and principled course, we will seek to follow it ourselves." *Id.* at 1236.

Thus, certification in the Tenth Circuit is appropriate only where the state law questions are both "unsettled and dispositive."  *Anaconda Minerals Co. v. Stoller Chem. Co.*, 990 F.2d 1175, 1177 (10th Cir. 1993).   "Moreover, where statutory interpretation is at issue, the touchstone of our certification inquiry is whether the state statute is readily susceptible of an interpretation that 'would avoid or substantially modify the federal constitutional challenge to the statute.'"  *Kansas Judicial Review v. Stout*, 519 F.3d 1107, 1119 (10th Cir. 2008) (quoting *Bellotti v. Baird*, 428 U.S. 132, 148 (1976)).

Defendant cited *Larrieu v. Best Buy Stores*, 491 F. Appx. 864 (10th Cir. 2012), for the applicable standard.  *Larrieu*, unlike the cases cited above, is an unpublished decision.   However, the standard recited in *Larrieu* focuses on whether the state law question is, among other things, "determinative."  *Id.* at 866.   It is therefore similar to the "unsettled and dispositive" standard in *Anaconda Minerals*.

*Larrieu* also provides a very useful contrast between the kinds of cases deserving of certification and those that are not.  In *Larrieu* the outcome of a personal injury lawsuit depended on which of two competing interpretations of the Colorado Premises Liability Act would prevail in Colorado state courts.  The case did not involve a constitutional challenge to the Act.  The Tenth Circuit, emphasizing that both its own precedent as well as C.A.R. 21.1 focuses on the word "determinative," *id.* at 865, certified the case to the Colorado Supreme Court to address whether the Act applies to injuries caused by a defendant-landowner's employee during an activity not directly or inherently related to the land. If the answer was no, the district court's grant of summary judgment would be affirmed and the case would be at an end; if the answer was yes, the plaintiff's lawsuit would be reinstated.  The answer to the certified question would be determinative.

By contrast, in this case the answer to Defendant's proposed questions will not be determinative in any sense.  As discussed above, even if the Colorado Supreme Court answers the questions in the way Defendant would like, substantial vagueness and uncertainty will remain.  Simply stated, the questions as posed do nothing to address, much less correct, the vagueness concerns with regard to the terms "designed to be readily converted" and "continuous possession."  As a result, the Supreme Court's response will be neither "determinative" nor "dispositive" of the vagueness problems created by the use of these two terms.[1]

---

[1]  While Defendant presumably wishes that the Colorado Supreme Court would read out of the statute the words "designed to be readily converted," as further discussed below, rewriting a statute is not an appropriate purpose for certification.

**B.    The *Pullman* Abstention Doctrine Provides Additional Guidance to this Court in Addressing Motions for Certification to a State Supreme Court**

The Tenth Circuit, in fashioning the principles applicable to state certification questions, has borrowed heavily from the *Pullman* abstention doctrine.  *R.R. Comm'n v. Pullman Co.*, 312 U.S. 496 (1941).  In *Kansas Judicial Review*, the Tenth Circuit held that the "touchstone" of a certification inquiry is whether the state legislation can readily be interpreted in a way that "would avoid or substantially modify the federal constitutional challenge to the statute."  519 F.3d at 1119 (quoting *Bellotti v. Baird*, 428 U.S. at 148).  This "touchstone" was derived, in turn, from *Pullman* abstention cases.  *See, e.g., Harman v. Forssenius*, 380 U.S. 528, 535 (1965) (abstention appropriate only when the state law is "fairly subject to an interpretation ***which will render unnecessary or substantially modify the federal constitutional question***" (emphasis added)).

Although Defendant does not bring his motion pursuant to the *Pullman* abstention doctrine, other principles derived from *Pullman* precedent are equally applicable to his certification request.  Indeed, even Defendant himself has treated abstention and certification interchangeably.  He states that "***certification or abstention*** is inappropriate in cases involving a challenged provision that is not 'fairly subject to an interpretation which will render unnecessary or substantially modify the federal constitutional question.'"  Motion, ¶ 7 (quoting *Board of Airport Comm'rs v. Jews for Jesus*, 482 U.S. 569, 575-76 (1989)).

**1.    When a Statute's Language Is Open to an Indefinite Number of Interpretations, State Certification Will Not Be Useful**

In *Board of Airport Comm'rs v. Jews for Jesus*, the United States Supreme Court held that neither certification nor abstention was available.  482 U.S. at 575.  Of particular relevance

8

to the instant case, the Court held that abstention was inappropriate because the state statute at issue was so vague that any limiting construction would be of no assistance. *Id.* In so holding, the Court discussed its earlier decision in *Baggett v. Bullitt*, 377 U.S. 360 (1964), which involved the constitutionality of several statutes requiring loyalty oaths:

> The *Baggett* Court concluded that abstention would serve no purpose given the lack of any limiting construction, and held the statutes unconstitutional on their face under the First Amendment overbreadth doctrine. We observed that the challenged loyalty oath was not "open to one or a few interpretations, but to an indefinite number," and concluded that "[i]t is fictional to believe that anything less than extensive adjudications, under the impact of a variety of factual situations, would bring the oath within the bounds of permissible constitutional certainty." Here too, it is difficult to imagine that the resolution could be limited by anything less than a series of adjudications, and the chilling effect of the resolution on protected speech in the meantime would make such a case-by-case adjudication intolerable.

482 U.S. at 575. Thus, when a state statute is vague, it is not fairly subject to a limiting interpretation, and certification is therefore inappropriate.

In this case, Defendant concedes that HB 1224 "is subject to a range of interpretations," *i.e.*, that it is vague. Motion at ¶ 8.a. Despite Defendant's assurance that submitting HB 1224 to the Colorado Supreme Court for interpretation "will likely" "obviate Plaintiffs' vagueness challenges altogether," that assurance flies in the face of the very United States Supreme Court precedent which Defendant cited in his Motion. Similar to *Jews for Jesus* and *Baggett* decisions, certification would be of no use because the vagueness problems inherent in HB 1224 are such that it can be limited by nothing less than a series of adjudications involving numerous factual situations.

**2.     This Court Cannot Certify to the Colorado Supreme Court for Purposes of Rewriting the Statute**

It is also inappropriate to certify the interpretation of a state statute to a state supreme court for purposes of effectively re-writing the statute.  *City of Houston v. Hill*, 482 U.S. 451 (1987).  In *City of Houston*, the Court refused to certify a question of interpretation to the Texas courts because "there is no uncertain question of state law whose resolution might affect the pending federal claim. . . . [T]his ordinance is neither ambiguous nor obviously susceptible of a limiting construction. A federal court may not properly ask a state court if it would care in effect to rewrite a statute." *Id.* at 471.

Defendant's two proposed questions effectively invite the Colorado Supreme Court to rewrite HB 1224.  For example, Defendant's first question invites the Court to (1) import into the bill the words "principally used" despite the fact that neither of those words appears anywhere in the bill, and (2) write out of the bill the words "designed to be readily converted."  Similarly, Defendant's second proposed question invites the Court to import into the bill an exception to the "continuous possession" requirement, allowing the owner to "allow[] another person to temporarily hold, use, or share it for lawful purposes."  Again, the words "temporary" or "temporarily" do not appear anywhere in HB 1224.  Defendant cannot utilize the certification procedure to ask the Colorado Supreme Court to rewrite an overbroad and vague bill.

**3.     Federal Courts Should Be More Reluctant to Certify Questions in Cases Involving Challenges Based on Fundamental Rights**

The Tenth Circuit observed that "[c]ourts have been particularly reluctant to abstain in cases involving facial challenges on First Amendment grounds, in part because the delay caused by declining to adjudicate the issues could prolong the chilling effect on speech." *Kansas*

*Judicial Review*, 519 F.3d at 1119 (citing *City of Houston v. Hill*, 482 U.S. 451, 467-68 (1987)). The same concerns regarding delay are applicable to certification of questions to a state supreme court.

Defendant clearly contemplates that all proceedings before this Court will stop while the parties brief the proposed questions to the Colorado Supreme Court. *See* Motion at ¶ 10 (alluding to concerns about delay "during the pendency of any certification proceedings"). Granting Defendant's motion would mean that a ruling on Plaintiffs' constitutional challenges inevitably would be delayed. There are many other issues involved in this case not addressed in either the Plaintiffs' motion for preliminary injunction or in the proposed certified questions (*e.g.*, the legality of all of HB 1229 requiring background checks of all private loans and transfers). There is no question that HB 1224 and HB 1229 seriously implicate all Coloradans' Second Amendment rights. Whether these rights are in fact violated should be determined at the earliest possible time.

> ### C. Certification Is Unnecessary Where the Federal Court Has Ready Access to State Court Precedent and Other State Materials, and Where the Parties Are Represented by State-Based Counsel

In *L. Cohen & Co., Inc. v. Dun & Bradstreet, Inc.*, 629 F. Supp. 1419 (D. Conn. 1986), the court noted that "[a] federal district court sitting in [the relevant state] is not without resources to decide the routine questions of statutory construction," for it has "ready access to the various reported decisions of the [state] Supreme Court and the state lower courts construing the [relevant laws] . . . [and] also has access to the decisions of other courts construing similar state and federal statutes." Further, and most relevant to the present case, the court believed certification was unnecessary because the parties were "represented by competent [state-based]

counsel who [could] be relied upon to bring other relevant legislative and administrative materials to the court's attention." *Id.* at 1424-25.

The Governor, his team of lawyers in the Attorney General's office, and all executive branch departments including the Department of Public Safety (to whom the "Technical Guidance" was addressed) are before this Court and can inform this Court's decision. The Colorado Supreme Court can add nothing more than to attempt a potential rewrite of the actual language used in HB 1224.

## IV.    THIS COURT SHOULD DENY CERTIFICATION IN THIS CASE

The certification proposed by the Defendant fails all of the tests federal courts look to in determining whether to certify questions of law to state supreme courts. The motion to certify should be denied.

Dated this 14th day of June, 2013.

Respectfully submitted,

s/Richard A. Westfall
Richard A. Westfall
Peter J. Krumholz
HALE WESTFALL LLP
1445 Market Street, Suite 300
Denver, CO 80202
Phone: (720) 904-6022
Fax: (720) 904-6020
rwestfall@halewestfall.com

ATTORNEYS FOR DISABLED CITIZENS, OUTDOOR BUDDIES, INC. THE COLORADO OUTFITTERS ASSOCIATION, COLORADO FARM BUREAU, AND WOMEN FOR CONCEALED CARRY

David B. Kopel
INDEPENDENCE INSTITUTE
727 E. 16th Avenue
Denver, CO 80203
Phone: (303) 279-6536
Fax: (303) 279-4176
david@i2i.org

**ATTORNEY FOR SHERIFFS AND DAVID STRUMILLO**

Jonathan M. Anderson
HOLLAND & HART LLP
Post Office Box 8749
Denver, CO 80201-8749
Phone: (303) 295-8566
Fax: (303) 672-6508
jmanderson@hollandhart.com

**ATTORNEYS FOR MAGPUL INDUSTRIES AND THE NATIONAL SHOOTING SPORTS FOUNDATION**

Marc F. Colin
BRUNO, COLIN & LOWE PC
1999 Broadway, Suite 3100
Denver, CO 80202-5731
Phone: (303) 831-1099
Fax: (303) 831-1088
mcolin@brunolawyers.com

**ATTORNEY FOR LICENSED FIREARMS DEALERS**

Anthony J. Fabian
LAW OFFICES OF ANTHONY J. FABIAN PC
510 Wilcox Street, Suite C
Castle Rock, CO 80104
Phone: (303) 663-9339
Fax: (303) 713-0785
fabianlaw@qwestoffice.net

**ATTORNEY FOR COLORADO STATE SHOOTING ASSOCIATION AND HAMILTON FAMILY ENTERPRISES, INC. D/B/A FAMILY SHOOTING CENTER AT CHERRY CREEK STATE PARK**

## CERTIFICATE OF SERVICE

I hereby certify that on June 14, 2013, I have caused to be presented the foregoing to the Clerk of Court for filing and uploading to the CM/ECF system which will send notification of such filing to the following e-mail address:

David B. Kopel                 david@i2i.org

Jonathan M. Anderson           jmanderson@hollandhart.com

Douglas Abbott                 dabbott@hollandhart.com

Marc F. Colin                  mcolin@bcjlpc.com

Anthony J. Fabian              fabianlaw@qwestoffice.net

Matthew Groves                 matt.grove@state.co.us

Kathleen Spalding              kit.spalding@state.co.us

Jonathan Fero                  jon.fero@state.co.us

David Blake                    david.blake@state.co.us

Daniel D. Domenico             dan.domenico@state.co.us


s/Peter J. Krumholz
HALE WESTFALL LLP
1445 Market Street, Suite 300
Denver, CO 80202
Phone: (720) 904-6022
Fax: (720) 904-6020
rwestfall@halewestfall.com