No. 14-1290

# In the
# United States Court of Appeals for the Tenth Circuit

———————————————————————

COLORADO OUTDOOR OUTFITTERS ASSOCIATION *et* al.,

*Petitioners*,

v.

JOHN W. HICKENLOOPER, GOVERNOR OF THE STATE OF COLORADO,

*Respondent.*

———————————————————————

On Appeal from the United States District Court
for the District of Colorado

———————————————————————

**BRIEF OF *AMICI CURIAE* STATES OF UTAH, IDAHO, MONTANA,
SOUTH CAROLINA, WYOMING**

———————————————————————

SEAN D. REYES
Utah Attorney General

PARKER DOUGLAS
Utah Federal Solicitor

Utah Attorney General's Office
350 North State Street, Ste. 230
Salt Lake City, Utah 84114-2320
pdouglas@utah.gov
*Counsel for Amici Curiae*

ADDITIONAL COUNSEL

LAWRENCE G. WASDEN
Attorney General of Idaho

TIM FOX
Attorney General of Montana

ALAN WILSON
Attorney General of South Carolina

PETER K. MICHAEL
Attorney General of Wyoming

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................. ii

STATEMENT OF INTEREST OF *AMICI CURIAE* ................................................ 1

ARGUMENT ................................................................................................... 4

I.  THE TRIAL COURT SHOULD HAVE LIMITED ITS CONSIDERATION OF THE LEGISLATURE'S PREDICTIVE JUDGMENTS AND RATIONALE FOR THE LEGISLATION TO THE RECORD THE LEGISLATURE HAD BEFORE IT WHEN IT ACTED ..................................................................................................... 4

    A.  The Applicable Standard: *Turner Broadcasting* and its Roots ....................... 5

    B.  *Turner*'s Progeny and Application .............................................................. 8

II. THE TRIAL COURT ERRED BY FAILING TO ENGAGE IN THE PROPER ANALYSIS UNDER FEDERAL RULE OF EVIDENCE 702, THEREBY DEPRIVING THIS COURT OF ANY RECORD REGARDING THE RELIABILITY OF EXPERT EVIDENCE IN SUPPORT OF THE LEGISLATIVE JUDGMENTS AT ISSUE ......... 16

CONCLUSION .............................................................................................. 25

CERTIFICATE OF COMPLIANCE ................................................................... 26

i

# TABLE OF AUTHORITIES

## Cases

*A.A. v. Raymond*, 2013 WL 3816565 (E.D. Cal. July 22, 2013)...........................................................21, 24

*Abilene Retail No. 30, Inc. v. Board of Com'rs.*, 492 F.3d 1164 (10th Cir. 2007) .........................................15

*Awad v. Ziriax*, 670 F.3d 1111 (10th Cir. 2012) ...........................................................14

*Carver v. Nixon*, 72 F.3d 633 (8th Cir. 1995).........................................................13

*Century Communications Corp. v. FCC*, 835 F.2d 292 (D.C. Cir. 1987) ...........................................6

*City of Richmond v. J.A. Croson*, 488 U.S. 469 (1989) ......................................................6, 7

*Colorado Outfitters,* et *al. v. Hickenlooper*, 24 F.Supp.3d 1050 (D. Colo. 2014).....................2, 4, 11, 12, 17

*Concrete Works of Colorado, Inc. v. Denver*, 36 F.3d 1513 (10th Cir. 1994)......................................11

*Costello v. Grundon*, 651 F.3d 614 (7th Cir. 2011) .......................................................18

*Doe v. City of Albuquerque*, 667 F.3d 1111 (10th Cir. 2012)..........................................14

*Drake v. Filko,*724 F.3d 426 (3d Cir. 2013) ..........................................................15

*E.E.O.C. v. Freemen*, 626 F.Supp.2d 811 (M. D. Tenn. 2009) .........................................19

*Elsayed Mukhtar v. California State Univ.*, 299 F.3d 1053 (9th Cir. 2002),.........................................22

*Estate of Barabin v. AstenJohnson, Inc.*, 740 F.3d 457 (9th Cir. 2014)........................................23

*Gibbs v. Gibbs*, 210 F.3d 491 (5th Cir. 2000) ..........................................................19

*Hutchins v. D.C.*, 188 F.3d 531 (D.C. Cir. 1999)......................................................8, 9

*In re Salem*, 465 F.3d 767 (7th Cir. 2006)..........................................................18, 19

*Kachalsky v. County of Westchester*, 701 F.3d 81 (2d Cir. 2012) ....................................12, 16

*Kitchen v. Herbert*, 755 F.3d 1193 (10th Cir. 2014) ..........................................13, 14

*Kumho Tire Co. v. Carmichael*, 526 U.S. 137 (1999) ........................................20, 21, 24

*Landell v. Sorrell*, 382 F.3d 91 (2d Cir. 2004) .........................................................12

*Many Cultures, One Message v. Clements*, 830 F. Supp. 2d 1111 (W.D. Wash. 2011) ...................21, 22, 23

*Metavante Corp. v. Emigrant Savs. Bank*, 619 F.3d 748 (7th Cir. 2010) ........................................................18

*Montes v. City of Yakima*, 2014 WL 4199364 (E.D. Wash. Aug. 22, 2014)................................................21

*Peruta v. County of San Diego*, 742 F.3d 1144 (9th Cir. 2014) ............................................. 13, 15

*Randall v. Sorrell*, 548 U.S. 230 (2006) ..........................................................................................12

*Rothe Development Corp. v. Department of Defense,* 413 F.3d 1327 (Fed. Cir. 2005)................................ 9, 10

*Rothe Development Corp. v. U.S. Dept. of Defense,* 262 F.3d 1306 (Fed. Cir. 2001)....................................12

*Safeco Ins. Co. of Am. v. S & T Bank*, 2010 WL 786257 (W. D. Pa. March 3,  2010) ............................18

*Satellite Broadcasting & Comm. Assoc. v FCC*, 275 F.3d 337 (4th Cir. 2001) ....................................... 10, 11

*Shaw v. Hunt*, 517 U.S. 899 (1996).............................................................................................................12

*Shea v. Kerry*, 961 F. Supp. 2d 17 (D.D.C. 2013) ..........................................................................21

*Stern v. Cigna Group Ins.*, 2009 WL 1835111 (S.D.N.Y. June 25, 2009)..........................................18

*Turner Broadcasting System Inc., v. F.C.C.*, 520 U.S. 180 (1997) ........................................................11

*Turner Broadcasting System, Inc. v. FCC*, 512 U.S 622 (1994) ................................. 5, 6, 9, 10, 12, 13, 14, 15

*United States v. Brown*, 415 F.3d 1257 (11th Cir. 2005)........................................................................19

*Video Software Dealers' Ass'n v. Schwarznegger*, 556 F.3d 950 (9th Cir. 2009) ................................12

*Woollard v. Gallagher*, 712 F.3d 865 (4th Cir. 2013) ......................................................................16

*Wyeth v. Apotex Inc.,*  2009 WL 8626786 (S.D. Fla. Oct. 6, 2009).............................................................18

## Rules

Fed. R. App. P. 32(a)(5) ...........................................................................................................26

Fed. R. App. P. 32(a)(7)(C)(ii) .................................................................................................26

Fed. R. Evid. 702 ...................................................................2, 3, 16, 17, 19, 20, 21, 22, 23, 24, 25

## STATEMENT OF INTEREST OF *AMICI CURIAE*[1]

Utah, as the other several States, has an inherent interest in how federal courts review state legislation for federal constitutional conformance or infirmity. State Attorneys General possess an unquestionable duty to defend state law passed by a state's legislature or by the People through initiative. They also possess just as important a duty to protect the interests and rights of individual state citizens. So too, in exercise of their police powers, the several States may enact laws for the health, safety, welfare of their citizens, while at the same time balancing the individual rights of citizens who may be impacted by such a state law. To this end, Utah and *amici* States have an intimate interest in cases addressing how federal courts review for constitutionality provisions enacted by state legislatures and signed into law by state executives, or laws enacted the People directly.

Such is this case. The *amici* States take no position on the substantive issues raised regarding the constitutionality of Colorado's gun magazine limitation and registration laws at issue here. Instead, they seek to guard and make plain only the

---

[1] The States of Utah, joined by the states of Idaho, Montana, South Carolina and Wyoming, submit this brief pursuant to Federal Rule of Appellate Procedure 29(a). Fed. R. App. P. 29(a). Undersigned counsel has contacted counsel for the parties and the parties have consented to and do not oppose the filing of Amici's brief. Further, undersigned counsel contacted Mr. Dan Domenico, counsel for Respondent, who stipulated to the date of filing for this brief. Though not required under Rule 29, state *Amici* here also address both their interests and the reason why an amicus brief is desirable and why the matters asserted are relevant to the disposition of the case. Finallly, this brief conforms to the formal requirements of Federal Rule of Appellate Procedure 29(c),(d).

legal and evidentiary standards applicable when federal courts review the constitutionality of state statutory provisions.  Specifically, the *amici* States look for clarity on the following questions at the center of the matter before this Court: 1) whether evidence is relevant to federal judicial review when that evidence was not before a state legislature at the time it passed the legislation later challenged on constitutional grounds and subject to heightened scrutiny; and 2) whether a reviewing district court, having challenged expert testimony tendered by a party, must engage in an analysis under Rule 702 of the Federal Rules of Evidence, even in the case of a bench trial?  The *amici* States contend the answer to the first question is "no" and to the second question, "yes."  With respect to the first issue, this is a matter of first impression in the Tenth Circuit in a case involving the Second Amendment.  Consequently, the Court's decision will be of particular interest for those litigating in the area because, as described below, all other circuits to consider this question have held that under the proper constitutional analysis, the only relevant evidence is that which was before the legislative body when it considered and passed legislation.

When federal courts review state statutes, the several States have an inherent interest in the procedure by which their laws are subject to review.  As the district court noted below, the "role of [state] legislature[s are] to carefully examine … concerns [related to proposed legislation], to weigh them against each other, and to create social policy in the form of legislation (or, indeed, to elect not to do so)." *Colorado Outfitters,* et *al. v. Hickenlooper*, 24 F.Supp.3d 1050, 1055 (D. Colo. 2014).

Similarly, "[j]udicial review of [state] laws [by federal courts] for constitutional compliance focuses only on a small sliver of the issues that the legislature considers. A court does not act as a super-legislature to determine the wisdom or workability of legislation. Instead, it determines only whether the legislation is constitutionally permissible. A law may be constitutional, but nevertheless foolish, ineffective, or cumbersome to enforce." *Id.*

In spite of those vital observations, *Amici* contend that the district court effectively engaged in two serious procedural errors that prevented it from reviewing the statutes at issue in the manner the court expressly stated it would. By considering evidence that was not in front of the legislature when it enacted the provisions at issue, the district court effectively substituted its judgment and rationale, regarding the predictive judgment of the Colorado legislature, and found in its own estimation and on evidence not before the Colorado legislature, the statutes withstand constitutional scrutiny. Similarly, by not subjecting the expert testimony before it to full scrutiny under the demands of Federal Rule of Evidence 702, the district court relinquished its obligations and substituted, instead, its own predictive judgments for the Colorado legislature. In doing so, the district court abandoned the limited review it declared bound it.

## ARGUMENT

I.  **THE TRIAL COURT SHOULD HAVE LIMITED ITS CONSIDERATION OF THE LEGISLATURE'S PREDICTIVE JUDGMENTS AND RATIONALE FOR THE LEGISLATION TO THE RECORD THE LEGISLATURE HAD BEFORE IT WHEN IT ACTED**

In the context of heightened scrutiny review, when assessing whether a legislature's predictive judgments are supported by substantial evidence, a reviewing court is limited to the evidence the legislature had before it at the time it enacted the challenged law.  As noted in Appellants' opening brief ("Op. Br."), only one of the eleven witnesses that testified on Appellee's behalf at trial, testified before the legislature when HB1224 and HB1229 were contemplated and passed.  Op. Br. at 60-61.  The remaining ten witnesses presented evidence and testimony in court that was not before the legislature when it considered and crafted the legislation.  *Id.*

The trial court erred when it relied on that evidence, it being of little or no relevance to the statutes' constitutionality.  But when a federal court reviews legislation challenged for possible infringement of a fundamental right, in formulating its judgments, the reviewing court must confirm that the legislature drew reasonable inferences based on the substantial evidence before it.

Here, the Colorado legislature could not have drawn any inference, let alone a reasonable inference based on evidence it never considered.  The trial court clearly erred by considering, *post hoc,* evidence that was not before the legislature and that is irrelevant as a matter of law in a constitutional analysis.  And this Court should

4

reverse and remand the case with specific directions for the trial court to conduct the proper analysis.

## A. The Applicable Standard: *Turner Broadcasting* and its Roots

In *Turner Broadcasting System, Inc. v. FCC*, 512 U.S 622, 665-66 (1994) (plurality opinion), the United States Supreme Court announced the standard that reviewing courts must apply to evaluate constitutional challenges to a legislature's predictive judgments in the heightened scrutiny context. The *Turner* plurality observed that while "courts must accord substantial deference to the predictive judgments of Congress," such judgments are not "insulated from meaningful judicial review altogether." *Id.* The Court further described a reviewing court's obligation as one to "assure that, in formulating its judgments, Congress has drawn reasonable inferences based on substantial evidence." *Id.* In discharging this obligation, while a reviewing court does not have a "license to reweigh the evidence de novo," it still must "exercise independent judgment." *Id.* Applying those principles and reviewing under intermediate scrutiny the Court identified multiple deficits in the evidence that Congress relied upon to enact a federal law requiring cable broadcasters to carry certain enumerated channels. *Id.* In view of those evidentiary shortcomings, the Court determined the law at issue violated the First Amendment.

*Turner* is not anomalous, and the procedure used by the plurality, as described below, has been generally and uniformly followed by the courts of appeal, and

followed without deviation in the context of heightened review in the Second Amendment context.

But the Court's insistence in *Turner* that a legislature's predictive judgment rest on reasonable inferences drawn from substantial evidence has deep roots. The *Turner* Court grounded its rule in *Century Communications Corp. v. FCC*, 835 F.2d 292 (D.C. Cir. 1987), a case in which the D.C. Circuit struck down on First Amendment grounds certain cable broadcasting regulations finding they lacked evidentiary support. In finding the rules overbroad, the court commented extensively on evidentiary deficits in the administrative record the FCC offered to support the congruence between the means the agency chose and the ends it sought to achieve. *Id.* at 304. Because the FCC "adduce[d] literally no evidence," the court expressly rejected the agency's attempt to "fall[] back on what it term[ed] a 'sound predictive judgment.'" *Id.* But describing the FCC's purported "judgment" as a "guess," the court "f[ou]nd it difficult to defer blindly to the Commission's unproven belief." *Id.*

Even before *Century Communications*, and outside the First Amendment context, federal courts were accustomed to treating pre-enactment evidence as the only relevant support a legislature's predictive judgment against a constitutional challenge. Most notably, reviewing courts evaluated evidentiary support for legislative predictions in the context of race-based classifications and employment discrimination. The seminal authority in this context is *City of Richmond v. J.A. Croson*, 488 U.S. 469 (1989), a case in which the Court considered a constitutional challenge

to a city's plan requiring prime contractors to subcontract at least 30% of the dollar value of each contract to minority business enterprises. There, the Court struck the program for lack of supporting evidence.

The Court in *City of Richmond* squarely rejected the idea of blind deference to legislative judgments, holding that "the mere recitation of a benign or compensatory purpose for the use of a racial classification would … insulate any racial classification from judicial scrutiny." *Id.* at 490. Indeed, the Court observed, "[t]hat Congress may identify and redress the effects of society-wide discrimination does not mean that, a fortiori, the States and their political subdivisions are free to decide that such remedies are appropriate." *Id.* On a searching review, the Court found the city's evidentiary support insufficient: it rested on "generalized assertion[s]," "sheer speculation" and "highly conclusionary" statements by legislative participants. *Id.* at 500. In its narrow-tailoring analysis, the Court found the evidentiary record so bare that it "[wa]s almost impossible to assess whether the Richmond Plan [was] narrowly tailored to remedy prior discrimination." *Id.* at 507. The Court observed that the quota "rest[ed] upon [a] completely unrealistic assumption" and rejected it.

Ultimately, the Court identified the operative evidentiary deficit as *the one before the City at the time of enactment*: "If the city of Richmond had evidence before it that nonminority contractors were systematically excluding minority business from subcontracting opportunities it could take action to end the discriminatory exclusion." *Id.* at 509. Taken with the Court's searching evidentiary review, this finding makes

7

plain that the relevant body of evidence for a court reviewing a legislature's predictive judgment is the evidence the legislature considers before it enacts (and that motivates it to enact) the challenged legislation, not post-enactment evidence marshaled by the government's legal team in the face of litigation. Just as *Turner* does in the First Amendment context, *City of Richmond* reflects the Court's decisive rejection of blind deference to legislative judgments and its election, instead, to review intently the evidence the legislature actually considered and that supports its judgment.

### B. *Turner*'s Progeny and Application

*Turner's* substantial progeny holds that, when evaluating the predictive judgments of a legislature in a heightened scrutiny case, courts must ensure that the legislature has drawn reasonable inferences based on substantial evidence by examining the evidence that was actually before the legislature when it enacted the law. Those cases also make clear that a *Turner* inquiry is not limited to First Amendment queries and that the test in *Turner* is applicable in federal court review of state and local statutes and ordinances.

In an important *Turner* analysis case, of particular relevance here, in *Hutchins v. D.C.*, 188 F.3d 531, 567 (D.C. Cir. 1999), the D.C. Circuit considered *Turner* to require a showing that the legislature actually considered at the time of its enactment the evidence later offered in court to support its predictive judgment. In *Hutchins*, the D.C. Circuit conducted an intermediate-scrutiny analysis of a D.C. ordinance enacting

a juvenile curfew.  Citing *Turner*, the court observed that the "government must

demonstrate that its asserted interests are real and not merely conjectural." *Id.* at 542.

Also in light of *Turner*, the court held the factual premise advanced in litigation

for the legislature's decision must be the one actually relied upon by the legislature:

"[F]or a legislative judgment to warrant judicial deference, there must be a

contemporaneous factual foundation from which the court can conclude that there is

a close nexus between the burden on fundamental rights and the important state

interest." *Id.* (emphasis added).  On the merits, the court recited multiple sources of

information upon which the D.C. Council had actually relied during its own

deliberations on the curfew, *id.* at 543-44 & n.5, and ruled that those data points

"support[ed] the relationship between the government's interest and the imposition of

the curfew." *Id.*  No *post hoc* evidence was considered relevant to the court.

Likewise, in *Rothe Development Corp. v. Department of Defense*, the Federal Circuit

specifically held that to be relevant on judicial review, the government's evidence must

have been actually and contemporaneously considered by the legislature when

enacting the challenged law.  413 F.3d 1327, 1338 (Fed. Cir. 2005).  There, the

plaintiff challenged a federal statute designed to make socially and economically

disadvantaged businesses more competitive for government contracts, and the appeals

court conducted a strict scrutiny analysis. The plaintiff specifically argued that

evidence not presented to Congress should be stricken from the record or given no

weight, and that it was reversible error for the district court to consider it.

9

The Federal Circuit agreed, noting that the district court should have made a specific finding that Congress considered the evidence before it enacted the law. *Id.* at 1338 ("Thus, to be relevant in the strict scrutiny analysis, the evidence must be proven to have been before Congress prior to enactment of the racial classification. Although these statistical studies predate the [passage of the act], their relevance is unclear because it is uncertain whether they were ever before Congress in relation to [the act]. Without a finding that these studies were put before Congress prior to the date of [the act] and to ground its enactment, it was error for the district court to rely on the studies.").

Similarly, the Fourth Circuit has held that a *Turner* analysis must be grounded in the legislative record, with evidence outside that record reserved only for confirmatory purposes. *Satellite Broadcasting & Comm. Assoc. v. FCC*, 275 F.3d 337 (4th Cir. 2001). In *Satellite Broadcasting*, the court conducted an intermediate-scrutiny analysis of cable TV rules. Citing *Turner*, the court described its substantial evidence inquiry by stating: "We must decide whether Congress's factual predictions about the consequences of enacting a station-by-station copyright license were supported by substantial evidence in the legislative record. We may also look to evidence outside the legislative record in order to confirm the reasonableness of Congress's predictions." *Id.* at 357-58 (internal citations omitted). The court then reviewed the items in the legislative record, "one by one," and determined that "each of Congress's predictions was supported by substantial evidence." *Id.* at 358-61 (*citing Turner*

10

*Broadcasting System Inc., v. F.C.C.*, 520 U.S. 180, 204 (1997)).  But it is important to note that the legislation at issue in *Satellite Broadcasting* could not have survived constitutional scrutiny if Congress lacked substantial evidence before enacting the rules.  *Id.*

      In stark contrast to these cases, in the case at issue here,  and purporting to rely on *Concrete Works of Colorado, Inc. v. Denver*, 36 F.3d 1513 (10th Cir. 1994),the district court held that  it was not bound to restrict its analysis to the evidence actually before the legislature at the time of enactment, and it expressly noted so.  *Colorado Outfitters*, 24 F.Supp.3d at 1071-72, n. 28.  That holding is at once a fundamental misapplication of *Concrete Works* and an abdication of the district court's required *Turner* analysis. But read in full, and in context, the passage the district court cited as its support reads:

> In [*City of Richmond*], the Court underscored that a municipality "must identify [the] discrimination ... with some specificity before [it] may use race-conscious relief." Absent any pre-enactment evidence of discrimination, a municipality would be unable to satisfy [that case]. However, we do not read [*City of Richmond*'s] evidentiary requirement as foreclosing the consideration of post-enactment evidence. Indeed, post-enactment evidence, if carefully scrutinized for its accuracy, will often prove quite useful in evaluating the remedial effects or shortcomings of the race-conscious program.

*Concrete Works*, 36 F.3d at 1521 (emphases added) (internal citations omitted); *compare Cololrado Outfitters*, 24 F.Supp.3d at 1071-72, n. 28.

      This passage is critical for several reasons.  First, it makes it clear that, contrary to the district court's interpretation, *Concrete Works* holds that to survive a heightened scrutiny review, there must have been some foundation of substantial evidence before

the legislature at the time it enacted the law at issue.  Second, the passage provides

that any post-enactment evidence, if considered at all, must be "carefully scrutinized

for its accuracy." *Id.*  And finally, as the Federal Circuit realized in *Rothe Development

Corp*, a *Turner* analysis requires a reviewing court to limit its heightened scrutiny of a

statute to the evidence actually before the legislature at the time of the statute's

enactment, thus limiting *Concrete Works* observation about evidence gathered

subsequent to the original enactment as being applicable only to gauge the

permissibility of a legislative re-enactment of that law or scheme.   *See id.*, 262 F.3d at

1327.

Subsequent decisions by the Supreme Court and several lower courts are in

accord.  *See Shaw v. Hunt*, 517 U.S. 899 (1996) (generally recognizing that post

enactment evidence is not relevant to a *Turner* analysis); *see also, e.g.*, *Kachalsky v. County

of Westchester*, 701 F.3d 81, 97 (2d Cir. 2012) (observing that "[i]t is the legislature's job,

not [the court's], to weigh conflicting evidence and make policy judgments," reciting

"studies and data" the New York legislature considered, and upholding challenged law

on the basis of those studies and data); *Video Software Dealers' Ass'n v. Schwarznegger*, 556

F.3d 950 (9th Cir. 2009) (citing *Turner* , expressly premising findings on material upon

which the legislature "purportedly relied," and striking down challenged law because

materials provided inadequate evidentiary basis for challenged law);  *Landell v. Sorrell*,

382 F.3d 91, 97-101 (2d Cir. 2004), *reversed on other grounds*, *Randall v. Sorrell*, 548 U.S.

230 (2006) (citing *Turner* , expressly premising its conclusion on the legislative record

the Vermont legislature put together to support its prediction, and upholding challenged law on the basis of that record); *Carver v. Nixon*, 72 F.3d 633, 644 (8th Cir. 1995) (citing *Turner* and striking down challenged law because of a "failure of proof" of the items *Turner* would require the court to consider to "justify according deference"); *see also Peruta v. County of San Diego*, 742 F.3d 1144 (9th Cir. 2014) (citing *Turner* and observing that decisions that "deferred to the legislature's judgment … even though [the government could not present the court] with much evidence to show how or why its legislators arrived at this predictive judgment" was "not an appropriate application of intermediate scrutiny"); *Kitchen v. Herbert*, 755 F.3d 1193, 1222-23 & n.10 (10th Cir. 2014) (observing that if the court had been required to conduct a *Turner* analysis, it would consider "circumstances in which lawmaking authorities made factual findings regarding the feared risks before they promulgated the challenged laws").

Taken together, those authorities give two clear instructions: 1) reviewing courts must not blindly defer to a legislature's predictive judgment; and 2) when assessing whether a legislature's predictive judgment is supported by reasonable inferences drawn from substantial evidence,  reviewing courts must ground their analysis in evidence that the legislature actually considered before it enacted the challenged law.

Neither observation is remarkable. But each fits perfectly within the bedrock principles of separation of powers and independent courts:  If lawyers may supply *post*

*hoc* evidentiary bases to support a legislative infringement of a constitutional right, and thereby trigger de novo review, then courts may usurp the legislature's policymaking role by inserting themselves into a data-evaluation role for which they are not well-suited. The rule of *Turner* and its progeny is meant to prevent precisely that consequence.

This Court has used the *Turner* analysis consistently in the context of reviewing state or state local ordinances and stated that under such review of state law provisions: "When the Government defends a regulation on speech as a means to redress past harms or prevent anticipated harms, it must do more than simply posit the existence of the disease sought to be cured. It must demonstrate that the recited harms are real, not merely conjectural, and that the regulation will in fact alleviate these harms in a direct and material way." *Doe v. City of Albuquerque*, 667 F.3d 1111 (10th Cir. 2012), quoting *Turner*, 512 U.S. at 664 (internal citation and quotation marks omitted).

This Court has also used *Turner* in non-speech cases involving other fundamental rights. *See Awad v. Ziriax*, 670 F.3d 1111, 1129 (10th Cir. 2012). And even more recently, one judge of this Court aptly observed: "In conducting this analysis, we must defer to the predictive judgments of the electorate and the legislature and those judgments need not be based upon complete, empirical evidence." *Kitchen*, 755 F.3d at 1238 (Kelly, J., dissenting) *citing Turner*, 512 U.S. at 665–

66. The same analysis must obtain in the context of fundamental rights under the Second Amendment.

In fact, this Court has been very clear in stating the proper review of state provisions in such situations: "We are mindful that judicial review of an ordinance that implicates [fundamental rights] is not a license to reweigh the evidence de novo, or to replace [legislators'] factual predictions with our own. However, the Supreme Court has instructed that such deference to the legislative policymaking role nevertheless does not foreclose our independent judgment of the facts bearing on an issue of constitutional law. Our role is to assure that, in forming its judgments[, the legislature]has drawn reasonable inferences based on substantial evidence." *Abilene Retail No. 30, Inc. v. Board of Com'rs*., 492 F.3d 1164 (10th Cir. 2007) (citing and quoting *Turner*, 512 U.S. at 666 (internal quotation marks omitted; all but first brackets in original)).

Although an apparent matter of first impression in the Tenth Circuit, all sister circuits that have addressed the matter are unanimous that the *Turner* framework applies in the Second Amendment context, and that the only relevant materials for review are those things before the legislature when it acted—though the Ninth Circuit would apply it more rigorously against the government in its review of legislative findings and predictions than other circuit courts that have addressed the issue. *See Peruta*, 742 F.3d at 1177-78 (O'Scannlain, J.); *Drake v. Filko*,724 F.3d 426, 438, 456-57 (3d Cir. 2013) (Aldisert, J. applying analysis for the court; Hardiman, J. in dissent,

agreeing with applicability of test but insisting on more exacting review of what was before the legislature); *Woollard v. Gallagher*, 712 F.3d 865, 881-82 (4th Cir. 2013) (applying test as used in *Kachalsky*); *Kachalsky*, 701 F.3d at 95-97 (applying *Turner* framework and confining review to evidence before the legislature).

In fact, undersigned counsel has found no published decision in the Second Amendment context in which the court has reviewed legislative predictive judgments with use of post-enactment material in the manner the district court did here. The reason is simple. To do so was clear error. This Court should remand with instructions for the trial court to conduct the proper *Turner* analysis.

## II. THE TRIAL COURT ERRED BY FAILING TO ENGAGE IN THE PROPER ANALYSIS UNDER FEDERAL RULE OF EVIDENCE 702, THEREBY DEPRIVING THIS COURT OF ANY RECORD REGARDING THE RELIABILITY OF EXPERT EVIDENCE IN SUPPORT OF THE LEGISLATIVE JUDGMENTS AT ISSUE

As a separate matter, when evidence offered to support a legislative prediction is expert in nature, reviewing courts may rely on *only* that evidence that satisfies Federal Rule of Evidence 702. The district court below erred by not making explicit either its ruling or the rationale for its ruling on pending motions to strike expert testimony. *Amici* find this particularly troubling because, when combined with the *Turner* analysis error, it exacerbates the problem, in this case, of the district court substituting its weighing of the evidence for the legislature's, compounding the error of the district court's constitutional analysis and the substitution of the district court's

rationale for the provisions at issue for that of the Colorado legislature at the time the provisions were enacted.

The totality of the district court's treatment of the Motions to Strike and its rationale for its Rule 702 ruling was as follows:

> Also pending before the Court are the parties' Joint Motion to Strike Expert Opinions Per Fed. R. Evid. 702 (#118) and the Defendant's Second Motion to Dismiss (#133). The Court's findings of fact and conclusions of law set forth herein implicitly adjudicate the Rule 702 motion, and the Court will not otherwise address it separately.

*Colorado Outfitters*, 24 F.Supp.3d at n.4. Equally insufficient: "The parties' Joint Motion to Strike Expert Opinions Per FRE 702 (#118) is GRANTED, in part, and DENIED, in part consistent with the findings herein." *Id.* at 1082.

And apart from also parroting this rationale orally during the proceedings below, *see* Op. Br. at 62 (citing JA.9:1921), the district court's decision is otherwise bereft of reason, rationale, or explanation regarding what testimony was stricken, what testimony was not, and for what reasons. This analysis is no analysis at all. The district court provides neither the parties nor this Court an adequate record to assess the propriety and legality of its rationale. For this reason, the matter should be remanded so that Appellants may have an adequate record on which to ask this Court to review the district court's Rule 702 analysis should they continue to find it lacking.

The primary issue here is the insufficient consideration or almost non-existent rationale by the district court regarding its disposition of the motions to strike. Courts of Appeal dealing with unspecified treatments of pending motions to strike, even in

the context of a bench trial, are insistent that the rationale for the ruling on admissibility of expert evidence must be specified by the district court: "[B]ecause the district court's decision does not explain why it thought the motion to strike was moot, we are unsure how much consideration it gave to that motion." *Costello v. Grundon*, 651 F.3d 614, 636 (7th Cir. 2011); *see also Metavante Corp. v. Emigrant Savs. Bank*, 619 F.3d 748, 760 (7th Cir. 2010) ("Although we have held that the court in a bench trial need not make reliability determinations before evidence is presented, *In re Salem*, 465 F.3d 767, 776–77 (7th Cir. 2006), the determinations must still be made at some point.")

While the authority on the issue is sparse, perhaps because basic notice and record on appeal requirements are so commonplace, the issue seems rarely addressed. In addition to the authorities just noted, however, trial courts almost uniformly (the instant case being an exception) understand that even in the context of a bench trial they must make expert evidence rulings so that the parties may make their appropriate arguments and that courts of appeal, in turn, have an adequate record on which to assess the evidence. The case law reviewed demonstrates this practice is uniform for obvious reasons even when the district court is considering expert evidence in a bench trial setting. *See, e.g., Safeco Ins. Co. of Am. v. S & T Bank*, No. 07-01086, 2010 WL 786257, *6-7 (W. D. Pa. March 3, 2010) (unpublished); *Wyeth v. Apotex Inc.,* No. 08-22308-CIV., 2009 WL 8626786 *4-5 (S.D. Fla. Oct. 6, 2009) (unpublished); *Stern v.*

18

*Cigna Group Ins.*, No. 06 Civ. 1400, 2009 WL 1835111, *1 (S.D.N.Y. June, 25, 2009) (unpublished); *E.E.O.C. v. Freemen*, 626 F.Supp.2d 811, 815-16 (M. D. Tenn. 2009).

While some, if not many, district courts conducting a bench trial sometimes defer the decision on admissibility and reliability and other 702 review, those courts acknowledge that "[m]ost of the safeguards provided for in *Daubert* are not as essential in a case such as this where a district judge sits as the trier of fact in place of a jury." *Gibbs v. Gibbs*, 210 F.3d 491, 500 (5th Cir. 2000); *United States v. Brown*, 415 F.3d 1257, 1269 (11th Cir. 2005) ("There is less need for the gatekeeper to keep the gate when the gatekeeper is keeping the gate only for himself.").  Accordingly, "where the factfinder and the gatekeeper are the same, the court does not err in admitting evidence *subject to the ability later to exclude it or disregard it if it turns out not to meet the standard of reliability established by Rule 702.*"  *In re Salem*, 465 F.3d at 777 (emphasis added).  But the decisions are uniform in finding that a trial court must ultimately *make a decision*, at some point before the district court's resolution of the case, on a motion to strike and provide the parties with reasons for its ruling.

Here, the district court  abused its discretion and also erred in its fact finding because it did not give the parties notice of  its rationale to allow adequate response. Indeed, the district court failed to provide any rationale for finding the testimony relevant, reliable, and otherwise in conformity with Rule 702.  Consequently, this Court should reverse and remand due to the district court's mishandling of the motions to strike, so that the district court can provide a rationale for its findings, to

19

which the Appellants may respond, and, if Appellants still disagree with the district

court's rationale, they may appeal the issue again to this Court with a proper record

for review.

Such review and rationale necessary for an adequate record is fundamental in

Rule 702 or *Daubert* proceedings, and basic in any Rule 702 analysis.  In *Kumho Tire Co.*

*v. Carmichael*, 526 U.S. 137 (1999), for instance, the Court presented its "all expert

testimony" holding in very broad terms.  The Court stated four times in three ways in

two pages of the United States Reporter that Rule 702's reliability standard applies to

"all" expert testimony. *Id.* at 148-49 ("to all expert testimony," "to all expert

testimony," "to all experts," and "experts of all kinds"). This persistent repetition of

"all" is impossible to square with the district court's treatment of the motions to

strike, in this case, of "none," for the alleged expert evidence that it considered, but

which was not considered by the Colorado legislature.

As part and parcel of its holding that Rule 702's reliability standard – and the

judicial gatekeeping obligation that it triggers – applies to all expert testimony, *Kumho*

*Tire* makes clear that the reviewing court's reliability inquiry is mandatory, not

discretionary. The inquiry may be flexible, and the court may enjoy discretion to admit

or exclude certain evidence, but the court does not enjoy the discretion to refuse to

conduct the required analysis: "[Rule 702] requires a valid connection to the pertinent

inquiry as a precondition to admissibility. And where such testimony's factual basis,

data, principles, methods, or its application is called sufficiently into question, the trial

judge must determine whether the testimony has a reliable basis in the knowledge and experience of the relevant discipline." *Id.* (internal quotation marks and citation to *Daubert* omitted). *See also id.* at 152 (discussing trial court's "latitude in deciding *how* to test an expert's reliability" ((emphasis in original) and making no mention of court's latitude in deciding whether to test reliability.)

Following *Kumho Tire*, federal courts handling constitutional challenges routinely subject proposed expert testimony to a reliability analysis under Rule 702. *See, e.g.*, *Montes v. City of Yakima*, No. 12–CV–3108, 2014 WL 4199364 (E.D. Wash. Aug. 22, 2014) (unpublished) (conducting Rule 702 analysis regarding proposed expert opinion concerning action under Section 2 of Voting Rights Act); *A.A. v. Raymond*, No. 2:13–cv–01167, 2013 WL 3816565 (E.D. Cal. July 22, 2013) (unpublished) (conducting Rule 702 analysis regarding proposed expert opinion concerning action under Equal Protection Clause to enjoin closure of public elementary schools); *Many Cultures, One Message v. Clements*, 830 F. Supp. 2d 1111 (W.D. Wash. 2011) (conducting Rule 702 analysis regarding proposed expert opinion concerning § 1983 action seeking injunction against enforcement of state lobbying statute); *see also Shea v. Kerry*, 961 F. Supp. 2d 17 (D.D.C. 2013) (holding that pro se plaintiff's statistical analysis was forbidden by Rules of Evidence because it was expert opinion evidence properly within the scope of Rule 702, demonstrating inescapability of Rule 702 for matters properly within its scope). These courts' analyses reflect a widespread understanding

that the nature of the action is irrelevant to the need for a reliability analysis, which is always required.

Most notably, in *Many Cultures, One Message* ("*MCOM*"), the court reviewed expert testimony in the context of a state legislature's predictive judgments embodied in a statutory scheme pertaining to campaign finance, lobbying and grassroots advocacy. *Id.,* 830 F. Supp. 2d at 1121-22. The state defendants moved to strike the plaintiffs' social science expert on both Rule 702 and *Daubert* grounds, and the court conducted a complete Rule 702 analysis. *See id.* at 1122-1140. The court opened its analysis with a reminder of the settled principle, helpful here, that "it is the *proponent* of the expert witness – not the objecting party – who has the burden of proving admissibility … which must be established by a preponderance of the evidence." *Id.* at 1136 (emphasis in original). Further, the court described its "initial duty" as one "to ensure that the requirements of [Rule] 702 have been met." *Id.* at 1137.

The *MCOM* court's opinion is replete with language suggesting that its inquiry was essential, not elective. *See id.* at 1139 ("Rule 702 *demands* that expert testimony relate to scientific, technical, or other specialized knowledge, which does not include unsubstantiated speculation and subjective beliefs"); 1138 ("The Ninth Circuit has emphasized the obligatory nature of the initial 'gatekeeping' inquiry, by noting the trial court's broad latitude to make the reliability determination does not include the discretion to abdicate completely its responsibility to do so.") (quoting *Elsayed Mukhtar v. California State Univ.*, 299 F.3d 1053 (9th Cir. 2002), *overruled on other grounds*

*by Estate of Barabin v. AstenJohnson, Inc.*, 740 F.3d 457 (9th Cir. 2014). Ultimately, the *MCOM* court excluded the challenged expert on the ground that his opinions were unreliable. *Id.* at 1142.

In a separate portion of its opinion, the *MCOM* court discussed the requisite level of evidence that is needed to satisfy *Turner*'s "substantiality" requirement. *Id.* at 1178-80. Carefully, the court noted that, occasionally, a legislature's predictive judgments rest on "unprovable assumptions," such as that "good government requires greater transparency," or "value judgment[s] based on the common sense of the people's representatives." *Id.* at 1179. The court noted that "at bottom" those kinds of justifications (and the substantiality analysis that is required) are categorically different from justifications (such as in *Turner*) that "rest on economic analysis that [i]s susceptible to empirical evidence." *Id.* at 1178-79. In other words, when empirical evidence is in play, it must be reliable, and that determination must be made by reference to Rule 702 and, if necessary, *Daubert*.

In sum, *MCOM* is helpful in that: 1) it subjects evidence offered in support of a legislature's prediction to a reliability analysis under Rule 702, and expressly states that such an analysis is obligatory and essential; and 2) reinforces the need for a reliability analysis in a *Turner* context, when social science evidence susceptible to such examination is offered to support a legislative judgment. *MCOM* is an emphatic pronouncement that *no evidence* offered in support of a legislature's predictive judgment *in a court of law* can escape a reliability analysis under Rule 702.

There are important policy reasons supporting the requirement of a Rule 702 reliability analysis. At its core, the idea of an exception to Rule 702 for evidence offered in support of a legislative prediction is fundamentally incompatible with the purposes of Rule 702, as elucidated in well-settled Rule 702 precedent. The Court has made clear that the point of Rule 702 is to protect judicial fact-finders from unreliable evidence – a purpose that is irreconcilable with a "let anything in the courtroom that came into the legislative chamber" approach. *See, e.g., Kumho Tire*, 526 U.S. at 152 ("The objective of that [gatekeeping] requirement is to ensure the reliability and relevancy of expert testimony. It is to make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field.").

Indeed, even when the reliability analysis is "especially flexible" – "when the finder of fact is a judge rather than a jury [as in a bench trial], when the gatekeeper and the gated community are one and the same" – the analysis is still required. *Raymond*, 2013 WL 3816565, at *4 ("Even in these cases, the court must still conduct the *Daubert* analysis and make an explicit finding of the expert testimony's reliability, even if it does not conduct a separate *Daubert* hearing."). Ultimately, giving expert testimony evidence offered to support a legislature's prediction a free pass on a judicial reliability analysis would significantly undermine the important gatekeeping function preserved by Rule 702, and substantially deny the opportunity for meaningful

24

judicial review of the factual underpinnings of a legislative enactment. For this reason as well, the district court's disposition of the case should be reversed, and the case remanded with instruction to follow the requisite Rule 702 analysis.

## CONCLUSION

This Court should reverse and remand so that the district court can engage in the proper *Turner* analysis, without recourse to evidence that was not before Colorado's legislature when it enacted the statutes at issue, and also remand with instructions to follow the proper Rule 702 analysis, so that Appellants can adequately respond to the district court's rationale and all parties have a full, reasoned, record for this Court to review if the parties continue to find review necessary after remand.

DATED this 27th day of January 2015.

SEAN D. REYES
UTAH ATTORNEY GENERAL

PARKER DOUGLAS
UTAH FEDERAL SOLICITOR


By____/s/ *Parker Douglas*_____
       PARKER DOUGLAS
       Utah Federal Solicitor
       *Counsel for Amici Curiae*

## <u>CERTIFICATE OF COMPLIANCE</u>

I hereby certify pursuant to Fed. R. App. P. 32(a)(7)(C)(ii) that:

The foregoing brief is

__XX__   Proportionately spaced, has a typeface of 14 points or more and contains 6554__ words
or is

_____   Monospaced, has 10.5 or fewer characters per inch and contains _____
words or _____ lines of text
or is

_____In conformance with the type specifications set forth at Fed. R. App. P. 32(a)(5) and does not exceed _____ pages

By___/s/ *Parker Douglas*_____
Parker Douglas
Utah Federal Solicitor
*Counsel for Amici Curiae*

## **CERTIFICATE OF SERVICE**

I hereby certify that on January 27, 2015, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Tenth Circuit by using the appellate CM/ECF system.

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

By    */s/ Parker Douglas*
                Parker Douglas
                Utah Federal Solicitor
                *Counsel for Amici Curiae*