# IN THE UNITED STATES COURT OF APPEALS
## FOR THE TENTH CIRCUIT

| | |
|---|---|
| COLORADO OUTFITTERS ASSOCIATION, *et al.*, <br>     *Plaintiffs-Appellants*, <br><br> v. <br><br><br> JOHN W. HICKENLOOPER, <br> Governor of the State of Colorado, <br>     *Defendant-Appellee*, <br><br><br> JIM BEICKER, Sheriff of Fremont County, *et al.*, <br>     *Plaintiffs-Appellants*, <br><br> v. <br><br><br> JOHN W. HICKENLOOPER, <br> Governor of the State of Colorado, <br>     *Defendant-Appellee*, | |

On Appeal from the United States District Court
for the District of Colorado, No. 13-cv-01300 (Krieger, C.J.)

## DEFENDANT-APPELLEE'S ANSWER BRIEF

| | |
|---|---|
| CYNTHIA H. COFFMAN <br> Attorney General <br> KATHLEEN L. SPALDING <br> STEPHANIE L. SCOVILLE <br> Senior Assistant Attorneys General <br> LEEANN MORRILL <br> First Assistant Attorney General | MATTHEW D. GROVE <br> Assistant Solicitor General <br><br> Colorado Department of Law <br> 1300 Broadway, 6th Floor <br> Denver, Colorado 80203 <br> Telephone: 720 508-6157 <br> *Attorneys for Defendant-Appellee* |

***Oral argument is requested***
Filed April 22, 2015.

## CORPORATE DISCLOSURE STATEMENT

Because Defendant-Appellee is a state government officer, no corporate disclosure statement is required under F.R.A.P. 26.1.

# TABLE OF CONTENTS

**PAGE**

STATEMENT OF RELATED CASES............................................1

ISSUES PRESENTED ON APPEAL...........................................2

INTRODUCTION....................................................................4

STATEMENT OF THE CASE AND FACTS ...........................5

SUMMARY OF THE ARGUMENT .......................................8

ARGUMENT ...........................................................................9

   I.  Standard of review. ........................................................9

   II.  Analytical framework and the appropriate level of scrutiny. .......12

      A. The Tenth Circuit follows the two-step test adopted in *United States v. Reese*....................................................12

         1. Step one: determine whether the challenged regulation burdens conduct protected by the Second Amendment. ......13

         2. Step two: apply means-end scrutiny......................14

      B. The Tenth Circuit has not adopted a "narrow tailoring" requirement in Second Amendment cases. .................17

      C. Intermediate scrutiny does not require the type of evidentiary showing that Nonprofits urge. .................23

      D. Strict scrutiny is not warranted in this case. .............25

   III. Colorado did not violate the Second Amendment, either facially or as-applied, to certain of the nonprofit plaintiffs, by expanding background check requirements to cover many private firearms transfers............................................27

      A. No plaintiff established standing to maintain a challenge to the expanded background check requirement. ...........28

      B. Assuming that at least one plaintiff had standing to challenge § 18-12-112, the district court correctly affirmed its constitutionality. .............................................31

         1. Colorado's expanded background check requirement does not burden conduct protected by the Second Amendment. ..................................................31

         2. Even if § 18-12-112 implicates conduct protected by the Second Amendment, it does not burden the core right, and it satisfies intermediate scrutiny..................34

# TABLE OF CONTENTS

    a. Any burden on Plaintiffs' Second Amendment right is not substantial. ........................................... 35

    b. There is a reasonable fit between § 18-12-112 and the state's important interest in ensuring public safety. ................................................................. 38

  C. No plaintiff is entitled to an as-applied exemption from § 18-12-112. .................................................. 44

IV. Colorado did not violate the Second Amendment by restricting large-capacity magazines. ........................... 46

  A. The district court correctly rejected a categorical approach. ...... 48

    1. First Amendment rules have limited applicability in Second Amendment cases. ................................ 48

    2. *Heller* does not require a categorical approach simply because there are large numbers of LCMs in circulation. ................................................. 51

  B. The district court correctly found that limiting magazine capacity to 15 rounds does not severely burden the Second Amendment right. ......................................... 53

    1. Any historical pedigree of LCMs has no bearing on the burden that § 18-12-302 imposes on Second Amendment rights. ........................................ 54

    2. The fact that any burden applies "in the home" does not make it severe. ...................................... 56

    3. The evidence at trial established that limiting magazine capacity to 15 rounds does not diminish a gun owner's ability to engage in self-defense. ..................... 58

    4. Any burden associated with § 18-12-302 is reduced by the General Assembly's selection of a 15-round limit, along with the statute's grandfathering provisions. ............ 60

  C. Sec. 18-12-302 survives intermediate scrutiny because it is substantially related to the state's important interest in ensuring public safety. ...................................... 62

    1. Placing limits on magazine capacity will tend to reduce the number of times that firearms are discharged in confrontations. ....................................... 63

# TABLE OF CONTENTS

2. LCMs are particularly lethal in mass shooting situations. ................................................................ 66

3. Over time, § 18-12-302 will reduce the overall number of LCMs in circulation. ........................................... 69

4. Assuming *arguendo* that "narrow tailoring" was required, Defendant satisfied that standard. ...................... 72

V. The district court correctly rejected Plaintiffs' facial vagueness challenge to § 18-12-302. ............................. 74

A. Factual and procedural history. .................................. 75

B. Plaintiffs' facial vagueness challenges are barred because they neither implicate the First Amendment nor reach a substantial amount of conduct protected by the Second Amendment. ................................................................ 79

C. The "continuous possession" requirement is not unconstitutionally vague on its face because it is not vague in all of its applications. ........................................... 82

1. Because the "continuous possession" requirement is capable of valid application, it is not facially invalid. .......... 82

2. The Technical Guidance letters conform to case law construing "continuous possession" as a course of conduct. ....................................................................... 84

VI. Neither statute violates the Americans with Disabilities Act. ..... 88

A. Plaintiffs' ADA claims are not cognizable because they do not implicate a "service, program, or activity" of the state. ........ 89

1. Title II of the ADA applies to statutes, but only insofar as they provide a "program, service, or activity" of a governmental entity. ........................................... 89

2. Title II's reference to "discrimination by any such entity" is confined by the definition of "qualified individual with a disability." ................................. 92

B. Even if Plaintiffs' claims fell within the protections of the ADA, the district court correctly found that they were not entitled to relief. ............................................... 94

1. The district court correctly rejected Plaintiffs' disparate impact claim. ........................................... 95

# TABLE OF CONTENTS

2. Plaintiffs made no showing of intentional discrimination. ...................................................... 97

3. Plaintiffs are not entitled to an accommodation. ................. 99

VII. A governmental entity may present, and a trial court may rely upon, evidence outside the legislative record when defending the facial constitutionality of a law. ...................... 101

   A. Courts frequently consider "post-enactment" evidence when evaluating the constitutionality of state and local laws. .......... 102

   B. To the extent that the consideration of "post-enactment" evidence may be limited at all, such limitation is only with respect to the legislature's objectives for passing a law, and not its rationale for doing so. .................................................... 107

VIII. The district court did not err by failing to conduct an explicit *Daubert* analysis. ....................................................... 109

   A. Relevant procedural history. .................................................... 110

   B. Plaintiffs waived any objections to the opinions that they now contend the district court was required to explicitly analyze under *Daubert*. ................................................................ 112

   C. Assuming *arguendo* that the district court's *Daubert* findings were insufficient, any error was harmless. ................. 114

IX. The district court's rulings concerning the Article III standing of various plaintiffs need not be addressed on the merits, but if addressed, they should be affirmed. ........... 116

   A. The district court did not err by dismissing Sheriffs in their official capacities. ........................................................................ 118

   B. The district court did not err in its rulings regarding the standing of the FFLs or the additional Sheriffs in their individual capacities. ................................................................ 123

CONCLUSION ................................................................................ 124

# TABLE OF AUTHORITIES

**PAGE**

**CASES**

Aguayo v. Richardson, 473 F.2d 1090 (2d Cir. 1973) ............................ 120

Aswegan v. Bruhl, 113 F.3d 109 (8th Cir. 1997) ..................................... 91

Athanson v. Grasso, 411 F. Supp. 1153 (D. Conn. 1976) ..................... 120

Attorney General of Okla. v. Tyson Foods, Inc., 565 F.3d 769 (10th
    Cir. 2009) ................................................................................................ 115

Babbitt v. United Farm Workers Nat'l Union, 442 U.S. 289 (1979) ...... 29

Barber v. Colorado, 562 F.3d 1222 (10th Cir. 2009) ................... 90, 91, 98

Barden v. City of Sacramento, 292 F.3d 1073 (9th Cir. 2002) ............... 90

Bd. of Educ. v. Allen, 392 U.S. 236 (1968) ............................ 118, 119, 120

Behar v. Pa. Dep't of Transp., 791 F. Supp. 2d 383 (M.D. Pa. 2011) ..... 92

Bose Corp. v. Consumers Union, 466 U.S. 485, 499-500 (1984) ............ 10

Bronson v. Swensen, 500 F.3d 1099 (10th Cir. 2007) .................... 118, 122

Canfield v. Isaacs, 523 F. Supp. 2d 885 (N.D. Ind. 2007) ...................... 92

Cinnamon Hills Youth Crisis Center, Inc. v. St. George City, 685
    F.3d 917 (10th Cir. 2012) ............................................................... 90, 95

City of Hugo v. Nichols, 656 F.3d 1251 (10th Cir. 2011) ............... 118, 119

City of Los Angeles v. Alameda Books, Inc., 535 U.S. 425 (2002) .......... 24

City of Richmond v. J.A. Croson Co., 488 U.S. 469 (1989) ................... 103

Cmty. Servs., Inc. v. Wind Gap Mun. Auth., 421 F.3d 170 (3d Cir.
    2005) ........................................................................................................ 95

Coalition of N.J. Sportsmen v. Whitman, 44 F. Supp. 2d 666
    (D.N.J. 1999) .......................................................................................... 88

Concrete Works of Colo., Inc. v. City & Cnty. of Denver, 321 F.3d
    950 (10th Cir. 2003) ............................................................................. 62

Concrete Works v. City & County of Denver, 36 F.3d 1513 (10th
    Cir. 1994) .............................................................................................. 103

Daubert v. Merrell Dow Pharm., 509 U.S. 579 (1993) ......... 110, 113, 115

Dias v. City & County of Denver, 567 F.3d 1169 (10th Cir. 2009) ... 83, 84

District of Columbia v. Heller, 554 U.S. 570 (2008) ....................... passim

Doe v. Reed, 561 U.S. 186 (2010) ...................................................... 45, 53

Donelon v. La. Div. of Admin. Law, 522 F.3d 564 (5th Cir. 2008) ....... 121

Drake v. Filko, 724 F.3d 426 (3d Cir. 2013) ............................................ 26

Drake v. Jerejian, 134 S. Ct. 2134 (2014) .............................................. 26

Duvall v. County of Kitsap, 260 F.3d 1124 (9th Cir. 2001) ................... 98

Edenfield v. Fane, 507 U.S. 761 (1993) ................................ 23, 24, 41, 43

v

# TABLE OF AUTHORITIES

Elwell v. Okla. ex rel. Bd. of Regents of the Univ. of Okla., 693
F.3d 1303 (10th Cir. 2012) .......................... 88, 90, 91, 92, 93

Ernst J. v. Stone, 452 F.3d 186 (2d Cir. 2006) ....................... 17

Erznoznik v. City of Jacksonville, 422 U.S. 205 (1975) ......................... 81

Ezell v. City of Chicago, 651 F.3d 684 (7th Cir. 2011) .............. 14, 15, 27

Faustin v. City & County of Denver, 268 F.3d 942 (10th Cir. 2001) ... 117

Filush v. Town of Weston, 266 F. Supp. 2d 322 (D. Conn. 2003) ........... 91

Finch v. Miss. State Med. Ass'n, Inc., 585 F.2d 765 (5th Cir. 1978) .... 120

Fisher v. Okla. Health Care Auth., 335 F.3d 1175 (10th Cir. 2003) .... 100

Friedman v. City of Highland Park, __F. Supp.3d __, 2014 WL
4684944, (N.D. Ill., Sept. 18, 2014) ................................ 16, 25

Fyock v. City of Sunnyvale, 25 F. Supp. 3d 1267 (N.D. Cal. 2014) ........ 17

Fyock v. City of Sunnyvale, 779 F.3d 991 (9th Cir. 2015) .......... 16, 25, 60

Goebel v. Denver & Rio Grande W. R.R., 215 F.3d 1083 (10th Cir.
2000) .......................................................................... 114

Golan v. Holder, 609 F.3d 1076 (10th Cir. 2010) .................................. 69

Green v. Haskell County Bd. of Comm'rs, 568 F.3d 784 (10th Cir.
2009) .......................................................................... 9, 10

Heimbach v. Regan, 575 F. Supp. 767 (S.D.N.Y. 1983) ....................... 120

Hejira Corp. v. MacFarlane, 660 F.2d 1356 (10th Cir. 1981) ............... 83

Heller v. District of Columbia, 45 F. Supp. 3d 35 (D.D.C. 2014) ........... 24

Heller v. District of Columbia, 670 F.3d 1244 (D.C. Cir. 2011) .... .passim

High Ol' Times v. Busbee, 673 F.2d 1225 (11th Cir. 1982) ................... 83

Hightower v. City of Boston, 693 F.3d 61 (1st Cir. 2012) ...................... 50

Hill v. Colorado, 530 U.S. 7032000) ................................................ 83

Horne v. Flores, 557 U.S. 433 (2009) .............................................. 124

Hoult v. Hoult, 57 F.3d 1 (1st Cir. 1995) ......................................... 114

Jackson v. City & County of San Francisco, 746 F.3d 953 (9th Cir.
2014) ...................................................................... 12, 51, 58

Jacobs v. Clark County Sch. Dist., 526 F.3d 419 (9th Cir. 2008) ........... 17

Jordan v. Pugh, 425 F.3d 820 (10th Cir. 2005) ................................... 81

Kachalsky v. County of Westchester, 701 F.3d 81 (2d Cir. 2012) .... 19, 49

Kinser v. Gehl Co., 184 F.3d 1259 (10th Cir. 1999) ............................ 114

Kolbe v. O'Malley, 42 F. Supp. 3d 768 (D. Md. 2014) ................. 25, 57, 67

Kolender v. Lawson, 461 U.S. 352 (1983) ......................................... 75

Kwong v. Bloomberg, 723 F.3d 160 (2d Cir. 2013) .............................. 26

# TABLE OF AUTHORITIES

**PAGE**

Kwong v. de Blasio, 134 S.Ct 2696 (2014) .............................................. 26

Legislature of V.I. v. DeJongh, 645 F. Supp. 2d 452 (D.V.I. 2009) ...... 120

Lujan v. Defenders of Wildlife, 504 U.S. 555 (1992) ........................... 117

McCullen v. Coakley, 134 S. Ct. 2518, 2529 (2014)............. 18, 20, 22, 72

McDonald v. City of Chicago, 561 U.S. 742 (2010) ........................ passim

McIntyre v. Ohio Elections Comm'n, 514 U.S. 334 (1995) .................... 55

Michael M. v. Superior Court, 450 U.S. 464 (1981).............................. 22

Moore v. Madigan, 702 F.3d 933 (7th Cir. 2012)................................ 105

Nat'l Fed'n of Indep. Bus. v. Sebelius, 132 S. Ct. 2566 (2012) .............. 22

New York State Rifle & Pistol Ass'n v. Cuomo, 990 F. Supp. 2d
    349 (W.D.N.Y. 2013)................................ 4, 25, 60, 61, 64, 67

Nichols v. Harris, 17 F. Supp. 3d 989 (C.D. Cal. 2014) ......................... 80

Nixon v. Shrink Missouri Gov't PAC, 528 U.S. 377 (2000) ................. 103

NRA of Am., Inc. v. BATFE, 700 F.3d 185 (5th Cir. 2012) .................... 14

Orient Mineral Co. v. Bank of China, 506 F.3d 980 (10th Cir.
    2007) .......................................................................................... 9

Pena v. Lindley, Case No. 2:09-cv-01185-KJM-CKD, 2015 WL
    854684, at *13 (E.D. Cal. Feb. 26, 2015) .......................................... 49

People v. Abiodun, 111 P.3d 462 (Colo. 2005) ....................................... 86

Peruta v. County of San Diego, 742 F.3d 1144 (9th Cir. 2014)............. 106

Peterson v. Martinez, 707 F.3d 1197 (10th Cir. 2013) .................... 13, 14

Prairie Band of Potawatomi Indians v. Pierce, 253 F.3d 1234 (10th
    Cir. 2001) ................................................................................ 115

Questar Pipeline Co. v. Grynberg, 201 F.3d 1277 (10th Cir. 2000) ..... 113

Ramsey Winch, Inc. v. Henry, 555 F.3d 1199 (10th Cir. 2009)........ 79, 82

Randall v. Sorrell, 548 U.S. 230 (2006) .............................................. 103

Reg'l Econ. Cmty. Action Program v. City of Middletown, 294 F.3d
    35 (2d Cir. 2002) ......................................................................... 97

Richison v. Ernest Grp., Inc., 634 F.3d 1123 (10th Cir. 2011) ............. 113

Robertson v. Las Animas Cnty. Sheriff's Dep't, 500 F.3d 1185
    (10th Cir. 2007) .......................................................................... 99

Rubin v. Coors Brewing Co., 514 U.S. 476 (1995) ................................ 23

S. Lake Tahoe v. Cal. Tahoe Reg'l Planning Agency, 625 F.2d 231
    (9th Cir. 1980) ................................................................... 119, 120

S.F. Veteran Police Officers Ass'n v. City & County of San
    Francisco, 18 F. Supp. 3d 997 (N.D. Cal. 2014)........................... 25, 60

# TABLE OF AUTHORITIES

**PAGE**

S.G. v. Barbour Cnty. Dep't of Human Res., 148 So.3d 439 (Ala. Civ. App. 2013) .................................................................................. 92

Sabri v. United States, 541 U.S. 600 (2004) ........................................ 79

Schrader v. Holder, 704 F.3d 980 (D.C. Cir. 2013) .............................. 70

Schrock v. Wyeth, Inc., 727 F.3d 1273 (10th Cir. 2013) ................ 54, 97

Shew v. Malloy, 994 F. Supp. 2d 234 (D. Conn. 2014) ........................ 25

State v. Reid, 1 Ala. 612 (1840) ............................................................ 12

Taylor v. Roswell Indep. Sch. Dist., 713 F.3d 25 (10th Cir. 2013) ........ 79

Tinker v. Des Moines County Ind. Sch. Dist., 393 U.S. 503 (1969) ....... 49

Tsombanidis v. W. Haven Fire Dep't, 352 F.3d 565 (2d Cir. 2003).. 95, 96

Turner Broad. Sys. v. FCC, 512 U.S. 622 (1994)  (*Turner I*) .........passim

Turner Broad. Sys. v. FCC, 520 U.S. 180 (1997) (*Turner II*) ..........passim

Tyler v. Hillsdale Cnty. Sheriff's Dep't, 775 F.3d 308 (6th Cir. 2014) ........................................................................................... 15, 20

U.S. v. Marzzarella, 614 F.3d 85 (3d Cir. 2010) ................................ 105

United States v. Chester, 628 F.3d 673 (4th Cir. 2010) ............. 16, 50, 55

United States v. Chovan, 735 F.3d 1127 (9th Cir. 2013) ...................... 16

United States v. DeCastro, 682 F.3d 160 (2d Cir. 2012) ...................... 15

United States v. Fincher, 538 F.3d 868 (8th Cir. 2008) ....................... 52

United States v. Friday, 525 F.3d 938 (10th Cir. 2008) ....................... 10

United States v. Gaudreau, 860 F.2d 357 (10th Cir. 1988) .................. 83

United States v. Horodner, 993 F.2d 191 (9th Cir. 1993) ..................... 86

United States v. Huitron-Guizar, 678 F.3d 1164 (10th Cir. 2012) .passim

United States v. Jones, 533 F.2d 1387 (6th Cir. 1976) .......................... 85

United States v. Kalymon, 541 F.3d 624 (6th Cir. 2008) .................... 114

United States v. Martin, 203 F.3d 836 (10th Cir. 2000) ...................... 86

United States v. Masciandaro, 638 F.3d 458 (4th Cir. 2011) ........... 26, 27

United States v. McCane, 5 F.3d 1037 (10th Cir. 2009) ....................... 14

United States v. Miller, 307 U.S. 174 (1939) ....................................... 13

United States v. Moesser, No. 2:09-CR-842 TS, 2010 WL 4811945 (D. Utah Nov. 19, 2010) ................................................................. 80

United States v. Olano, 507 U.S. 725 (2003) ...................................... 112

United States v. Powell, 423 U.S. 87 (1975) ........................................ 83

United States v. Reed, 114 F.3d 1067 (10th Cir. 1997) ........................ 80

United States v. Reese, 627 F.3d 792 (10th Cir. 2010) ................. passim

United States v. Tagg, 572 F.3d 1320 (11th Cir. 2009) ........................ 52

PAGE

United States v. Teague, 443 F.3d 1310 (10th Cir. 2006) .................... 112
United States v. Weaver, Case No. 2:09-cr-00222, 2012 WL 727488
    (S.D. W.Va. March 7, 2012) ................................................................ 80
United States v. Yancey, 621 F.3d 681 (7th Cir. 2010) ....................... 104
Ward v. Rock Against Racism, 491 U.S. 781 (1989) ................. 20, 23, 73
Ward v. Utah, 398 F.3d 1239 (10th Cir. 2005) ……………………….....83
Wash. State Grange v. Wash. State Republican Party, 552 U.S.
    442 (2008) ............................................................................................ 79
Woollard v. Gallagher, 712 F.3d 865 (4th Cir. 2013) .................... 50, 106
Zimmerman v. Or. Dep't of Justice, 170 F.3d 1169 (9th Cir. 1999) ....... 93

## CONSTITUTIONS

U.S. Const amend. XIV ............................................................................ 7
U.S. Const. amend. II ................................................................... passim

## STATUTES

Colo. Rev. Stat. § 18-1-504(2)(c) ........................................................... 78
Colo. Rev. Stat. § 18-12-108.7 ............................................................... 33
Colo. Rev. Stat. § 18-12-111 .................................................................. 33
Colo. Rev. Stat. § 18-12-112 ......................................................... passim
Colo. Rev. Stat. § 18-12-112(6)(b) ......................................................... 42
Colo. Rev. Stat. § 18-12-112(6)(d) ......................................................... 42
Colo. Rev. Stat. § 18-12-112(6)(e) ......................................................... 46
Colo. Rev. Stat. § 18-12-112(6)(e)(III) ................................................... 42
Colo. Rev. Stat. § 18-12-112(6)(h) ................................................... 42, 46
Colo. Rev. Stat. §18-12-301 ..................................................................... 5
Colo. Rev. Stat. § 18-12-301(2)(a)(I) .................................................. 6, 78
Colo. Rev. Stat. § 18-12-301(2)(b)(I) ..................................................... 62
Colo. Rev. Stat. § 18-12-302 ......................................................... passim
Colo. Rev. Stat. § 18-12-302(2)(a) ..................................... 8, 74, 79, 83
Colo. Rev. Stat. § 18-12-303 ................................................................... 5
Colo. Rev. Stat. § 24-31-101(b) .............................................................. 76
N.C. Gen. Stat. § 14-402(a) ..................................................................... 5
Or. Rev. Stat. § 166.438 ........................................................................... 5
18 U.S.C. § 922(b) ................................................................................... 33
18 U.S.C. § 922(d) ................................................................................... 33
18 U.S.C. § 922(g)(3) ..................................................................... 104,105

# TABLE OF AUTHORITIES

**PAGE**

18 U.S.C. § 922(k) .................................................................. 105

42 U.S.C. § 12131(2) ............................................................... 92

42 U.S.C. § 12132 .......................................................... 88,90,92

18 U.S.C.S. § 922(g)(3) .......................................................... 104

18 U.S.C.S. § 922(g)(8) .......................................................... 103

430 Ill. Comp. Stat. 65/3(A-10) .................................................. 5

## RULES

Fed. R. Evid. 702 ................................................................ 40

Fed. R. Evid. 702(a)-(d) .............................................. 110, 112, 113, 115

28 C.F.R. § 35.130(B)(7) ........................................................ 100

## OTHER AUTHORITIES

Adam Winkler, <u>Fundamentally Wrong About Fundamental Rights,</u> 23 Const. Comment. 227 (Summer 2006) .............................. 27

Gun Control Act of 1968, Public Law 90-618, § 922(g) ........................... 32

National Firearms Act of 1938, 52 Stat. 1250, § 2(d) ........................... 32

## STATEMENT OF RELATED CASES

Per the Court's order of January 22, 2015, Defendant-Appellee submits the following consolidated response brief to the two opening briefs filed by Plaintiffs-Appellants in Case Nos. 14-1290 and 14-1292. There are no other related cases.

# ISSUES PRESENTED ON APPEAL

1.     Whether the district court applied the correct analytical framework to Plaintiffs' claims under the Second Amendment (all Plaintiffs).[1]

2.     Assuming at least one plaintiff had standing to challenge § 18-12-112, whether Colorado's expansion of its background check requirement to cover most private firearms transfers violates the Second Amendment (Nonprofits).

3.     Whether Colorado's limitation on the acquisition of large capacity magazines violates the Second Amendment (all Plaintiffs).

4.     Whether Colorado's limitation on the acquisition of large capacity magazines is unconstitutionally vague (Nonprofits).

5.     Whether Colorado's expanded background check requirements violate Title II of the Americans with Disabilities Act (Nonprofits).

---

[1] Several claims in Plaintiffs' two briefs overlap, but each brief also contains independent arguments.  For clarity, and except where a party's individual identity is significant, Plaintiffs in Case No. 14-1290 will be referred to as "Sheriffs," and Plaintiffs in Case No. 14-1292 will be referred to as "Nonprofits."

6. Whether Colorado's limitation on the acquisition of large capacity magazines violates Title II of the Americans with Disabilities Act (Nonprofits).

7. Whether the district court reversibly erred by admitting and relying upon evidence that does not appear in the legislative record (Nonprofits).

8. Whether the district court's *Daubert* analysis was sufficient, and if not, whether any shortcomings constitute reversible error (Nonprofits).

9. Whether the district court reversibly erred by finding that the Sheriffs lacked official capacity standing (Sheriffs).

10. Whether the district court abused its discretion by declining to recognize additional Sheriffs as Plaintiffs in their individual capacities (Sheriffs).

11. Whether the district court reversibly erred by failing to find that the Plaintiff Federal Firearms Licensees ("FFLs") stated an injury-in-fact to a legally protected interest (Nonprofits).

**INTRODUCTION**

During the 2013 legislative session, the Colorado General Assembly passed two bills intended to promote public safety by preventing prohibited individuals from acquiring firearms and by reducing the firepower wielded by mass shooters and other criminals. While a number of states and municipalities reacted to mass shootings in Aurora, Colorado, and Newtown, Connecticut, by tightening various types of gun regulations, Colorado took a more measured approach than most. New York, for example, banned assault weapons, limited magazine capacity to 10 rounds (with no grandfathering provision), tightened firearm licensing requirements, created a statewide firearm registry, established firearm storage requirements, and expanded background check requirements to cover both ammunition purchases and most private firearm transfers. *See New York State Rifle & Pistol Ass'n v. Cuomo*, 990 F. Supp. 2d 349, 355-56 (W.D.N.Y. 2013) ("*NYSRPA*"). Colorado, by contrast, limited magazine capacity to fifteen rounds (while grandfathering previously-owned large-capacity magazines ("LCMs")), and expanded background check requirements to cover many firearm transfers between private individuals.

At present, Colorado is one of seventeen states, along with the District of Columbia, requiring background checks for at least some private firearm transfers.[2] A total of eight states, plus the District of Columbia and several municipalities, have laws setting limits on magazine capacity.[3] Many of these laws have been challenged in recent years. Thus far, all have passed constitutional muster.

## STATEMENT OF THE CASE AND FACTS

House Bill 1224, later codified at Colo. Rev. Stat. §§ 18-12-301 through -303, generally prohibits the new acquisition of large-capacity magazines ("LCMs"), which the statute defines as ammunition feeding devices "capable of accepting, or designed to be readily converted to

---

[2] Washington's voters, for example, adopted a ballot initiative (I-594) in 2014 that, like Colorado, employs point-of-sale background check requirements. Illinois mandates point-of-sale checks for private sales at gun shows, and for private transfers requires the buyer to present a firearm owner's identification card (which the seller must verify). *See* 430 Ill. Comp. Stat. 65/3(a-10). Some other states have expanded their background check requirements to a lesser degree. *See, e.g.,* Or. Rev. Stat. § 166.438 (requiring background checks for private sales at gun shows); N.C. Gen. Stat. § 14-402(a) (requiring license or possession of concealed carry permit for acquisition of any pistol, whether through FFL or private seller).

[3] Colorado is the only state with a fifteen-round limit. Most other similar laws define a "large-capacity magazine" as one holding more than ten rounds.

accept, more than fifteen rounds of ammunition." Colo. Rev. Stat. § 18-12-301(2)(a)(I).  House Bill 1229, codified at Colo. Rev. Stat. §18-12-112, expands background check requirements for firearms purchases to cover most transfers between private individuals.

After signing the bills, the Governor requested that the Colorado Department of Public Safety, in consultation with the Attorney General, issue "Technical Guidance on how the law should be interpreted and enforced in Colorado."  J.A. 380.

A few weeks after House Bills 1224 and 1229 were signed by the Governor, and the day after the Attorney General issued his first Technical Guidance letter, Plaintiffs, a consortium of county sheriffs, firearms dealers, nonprofit organizations, and assorted other individuals, filed facial constitutional challenges to both statutes (later, Plaintiffs attempted to add as-applied claims to this case).  J.A. 43. Plaintiffs then filed a motion for a preliminary injunction challenging two aspects of the magazine capacity bill, and the Attorney General issued the second Technical Guidance letter, which was a result of pre-hearing negotiations with the Plaintiffs, after the district court declined to enter the stipulated order that the parties proposed. *See* J.A. 259-

261; 575-576.  The effect of those Technical Guidance letters is discussed in Section V, *infra.*

The Governor filed a partial motion to dismiss challenging the official capacity standing of Sheriffs as to all claims, as well as the Article III standing of all Plaintiffs with respect to certain aspects of their challenge to § 18-12-302.  J.A. 639-655.  The district court granted the motion in part and denied it in part. J.A. 1032-1056.  As relevant to Plaintiffs' claims on appeal, the district court dismissed the Sheriffs in their official capacities, finding that they lacked Article III standing under the political subdivision doctrine.  *Id.*  The district court subsequently readmitted eleven of the Sheriffs as individual capacity plaintiffs.  J.A. 1362-63.

In a written order issued after a nine-day bench trial, the district court affirmed the constitutionality of both challenged statutes under the Second and Fourteenth Amendments, found that the definition of LCM and the grandfathering provision of §18-12-302 were not unconstitutionally vague, and rejected Plaintiffs' challenges under the Americans with Disabilities Act (ADA).  J.A. 1750-1799.  This appeal followed.

7

## SUMMARY OF THE ARGUMENT

The district court's ruling should be affirmed in all respects. The district court applied the correct analytical framework and level of scrutiny to conclude that both § 18-12-112 and § 18-12-302 pass constitutional muster. There were no evidentiary errors below, but to the extent any errors occurred, they were harmless.

The grandfathering provision of § 18-12-302(2)(a) is not unconstitutionally vague. The district court correctly rejected Plaintiffs' facial vagueness challenge after concluding that it created a discernible core of prohibited conduct.

Neither challenged statute implicates Title II of the ADA. Even assuming *arguendo* that Plaintiffs did state a claim under the ADA, it fails on the merits.

There is no need to address the Article III standing of either the FFLs or Sheriffs in their official capacities because their party status could have no effect on the outcome of the facial challenges at issue in this case. To the extent that the standing of the FFLs or Sheriffs is addressed on the merits, the district court's rulings should be affirmed.

# ARGUMENT

## I. Standard of review.

With respect to their argument that Colorado's LCM restriction is unconstitutional, Sheriffs urge this Court to conduct a *de novo* review of the entire record, and particularly to an unidentified subset of "constitutional facts."

The Tenth Circuit ordinarily "review[s] a district court's factual findings, made after a bench trial, for clear error[,] and its legal conclusions *de novo*." *Orient Mineral Co. v. Bank of China*, 506 F.3d 980, 1001 (10th Cir. 2007). Certain First Amendment cases, however, require an appellate court "to make an independent examination of the whole record," and to "review *de novo* a district court's findings of constitutional fact and its ultimate conclusions regarding a First Amendment challenge." *Green v. Haskell County Bd. of Comm'rs*, 568 F.3d 784, 795 (10th Cir. 2009) (internal quotations and citations omitted).

Sheriffs advocate for this standard of review, but cite no case, and counsel for the Governor has found none, extending this altered standard of review beyond the First Amendment context. Nor do

Sheriffs identify what should be considered a "constitutional fact" in a Second Amendment case such as this. And regardless of what is or is not a "constitutional fact," it is certainly incorrect to suggest that this Court should simply review the cold record and come to its own conclusions about, for example, witness credibility or the weight accorded to particular evidentiary showings. An appellate court must "give 'due regard' . . . to the trial judge's opportunity to observe the demeanor of witnesses." *Green*, 568 F.3d at 796 (quoting *Bose Corp. v. Consumers Union*, 466 U.S. 485, 499-500, 514 (1984)). "The independent review function is not equivalent to a 'de novo' review of the ultimate judgment itself, in which a reviewing court makes an original appraisal of all the evidence to decide whether or not it believes that judgment should be entered for plaintiff." *Bose*, 466 U.S. at 514 n.31. Rather, "the special *Bose* rule," even to the extent that it should apply at all outside the First Amendment context, "applies only to 'constitutional facts' and not to the basic historical facts upon which the claim is grounded, which are subject to the usual 'clearly erroneous' standard of review." *United States v. Friday*, 525 F.3d 938, 949-50 (10th Cir. 2008).

The trick, of course, is distinguishing between "constitutional" and "basic historical" facts. It is true that cases of this type—involving a pre-enforcement constitutional challenge to a statute—do not typically hinge on historical events. At the same time, an appellate court is not in a position to review *de novo* a trial court's decisions about whether and how a live witness's testimony should be credited or weighed. These decisions often matter, particularly in cases (such as this one) where expert testimony makes up a substantial portion of the evidence. In the end, because most of the operative facts in this case are either undisputed, went unrebutted at trial, or both, the distinction may not matter here. But assuming *arguendo* that the *Bose* "constitutional facts" doctrine should extend into the Second Amendment context, this Court should apply the clear error standard to a district court's decision to credit or disregard the testimony of a particular witness. What the district court does with that testimony—finding it relevant to or dispositive of a particular constitutional question, for example— remains subject to *de novo* review.

## II. Analytical framework and the appropriate level of scrutiny.

### A. The Tenth Circuit follows the two-step test adopted in *United States v. Reese.*

*Heller* and *McDonald* addressed the constitutionality of outright bans on handgun possession, laws that the Supreme Court held amounted to a "severe restriction" on the core right of self-defense that were comparable to "[f]ew laws in the history of our Nation." *District of Columbia v. Heller,* 554 U.S. 570, 629 (2008); *see also McDonald v. City of Chicago*, 561 U.S. 742 (2010). The Court held that a restriction of this type—which "'under the pretence of regulating, amounts to a destruction of the right, or which requires arms to be so borne as to render them wholly useless for the purpose of defense'"—is categorically unconstitutional. *Id.* at 629 (quoting *State v. Reid*, 1 Ala. 612, 616-17 (1840)). Accordingly, "[a] law that imposes such a severe restriction on the core right of self-defense that it 'amounts to a destruction of the [Second Amendment] right,' is unconstitutional under any level of scrutiny." *Jackson v. City & County of San Francisco*, 746 F.3d 953, 961 (9th Cir. 2014).

Despite its clear statements as to the unconstitutionality of a government's ban on an entire class of arms, the Supreme Court has provided little explicit guidance for cases involving regulations that impose lesser burdens.  Left to navigate on their own post-*Heller*, the federal circuits have uniformly adopted a two-step approach under which a reviewing court first determines whether the law burdens conduct falling within the scope of the Second Amendment's guarantee and then, assuming that it does, applies means-end scrutiny. *Peterson v. Martinez*, 707 F.3d 1197, 1208 (10th Cir. 2013); *United States v. Reese,* 627 F.3d 792, 800-01(10th Cir. 2010).

> 1.  **Step one: determine whether the challenged regulation burdens conduct protected by the Second Amendment.**

With respect to the first step of this framework, *Heller* and *McDonald* make clear that "the Second Amendment is not unlimited.  It is not a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose." *Heller*, 554 U.S. at 626.  For example, the Second Amendment does not "protect those weapons not typically possessed by law-abiding citizens for lawful purposes," *id.* at 625 (citing *United States v. Miller*, 307 U.S. 174 (1939)), or "dangerous

and unusual weapons." *Id.* at 627. Restrictions that have been the subject of longstanding, accepted regulation, such as "felon in possession" laws, also fall outside the Second Amendment's scope. *See United States v. McCane*, 5 F.3d 1037, 1047 (10th Cir. 2009); *see also NRA of Am., Inc. v. BATFE*, 700 F.3d 185, 196 (5th Cir. 2012) ("*Heller* demonstrates that a regulation can be deemed 'longstanding' even if it cannot boast a precise founding-era analogue"). If a challenged regulation does not burden conduct falling within the scope of the Second Amendment's guarantee, then the inquiry is complete. *Peterson*, 707 F.3d at 1208.

## 2. Step two: apply means-end scrutiny.

"[T]he rigor of judicial review" under the second step of the two-part *Reese* test "will depend on how close the law comes to the core of the Second Amendment right and the severity of the burden on that right." *Peterson,* 707 F.3d at 1218 (Lucero, J., concurring separately) (quoting *Ezell v. City of Chicago,* 651 F.3d 684, 703 (7th Cir. 2011)). Some courts have set a baseline of intermediate scrutiny, concluding that if the challenged regulation places any burden on the Second Amendment right, the burden shifts to the government to demonstrate

a substantial relationship between the regulation and its important objective of ensuring public safety. *See, e.g., NRA of Am.,* 700 F.3d at 194. Others have hewed more closely to traditional constitutional analysis, requiring the party challenging the law's constitutionality to demonstrate that it substantially burdens the Second Amendment right before applying any type of heightened scrutiny. *See United States v. DeCastro*, 682 F.3d 160, 166 (2d Cir. 2012); *Heller v. District of Columbia,* 670 F.3d 1244, 1252-53 (D.C. Cir. 2011) (*Heller II*).

With only one exception, no federal appellate court has applied strict scrutiny to a Second Amendment claim. *See Tyler v. Hillsdale Cnty. Sheriff's Dep't*, 775 F.3d 308 (6th Cir. 2014) (applying strict scrutiny and invalidating prohibition on gun ownership as applied to individual who had been involuntarily committed to a mental institution twenty-eight years earlier). A few other courts have come close—applying "not quite strict scrutiny" when evaluating laws that are invidiously designed to prevent the effective exercise of the core rights associated with lawful firearm ownership. *See, e.g., Ezell*, 651 F.3d at 708 ("The City's firing-range ban is not merely regulatory; it *prohibits* the 'law-abiding, responsible citizens' of Chicago from

engaging in target practice in the controlled environment of a firing range.") (emphasis in original). Every court that has evaluated a limit on magazine capacity, however, has rejected strict scrutiny in favor of either intermediate scrutiny or a sliding-scale approach. *See, e.g., Fyock v. City of Sunnyvale*, 779 F.3d 991, 999 (9th Cir. 2015) (applying intermediate scrutiny to ten-round limitation); *Friedman v. City of Highland Park*, __F. Supp.3d __, 2014 WL 4684944 (N.D. Ill., Sept. 18, 2014) (applying sliding-scale approach to ten-round limitation).

In prior cases, the Tenth Circuit has applied intermediate scrutiny to laws that flatly prohibit firearm possession. *See United States v. Huitron-Guizar,* 678 F.3d 1164, 1169 (10th Cir. 2012); *Reese*, 627 F.3d at 802. Under that test, the Court's analysis is dictated by: (1) how close the challenged regulation comes to the core of the Second Amendment right; and (2) how severely, if at all, the challenged regulation burdens that right. *See* J.A. 1772-73; *see also United States v. Chovan*, 735 F.3d 1127, 1138 (9th Cir. 2013); *United States v. Chester*, 628 F.3d 673, 682-683 (4th Cir. 2010). Laws that do not burden the core right of self-defense articulated in *Heller*—and thus lie "on the periphery" of the Second Amendment—should be subject to a less demanding standard

than those that do.  *Fyock v. City of Sunnyvale*, 25 F. Supp. 3d 1267,

1271 (N.D. Cal. 2014).

> ### B. The Tenth Circuit has not adopted a "narrow tailoring" requirement in Second Amendment cases.

As already discussed, the federal circuits have been nearly

uniform in their application of intermediate scrutiny to Second

Amendment challenges.  Unsurprisingly, their formulations of

intermediate scrutiny have varied as the cases analyze different facets

of the Second Amendment.  *See Huitron-Guizar*, 678 F.3d at 1166 ("The

right to bear arms . . . is qualified by what one might call the 'who,'

'what,' 'where,' 'when,' and 'why.'").  This variability is to be expected;

courts have long recognized that "the label 'intermediate scrutiny'

carries different connotations depending on the area of law in which it

is used." *Ernst J. v. Stone*, 452 F.3d 186, 200 n.10 (2d Cir. 2006).  Thus,

its "precise contours vary slightly depending upon which constitutional

right is at issue." *Jacobs v. Clark County Sch. Dist.*, 526 F.3d 419, 429

n.23 (9th Cir. 2008).

Applying intermediate scrutiny in the Second Amendment

context, this Court has held that "a law is sustained if the government

shows that it is 'substantially related' to an 'important' official end."

*Huitron-Guizar*, 678 F.3d at 1169.  This is precisely the standard that

the district court applied.  J.A. 1772.

Sheriffs, Nonprofits, and some *amici* disagree with this

formulation, and instead advance a "narrow tailoring" version of

intermediate scrutiny that is inconsistent with the precedent set by

*Reese* and *Huitron-Guizar*.  Drawing on several First Amendment cases

analyzing "time, place, and manner" restrictions on speech, Sheriffs

argue that "for a law to pass intermediate scrutiny, it 'must be narrowly

tailored to serve a significant government interest,'" and that "to be

narrowly tailored, [a law] must not burden substantially more speech

than necessary to further the government's legitimate interests."

*Sheriffs' Br.* at 38 (quoting *McCullen v. Coakley*, 134 S. Ct. 2518, 2529,

2535 (2014)).[4]

In the Second Amendment context, the Supreme Court has

recognized not only that "state and local experimentation with

_____

[4] Sheriffs rely on several "time, place, and manner" cases to support this
argument, while simultaneously complaining of the district court's
"analogy to time, place, and manner regulations under the First
Amendment."  *Compare Sheriffs' Br.* at 30 *with* 38-40.  It is unclear how
to reconcile these two inconsistent positions.

reasonable firearms regulations will continue under the Second Amendment," but also that "incorporation [of the Second Amendment] does not imperil every law regulating firearms." *McDonald*, 561 U.S. at 785, 786. These assurances are incompatible with the demanding "narrow tailoring" requirement that Plaintiffs urge this Court to adopt. Although courts have frequently acknowledged that parallels can be drawn between the rights protected by the First and Second Amendment, they also have cautioned against "assum[ing] that the principles and doctrines developed in connection with the First Amendment apply equally to the Second." *Kachalsky v. Cnty. of Westchester*, 701 F.3d 81, 92 (2d Cir. 2012). Background check requirements and limitations on magazine capacity represent two areas in which the type of narrow tailoring urged by Plaintiffs can be troublesome to apply.

To be sure, a few cases have suggested that narrow tailoring has a place in Second Amendment cases, but most include no such requirement. Moreover, even those courts that have mentioned narrow tailoring have articulated the standard in a different manner than

*McCullen* did.[5]  For example, in evaluating the District of Columbia's magazine capacity limitation, *Heller II* cited several cases that applied narrow tailoring standards, but only required the government to show "a substantial relationship or reasonable 'fit' between, on the one hand, the prohibition on assault weapons and magazines holding more than ten rounds and, on the other, its important interests in protecting police officers and controlling crime." 670 F.3d at 1262.  The court applied "a mild form of intermediate scrutiny" because "the prohibition of . . . [ten-round] large-capacity magazines does not effectively disarm individuals or substantially affect their ability to defend themselves.  *Id.*  That version of narrow tailoring was more akin to a traditional "time, place, and manner" approach, which only requires a showing that the challenged laws "promote[] a substantial government interest that would be achieved less effectively absent the regulation," and leave "ample alternative channels" for protected conduct. *Ward v. Rock Against Racism*, 491 U.S. 781, 798-99 (1989).

---

[5] In *Tyler*, for example, which was issued several months after *McCullen*, the Sixth Circuit rejected intermediate scrutiny precisely because it *does not* require narrow tailoring in the Second Amendment context. 775 F.3d at 329-30.

This is not to say that a state may, in the name of stopping a few criminals, enact laws that destroy the core Second Amendment rights of everyone, law-abiding citizens included. Sheriffs suggest that by generally prohibiting LCM acquisition, rather than imposing a targeted ban on certain high-risk groups or individuals, this is precisely what Colorado's LCM restriction does. *Sheriffs' Br.* at 40. Nonprofits similarly assert that Colorado went too far by expanding background checks to cover both private sales and some temporary transfers. But this argument misses the point in two ways. First, the relevant question is how the law affects the *core* Second Amendment right—self-defense. As discussed in detail below, neither provision materially burdens anyone's ability to exercise that right.

Second, in general "the requirement of narrow tailoring is satisfied so long as the regulation promotes a substantial government interest that would be achieved less effectively absent the regulation." *Turner Broad. Sys. v. FCC*, 512 U.S. 622, 662 (1994) (*"Turner I"*). While, in the First Amendment context, the regulation should not "burden substantially more speech than is necessary to further the government's legitimate interests," the regulatory path chosen by the

government need not be the least restrictive means. *Id.* "The relevant inquiry . . . is not whether the statute is drawn as precisely as it might have been, but whether the line chosen by the . . . Legislature is within constitutional limitations." *Michael M. v. Superior Court*, 450 U.S. 464, 473 (1981) (plurality opinion). And when engaging in a constitutional analysis, "substantial deference to the predictive judgments of [the legislature]" is warranted. *Turner Broad. Sys. v. FCC*, 520 U.S. 180, 195 (1997) ("*Turner II*"); *see also Nat'l Fed'n of Indep. Bus. v. Sebelius*, 132 S. Ct. 2566, 2579 (2012) ("Proper respect for a coordinate branch of the government requires that we strike down an Act of Congress only if the lack of constitutional authority to pass the act in question is clearly demonstrated.") (internal quotation and alteration omitted).

*McCullen*'s approach does not translate well into the Second Amendment context. This is unsurprising given the public safety concerns that underpin virtually every piece of firearms safety legislation. Thus, even those courts that have applied some sort of narrow tailoring to Second Amendment challenges have not adopted the stringent First Amendment standards that Sheriffs urge this Court to follow. Assuming *arguendo* that narrow tailoring is required at all, this

Court should follow the D.C. Circuit's approach and apply *Ward*'s "mild form" of intermediate scrutiny to the challenged laws.

### C. Intermediate scrutiny does not require the type of evidentiary showing that Nonprofits urge.

Nonprofits contend that to survive intermediate scrutiny, Defendant bears the burden of showing that the challenged regulation will "advance the Government's interest in 'a direct and material way.'" *Nonprofit Br.* at 29 (citing *Edenfield v. Fane*, 507 U.S. 761, 770-71 (1993) and *Rubin v. Coors Brewing Co.*, 514 U.S. 476, 487 (1995)).  In *Edenfield*, which arose in the very different context of a solicitation ban, the Supreme Court held that the government could not rely on "mere speculation or conjecture; rather, a governmental body seeking to sustain a restriction on commercial speech must demonstrate that the harms it recites are real and that its restriction will in fact alleviate them to a material degree."  507 U.S at 770-71.

Leaving aside the substantial differences between restrictions on solicitation and the laws at issue here, *Edenfield*'s discussion of the burden that the government carries in commercial speech cases relates primarily to how—and with what evidence—a governmental entity may

defend the constitutionality of challenged legislation. Nonprofits rely on *Edenfield* to argue that the laws must *actually have* the impact that the legislature hopes. *Nonprofit Br.* at 29. While the defense satisfied that standard at trial, it was not required to do so. "When applying the intermediate scrutiny standard, '[t]he question is not whether [the legislature], as an objective matter, was correct[;] . . . [r]ather, the question is whether the legislative conclusion was reasonable and supported by substantial evidence in the record.'" *Heller v. District of Columbia*, 45 F. Supp. 3d 35, 45 (D.D.C. 2014) ("*Heller III*") (quoting *Turner II*, 520 U.S. at 211). "Sound policymaking often requires legislators to forecast future events and to anticipate the likely impact of those events based on deductions and inferences for which complete empirical support may be unavailable." *Turner I*, 512 U.S. at 665. The government "does not bear the burden of providing evidence that rules out every theory . . . that is inconsistent with its own." *City of Los Angeles v. Alameda Books, Inc.*, 535 U.S. 425, 437 (2002).

Faced with a similar argument in *Heller III*, the court rejected the assertion that the government must "establish with certitude that the law will actually achieve its desired end." *Heller III*, 45 F. Supp. 3d at

45. This Court should take the same approach, and defer to the Colorado General Assembly's "rational [prediction] of the consequences of inaction and of the effects of regulation in furthering governmental interests." *Turner II*, 520 U.S. at 212.

### D. Strict scrutiny is not warranted in this case.

Finally, Nonprofits argue that the district court should have applied strict scrutiny. As already discussed, *Reese* and *Huitron-Guizar* have settled this question, and the district court's adherence to that precedent is only bolstered by the growing number of courts that have applied intermediate scrutiny to restrictions far more stringent than those at issue in this case. *See, e.g., Heller II*, 670 F.3d at 1261-62 (applying intermediate scrutiny to ten-round magazine limit and firearm registration requirement); *Fyock*, 779 F.3d at 999 (ten-round limit); *NYSRPA*, 990 F. Supp. 2d at 371-72 (ten-round limit); *Shew v. Malloy*, 994 F. Supp. 2d 234, 246-48 (D. Conn. 2014) (ten-round limit); *S.F. Veteran Police Officers Ass'n v. City & Cnty. of San Francisco*, 18 F. Supp. 3d 997, 1003 (N.D. Cal. 2014) (ten-round limit); *Kolbe v. O'Malley*, 42 F. Supp. 3d 768, 793-96 (D. Md. 2014) (ten-round limit); *Friedman*, 2014 WL 4684944 (ten-round limit).

Nor does the fact that the challenged laws apply generally "to every law-abiding citizen," *Nonprofit Br.* at 26, create any independent reason to apply strict scrutiny. Many aspects of firearm ownership are heavily regulated, just as they have been for generations, and examples abound of firearms laws that apply to law abiding citizens and criminals alike. *See, e.g., Kwong v. Bloomberg*, 723 F.3d 160, 163, 168 (2d Cir. 2013), *cert. denied sub nom., Kwong v. de Blasio,* 134 S. Ct. 2696 (2014) (applying intermediate scrutiny to a challenge to fees applicable to residential handgun licenses); *Drake v. Filko*, 724 F.3d 426, 429-30 (3d Cir. 2013), *cert. denied sub nom.*, *Drake v. Jerejian*, 134 S. Ct. 2134 (2014) (applying intermediate scrutiny to discretionary licensing scheme for public carriage permit); *United States v. Masciandaro*, 638 F.3d 458, 471 (4th Cir. 2011) (applying intermediate scrutiny to ban on firearm possession in national park); *Heller II*, 670 F.3d at 1257 (applying intermediate scrutiny to registration scheme).

Finally, the fact that the right at issue is "fundamental"—and the Supreme Court's incorporation of the Second Amendment in *McDonald* leaves no doubt that it protects at least some fundamental rights—does not compel either categorical analysis or strict scrutiny. It is simply a

myth that such a demanding standard is automatically triggered once a right is declared "fundamental." While the intensity of scrutiny should ratchet upward for restrictions that have some sort of invidious intent, *see, e.g., Ezell,* 651 F.3d at 708, it is not true that fundamental rights receive strict scrutiny no matter the context. *See* Adam Winkler, *Fundamentally Wrong About Fundamental Rights*, 23 Const. Comment. 227, 229, 239 (Summer 2006)) ("[T]he old adage about laws infringing fundamental rights being subject to strict scrutiny remains a favorite of scholars, judges, and law students. And it is flatly wrong."). This has proven particularly true in the case of the Second Amendment, where vital public safety concerns attend every legislative judgment. *See Masciandaro*, 638 F.3d at 475-76.

### III. Colorado did not violate the Second Amendment, either facially or as-applied, to certain of the nonprofit plaintiffs, by expanding background check requirements to cover many private firearms transfers.

Arguing that "HB 1229 amounts to a prohibition, rather than a regulation, of . . . covered sales and temporary transfers," Plaintiffs initially mounted a broad challenge to Colorado's expanded background check requirements. J.A. 1414. Over time, Plaintiffs have narrowed

the scope of their arguments. The district court noted: "Plaintiffs do not argue that requiring background checks for the private sales of firearms is unconstitutional. Rather, they focus their challenge on the effect of the statute on *temporary* transfers, when ownership of the firearm does not change." J.A. 1785. Nonprofits' opening brief likewise focuses more on certain temporary private transfers of firearms—many of which would require background checks if of sufficient duration—than on permanent transfers such as sales. *Nonprofit Br.* at 36-41. However broad or narrow their focus may be, the gist of Plaintiffs' argument remains the same. They contend that Colorado's expanded background check requirement burdens their Second Amendment rights, and that there is not a "reasonable fit" between the state's goal of ensuring public safety and its decision to expand background check requirements. *Id.* at 36.

### A. No plaintiff established standing to maintain a challenge to the expanded background check requirement.

Before reaching the merits of Plaintiffs' challenge to Colorado's expanded background check requirement, the district court considered whether "at least one Plaintiff [had] establish[ed] a continuing injury by

showing that he or she intends to engage in conduct protected by the Second Amendment but which violates § 18-12-112, and that if the Plaintiff engaged in such conduct, there is a credible threat that he or she would be prosecuted." J.A. 1762. The district court expressed "profound reservations as to whether any Plaintiff has standing to challenge § 18-12-112," but "in the interests of providing a complete ruling," assumed that three organizational plaintiffs did have standing. J.A. 1768. The district court's evaluation of the facts presented was correct; Plaintiffs failed to show at trial that any of them: (1) intended to engage in a course of conduct that is constitutionally protected but that is proscribed by § 18-12-112; and (2) faced a credible threat that they would be prosecuted if they did so. *See Babbitt v. United Farm Workers Nat'l Union*, 442 U.S. 289, 298-99 (1979).

The district court's concerns about the Plaintiffs' standing to challenge § 18-12-112 were well-founded. *Heller* and *McDonald* make clear that the Second Amendment protects a law-abiding citizen's right to "possess" handguns for the purpose of self-defense. *Heller*, 554 U.S. at 592. As the district court pointed out, no individual plaintiff credibly "demonstrated a continuing injury" due to Colorado's expansion of

background checks.  J.A. 1763.  Plaintiffs' claim was based solely on the

fact that they wished to *loan* firearms without complying with

background check requirements.  J.A. 1786 n.29.  While "[i]t is difficult

to imagine how a firearm owner's Second Amendment rights are

impaired by prohibiting him or her from loaning a firearm to another,"

*id.*, § 18-12-112 does not go so far; instead, it only requires background

checks to be performed prior to permanent transfers and some longer-

term loans.  Either way, Plaintiffs did not establish standing by

presenting evidence that their desire to loan weapons to others had

been affected by the challenged law.

Likewise, the FFLs could assert no injury-in-fact because they are

neither subject to § 18-12-112, nor are they required to conduct private

background checks if asked. J.A. 1764-65.  And based on the evidence

presented at trial, the associational standing of the nonprofit entities

was questionable at best.  While representatives of each nonprofit

organization testified as to the inconvenience of acquiring background

checks before transferring firearms to their members or those to whom

they provide services, the district court found as a factual matter that

their testimony was speculative or incomplete.  J.A. 1764-68.  Based on

the evidence that Plaintiffs presented to the district court, this Court should conclude that Plaintiffs lacked standing to challenge Colorado's expanded background check requirements.

## B. Assuming that at least one plaintiff had standing to challenge § 18-12-112, the district court correctly affirmed its constitutionality.

Nonprofits contend that Colorado's expansion of its background check requirements to cover most private transfers "is absurd and cannot survive even intermediate scrutiny." *Nonprofit Br.* at 30. The district court correctly rejected this claim on the merits.

### 1. Colorado's expanded background check requirement does not burden conduct protected by the Second Amendment.

The district court began its merits analysis by noting that "it is not at all clear that the Second Amendment prevents the government from restricting the ability of persons to acquire firearms via temporary loans from others." J.A. 1785. Section 18-12-112 might be better described as "regulating" private sales and temporary loans, rather than "restricting" them, but the district court's broader point was well-taken. While some courts have recognized that the Second

Amendment's protections extend beyond the core right of self-defense, nothing in *Heller*, *McDonald*, or any other authority identifies a right to privately transfer a firearm to someone else without first ensuring that the transferee may legally possess it.

Indeed, because the challenged law is intended to effectuate "longstanding regulatory measures," § 18-12-112 falls outside the scope of the Second Amendment entirely. *McDonald*, 561 U.S. at 786. In *Heller*, the Supreme Court made clear that its opinion should not "be taken to cast doubt on," among other things, "longstanding prohibitions on the possession of firearms by felons and the mentally ill. . . . ." 554 U.S. at 626. It has been illegal to knowingly transfer a firearm to a felon since 1938. National Firearms Act of 1938, 52 Stat. 1250, § 2(d). And in the Gun Control Act of 1968, Congress prohibited several additional categories of persons from lawfully "receiv[ing] any firearm or ammunition which has been shipped or transported in interstate or foreign commerce." Public Law 90-618, § 922(g).

The United States Code has long prohibited private transfers to persons whom the transferor "know[s] or ha[s] reasonable cause to believe . . . is prohibited from receiving or possessing firearms under

Federal law," such as felons, certain individuals with mental illness, users of illegal drugs, and persons subject to a protective order. 18 U.S.C. §§ 922(d). Federal law likewise prohibits the sale of firearms to a person whom the transferor knows or has reasonable cause to believe is prohibited. 18 U.S.C. § 922(b). Colorado bars additional types of transfers. Colo. Rev. Stat. § 18-12-108.7 (generally prohibiting transfers of firearms to juveniles); Colo. Rev. Stat. § 18-12-111 (prohibiting straw purchase on behalf of individual who purchaser knows to be prohibited to possess firearm). By passing § 18-12-112, the Colorado legislature did nothing more than create a mechanism to ensure that firearm transfers between private parties comply with these longstanding restrictions.

So long as they are not designed to, and do not in fact, prevent legal firearm acquisition, regulations designed to enhance public safety by preventing prohibited individuals from obtaining firearms do not impinge on the Second Amendment rights of current or prospective law-abiding gun owners. Because Colorado's expansion of background checks is inextricably intertwined with its exercise of the broad regulatory latitude that *Heller* acknowledged governments possess for

the purpose of public safety, Plaintiffs cannot demonstrate that § 18-12-112 "imposes a burden on conduct falling within the scope of the Second Amendment's guarantee." *Reese,* 627 F.3d at 800-01. Colorado's expansion of the background check requirement to cover private sales is a prime example of the type of widespread, and historically grounded, regulatory measure that *Heller* suggested is presumptively reasonable. It therefore falls outside the scope of the Second Amendment.

> **2. Even if § 18-12-112 implicates conduct protected by the Second Amendment, it does not burden the core right, and it satisfies intermediate scrutiny.**

Because § 18-12-112 does nothing more than effectuate longstanding regulatory measures that the Supreme Court explicitly approved in *Heller* and *McDonald*, this Court's inquiry under *Reese* should be complete at the first step of the analysis. Even if § 18-12-112 implicates Second Amendment rights, however, the evidence at trial demonstrated that it does not substantially burden them. Moreover, there is a reasonable fit between Colorado's decision to expand background checks and its important goal of ensuring public safety.

### a. Any burden on Plaintiffs' Second Amendment right is not substantial.

If Plaintiffs had presented proof that Colorado law had entirely prevented them from acquiring firearms, then § 18-12-112 might indeed be vulnerable to a constitutional challenge. But the evidence at trial showed nothing of the sort. Rather, witnesses for both Plaintiffs and Defendant testified that they had successfully conducted one or more transfers in compliance with § 18-12-112. J.A. 2819:12-2820:21 (Montgomery); J.A. 2244:9-19 (Harrell). The representative of Colorado State Shooting Association admitted that he had "not had a member specifically tell me they have been unable" to find an FFL willing to run a check. J.A. 2352:23-2353-5. And perhaps most tellingly, several of the FFLs themselves performed background checks for private transfers after July 1, 2013.[6] J.A. 3020:8-21; 5101. Based on this evidence it is unsurprising that the district court specifically rejected Plaintiffs' claim that "all, or even most, firearms dealers refuse to perform private

---

[6] Admittedly, some, although not all, of the private checks run by the FFLs may have been for interstate transfers rather than in-person transfers between Colorado residents. Nonetheless, of the 103 checks performed by the FFLs between July 1, 2013, and February 28, 2014, three resulted in an initial denial. J.A. 3020:23-3021:3.

background checks, or that it would be impossible for many, or most, who would receive a weapon to obtain a background check." J.A. 1787.

With no evidence that § 18-12-112 prevents them from acquiring firearms, Nonprofits instead argue that the expansion of background checks burdens the Second Amendment due to the inconvenience of complying. To that end, a few of Plaintiffs' witnesses testified that not every FFL in the state is willing to run private background checks. *See, e.g.,* J.A. 2244:9-19; 2637:14-16. Similarly, representatives of several nonprofit organizations complained that complying with the background check requirements was cumbersome and, in their opinion, unnecessary.

With respect to individuals, Plaintiffs claim that "a temporary transfer is unlikely to take place anywhere near a gun store that can conduct a background check" and that not every FFL is willing to perform private checks. *Nonprofit Br.* at 31. Thus, they argue, § 18-12-112 "imposes additional burdens that are not present in commercial transactions." *Id.* Plaintiffs advance a similar argument with respect to the nonprofits, maintaining that the "burden of requiring in-store processing for each transfer is significant," particularly when applied to

corporate entities with many individuals who "may possess the firearm." *Id.* at 32.[7,8]

The district court appropriately found that "the burden imposed on the right [by § 18-12-112] is no more severe than the law already provides with regard to firearm sales." J.A. 1786. And it certainly follows from the evidence presented at trial that Colorado's expansion of background check requirements places no burden on the core right protected by the Second Amendment. As the opinion below put it, § 18-12-112 "does not prevent a person otherwise permitted to obtain a firearm from acquiring one, nor subject that person to any greater

---

[7] In a footnote, Nonprofits claim that Colorado Youth Outdoors (CYO) had "difficulties with acquiring new firearms due to HB 1229." *Nonprofit Br.* 30 n.23. However, the cited testimony from CYO showed that the reason it had not picked up a firearm it had purchased from an FFL was because of alleged uncertainty about which of its staff would need a background check. J.A. 1962:4-1963:25. Plaintiffs did not challenge § 18-12-112 as unconstitutionally vague.

[8] Nonprofits contend that the burden is further demonstrated by the district court's Fifth Amendment instruction to one of their witnesses. *Nonprofit Br.* at 35. Assuming that § 18-12-112 does not qualify as a longstanding regulatory measure, Defendant does not contest that it imposes *some* burden on the Second Amendment, including not only the inconvenience that Plaintiffs identify but also the potential of criminal liability for noncompliance. The question under intermediate scrutiny, however, is whether it is a reasonable fit to impose those burdens in the interest of public safety.

burdens than he or she would face if acquiring the weapon commercially. Nothing in the Second Amendment can be read to suggest that a permissible burden on commercial sales of firearms cannot similarly be extended to apply to those acquiring firearms by loan." *Id.*

>            **b.**    **There is a reasonable fit between § 18-12-112 and the state's important interest in ensuring public safety.**

As outlined above, intermediate scrutiny as articulated by the Tenth Circuit requires the government to bear the burden "of demonstrating that its objective is an important one and that its objective is advanced by means substantially related to that objective." *Reese,* 627 F.3d at 802. Where applicable, § 18-12-112 requires a private transferor of a firearm to ensure, by obtaining a background check, that the transferee is not a prohibited person. Public safety measures of this type are not just an important interest, they are a central reason that government exists. *See Huitron-Guizar,* 678 F.3d at 1170 ("The bottom line is that crime control and public safety are indisputably 'important' interests.").

The defense carried its burden in two ways. First, it presented unrebutted expert testimony as well as testimony from experienced law enforcement officers that established the positive public safety impact of universal background checks. Second, the defense showed that after just a few months of implementation, checks on private transfers, including those performed under Colorado's new law, had already halted scores of potentially prohibited transactions.

Johns Hopkins Professor Daniel Webster testified as an expert about the efficacy of expanded background check requirements, discussing at length findings from his own work and that of other researchers. He explained that while there are many different types of "laws that are designed to reduce the risk of firearm violence . . . the most important objective . . . is keeping firearms out of [the] wrong hands, individuals whose past behavior indicates that [they pose] an increased risk for committing violence." J.A. 3100:16-22. Prohibiting certain categories of persons from firearm possession, such as those with "felony convictions, convictions for domestic violence misdemeanors, restraining orders, under age requirements . . . can be justified based upon quite significantly increased risk within those

groups as a whole for future commission of violence and crime." J.A. 3103:8-13. Dr. Webster opined that expanding background check requirements beyond those applicable to commercial sales under federal law is an effective way to reduce the risk that prohibited persons will be able to acquire firearms. J.A. 3113:20-3117:19.

Dr. Webster's testimony went unrebutted,[9] and was supported by evidence from the Colorado Bureau of Investigation—which runs background checks for firearm purchases in Colorado—showing that private background checks resulted in 182 initial denials during the first 7½ months of implementation.[10] J.A. 3075:12-23. The district court explicitly credited Dr. Webster's opinions that: (1) "imposition of accountability on law-abiding citizens who are tempted to transfer a firearm to a prohibited individual deters diversion of firearms into the trafficking market," J.A. 1788; (2) that "[d]ecreasing diversion

[9] Plaintiffs separately contend that the district court erred in failing to make explicit findings under Fed. R. Evid. 702 regarding Dr. Webster's expert opinions. That argument is addressed in detail below, but it should be noted that Plaintiffs waived any *Daubert* challenge to Dr. Webster's testimony.

[10] Many of these denials fell into the highest risk categories identified by Dr. Webster. J.A. 5194 (recording initial denials for private transferees based on restraining orders, sexual assaults, and robberies, among other prohibiting factors).

ultimately impacts the availability of firearms to criminals," *id.* at 1788-89; and that (3) "when measures of accountability for private transfers are taken away, the rates of firearm homicide grow substantially." *Id.* at 1789. Thus, the district court found, by expanding background check requirements to cover private sales, "the [Colorado] General Assembly could reasonably expect the rates of criminal gun trafficking and use to decrease." *Id.*

Plaintiffs do not seriously challenge either the district court's findings as to the Colorado General Assembly's objectives or the likely result of expanding the background check requirement to cover private sales. Instead, they first attempt to distinguish between private sales and transfers, suggesting that because Dr. Webster's testimony focused primarily—although not exclusively—on permanent rather than temporary transfers of firearm ownership, the defense failed to carry its burden of showing that short-term firearm loans may also be constitutionally subject to background check requirements. Second, relying on *Edenfield, supra,* Plaintiffs assert that § 18-12-112 does not advance Colorado's interest "in a direct and material way" because

fewer people have acquired private background checks than the General Assembly initially projected.

Neither of these arguments is availing. First, the duration of a transfer has no bearing on either the transferee's eligibility to legally possess a firearm or the danger associated with that transaction. One who borrows a firearm is just as capable of armed mayhem as a purchaser. Moreover, an individual is either permitted to possess a firearm or he is not, and Colorado's law is designed with the goal of increasing the number of long-term transferees—whether purchasers or borrowers—who go through a background check before taking possession of a firearm. Notwithstanding these concerns, the Colorado General Assembly tailored the law by including exceptions for situations that it deemed to be either low-risk or necessary to ensure that citizens may still protect themselves. Thus, temporary loans for hunting are exempted, as are transfers to family members, short-term transfers for immediate self-defense, and for periods not exceeding 72 hours. § 18-12-112(6)(e)(III), (6)(b), (6)(d), and (6)(h). The 72-hour period is designed to ensure that a temporary transferee may meet his or her pressing self-defense needs if there is no immediate opportunity

to acquire a private background check or to purchase a firearm from an FFL. As the district court concluded, "[t]he legislature was free to conclude, as it did, that 72 hours would be an adequate period of time to permit transfers without background checks while ensuring that sham loans would not occur beyond that timeframe. Whether or not the legislature's policy decision was wise or warranted is not a question properly presented to this Court." J.A. 1789.

Second, the district court properly rejected Plaintiffs' argument that § 18-12-112 must advance the state's objective "in a direct and material way." Concluding that "arguments about whether the statute has been successful are not relevant," the district court held that "Colorado is not required to show that the statute has already achieved success if its rationale for imposing the law is substantially related to an important purpose." *Id.* As discussed in detail in Section II.C, *supra*, the district court correctly declined to import *Edenfield*'s articulation of intermediate scrutiny into the Second Amendment context. But even if such an approach was required, the evidence at trial showed that Colorado's law *does* advance its interest in a direct and material way. The key issue is not the overall number of background checks—that

figure varies widely based on economic and political conditions. J.A. 3071:16-3073:3. Instead, the pertinent question is whether Colorado's law has resulted in oversight of some private transfers that were, before now, entirely unregulated. On that score, the implementation of § 18-12-112 has unquestionably been a success. As the evidence at trial showed, 182 private transfers were initially flagged as prohibited between July 1, 2013 and February 28, 2014. By preventing these prohibited transactions from going forward, § 18-12-112 has advanced the legislature's goal in a direct and material way.

## C. No plaintiff is entitled to an as-applied exemption from § 18-12-112.

Finally, in a footnote, Nonprofits assert that "[a]t a minimum . . . CYO is entitled to as-applied relief for the routine transfers it makes as part of its ongoing programs (most especially inter-organizational transfers), and Outdoor Buddies is entitled to as-applied relief for the transfer of its specialized firearms for members and participants." *Nonprofit Br.* at 25 n.20. The district court's denial of as-applied relief should also be affirmed.

First, as the district court found, Plaintiffs failed to assert an as-applied claim. Nonprofits assert that they did so in their complaint, but

overlook the fact that the operative complaint is merged into the final pretrial order, which controls the course of proceedings once it is approved. J.A. 1513. In the final pretrial order, Plaintiffs described their challenge to § 18-12-112 in general terms, indicating "that Section 18-12-112 severely restricts the temporary transfer of *all* firearms," and "that Section 18-12-112 has caused many federal licensed firearms dealers to refuse to conduct background checks, which results in law-abiding citizens being unable to privately sell, purchase, or temporarily transfer firearms." J.A. 1497. The pretrial order contains no indication that any plaintiff sought an as-applied exemption.[11] The district court correctly rejected their attempt to do so after the fact, and this Court should affirm that ruling.

---

[11] Nonprofits assert that their challenge to the background check requirement for *temporary* transfers, as opposed to their challenge to the background check requirement for *all* transfers, is an "as applied" challenge. *Nonprofit Br.* at 24. Because Plaintiffs sought to void entirely the background check requirement for temporary transfers, it is not clear that this narrower claim would be properly characterized as an as-applied challenge. The characterization, however, makes no difference to the manner in which their claim is reviewed. "The claim "reach[es] beyond the particular circumstances of these plaintiffs. They must therefore satisfy [the] standards for a facial challenge to the extent of that reach." *Doe v. Reed*, 561 U.S. 186, 194 (2010). As discussed in detail above, the General Assembly's application of background check requirements to temporary transfers passes constitutional muster.

Even assuming that they raised the claim below, neither CYO nor Outdoor Buddies qualifies for as-applied relief from the private background check requirements of § 18-12-112. First, many of the temporary transfers that those organizations make are *already* exempt because they last less than 72 hours or are for hunting or competition purposes. § 18-12-112(6)(e) and (h). To the extent that CYO and Outdoor Buddies complain that other temporary transfers—those that are made for other purposes or may last for a longer time—should be exempt specifically for them, they failed to demonstrate why they are entitled to a special exemption. After all, the prohibitions on possession and the risks associated with transferring firearms to individuals whose backgrounds have not been vetted apply regardless of an organization's charitable purpose. Accordingly, Nonprofits fail to qualify for either facial or as-applied relief from § 18-12-112.

## IV. Colorado did not violate the Second Amendment by restricting large-capacity magazines.

Plaintiffs next assert that the district court erred by finding that § 18-12-302, which sets a 15-round limit on magazine capacity, survives intermediate scrutiny. Applying *Reese*'s two-step test, the district court first concluded that Colorado's LCM restriction "affects the use of

46

firearms that are both widespread and commonly used for self-defense[.]" J.A.1776. The court therefore concluded "at the first step of the analysis, the statute burdens the core right protected by the Second Amendment."[12] *Id.* Based on the evidence presented at trial, however, the district court also found that the burden imposed by § 18-12-302 is not severe, and as a consequence applied intermediate scrutiny to Plaintiffs' challenge. Finding that "[t]he fit may not be perfect, but the evidence establishes both an important governmental interest and a substantial relationship between that policy and the restriction of § 18-12-302," the court affirmed the statute's constitutionality. J.A. 1785.

Plaintiffs argue that the district court erred in three alternative ways: first, by applying means-end scrutiny at all; second, by rejecting strict scrutiny; and third, by applying a version of intermediate scrutiny that was not explicitly dependent on the various standards that they selectively import from First Amendment cases. Consistent with the district court's factual findings and conclusions of law, however, even if

[12] Defendant does not concede that LCMs qualify for Second Amendment protection at all. Their status depends in part on the definition of "common use." Alternatively, LCMs could be classified as dangerous and unusual or the subject of longstanding regulation, and thus fall outside the scope of the Second Amendment notwithstanding their numerosity.

Colorado's LCM restriction touches the core of the Second Amendment right, it does not severely burden that right, much less destroy it. Moreover, placing limits on magazine capacity is substantially related to the important governmental purpose of ensuring public safety. Therefore, in accord with this Court's precedent—and with that of every other court that has considered the constitutionality of magazine capacity limitations—the district court appropriately selected intermediate scrutiny and accurately applied it to deny Plaintiffs' Second Amendment challenge.

**A. The district court correctly rejected a categorical approach.**

**1. First Amendment rules have limited applicability in Second Amendment cases.**

Sheriffs argue as a threshold matter that the district court erred by employing tiered scrutiny. They assert that *Heller* and *McDonald* entirely "proscribed interest balancing," and instead created a "principle against courts and legislatures deciding the necessity of particular defensive arms." *Sheriffs Br.* at 16, 17. Urging this Court to adopt substantive rules that they claim are common under the Establishment Clause and also in cases involving content-based speech regulation,

Sheriffs argue that "[g]overnment officials have no greater ability than other citizens to discern religious truths, or how 'important' some speech is, or which common arms are 'necessary' for self-defense." *Id.* at 17. Under Sheriffs' theory, the choice of magazine capacity is an "intensely personal decision" that the government simply cannot regulate, particularly because large numbers of LCMs are already in existence. *Id.*

As already discussed, First Amendment analogies can be useful in Second Amendment cases. But there are limits to the parallels that can be drawn, not least because "State regulation under the Second Amendment has always been more robust than [that] of other enumerated rights." *Kachalsky*, 701 F.3d at 100. A government cannot ban speech in a public school, *Tinker v. Des Moines Cnty. Indep. Sch. Dist.*, 393 U.S. 503 (1969), but it can indisputably outlaw firearms there. *See Heller,* 554 U.S. at 626-27. Content-based speech regulations are strictly scrutinized, but a state's police power permits it to "express a preference for handguns it deems safe." *Pena v. Lindley*, Case No. 2:09-cv-01185-KJM-CKD, 2015 WL 854684, at *13 (E.D. Cal. Feb. 26, 2015) (internal alteration and quotation omitted). And while the First

Amendment strongly protects the right of felons and violent misdemeanants to exercise their religion of choice and to engage in free speech, individuals with that background have been categorically prohibited from firearm possession for generations. *Chester*, 628 F.3d at 679.

Thus, while some Second Amendment cases have borrowed the *analytical framework* developed under the First Amendment, courts have generally rejected attempts to apply *substantive* First Amendment rules to Second Amendment challenges. *See Woollard v. Gallagher*, 712 F.3d 865, 883 n.11 (4th Cir. 2013); *Hightower v. City of Boston*, 693 F.3d 61, 80 (1st Cir. 2012) (concluding that First Amendment prior restraint and overbreadth doctrines were "a poor analogy for the purpose of facial challenges under the Second Amendment"). But by relying on cases expressing reluctance to interfere with sincerely held religious beliefs, or that decline to dictate the permissible content of speech, that is precisely what Sheriffs urge this Court to do.

Even if intermediate scrutiny were not already the standard in this Circuit, Sheriffs' push for a categorical approach to Colorado's LCM restriction would be undermined substantially by the hundreds of

cases—all of which the Supreme Court has declined to review—that have applied some form of tiered scrutiny to firearms regulations that do not destroy the core Second Amendment right. In fact, the *Reese* two-step test requires this analytical approach except in cases where the challenged regulation destroys the core Second Amendment right. *See Jackson*, 746 F.3d at 960-61. As detailed below, the district court correctly found that § 18-12-302 comes nowhere near to imposing such a severe burden. It therefore did not err by considering the evidence Defendant presented to satisfy his burden under intermediate scrutiny.

### 2. *Heller* does not require a categorical approach simply because there are large numbers of LCMs in circulation.

According to Sheriffs and *amicus* National Rifle Association, the parties' stipulation that there are large numbers of LCMs in circulation is dispositive. They reason as follows: (1) LCMs are "arms" protected by the Second Amendment; and (2) the Supreme Court has flatly prohibited a state from banning any arm that is in "common use." *NRA Br.* at 2-7. Because there are millions of magazines in circulation that accept more than fifteen rounds, the NRA contends that Colorado's restriction on LCMs is categorically unconstitutional. Plaintiffs are

incorrect to assert that "common use" of LCMs depends solely on their numerosity. But even if that were the case, all that a finding of "common use" suggests is that Second Amendment protections apply.

No court has adopted the NRA's suggestion that *Heller*'s "common use" language eliminates a state's authority to regulate firearms or accessories simply because they are widely circulated. Rather, consistent with *Heller*, courts have held in case after case that a showing of "common use" is necessary to qualify for Second Amendment protection. *See, e.g., United States v. Fincher*, 538 F.3d 868, 874 (8th Cir. 2008) (machine gun not in common use and therefore not protected); *United States v. Tagg*, 572 F.3d 1320, 1326-27 (11th Cir. 2009) (pipe bombs not protected because they are not typically possessed by law-abiding citizens for lawful purposes). A showing of "common use" does not proscribe regulation; at most, it triggers constitutional scrutiny as outlined below. If—and only if—a plaintiff can show that the challenged regulation implicates the Second Amendment, then the court "must proceed to the second part of the analysis and evaluate [it] under some form of means-end scrutiny." *Reese*, 627 F.3d at 801.

**B.    The district court correctly found that limiting magazine capacity to 15 rounds does not severely burden the Second Amendment right.**

The district court found that although § 18-12-302 touches the core of the Second Amendment right, it does not severely burden it. Plaintiffs argue that limiting magazine capacity does severely burden the core right recognized in *Heller* because: (1) LCMs allegedly predate the Second Amendment and have been "common" since the time of the Fourteenth Amendment; (2) Colorado's law applies in the home; and (3) magazine capacity is important to defensive shooters.[13]  The record lends strong support to the district court's conclusions.  As its order stated, "this statute does not prevent the people of Colorado from

---

[13] Sheriffs also argue that § 18-12-302 imposes a severe burden because it does not exempt the Colorado Mounted Rangers, a non-sworn law enforcement auxiliary that was not a plaintiff in the case.  As discussed above, the district court correctly construed Plaintiffs' pleadings as raising only a facial challenge to the LCM restriction.  But even if the district court had been wrong on that point, a non-party cannot qualify for as-applied relief.  To the extent it had any probative value, testimony from the Colorado Mounted Rangers was relevant only to Plaintiffs' facial challenges, and does little to show that § 18-12-302 itself, when "measured against the relevant constitutional doctrine, and independent of the constitutionality of particular applications, contain[s] a constitutional infirmity that invalidates the statute in its entirety." *Doe v. City of Albuquerque*, 667 F.3d 1111, 1127 (10th Cir. 2012) (quotations omitted).

possessing semiautomatic weapons for self-defense, or from using those weapons as they are designed to function.  The only limitation imposed is how frequently they must reload their weapons." J.A. 1777.

> **1.    Any historical pedigree of LCMs has no bearing on the burden that § 18-12-302 imposes on Second Amendment rights.**

Sheriffs point to the allegedly long history of firearms with large ammunition capacities as a reason that § 18-12-302 imposes severe burdens on Second Amendment rights. *Sheriffs Br.* at 19-21.  At the threshold, Plaintiffs' trial brief discussed their view of firearms history at length, but no actual evidence of the history of large-capacity magazines or firearms was admitted at trial.  Thus, even if Sheriffs were correct that the historical pedigree of LCMs is related to the analysis of the burden associated with § 18-12-302, their argument would not be reviewable because they failed to present it to the court below.  *Schrock v. Wyeth, Inc.*, 727 F.3d 1273, 1284 (10th Cir. 2013) (declining to entertain new arguments not raised at trial).

*Heller* does make clear that the Second Amendment protects more than the technology available during the late eighteenth century.  554 U.S. at 582.  But there is no reason that a state should be prohibited

from adapting its regulatory structure to address evolving public safety concerns. *Cf. McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 373 (1995) (Scalia, J., dissenting) ("Quite obviously, not every restriction upon expression that did not exist in 1791 or in 1868 is *ipso facto* unconstitutional, or else modern election laws … would be prohibited, as would (to mention only a few other categories) modern antinoise regulation … and modern parade-permitting regulation."). It cannot be seriously argued that an air rifle or multi barreled "pepperbox" handgun could be used to inflict damage on the same scale as a modern AR-15.

Moreover, while the evidentiary record in this case is devoid of any testimony on LCM history, the *burden* associated with a regulatory measure does not depend on the provenance of the particular firearm or accessory that is being regulated. Rather, text and history are guideposts for the threshold question of whether or not a particular regulatory measure impacts protected conduct at all. *See Chester*, 628 F.3d at 680 (a court's "historical inquiry seeks to determine whether the conduct at issue was understood to be within the scope of the right at the time of ratification"). That analysis should look not only to the

history of the particular type of firearm or accessory at issue, but also the relevant regulatory structure. "Traditional restrictions go to show the scope of the right." *McDonald*, 561 U.S. at 802 (Scalia, J., concurring). As a consequence, some types of weapons—including those that are "dangerous and unusual," or that have been subject to "longstanding regulations"—may not qualify regardless of how long they have been in existence. *Heller*, 554 U.S. at 626-27.

Thus, at most, the history of LCMs may lend support to a claim that a particular arm or activity enjoys some degree of constitutional protection. But the fact that an arm or activity falls within the scope of the Second Amendment reveals nothing about the severity of the burden imposed upon that right by virtue of state regulation. Assessing the burden requires an entirely separate inquiry—one that the district court in this case recognized is factual in nature.

### 2. The fact that any burden applies "in the home" does not make it severe.

Relying on *Heller*'s statement that the Second Amendment "elevates above all other interests the right of law-abiding, responsible citizens to use arms in defense of hearth and home," Sheriffs briefly

suggest that the burden associated with Colorado's LCM restriction is "particularly severe because it applies in the home." *Sheriffs' Br.* at 23-24.

The fact that a regulation applies in the home as well as on the street, however, cannot itself be determinative of the burden associated with it. Indeed, many gun laws—including those banning particular firearms, accessories, or ammunition—by their very nature apply both within the home and outside of it. These laws have frequently been challenged post-*Heller*, and courts have repeatedly found that the burden imposed was slight, notwithstanding their applicability in the home. *See, e.g., Heller II*, 670 F.3d at 1261-62 (ban on magazines holding more than ten rounds did not impose substantial burden); *Kolbe*, 42 F. Supp. 3d at 790 (assault weapon ban did not impose substantial burden).

One reason that equipment-related regulations—as opposed to the outright handgun ban at issue in *Heller*—do not typically impose a severe burden is that they neither prohibit an entire category of firearms nor interfere with "the inherent right of self-defense [that] has been central to the Second Amendment right." *Heller*, 554 U.S. at 628.

Drawing on "time, place, and manner" cases decided under the First Amendment, the district court here pointed out that "[f]irearm regulations that leave open alternative channels for self-defense are less likely to severely burden the Second Amendment right than those that do not." J.A. at 1772 n.19, (citing *Jackson*, 746 F.3d at 961). There was no dispute at trial that § 18-12-302 leaves open "ample alternative channels." Based in part on the parties' factual stipulations (*see* J.A. 1500-09), the district court found that "semiautomatic weapons that use large-capacity magazines will also accept compliant magazines (*i.e.*, 15 rounds or fewer), and that compliant magazines can be obtained from manufacturers of large-capacity magazines." J.A. 1777. "Unlike the restriction considered in *Heller*, this statute does not ban any firearm nor does it render any firearm useless." *Id.*

> **3.** **The evidence at trial established that limiting magazine capacity to 15 rounds does not diminish a gun owner's ability to engage in self-defense.**

The district court acknowledged that "the effect of magazine size limitations on defensive use of a weapon is important in assessing whether and to what degree a citizen's lawful ability to defend him or

herself is compromised." J.A. 1777.  In other words, it was open to the possibility of a showing that limiting magazine capacity to fifteen rounds actually diminishes a citizens' ability to engage in self-defense. The evidence at trial, however, showed just the opposite.  It was undisputed that gunfights are exceedingly rare, and that defensive shooters virtually never fire large numbers of rounds in confrontations. None of Plaintiffs' lay witnesses described a single example in which multiple rounds were necessary for self-defense. *See, e.g.*, J.A. 2784:1-4 (Abramson); 2598:6-24 (Bayne); 2579:13-14 (Colglazier); 2200:7-10 (Maketa); 2230:17-20 (Dahlberg); 2257:18-23 (Harrell); 2353:23-24 (Gill); 2164:18-21 (Heap).  And even the Plaintiffs' expert, Massad Ayoob, could cite only three such instances despite decades of experience in this area.  J.A. 2323:9-2325:13.  Accordingly, consistent with the parties' evidentiary showings, the district court found that "[n]o evidence presented here suggests that the general ability of a person to defend him or herself is seriously diminished if magazines are limited to 15 rounds." J.A. 1777.

This finding is not only amply supported by the record developed below, but is also consistent with the growing number of cases that

have upheld the constitutionality of magazine capacity limits. While ten-round limits are more common than Colorado's 15-round definition of an LCM, no court has found that even a ten-round limit severely burdens the Second Amendment right. *See, e.g., Fyock*, 779 F.3d at 999 (affirming district court's conclusion that ten-round limitation "likely reaches the core Second Amendment right, but its resulting impact on that right is not severe"). The evidence presented here does not warrant deviating from this increasingly settled precedent.

> **4. Any burden associated with § 18-12-302 is reduced by the General Assembly's selection of a 15-round limit, along with the statute's grandfathering provisions.**

Because the Second Amendment is "oriented to the end of self-defense," *S.F. Veteran Police Officers Ass'n*, 18 F. Supp. 3d at 1004, there likely is a point at which limits on magazine capacity will begin to run up against the minimum standards of the Second Amendment. Thus, *Heller* struck down the law at issue because it prohibited rendering "any lawful firearm in the home operable for the purpose of immediate self-defense." 554 U.S. at 635. And in *NYSRPA*, the court invalidated New York's law to the extent that it permitted 10-round

magazines but only allowed them to be loaded with seven cartridges.[14] 990 F. Supp. 2d at 371-72.

Perhaps most importantly for the *Heller* analysis, magazines holding fifteen or fewer rounds come as standard equipment for virtually every .40 and .45 caliber pistol, and are also standard equipment for many 9mm handguns. J.A. 1501 (¶6), 1504 (¶23). Section 18-12-302 thus has virtually no effect on "the quintessential self-defense weapon." *Heller*, 554 U.S. at 629. And although many—but not all—AR-15 platform rifles are sold with LCMs, magazines holding 15 or fewer rounds are readily available for, and fully compatible with, those firearms. J.A. 1503 (¶¶15-16); 1505 (¶27).

Moreover, what little burden § 18-12-302 imposes is further mitigated by the statute's generous grandfathering and modification provisions. In contrast to more stringent laws passed in many other states, Colorado law does not require relinquishment of LCMs acquired before July 1, 2013. In fact, all of Plaintiffs' witnesses possessed still-

---

[14] Even in *NYSRPA*, however, invalidation of the seven-round limitation was not based on a finding that a seven-round capacity, in and of itself, diminishes an individual's ability to engage in lawful self-defense. The court was far more concerned with the arbitrariness of a law that permitted 10-round magazines but only allowed them to be loaded with seven cartridges. 990 F. Supp. 2d at 371-72.

operable LCMs. And even crediting the possibility that a few scattered firearms may not be compatible with smaller after-market magazines, Colorado law exempts from the definition of LCM a magazine that has been "permanently altered so that it cannot accommodate more than fifteen rounds of ammunition." § 18-12-301(2)(b)(I). These accommodations further lessen the already slight burden associated with the fifteen-round cap.

> ### C. Section 18-12-302 survives intermediate scrutiny because it is substantially related to the state's important interest in ensuring public safety.

Applying intermediate scrutiny, the district court required the state to "prove that its objective in enacting § 18-12-302 was 'important' — that is, that that the statute was based on 'reasoned analysis,' *Concrete Works of Colo., Inc. v. City & Cnty. of Denver*, 321 F.3d 950, 959 (10th Cir. 2003) —and that the provisions of § 18-12-302 are 'substantially related' to its stated objective." J.A. 1781.

Plaintiffs do not dispute that the Colorado General Assembly's objective in placing limits on magazine capacity—"to reduce the number and magnitude of injuries caused by gun violence"—is an important government interest. J.A. 1781. Instead they contend that § 18-12-302

fails intermediate scrutiny because it employs means that they maintain are not substantially related to that goal. As the district court found, the evidence at trial proved otherwise.

> **1.** **Placing limits on magazine capacity will tend to reduce the number of times that firearms are discharged in confrontations.**

The undisputed evidence at trial showed that the number of rounds expended in a confrontation is directly related to magazine capacity. J.A. 1782 ("[Defense expert] Dr. Jeffery Zax testified that there is a direct positive correlation between the firearm ammunition capacity and the average number of shots fired during criminal aggression. [Plaintiffs' expert] Mr. Ayoob agreed that this is true in defense, as well.").[15] Although confrontations with firearms are rare, their lethality is directly related to the number of times that a

---

[15] Dr. Zax's testimony on this point described a broad "moderating effect" of limiting magazine capacity on the number of shots fired. This testimony was grounded both in economic theory, J.A. 3656:2-3658:5, and in the scientific literature demonstrating a link between firearm capacity and the number of shots discharged in violent confrontations. J.A. 3658:14-3660:4; *see also* 5095-5096 ("A small number of studies suggest that gun attacks with semi-automatics—including [assault weapons] and other guns equipped with LCMs—tend to result in more shots fired, more persons wounded, and more wounds inflicted per victim than do attacks with other firearms.").

participant—or bystander—is struck by the rounds expended. J.A. 3228:19-25. Because a participant's risk of being shot rises along with the number of rounds fired, there is a strong connection between limiting magazine capacity and Colorado's important goal of reducing the lethality of all armed confrontations. *See NYSRPA*, 990 F. Supp. 2d at 371 (finding that magazine capacity limitation would be more effective in "prevent[ing] shootings and sav[ing] lives" than assault weapon ban, and concluding that "quite simply, more people die when a shooter has a large-capacity magazine.").

Plaintiffs nonetheless maintain that restricting magazine capacity across the board will disproportionately affect defensive shooters because "[f]or victims, the 'violent interaction' is far more unpredictable than it is for criminals." *Sheriffs' Br.* at 27. This claim finds little support in the record, and in any event misses the point. The evidence at trial showed that the need to fire large numbers of rounds in self-defense is virtually nonexistent. J.A. 1777-78 & n.23, 24. Indeed, for defensive shooters, larger magazine capacity encourages a tendency to "'spray and pray,' meaning that they believe that they should fire all of

their rounds in the hope that at least one shot will hit the intended target." J.A. 1782.

At the same time, violent interactions with larger capacity weapons result in more potential for injury simply because the greater reserve capacity encourages more gunfire. J.A. 2280:8-14 ("When someone suddenly goes from a six-shot gun to an eighteen-shot gun . . . particularly if fire power was the reason for the decision, it's real easy to get the idea that the fire power was the *raison d'être*. And that means, if I ever have to pull this thing out, I better hose all 18 rounds and hope something sticks; hence, spray and pray."). While this is never a desirable outcome, it is particularly problematic anywhere innocent bystanders can be put at risk. *Heller II*, 670 F.3d at 1263-64 (crediting testimony that "high-capacity magazines are dangerous in self-defense situations because the tendency is for defenders to keep firing until all bullets have been expended, which poses grave risks to others in the household, passersby, and bystanders") (internal quotation omitted).

Thus, § 18-12-302 creates a reasonable fit between the General Assembly's public safety objective and the Second Amendment's guarantee by discouraging the exchange of large amounts of gunfire

while still ensuring that Coloradans may possess and use the firearms that they prefer to adequately protect themselves.

### 2. LCMs are particularly lethal in mass shooting situations.

It is no secret that the Colorado General Assembly's decision to limit magazine capacity was prompted in large part by mass shootings in an Aurora movie theater and at Sandy Hook Elementary School. Gunmen in both massacres used LCMs to devastating effect, killing dozens and wounding scores more. J.A. 1781 ("The legislative record reflects that members of the General Assembly were acutely aware of the Aurora Theater shooting in 2012, as well as other mass shootings inside and outside Colorado.").

While mass shootings are comparatively rare, they still "occur with alarming frequency and often involve use of large-capacity magazines." *Id.* And a mass shooter's choice of equipment matters. Economic theory suggests a preference for LCMs among mass shooters, J.A. 3661:8-3662:3, and the evidence at trial lent strong empirical support to that theory. J.A. 2893:5-8; 3667:20-3668:3. Expert testimony showed that when a mass shooter uses LCMs, more victims are shot and more victims are killed. J.A. 3727:19-25. Plaintiffs are critical of

the district court's findings of fact on these points, but they have substantial record support and are also consistent with the evidentiary findings of a host of other district courts in similar cases around the country. *See, e.g., NYSRPA*, 990 F. Supp. 2d at 371 (finding that "the average number of fatalities or injuries per mass shooting more than doubles when a shooter uses a large-capacity magazine"); *Kolbe*, 42 F. Supp. 3d at 788 (finding that "assault weapons and LCMs are disproportionately represented in mass shootings," and that "the use of assault weapons and LCMs in mass shootings is correlated with more fatalities and more injuries than shootings in which they were not used").

LCMs are effective in mass shootings for a simple reason: they require fewer magazine changes. This is primarily because a smaller capacity makes the shooter's "critical pause," as the district court described it, more frequent, thereby creating additional opportunities for intervention, escape, hesitation by the shooter, equipment malfunction, and the like. J.A. 1783.

Plaintiffs urge this Court to reject the district court's factual finding that forcing more frequent critical pauses during a mass

shooting will give "potential victims an opportunity to hide, escape, or attack the shooter." J.A. 1783. They attempt to minimize the significance of the district court's factual findings concerning mass shootings "at the Aurora theater, at a Safeway in Tucson, Arizona, and at an elementary school in Sandy Hook, Connecticut, when a pause allowed a shooter to be overcome, law enforcement to intercede, or potential victims to flee" by quibbling about what led to the pause that allowed those defensive actions. While the evidence presented was adequate to support a conclusion that bystanders at those events took advantage of magazine changes to intervene or flee, the source of the pause is largely irrelevant. What is undisputed is that: (1) smaller magazines must be changed more often than larger ones; (2) even a smooth magazine exchange can take several seconds; and (3) more pauses to change magazines lead to more windows of opportunity, however brief, for a potential victim to take evasive or defensive action. Pauses of the type that everyone agrees a magazine change requires have saved lives in previous mass shootings.[16] Based on the evidence

---

[16] The defense presented testimony on this point from a first responder who interviewed Sandy Hook victims, the Chief of Police of Aurora, Colorado, and the man who tackled Jared Loughner shortly after he

presented at trial, the district court correctly found that they will continue to do so in the future.

### 3. Over time, § 18-12-302 will reduce the overall number of LCMs in circulation.

From the beginning of this case, Plaintiffs have maintained that one of the primary shortcomings of § 18-12-302 is that it is "utterly unenforceable" and, as such, will not lead to a reduction in the number of LCMs in circulation in Colorado. J.A. 55, ¶ 93. As already discussed, no version of intermediate scrutiny requires a legislative body to predict with mathematical certainty the effects of laws designed to enhance public safety. *Turner I*, 512 U.S. at 665; *see also Golan v. Holder*, 609 F.3d 1076, 1084-85 (10th Cir. 2010). This is particularly true when it comes to the Second Amendment. "In the context of firearm regulation, the legislature is far better equipped than the judiciary to make sensitive public policy judgments (within constitutional limits) concerning the dangers in carrying firearms and the manner to combat

---

shot Congresswoman Gabby Giffords and 18 other people in Tucson, Arizona. J.A. 3489:8-15, 3498:14 - 3499:19; 3637:9 – 3638:21; 3348:16 – 3351:10. Sheriffs point to additional instances in their opening brief. *Sheriffs' Br.* at 51-52.

those risks." *Schrader v. Holder*, 704 F.3d 980, 990 (D.C. Cir. 2013) (quotation omitted).

But even if intermediate scrutiny required a demonstration of the efficacy of § 18-12-302, Defendant's expert testified that the law would indeed result in a reduction of LCMs in Colorado, and the district court credited that testimony. J.A. 1784. Despite this record, Plaintiffs argue that Colorado's law will not be effective because a preliminary study on the federal "ban" on LCMs that was in place from 1994-2004 "found no evidence that the statute had reduced criminal use of such magazines." *Sheriffs' Br.* at 47. The conclusions in that study were a poor fit for this case, however, not only because of substantive differences between the federal law and § 18-12-302, *see* J.A. 3591:2-3593:1, but also because it was based on an incomplete dataset. J.A. 5093 (in 2013 follow-up study done by the same researcher who performed the study cited by Plaintiffs, the researcher noted that "[t]he trend in crimes with LCMs may have been changing by the early 2000s, but the available data were too limited and inconsistent to draw clear inferences").

This point was also directly addressed by defense expert Jeffery Zax, a University of Colorado economist and statistician, who described

at length his analysis of a very large set of data that contained information about firearms and magazines seized in Virginia before, during, and immediately following the federal assault weapons ban. J.A. 3596:5-3613:13.  His conclusions based on this more complete dataset were clear.  The federal law—despite enormous loopholes that permitted the unrestricted importation of tens of millions of ostensibly prohibited magazines between 1994 and 2004—actually *was* effective in reducing the number of LCMs in circulation.  J.A. 3612:2-10; J.A. 5369-5373 (exhibits accompanying testimony).  And because Colorado's law is stricter than the now-expired federal law was, the reduction of the number of LCMs in circulation as a consequence of § 18-12-302 "will be more pronounced, bigger than it was under the federal ban."  J.A. 3613:11-13.

The district court credited this evidence, finding that "although it may be impossible to completely eliminate access to large-capacity magazines, it is reasonable to infer that the restriction will, at a minimum, reduce the ready availability of large-capacity magazines to both criminals and law-abiding citizens."  J.A. 1784.  Whether those criminals are minor offenders or mass shooters, the district court

correctly credited Defendant's evidence that reducing availability of LCMs will lessen firearm violence.

### 4. Assuming *arguendo* that "narrow tailoring" was required, Defendant satisfied that standard.

Finally, Sheriffs maintain that § 18-12-302 fails narrow tailoring, and that the district court erred in declining to apply that standard. *Sheriffs' Br.* at 37-43. As the district court noted, and as discussed in detail above, the intermediate scrutiny standards outlined in *Reese* and *Huitron-Guizar* do not require *McCullen*-style "narrow tailoring." *See* J.A. 1773 n.20; *supra*, Section II.B. Because these cases represent binding precedent in this Circuit, Sheriffs' position is foreclosed.

Nonetheless, the evidence at trial would support a finding of narrow tailoring if such a showing were required. First, by focusing solely on criminal misuse of firearms and LCMs, Plaintiffs misapprehend the breadth of the challenged statute's beneficial effects. As all of the experts in this case agreed, one of the primary dangers of LCMs is that they encourage more gunfire by *all* participants during violent confrontations, however rare those confrontations may actually be. Any tendency to reduce the number of shots fired has obvious public

safety benefits—benefits that would not be realized by adopting the alternative measures that Sheriffs contend the General Assembly was required to consider.

Second, Sheriffs' assertion that § 18-12-302 fails narrow tailoring relies on their untenably expansive interpretation of the Second Amendment. Citing *Ward*, 491 U.S. at 800, they argue that "[a] broad ban that does not accommodate lawful activity is not narrowly tailored." *Sheriffs' Br.* at 41. Colorado's limitation of magazine capacity does not amount to "a broad ban" in the first place. Even if it did, however, importing this concept from free speech cases would prove too much here. *Any* weapon or accessory, from antique musket to machine gun to howitzer, from laser scope to silencer to grenade launcher, is perfectly capable of being used lawfully. Yet there is no doubt that blanket bans of certain weapons and accessories pass muster under the Second Amendment. *Heller*, 554 U.S. at 626 (noting that there is no "right to keep and carry any weapon whatsoever in any manner whatsoever for whatever purpose"). Thus, to the extent that Sheriffs' version of narrow tailoring can be imported at all, the relevant question is the one that the district court answered in this case: whether the law at issue

adversely affects an individual's ability to engage in lawful self-defense. Because the evidence at trial established that § 18-12-302 has no such effect, it would be constitutionally valid even if narrow tailoring were required.

## V.   The district court correctly rejected Plaintiffs' facial vagueness challenge to § 18-12-302.

Nonprofits and *amicus* Western Sheriffs' Association challenge, on facial vagueness grounds, the grandfathering provision of § 18-12-302(2)(a).  *Nonprofit Br.* at 48-50.[17]  That provision states that a person may possess a large-capacity magazine if he or she: (1) owned the large-capacity magazine on July 1, 2013, and (2) has maintained "continuous possession" of the magazine since that date.  Colo. Rev. Stat. § 18-12-302(2)(a) (2015).

[17] Nonprofits also briefly mention the definition of "large-capacity magazine," *Nonprofit Br.* at 49-50, but neither Plaintiffs nor their *amici* offer any argument that it is vague.  Moreover, Plaintiffs did not pursue their vagueness challenge to the definition of "large-capacity magazine" at trial.  Neither the final pretrial order or Plaintiffs' trial brief mentions the issue, nor was it discussed in closing arguments.  J.A. 1483-1513; 1654-1719; 3764-3917.  Because issues not pursued in the trial court cannot be the basis for an appeal, *Lyons v. Jefferson Bank & Trust*, 994 F.2d 716, 722 (10th Cir. 1993), this Court should decline to construe Plaintiffs' passing reference to the definition of LCM as raising a substantive argument in favor of reversal.

The district court rejected Plaintiffs' vagueness challenge after applying the standard outlined in *Kolender v. Lawson*, 461 U.S. 352, 357 (1983). As the district court correctly described it, a statute can be impermissibly vague if it (1) fails to provide people of ordinary intelligence a reasonable opportunity to understand what conduct it prohibits; or (2) authorizes or even encourages arbitrary or discriminatory enforcement. J.A. 1790.

On appeal, Plaintiffs' arguments are advanced primarily by the Western Sheriffs' Association, which argues not only that the grandfather clause is vague and unintelligible, but also that interpretive guidance provided by the Attorney General exacerbates the alleged problem. *W. Sheriffs' Ass'n Br.* at 5-17. The district court rightly rejected these claims.

### A.    Factual and procedural history.

The public debate surrounding the passage of § 18-12-302 was particularly intense. In response to concerns that the statute was a backdoor attempt to ban all magazines and that the grandfather clause was laden with traps for the unwary, the Governor's signing statement rejected an expansive interpretation of the bill, instead stating "that the

large capacity magazine ban should be construed narrowly to ensure compliance with the requirements of the Second Amendment and the Due Process Clause of the Fourteenth Amendment." J.A. 380. The Governor went on to request that the Colorado Department of Public Safety, in consultation with the Attorney General, issue "technical guidance on how the law should be interpreted and enforced." *Id.*

The Attorney General subsequently issued two Technical Guidance letters, the second of which was negotiated with Plaintiffs just prior to the preliminary injunction hearing in this case. J.A. 259-261; 575-576. Both were signed by the Attorney General and issued at the Governor's request. *See* Colo. Rev. Stat. § 24-31-101(b). Under Colorado law they are "entitled to respectful consideration as a contemporaneous interpretation of the law by a governmental official charged with the responsibility of such interpretation." *Colo. Common Cause v. Meyer*, 758 P.2d 153, 159 (Colo. 1988); *see also Phelps v. Hamilton*, 59 F.3d 1058, 1070 (10th Cir. 1995) ("Among the statutory construction tools available to us are…to some degree…the interpretation of the statute given by those charged with enforcing it.") (internal quotation omitted).

The first letter stated in pertinent part that the bill could not be "reasonably construed as barring the temporary transfer of a large-capacity magazine by an individual who remains in the continual physical presence of the temporary transferee." J.A. 260. Further, "an owner should not be considered to have 'transferred' a large-capacity magazine or lost 'continuous possession' of it simply by handing it to a gunsmith, hunting partner, or an acquaintance at a shooting range with the expectation that it will be promptly returned." *Id.* The second letter provided additional detail, stating that:

> The phrase 'continuous possession' in HB 1224 shall be afforded its reasonable, every-day interpretation, which is the fact of having or holding property in one's power or the exercise of dominion over property, that is uninterrupted in time, sequence, substance, or extent. "Continuous possession" does not require a large-capacity magazine owner to maintain literally continuous physical possession of a magazine. "Continuous possession" is only lost by a voluntary relinquishment of dominion and control.

J.A. 575-576 ¶2.

Colorado law protects an individual from criminal liability if his conduct is permitted by "[a]n official written interpretation of the statute or law relating to the offense, made or issued by a public

servant, agency, or body legally charged or empowered with the responsibility of administering, enforcing, or interpreting a statute, ordinance, regulation, order, or law." Colo. Rev. Stat. § 18-1-504(2)(c) (2015). The parties agreed that the Governor is the proper defendant in this case, and the two Technical Guidance letters, along with the signing statement, are the official written interpretation of § 18-12-302. This Court's review of Plaintiffs' facial challenge should account for this binding effect under Colorado law.[18] *See* § 18-1-504(2)(c); *see also Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.,* 455 U.S. 489, 494 n.5 (1982) ("In evaluating a facial challenge to a state law, a federal court must … consider any limiting construction that a state court or enforcement agency has proffered.").

---

[18] As noted above, it is unclear whether Plaintiffs still maintain that the "designed to be readily converted" language in § 18-12-301(2)(a)(I) is unconstitutionally vague or somehow effectively bans all magazines that are equipped with a removable baseplate. The two Technical Guidance letters reject this interpretation. As the second letter states: "Magazines with a capacity of 15 or fewer rounds are not large capacity magazines as defined in HB 13-1224 whether or not they have removable base plates." J.A. 575 ¶1. As with the "continuous possession" requirement, this interpretation is binding on the Governor and should guide this Court's interpretation of the law.

78

**B.    Plaintiffs' facial vagueness challenges are barred because they neither implicate the First Amendment nor reach a substantial amount of conduct protected by the Second Amendment.**

Plaintiffs brought a pre-enforcement facial vagueness challenge to the "continuous possession" language of § 18-12-302(2)(a).  "'Facial challenges are disfavored for several reasons' including the risk of 'premature interpretation' because such challenges 'often rest on speculation.'" *Taylor v. Roswell Indep. Sch. Dist.*, 713 F.3d 25, 40 (10th Cir. 2013) (quoting *Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 450 (2008)).  As the Supreme Court has explained, "[a]lthough passing on the validity of a law wholesale may be efficient in the abstract, any gain is often offset by losing the lessons taught by the particular, to which common law method normally looks." *Sabri v. United States*, 541 U.S. 600, 608-09 (2004).

The disadvantages associated with entertaining facial challenges have led the Tenth Circuit—like all other Circuits—to circumscribe their use to a specific subset of First Amendment cases.  *See, e.g., Ramsey Winch, Inc. v. Henry*, 555 F.3d 1199, 1211 n.11 (10th Cir. 2009) ("Facial vagueness challenges to statutes which do not involve First

Amendment freedoms must be examined in light of the facts of the case at hand.") (internal quotation omitted); *United States v. Reed*, 114 F.3d 1067, 1069 (10th Cir. 1997) ("[A] vagueness challenge in [the context of a criminal prosecution for unlawful firearm possession] cannot be aimed at the statute on its face but must be limited to the application of the statue to the particular conduct charged.").

Accordingly, some courts, including at least one district court in the Tenth Circuit, have altogether declined to consider facial vagueness challenges under the Second Amendment. *See, e.g., United States v. Moesser*, No. 2:09-CR-842 TS, 2010 WL 4811945, at *12 n.96 (D. Utah Nov. 19, 2010) ("[T]here is currently no case law to support allowing facial vagueness challenges in Second Amendment cases."); *United States v. Weaver*, Case No. 2:09-cr-00222, 2012 WL 727488, at *9-10 (S.D. W.Va. March 7, 2012) (declining to consider facial vagueness challenge invoking Second Amendment). Although the issue arises most often in criminal cases, it has been extended to the civil context as well. *See, e.g., Nichols v. Harris*, 17 F. Supp. 3d 989, 1012 (C.D. Cal. 2014) (rejecting facial Second Amendment vagueness challenge to open carry restriction because "facial challenges on the ground of

unconstitutional vagueness that do not involve the First Amendment are not cognizable") (internal quotation omitted).

Moreover, even in the First Amendment context, in order to qualify for facial relief a "litigant must show that the potential chilling effect on protected expression is 'both real and substantial.'" *Jordan v. Pugh*, 425 F.3d 820, 828 (10th Cir. 2005) (quoting *Erznoznik v. City of Jacksonville*, 422 U.S. 205, 216 (1975)). If the enactment does not reach "a substantial amount of constitutionally protected conduct," facial relief is unavailable. *Jordan*, 425 F.3d at 828 (quoting *Hoffman Estates*, 455 U.S. at 494). Here, the grandfather clause does not implicate a large amount of protected conduct under the Second Amendment—particularly conduct that is within the core of the right. Notwithstanding Plaintiffs' unreasonable construction of the pertinent statutory provisions, the grandfather clause is designed to ensure that individuals who lawfully owned LCMs before the effective date of the statute will not run afoul of the law.

This Court should bypass the merits of Plaintiffs' facial vagueness challenge based solely on its own precedent limiting facial vagueness challenges outside of the First Amendment context challenges to "the

facts of the case at hand."  *Ramsey Winch, Inc.,* 555 F.3d at 1211 n.11.

In the alternative, if it concludes that facial challenges may be asserted

under the Second Amendment, it should nonetheless decline to consider

Plaintiffs' challenge because it does not reach a substantial amount of

constitutionally protected conduct.

> ### C. The "continuous possession" requirement is not unconstitutionally vague on its face because it is not vague in all of its applications.

>> ### 1. Because the "continuous possession" requirement is capable of valid application, it is not facially invalid.

Even if a facial vagueness challenge were permissible here,

Plaintiffs' claim fails on the merits.  As the district court pointed out, a

pre-enforcement attempt to show facial vagueness in the First

Amendment context imposes a demanding burden on the challenger.  In

order to prevail, a plaintiff must show that the statute is "vague in all of

its applications."  *Hoffman Estates*, 455 U.S. at 497.  "[S]peculation

about possible vagueness in hypothetical situations not before the Court

will not support a facial attack on a statute when it is surely valid in

the vast majority of its intended applications." *Hill v. Colo.*, 530 U.S. 703, 733 (2000).

"Facial challenges are strong medicine." *Ward v. Utah*, 398 F.3d 1239, 1246 (10th Cir. 2005). Accordingly, "a statute with some arguably vague elements is not automatically vague on its face in violation of the Fourteenth Amendment." *Dias v. City & Cnty. of Denver*, 567 F.3d 1169, 1180 (10th Cir. 2009); *see also Hejira Corp. v. MacFarlane*, 660 F.2d 1356, 1367 (10th Cir. 1981). Rather, to fail a facial vagueness challenge, the statute must be "utterly devoid of a standard of conduct so that it 'simply has no core' and cannot be validly applied to any conduct." *High Ol' Times v. Busbee,* 673 F.2d 1225, 1228 (11th Cir. 1982) (quoting *United States v. Powell,* 423 U.S. 87, 92 (1975)); *see also United States v. Gaudreau,* 860 F.2d 357, 364 (10th Cir. 1988).

The grandfather clause in general, and the "continuous possession" requirement in particular, plainly prohibits on the one hand, and allows on the other, some of the core conduct in which Plaintiffs wish to engage. If nothing else, the "continuous possession" requirement of § 18-12-302(2)(a) makes clear that a legal owner of an LCM cannot sell it to another person with the expectation that he or she

will be able to buy it back at some future time.  That fact alone should terminate Plaintiffs' facial vagueness challenge, because it demonstrates that the "continuous possession" requirement is not "incapable of valid application."  *Dias*, 567 F.3d at 1179-80.

### 2. The Technical Guidance letters conform to case law construing "continuous possession" as a course of conduct.

Plaintiffs focus on the two Technical Guidance letters issued by the Attorney General at the request of Governor, claiming (incorrectly) that are inconsistent and as a result, "[n]o one knows what the law requires."  *Nonprofit Br.* at 50.  At the threshold, Nonprofits' claim that the two letters "conflict with one another," *id.,* is based on an apparent misunderstanding of what they actually say.  For example, Nonprofits claim that the "first Technical Guidance allows grandfathered magazines *only if* the magazine remains in the owner's 'continual physical presence' along with 'the expectation that it will be promptly returned.'"  *Id.* (emphasis added) *(*quoting J.A. 260).  But the Technical Guidance is not nearly so restrictive.  In pertinent part, it says that "[r]esponsible maintenance, handling, and gun safety practices, as well as constitutional principles, dictate that [the grandfather clause] cannot

be reasonably construed as barring the temporary transfer of a large-capacity magazine by an individual who remains in the continual physical presence of the temporary transferee, unless that temporary transfer is otherwise prohibited by law." J.A. 260. This is entirely consistent with the subsequent clarification in the second letter, which was the product of negotiation with Plaintiffs in this case.

In any event, the analysis in the Technical Guidance letters parallels criminal cases that have analyzed and applied similar concepts in the double jeopardy context, which hold that continuous possession of a firearm involves a course of conduct, rather than a single act. For example, in *United States v. Jones,* 533 F.2d 1387 (6th Cir. 1976), the defendant was charged with five counts of unlawful possession of a firearm, based on his possession of the same firearm on five separate occasions. On appeal, he argued that he had "committed only one offense because of his continuous and uninterrupted possession of the same weapon." *Id.* at 1390. The Sixth Circuit agreed, holding that "[p]ossession is a course of conduct, not an act; by prohibiting possession Congress intended to punish as one offense all of the acts of

dominion which demonstrate a continuing possessory interest in the firearm." *Id.* at 1391.

More recent cases, including one unpublished decision from the Tenth Circuit, have followed this approach. *See United States v. Martin*, 203 F.3d 836 (10th Cir. 2000) (unpublished table opinion). *Martin* adopted the "course of conduct" analysis, and favorably cited *United States v. Horodner,* 993 F.2d 191 (9th Cir. 1993), in which the court vacated one of two separate convictions for being a felon in possession of a single firearm over the course of several months. Evidence at trial in *Horodner* established at least one break in physical custody, a ten-day period in which the defendant left his shotgun with a gunsmith for repair. *Id.* at 193. The Ninth Circuit vacated the second conviction because during this period the defendant "retained the right to possess and control" the shotgun. *Id.* "In short," the court held, "he retained constructive possession" and his "possession was one uninterrupted course of conduct." *Id.*[19]

---

[19] Colorado courts similarly have recognized that "possession" in other contexts can connote a course of conduct. *See, e.g., People v. Abiodun*, 111 P.3d 462, 470 (Colo. 2005) ("Where the legislature has chosen to proscribe an entire course of conduct as one offense … a second or successive offense is not necessarily committed by acts that are

The Attorney General's Technical Guidance letters employ similar reasoning, and indicate that the "continuous possession" requirement of the grandfather clause connotes a course of conduct, rather than actual, physical possession at all times. This interpretation demonstrates that the statute has an easily discernible core, under which the course of conduct associated with "continuous possession" can be interrupted by "voluntary relinquishment of dominion and control." J.A. 575. Thus, "continuous possession" would be unequivocally interrupted if the owner sold, gifted, or indefinitely leased an LCM to someone else. But the owner would not voluntarily give up dominion and control by leaving a magazine with a gunsmith, by storing it at his home, or in a locker at the gun range.

This is not to say that the language of the grandfather clause would be simple to apply under every hypothetical circumstance. But facial vagueness does not follow from the possibility that there may be difficult cases at the margins. "A statute challenged for vagueness does not depend on whether the challengers can posit some obscure

---

factually distinct from each other but only by acts that are factually distinct from the entire course of conduct punished by the first conviction.").

and difficult application of the legislation which causes confusion.  It is doubtful whether any criminal statute could survive such scrutiny." *Coalition of N.J. Sportsmen v. Whitman*, 44 F. Supp. 2d 666, 682 (D.N.J. 1999).  The district court correctly rejected Plaintiffs' facial challenge; this Court should affirm its ruling.

## VI.  Neither statute violates the Americans with Disabilities Act.

Nonprofits assert that both § 18-12-112 and § 18-12-302 violate Title II of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12132.  They argue that "magazine bans disproportionately harm disabled persons' ability to defend themselves," and that Colorado's expansion of background check requirements "has unnecessarily harmed Outdoor Buddies' program for persons with disabilities." *Nonprofit Br.* at 51.  Nonprofits maintain that they are entitled to relief because "Title I [of the ADA] is for state employees, and Title II is for state (or local) laws."  *Id.* at 55.

Relying primarily on this Court's opinion in *Elwell v. Okla. ex rel. Bd. of Regents of the Univ. of Okla.*, 693 F.3d 1303 (10th Cir. 2012), the district court found that Title II of the ADA does not apply to Plaintiffs' circumstances because neither challenged statute is a "service,

88

program, or activity" of the state.  J.A. 1798.  This ruling should be affirmed.

### A.   Plaintiffs' ADA claims are not cognizable because they do not implicate a "service, program, or activity" of the state.

Plaintiffs contend that they are "qualified individuals with a disability" and that Colorado is a "public entity."  *Nonprofit Br.* at 51. Thus, they maintain, all that they must do in order to prevail under Title II is show that Colorado has "discriminated [against them] by reason of such disabilities."  *Id.*  As the district court found, Plaintiffs failed to establish any such discrimination at trial.  J.A. 1798-99.  There is no need to reach that question here, however, because Plaintiffs inaccurately articulate and apply the prevailing standards under Title II.

### 1.   Title II of the ADA applies to statutes, but only insofar as they provide a "program, service, or activity" of a governmental entity.

Title II of the ADA states that "[s]ubject to the provisions of this title, no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of

the *services, programs, or activities* of a public entity, or be subjected to

discrimination by any such entity." 42 U.S.C. § 12132 (emphasis added).

The ADA does not define "service, program, or activity."  While a

few courts have construed this phrase broadly—as "anything a public

entity does," *see, e.g., Barden v. City of Sacramento,* 292 F.3d 1073,

1076-77 (9th Cir. 2002)—the Tenth Circuit has followed the majority of

courts that have adopted a narrower interpretation.  *Elwell,* 693 F.3d at

1306 (holding that "an agency's services, programs and activities refer

to the 'outputs' it provides some public constituency").  Although the

term "activities" could be read broadly in isolation—as Plaintiffs urge—

the better reading, as *Elwell* holds, accounts for context and ensures

that the ADA does not "rope in everything the public entity does."  *Id.* at

1307.

This conclusion is not inconsistent with *Cinnamon Hills Youth*

*Crisis Center, Inc. v. St. George City*, 685 F.3d 917 (10th Cir. 2012), or

*Barber v. Colorado*, 562 F.3d 1222 (10th Cir. 2009), the cases on which

Plaintiffs chiefly rely.  The *Cinnamon Hills* opinion involved a zoning

dispute, and the opinion was based almost entirely on the Fair Housing

Act.  685 F.3d at 919-23.  It mentioned the ADA only in passing, and

contained no analysis of whether the zoning decision in question amounted to a "service, program, or activity" of the defendant municipality. For its part, *Barber* plainly involved a "service, program, or activity" of the state—qualification for a driver's license. 562 F.3d at 1224.

*Elwell*'s reasoning is also consistent with that of the many other courts that have rejected expansive interpretations of what constitutes a "public service, program, or activity" under the ADA. *See Aswegan v. Bruhl,* 113 F.3d 109, 110 (8th Cir. 1997) (holding that a lack of cable television reception for a prisoner did not violate the ADA, because cable television "is not a public service, program, or activity within the contemplation of the ADA"); *Filush v. Town of Weston*, 266 F. Supp. 2d 322, 328 (D. Conn. 2003) (finding that personnel and equipment engaged by municipality to provide services such as public education, public transportation, or law enforcement are not services or programs within meaning of Title II of the ADA, rather they are conduits used by public entity to provide services, programs, and activities); *S.G. v. Barbour Cnty. Dep't of Human Res.*, 148 So.3d 439, 447 (Ala. Civ. App.

2013) (proceeding to terminate parental rights is not a governmental service, program, or activity).

> ### 2. Title II's reference to "discrimination by any such entity" is confined by the definition of "qualified individual with a disability."

Nor does the second phrase of 42 U.S.C. § 12132 – "or be subjected to discrimination by any such entity" – operate as a "catch-all" that stretches the ADA's coverage beyond governmental outputs. *Elwell*, 693 F.3d at 1308. "Although the second clause of § 12132 appears to be all-encompassing, it is limited by Title II's definition of 'qualified individual with a disability.'" *Behar v. Pa. Dep't of Transp.*, 791 F. Supp. 2d 383, 400 (M.D. Pa. 2011) (internal quotation omitted). Rather, a contextual review of the ADA as a whole "unambiguously demonstrates that Congress intended Title II to be confined to the context of public services." *Canfield v. Isaacs*, 523 F. Supp. 2d 885, 890 (N.D. Ind. 2007). To bring an actionable claim under Title II, an individual must meet *"the essential eligibility requirements for the receipt of services or the participation in programs or activities provided by a public entity."* 42 U.S.C. § 12131(2) (emphasis added).

The ADA thus assumes "a relationship between a public entity, on the one hand, and a member of the public, on the other." *Zimmerman v. Or. Dep't of Justice*, 170 F.3d 1169, 1176 (9th Cir. 1999). "The former *provides* an output that the latter *participates in or receives*." *Id.* (emphasis in original). Thus, "the first clause precludes an agency from discriminatorily 'exclud[ing]' or 'den[ying] benefits' to disabled persons who are eligible for the services, programs, or activities the agency provides to the public. The second does distinctly additional work by prohibiting the agency from engaging in other forms of discrimination against those same individuals." *Elwell,* 693 F.3d at 1308.

Applying the reasoning in *Elwell*, neither § 18-12-112 nor § 18-12-302 implicates Title II of the ADA. Plaintiffs have not alleged that either statute provides or relates to a governmental service, program, or activity. For good reason: they do not. Rather, § 18-12-302 simply limits the capacity of ammunition magazines. As a public safety regulation, the statute is not itself a governmental service, program or activity. And although § 18-12-112 does, indirectly, involve government activity—the state's management of background checks—Plaintiffs offered no evidence to support a conclusion that any disabled individual

would have extra difficulty initiating a background check for a private sale *due to a disability*.  As the district court put it, "[t]he statutes at issue do not create any governmental 'output' which disabled persons are less able to access. Rather, the statutes merely embody a criminal prohibition on conduct generally applicable to all persons. Thus, the Plaintiffs' claims fail to establish a violation of Title II of the ADA." J.A. 1798.

> **B.    Even if Plaintiffs' claims fell within the protections of the ADA, the district court correctly found that they were not entitled to relief.**

Assuming *arguendo* that Colorado's restriction on magazine capacity and expansion of background checks do implicate the ADA, the district court still correctly found "that the evidence is insufficient to establish a disparate impact." J.A. 1798.  Plaintiffs disagree, and also assert that they are entitled to relief under theories of disparate treatment (*i.e.,* intentional discrimination), and failure to make a reasonable accommodation.  *Nonprofit Br.* at 58-59.

1.  **The district court correctly rejected Plaintiffs' disparate impact claim.**

"To prove a case of disparate impact discrimination, the plaintiff must show that a specific policy caused a significant disparate effect on a protected group." *Cinnamon Hills*, 685 F.3d at 922 (internal quotation omitted).[20] "This is generally shown by statistical evidence involving the appropriate comparables necessary to create a reasonable inference that any disparate effect identified was caused by the challenged policy and not other causal factors." *Id.* (internal quotations and alterations omitted); *see also Tsombanidis v. W. Haven Fire Dep't*, 352 F.3d 565, 575 (2d Cir. 2003) (holding that disparate impact claims must include proof of a "significantly adverse or disproportionate impact" on a protected group of individuals).

Nonprofits claim that "[t]he record shows that disabled persons are disproportionately victimized by violent crime." *Nonprofit Br.* at 56. However, Plaintiffs offered no such evidence. While Plaintiffs' *trial*

---

[20] As already noted, *Cinnamon Hills* is substantively an FHA case. Disparate impact claims under both the FHA and ADA both utilize the framework developed under Title VII of the Civil Rights Act of 1964. *Cinnamon Hills Youth Crisis Ctr., Inc.*, 685 F.3d at 919; *see also Cmty. Servs., Inc. v. Wind Gap Mun. Auth.*, 421 F.3d 170, 176 n.5 (3d Cir. 2005).

*brief* (J.A. 1707) cited the same statistical report discussed in Nonprofits' opening brief, it was neither admitted nor discussed at trial.

More importantly, Plaintiffs did not demonstrate that Colorado's LCM restriction imposes a significantly adverse or disproportionate impact on a protected group. Plaintiffs neither defined the relevant protected group beyond the extraordinarily broad label of "disabled individuals," nor demonstrated any statistical link between an increase in crime victimization among the disabled and the need for large-capacity magazines. And *some* statistical showing, rather than just a few isolated anecdotes, was necessary in this context. As in *Tsombanidis*, 352 F.3d at 577, where the plaintiffs' fair housing claim "would likely require some quantification of what each group 'needs' from a living arrangement standpoint," Plaintiffs here would need to quantify the relationship between magazine capacity and the ability of a disabled individual—however defined—to successfully exercise the core Second Amendment right of self-defense. What little evidence Plaintiffs presented on this question was entirely qualitative and speculative, and much of it flatly contradicted Plaintiffs' suggestion of disparate impact. Plaintiffs' expert, Massad Ayoob, summed it up best

when he stated, "[o]verwhelmingly, the great majority of the time, when the gun comes out, the fight is over." J.A. 2327:5-6.

## 2. Plaintiffs made no showing of intentional discrimination.

Nonprofits suggest that the district erred by "fail[ing] to rule" on their intentional discrimination claim. *Nonprofit Br.* at 58. The district court did not rule on this claim because it was not raised below. Plaintiffs' failure to assert it at all—in any version of the complaint, the final pretrial order, in closing arguments, or anywhere else—bars them from raising it now. *Schrock,* 727 F.3d at 1284.

In any event, a claim of disparate treatment under the ADA would clearly fail on the record here. In order to establish a prima facie case of discrimination under the ADA in the legislative context, a plaintiff must typically "present evidence that animus against the protected group was a significant factor in the position taken by the [governmental] decision-makers themselves or by those to whom the decision-makers were knowingly responsive." *Reg'l Econ. Cmty. Action Program v. City of Middletown*, 294 F.3d 35, 49 (2d Cir. 2002) (analyzing ADA challenge to municipal ordinance) (internal quotation omitted).

Nonprofits do not cite this standard, instead arguing that to prevail under the ADA they need only show deliberate indifference on the part of the Colorado General Assembly. *Nonprofit Br.* at 58. Because deliberate indifference cases typically involve some failure to provide access to a particular government service, program, or activity, it is not clear how the standard that Nonprofits urge would apply to a legislative enactment.

Nonetheless, even assuming *arguendo* that a showing a deliberate indifference may suffice to show intentional discrimination under the ADA in the legislative context, Plaintiffs' argument fails at the threshold. "The test for deliberate indifference in the context of intentional discrimination comprises two prongs: (1) 'knowledge that a harm to a federally protected right is substantially likely,' and (2) 'a failure to act upon that … likelihood.'" *Barber*, 562 F.3d at 1229 (quoting *Duvall v. Cnty. of Kitsap,* 260 F.3d 1124, 1139 (9th Cir. 2001)). Here, Nonprofits contend that the legislature had knowledge that a harm to a federally protected right is substantially likely based on the testimony of a single legislative witness who claimed he was disabled and that he would prefer a thirty round magazine for self-defense.

*Nonprofit Br.* at 59. As discussed at length above, the evidence at trial established that § 18-12-302 does not harm anyone's core Second Amendment right. But even if Plaintiffs had proven otherwise, the testimony that they cite—claims of a single, unsworn, legislative witness who neither detailed his disability nor expressed anything but a personal preference for larger capacity magazines—would not suffice to undermine the validity of the Colorado General Assembly's policy decisions. *Cf. Robertson v. Las Animas Cnty. Sheriff's Dep't,* 500 F.3d 1185, 1197 (10th Cir. 2007) (before public entity can be required to provide accommodation under ADA, it must have knowledge that an individual's disability limits his or her ability to participate in or receive the benefits of its services).

### 3. Plaintiffs are not entitled to an accommodation.

Finally, Plaintiffs argue they are entitled to a "reasonable modification," although they neither identify to whom the modification should apply or what precise measures should be implemented. The district court declined to address this argument because Plaintiffs

waived it by failing to include it in the final pretrial order.[21]  J.A. 1795

n.31.  This Court should affirm the district court's ruling on that ground

alone.

Even if Plaintiffs had not waived their claim, however, it would

still fail.  Modifications by a public entity are not required if "making

the modifications would fundamentally alter the nature of the service,

program, or activity." 28 C.F.R. § 35.130(b)(7); *Fisher v. Okla. Health

Care Auth.,* 335 F.3d 1175, 1181 (10th Cir. 2003).  In passing § 18-12-

302, the Colorado General Assembly intended to ensure the

preservation of the public peace, health, and safety by limiting

magazine capacity to fifteen rounds.  Carving out an exception for

disabled individuals would increase the avenues for illegal acquisition

by non-disabled individuals, thereby fundamentally altering the nature

and effectiveness of the restriction.

---

[21] Plaintiffs do not claim that they included a request for a reasonable modification in the final pretrial order.  Instead, they assert that *Defendant's* contribution to the final pretrial order contained a "concession that Plaintiffs were in fact seeking a reasonable modification."  *Nonprofit Br.* at 60 n.35.  Defendant disagrees that his preservation of general affirmative defenses in the final pretrial order (J.A. 1499) amounts to a "concession" of any kind, much less one that somehow preserved a claim that Plaintiffs failed to assert in the pleading that, once approved, "control[led] the subsequent course of this action and the trial."  J.A. 1513.

### VII. A governmental entity may present, and a trial court may rely upon, evidence outside the legislative record when defending the facial constitutionality of a law.

Relying primarily on the Supreme Court's opinions in *Turner I* and *Turner II*, Nonprofits and state *amici* contend that the district court erred by admitting testimony and evidence from witnesses who did not testify in favor of the challenged laws when they were bills before the Colorado General Assembly. In doing so, they attempt to elevate *Turner*'s cautionary statements about the degree of deference that courts owe to legislative judgments into an exclusionary rule that would unduly interfere with state legislative prerogatives. Accepting Plaintiffs' unprecedented arguments would not only run counter to the *Turner* opinions themselves, but also would undermine state and local political processes while simultaneously hamstringing the judiciary's ability to properly evaluate the constitutionality of laws when they are challenged.

## A. Courts frequently consider "post-enactment" evidence when evaluating the constitutionality of state and local laws.

A court is not foreclosed from considering "post-enactment" evidence when analyzing the constitutionality of legislative enactments. Indeed, *amici* Utah's suggestion that under the *Turner* framework "the only relevant materials for review are those things before the legislature when it acted," *Utah Br.* at 15, is at odds with case after case in which courts *have* considered evidence that does not appear in the legislative record.[22]  Moreover, although Utah claims that courts in the Second Amendment context have not "reviewed legislative predictive judgments with the use of post-enactment material," *id.* at 16, published case law from the Tenth Circuit itself demonstrates otherwise.

---

[22] This statement confirms that Plaintiffs' position on "post-enactment" evidence has nothing to do with *when* the particular study or analysis at issue was performed.  Under Plaintiffs' theory, a law cannot be justified by an ancient treatise that was not presented to the legislature any more than it can be supported by academic research that did not exist at the time of the law's passage.  Rather, Plaintiffs argue, the district court's error in this case was its consideration of evidence that was not before the legislature, regardless of its provenance.

As a general matter, the Tenth Circuit has never constrained its review of constitutional challenges to the legislative record. In *Concrete Works v. City & County of Denver*, 36 F.3d 1513 (10th Cir. 1994), for example, this Court examined a race-conscious ordinance on a challenge that the ordinance violated equal protection guarantees. The Court noted that a municipality must have evidence before it of pre-enactment discrimination "before [it] may use race-conscious relief." *Id.* at 1521 (quoting *City of Richmond v. J.A. Croson Co.*, 488 U.S. 469, 504 (1989)). However, it was proper and useful for the Court to consider post-enactment evidence for the purpose of evaluating the "remedial effects or shortcomings" of the city's ordinance. *Id.*; *see also Nixon v. Shrink Missouri Gov't PAC*, 528 U.S. 377, 393-95 (2000) (noting that "Missouri does not preserve legislative history," and considering affidavits, newspaper articles, and academic studies to evaluate constitutionality of campaign finance contribution limits); *Randall v. Sorrell*, 548 U.S. 230, 253-56 (2006) (analyzing research results issued after challenged law was enacted as well as expert testimony developed specifically for litigation).

When analyzing a statute challenged on Second Amendment grounds, this Court has considered non-legislative evidence for the same purpose the district court used it in this case: to determine whether legislation at issue was substantially related to an important governmental objective. In *Reese*, a criminal defendant challenged the constitutionality of 18 U.S.C.S. § 922(g)(8), a 1994 amendment to the Gun Control Act of 1968 that prohibited individuals subject to a domestic violence court order from possessing firearms. This Court considered numerous post-enactment domestic violence studies that linked injury and death in domestic violence incidents to the possession of firearms. *Reese*, 627 F.3d at 802-03. Relying in part on these studies, and employing an intermediate scrutiny analysis, the Court concluded that the statute was substantially related to the government's interest in preventing serious injury or death in domestic abuse incidents. *Id*. at 803-04.

Other circuits have done the same. In *United States v. Yancey*, 621 F.3d 681 (7th Cir. 2010), a defendant challenged the constitutionality of 18 U.S.C.S. § 922(g)(3), a 1986 amendment that barred habitual drug abusers from possessing firearms. In its analysis,

the court considered numerous studies published after the statute was enacted. *Id.* at 686. Relying on these studies, the court concluded that the academic research confirmed the connection between drug abuse and violent crime "and illuminate[d] the nexus between Congress's attempt to keep firearms away from habitual drug abusers and its goal of reducing violent crime." *Id.*; *see also United States v. Carter*, 750 F.3d 462, 467-68 (4th Cir. 2014) (relying in part on post-enactment studies in determining that 18 U.S.C. § 922(g)(3) was a reasonable fit between drug use and Congress's important interest in protecting the community from gun violence); *U.S. v. Marzzarella*, 614 F.3d 85, 100 (3d Cir. 2010) (relying in part on an ATF post-enactment study in determining that 18 U.S.C. § 922(k), which prohibited the possession of firearms with altered or obliterated serial numbers, was a reasonable fit with Congress's interest in preventing gun violence).

Federal circuit courts have applied the same analysis when considering the constitutionality of state statutes restricting the use or possession of firearms. In *Moore v. Madigan*, 702 F.3d 933, 937-41 (7th Cir. 2012), the court considered numerous empirical studies in determining that an Illinois law banning the public carry of firearms

outside the home was an unreasonable fit to the state's interest in preventing gun violence.[23]  *Id*. at 942.  In *Woollard*, the Fourth Circuit considered whether a Maryland statute requiring individuals to demonstrate good cause in order to obtain a handgun permit violated the Second Amendment.  712 F.3d 865.  The court considered post-enactment affidavits of various law enforcement officials in determining that the statute reasonably fit the state's goal of preventing gun violence.  *Id.* at 877.  And even in *Peruta v. County of San Diego*, 742 F.3d 1144 (9th Cir. 2014)—an opinion that figures prominently in Utah's argument but which has since been withdrawn in anticipation of *en banc* rehearing—the majority embarked on a thorough historical analysis that reviewed materials ranging from Blackstone to "major post-civil war commentators" without any mention that these sources were considered by those enacting the law.  742 F.3d at 1154, 1163 (alterations omitted).

---

[23] *Moore* was decided in the district court on motions to dismiss.  The underlying pleadings indicate that the legislative history was not presented to the district court.

**B.**   **To the extent that the consideration of "post-enactment" evidence may be limited at all, such limitation is only with respect to the legislature's objectives for passing a law, and not its rationale for doing so.**

The district court relied solely on legislative history in its determination of the General Assembly's legislative objectives and the importance of those objectives. J.A. 1781 n.27 ("Plaintiffs urge the Court to limit its consideration of the evidence to the legislative history . . . . As to the determination of the General Assembly's objective and whether it is important, the Court has done so."). Despite this statement, Nonprofits insist that the district court considered evidence other than the legislative history for the purpose of determining the legislature's "justifications" for the challenged statutes. *Nonprofit Br.* at 60. Unsurprisingly, they cite no instance where the district court actually did so. As the district court plainly stated, the court did not consider non-legislative history for this purpose.

The district court considered the testimony of witnesses who had not testified before the legislature instead to determine "whether there is a substantial relationship between the statute and . . . Colorado's asserted purpose." J.A. 1782 n.28. This limited use of evidence not

presented to the legislature is entirely consistent with the court's function (in an intermediate scrutiny analysis) to ensure that "in formulating its judgments, [the legislature] has drawn reasonable inferences based on substantial evidence." *Turner I*, 512 U.S. at 666.  In *Turner I,* the Court considered the constitutionality of provisions of federal law requiring cable television systems to carry local broadcast stations.  The Court found ample evidence in the legislative history of important governmental interests Congress sought to advance through the legislation.  *Id*. at 662-63.  The Court remanded the case after determining that there was insufficient evidence in the record of the need for the legislation, or whether the legislation was narrowly tailored to those needs.  *Id*. at 667-68.

The *Turner* case returned to the Supreme Court three years later with an expanded record that included both additional legislative history and evidence Congress never considered.  *Turner II*, 520 U.S. at 187, 214, 219, 221, 223.  The Court relied on expert affidavits and industry documents that were not in the legislative history as evidence that the legislation was substantially related to the government's stated interests. *See Turner II* at 195 ("The expanded record now permits us to

consider whether [the statute was] designed to address a real harm, and whether those provisions will alleviate it any material way.")  The Court used the same expert declarations and industry documents as evidence supporting "the reasonableness of Congress's predictive judgment" that the public would be harmed absent congressional action. *Id.* at 204.

It is clear from *Turner I* and *Turner II* that an asserted legislative *purpose* must be supported by evidence in the legislative record.  But nothing in these cases or their progeny prohibits courts from considering non-legislative evidence to evaluate whether a statute furthers the legislature's asserted interests. As the Supreme Court indicated in *Turner II*, this analysis does not rest on legislative history alone.

## VIII. The district court did not err by failing to conduct an explicit *Daubert* analysis.

Plaintiffs next contend that the district court reversibly erred by failing to include explicit findings concerning the admissibility of expert testimony that the parties offered at trial.  *Nonprofit Br.* at 62-63.  It is not clear from Nonprofits' brief whether they are complaining about the

lack of a *Daubert* analysis[24] concerning the expert evidence that was admitted and cited by the district court, the expert evidence that was admitted but *not* cited, or both. What is clear, however, is that with one possible exception, Plaintiffs waived their Rule 702 objections with respect to *all* of the expert testimony that the district court cited in its order. Particularly given that this case was tried to the bench, that waiver alleviated any requirement that the district court engage in an explicit *Daubert* analysis.

## A. Relevant procedural history.

Prior to trial, per the district court's procedures, the parties submitted a "Joint Fed.R.Evid. 702 Motion to Strike Expert Opinions." J.A. 1467-82. In that motion, the parties stated each opinion to which their experts would testify at trial and their objections, if any, to the opinions of the opposing party's experts. In accordance with the district court's procedures, the objections applied to each proffered opinion, rather than to the expert's testimony as a whole. For each opinion, the

---

[24] *Daubert v. Merrell Dow Pharm.*, 509 U.S. 579 (1993).

objecting party identified which of the four Rule 702 factors[25] that it believed the proffered opinions would not satisfy.

The parties listed four experts each. Defendants identified Douglas Fuchs, John Cerar, Jeffrey Zax, and Daniel Webster. Plaintiffs' experts were Michael Shain, Gary Kleck, Kevin Davis, and Massad Ayoob. Critically, Plaintiffs lodged no Rule 702 objection to any of the opinions of Drs. Webster or Zax. Plaintiffs objected to all of the opinions of Mr. Fuchs and to some of those offered by Mr. Cerar. Defendant did not object to all of the opinions offered by Plaintiffs' experts, but did lodge objections to at least some of the opinions offered by each of them.

The district court allowed all experts to testify at trial without limitation. In its Findings of Fact, Conclusion of Law, and Order, the district court relied on several opinions expressed by Drs. Zax and Webster. J.A. 1782, 1784, 1788, 1789. The district court credited one

---

[25] Rule 702 requires consideration of whether: (1) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (2) the testimony is based on sufficient facts or data; (3) the testimony is the product of reliable principles and methods; and (4) the expert has reliably applied the principles and methods to the facts of the case. Fed. R. Evid. 702(a)-(d).

opinion expressed by both Douglas Fuchs and John Cerar.  J.A. 1783

(noting that "there is no dispute" that a magazine changes forces a

pause, and that "Mr. Cerar and Mr. Fuchs call this the 'critical pause'

because it gives potential victims an opportunity to hide, escape, or

attack the shooter").  Plaintiffs expressed no objection to that opinion as

expressed by Mr. Cerar at trial, J.A. 3394:7-3995:22, but did object to

the same testimony by Mr. Fuchs.  J.A. 1468-69.

> **B.     Plaintiffs waived any objections to the opinions that they now contend the district court was required to explicitly analyze under *Daubert*.**

Waiver and forfeiture are two distinct concepts that are

accompanied by two distinct consequences for appellate review.  In

short, whereas waiver requires intentional relinquishment of a known

right, forfeiture requires only neglect.  *See United States v. Olano*, 507

U.S. 725, 733 (2003).  Waiver bars appellate review altogether.  *United

States v. Teague*, 443 F.3d 1310, 1314 (10th Cir. 2006) ("a party that has

waived a right is not entitled to appellate relief").  Forfeited arguments

and objections, on the other hand, may be reviewed on appeal, but this

Court "will reverse a district court's judgment on the basis of a forfeited

theory only if failing to do so would entrench a plainly erroneous

result." *Richison v. Ernest Grp., Inc.*, 634 F.3d 1123, 1128 (10th Cir. 2011).

In the context of Rule 702, "[a] party may *waive* the right to object to evidence on *Kumho/Daubert* grounds by failing to make its objection in a timely manner." *Questar Pipeline Co. v. Grynberg*, 201 F.3d 1277, 1289-90 (10th Cir. 2000) (emphasis added). As discussed above, although forfeited arguments can be reviewed for plain error, issues that have been waived cannot be reviewed at all.

Plaintiffs stated in the joint Rule 702 motion: "Defendant has offered expert opinions from Douglas S. Fuchs, John C. Cerar, Jeffrey S. Zax, and Daniel W. Webster. Plaintiffs only object to the admissibility under Rule 702 of select opinions from Douglas S. Fuchs and John C. Cerar." J.A. 1468 n.1. This was not a mere forfeiture under Rule 702. It was a waiver. Plaintiffs were plainly aware of their right to challenge the admissibility of the opinions in question under *Daubert* and the Federal Rules of Evidence, and expressly informed the district court that they chose not to do so. Plaintiffs' waiver forecloses any arguments on appeal that the district court's *Daubert* analysis with respect to those opinions was insufficient. Moreover, it relieved the district court of any

obligation to make "explicit on-the-record rulings" with respect to those opinions because, when no objection is raised, an appellate court "assume[s] that the district court consistently and continually performed a trustworthiness analysis sub silentio of all evidence introduced at trial." *Goebel v. Denver & Rio Grande W. R.R.,* 215 F.3d 1083, 1088 n.2 (10th Cir. 2000) (quoting *Hoult v. Hoult*, 57 F.3d 1, 5 (1st Cir. 1995)).

### C. Assuming *arguendo* that the district court's *Daubert* findings were insufficient, any error was harmless.

Even if Plaintiffs are correct that the district court's *Daubert* analysis was lacking, any error was harmless. "A district court has broad discretion in the matter of admission or exclusion of expert evidence, and the court's action is to be sustained unless manifestly erroneous.' This discretion is at its zenith during a bench trial." *United States v. Kalymon*, 541 F.3d 624, 636 (6th Cir. 2008) (internal quotation and alteration omitted). Harmless error analysis applies to expert testimony that has been admitted without adequate findings. *Kinser v. Gehl Co.*, 184 F.3d 1259, 1271 (10th Cir. 1999).

In a bench trial, "inadequate findings of fact constitute harmless error if a reviewing court 'can ascertain from the record that one party or the other was clearly entitled to judgment in its favor,' or if there is no danger of confusion about the basis of the decision, the record supports the court's order, and the record indicates the court heard evidence on each element." *Attorney General of Okla. v. Tyson Foods, Inc.*, 565 F.3d 769, 782 (10th Cir. 2009) (quoting *Prairie Band of Potawatomi Indians v. Pierce,* 253 F.3d 1234, 1246 (10th Cir. 2001)); *see also Kinser*, 184 F.3d at 1271 (holding that an appellate court may "look to [the] entire record, including testimony presented at trial," to evaluate the admissibility of expert testimony).

Here, the trial record reflects not only that all of Defendant's expert witnesses were highly qualified, but also that the opinions that the district court relied upon did in fact satisfy the standards of Rule 702 and *Daubert*. Moreover, as the district court pointed out, a striking amount of the expert testimony was undisputed. J.A. 1782-84. In particular, the "critical pause" opinion was buttressed by the testimony of several lay witnesses with first-hand experience. J.A. 3348:4-3350:2 (witness who tackled Gabby Giffords's shooter while he was reloading);

3255:24-3257:2 (former Colorado Springs police chief describing how officers were able to intervene when suspect paused to reload during shootout); 3637:9-3638:11 (stipulation that victims escaped Aurora theater when shooter paused to clear a malfunction and reload his weapon).

Finally, even if the district court's findings under Rule 702 were inadequate and not harmless based on the record on appeal, the remedy is not remand for a new trial as Nonprofits suggest. *Nonprofit Br.* at 63. Instead, as Utah's *amicus* brief recognizes, in the bench trial setting, the appropriate remedy would be to remand the case for additional findings by the district court. *Utah Br.* at 25. Remand would permit the district court to rely on its first-hand observation of the trial testimony in order to create any additional record needed for further appellate proceedings.

## IX. The district court's rulings concerning the Article III standing of various plaintiffs need not be addressed on the merits, but if addressed, they should be affirmed.

Finally, both Sheriffs and Nonprofits challenge various pre- and post-trial rulings concerning the Article III standing of several Plaintiffs. Specifically, Sheriffs argue that the district court

erroneously applied the political subdivision doctrine to dismiss them in their official capacities prior to trial. *Sheriffs' Br.* at 55-63. They also argue that the district court erred by declining to readmit all of them in their individual capacities. *Id.* at 64-67. Nonprofits argue that the FFLs had standing, either as entities or on behalf of their customers. *Nonprofit Br.* at 45-48. Although there is no need to address any of these arguments, the district court's rulings were correct in all respects.

Sheriffs and Nonprofits bear the burden to demonstrate that each of the parties who they claim were wrongly excluded satisfies three "irreducible constitutional" elements for standing. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992). A plaintiff must prove: (1) he has suffered an "injury in fact"; (2) that injury is fairly traceable to the conduct at issue; and (3) it is likely that the injury would be redressed by a favorable decision. *Id.* at 560-61. A party's asserted "injury or threat of injury must be real and immediate, not conjectural or hypothetical." *Faustin v. City & Cnty. of Denver*, 268 F.3d 942, 947 (10th Cir. 2001). When challenging a criminal statute based on the prospect of future enforcement, a plaintiff must demonstrate "a credible

threat of prosecution." *Bronson v. Swensen*, 500 F.3d 1099, 1107 (10th

Cir. 2007).

### A. The district court did not err by dismissing Sheriffs in their official capacities.

Sheriffs no longer contest that the political subdivision doctrine

ordinarily would bar them from challenging the constitutionality of a

state statute in their official capacities.  That doctrine precludes federal

court jurisdiction over certain controversies between political

subdivisions and their parent states.  *City of Hugo v. Nichols*, 656 F.3d

1251, 1255, 1257 (10th Cir. 2011) (holding that political subdivisions do

not have standing to enforce substantive provisions of the Constitution,

such as those conferring individual rights).

Sheriffs instead insist that they fall within an exception to the

political subdivision doctrine because they are officeholders who would

violate their oaths of office by enforcing the challenged statutes.  This

argument is based on a single footnote in *dicta* that is nearly 50 years

old.  *Bd. of Educ. v. Allen*, 392 U.S. 236, 241 n.5 (1968).  That footnote

approved of the parties' decision not to challenge the standing of a

Board of Education because the Board members were in the position of

having to choose between violating their oaths and enforcing a statute that "would bring their expulsion from office and also a reduction in state funds for their school districts." *Id.*

Sheriffs argue that the district court erred in its reading of the *Allen* footnote and *Hugo*'s later recitation of the footnote. *Sheriffs' Br.* at 58. They contend that the plaintiffs in *Allen* were only boards, not individuals, and thus, that opinion does not support the district court's conclusion that an individual in his official capacity would not have standing. Plaintiffs overlook the fact that *Allen* focused on whether the Board members could be expelled from office. This was necessarily a claim about an official's right to a position as an individual, not a right of the political subdivision.

More importantly, Sheriffs' reading of the *Allen* footnote has been rejected more often than not when considered by other courts. In fact, other courts have rejected the very argument advanced by Sheriffs. *See S. Lake Tahoe v. Cal. Tahoe Reg'l Planning Agency*, 625 F.2d 231, 236-37 (9th Cir. 1980) (noting subsequent Supreme Court decisions taking a more restrictive view of standing and concluding that officers' desire not to violate their oaths of office did not confer standing); *Finch v. Miss.*

*State Med. Ass'n, Inc.*, 585 F.2d 765, 773-74 (5th Cir. 1978) (rejecting a broad reading of the *Allen* footnote and finding that Governor did not have standing by virtue of his oath of office); *Legislature of V.I. v. DeJongh*, 645 F. Supp. 2d 452, 463 (D.V.I. 2009) (same); *Heimbach v. Regan*, 575 F. Supp. 767, 769 (S.D.N.Y. 1983) (same); *Athanson v. Grasso*, 411 F. Supp. 1153, 1159 (D. Conn. 1976) (examining unique circumstances behind *Allen* footnote and finding that law at issue did not require officeholders to take any action to violate their oaths); *but see Aguayo v. Richardson*, 473 F.2d 1090, 1100 (2d Cir. 1973).

As noted by the Ninth Circuit, "[s]ince virtually every public official is subject to severe, and generally criminal, sanctions for non-performance of official duties, and also takes an oath of office which requires him or her to uphold the Constitution, the theory announced in *Allen* would confer standing on any public official who believes that a statute which he or she is charged with enforcing is unconstitutional." *S. Lake Tahoe*, 625 F.2d at 237.

Even if this Court accepts the *Allen* footnote as binding precedent, Sheriffs' pleadings did not bring their claims within the scope of the *Allen* exception. Sheriffs have never asserted they would be subject to

expulsion from office for enforcing the Colorado laws, nor have they claimed that enforcement of Colorado's laws would reduce the funding of their offices. *See Donelon v. La. Div. of Admin. Law*, 522 F.3d 564, 568 (5th Cir. 2008).

Sheriffs also assert a second exception to the political subdivision doctrine, contending that they have standing because the Colorado laws could criminalize their conduct in the course of their duties. *Sheriffs' Br.* at 60. Sheriffs cite no authority for this exception to the political subdivision doctrine.

Rather, the district court appropriately recognized that the kind of injuries now asserted by Sheriffs would affect them only as individuals. J.A. 1053. To the extent a sheriff could be held criminally liable under the Colorado laws, he or she would be held liable as an individual. In fact, one of the examples offered by Sheriffs—the possible criminalization of their conduct as holders of large capacity magazines upon retirement—could only affect them when they no longer hold their offices. As to each example offered, the office of a county sheriff would not be cited for violating Colorado's laws; rather, the individual sheriff or his or her deputy would be charged. Because the injury to Sheriffs

would be personal, they were appropriately dismissed in their official capacities, and their alleged injuries could have been (and were) adequately advanced by the eleven sheriffs who ultimately participated in the suit in their individual capacities.

Notably, neither Sheriffs' pleadings nor their testimony at trial established any of the instances of criminalization cited in their brief. *See* J.A. 2156-2169, 2174-2209, 2394-2404. Sheriffs, furthermore, did not establish any risk—much less a credible threat—of prosecution for this conduct. As a result, Sheriffs have not demonstrated a real or immediate threat of injury such that standing could be conferred upon them in their official capacities. *See Bronson*, 500 F.3d at 1107.

Finally, even if Sheriffs could have been added as parties in their official capacities, the district court did not commit reversible error in excluding them. The facial challenges advanced by Sheriffs in their official capacities were identical to those advanced by other parties and were fully resolved on the merits.

### B. The district court did not err in its rulings regarding the standing of the FFLs or the additional Sheriffs in their individual capacities.

In ruling on Defendant's Motion to Dismiss, the district court determined that the FFLs—along with all other plaintiffs—did not have standing to challenge § 18-12-302 on the grounds that the "designed to be readily converted" language was unconstitutionally vague. J.A. 1045. The FFLs nonetheless proceeded to participate at trial to challenge the constitutionality of both Colorado laws.[26] The district court ultimately did not determine whether the FFLs had standing to challenge §18-12-302, J.A. 1760-62, and found that they did not demonstrate an injury to challenge § 18-12-112. J.A. 1764-65. The district court nonetheless proceeded to rule on the merits. Nonprofits now contend that the district court erred when it failed to expressly find that the FFLs had standing. *Nonprofit Br.* at 45-48. Sheriffs similarly complain that the district court abused its discretion by refusing to find

---

[26] In this respect, Nonprofits' claim that the FFLs were not permitted to be heard or that they were "divested of their right to challenge a statute which adversely affected their own businesses" is inaccurate. *Nonprofit Br.* at 48.

standing for all 55 Sheriffs in their individual capacities. *Sheriffs' Br.* at 64.

This Court, like the district court below, need not reach these questions. Because at least one plaintiff established standing, there is no need to consider whether some or all other plaintiffs also had standing. *See, e.g., Horne v. Flores*, 557 U.S. 433, 446 (2009). As the district court rightly noted, "the determination will be made on the evidence and the law, not who participates in the lawsuit." J.A. 1886:10-12.

## CONCLUSION

Based on the foregoing reasoning and authorities, Defendant respectfully requests that this Court affirm the district court's ruling in its entirety.

Respectfully submitted this 22nd day of April, 2015.

\* \* \*

CYNTHIA H. COFFMAN
Attorney General

s/ *Matthew D. Grove*

MATTHEW D. GROVE *
Assistant Solicitor General
KATHLEEN SPALDING*
Senior Assistant Attorney General
STEPHANIE LINDQUIST
  SCOVILLE*
Senior Assistant Attorney General
LEEANN MORRILL*
First Assistant Attorney General

## STATEMENT ON ORAL ARGUMENT

Defendant concurs in Plaintiffs' requests for oral argument. Given the length of the briefing and the complexity and importance of the issues, Defendant agrees with the Sheriffs that an extended argument period would be appropriate.

## CERTIFICATE OF SERVICE

This is to certify that I have duly served the within **DEFENDANT-APPELLEE'S ANSWER BRIEF** upon all parties through ECF-file and serve or as indicated below at Denver, Colorado, this 22nd day of April, 2015 .

| | |
|---|---|
| David B. Kopel | david@i2i.org |
| | |
| Jonathan M. Anderson | jmanderson@hollandhart.com |
| Douglas L. Abbott | dabbot@hollandhart.com |
| | |
| Richard A. Westfall | rwestfall@halewestfall.com |
| Peter J. Krumholz | pkrumholz@halewestfall.com |
| | |
| Marc F. Colin | mcolin@brunolawyers.com |
| Jonathan Watson | jwatson@brunolawyers.com |
| | |
| Anthony J. Fabian | fabianlaw@qwestoffice.net |

s/ *Matthew D. Grove*
Matthew D. Grove

# CERTIFICATE OF COMPLIANCE

On April 7, 2015, the Court granted Defendant's motion to file an oversized brief of 28,000 words.  As required by Fed. R. App. P. 32(a)(7)(C), I certify that this brief is proportionally spaced and contains ___23, 907_____words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a) (7)(B)(iii).

Complete one of the following:

☑ I relied on my word processor to obtain the count and it is Microsoft Office Word 2010.

☐ I counted five characters per word, counting all characters including citations and numerals.

☐ I certify that the information on this form is true and correct to the best of my knowledge and belief formed after a reasonable inquiry.

*s/ Matthew D. Grove*
Dated April 22, 2015

# CERTIFICATE OF DIGITAL SUBMISSION

No privacy redactions were necessary. Any additional hard copies required to be submitted are exact duplicates of this digital submission.

The digital submission has been scanned for viruses with the most recent version of a commercial virus scanning program, System Center Endpoint Protection, Antivirus definition 1.197.174.0, Engine Version 1.1.11602.0, dated April 22, 2015, and according to the program is free of viruses.

*s/Matthew D. Grove*
Dated: April 22, 2015
