# UNITED STATES COURT OF APPEALS
# FOR THE TENTH CIRCUIT
————————————————

COLORADO OUTFITTERS ASSOCIATION, *et al.*,
*Plaintiffs-Appellants*,
*v.*
JOHN W. HICKENLOOPER,
*Defendant-Appellee.*

JIM BEICKER, *et al.*,
*Plaintiffs-Appellants,*
*v.*
JOHN HICKENLOOPER,
*Defendant-Appellee.*

————————————————

On Appeal from the United States District Court
for the District of Colorado

No. 13-cv-01300-MSK-MJW
Honorable Marcia S. Krieger
————————————————

## BRIEF OF AMICUS CURIAE BRADY CENTER TO PREVENT GUN VIOLENCE IN SUPPORT OF APPELLEE
————————————————

*Counsel for Amicus Curiae*

Edward T. Ramey
Tierney Paul Lawrence LLP
2401 15th Street, Suite 300
Denver, CO 80202
(303) 595-4747
eramey@tplfirm.com

*in cooperation with*
Robert P. Haney Jr.
Cléa P.M. Liquard
Alan C. Lau
Covington & Burling LLP
The New York Times Building
620 Eighth Avenue
New York, NY 10018
(212) 841-1000
rhaney@cov.com
cliquard@cov.com
alau@cov.com

*Of Counsel*

Jonathan E. Lowy
Brady Center To Prevent
  Gun Violence
Legal Action Project
840 First Street, NE, Suite 400
Washington, DC 20002
(202) 898-0792
jlowy@bradymail.org

## CORPORATE DISCLOSURE STATEMENT

The Brady Center To Prevent Gun Violence has no parent corporation and no publicly held corporation is a holder of stock in this organization.

# TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT ....................................... i

TABLE OF CONTENTS........................................................................ ii

TABLE OF AUTHORITIES ............................................................... iv

STATEMENT OF INTEREST............................................................. ix

INTRODUCTION ................................................................................ 1

ARGUMENT ........................................................................................ 1

I.     The Second Amendment Is Not Implicated By HB 1224 or HB 1229. ......... 1

     A.     Background checks do not burden Second Amendment conduct. ............................................................................ 3

     B.     Prohibition of high-capacity magazines does not burden Second Amendment conduct.................................................. 8

          1.     High-capacity magazines are not "arms" for Second Amendment purposes.................................. 8

          2.     "Common use" is not the *sine qua non* of constitutionality....................................................... 10

II.     Assuming, *Arguendo*, that HB 1224 and HB 1229 Implicate the Second Amendment, Intermediate Scrutiny Applies. .................................. 12

III.     HB 1224 and HB 1229 Pass Intermediate Scrutiny. .................................... 15

     A.     Comprehensive background checks are substantially related to an important government objective..................................... 15

          1.     The aim of background checks is to increase public safety. ...................................................................... 15

          2.     A significant number of firearms change hands through private, non-commercial transfers. ........................................... 17

          3.     Substantial evidence shows that comprehensive background checks enhance public safety. .............................. 19

B.    Bans on high-capacity magazines are substantially related to an important government objective.......................................................... 24

    1.    The ban on high-capacity magazines is aimed at reducing deaths and injury related to firearm crimes. ........................... 24

    2.    Substantial evidence shows that prohibitions on high-capacity magazines will reduce gun-related injuries and death. ...................................................................................... 24

CONCLUSION .................................................................................... 29

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Colo. Outfitters Ass'n v. Hickenlooper,*
    24 F. Supp. 3d 1050 (D. Colo. 2014)....................................................24

*District of Columbia v. Heller,*
    554 U.S. 570 (2008)..................................................................passim

*Drake v. Filko,*
    724 F.3d 426 (3d Cir. 2013) .................................................................3

*Friedman v. City of Highland Park,*
    No. 1:14-cv-3091, 2015 WL 1883498 (7th Cir. April 27, 2015) ......................27

*Fyock v. City of Sunnyvale,*
    25 F. Supp. 3d 1267 (N.D. Cal. 2014).................................................26

*Fyock v. City of Sunnyvale,*
    779 F.3d 991 (9th Cir. 2015) .............................................................27

*Heller v. District of Columbia ("Heller II"),*
    670 F.3d 1244 (D.C. Cir. 2011).....................................10, 14, 15, 27

*Jackson v. City and Cnty. of San Francisco,*
    746 F.3d 953 (9th Cir. 2014) .............................................................28

*Kachalsky v. Cnty. of Westchester,*
    701 F.3d 81 (2d Cir. 2012) ...........................................13, 16, 22, 23

*Kolbe v. O'Malley,*
    42 F. Supp. 3d 768 (D. Md. 2014)....................................................26

*McDonald v. City of Chicago, Ill.,*
    561 U.S. 742 (2010)..........................................................................22

*N.Y. State Rifle & Pistol Ass'n v. Cuomo,*
    990 F. Supp. 2d 349 (W.D.N.Y. 2014)..............................................26

*Nat'l Rifle Ass'n of Am., Inc. v. Bureau of Alcohol, Tobacco, Firearms, & Explosives ("NRA")*,
    700 F.3d 185 (5th Cir. 2012) ....................................................2, 4, 16

*Peterson v. Martinez*,
    707 F.3d 1197 (10th Cir. 2013) ...............................................passim

*Robertson v. Baldwin*,
    165 U.S. 275 (1897)...................................................................1

*San Francisco Veteran Police Officers Ass'n v. City and Cnty. of San Francisco*,
    18 F. Supp. 3d 997 (N.D. Cal. 2014).........................................26

*Shew v. Malloy*,
    994 F. Supp. 2d 234 (D. Conn. 2014).......................................26

*United States v. Huitron-Guizar*,
    678 F.3d 1164 (10th Cir. 2012) .......................................7, 12, 16

*United States v. Marzzarella*,
    614 F.3d 85 (3d Cir. 2010) ...............................................2, 9, 15

*United States v. McCane*,
    573 F.3d 1037 (10th Cir. 2009) .................................................3

*United States v. Reese*,
    627 F.3d 792 (10th Cir. 2010) .........................................6, 12, 16

*United States v. Skoien*,
    614 F.3d 638 (7th Cir. 2010) .............................................2, 16

**STATUTES**

Cal. Penal Code §§ 27545, 27850-28070 ....................................20

Cal. Penal Code § 12072.................................................................5

Cal. Penal Code § 28055...............................................................14

Colo. Rev. Stat. § 18-12-112(1)....................................................24

Colo. Rev. Stat. § 18-12-122 .........................................................1

Colo. Rev. Stat. § 18-12-204(1)(b) ...................................................22

Colo. Rev. Stat. § 18-12-302 ............................................................1

Conn. Gen. Stat. §§ 29-33(c), 29-36l(f), 29-37a(j) ..........................20

D.C. Code § 7-2505.02 ....................................................................20

Del. Code Ann. tit. 11, § 1448A .......................................................5

Del. Code Ann. tit. 11, § 1448B, tit. 24, § 904A ............................20

Fla. Stat. Ann. § 790.065 ..................................................................5

Haw. Rev. Stat. Ann. §§ 134-7 .........................................................5

Haw. Rev. Stat. Ann. §§ 134-2 ....................................................5, 21

Haw. Rev. Stat. Ann. §§ 134-13 ......................................................21

430 Ill. Comp. Stat. Ann. 65/1–65/15a. ..........................................21

720 Ill. Comp. Stat. Ann. .................................................................21

Ind. Code Ann. § 35-47-2-3 ...............................................................5

Iowa Code Ann. § 724.17 (West 1976) ..........................................5, 6

Mass. Gen. Laws Ann. ch. 140, §§ 121, 129B, 129C, 131A, 131E, 131P..............21

Mass. Gen. Laws Ann. ch. 140, §§ 131 ........................................5, 21

Md. Code Ann., Crimes and Punishments § 27-442 ..........................5

Md. Code Ann., Pub. Safety §§ 5-101(t), 5-124 ..............................20

Mo. Ann. Stat. Ann. § 166.420 .........................................................5

N.J. Stat. Ann. § 2C:58-3 ..........................................................5, 6, 21

N.Y. Gen. Bus. Law § 898 ................................................................20

N.Y. Penal Law § 400.00 ....................................................................5

Or. Rev. Stat. Ann. §166.420...............................................................5

18 Pa. Cons. Stat. § 6111(b), (c), (f)(2) ....................20

R.I. Gen. Laws §§ 11-47-35–11-47-35.2.................20

Va. Code Ann. § 18.2-308.2:2(c)...........................5, 6

Wis. Stat. Ann. § 175.35 .......................................5

## OTHER AUTHORITIES

Adam Winkler, GUNFIGHT: THE BATTLE OVER THE RIGHT TO
    BEAR ARMS IN AMERICA 165 (2011) ....................4

Amicus Brief of Nat'l Rifle Ass'n .........................24

Brief for Petitioners at 48, *Heller*, 554 U.S. 570 (No. 07-290) ............................11

Christopher S. Koper et al., Univ. Penn. Jerry Lee Ctr. of Criminology, *An
    Updated Assessment of the Federal Assault Weapons Ban: Impacts on
    Gun Markets and Gun Violence, 1994-2003* (2004) .........................27

Colo. Bureau of Investigation, CBI Annual Report 2013 available at
    https://www.colorado.gov/pacific/sites/default/files/CBI%20Annual%20
    Report%202013.pdf .........................20

Colo. Bureau of Investigation, *History of InstaCheck in Colorado*, *available
    at* https://www.colorado.gov/pacific/cbi/instacheck-unit (select CBI
    InstaCheck Presentation (2013).....................6, 20

Eugene Volokh, *Implementing the Right to Keep and Bear Arms for Self-
    Defense: An Analytical Framework and a Research Agenda*, 56 UCLA L.
    Rev. 1443 (2009) .........................9, 11

Everytown for Gun Safety, *Analysis of Recent Mass Shootings*, *available at*
    http://everytown.org/documents/2014/10/analysis-of-recent-mass-
    shootings.pdf.........................25

Everytown For Gun Safety, *How Many Gun Dealers Are There In Your
    State*, *available at* http://everytown.org/article/how-many-gun-dealers-
    are-there-in-your-state/.. .........................13

Garen Wintemute, Dep't of Emergency Medicine Univ. Cal. Davis School of Medicine, Violence Prevention Research Program, Background Checks for Firearm Transfers: Assessments and Recommendations................18

Garen Wintemute, *Comprehensive Background Checks for Firearm Sales in* REDUCING GUN VIOLENCE IN AMERICA: INFORMING POLICY WITH EVIDENCE AND ANALYSIS 95, 104-105 (Daniel W. Webster & Jon S. Vernick eds., 2013)....................................................................................14, 22

Katherine A. Vittes et al., Center for Gun Policy and Research, *Legal Status and source of offenders' firearms in states with the least stringent criteria for gun ownership* (June 2012)............................................................18

Philip J. Cook & Jens Ludwig, U.S. Dep't of Justice, National Institute of Justice, *Guns in America: National Survey on Private Ownership and Use of Firearms*, 6 (May 1997) ....................................................18, 19

Robert R. Dykstra, CATTLE TOWNS (1968)................................................................4

Robert Spitzer, THE POLITICS OF GUN CONTROL (1995)............................................4

Third Way, *What a Difference a Law Makes: Online Gun Sales in States With and Without Background Checks* (Sept. 2013), *available at* http://content.thirdway.org/publications/744/Third_Way_Report_-_What_a_Difference_a_Law_Makes-_Online_Gun_Sales_in_States_With_and_Without_Background_Checks.pdf. ...............................................................................................17

U.S. Dep't of Justice, Bureau of Alcohol, Tobacco, Firearms & Explosives, *Firearms Commerce in the United States: Annual Statistical Update 2014*, *available at* http://www.atf.gov/sites/default/files/assets/statistics/CommerceReport/firearms_commerce_annual_statistical_report_2014.pdf. ....................................13

U.S. Dep't of Justice, Bureau of Alcohol, Tobacco and Firearms, *ATF Crime Gun Trace Reports (2000) Denver/Aurora* (July 2002) ...................................17

U.S. Dep't of Justice Statistics, *Background Checks for Firearm Transfers, 2012—Statistical Tables* (2014) .......................................................19

## STATEMENT OF INTEREST

The Brady Center To Prevent Gun Violence is the nation's largest, non-partisan, non-profit organization dedicated to reducing gun violence through education, research and legal advocacy. Through its Legal Action Project, the Brady Center has filed numerous amicus curiae briefs in cases involving firearms regulations.

The Brady Center has a substantial interest in ensuring that the Second Amendment is not interpreted or applied in a way that would jeopardize reasonable government action to prevent gun violence.

A party's counsel has not authored this brief in whole or in part, nor has a party, party's counsel, or any other person other than amicus curiae, its members, or its counsel, contributed money that was intended to fund preparing or submitting this brief.

**INTRODUCTION**

In the wake of recent devastating gun violence, particularly mass shootings in Colorado and across the country, Colorado has enacted two statutes in an effort to secure the safety of its citizens. The first, HB 1229, extends the background check requirement to cover all transfers of firearms, including non-commercial trades, loans and gifts. Colo. Rev. Stat. § 18-12-302. The second statute, HB 1224, bans the possession of high-capacity magazines—those capable of holding more than 15 rounds of ammunition. Colo. Rev. Stat. § 18-12-122.

Both laws are constitutional for two reasons. First, neither law regulates conduct falling within the protection of the Second Amendment. Comprehensive background checks are part of a longstanding tradition of enforcing sensible firearm laws and high-capacity magazines are not within the traditional definition of "arms" for Second Amendment purposes.

Second, even assuming the Second Amendment applies, both laws are amply supported by substantial evidence showing that each enhances public safety and reduces the devastating consequences of gun violence.

**ARGUMENT**

**I.    The Second Amendment Is Not Implicated By HB 1224 or HB 1229.**

As the Supreme Court, this Court, and sister circuits have all held, not all conduct that touches on firearm possession falls within the scope of the Second Amendment. *See e.g.*, *Robertson v. Baldwin*, 165 U.S. 275, 281 (1897) (the right to

keep and bear arms has "from time immemorial, been subject to certain well-recognized exceptions, arising from the necessities of the case").[1] Whether a regulation burdens Second Amendment conduct depends, in part, on "whether the law harmonizes with the historical traditions associated with the Second Amendment guarantee." *Peterson*, 707 F.3d at 1211. Longstanding limitations on the keeping and carrying of firearms are considered to have been "enshrined with[in] the scope" of the right. *Heller*, 554 U.S. at 634. *See also NRA*, 700 F.3d at 200 ("It appears that when the fledgling republic adopted the Second Amendment, an expectation of sensible gun safety regulation was woven into the tapestry of the guarantee."); *Marzzarella*, 614 F.3d at 91 ("[L]ongstanding limitations are exceptions to the right to bear arms.").

For instance, laws such as those restricting the carrying of concealed weapons, *see Peterson*, 707 F.3d at 1211, restrictions on the possession of firearms

---

[1] *See also Peterson v. Martinez*, 707 F.3d 1197, 1210-1211 (10th Cir. 2013) (carriage of concealed weapons falls outside of Second Amendment protection; Second Amendment does not confer "a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose") (internal quotations omitted); *United States v. Skoien*, 614 F.3d 638, 640 (7th Cir. 2010) ("That *some* categorical limits are proper is part of the original meaning [of the Second Amendment], leaving to the people's elected representatives the filling in of the details."); *United States v. Marzzarella*, 614 F.3d 85, 91 (3d Cir. 2010) ("[I]f the right to bear arms as commonly understood at the time of ratification did not bar restrictions on possession by felons or the mentally ill, it follows that by constitutionalizing this understanding, the Second Amendment carved out these limitations from the right."); *Nat'l Rifle Ass'n of Am., Inc. v. Bureau of Alcohol, Tobacco, Firearms, & Explosives ("NRA")*, 700 F.3d 185, 200 (5th Cir. 2012) ("As the Supreme Court recognized in *Heller*, the right to keep and bear arms has never been unlimited.").

by felons, *see United States v. McCane*, 573 F.3d 1037, 1047 (10th Cir. 2009), and the requirement of showing a "justifiable need" to obtain a carry permit, *see Drake v. Filko*, 724 F.3d 426, 434 (3d Cir. 2013) regulate conduct that the Second Amendment does not reach.

Likewise, HB 1224 and HB 1229 are regulations that do not infringe on any Second Amendment conduct. Background checks are merely a method of enforcing sensible firearm laws. The enforcement of regulations that are themselves constitutional must be understood to have been "enshrined" within the Second Amendment—whatever its scope. Likewise, high-capacity magazines do not come within the constitutional definition of "arms," nor are such magazines necessary to the effective use of arms. Thus neither of Colorado's recent measures implicates the Second Amendment.

A.     **Background checks do not burden Second Amendment conduct.**

Like the regulations in *Peterson*, *McCane*, and *Filko*, comprehensive background checks are simply the modern day equivalent of longstanding public safety laws that do not raise constitutional concern. Indeed, background checks do not directly regulate the possession or use of firearms at all. They simply *enforce* lawful public safety regulations that prohibit firearm possession by high-risk

individuals.[2] Rather than enforcing the underlying laws *after* a violation is discovered (likely because of the commission of a firearm-related crime), background checks ensure compliance with those laws *before* a violation materializes. Appellants have not offered an argument for why the method of enforcement—as distinct from the primary obligation itself—implicates the Second Amendment.

Moreover, enforcement of firearm regulations is as longstanding as those regulations themselves. *See NRA*, 700 F.3d at 200 ("The historical record shows that gun safety regulation was commonplace in the colonies, and around the time of the founding, a variety of gun safety regulations were on the books…."). Even during the mid- and late-19th century—a period popularized as the violent Wild West—enforcement of gun regulations was robust.

In his famous cattle town studies, Robert Dykstra found that although, "[g]uns were widespread on the frontier, so was gun regulation." Adam Winkler, GUNFIGHT: THE BATTLE OVER THE RIGHT TO BEAR ARMS IN AMERICA 165 (2011); *see also* Robert R. Dykstra, CATTLE TOWNS 131-40 (1968) (describing zealous enforcement of regulations prohibiting the carrying of deadly weapons in 1873); Robert Spitzer, THE POLITICS OF GUN CONTROL 11 (1995) ("Even in the most

---

[2] Appellants do not challenge the authority of Colorado or the federal government to prohibit possession of firearms by certain classes of people.

violence-prone towns, the western cattle towns, vigilantism and lawlessness were only briefly tolerated. . . . Prohibitions against carrying guns were strictly enforced, and there were few homicides."). Modern day background check regimes are simply the contemporary analogue of older methods of ensuring compliance with firearm regulations.

Even looking at the practice of background investigations themselves, they too have been part of the fabric of efficient law enforcement for decades. Before the federal background check policy went into effect in 1994, 15 states already had background check regimes in place.[3] Those systems were enacted as early as 1965 when New York began checking criminal and mental health records to ensure prospective firearm owners were not prohibited persons. *See* N.Y. Penal Law § 400.00 (McKinney 1965). One year later, Maryland enacted similar laws requiring state police to "conduct an investigation promptly to determine the truth or falsity" of the purchaser's statement that he or she is not a prohibited person. Md. Code Ann., Crimes and Punishments § 27-442 (West 1966). Other states

---

[3] In addition to New York and Maryland cited in the text above, see Cal. Penal Code § 12072 (West 1993) (currently codified at Cal. Penal Code § 27540 (West 2010)); Conn. Gen. Stat. Ann. § 29-36*l* (West 1994); Del. Code Ann. tit. 11, § 1448A (West 1990); Fla. Stat. Ann. § 790.065 (West 1989); Haw. Rev. Stat. § 134-2 (West 1988); Haw. Rev. Stat. § 134-7 (West 1988); Ind. Code Ann. § 35-47-2-3 (West 1983); Iowa Code Ann. § 724.17 (West 1976); Mass. Gen. Laws Ann. ch. 140, § 131 (West 1986); Mo. Ann. Stat. § 571.090 (West 1981); N.J. Stat. Ann. § 2C:58-3 (West 1978); Or. Rev. Stat. Ann. § 166.420 (West 1989); Va. Code Ann. § 18.2-308.2:2(c) (West 1989); Wis. Stat. Ann. § 175.35 (West 1991).

followed in the 1970s and 80s enacting a variety of background investigation

policies for prospective firearm purchasers.[4]

As technology advanced, these investigations were streamlined and

electronic records made quick work of the background investigations. Today, the

average background check in Colorado is processed within 4 minutes.[5]

Background checks may not be a precise analogue for the law enforcement

mechanisms in place at the time of the Founding, but "*Heller* demonstrates that a

regulation can be deemed 'longstanding' even if it cannot boast a precise founding-

era analogue…" *Peterson*, 707 F.3d at 1211; *see also id.* ("*Heller* considered

firearm possession bans on felons and the mentally ill to be longstanding, yet the

current versions of these bans are of mid-20th century vintage."); *United States v.*

*Reese*, 627 F.3d 792, 802 (10th Cir. 2010) ("exclusions" from the scope of the

right "need not mirror limits that were on the books in 1791"). At bottom, the

question is whether comprehensive background checks "harmonize[ ] with the

---

[4] *See e.g.*, Iowa Code Ann. § 724.17 (West 1976) ("[T]he sheriff shall conduct a criminal history check concerning each applicant by obtaining criminal history data from the department of public safety."); N.J. Stat. Ann. § 2C:58-3 (requiring fingerprints to be taken and "compared with any and all records of fingerprints" held by the state and FBI); Va. Code Ann. § 18.2-308.2:2(c) (requiring that firearms dealers obtain "a report indicating that a search of all available criminal history record information has not disclosed that the person is prohibited from possessing or transporting a firearm….").

[5] *See* Colo. Bureau of Investigation, *History of InstaCheck in Colorado*, *available at* https://www.colorado.gov/pacific/cbi/instacheck-unit (select CBI InstaCheck Presentation (2013)) (average processing time of background check in Colorado is 3 minutes 32 seconds).

historical traditions associated with the Second Amendment guarantee." *Peterson*, 707 F.3d at 1211. Without a doubt, effective enforcement of lawful gun regulations is in harmony with the traditions of the Second Amendment. Background checks, as modern day enforcement tools, fit well within that tradition.

Appellants apparently concede that comprehensive background checks on the "commercial sale of arms" do not raise constitutional concern in light of the Supreme Court's limiting dicta in *Heller*. *See Heller*, 554 U.S. at 626-27 ("nothing in our opinion should be taken to cast doubt on . . . laws imposing conditions and qualifications on the commercial sale of arms."). In an attempt to manufacture a controversy on appeal, appellants now stress the difference between the "commercial sale of arms" and the *non-commercial transfer* of firearms, the latter of which are now subject to Colorado's background check policy. But appellants read far too much into *Heller's* dicta, an interpretive misstep this Court cautioned against in *Huitron-Guizar*. *See United States v. Huitron-Guizar*, 678 F.3d 1164, 1168 (10th Cir. 2012) (declining to infer from *Heller*'s use of "citizen" that the Second Amendment applies exclusively to citizens). *Heller* defined the core of the Second Amendment right, but it cannot be said that the Supreme Court's choice of the phrase "commercial sale of arms," "was used deliberately to settle the question" of whether comprehensive background checks for non-commercial transfers are within the scope of the right. *Id*.

*Heller*'s holding, and its limiting dicta, is sensibly read as acknowledging that not all regulations concerning firearms fall within the scope of the Second Amendment; "[l]ike most rights, the right secured by the Second Amendment is not unlimited." *Heller*, 554 U.S. at 626.

Comprehensive background checks, as part of a longstanding tradition of enforcing sensible firearm laws, do not implicate the Second Amendment.

**B.     Prohibition of high-capacity magazines does not burden Second Amendment conduct.**

**1.     High-capacity magazines are not "arms" for Second Amendment purposes.**

Appellants assume without discussion that high-capacity magazines are "arms" within the meaning of the Second Amendment. The assumption is not warranted.

*Heller* referenced definitions of "arms" as "weapons of offence, or armour of defence. . . any thing that a man wear for his defence, or takes into his hands, or useth in wrath to cast at or strike another." *Heller*, 554 U.S. at 581 (internal citations omitted). High-capacity magazines do not fall within any of these categories. They are not themselves weapons, nor are they used to "cast at or strike another."

Moreover, excluding high-capacity magazines from the definition of "arms" is consistent with *Heller*'s focus on the severity of the law's impact on self-defense

in determining whether a regulation implicates the Second Amendment. *Heller*,

544 U.S. at 630-32. The principle at work here is that if a regulation *meaningfully*

affects a firearm's utility for self-defense, it will likely implicate the Second

Amendment. On the other hand, if regulating a firearm's non-essential

characteristics does not substantially affect its utility for self-defense, the

regulation falls outside the scope of the Second Amendment. *See* Eugene Volokh,

*Implementing the Right to Keep and Bear Arms for Self-Defense: An Analytical*

*Framework and a Research Agenda*, 56 UCLA L. Rev. 1443, 1454 (2009) ("A

restriction may also be justified on the grounds that it imposes a less than

substantial burden on the exercise of a right, and therefore doesn't

unconstitutionally 'infringe[ ]' the right even though it regulates the right's

exercise."); *Marzzarella*, 614 F.3d at 94 ("Because the presence of a serial number

does not impair the use or functioning of a weapon in any way, the burden on

Marzzarella's ability to defend himself is arguably *de minimis*.").

Colorado's ban on high-capacity magazines does not meaningfully affect the

ability of citizens to defend themselves. The regulation neither prohibits all

magazines, nor regulates the number of magazines one can lawfully possess. It

regulates a subset of a category of firearm accessories—those that, because of their

large capacity, are frequently used in mass killings and have the potential for

resulting in a greater number of deaths and injuries when used by offensive *or*

*defensive* shooters. *See Heller v. District of Columbia ("Heller II")*, 670 F.3d 1244, 1263-64 (D.C. Cir. 2011) (evidence "supports the District's claim that high-capacity magazines are dangerous in self-defense situations because the tendency is for defenders to keep firing until all bullets have been expended, which poses grave risks to others in the household, passersby, and bystanders") (internal quotation marks omitted); *cf.* J.A. 11:2280 (testimony of firearms instructor, Mr. Ayoob, describing students' tendency to "spray and pray"). This falls well short of a constitutionally cognizable burden on the right to bear arms.

## 2. **"Common use" is not the *sine qua non* of constitutionality.**

Appellants' view is that if a firearm is "'preferred,' [it] 'must be permitted.'" Sheriffs Br. 14. This is an unsupported reading of *Heller* and an unsustainable interpretation of the Second Amendment.

To be sure, *Heller* does say that handguns are "the most popular weapon chosen by Americans for self-defense in the home," and that a prohibition amounting to a total ban on this "entire class of 'arms'" is invalid. *Heller*, 554 U.S. at 628-29. The lesson to be drawn is not, as appellants would have it, that commonly possessed arms are exempt from regulation. Rather, the focus on popularity only makes sense when considered in context—as a response to D.C.'s argument that, "[s]o long as homeowners have a means of defending themselves, the handgun ban can be understood as the Second Amendment analog to a time,

place, or manner restriction . . ." Brief for Petitioners at 48, *Heller*, 554 U.S. 570

(No. 07-290). *Heller* rejected the argument that D.C.'s handgun ban left open

reasonable alternative means for homeowners to defend themselves. In this

analysis, the popularity of handguns served as a proxy for how burdensome a

regulation is on the constitutional right to self-defense. But *Heller* does not suggest

that popularity is in itself of constitutional import. *See* Volokh, *Implementing the*

*Right to Keep and Bear Arms for Self-Defense: An Analytical Framework and a*

*Research Agenda*, 56 UCLA L. Rev. at 1457 ("The Court is pointing out that

handguns are popular for a reason: For many people, they are the optimal self-

defense tool, and bans on handguns make self-defense materially more difficult.

The handgun ban, then, is a material burden on the right to bear arms in self-

defense.").

   Appellants' attempt to draw a favorable comparison between the total ban on

handguns at issue in *Heller* and the magazine regulation at issue in this case is not

well taken. High-capacity magazines may number in the millions, but that does not

prove they are popular for lawful self-defense, let alone that they are "the

quintessential self-defense weapon" or "*the* most popular weapon chosen by

Americans for self-defense." *Heller*, 554 U.S. at 629 (emphasis added). Moreover,

as just discussed, Colorado's law regulates only a *subset* of a class of firearm

*accessories* — the regulation does not "amount[ ] to a prohibition of an entire class of 'arms.'" *Id* at 628.

The relative number of high-capacity magazines does not serve as an accurate indication of how burdensome the regulation is on the right to bear arms in self-defense and thus has no constitutional significance.

## II. Assuming, *Arguendo*, that HB 1224 and HB 1229 Implicate the Second Amendment, Intermediate Scrutiny Applies.

To determine the appropriate level of scrutiny for Second Amendment challenges, this Court has considered the type of law challenged and the extent to which it burdens constitutional conduct, "look[ing] to analogous cases for guidance." *Reese*, 627 F.3d at 801. Applying the same analysis to the regulations at bar, it would be appropriate for the Court to apply a standard no more rigorous than intermediate scrutiny.

In two recent cases, this Court considered challenges to federal laws prohibiting possession of firearms by non-citizens and by persons subject to domestic protection orders. *See Huitron-Guizar*, 678 F.3d at 1169; *Reese*, 627 F.3d at 802. Those laws are strict prohibitions on possession of *all* firearms by particular classes of people—a much more restrictive policy than either of the regulations at issue here. Yet this Court applied intermediate scrutiny in both *Reese* and *Huitron-Guizar*. Nothing more is warranted here.

Appellants argue that because Colorado's regulations apply to all law-abiding citizens, strict scrutiny is warranted. But other courts have already rejected this argument. *See Peterson*, 707 F.3d at 1219-1220 (Lucero, J., concurring) (rejecting the argument that regulations affecting all law-abiding citizens must pass strict scrutiny because the contention does not "square with *Heller*'s presumptive approval of 'laws forbidding the carrying of firearms in sensitive places such as schools and government buildings.'") (quoting *Heller*, 554 U.S. at 626); *Kachalsky v. Cnty. of Westchester*, 701 F.3d 81, 93 (2d Cir. 2012) (applying intermediate scrutiny to permit requirement that applied to all law-abiding citizens).

Moreover, intermediate scrutiny is appropriate because the burden imposed by background checks and the magazine ban is minimal. Obtaining a background check from a Federal Firearms Licensee ("FFL") should not be difficult given that 98.1% of Coloradans live within 10 miles of a federally licensed gun dealer.[6] The U.S. Bureau of Alcohol, Tobacco, Firearms, & Explosives ("ATF") reports that in 2013 Colorado was home to 2,829 FFLs.[7]

---

[6] Everytown for Gun Safety, *How many gun dealers are there in your state?*, *available at* http://everytown.org/article/how-many-gun-dealers-are-there-in-your-state/.

[7] U.S. Dep't of Justice, Bureau of Alcohol, Tobacco, Firearms & Explosives, *Firearms Commerce in the United States: Annual Statistical Update 2014*, *available at* http://www.atf.gov/sites/default/files/assets/statistics/CommerceReport/firearms_commerce_annual_statistical_report_2014.pdf.

Appellants predict that legions of FFLs will refuse to process private background checks because of the $10 cap on the fee for such services. But there is no reason to think this crude economic argument is accurate. Far from being deterred from performing background checks for private transfers, licensed dealers in other states with comprehensive background checks have actually *benefited* from the increased traffic to their stores. In California (a state that also has a $10 cap on background check fees[8]), a licensed dealer described the situation this way: "when they come in to do the paper, everybody needs bullets and cleaning supplies."[9]

To be sure, obtaining a background check takes *some* amount of effort and time. But the requirements at issue here are no more onerous than those routine inconveniences that accompany the exercise of many fundamental rights such as the registration requirement before voting on election day, the inconvenience of getting to a polling station on a Tuesday, and the effort required to get a marriage license.[10] *Cf. Heller II*, 670 F.3d at 1255 (comparing firearm registration to "other

---

[8] *See* Cal. Penal Code § 28055.

[9] Garen Wintemute, *Comprehensive Background Checks for Firearm Sales in* REDUCING GUN VIOLENCE IN AMERICA: INFORMING POLICY WITH EVIDENCE AND ANALYSIS 95, 99 (Daniel W. Webster & Jon S. Vernick eds., 2013).

[10] Indeed, the negligible inconvenience of background checks pales in comparison to the harm suffered by society when high-risk individuals obtain firearms.

common registration or licensing schemes, such as those for voting or for driving a car, that cannot reasonably be considered onerous") (collecting cases).

Likewise, the burden on constitutional conduct resulting from the ban on high-capacity magazines is negligible, amounting to nothing more than having to load another magazine after having expended 15 rounds. Appellants consider the impact on their conduct severe because the law regulates conduct in the home. But not every regulation that applies to conduct in the home is evaluated under strict scrutiny. *See e.g.*, *Heller II*, 670 F.3d at 1261-62 (applying intermediate scrutiny to prohibition on assault weapons and high-capacity magazines); *Marzzarella*, 614 F.3d at 99 (applying intermediate scrutiny to prohibition on possession of firearm with obliterated serial number).

Neither the background check policy nor the magazine ban place a substantial burden on constitutional conduct. Intermediate scrutiny, at most, applies to the regulations at bar.

III.  **HB 1224 and HB 1229 Pass Intermediate Scrutiny.**

Even if this Court were to hold that Colorado's firearm regulations burden Second Amendment conduct, they nonetheless pass constitutional muster; each is substantially related to the important policy of public safety.

A.  **Comprehensive background checks are substantially related to an important government objective.**

1.  **The aim of background checks is to increase public safety.**

Background checks ensure that persons who acquire firearms are legally entitled to possess and use them, thereby reducing the chance that the harms associated with possession by prohibited persons will materialize. As *Reese*, *Huitron-Guizar*, and the decisions of sister circuits have held, the underlying prohibitions themselves advance important government objectives. *See Reese*, 627 F.3d 792 at 804 (federal law prohibiting possession by person subject to domestic protective order is constitutional); *Huitron-Guizar*, 678 F.3d at 1170 (same as to federal law prohibiting possession by non-citizens); *Skoien*, 614 F.3d at 642 (same as to federal law prohibiting possession by persons convicted of a domestic violence misdemeanor); *NRA*, 700 F.3d at 211 (same as to federal law prohibiting FFLs from selling handguns to persons under the age of 21); *Kachalsky*, 701 F.3d at 100 (same as to New York law requiring applicant to show proper cause to carry concealed weapon).

It cannot be doubted that effective enforcement of these laws likewise advances an important policy goal. As Judge Lucero reasoned when considering a Colorado law whose purpose was to "ensure that an applicant is qualified to obtain a [concealed handgun license]": "Given that the statutory scheme rests on an important governmental objective, I have no trouble concluding the state has a substantial interest in ensuring compliance with the statute." *Peterson*, 707 F.3d at 1221 (Lucero, J., concurring). The same is true here. By ensuring compliance with

state and federal law, background checks prevent violations of federal and state law before they occur.

### 2. A significant number of firearms change hands through private, non-commercial transfers.

Appellants downplay the need for comprehensive background checks, but as the district court noted, experts estimate that 40% of firearms are acquired through private transfer. The number is even higher for those firearms that are associated with crimes. Statistics from the ATF show that nearly 90% of firearms that are traced in Denver, Colorado in connection with a crime have gone through at least one private transfer.[11]

A study done of the website armslist.com (a popular site for the selling or trading of guns) showed that in 2013, Colorado had the second-highest number of listings by private sellers per capita and the fourth-highest number of listings seeking to acquire a firearm from a private seller.[12] To be sure, some private transfers occur at gun shows where, under a preexisting Colorado law, a background check is required. But gun shows account for only a small percentage

---

[11] *See* U.S. Dep't of Justice, Bureau of Alcohol, Tobacco and Firearms, *ATF Crime Gun Trace Reports (2000) Denver/Aurora* (July 2002).

[12] *See* Third Way, *What a Difference a Law Makes: Online Gun Sales in States With and Without Background Checks* (Sept. 2013), *available at* http://content.thirdway.org/publications/744/Third_Way_Report_-_What_a_Difference_a_Law_Makes-_Online_Gun_Sales_in_States_With_and_Without_Background_Checks.pdf.

of firearm acquisitions—between 4 and 9 percent.[13] As detailed below, far more firearms are acquired through private, non-commercial transfers.

Researchers at John Hopkins Bloomberg School of Public Health interviewed inmates in thirteen states who were serving time for an offense committed with a firearm. Only half of the offenders said they acquired their firearms through sale or trade. The second-most frequent method of acquisition was borrowing or holding the gun for someone: 17.4% reported they acquired the firearm used in the crime this way and another 8.3% of offenders reported that they received their firearm as a gift.[14]

These findings are consistent with studies showing that a significant segment of the national population as a whole acquires firearms through non-commercial, private transfers. For example, the National Institute of Justice issued a study showing that 19% of adults surveyed received their most recent firearm as a gift, and 3% acquired it through trade. Significantly, 12% of the respondents acquired

---

[13] *See* Philip J. Cook & Jens Ludwig, U.S. Dep't of Justice, National Institute of Justice, *Guns in America: National Survey on Private Ownership and Use of Firearms*, 6 (May 1997) (finding that 4% of firearms were acquired at a gun show or flea market); Garen Wintemute, Dep't of Emergency Medicine Univ. Cal. Davis School of Medicine, Violence Prevention Research Program, Background Checks for Firearm Transfers: Assessments and Recommendations 22 (discussing the National Firearms Survey which found that 9% of respondents acquired their most recent firearm at a gun show).

[14] *See* Katherine A. Vittes et al., Center for Gun Policy and Research, *Legal Status and source of offenders' firearms in states with the least stringent criteria for gun ownership* (June 2012).

their most recent firearm from a friend or acquaintance. The researchers concluded that "about 2 million acquisitions per year, were off-the-books transfers in the secondary market."[15]

Non-commercial, private transfers make up a significant portion of the total transfers of firearms, and a startling proportion of the firearms that ultimately end up involved in the commission of a crime. Accordingly, comprehensive background checks are necessary to prevent prohibited persons and criminals from obtaining a firearm through this frequently-used means of acquisition.

### 3. Substantial evidence shows that comprehensive background checks enhance public safety.

By preventing violations of firearms regulations before they occur, background checks substantially relate to the enforcement of gun regulations and the reduction of gun-related crimes, with minimal restriction on constitutionally protected conduct.

The track record of background check policies shows that they work. In the twenty-one years since federal background checks were instituted for commercial firearms sales, well over two million potential sales to high-risk persons were prevented.[16] The Colorado Bureau of Investigation reports that in 2012 alone

---

[15] Philip J. Cook & Jens Ludwig, *Guns in America: National Survey on Private Ownership and Use of Firearms* at 7.

[16] *See* U.S. Dep't of Justice, Office of Justice Programs Bureau of Justice Statistics, *Background Checks for Firearm Transfers, 2012—Statistical Tables* (2014) (continued…)

background checks preempted the transfer of firearms to over 5,000 prospective buyers who were prohibited from possessing firearms.[17] In 2013, background checks were responsible for the arrest of 188 people in Colorado who attempted to purchase a firearm while they had an active warrant.[18]

Nor is Colorado's comprehensive background check regime unduly restrictive of constitutional conduct. In addition to Colorado, five other states and the District of Columbia require universal background checks at the point of transfer for all classes of firearms.[19] Two more states require comprehensive background checks for all transfers of handguns.[20] And four more states require all potential transferees to obtain a license or permit to acquire a firearm, after having

---

(between March 1, 1994 and December 31, 2012 more 2.4 million applications for firearm transfers or permits were denied).

[17] *See* Colo. Bureau of Investigation, *History of InstaCheck in Colorado*, *available at* https://www.colorado.gov/pacific/cbi/instacheck-unit (select CBI InstaCheck Presentation (2013)).

[18] *See* Colo. Bureau of Investigation, CBI Annual Report 2013, *available at* https://www.colorado.gov/pacific/sites/default/files/CBI%20Annual%20Report%202013.pdf.

[19] *See* Cal. Penal Code §§ 27545, 27850-28070; Conn. Gen. Stat. §§ 29-33(c), 29-36l(f), 29-37a(j); Del. Code Ann. tit. 11, § 1448B, tit. 24, § 904A; N.Y. Gen. Bus. Law § 898; R.I. Gen. Laws §§ 11-47-35–11-47-35.2; D.C. Code § 7-2505.02.

[20] *See* Md. Code Ann., Pub. Safety §§ 5-101(t), 5-124; 18 Pa. Cons. Stat. § 6111(b), (c), (f)(2).

passed a background check.[21] None of these various enforcement regimes have been held unconstitutional.

Appellants would prefer that Colorado adopt a policy that would not require background checks to be conducted by an FFL, citing Massachusetts as an example of such a regime. Appellants are correct that Massachusetts has made different policy choices than Colorado, but the Massachusetts system is not the only constitutionally permissible system, nor is it on the whole less restrictive than the system in place in Colorado. For example, Massachusetts requires potential firearm purchasers to obtain a "permit to purchase, rent or lease," which is issued after a showing of "proper purpose" is made. The permit to purchase is valid for only 10 days, it can restrict the caliber and capacity of the firearm that may be purchased, and can be revoked at any time. Mass. Gen. Laws Ann. ch. 140 § 131A, E. A potential buyer in Massachusetts must also have a Firearm Identification Card, which requires submitting a background check and a copy of the applicant's fingerprints to the state police. Mass. Gen. Laws Ann. ch. 140 § 129B. Colorado does not require any of these measures.

The same is true of appellants' preference for an exception to Colorado's background check law for individuals who have a concealed carry permit. While

---

[21] *See* Haw. Rev. Stat. Ann. §§ 134-2, 134-13; 430 Ill. Comp. Stat. Ann. 65/1–65/15a, 720 Ill. Comp. Stat. Ann. 5/24-3(k); Mass. Gen. Laws Ann. ch. 140, §§ 121, 129B, 129C, 131, 131A, 131E, 131P; N.J. Stat. Ann. § 2C:58-3.

some states have adopted such policies, the people of Colorado had good reason for choosing not to exempt permit holders. For example, Colorado's concealed carry permits are valid for five years, Colo. Rev. Stat. § 18-12-204(1)(b), creating a risk that a potential purchaser will have become a prohibited person after obtaining the permit. *See* Garen Wintemute, *Comprehensive Background Checks for Firearm Sales in* REDUCING GUN VIOLENCE IN AMERICA: INFORMING POLICY WITH EVIDENCE AND ANALYSIS 95, 104-105 (Daniel W. Webster & Jon S. Vernick eds., 2013) ("[a]n important fraction of permit holders become prohibited persons during [the time a permit is valid]"; an exception for permit holders would "allow newly prohibited individuals who are at high risk for committing further crimes to avoid background checks and acquire firearms").

Differences in state policies, far from indicating constitutional deficiency, are the result of salutary experimentation which states are constitutionally permitted and encouraged to engage in when regulating firearms. *See McDonald v. City of Chicago, Ill.*, 561 U.S. 742, 785 (2010) ("state and local experimentation with reasonable firearms regulations will continue under the Second Amendment"); c*f. Kachalsky*, 701 F.3d at 99 ("It is the legislature's job, not ours, to weigh conflicting evidence and make policy judgments. Indeed, assessing the risks and benefits of handgun possession and shaping a licensing scheme to maximize the competing public-policy objectives . . . is precisely the type of

discretionary judgment that officials in the legislative and executive branches of state government regularly make.").

Appellants' argument that less burdensome alternatives are available is misplaced. In essence, it asks this Court to put Colorado's legislation to a strict scrutiny test, rather than the appropriate intermediate scrutiny standard. As the Second Circuit reasoned when rebuffing a challenge to New York's permitting laws:

> The Supreme Court has long granted deference to legislative findings regarding matters that are beyond the competence of courts. In the context of firearm regulation, the legislature is far better equipped than the judiciary to make sensitive public policy judgments (within constitutional limits) concerning the dangers in carrying firearms and the manner to combat those risks. Thus, our role is only to assure that, in formulating its judgments, [New York] has drawn reasonable inferences based on substantial evidence.

*Kachalsky*, 701 F.3d at 97 (alteration in original) (internal quotation marks omitted). The evidence considered by the Colorado legislature supports the District Court's finding that background checks have a substantial relationship to enforcing federal and state law, thereby enhancing public safety.

The people of Colorado, through their representatives, have chosen to use comprehensive background checks as one method of enhacing public safety and

the quality of life among its citizenry. They were well within constitutional bounds in doing so.[22]

**B.**   **Bans on high-capacity magazines are substantially related to an important government objective.**

**1.**   **The ban on high-capacity magazines is aimed at reducing deaths and injury related to firearm crimes.**

Colorado's General Assembly "considered relevant evidence in determining that the use of large-capacity magazines in gun violence poses a serious threat to public safety." *Colo. Outfitters Ass'n v. Hickenlooper*, 24 F. Supp. 3d 1050, 1072 (D. Colo. 2014). Colorado's goal in enacting the regulation was to reduce the number and magnitude of injuries caused by gun violence—a goal the parties do not dispute is important, and indeed compelling.

**2.**   **Substantial evidence shows that prohibitions on high-capacity magazines will reduce gun-related injuries and death.**

The Colorado legislature heard testimony from the Chief of Police of Golden, Colorado, stating that:

---

[22] Amicus argue that "it is fanciful to expect violent criminals to go to the trouble of obtaining a background check." Br. Nat'l Rifle Ass'n at 26. This argument is belied by the number of prohibited persons that do in fact attempt to acquire a firearm, but are prevented from doing so after having failed the background check. *See supra*, n.16 and accompanying text (noting that in over two million background checks resulted in denials ). Moreover, by imposing an obligation on potential transferors—not just transferees—Colorado's policy deters potential transferors who might otherwise be inclined not to inquire about a potential transferee's legal status. *See* Colo. Rev. Stat. § 18-12-112(1).

Large-capacity magazines are frequently used in mass shootings, including those which occurred at Columbine High School, Virginia Tech, Fort Hood, Tucson, Aurora, Oak Creek, and Newtown. As a police chief, I am aware of data suggesting that perhaps as many as one in five officer-involved shootings in the United States involve high-capacity magazines. . . . Large-capacity magazines increase the capacity, and thus the potential lethality of any firearm that can accept a large-capacity magazine, including a firearm that is not an assault weapon. Therefore, a limitation on large-capacity magazines will reduce the capacity and lethality of many more firearms than would a limitation on assault weapons alone.

J.A. 19:3929.

The Chief's testimony is amply supported by the available evidence. A study of every mass shooting between January 2009 and July 2014 identified 110 such shootings—an average of over one per month.[23] Mass shootings that were committed with high-capacity magazines resulted in an average of 156% more persons injured and 63% more fatalities than other mass shootings.[24] This connection between high-capacity magazines and a higher rate of injury and fatalities has been confirmed by other studies.[25] The empirical data available show

---

[23] *See* Everytown For Gun Safety, *Analysis of Recent Mass Shootings*, *available at* http://everytown.org/documents/2014/10/analysis-of-recent-mass-shootings.pdf.

[24] *Id.*

[25] *See e.g.*, J.A. 23:5096 (study of shootings between 1984 to 1993 found that, in shootings that resulted in at least 6 fatalities or 12 gunshot victims, offenders that possessed weapons with high-capacity magazines wounded or killed an average of 29 victims, as compared with an average of 13 wounded or killed by other offenders).

that keeping high-capacity magazines out of the hands of criminals can be expected to result in fewer deaths and serious injuries.[26]

Appellants concede that prohibiting high-capacity magazines has helped to thwart killers, but they speculate that this happens so rarely that it defeats any salutary aspects of the regulation. Hardly. Even a small reduction in the potential lethal use of guns by criminals could have major societal benefits: "[R]educing shootings by just 1% . . . would amount to preventing about 650 shootings [in the United States] annually." J.A. 23:5096.

Recognizing the relationship between high-capacity magazines and increased injury and death, all federal courts to address bans on magazines have found the measures pass constitutional muster.[27] That includes the D.C. Circuit and the Seventh Circuit—the only two Court of Appeals to have decided the issue as of this filing. Both courts upheld bans on magazines that contain more than ten rounds of ammunition, relying on the same evidence that supports Colorado's

---

[26] Several other studies confirm the Chief's testimony that large-capacity magazines are disproportionately connected with officer killings. *See e.g.*, J.A. 23:5091 (high-capacity magazines are used in roughly 31-41% of gun murders of police).

[27] *See San Francisco Veteran Police Officers Ass'n v. City and Cnty. of San Francisco*, 18 F. Supp. 3d 997 (N.D. Cal. 2014) (law prohibiting possession of magazines over ten rounds survived intermediate scrutiny); *Fyock v. City of Sunnyvale*, 25 F. Supp. 3d 1267 (N.D. Cal. 2014) (same); *Shew v. Malloy*, 994 F. Supp. 2d 234 (D. Conn. 2014) (same); *Kolbe v. O'Malley*, 42 F. Supp. 3d 768 (D. Md. 2014) (same); *N.Y. State Rifle & Pistol Ass'n v. Cuomo*, 990 F. Supp. 2d 349 (W.D.N.Y. 2014) (same).

legislation. *See Heller II*, 670 F.3d at 1264;[28] *Friedman v. City of Highland Park*, No. 1:14-cv-3091, 2015 WL 1883498 (7th Cir. April 27, 2015).[29]

The D.C. Circuit's reasoning in *Heller II* is informative for the analysis here. The court discussed three ways in which the magazine limitation furthered the District's public safety goals. First, high-capacity magazines "greatly increase the firepower of mass shooters," and such magazines "result in more shots fired, persons wounded, and wounds per victim." *Heller II*, 670 F.3d at 1263 (quoting testimony of Brian J. Siebel, Brady Center To Prevent Gun Violence, at 1 (Oct. 1, 2008) and citing J.A. 23:5061, Christopher S. Koper et al., Univ. Penn. Jerry Lee Ctr. of Criminology, *An Updated Assessment of the Federal Assault Weapons Ban: Impacts on Gun Markets and Gun Violence, 1994-2003*, 51, 87 (2004)). Second, high-capacity magazines are dangerous in self-defense situations where the instinct to empty a magazine puts innocent bystanders at risk. *Heller II*, 670 F.3d at 1263-64. And finally, the regulation necessitates reloading a magazine after 10 rounds, creating a "2 or 3 second pause," which "can be of critical benefit to law

---

[28] Notably, the D.C. Circuit did not hold that the District's regulations infringed the Second Amendment, but rather assumed so for purposes of the analysis. *See Heller II*, 670 F.3d at 1261-62 ("Although we cannot be confident the prohibitions impinge at all upon the core right protected by the Second Amendment, we are reasonably certain the prohibitions do not impose a substantial burden upon that right.").

[29] *See also Fyock v. City of Sunnyvale*, 779 F.3d 991, 1000 (9th Cir. 2015) (plaintiffs were not likely to succeed on the merits of their challenge to a local municipal code banning large-capacity magazines).

enforcement." *Id.* "Overall," the court held, "the evidence demonstrates that large-capacity magazines tend to pose a danger to innocent people and particularly to police officers, which supports the District's claim that a ban on such magazines is likely to promote its important governmental interests." *Id.*[30]

Colorado's legislature considered similar evidence and came to the same conclusion. As the legislative history illustrates, many of the arguments appellants raise were explicitly considered by the legislature when it debated the merits of the proposed legislation. After a full hearing and debate, Colorado resolved the question in favor of the regulation. That it did so does not mean the decision was based on an absence of substantial support. On the contrary, the legislative record shows quite the opposite.

The role of the federal courts is not to substitute the judgment of the popularly-elected branches for their own. When fundamental rights are involved courts must ensure that the legislature entertains debate, considers and weighs the evidence, and comes to a reasoned decision in light of that evidence. The record shows that the Colorado legislature exemplified all of these important conditions in the lead up to passing the regulations at issue here.

---

[30] As the Ninth Circuit noted, it is appropriate to look at the "legislative history of the enactment as well as *studies in the record or cited in pertinent case law*." *Jackson v. City and Cnty. of San Francisco*, 746 F.3d 953, 969 (9th Cir. 2014) (emphasis added). Thus, contrary to what appellants have argued, it is appropriate for this court to look at evidence outside the legislative record, in particular, empirical evidence cited by other courts that have addressed similar legislation.

## CONCLUSION

For the foregoing reasons, this Court should affirm the lower court's order.

# CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitations of Fed. R. App. P.

28.1(e)(2)(a) and 29(d) because this brief contains 6910 words, excluding the parts

of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

This brief complies with the typeface requirements of Fed. R. App. P.

32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this

brief has been prepared in a proportionally spaced typeface using Microsoft Word

in 14-point Times New Roman font.


Date: April 29, 2015


/s/    Cléa Liquard

COVINGTON & BURLING LLP
The New York Times Building
New York NY 10018
Tel.:  (212) 841-1000
cliquard@cov.com
*Counsel for Amicus Curiae*
*Brady Center To Prevent Gun Violence*

## CERTIFICATE OF SERVICE

I hereby certify that on April 29, 2015, this brief of amicus curiae Brady Center To Prevent Gun Violence was served, via electronic delivery to all parties' counsel via CM/ECF system which will forward copies to Counsel of Record.

Date: April 29, 2015

/s/    Cléa Liquard

COVINGTON & BURLING LLP
The New York Times Building
New York NY 10018
Tel.: (212) 841-1000
cliquard@cov.com
*Counsel for Amicus Curiae*
*Brady Center To Prevent Gun Violence*

## CERTIFICATE OF DIGITAL SUBMISSION

No privacy redactions were necessary. If required to file additional hard copies, the ECF submission in digital form is an exact copy of the document filed with the Clerk. In addition, the digital submission has been scanned for viruses with the most recent version of a commercial virus scanning program, TREND MICRO Worry Free Business Security Advanced, Version 6.0 SP3, engine Version 9.800.1009, Virus Pattern File 11.453.00, dated April 29, 2015, and according to the program is free of viruses.


*s/Edward T. Ramey*