Case Nos. 14-1290, 14-1292

IN THE

# United States Court of Appeals

## FOR THE TENTH CIRCUIT

◆◆◆

COLORADO OUTFITTERS ASSOCIATION, *et al.*,

*Plaintiffs-Appellants,*

—v.—

JOHN W. HICKENLOOPER, Governor of the State of Colorado,

*Defendant-Appellee.*

CONGRESS OF RACIAL EQUALITY, *et al.*,

*Amici Curiae.*

———————

JIM BEICKER, SHERIFF OF FREMONT COUNTY, *et al.*,

*Plaintiffs-Appellants,*

—v.—

JOHN W. HICKENLOOPER, Govenor of the State of Colorado,

*Defendant-Appellee.*

CONGRESS OF RACIAL EQUALITY, *et al.*,

*Amici Curiae.*

———————

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO–DENVER
HONORABLE MARCIA S KRIEGER
D.C. NO. 1082-1

## BRIEF FOR *AMICI CURIAE* LAW CENTER TO PREVENT GUN VIOLENCE

MARK T. CIANI
KATTEN MUCHIN ROSENMAN LLP
575 Madison Avenue
New York, New York 10022-2585
(212) 940-8800

JONATHAN K. BAUM
*Counsel of Record*
KATTEN MUCHIN ROSENMAN LLP
525 West Monroe Street
Chicago, Illinois 60661-3693
(312) 902-5200

*Attorneys for Law Center to Prevent Gun Violence*

April 29, 2015

## CORPORATE DISCLOSURE STATEMENT

*Amicus curiae* Law Center to Prevent Gun Violence does not have any parent company.  It has no stock, and therefore, no publicly held company owns 10% or more of its stock.

/s/ Jonathan K. Baum
Jonathan K. Baum

# Table of Contents

**Page**

INTEREST OF *AMICUS CURIAE*...................................................................1

SUMMARY OF ARGUMENT .........................................................................2

ARGUMENT ...................................................................................................4

I.    THE ACT REGULATES CONDUCT WHICH FALLS OUTSIDE THE SCOPE OF THE SECOND AMENDMENT RIGHT RECOGNIZED IN *HELLER*. ..............................4

    A.    Background of the Act. .......................................................................4

        1.    Prohibition on Large Capacity Ammunition Magazines. ...........................4

        2.    Universal Background Check Requirement................................7

    B.    The Second Amendment Does Not Protect a Right to Possess LCMs. ..................9

        1.    LCMs Are Not "Arms."...................................................9

        2.    Even If LCMs Are "Arms," They Are Still "Dangerous and Unusual" and Not Protected by the Second Amendment. .........................12

    C.    The Second Amendment Is Not Implicated by the Act's Background Check Requirement...................................................................15

        1.    Background Checks are an Essential Means of Enforcing the "Longstanding" and "Presumptively Lawful" Prohibitions on Firearm Possession for Certain Dangerous Persons. ................................16

        2.    The Presumptive Validity of Laws Placing Conditions on the Commercial Sale of Firearms Suggests the Presumptive Validity of Laws Placing Similar Conditions on Private Transfers. ..........................17

        3.    Requiring Background Checks for Private Transfers Does Not Interfere with the Ability of Law-Abiding Individuals to Use Firearms for Self-Defense.................................................18

II.    EVEN IF THE ACT IMPLICATES THE SECOND AMENDMENT, IT REMAINS CONSTITUTIONAL................................................................20

    A.    If Heightened Scrutiny Is Necessary In Evaluating This Challenge, Strict Scrutiny Is Not Appropriate.................................................20

1.      The Application of Strict Scrutiny to Firearm Regulations Is Generally Inappropriate. ...........................................................................20

2.      Strict Scrutiny is Inconsistent with *Heller* and *McDonald*. ......................22

B.      If Heightened Scrutiny Applies, Intermediate Scrutiny is the Appropriate Level of Review. ...................................................................................24

C.      The Background Check Requirement and LCM Ban Satisfy Intermediate Scrutiny. ................................................................................................26

1.      Preservation of Public Safety and Prevention of Crime Are Paramount Government Interests.................................................................27

2.      LCMs and Permitting Transfers of Firearms Without Background Checks Jeopardize Public Safety. ..............................................................27

3.      The Act is Substantially Related to the Government's Significant Interests. .................................................................................................29

CONCLUSION.....................................................................................................30

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Commonwealth v. McGowan*,
464 Mass. 232 (2013) .................................................................................16, 17

*District of Columbia v. Heller*,
554 U.S. 570 (2008).................................................................................. *passim*

*Fyock v. Sunnyvale*,
779 F.3d 991 (9th Cir. 2015) ....................................................................25, 29

*Heller v. Dist. of Columbia*,
670 F.3d 1244 (D.C. Cir. 2011)...................................................21, 25, 26, 29

*Heller v. Dist. of Columbia*,
698 F. Supp. 2d 179 (D.D.C. 2010).........................................................22, 28

*Hightower v. City of Boston*,
693 F.3d 61 (1st Cir. 2012).............................................................................14

*Jackson v. San Francisco*,
746 F.3d 953 (9th Cir. 2014) ...............................................................11, 21, 27

*Kachalsky v. Cnty. of Westchester*,
701 F.3d 81 (2d Cir. 2012)..............................................................................21

*Kelley v. Johnson*,
425 U.S. 238 (1976).........................................................................................21

*Kolbe v. O'Malley*,
42 F. Supp. 3d 768 (D. Md. 2014) ........................................................... *passim*

*Lorrilard Tobacco Co. v. Reilly*,
533 U.S. 525 (2001).................................................................................26, 27

*McDonald v. City of Chicago*,
561 U.S. 742 (2010).....................................................................................1, 21

*N.Y. State Rifle and Pistol Ass'n, Inc. v. Cuomo*,
990 F. Supp. 2d 349 (W.D.N.Y. 2013)......................................................25, 29

*Shew v. Malloy*,
994 F. Supp. 2d 234 (D.Conn. 2014).........................................................25, 29

*Turner Broad. Sys., Inc. v. F.C.C.*,
   512 U.S. 622 (1994) ...................................................................................26, 29

*Tyler v. Hillsdale County Sheriff's Dep't*,
   No. 13–1876, 2014 WL 7181334 (6th Cir. Dec. 18, 2014) .....................................22

*United States v. Decastro*,
   682 F.3d 160 (2d Cir. 2012) ...................................................................13, 23, 24

*United States v. Fincher*,
   538 F.3d 868 (8th Cir. 2008) ...........................................................................13

*United States v. Huitron-Guizar*,
   678 F.3d 1164 (10th Cir. 2012) .......................................................................21

*United States v. Marzzarella*,
   595 F. Supp. 2d 596 (W.D. Pa. 2009) ..............................................................22

*United States v. Marzzarella*,
   614 F.3d 85 (3d Cir. 2010) ..................................................................... *passim*

*United States v. Masciandaro*,
   638 F.3d 458 (4th Cir. 2011) ...........................................................................21

*United States v. McCartney*,
   357 F. App'x. 73 (9th Cir. 2009) .....................................................................12

*United States v. Reese*,
   627 F.3d 792 (10th Cir. 2010) ...............................................................20, 21, 23

*United States v. Skoien*,
   614 F.3d 638 (7th Cir. 2010) ...........................................................................26

*United States v. Walker*,
   709 F. Supp. 2d 460 (E.D. Va. 2010) ...............................................................21

*United States v. Williams*,
   616 F.3d 685 (7th Cir. 2010) ...........................................................................21

*Ward v. Rock Against Racism*,
   491 U.S. 781 (1989) .......................................................................................24

*Woollard v. Gallagher*,
   712 F.3d 865 (4th Cir. 2013) ...........................................................................21

**Statutes**

Act for Regulating and Disciplining Militia, 1785 Va. Acts ch. 1, § 3 .........................10

C.R.S. § 18-12-112 .................................................................................................7, 19

C.R.S. § 18-12-301(2)(a)(I) ...........................................................................................5

C.R.S. § 18-12-302(2)-(3) ..............................................................................................5

C.R.S. §§ 24-33.5-424, 12-26.1-101 .............................................................................7

18 U.S.C. § 922(g)(4) ...................................................................................................22

18 U.S.C. § 922(s) ...........................................................................................................7

Cal. Penal Code §§ 16150, 30305, 32310 (2015) ..........................................................5

Cal. Penal Code §§ 26825, 26845, 28100-28415 (2015) ...............................................8

Conn. Gen. Stat. Ann. §§ 29-33, 29-37a(a), 29-37g(c) (West 2015)..............................8

Conn. Gen. Stat. Ann. §§ 53-202a(1)(e), 53-202b(a)(1), 53-202w(b) (West 2013).......................5

Cook Cnty. Code of Ordinances §§ 54-211 – 54-213 ....................................................5

D.C. Code §§ 7-2502.01, 7-2502.03, 7-2502.04, 7-2502.05, 7-2502.07(a)-(b)
      (2015).......................................................................................................................8

D.C. Code §§ 7-2551.01 – 7-2551.03 (2012) .................................................................5

Del. Code Ann. Tit. 11, § 1448A (West 2015) ...............................................................8

Haw. Rev. Stat. Ann. §§ 134-1, 134-4, 134-8 (2013) .....................................................5

Haw. Rev. Stat. §§ 134-2, 134-3.5 (West 2014) .............................................................8

430 Ill. Comp. Stat. 65/2-11 (West 2014) ......................................................................8

Iowa Code Ann. §§ 724.16, 724.17 – 724.21A (West 2015) ..........................................8

Kan. Stat. Ann. § 50-1203(b) ........................................................................................11

Mass. Gen. Laws ch. 140, §§ 121-123, 131, 131M (2014) ............................................5

Mass. Gen. Laws ch. 140, §§ 123, 129B, 131 (2013).....................................................5

Md. Code Ann., Crim. Law §§ 3-301-306 (West 2015)..................................................8

Md. Code Ann., Pub. Safety §§ 5-117 – 5-126 (West 2015)...........................................8

Mich. Comp. Laws Ann. § 28.422 (West 2015)..............................................................8

N.C. Gen. Stat. §§ 14-402 – 14-404 (West 2015)...........................................................8

N.J. Stat. Ann. § 2C:58-3 (West 2015) ...........................................................................8

N.J. Stat. Ann. §§ 2C:58-5, 2C:58-12, 2C:58-13 (West 2014) .......................................5

N.Y., Admin. Code § 10-301 ............................................................................................5

N.Y. Gen. Bus. Law § 898 (McKinney 2015) .................................................................8

N.Y. Penal Law §§ 265.02(7)-(8), 265.37 .......................................................................5

N.Y. Penal Law § 400.02-03 (McKinney 2015) ..............................................................8

Neb. Rev. Stat. § 69-2401– 69-2423 (2014) ....................................................................8

Or. Rev. Stat. §§ 166.412, 166.432, 166.434, 166.436 (West 2015) ...............................8

18 Pa. Cons. Stat. Ann. §§ 6111 – 6111.3 (West 2014) ..................................................8

R.I. Gen. Laws Ann. §§ 11-47-35 (West 2014) ...............................................................8

San Francisco Police Code § 619 .....................................................................................5

Sunnyvale Municipal Code § 9.44.050 .............................................................................5

**Other Authorities**

Atlantic Firearms, http://www.atlanticfirearms.com/accessories.html ...........................12

Brian J. Siebel, Brady Ctr. To Prevent Gun Violence, Assault Weapons: Mass
    Produced Mayhem 16 (2008),
    http://www.bradycampaign.org/sites/default/files/mass-produced-mayhem.pdf ...................14

Daniel W. Webster, *et al.*, *Preventing the Diversion of Guns to Criminals through*
    *Effective Firearm Sales Laws*, Reducing Gun Violence in America (2013),
    https://jhupress.files.wordpress.com/2013/01/1421411113_updf.pdf .......................................8

David Olinger, *Gun Dealer Surrenders Firearms License*, Denver Post, Oct. 14,
    1999 ....................................................................................................................................6

Dennis A. Henigan, *The Heller Paradox*, 56 UCLA L. Rev. 1171, 1197-98 (2009) ....................22

Guns America,
    http://www.gunsamerica.com/BrowseSpecificCategory/Parent/Non-
    Guns/ViewAll.htm .............................................................................................................12

Karyn Hunt, *Gunman Said to Have List of 50 Names*, Charlotte Observer, July 3,
    1993 ....................................................................................................................................6

Mayors Against Illegal Guns, Analysis of Recent Mass Shootings (2013),
s3.amazonaws.com/s3.mayorsagainstillegalguns.org/images/analysis-of-
recent-mass-shootings.pdf ...................................................................................................7

Mississippi Auto Arms, Inc., http://www.mississippiautoarms.com/sort-by-item-
magazines-c-169_177.html ...............................................................................................12

Palmetto State Armory,
http://palmettostatearmory.com/index.php/accessories.html....................................................12

Susan Candiotti, Greg Botelho and Tom Watkins, *Newtown shooting details
revealed in newly released documents*, cnn.com, Mar. 29, 2013, *available at*
http://www.cnn.com/2013/03/28/us/connecticut-shooting-documents ....................................6

Violence Policy Ctr., Mass Shootings in the United States Involving High
Capacity Ammunition Magazines (Jan. 2011),
http://www.vpc.org/fact_sht/VPCshootinglist.pdf ...................................................................6

## INTEREST OF *AMICUS CURIAE*[1]

*Amicus curiae* the Law Center to Prevent Gun Violence ("the Law Center") is a non-profit, national law center dedicated to reducing gun violence and the devastating impact it has on communities. The Law Center focuses on providing comprehensive legal expertise to promote smart gun laws. These efforts include tracking all Second Amendment litigation nationwide and providing support to jurisdictions facing legal challenges. As an *amicus*, the Law Center has provided informed analysis in a variety of firearm-related cases, including *District of Columbia v. Heller*, 554 U.S. 570 (2008) and *McDonald v. City of Chicago*, 561 U.S. 742 (2010).

The Law Center has a particular interest in this litigation as it was formed in the wake of a mass shooting at a San Francisco law firm in 1993 that involved the use of large capacity ammunition magazines. The shooter in that massacre, which left eight dead and six injured, was armed with two assault weapons and multiple large capacity ammunition magazines, some capable of holding up to 50 rounds of ammunition. In the years since the shooting, the Law Center has worked with local, state, and federal leaders on the enactment and defense of reasonable

---

[1] Amicus curiae make the following disclosure pursuant to Fed. R. App. P. 29(c)(5): no party's counsel authored this brief in whole or in part. No party, party's counsel, nor any other person contributed any money to fund the preparation or submission of this brief, other than amicus curiae. All parties have consented to the filing of this brief.

1

restrictions on dangerous, military-style devices, such as assault weapons and large capacity ammunition magazines. The Law Center has also long advocated for laws requiring universal background checks, which—more than any other type of regulation—help ensure that firearms do not fall into the hands of dangerous people.

## SUMMARY OF ARGUMENT

On July 20, 2012, a man walked into a showing of *The Dark Knight Rises* at a movie theater in Aurora, Colorado, carrying several firearms, including an assault weapon equipped with a 100-round drum magazine, which he used to fire at the audience.  In a matter of minutes, he shot 58 individuals, killing twelve.  In the wake of this horrific event, the State of Colorado enacted laws banning large capacity magazines (those capable of accepting more than 15 rounds of ammunition) and requiring background checks on private gun transfers (together, the "Act") in an effort to reduce gun-related deaths and injuries in the state.

Plaintiffs filed a lawsuit challenging the Act, claiming it violates the Second Amendment.  After a nine-day bench trial, the District Court upheld the Act in its entirety.  The Court held that "the evidence establishes both an important governmental policy and a substantial relationship between that policy" and the restrictions imposed by the Act, and concluded that the Act "is constitutionally permissible under the Second Amendment."  JA-1785.  This Court should affirm

the District Court's order as the Act is indeed consistent with the Second Amendment as interpreted by the Supreme Court and subsequent case law.

In *District of Columbia v. Heller*, 554 U.S. 570 (2008), the United States Supreme Court held that the Second Amendment protects the right of law-abiding, responsible citizens to possess an operable handgun in the home for self-defense. With respect to large capacity ammunition magazines, the Act does not conflict with this right, as residents may still lawfully purchase and possess a wide array of guns and ammunition magazines for use in self-defense. Appellants, however, demand that this Court radically extend *Heller* to protect the possession of large capacity ammunition magazines, offensive devices designed to facilitate the killing large numbers of people quickly and efficiently. *Heller* does not support such an extension, and, as all other courts addressing the issue have ruled, the Second Amendment does not guarantee the right to possess these military-style devices, which are frequently employed in mass shootings and attacks on law enforcement officers and are not suitable for self-defense.

Colorado's decision to close a loophole in its background check law by extending it to include private sales and transfers also does not run afoul of the Second Amendment. Appellants' challenge is doomed because Colorado's background check law is merely a mechanism for enforcing longstanding federal and state prohibitions on firearm ownership by potentially dangerous individuals,

such as convicted felons and the mentally ill, which were expressly endorsed as "presumptively lawful" by the Supreme Court in *Heller*. 554 U.S. at 626-27, n.26. The Act constitutes a logical extension of Colorado's existing background check requirement, which imposes exactly the sort of "conditions and qualifications on the commercial sale of arms" that the *Heller* Court also identified as "presumptively lawful." *Id.* Finally, the Act's background check provisions fall outside of the scope of the Second Amendment as they in no way interfere with the ability of law-abiding, responsible citizens to acquire firearms for the purpose of self-defense in the home.

In sum, Appellants' challenge to the Act fails because the entirety of the Act falls outside of the scope of the Second Amendment. However, even if the Court finds that the Act does implicate the Second Amendment, the statute easily passes constitutional muster under intermediate scrutiny, which is the most appropriate standard of review in this context.

## ARGUMENT

### I.   THE ACT REGULATES CONDUCT WHICH FALLS OUTSIDE THE SCOPE OF THE SECOND AMENDMENT RIGHT RECOGNIZED IN *HELLER*.

#### A.   Background of the Act.

##### 1.   Prohibition on Large Capacity Ammunition Magazines.

The Act prohibits the sale, possession, or transfer of large capacity magazines ("LCMs"), generally defined as a "fixed or detachable magazine, box,

drum, feed strip, or similar device capable of accepting . . . more than fifteen rounds of ammunition." C.R.S. § 18-12-301(2)(a)(I). With specific exceptions, the Act also prohibits the manufacture of LCMs within Colorado. C.R.S. § 18-12-302(3)(a). Individuals who possessed LCMs before July 1, 2013 are permitted to continue possessing them, as are firearm manufacturers, firearm dealers, and government officials who carry weapons as part of their official duties. C.R.S. § 18-12-302(2)-(3). Dealers may continue to sell LCMs to firearms retailers for the purpose of sales conducted outside the state, and may sell to government agencies as well as to out-of-state transferees who may legally possess LCMs. C.R.S. § 18-12-302(3)(a).

State and local governments across the country have adopted laws restricting civilian access to LCMs because of the devastating role they repeatedly play in mass shootings and attacks on peace officers.[2] Congress also enacted a ban on LCMs in 1994, but that law included a sunset provision and was allowed to expire in 2004. JA-4978, 4980.

---

[2] *See* Md. Code Ann., Crim. Law §§ 4-301-306 (2013); N.Y. Penal Law §§ 265.02(7)-(8), 265.37; Cal. Penal Code §§ 16150, 30305, 32310 (2015); Haw. Rev. Stat. Ann. §§ 134-1, 134-4, 134-8 (2013); Conn. Gen. Stat. Ann. §§ 53-202a(1)(e), 53-202b(a)(1), 53-202w(b) (West 2013); Mass. Gen. Laws ch. 140, §§ 121-123, 131, 131M (2014); N.J. Stat. Ann. §§ 2C:58-5, 2C:58-12, 2C:58-13 (West 2014); D.C. Code §§ 7-2551.01 – 7-2551.03 (2012); Cook Cnty., Ill., Code of Ordinances §§ 54-211 – 54-213; New York City, N.Y., Admin. Code § 10-301; San Francisco, Cal., Police Code § 619; Sunnyvale, Cal., Municipal Code § 9.44.050.

The shooting rampage at the Aurora movie theater is only one of the more recent examples of the enormous public safety threat posed by LCMs. This threat, however, is not new. For example:

- In July 1993, a shooter armed with assault weapons and LCMs killed eight people and injured six others at a law firm in San Francisco.[3]

- In April 1999, the gunmen in the Columbine High School massacre killed 15 people and wounded 23 others using assault weapons and LCMs.[4]

- In January 2011, a shooter killed six people and wounded 13 others, including Congresswoman Gabrielle Giffords, in a parking lot in Tucson using a LCM holding 31 rounds.[5]

- In December 2012, a gunman killed 26 people and wounded two more at Sandy Hook Elementary School in Newtown, Connecticut. Twenty of the dead were young children. The gunman was armed with a Bushmaster XM-15 assault rifle, two handguns, multiple 30-round magazines, and hundreds of rounds of ammunition.[6]

Criminals disproportionately use LCMs in two categories of crimes: those with multiple victims and those that target law enforcement. On average, shooters

---

[3] Karyn Hunt, *Gunman Said to Have List of 50 Names*, Charlotte Observer, July 3, 1993, at 2A. This tragedy led to the formation of *amicus* Law Center to Prevent Gun Violence.

[4] David Olinger, *Gun Dealer Surrenders Firearms License*, Denver Post, Oct. 14, 1999, at B07.

[5] Violence Policy Ctr., Mass Shootings in the United States Involving High Capacity Ammunition Magazines (Jan. 2011), http://www.vpc.org/fact_sht/VPCshootinglist.pdf.

[6] Susan Candiotti, Greg Botelho and Tom Watkins, *Newtown shooting details revealed in newly released documents*, cnn.com, Mar. 29, 2013, *available at* http://www.cnn.com/2013/03/28/us/connecticut-shooting-documents.

who use assault weapons or LCMs in mass shootings shoot 151% more people, and kill 63% more people than shooters who do not.[7]

### 2.     Universal Background Check Requirement.

The Act also prohibits, with certain exceptions, the private transfer of a firearm unless the person receiving the firearm has undergone a background check. C.R.S. § 18-12-112.  The Act strengthened existing state law, which mirrored federal law by requiring firearms dealers—but not private sellers—to conduct background checks on purchasers of firearms.  C.R.S. §§ 24-33.5-424, 12-26.1-101; *cf.* 18 U.S.C. § 922(s).  There are several important exceptions to the Act's background check requirement, including temporary transfers that do not last more than 72 hours, transfers between immediate family members, and temporary transfers occurring in specified locations, such as shooting ranges, on hunting grounds, or in the home of the transferee.  C.R.S. § 18-12-112(6).

Extending the background check requirement to private transfers is critical to public safety.  When passing the Act, for example, the Colorado Legislature considered evidence demonstrating that almost 40% of gun purchases are made through private sales, in person, or over the internet. Alarmingly, 62% of private sellers on the Internet agree to sell to buyers who are known not to be able to pass

---

[7]  Mayors Against Illegal Guns, Analysis of Recent Mass Shootings (2013), s3.amazonaws.com/s3.mayorsagainstillegalguns.org/images/analysis-of-recent-mass-shootings.pdf.

a background check. JA-1788. Moreover, one study found that approximately 80% of criminals involved in gun violence obtained their weapon through a private transaction where they were not the subject of a background check. Daniel W. Webster, *et al.*, *Preventing the Diversion of Guns to Criminals through Effective Firearm Sales Laws*, Reducing Gun Violence in America at 118 (2013), *available at* https://jhupress.files.wordpress.com/2013/01/1421411113_updf.pdf. For these same reasons, many states across the country have enacted background check laws similar to those enacted by the Colorado Legislature.[8]

In light of the distressing facts regarding both LCMs and the "private sale" loophole, the Colorado Legislature adopted the Act to prohibit the possession of LCMs, and to extend Colorado's background check requirement to cover private transfers. Both of these protective measures should be upheld by the Court as neither falls within the scope of the Second Amendment.

---

[8] *See* Cal. Penal Code §§ 26825, 26845, 28100-28415 (2015); Conn. Gen. Stat. Ann. §§ 29-33, 29-37a(a), 29-37g(c) (West 2015); Del. Code Ann. Tit. 11, § 1448A (West 2015); D.C. Code §§ 7-2502.01, 7-2502.03, 7-2502.04, 7-2502.05, 7-2502.07(a)-(b) (2015); Md. Code Ann., Pub. Safety §§ 5-117 – 5-126 (West 2015); R.I. Gen. Laws Ann. §§ 11-47-35, 11-47-35.2 (West 2014); N.Y. Gen. Bus. Law § 898 (McKinney 2015); N.Y. Penal Law § 400.02-03 (McKinney 2015); 18 Pa. Cons. Stat. Ann. §§ 6111 – 6111.3 (West 2014); 430 Ill. Comp. Stat. 65/2-11 (West 2014); Or. Rev. Stat. §§ 166.412, 166.432, 166.434, 166.436 (West 2015); Haw. Rev. Stat. §§ 134-2, 134-3.5 (West 2014); Mass. Gen. Laws ch. 140, §§ 123, 129B, 131 (West 2015); N.J. Stat. Ann. § 2C:58-3 (West 2015); Iowa Code Ann. §§ 724.16, 724.17 – 724.21A (West 2015); Mich. Comp. Laws Ann. § 28.422 (West 2015); Neb. Rev. Stat. § 69-2401– 69-2423 (2014); N.C. Gen. Stat. §§ 14-402 – 14-404 (West 2015).

### B.     The Second Amendment Does Not Protect a Right to Possess LCMs.

In *Heller*, the Supreme Court held that the Second Amendment right to bear "arms" protects the right of responsible, law-abiding citizens to possess a handgun in the home for self-defense.  *Heller*, 554 U.S. at 635.  However, the Court cautioned that the Second Amendment right is "not unlimited" and does not confer a "right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose."  *Id.* at 626.  Furthermore, the Court explicitly excluded certain classes of weapons from the scope of the Second Amendment, endorsing the "historical tradition of prohibiting the carrying of dangerous and unusual weapons."  *Id.* at 627.  For the reasons explained below, LCMs are not protected by the Second Amendment right to bear "arms," and the provisions of the Act regulating such magazines are constitutional without the need for further review.

### 1.     LCMs Are Not "Arms."

The right protected under the Second Amendment applies only to "arms." *See Heller*, 554 U.S. at 581.  The *Heller* Court undertook to define "arms," looking first to the 1773 edition of Samuel Johnson's dictionary, which defined "arms" as "weapons of offence, or armour of defence."  *Id.* (citation omitted).  A LCM is not a "weapon of offence" or "armour."  Instead, it is a special type of ammunition storage device, which merely enhances a firearm's ability to fire more rounds

9

without reloading—it is neither an integral nor necessary component of the vast majority of firearms.[9]

While a magazine necessary to supply a firearm with *some* number of bullets may be considered integral to its core functionality, the same cannot be said of a magazine that expands that supply beyond 15 rounds.  Indeed, Appellants here have stipulated that "[w]ith very few exceptions, every gun that was available before July 1, 2013, is compatible with magazines holding 15 or fewer rounds." JA-1502-03.

As non-essential items that merely enhance a feature beyond what was previously available, LCMs are not "arms," but, rather, firearm *accessories*. Historical sources support the conclusion that firearm accessories are separate and distinct from "arms."  *See, e.g.*, Act for Regulating and Disciplining the Militia, 1785 Va. Acts ch. 1, § 3, p. 2 ("[O]fficers . . . shall constantly keep the aforesaid *arms*, *accoutrements*, and *ammunition*, ready to be produced whenever called for.") (emphasis added).  LCMs are not arms, *nor are they ammunition*.  They fall most readily into the separate category of accoutrements—i.e., accessories, akin to today's detachable scopes or silencers.

_____

[9] The *Heller* majority also relied on a historical legal definition of the term "arms":  "Servants and labourers shall use bows and arrows on Sundays, . . . and not bear other arms."  *Heller*, 554 U.S. at 581 (citing Timothy Cunningham, *A New and Complete Law Dictionary* (2d ed. 1771)).  The definition is instructive here: guns are like bows and bullets are like arrows, but the analog to a LCM— the quiver—is conspicuously *not* an "arm."

The "functionality" principle accords with definitions of "firearm accessories" found in state law. The state of Kansas, for example, recently defined "firearms accessories" as "items that are used in conjunction with or mounted upon a firearm but *are not essential to the basic function of a firearm*, including, but not limited to, telescopic or laser sights, *magazines*,…collapsible or adjustable stocks and grips, pistol grips, thumbhole stocks, speedloaders, [and] ammunition carries." Kan. Stat. Ann. § 50-1203(b) (emphasis added).

Here, the lower court specifically held that prohibitions on LCMs do not deprive gun owners of the magazines they need for their weapons to function. *See* JA-1777 ("The parties agree that semiautomatic weapons that use large-capacity magazines will also accept compliant magazines . . . and that compliant magazines can be obtained from manufacturers of large-capacity magazines.   Thus, this statute does not prevent the people of Colorado from possessing semiautomatic weapons for self-defense, or from using those weapons as they are designed to function. The only limitation imposed is how frequently they must reload their weapons.").[10]

Indeed, the firearm industry itself categorizes magazines as accessories.  For

---

[10] That most firearms are fully operable without LCMs and function perfectly well with standard, compliant magazines distinguishes LCMs fundamentally from, for example, ammunition.  *Cf. Jackson v. San Francisco*, 746 F.3d 953, 967 (9th Cir. 2014) (Without the ability to obtain ammunition, "the right to bear arms would be meaningless" by "mak[ing] it impossible to use firearms for their core purpose.") (citation omitted).

instance, Mississippi Auto Arms organizes its online store by item type, differentiating between items such as "firearms" and "ammunition," and offers magazines for sale under an entirely separate category: "accessories."[11]  Atlantic Firearms, Guns America, and Palmetto State Armory similarly categorize magazines as accessories, not firearms.[12]

Just as the Second Amendment does not protect a person's right to possess other non-essential accessories (i.e., accessories that do not affect a firearm's core functionality), such as silencers, it does not protect a right to possess LCMs.  *See United States v. McCartney*, 357 F. App'x. 73, 76 (9th Cir. 2009) (silencers are "not protected by the Second Amendment.").

### 2. Even If LCMs Are "Arms," They Are Still "Dangerous and Unusual" and Not Protected by the Second Amendment.

Even if LCMs are "arms," they still are not protected by the Second Amendment because they are "dangerous and unusual" weapons not typically possessed for lawful purposes.  The *Heller* Court explicitly endorsed the "historical tradition of prohibiting the carrying of dangerous and unusual weapons" and held that the Second Amendment "does not protect those weapons not typically

---

[11] *See* Mississippi Auto Arms, Inc., http://www.mississippiautoarms.com/sort-by-item-magazines-c-169_177.html.

[12] *See* Atlantic Firearms, http://www.atlanticfirearms.com/accessories.html; Guns America, http://www.gunsamerica.com/BrowseSpecificCategory/Parent/Non-Guns/ViewAll.htm; Palmetto State Armory, http://palmettostatearmory.com/index.php/accessories.html.

possessed by law-abiding citizens *for lawful purposes*."   554 U.S. at 625, *aff'g United States v. Miller*, 307 U.S. 174, 178 (1939) (short-barreled shotguns not protected by the Second Amendment because they are dangerous and unusual) (emphasis added) (internal quotation omitted).

Courts around the nation have confirmed the limited nature of the Second Amendment right recognized in *Heller*.  *See United States v. Decastro*, 682 F.3d 160, 165 n.4 (2d Cir. 2012) ("[T]he Second Amendment right does not encompass all weapons, but only those 'typically possessed by law-abiding citizens for lawful purposes' and thus does not include the right to possess 'dangerous and unusual weapons.'" (quoting *Heller*, 544 U.S. at 625, 627)); *United States v. Fincher*, 538 F.3d 868, 874 (8th Cir. 2008) (machine guns not protected by the Second Amendment as those firearms fall "within the category of dangerous and unusual weapons").

LCMs, which potentially enable a shooter to fire as many as 100 rounds without having to reload, are "dangerous and unusual."  The District Court in this case found that "large capacity magazines are frequently used in gun violence and mass shootings . . . [and] there is a positive correlation between the firearm ammunition capacity and the average number of shots fired during criminal aggression." JA-1782.  In *Kolbe v. O'Malley*, 42 F. Supp. 3d 768 (D. Md. 2014), a case also involving a challenge to a prohibition on LCMs, the court cited evidence

that LCMs are used "disproportionately" in mass shootings and "in the killing of law enforcement officers." *Id.* at 795. Indeed, "over the last three decades LCMs of more than ten rounds were used in thirty-four out of forty mass shootings in which the magazines capacity was known." *Id.*

Their exceedingly dangerous nature makes LCMs a popular choice for criminals and inappropriate for self-defense in the home. *See, e.g.*, *Hightower v. City of Boston*, 693 F.3d 61, 66, 71-72 & n.7 (1st Cir. 2012) (noting that "large capacity weapons" are not "of the type characteristically used to protect the home."). According to a former Baltimore Police Colonel, "[t]he typical self-defense scenario in a home does not require more ammunition than is available in a standard 6-shot revolver or 6-10 round semiautomatic pistol. In fact, because of potential harm to others in the household, passersby, and bystanders, too much firepower is a hazard." *See* Brian J. Siebel, Brady Ctr. To Prevent Gun Violence, Assault Weapons: Mass Produced Mayhem, 16 (2008), http://www.bradycampaign.org/sites/default/files/mass-produced-mayhem.pdf (quoting *Police Fear a Future of Armored Enemies*, USA Today, Mar. 3, 1997, at 02A). LCMs exacerbate the threat of stray bullets, because "the tendency for defenders [is] to keep firing until all bullets have been expended." *Id.*

Responsible, lawful self-defense does not require the ability to continuously spray a multitude of bullets without reloading. LCMs are better suited for

offensive, criminal purposes. Indeed, Appellants have conceded that AR-15s—dangerous weapons to which LCMs are frequently attached—are used for unlawful purposes. JA-1502. Here, the lower court found that a limitation on magazine capacity did not meaningfully impact "a person's ability to keep and bear (use) firearms for the *purpose of self-defense*," explaining that "[e]ven in the relatively rare scenario where the conditions are 'ideal' for defensive firing, there is no showing of a severe effect [of the magazine capacity limitation] on the defensive shooter." JA-1777, 1780. Similarly, the *Kolbe* court observed that "the plaintiffs can point to no instance where . . . LCMs were used or useful in an instance of self-defense in Maryland." 42 F. Supp. 3d at 790.

For the reasons discussed above, LCMs fall outside of the protection of the Second Amendment.

**C.    The Second Amendment Is Not Implicated by the Act's Background Check Requirement.**

Appellants argue that the Act's background check requirement with respect to private transfers violates the Second Amendment by burdening "an individual's right to borrow a firearm for lawful purposes, including for self-defense." JA-1785. However, this argument is baseless, as the Act does not even implicate the Second Amendment for at least three distinct reasons discussed below.

1. **Background Checks are an Essential Means of Enforcing the "Longstanding" and "Presumptively Lawful" Prohibitions on Firearm Possession for Certain Dangerous Persons.**

The Supreme Court stated in *Heller* that "nothing in our opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill . . . [w]e identify these presumptively lawful regulatory measures only as examples; our list does not purport to be exhaustive." 554 U.S. at 626-27, n.26. Background checks are intimately tied to these "longstanding" and "presumptively lawful" prohibitions.

The background check requirement is the mechanism for ensuring that those acquiring firearms are the "law-abiding, responsible citizens" identified in *Heller* as being entitled to Second Amendment protection. *Id.* at 652. If laws barring firearm possession for certain dangerous individuals are "presumptively lawful," then the laws necessary to enforce such prohibitions must also be presumptively lawful, and therefore fall outside the scope of the Second Amendment. *See United States v. Marzzarella,* 614 F.3d 85, 91 (3d Cir. 2010) (finding, in upholding a law prohibiting the possession of a firearm with an obliterated serial number, that the "presumptively lawful" categories identified by the *Heller* Court "are presumptively lawful because they regulate conduct outside the scope of the Second Amendment."); *Commonwealth v. McGowan*, 464 Mass. 232 (2013) (finding, in upholding a law requiring firearms to be stored with a safety

mechanism, that "the 'presumptively lawful' prohibitions and regulations do not burden conduct that falls within the scope of the Second Amendment and therefore are not subject to the heightened scrutiny . . .").

*Heller* also identified as "presumptively valid" those laws "forbidding the carrying of firearms in sensitive places such as schools and government buildings." 554 U.S. at 626, n.26.  Just as a law requiring the placement of metal detectors at the entrance of a school or other sensitive area serves as a necessary enforcement mechanism of this presumptively valid location prohibition, background checks act as an up-front screening mechanism, and only block firearm acquisition by those individuals already identified in *Heller* as falling outside the scope of the Second Amendment.  As the Massachusetts high court recently explained in the context of a decision upholding the state's safe storage law, "because [the law] is consistent with the right to bear arms in self-defense in one's home *and is designed to prevent those who are not licensed to possess or carry firearms from gaining access to firearms*, it falls outside the scope of the Second Amendment."  *McGowan*, 464 Mass. at 244 (emphasis added).

> **2.    The Presumptive Validity of Laws Placing Conditions on the Commercial Sale of Firearms Suggests the Presumptive Validity of Laws Placing Similar Conditions on Private Transfers.**

In addition to laws prohibiting firearm possession for certain categories of individuals, the *Heller* Court also expressly acknowledged that "laws imposing

conditions and qualifications on the commercial sale of arms" have been historically permissible and are "presumptively lawful." 554 U.S. at 626–27, n.26. For that reason, the District Court expressed "grave doubt" that the Act's background check requirement implicates the Second Amendment at all, reasoning that "if the government can lawfully regulate the ability of persons to obtain firearms from commercial dealers, that same power to regulate should extend to non-commercial transactions, lest the loophole swallow the regulatory purpose." JA-1785-86. In other words, the presumptive validity of laws concerning the commercial sale of firearms logically extends to private transfers as well. As the District Court found, "[n]othing in the Second Amendment can be read to suggest that a permissible burden on commercial sales of firearms cannot similarly be extended to apply to" non-commercial transfers. JA-1786.

### 3. Requiring Background Checks for Private Transfers Does Not Interfere with the Ability of Law-Abiding Individuals to Use Firearms for Self-Defense.

Finally, *Heller* instructs that the essence of the Second Amendment right is self-defense. *Heller*, 554 U.S. at 628 ("the inherent right of self-defense has been central to the Second Amendment right."). Extending Colorado's background check requirement to private transactions in no way interferes with a law-abiding citizen's ability to use a firearm for self-defense. Appellants claim that the Act infringes on Second Amendment rights by imposing a burden on the ability of

18

private parties to make *temporary* transfers, where the ownership of a firearm does not actually change hands.  Brief of Appellant-Petitioner at 30-31, No. 14-1290, Document 01019371775.  However, as the District Court noted, "it is not at all clear that the Second Amendment prevents the government from restricting the ability of persons to acquire firearms via temporary loans from others." JA-1785.

Importantly, the Act does not prevent the short-term loan of a firearm for self-defense purposes.  Under the Act, a background check is not required for a private firearm transfer that does not last longer than 72 hours.  C.R.S. § 18-12-112(6).  If an individual in an emergency situation were to temporarily borrow a friend or neighbor's firearm, for example, such a transfer would not require a background check.  In a hypothetical situation involving some potential longer-term danger, a law-abiding citizen may simply acquire a firearm via private or commercial transfer from one of the "more than 600 firearms dealers in Colorado" upon completion of a background check that "takes an average of less than fifteen minutes."  JA-1787.  The only individuals who would be unable to acquire a firearm in this scenario would be those already prohibited by law from doing so, such as convicted felons.  As *Heller* instructs, such individuals have no Second Amendment right to acquire a firearm.

Despite the District Court's "grave doubt" regarding the issue, it assumed that the Act's background check provisions implicate the Second Amendment for

purposes of its constitutional analysis.  For all the reasons stated above, this Court

need not make that same assumption, and should hold that the Act falls outside the

scope of the Second Amendment.

## II.    EVEN IF THE ACT IMPLICATES THE SECOND AMENDMENT, IT REMAINS CONSTITUTIONAL.

The fact that the Act does not burden the Second Amendment should end

this Court's inquiry.  *See, e.g., United States v. Reese*, 627 F.3d 792, 800-01 (10th

Cir. 2010).  But even if this Court were to radically expand the limited holding of

*Heller* and conclude that the Act implicates the Second Amendment, the Act would

still pass constitutional muster.  As the District Court correctly held, intermediate

scrutiny is the most appropriate level of review and the Act easily meets this

standard.  JA-1787.

### A.    If Heightened Scrutiny Is Necessary In Evaluating This Challenge, Strict Scrutiny Is Not Appropriate.

#### 1.    The Application of Strict Scrutiny to Firearm Regulations Is Generally Inappropriate.

Appellants suggest that the Act must be subject to strict scrutiny because the

Second Amendment protects a fundamental right.  Brief of Appellant-Petitioner at

24, 32, No. 14-1292, Document 01019371803, Brief of Appellant-Petitioner at 26-

29, No. 14-1290, Document 1019371775.  However, not all restrictions on

constitutional rights—even those that are fundamental—trigger strict scrutiny.

This Court has held that the appropriate level of scrutiny depends on "the type of

law challenged and the type of [Second Amendment restriction] at issue." *Reese*, 627 F.3d at 801 (quoting *Marzzarella*, 614 F.3d at 97).

The application of strict scrutiny is generally inappropriate in the evaluation of firearm regulations. Protecting public safety is the bedrock function of government, and guns have a "unique potential to facilitate death and destruction and thereby to destabilize ordered liberty." *McDonald v. City of Chicago*, 561 U.S. 742, 891 (2010) (Stevens, J., dissenting). Accordingly, state and local governments have a profound interest in safeguarding the public and law enforcement personnel from gun violence. *See Kelley v. Johnson*, 425 U.S. 238, 247 (1976) ("promotion of safety of persons and property is unquestionably at the core of the State's police power").

Nearly all courts that have chosen a level of scrutiny for evaluating Second Amendment claims, including this Court, have rejected the use of strict scrutiny. *See, e.g., Reese*, 627 F.3d at 802; *United States v. Huitron-Guizar*, 678 F.3d 1164, 1169 (10th Cir. 2012); *Woollard v. Gallagher*, 712 F.3d 865, 876 (4th Cir. 2013); *United States v. Masciandaro*, 638 F.3d 458, 471 (4th Cir. 2011); *Kachalsky v. Cnty. of Westchester*, 701 F.3d 81, 96 (2d Cir. 2012); *Heller v. Dist. of Columbia*, 670 F.3d 1244, 1256 (D.C. Cir. 2011) ("*Heller II*"); *Jackson*, 746 F.3d at 964-65; *United States v. Williams*, 616 F.3d 685, 691-93 (7th Cir. 2010); *Marzzarella*, 614 F.3d at 96-97; *United States v. Walker*, 709 F. Supp. 2d 460, 466 (E.D. Va. 2010).

21

*Cf.  Tyler v. Hillsdale County Sheriff's Dep't*, No. 13–1876, 2014 WL 7181334, at
*17 (6th Cir. Dec. 18, 2014).[13]

### 2.    Strict Scrutiny is Inconsistent with *Heller* and *McDonald*.

As "numerous other courts and legal scholars have pointed out, a strict
scrutiny standard of review" does "not square with the [*Heller*] majority's
references to 'presumptively lawful regulatory measures.'"    *Heller v. Dist. of
Columbia* (*"Heller III"*), 698 F. Supp. 2d 179, 187 (D.D.C. 2010) (citing *United
States v. Skoien*, 587 F.3d 803, 811 (7th Cir. 2009) (noting that the court did "not
see how the listed laws could be 'presumptively' constitutional if they were subject
to strict scrutiny")); *United States v. Marzzarella*, 595 F. Supp. 2d 596, 604 (W.D.
Pa. 2009) (observing that "the Court's willingness to presume the validity of
several types of gun regulations is arguably inconsistent with the adoption of a
strict scrutiny standard of review"); *see also* Dennis A. Henigan, *The Heller
Paradox*, 56 UCLA L. Rev. 1171, 1197-98 (2009) (stating "the *Heller* majority . . .
implicitly rejected strict scrutiny").

---

[13] The Sixth Circuit recently became the only federal appellate court to depart from
this consensus.  2014 WL 7181334, at *17.  However, *Tyler* dealt with a law
much more restrictive than the Act at issue here—one that permanently prohibits
any person involuntarily "committed to a mental institution" from purchasing or
possessing a firearm.  18 U.S.C. § 922(g)(4).  After reviewing "scores of
opinions presenting post-*Heller* Second Amendment challenges" the *Tyler* court
was careful to note that no other court of appeals had "reviewed a firearm
restriction as severe as this one—one that forever deprives a law-abiding, non-
violent, non-felon of his Second Amendment rights."  2014 WL 7181334 at *22.

Indeed, this Court has expressly rejected the indiscriminate application of strict scrutiny to firearm laws, explaining that courts determining the appropriate level of scrutiny for examination of firearm regulations must look to the scope of firearms prohibited and the scope of individuals affected by the regulation. *See Reese*, 627 F.3d at 802. In *Reese*, this Court cited the Third Circuit's *Marzzarella* opinion approvingly. *Marzzarella* concerned the federal government's prohibition on the possession of firearms with obliterated serial numbers. *Marzzarella*, 614 F.3d at 88. The Third Circuit held that strict scrutiny should not apply to that prohibition because "the law does not severely limit the possession of firearms." *Id.* at 97. The *Marzzarella* court compared the analysis to First Amendment jurisprudence, where content-based regulations must survive strict scrutiny, but time, place and manner restrictions need only survive intermediate scrutiny. *See id.* at 96. Indeed, the Second Circuit explained in *United States v. Decastro*, 682 F.3d 160 (2d Cir. 2012), that "it is . . . appropriate to consult principles from other areas of constitutional law, including the First Amendment":

> Regulation may "reduce to some degree the potential audience for [one's] speech" so long as "the remaining avenues of communication are [ ]adequate." . . . By analogy, [a] law that regulates the availability of firearms is not a substantial burden on the right to keep and bear arms if adequate alternatives remain for law-abiding citizens to acquire a firearm for self-defense.

*Id.* at 167-168 (citations omitted).[14]    As *Heller* specifically held, the Second Amendment does not confer—even in the home—"a right to keep and carry any weapon whatsoever." *Heller*, 554 U.S. at 626.

Here, the Act's prohibition on LCMs—a limited class of weapons that are particularly dangerous and ill-suited for self-defense—leaves citizens free to possess a vast array of firearms and magazines with which to defend themselves, including the "most preferred firearm in the nation" for self-defense purposes, the handgun.  *Heller*, 554 U.S. at 628-29.   Accordingly, the application of strict scrutiny to the Act's prohibition on LCMs is unwarranted.  This conclusion applies with even more force to the Act's background check provisions, because they in no way prohibit or reduce access to firearms for law-abiding citizens.

### B.    If Heightened Scrutiny Applies, Intermediate Scrutiny is the Appropriate Level of Review.

Because the Act does not substantially burden Second Amendment rights, intermediate scrutiny is the appropriate level of review, assuming that any heightened scrutiny is required at all.  Courts have reached the same conclusion in analogous cases, including cases involving prohibitions on certain classes of particularly dangerous weapons and those involving the mandatory registration of firearms.

---

[14] *Compare Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989) (upholding content-neutral regulations on the time, place, and manner of speech, aimed at limiting the volume of amplified music and speeches)

The *Heller II* court applied intermediate scrutiny to the District of Columbia's ban on assault weapons and LCMs. 670 F.3d at 1261-62. The court stated that the prohibition of assault weapons and LCMs was "more accurately characterized as a regulation of the manner in which persons may lawfully exercise their Second Amendment rights," since the prohibition did not "prevent a person from keeping a suitable and commonly used weapon for protection in the home." *Id.* at 1262. The court also summarized a fundamental distinction from the absolute handgun ban in *Heller*: "Unlike the law held unconstitutional in *Heller*, [bans on assault weapons and LCMs] do not prohibit the possession of the 'quintessential self-defense weapon,' to wit, the handgun." *Id.* at 1261-62 (quoting *Heller*, 544 U.S. at 629). A number of other courts have applied intermediate scrutiny to similar prohibitions. *Fyock v. Sunnyvale*, 779 F.3d 991, 999 (9th Cir. 2015); *Kolbe*, 42 F. Supp. 3d at 790; *Shew v. Malloy*, 994 F. Supp. 2d 234, 247–50 (D.Conn. 2014); *N.Y. State Rifle and Pistol Ass'n, Inc. v. Cuomo*, 990 F. Supp. 2d 349, 365–67, 371 (W.D.N.Y. 2013)

Courts have also applied intermediate scrutiny to other laws imposing conditions and requirements on the possession of firearms, such as registration requirements, which are analogous to the background checks required by the Act. In *Heller II*, for example, the court held that intermediate scrutiny was appropriate because "registration requirements do[] not severely limit the possession of

firearms…[i]ndeed, none of the District's registration requirements prevents an individual from possessing a firearm in his home or elsewhere, whether for self-defense or hunting, or any other lawful purpose." *Heller II*, 670 F.3d at 1257-58 (quotations omitted) (citing *Marzzarella*, 614 F.3d at 97).

For similar reasons, the District Court applied intermediate scrutiny to the laws at issue in this case. Citing evidence that obtaining a background check takes less than fifteen minutes to process, the lower court held that the imposition of a background check on private transfers "does not severely impact the Second Amendment right. . . . [a]ccordingly, intermediate scrutiny is appropriate." JA-1787. Similarly, the District Court explained that the ban on LCMs "does not ban any firearm nor does it render any firearm useless . . . [t]he only limitation imposed is how frequently they must reload their weapons." JA-1777.

## C.     The Background Check Requirement and LCM Ban Satisfy Intermediate Scrutiny.

Intermediate scrutiny requires a showing that the asserted governmental end is "significant," "substantial," or "important." *See, e.g., Turner Broad. Sys., Inc. v. F.C.C.*, 512 U.S. 622, 662 (1994); *United States v. Skoien*, 614 F.3d 638, 641-42 (7th Cir. 2010). It requires that the fit between the challenged regulation and the stated objective be reasonable, not perfect, and does not require that the regulation be the least restrictive means of serving the interest. *See, e.g., Lorrilard Tobacco*

*Co. v. Reilly*, 533 U.S. 525, 556 (2001); *Marzzarella*, 614 F.3d at 98; *Jackson*, 746 F.3d at 965. The Act easily satisfies this standard.

### 1.    Preservation of Public Safety and Prevention of Crime Are Paramount Government Interests.

In passing the Act, the Colorado Legislature was concerned by the enormous threat to public safety posed by LCMs, specifically in mass shootings. The District Court found that the use of LCMs in gun violence poses a serious threat to public safety. JA-1782. The court also characterized public safety as "undoubtedly an important governmental purpose." *Id.* Similarly, citing evidence that 40% of gun purchases are made through private sales, and that many gun crimes perpetrated by individuals with prior arrests or convictions could be prevented by imposing the background check requirement, the lower court held that the background check requirement serves the important government interests of "prevent[ing] crime and improv[ing] public safety." JA-1788.

### 2.    LCMs and Permitting Transfers of Firearms Without Background Checks Jeopardize Public Safety.

Because LCMs pose a significant threat to public safety, Colorado has a substantial interest in preventing devastating attacks committed with these weapons, such as the mass shooting at the movie theater in Aurora, Colorado. Colorado also has a substantial interest in protecting its law enforcement officers from harm. The prohibition on LCMs protects officers because gun users limited

to fifteen-round magazines must reload more frequently. For law enforcement confronting dangerous shootouts, "the 2 or 3 second pause to reload [ammunition] can be of critical benefit." *Heller v. Dist. of Columbia*, 698 F. Supp. 2d 179, 194 (D.D.C. 2010); *see also Kolbe*, 42 F. Supp. 3d at 795-96 (D. Md.). The District Court found that "[a] pause, of any duration, imposed on the offensive shooter can only be beneficial, allowing some period of time for victims to escape, victims to attack, or law enforcement to intervene."[15] JA-1783.

Likewise, a failure to impose background checks on private firearm transfers endangers public safety. The District Court cited evidence that 80% of criminals who use guns in crime acquired one through a private sale. JA-1788. For those who have prior arrest or conviction records, the required background check under the Act would result in the denial of a sale to the criminal. *Id.* For those reasons, the Court found that "private background checks will make it more difficult for prohibited individuals to acquire firearms, reduce the rate of diversion of firearms from legal commerce into the trafficking market, and reduce the firearm homicide rate." *Id.*

---

[15] Indeed, in the attack on Congresswoman Gabrielle Giffords in Tucson, Arizona in 2011, the shooter was only prevented from continuing his rampage because he was subdued while reloading his weapon.

### 3.     The Act is Substantially Related to the Government's Significant Interests.

This Court should affirm the District Court's ruling.  Given the real and immediate threats to public safety and law enforcement personnel posed by LCMs, Colorado has made the reasonable choice to prohibit access to these dangerous instruments of mass mayhem, while preserving access to a wide array of firearms and magazines for use in self-defense.  Since the most effective way to eliminate the danger posed by LCMs is to prohibit their use, possession, and sale, a substantial relationship clearly exists between the Act and the government's significant interests.  *Heller II*, 670 F.3d at 1263-64; *Fyock*, 779 F.3d at 1000-01; *Kolbe*, 42 F. Supp. 3d at 795; *Shew*, 994 F. Supp. 2d at 249-50; *N.Y. State Rifle*, 990 F. Supp. 2d at 371.  Similarly, the Act's background check provisions do not impinge on law-abiding citizens' ability to purchase any firearms.  Rather, these provisions only create a significant hurdle for criminals and other potentially dangerous individuals to obtain access to firearms.

The Act is a reasonable means of serving vital government interests that is neither overly broad nor arbitrary.  *See, e.g., Turner Broad. Sys.*, 512 U.S. at 662; *Heller II*, 670 F.3d at 1262; *Marzzarella*, 614 F.3d at 98. In the wake of the horrific 2012 Aurora movie theater shooting, the State of Colorado enacted constitutional policies that will help prevent such tragedies from occurring again, without unduly burdening the Second Amendment rights of law-abiding citizens.

## CONCLUSION

For all of the reasons set forth above, this Court should affirm the District

Court's Order.

Dated:         April 29, 2015
               Chicago, Illinois

                                   Respectfully submitted,


                                   KATTEN MUCHIN ROSENMAN LLP


                                   By: /s/Jonathan K. Baum
                                   JONATHAN K. BAUM
                                   525 West Monroe Street
                                   Chicago, Illinois 60661-3693
                                   (312) 902-5200
                                   www.kattenlaw.com

                                   KATTEN MUCHIN ROSENMAN LLP
                                   MARK T. CIANI
                                   575 Madison Avenue
                                   New York, New York 10022-2585
                                   Tel:   (212) 940-8800
                                   www.kattenlaw.com

                                   *Counsel for Amicus Curiae Law Center to*
                                   *Prevent Gun Violence*

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitations of Fed. R. App. P. 28(e)(2)(a) because this brief contains 6,956 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(viii).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word 2010 in 14-point Times New Roman font.

Dated: April 29, 2015

/s/Jonathan Baum
Jonathan Baum, Esq.

*Counsel for Amicus Curiae Law Center to Prevent Gun Violence*

103539525

## CERTIFICATE OF DIGITAL SUBMISSION

I hereby certify that with respect to the foregoing:

(1) Privacy redactions were not required on any page of this brief.

(2) The ECF submission is an exact duplicate of the seven hard copies to be delivered to the clerk's office pursuant to 10th Cir. R. 31.5.

(3) The digital form of this pleading submitted to the Court was scanned for viruses using Trend Micro Titanium Internet Security (most recent virus definition created on April 17, 2015), and, according to the program, the document is virus-free.

KATTEN MUCHIN ROSENMAN LLP

April 29, 2015                    /s/Jonathan K. Baum
                                  JONATHAN K. BAUM
                                  525 West Monroe Street
                                  Chicago, Illinois 60661-3693
                                  (312) 902-5200
                                  www.kattenlaw.com

                                  MARK T. CIANI
                                  575 Madison Avenue
                                  New York, New York 10022-2585
                                  Tel:   (212) 940-8800
                                  www.kattenlaw.com

                                  *Counsel for Amicus Curiae Law Center to Prevent Gun Violence*

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing Brief of *Amicus Curiae* was served via ECF on the following:

| | |
|---|---|
| Douglas Abbott | dabbott@hollandhart.com |
| Anna M. Barvir | abarvir@michellawyers.com |
| Marc F. Colin | mcolin@brunolawyers.com |
| Parker Douglas | pdouglas@utah.gov |
| Anthony Fabian | fabianlaw@qwestoffice.net |
| Matthew D. Grove | matt.grove@state.co.us |
| Brian S. Koukoutchos | bkoukoutchos@gmail.com |
| Peter Krumholz | pkrumholz@halewestfall.com |
| John T. Lee | jtlee@state.co.us |
| Peter Kenneth Michael | peter.michael@wyo.gov |
| Carl D. Michel | cmichel@michellawyers.com |
| Clinton B. Monfort | cmonfort@michellawyers.com |
| LeeAnn Morrill | leeann.morrill@state.co.us |
| Dan M. Peterson | dan@danpetersonlaw.com |
| Stephanie Scoville | Stephanie.scoville@state.co.us |
| Kathleen Spalding | kit.spalding@state.co.us |

Richard A. Westfall                                    rwestfall@halewestfall.com

David Kopel                                                david@i2i.org

I hereby certify that a true and correct copy of the foregoing Brief of *Amicus Curiae* was served via-email on the following:

Jonathan Michael Anderson                      jmanderson@hollandhart.com

Jonathan Patrick Fero                              jon.fero@state.co.us

Molly Allen Moats                                   molly.moats@state.co.us

Charles J. Cooper                                    ccooper@cooperkirk.com

I hereby certify that a true and correct copy of the foregoing Brief of *Amicus Curiae* was served FedEx Next Business Day Delivery on the following:

Tim Fox
Office of the Attorney General for the
State of Montana
215 North Sanders
Helena, MT 59620-1401
(406) 444-2026

Lawrence G. Wasden
Office of the Attorney General for the
State of Idaho
700 West Jefferson Street, Suite 210
Boise, ID 83720-0010
(208) 334-2400

Sean D. Reyes
Office of the Attorney General for the
State of Utah
160 East 300 South, 6th Floor
Salt Lake City, UT 84114
(801) 366-0260

Alan Wilson
Office of the Attorney General for the
State of South Carolina
1000 Assembly Street, Room 519
Columbia SC 29211
(803) 734-3970

KATTEN MUCHIN ROSENMAN LLP

April 29, 2015

/s/Jonathan K. Baum

JONATHAN K. BAUM
525 West Monroe Street
Chicago, Illinois 60661-3693
(312) 902-5200
www.kattenlaw.com

MARK T. CIANI
575 Madison Avenue
New York, New York 10022-2585
Tel:    (212) 940-8800
www.kattenlaw.com

*Counsel for Amicus Curiae Law Center to
Prevent Gun Violence*