**14-1290, 14-1292**

# United States Court of Appeals
# for the Tenth Circuit

COLORADO OUTFITTERS ASSOCIATION, et al.,

*Plaintiffs-Appellants,*

v.

JOHN W. HICKENLOOPER, Governor of the State of Colorado,

*Defendant-Appellee.*

───────────────────────

JIM BEICKER, Sheriff of Fremont County, et al.,

*Plaintiffs-Appellants,*

v.

JOHN W. HICKENLOOPER, Governor of the State of Colorado,

*Defendant-Appellee.*

──────────

On Appeal from the United States District Court for the
District of Colorado, No. 13-cv-01300 (Krieger, C.J.)

**BRIEF FOR THE STATES OF NEW YORK, CONNECTICUT, HAWAII,
ILLINOIS, IOWA, MARYLAND, MASSACHUSETTS, OREGON, AND
WASHINGTON, AND THE DISTRICT OF COLUMBIA
AS AMICI CURIAE IN SUPPORT OF APPELLEE**

BARBARA D. UNDERWOOD
 *Solicitor General*
ANISHA S. DASGUPTA
 *Deputy Solicitor General*
CLAUDE S. PLATTON
 *Assistant Solicitor General*
  *of Counsel*

ERIC T. SCHNEIDERMAN
 *Attorney General of the
 State of New York*
Attorney for State of New York
120 Broadway
New York, New York 10271
(212) 416-8020

Dated: April 29, 2015

*Additional counsel listed on signature page*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES..................................................................iii

INTEREST OF AMICI CURIAE.............................................................. 1

SUMMARY OF ARGUMENT ................................................................ 2

ARGUMENT ....................................................................................... 4

POINT I - THE SECOND AMENDMENT AUTHORIZES
STATE EXPERIMENTATION WITH MEASURES
TO PREVENT GUN VIOLENCE AND GUN
FATALITIES ..................................................................... 4

    A. The Second Amendment Preserves the States'
Authority to Enact Firearm Restrictions in
Furtherance of Public Safety. ........................................ 5

    B. The Second Amendment Does Not Require Strict
Scrutiny of All Firearm Regulations that Extend
Within the Home or Apply to Law-Abiding
Citizens..................................................................... 13

        1. Strict scrutiny is not required where a
regulation does not substantially burden the
Second Amendment right...................................... 15

        2. Place-specific distinctions have less salience
for restrictions aiming to limit access to
dangerous firearm features.................................... 20

POINT II - HEIGHTENED SCRUTINY DOES NOT LIMIT
THE SOURCES A COURT MAY CONSIDER
WHEN ASSESSING MEANS-ENDS FIT ....................... 24

    A. Courts May Consider Post-Enactment Evidence
of Means-Ends Fit........................................................ 25

i

## TABLE OF CONTENTS (cont'd)

**Page**

B. Plaintiffs' Amici Rely on Inapposite Precedents in Which Legislative Motivation Was at Issue................29

C. Intermediate Scrutiny Does Not Authorize Courts to Second-Guess the Foundation of a Legislature's Policy Judgment....................................31

CONCLUSION ........................................................................34

# TABLE OF AUTHORITIES

**Cases**                                                                 **Page(s)**

*Carver v. Nixon,*
   72 F.3d 633 (8th Cir. 1995)................................................................. 29

*Chaplinsky v. New Hampshire,*
   315 U.S. 568 (1942)........................................................................... 7

*City of Renton v. Playtime Theatres, Inc.,*
   475 U.S. 41 (1986)............................................................................. 33

*City of Richmond v. J.A. Croson Co.,*
   488 U.S. 469 (1989)...................................................................... 29, 30

*Concrete Works of Colo., Inc. v. City & County of Denver,*
   36 F.3d 1513 (10th Cir. 1994) ............................................................ 27

*District of Columbia v. Heller,*
   554 U.S. 570 (2008).................................................................. passim

*Doe v. City of Albuquerque,*
   667 F.3d 1111 (10th Cir. 2012).................................................... 19, 29

*Drake v. Filko,*
   724 F.3d 426 (3d Cir. 2013)............................................................... 28

*Ewing v. California,*
   538 U.S. 11 (2003)............................................................................. 7

*Ezell v. City of Chicago,*
   651 F.3d 684 (7th Cir. 2011) ............................................................. 18

*Fla. Bar v. Went For It, Inc.,*
   515 U.S. 618 (1995)......................................................................... 29

*Friedman v. City of Highland Park, Ill.,*
   2015 WL 1883498 (7th Cir. Apr. 27, 2015) ................................... passim

*Heller v. District of Columbia,*
   670 F.3d 1244 (D.C. Cir. 2011)............................................. 17, 20, 21

## TABLE OF AUTHORITIES (cont'd)

**Cases**                                                                                   **Page(s)**

*Hutchins v. District of Columbia,*
   188 F.3d 531 (D.C. Cir. 1999) .................................................. 29, 30, 33

*Jackson v. City and County of San Francisco,*
   746 F.3d 953 (9th Cir. 2014) ........................................................ 17, 20

*Kachalsky v. County of Westchester,*
   701 F.3d 81 (2d Cir. 2012) ............................................... 14, 23, 25, 28

*Kitchen v. Herbert,*
   755 F.3d 1193 (10th Cir.) ............................................................. 25, 29

*Kwong v. Bloomberg,*
   723 F.3d 160 (2d Cir. 2013) ................................................................ 16

*Landell v. Sorrell,*
   382 F.3d 91 (2d Cir. 2004) ................................................................. 29

*McDonald v. City of Chicago,*
   561 U.S. 742 (2010) ................................................................... passim

*Mincey v. Arizona,*
   437 U.S. 385 (1978) ............................................................................. 7

*New York v. Quarles,*
   467 U.S. 649 (1984) ............................................................................. 7

*Oregon v. Ice,*
   555 U.S. 160 (2009) ........................................................................... 13

*Patterson v. New York,*
   432 U.S. 197 (1977) ........................................................................... 13

*Peruta v. County of San Diego,*
   742 F.3d 1144 (9th Cir. 2014) ...................................................... 15, 29

*Peterson v. Martinez,*
   707 F.3d 1197 (10th Cir. 2013) .......................................................... 14

## TABLE OF AUTHORITIES (cont'd)

**Cases**                                                                    **Page(s)**

*Randall v. Sorrell,*
548 U.S. 230 (2006)......................................................................29

*Rothe Dev. Corp. v. U.S. Dep't of Def.,*
262 F.3d 1306 (Fed. Cir. 2001) ......................................................30

*Rothe Dev. Corp. v. Dep't of Def.,*
413 F.3d 1327 (Fed. Cir. 2005) ......................................................29

*Sable Commc'ns of Cal., Inc. v. FCC,*
492 U.S. 115 (1989).....................................................................27

*Schenk v. United States,*
249 U.S. 47 (1919).........................................................................7

*Shaw v. Hunt,*
517 U.S. 899 (1996).....................................................................29

*Thompson v. Oklahoma,*
487 U.S. 815 (1988).....................................................................24

*Turner Broad. Sys., Inc. v. FCC,*
512 U.S. 622 (1994).............................................................25, 26

*Turner Broad. Sys., Inc. v. FCC,*
520 U.S. 180 (1997).......................................................25, 26, 27

*United States v. Carter,*
669 F.3d 411 (4th Cir. 2012) ........................................................28

*United States v. Decastro,*
682 F.3d 160 (2d Cir. 2012) .........................................................20

*United States v. Huitron-Guizar,*
678 F.3d 1164 (10th Cir. 2012)......................................................4

*United States v. Lopez,*
514 U.S. 549 (1995).......................................................................5

v

# TABLE OF AUTHORITIES (cont'd)

**Cases**                                                          **Page(s)**

*United States v. Marzzarella,*
   614 F.3d 85 (3d Cir. 2010)............................................................. 18, 20

*United States v. Masciandaro,*
   638 F.3d 458 (4th Cir. 2011) ................................................. 15, 21, 23

*United States v. Morrison,*
   529 U.S. 598 (2000)................................................................................5

*United States v. Reese,*
   627 F.3d 792 (10th Cir. 2010)....................................................... 14, 15

*United States v. Skoien,*
   614 F.3d 638 (7th Cir. 2010) ............................................................. 28

*United States v. Williams,*
   616 F.3d 685 (7th Cir. 2010) ............................................................. 14

*Video Software Dealers Ass'n v. Schwarzenegger,*
   556 F.3d 950 (9th Cir. 2009).............................................................. 29

*Woollard v. Gallagher,*
   712 F.3d 865 (4th Cir. 2013)............................................................. 14

## Miscellaneous Authorities

Bureau of Justice Statistics, "Guns Used in Crime" (July 1995),
   *available at* http://www.bjs.gov/content/pub/pdf/GUIC.PDF
   (last visited Jan. 7, 2015)....................................................................22

FBI, *Crime in the United States 2013*, tbl. 20,
   *available at* http://www.fbi.gov/about-us/cjis/ucr/crime-in-the-
   u.s/2013/crime-in-the-u.s.-2013/tables/table-20
   (last visited Apr. 29, 2015)...................................................................9

## TABLE OF AUTHORITIES (cont'd)

**Miscellaneous Authorities**                                    **Page(s)**

FBI, *Crime in the United States 2013*, tbl. 22, *available at*
  http://www.fbi.gov/about-us/cjis/ucr/crime-in-the-
  u.s/2013/crime-in-the-u.s.-2013/tables/table-22
  (last visited Jan. 7, 2015)........................................................................9

FBI, "Overview," *Law Officers Killed & Assaulted 2012*, *available
  at* http://www.fbi.gov/about-us/cjis/ucr/leoka/2012/officers-
  feloniously-killed/felonious_topic_page_-2012
  (last visited Jan. 7, 2015)......................................................................10

FBI, "Uniform Crime Reporting Statistics: Their Proper Use,"
  (January 2011), *available at* http://www.fbi.gov/about-
  us/cjis/ucr/ucr-statistics-their-proper-use
  (last visited Apr. 29, 2015)......................................................................9

"Large Capacity Ammunition Magazines Policy Summary:
  Summary of State Law" (May 31, 2013),
  http://smartgunlaws.org/large-capacity-ammunition-magazines-
  policy-summary/#state (last visited Apr. 29, 2015) ...........................11

Law Ctr. to Prevent Gun Violence, "Assault Weapons Policy
  Summary: Summary of State Law" (June 19, 2013),
  http://smartgunlaws.org/assault-weapons-policy-
  summary/#state (last visited Jan. 7, 2015) .......................................11

Law Ctr. to Prevent Gun Violence, "Concealed Weapons
  Permitting Policy Summary: Summary of State Law"
  (Aug. 28, 2013), http://smartgunlaws.org/concealed-weapons-
  permitting-policy-summary/#state (last visited Jan. 7, 2015)...........10

Law Ctr. to Prevent Gun Violence, "Universal Background Checks
  & the Private Sale Loophole Policy Summary: Summary of
  State Law (Aug. 21, 2013), http://smartgunlaws.org/universal-
  gun-background-checks-policy-summary/#state
  (last visited Jan. 7, 2015)......................................................................11

## TABLE OF AUTHORITIES (cont'd)

**Miscellaneous Authorities**                                    **Page(s)**

Office of the State's Attorney, *Report of the State's Attorney for the Judicial District of Danbury on the Shootings at Sandy Hook Elementary School* (Nov. 25, 2013), *available at* http://www.ct.gov/csao/lib/csao/Sandy_Hook_Final_Report.pdf (last visited Jan. 7, 2015).....................................................................23

## INTEREST OF AMICI CURIAE

New York, Connecticut, Hawaii, Illinois, Iowa, Maryland, Massachusetts, Oregon, Washington, and the District of Columbia file this brief under Rule 29(a) of the Federal Rules of Appellate Procedure. The amici States seek to protect their sovereign prerogative to enact and implement legislation that advances their compelling interest in promoting public safety, preventing crime, and reducing the negative effects of firearm violence. The amici States have each taken different approaches to addressing the problem of firearm violence based on their own determinations about the measures that will best meet the needs of their citizens. They join this brief not because they necessarily believe that Colorado has chosen the optimal policy for itself—or that Colorado's approach would be optimal for them—but because they believe that Colorado's decision to (1) restrict access to large-capacity ammunition magazines and (2) require background checks for many private firearm transfers represent policy choices that Colorado should be constitutionally free to adopt.

The enactment by States of reasonable firearm regulations that are substantially related to the achievement of an important

governmental interest is fully compatible with the right to keep and bear arms protected by the Second Amendment. The amici States are concerned that the absolutist reading of the Second Amendment advanced by the plaintiffs and their amici threatens to tie the hands of the States in responding to threats to public safety, even in the absence of any substantial burden on the Second Amendment right. Moreover, the searching judicial review of legislative decision-making that plaintiffs and their amici seek would impermissibly impinge on the States' policymaking authority.

## SUMMARY OF ARGUMENT

Colorado Revised Statute § 18-12-302 restricts access to ammunition magazines capable of holding more than fifteen rounds—a firearm feature that enables the rapid firing of a large number of bullets without reloading. Colorado Revised Statute § 18-12-112 extends Colorado's requirement of criminal-background checks to many private transfers of firearms. The Colorado General Assembly determined that these measures would advance public safety by reducing firearm injuries and fatalities, including in mass shootings and confrontations

with law enforcement, and by keeping firearms out of the hands of persons who are forbidden by law to possess them. This appeal presents the question whether a State may enact such measures, consistent with the Second Amendment, in order to protect its citizens from the devastating effects of firearm violence. The court below correctly recognized that the Second Amendment does not bar States from restricting access to particularly dangerous firearm features or requiring background checks. Such restrictions are likely to advance public safety without significantly burdening the core Second Amendment right.

Plaintiffs' conception of the Second Amendment would deprive States of the flexibility to address the problem of gun violence in a manner consistent with local needs and values. The Supreme Court, however, has affirmed that the Second Amendment permits state experimentation with reasonable gun regulation. Moreover, no court of appeals has accepted the contention that strict scrutiny must apply to a firearm regulation simply because it covers law-abiding citizens and extends to the home, irrespective of any burden on the core Second Amendment right.

Plaintiffs also urge this Court to adopt a novel and exacting approach to judicial review of legislation implicating Second

3

Amendment rights. They assert that only the evidence that was before the legislature prior to enactment may be examined when evaluating means-ends fit, and that other probative evidence may not be considered. But heightened scrutiny does not circumscribe the sources a court may consider when assessing the constitutionality of legislation. And, even if it did, the record before the General Assembly here amply satisfies that requirement.

## ARGUMENT

### POINT I

### THE SECOND AMENDMENT AUTHORIZES STATE EXPERIMENTATION WITH MEASURES TO PREVENT GUN VIOLENCE AND GUN FATALITIES

The Second Amendment confers an individual right to bear arms, but that right "is not unlimited." *District of Columbia v. Heller*, 554 U.S. 570, 626 (2008). Rather, the Second Amendment protects the "right of law-abiding, responsible citizens to use arms in defense of hearth and home." *Id.* at 634-35; *see United States v. Huitron-Guizar*, 678 F.3d 1164, 1170 (10th Cir. 2012). As explained below, the Second Amendment preserves the States' authority to experiment with reasonable measures to reduce firearm violence. And that authority is not diminished merely

4

because a restriction—like the restriction on large-capacity magazines challenged here—regulates the possession of a dangerous firearm feature in the home as well as in public.

## A. The Second Amendment Preserves the States' Authority to Enact Firearm Restrictions in Furtherance of Public Safety.

The States have primary responsibility for ensuring public safety. *See United States v. Morrison*, 529 U.S. 598, 618 (2000) ("[W]e can think of no better example of the police power . . . reposed in the States[] than the suppression of violent crime and vindication of its victims."); *United States v. Lopez*, 514 U.S. 549, 561 n.3 (1995) ("Under our federal system, the States possess primary authority for defining and enforcing the criminal law." (quotation marks omitted)). This includes a duty to take steps to reduce the likelihood that a State's citizens will fall victim to preventable firearm violence. Indeed, in responding to the problem of gun violence, "the theory and utility of our federalism are revealed, for the States may perform their role as laboratories for experimentation to devise various solutions where the best solution is far from clear." *Lopez*, 514 U.S. at 581 (Kennedy, J., concurring).

5

The Second Amendment does not bar the States' democratically chosen representatives from considering every policy proposal that, in furtherance of public safety, might limit access to particular firearm features or firearms in some way. To the contrary, the Supreme Court has made clear that the constitutional protection of the right to bear arms, while imposing "limits" on policy alternatives, "by no means eliminates" the States' "ability to devise solutions to social problems that suit local needs and values." *McDonald v. City of Chicago*, 561 U.S. 742, 785 (2010) (plurality op.); *see Friedman v. City of Highland Park, Ill.*, — F.3d —, 2015 WL 1883498, at *5 (7th Cir. Apr. 27, 2015) ("Within the limits established by the Justices in *Heller* and *McDonald*, federalism and diversity still have a claim."). The Court affirmed that "state and local experimentation with reasonable firearms regulations will continue under the Second Amendment." *Id.* (quotation marks and brackets omitted).

In this case, plaintiffs assert a conception of the Second Amendment that would tie the hands of States in addressing the indisputable problem of firearm violence. In effect, plaintiffs would have this Court constitutionalize their own policy preferences regarding firearms, thereby foreclosing Colorado from making different choices. That approach is

inconsistent with the treatment of other guarantees in the Bill of Rights and with the Supreme Court's decisions in *Heller* and *McDonald*.

The Supreme Court has long recognized public safety as a compelling governmental interest that may support limits on enumerated constitutional rights. For example, the Court has held that the First Amendment's protection of speech does not extend to fighting words or incitements to violence, *see, e.g.*, *Chaplinsky v. New Hampshire*, 315 U.S. 568, 571-72 (1942), or to falsely shouting fire in a crowded theater, *see Schenk v. United States*, 249 U.S. 47, 52 (1919). Similarly, in the Fifth Amendment context, the Court has recognized a public-safety exception to the requirement to provide Miranda warnings before a suspect's answers may be admitted into evidence. *New York v. Quarles*, 467 U.S. 649, 655-56 (1984). The Court has held that the Eighth Amendment does not prohibit long sentences under "three-strikes" laws because of the special public-safety dangers posed by recidivist offenders. *See Ewing v. California*, 538 U.S. 11, 24-26 (2003) (plurality op.). And it has explained that the protections of the Fourth Amendment yield to the interest in public safety when exigent circumstances exist. *See Mincey v. Arizona*, 437 U.S. 385, 392-93 (1978).

The government interest in promoting public safety is no less compelling in the context of the Second Amendment. Indeed, the Supreme Court, "aware of the problem of handgun violence in this country," has made clear that policymakers retain "a variety of tools for combating that problem." *Heller*, 554 U.S. at 636. The Court has elaborated on this point by identifying a list—which "does not purport to be exhaustive"—of "presumptively lawful" firearms regulations. *Id.* at 626-27 & n.26. These include complete prohibitions on carrying concealed weapons, *id.* at 626; bans on the possession of firearms by felons and the mentally ill and on carrying firearms in sensitive places, *id.*; and bans on carrying "dangerous and unusual weapons," including weapons "not typically possessed by law-abiding citizens for lawful purposes," *id.* at 625, 627 (discussing *United States v. Miller*, 307 U.S. 174 (1939)). These regulatory measures all derive from concerns for public safety, and for that reason are presumptively consistent with the Second Amendment's guarantee.

The Second Amendment affords state lawmakers latitude to respond to concerns for public safety in a variety of ways. Although firearm violence is a national problem, "conditions and problems differ from

8

locality to locality," *McDonald*, 561 U.S. at 783 (plurality op.), and from State to State. The FBI has identified numerous factors "known to affect the volume and type of crime occurring from place to place," including population density, composition, and stability, and the extent of urbanization; economic conditions, including median income, poverty level, and job availability; the strength of law enforcement; and the policies of other components of the criminal-justice system, including prosecutors, courts, and probation and correctional agencies.[1] These and many other factors vary widely across States (and within them). As a result, the number of murders and aggravated assaults committed with firearms vary significantly from State to State.[2] There are also notable

---

[1] FBI, "Uniform Crime Reporting Statistics: Their Proper Use," (January 2011), *available at* http://www.fbi.gov/about-us/cjis/ucr/ucr-statistics-their-proper-use (last visited Apr. 29, 2015).

[2] Murders: FBI, *Crime in the United States 2013*, tbl. 20, *available at* http://www.fbi.gov/about-us/cjis/ucr/crime-in-the-u.s/2013/crime-in-the-u.s.-2013/tables/table-20 (last visited Apr. 29, 2015); Aggravated assaults: FBI, *Crime in the United States 2013*, tbl. 22, *available at* http://www.fbi.gov/about-us/cjis/ucr/crime-in-the-u.s/2013/crime-in-the-u.s.-2013/tables/table-22 (last visited Apr. 29, 2015).

regional variations in the number of law-enforcement officers killed in the line of duty, almost all of whom were killed with firearms.[3]

In light of these distinctions, and as contemplated by our federalism, policymakers in different jurisdictions have varied in their approaches to addressing threats to public safety from firearm violence. Forty-six States require a permit to carry a concealed firearm, although they afford different degrees of discretion to licensing authorities.[4] Seventeen States (including Colorado) and the District of Columbia require some form of background check for certain private firearms

---

[3] *See* FBI, "Overview," *Law Officers Killed & Assaulted 2013* (noting that, in 2012, "[b]y region, 15 officers were feloniously killed in the South, 6 officers in the West, 4 officers in the Midwest, and 2 officers in the Northeast," and that 26 of those 27 officers were killed with firearms), *available at* http://www.fbi.gov/about-us/cjis/ucr/leoka/2013/officers-feloniously-killed/felonious_topic_page_-2013 (last visited Apr. 29, 2015).

[4] Law Ctr. to Prevent Gun Violence, "Concealed Weapons Permitting Policy Summary: Summary of State Law" (Aug. 28, 2013), http://smartgunlaws.org/concealed-weapons-permitting-policy-summary/#state (last visited Apr. 29, 2015).

transactions.[5] And eight States (including Colorado) and the District of Columbia restrict assault weapons, large-capacity magazines, or both.[6]

Given the unique conditions in each State and the "divergent views on the issue of gun control" held by the citizens of those States, *McDonald*, 561 U.S. at 783 (plurality op.), an approach to firearm violence that may be appropriate or effective in one State may not be appropriate or effective in another. But all States have an interest in maintaining flexibility to enact common-sense regulations aimed at minimizing the adverse effects of firearm violence while protecting the right of law-abiding citizens to use arms in defense of hearth and home. Neither the policy choices of other States, nor the policy preferences of plaintiffs here, should limit Colorado's ability to respond to the unique

---

[5] Law Ctr. to Prevent Gun Violence, "Universal Background Checks & the Private Sale Loophole Policy Summary: Summary of State Law (Aug. 21, 2013), http://smartgunlaws.org/universal-gun-background-checks-policy-summary/#state (last visited Apr. 29, 2015).

[6] *See* Law Ctr. to Prevent Gun Violence, "Assault Weapons Policy Summary: Summary of State Law" (June 19, 2013), http://smartgunlaws.org/assault-weapons-policy-summary/#state (last visited Apr. 29, 2015); "Large Capacity Ammunition Magazines Policy Summary: Summary of State Law" (May 31, 2013), http://smartgunlaws.org/large-capacity-ammunition-magazines-policy-summary/#state (last visited Apr. 29, 2015).

circumstances of firearm violence within its borders. *See Friedman*, 2015 WL 1883498, at \*6 ("[T]he Constitution establishes a federal republic where local differences are cherished as elements of liberty, rather than eliminated in a search for national uniformity.").

States must have the ability to try a variety of policies to reduce the negative effects of firearm violence—and, especially, the daunting challenges presented by mass-shooting incidents, which threaten law-enforcement officers, public safety, and the public's sense of security. And indeed, the Supreme Court has assured that such policy experimentation will be allowed to proceed, as long as it does not transgress the basic limitations imposed by the constitutional right. The Second Amendment imposes some "limits" on policy alternatives, but it "*by no means eliminates*" the States' "ability to devise solutions to social problems that suit local needs and values." *McDonald*, 561 U.S. at 785 (plurality op.) (emphasis added). Underscoring the degree to which States retain flexibility to devise new regulatory measures and to maintain existing ones, the Supreme Court has cautioned that "it should not be thought that the cases decided by . . . judges" under the pre-*Heller* understanding of the Second Amendment "would necessarily

have come out differently under a proper interpretation of the right," *Heller*, 554 U.S. at 624 n.24.

As the Supreme Court recently explained, "[w]e have long recognized the role of States as laboratories for devising solutions to difficult legal problems. This Court should not diminish that role absent impelling reason to do so." *Oregon v. Ice*, 555 U.S. 160, 171 (2009) (citation omitted). That is especially true when dealing with state efforts to control crime, which is "'much more the business of the States than it is of the Federal Government.'" *Id.* at 170-71 (quoting *Patterson v. New York*, 432 U.S. 197, 201 (1977)). The courts "should not lightly construe the Constitution so as to intrude upon" the States' crime-fighting efforts. *Patterson*, 432 U.S. at 201.

### B.  The Second Amendment Does Not Require Strict Scrutiny of All Firearm Regulations that Extend Within the Home or Apply to Law-Abiding Citizens.

Plaintiffs assert that any law implicating the Second Amendment triggers strict scrutiny if it extends within the home (*see* Br. for Sheriffs and David Strumillo (Sheriffs' Br.) 23-24) or applies to law-abiding citizens (*see* Br. for Nonprofit Organizations, *et al.* (Nonprofits' Br.) 26-

13

27). But although strict scrutiny may be especially inappropriate where a law affects only the carrying of firearms in public places[7] or by non-law-abiding citizens,[8] a law that covers all places or all citizens is not for that reason alone subject to strict scrutiny.

No court has held that strict scrutiny is required merely because a firearm regulation—like the restriction of large-capacity magazines at issue here—applies within the home or regulates conduct of law-abiding citizens. Moreover, a distinction between the home and the public sphere cannot sensibly be drawn with respect to restrictions of firearm features that pose a risk to public safety even when possessed in the home.

---

[7] *See Woollard v. Gallagher*, 712 F.3d 865, 876 (4th Cir.) (limitations on public carrying of firearms subject to intermediate scrutiny), *cert. denied*, 134 S. Ct. 422 (2013; *Kachalsky v. County of Westchester*, 701 F.3d 81, 93 (2d Cir. 2012) (same); *cf. Peterson v. Martinez*, 707 F.3d 1197, 1211 (10th Cir. 2013) (holding that "the Second Amendment does not confer a right to carry concealed weapons").

[8] *See United States v. Reese*, 627 F.3d 792, 801 (10th Cir. 2010) (applying intermediate scrutiny to restrictions on firearm possession by individuals under domestic-protection orders); *United States v. Williams*, 616 F.3d 685, 692 (7th Cir. 2010) (applying intermediate scrutiny to statute prohibiting firearm possession by convicted felons).

### 1. Strict scrutiny is not required where a regulation does not substantially burden the Second Amendment right.

The appropriate level of means-ends scrutiny under the Second Amendment depends on the extent to which the challenged regulation burdens the Second Amendment right to possess a firearm for self-defense. As this Court has recognized, "the Second Amendment can trigger more than one particular standard of scrutiny, depending, at least in part, upon the type of law challenged and the type of Second Amendment restriction at issue." *Reese*, 627 F.3d at 801 (quotation marks and brackets omitted). Some courts have assumed, without deciding, that strict scrutiny could be warranted for a regulation that imposes a "severe burden" on the right of armed self-defense in the home, "where the core *Heller* right applies." *United States v. Masciandaro*, 638 F.3d 458, 470 (4th Cir. 2011) (quotation marks omitted); *see Peruta v. County of San Diego*, 742 F.3d 1144, 1167-68 (9th Cir. 2014) (collecting cases), *pet'n for reh'g en banc granted*, 2015 WL 1381752 (9th Cir. Mar. 26, 2015). Thus, a regulation that substantially impinges on the right of law-abiding citizens to defend themselves in the home could face a higher level of scrutiny— such as the District of Columbia's handgun-storage regulation that made

15

it "*impossible* for citizens to use [firearms] for the core lawful purpose of self-defense," *Heller*, 554 U.S. at 630 (emphasis added).

A less burdensome restriction, however, would not trigger strict scrutiny—even if it applies within the home or regulates the conduct of law-abiding citizens. Indeed, no court of appeals has applied strict scrutiny solely based on the places or persons to which it applies. To the contrary, the Second Circuit, for example, has determined that strict scrutiny is appropriate only for firearm restrictions that "ban the right to keep and bear arms"—like the District of Columbia statute invalidated in *Heller*—and not for restrictions that "impose[] a burden on the right." *Kwong v. Bloomberg*, 723 F.3d 160, 168 n.16 (2d Cir. 2013), *cert. denied sub nom. Kwong v. de Blasio*, 134 S. Ct. 2696 (2014). When applying these principles to New York City's firearms-licensing fee in a case brought by persons seeking to possess handguns in the home, the Second Circuit noted that although *any* form of "heightened scrutiny [might be] unwarranted," it was unnecessary to decide the issue because the challenged regulation "would, in any event, survive under the so-called 'intermediate' form of heightened scrutiny." *Id.* at 168.

16

The D.C. Circuit, applying similar reasoning, applied intermediate scrutiny rather than strict scrutiny to the District of Columbia's generally applicable prohibition of assault rifles and large-capacity magazines (defined as magazines capable of holding more than ten rounds), noting that the prohibitions likely "do not impose a substantial burden" and certainly do "not effectively disarm individuals or substantially affect their ability to defend themselves." *Heller v. District of Columbia*, 670 F.3d 1244, 1262 (D.C. Cir. 2011) (*Heller II*); *see also Friedman*, 2015 WL 1883498, at *1 (declining to apply strict scrutiny when upholding restrictions on assault weapons and magazines capable of holding more than ten rounds). The Ninth Circuit held that San Francisco's requirement that handguns be kept in the home in locked containers or secured with trigger locks should receive intermediate scrutiny because it did "not impose the sort of severe burden that requires" strict scrutiny. *Jackson v. City and County of San Francisco*, 746 F.3d 953, 964 (9th Cir. 2014), *pet'n for cert. pending*, Dkt. No. 14-704.

So too, the Third Circuit held that intermediate scrutiny rather than strict scrutiny should apply to a federal statute prohibiting possession of a firearm with an obliterated serial number—a regulation

17

that plainly affected conduct within the home as well as outside it and applied equally to law-abiding citizens. The court observed that such a restriction "does not severely limit the possession of firearms" because it "leaves a person free to possess any otherwise lawful firearm he chooses." *United States v. Marzzarella*, 614 F.3d 85, 97 (3d Cir. 2010). And the Seventh Circuit—evaluating a Chicago ordinance that required residents to engage in firing-range training as a condition of firearm possession, including in the home, but prohibited firing ranges within the city limits—applied more than intermediate scrutiny, although "not quite 'strict scrutiny,'" in view of the ordinance's "serious encroachment" on the Second Amendment right. *Ezell v. City of Chicago*, 651 F.3d 684, 708 (7th Cir. 2011).

Although each of these cases concerned a law that to some extent restricted firearm possession in the home and by law-abiding citizens, in none of them did the court of appeals conclude that these aspects of the law's application required strict scrutiny. Instead, the courts carefully considered the degree to which the challenged restrictions burdened the Second Amendment right. To be sure, the Supreme Court has suggested that the need for a firearm for self-defense is "most

18

acute" in the home. *Heller*, 554 U.S. at 628. But, as these courts of appeals have recognized, restrictions that do not meaningfully jeopardize the ability to use a firearm for self-defense in the home do not warrant the most searching form of judicial scrutiny.

Plaintiffs invoke mistaken analogies to First Amendment doctrine in order to forestall application of intermediate scrutiny to § 18-12-302's restrictions of large-capacity magazines. Sheriffs' Br. 30-32. In their view, such a restriction is unlike a time, place, and manner restriction on speech, which receives a form of intermediate scrutiny, *see Doe v. City of Albuquerque*, 667 F.3d 1111, 1131-32 (10th Cir. 2012), because it "absolutely prohibits possession of the magazines at all times, in all places, and in all manners" (Sheriffs' Br. 30). But, as the district court found, § 18-12-302 "does not affect whether [a] semiautomatic firearm can be used, or even whether it can be used in semiautomatic mode," but "only affects how often it must be reloaded." (Joint Appendix (J.A.) 1775-1776.) By limiting access to a firearm feature that facilitates the rapid fire of large numbers of bullets, the statute channels the expression of the Second Amendment right toward other means of using firearms that are less risky to the public, but equally appropriate for

19

self-defense. *See Heller II*, 670 F.3d at 1262. The measure thus is closely akin to a time, place, and manner restriction under the First Amendment.[9] *See Marzzarella*, 614 F.3d at 97 (analogizing law regulating "the manner in which persons may lawfully exercise their Second Amendment rights" to a time, place, and manner restriction); *United States v. Decastro*, 682 F.3d 160, 167-68 (2d Cir. 2012), *cert. denied*, 133 S. Ct. 838 (2013) (likening a "law that regulates the availability of firearms" to a time, place, and manner regulation).

### 2. Place-specific distinctions have less salience for restrictions aiming to limit access to dangerous firearm features.

Plaintiffs' arguments also fail because a distinction between the home and the public sphere cannot easily be drawn with respect to restrictions that aim to limit access to dangerous firearm features. It is generally the case that "public safety interests often outweigh

---

[9] The Ninth Circuit reached the similar conclusion that a law requiring "retrieving a weapon from a locked safe or removing a trigger lock" was akin to a time, place, and manner restriction under the First Amendment, in that it "burden[ed] only the manner in which persons may exercise their Second Amendment rights." *Jackson*, 746 F.3d at 964 (quotation marks and emphasis omitted).

individual interests in self-defense" outside the home, but are less salient within it. *Masciandaro*, 638 F.3d at 470. But that is less true here for two reasons.

First, even if firearms with large-capacity magazines remain in the home and are used for lawful self-defense, they nonetheless can harm persons beyond the confines of the home. Bullets that miss their intended target can pass through walls and windows. The risk is heightened with large-capacity magazines because evidence shows that "the tendency is for defenders to keep firing until all bullets have been expended, which poses grave risks to others in the household, passersby, and bystanders." *Heller II*, 670 F.3d at 1263-64 (quotation marks omitted). As the district court found, this "may make the firing of large numbers of defensive rounds by a civilian ill-advised." (J.A. 1780.) The court also found that "the number of rounds that are fired in both an offensive and defensive capacity" correlates to "the size of a magazine." (J.A. 1782.) Thus, Colorado's interest in preventing injury to bystanders caused by the firing of large numbers of bullets is strongly implicated even by the presence of large-capacity magazines in the home.

Second, the home–public distinction is not a firm line here because guns with dangerous features that are kept in the home may not remain there. Firearms are frequently stolen during burglaries. The federal Bureau of Justice Statistics reported, based on victim-survey results, an estimated "341,000 incidents of firearm theft from private citizens annually from 1987 to 1992"; the agency further noted that "[b]ecause the survey does not ask how many guns were stolen, the number of guns stolen probably exceeds the number of incidents of gun theft."[10] Thus, the effectiveness of a restriction of large-capacity magazines would be undermined if it could not apply to possession in the home, because some number of firearms with such magazines kept in the home likely would find their way into the hands of criminals. Moreover, the presence of firearms with large-capacity magazines in the home also presents a risk to public safety because some mass shooters have obtained their weapons from family members. In one notable instance, the Sandy Hook Elementary School shooter in Newtown, Connecticut,

---

[10] Bureau of Justice Statistics, "Guns Used in Crime" at 3 (July 1995), *available at* http://www.bjs.gov/content/pub/pdf/GUIC.PDF (last visited Apr. 29, 2015).

used an AR-15-style assault weapon and other weapons taken from his mother's gun collection.[11] If persons intent on causing mass injury can obtain these weapons from the homes of family members, the restriction's effectiveness will be undermined, and the public will be put at risk.

\*     \*     \*

In sum, strict scrutiny would disable the States from enacting reasonable firearm regulations in the interest of public safety, an outcome that the Supreme Court has expressly cautioned the Second Amendment does not require. *See McDonald*, 561 U.S. at 785 (plurality op.). Such scrutiny would "likely foreclose an extraordinary number of regulatory measures, thus handcuffing lawmakers' ability to prevent armed mayhem in public places, and depriving them of a variety of tools for combating that problem." *Masciandaro*, 638 F.3d at 471 (quotation marks and brackets omitted)); *see also Kachalsky*, 701 F.3d at 93 (same).

---

[11] *See* Office of the State's Attorney, *Report of the State's Attorney for the Judicial District of Danbury on the Shootings at Sandy Hook Elementary School*, at 2 (Nov. 25, 2013), *available at* http://www.ct.gov/csao/lib/csao/Sandy_Hook_Final_Report.pdf (last visited Apr. 29, 2015).

## POINT II

### HEIGHTENED SCRUTINY DOES NOT LIMIT THE SOURCES A COURT MAY CONSIDER WHEN ASSESSING MEANS-ENDS FIT

Plaintiffs and their amici contend that the challenged legislation must rise or fall based on the evidence before the legislature at the time of its enactment. *See* Nonprofits' Br. 60; Br. for Amici Curiae States of Utah *et. al* (Utah Br.) 4. They argue that the district court erred in considering post-enactment evidence when determining whether the legislation bears a substantial relation to Colorado's interest in public safety.[12] Those arguments misunderstand how courts review legislative judgments under intermediate scrutiny and would, if accepted, result in unwarranted "interference in the States' legislative processes," which is "the heart of their sovereignty," *Thompson v. Oklahoma*, 487 U.S. 815, 877 (1988) (Scalia, J., dissenting).

---

[12] The district court considered post-enactment evidence in assessing the existence of "a substantial relation between the statute and . . . Colorado's asserted purpose," but not at the prior step of identifying "the General Assembly's objective and whether it is important." (J.A. 1781 n.27, 1782 n.28.)

## A. Courts May Consider Post-Enactment Evidence of Means-Ends Fit.

Under intermediate scrutiny, "courts must accord substantial deference to the predictive judgments of [the legislature]." *Turner Broad. Sys., Inc. v. FCC*, 520 U.S. 180, 195 (1997) (*Turner II*) (quotation marks omitted). This deference reflects that "'[s]ound policymaking often requires legislators to forecast future events and to anticipate the likely impact of these events based on deductions and inference for which complete empirical support may be unavailable.'" *Kitchen v. Herbert*, 755 F.3d 1193, 1223 (10th Cir.) (quoting *Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622, 665 (1994) (*Turner I*)), *cert. denied*, 135 S. Ct. 265 (2014). Deferential review is particularly apt "[i]n the context of firearm regulation," where "the legislature is 'far better equipped than the judiciary' to make sensitive public policy judgments (within constitutional limits) concerning the dangers in carrying firearms and the manner to combat those risks." *Kachalsky*, 701 F.3d at 97 (quoting *Turner I*, 512 U.S. at 665). Thus, a courts' role is limited to "assur[ing] that, in formulating its judgments, [the legislature] has drawn reasonable inferences based on substantial evidence." *Turner I*, 512 U.S. at 666.

Plaintiffs and their amici mistakenly assert that a court making this evaluation may consider only evidence that was before the legislature prior to enactment. Their argument relies principally on a misreading of the Supreme Court's decision in *Turner I. See* Nonprofits' Br. 60; Utah Br. 5. In that decision, which concerned a First Amendment challenge, the Court remanded the matter to the district court for development of "a more thorough factual record" relevant to the application of intermediate scrutiny. *Turner I*, 512 U.S. at 668. That step would have been unnecessary if the record developed in the course of litigation could not satisfy the government's burden under intermediate scrutiny.

The Court's subsequent decision in the *Turner* litigation confirms that plaintiffs' conception of intermediate scrutiny is misguided. After remand, the Court considered not just evidence compiled by Congress during "pre-enactment hearings," but also materials submitted to the district court, including "expert submissions, sworn declarations and testimony, and industry documents." *Turner II*, 520 U.S. at 187. The *Turner* Court's expansive approach to the sources of evidence available under intermediate scrutiny reflects the recognition that a requirement

26

of detailed fact-finding "would be an improper burden for courts to impose on" legislatures. *Id.* at 213.

Consistent with the *Turner* decisions, this Court has held that post-enactment evidence may be used—even under strict scrutiny—to justify the implementation of a race-based set-aside program. *See Concrete Works of Colo., Inc. v. City & County of Denver*, 36 F.3d 1513, 1521 (10th Cir. 1994). This precedent properly recognizes that it is the *outcome* of legislative decision-making, and not the *process* by which those decisions are reached, that courts review under intermediate scrutiny. *See Sable Commc'ns of Cal., Inc. v. FCC*, 492 U.S. 115, 133 (1989) (Scalia, J., concurring) ("Neither due process nor the First Amendment requires legislation to be supported by committee reports, floor debates, or even consideration, but only by a vote."). Indeed, as the Supreme Court has cautioned, a legislature "is not obligated, when enacting its statutes, to make a record of the type that an administrative agency or court does to accommodate judicial review." *Turner II*, 520 U.S. at 213 (quotation marks omitted).

Moreover, plaintiffs' amici are simply incorrect that "no published decision in the Second Amendment context" has considered post-

enactment evidence as the district court did in this case. Utah Br. 16. To the contrary, federal appellate courts have repeatedly confirmed that intermediate scrutiny under the Second Amendment is not limited to pre-enactment evidence, and the government may defend firearms restrictions through "legislative text and history, empirical evidence, case law, and common sense." *United States v. Carter*, 669 F.3d 411, 418 (4th Cir. 2012); *see also Drake v. Filko*, 724 F.3d 426, 438 (3d Cir. 2013) (government may justify a firearm regulation through "studies and anecdotes, . . . history, consensus, and simple common sense" (quotation marks omitted)), *cert. denied,* 134 S. Ct. 2134 (2014); *Kachalsky*, 701 F.3d at 99 (considering "studies and data" submitted by the parties)[13]; *United States v. Skoien*, 614 F.3d 638, 643-44 (7th Cir. 2010) (en banc) (citing extensive social-science evidence); *id.* at 651 (Sykes, J., dissenting) (noting that "[m]ost of this data . . . has been supplied by the court"). The Supreme Court has recognized the validity of such sources in the First Amendment context as well, confirming that even under strict scrutiny, a State may justify a

---

[13] Plaintiffs' amici mistakenly characterize *Kachalsky* as rejecting post-enactment evidence offered in support of a firearm regulation. *See* Utah Br. 16.

speech restriction "based solely on history, consensus, and simple common sense." *Fla. Bar v. Went For It, Inc.*, 515 U.S. 618, 628 (1995) (quotation marks omitted).

### B. Plaintiffs' Amici Rely on Inapposite Precedents in Which Legislative Motivation Was at Issue.

Plaintiffs' amici misplace their reliance on precedent concerning minority-set-aside programs and legislative-redistricting plans that implicate race-based classifications.[14] *See* Utah Br. 6, 9, 12 (citing *Shaw v. Hunt*, 517 U.S. 899 (1996); *City of Richmond v. J.A. Croson Co.*, 488 U.S. 469 (1989); and *Rothe Development Corp. v. Dep't of Def.*, 413 F.3d 1327 (Fed. Cir. 2005)). Courts have looked to pre-enactment evidence

---

[14] Other cases referenced by plaintiffs' amici (*see* Utah Br. 8-14) show courts considering sources outside the legislative record when assessing the constitutionality of the challenged legislation. *See Landell v. Sorrell*, 382 F.3d 91, 116 (2d Cir. 2004) (considering expert and lay testimony offered at trial), *rev'd on other grounds*, *Randall v. Sorrell*, 548 U.S. 230 (2006); *Randall*, 548 U.S. at 253-56 (same); *Doe v. City of Albuquerque*, 667 F.3d at 1134 (faulting the municipal defendant for *not* offering evidence in the litigation to satisfy intermediate scrutiny).

The remaining cases cited do not even discuss the use of post-enactment evidence. *See Kitchen*, 755 F.3d at 1222-23; *Peruta*, 742 F.3d at 1177-78; *Video Software Dealers Ass'n v. Schwarzenegger*, 556 F.3d 950, 963-64 (9th Cir. 2009); *Hutchins v. District of Columbia*, 188 F.3d 531, 542-43 (D.C. Cir. 1999) (en banc); *Carver v. Nixon*, 72 F.3d 633, 644-45 (8th Cir. 1995).

when assessing challenges to such programs because "governmental motivation plays a prominent role in a strict scrutiny analysis of a federal race-based scheme." *Rothe Dev. Corp. v. U.S. Dep't of Def.*, 262 F.3d 1306, 1327 (Fed. Cir. 2001). This scrutiny serves to "'smoke out' illegitimate uses of race by assuring that the legislative body is pursuing a goal important enough to use a highly suspect tool." *J.A. Croson Co.*, 488 U.S. at 493 (plurality op.); *see also Hutchins*, 188 F.3d at 543 (explaining that suspicion of government justifications may be appropriate for "legislation [that] provides for differential treatment of suspect (or quasi-suspect) classes," but not for legislation implicating fundamental rights). Plaintiffs and their amici do not contend that a government's motives are similarly suspect when it enacts legislation to prevent gun violence.

Indeed, there can be no serious dispute in this case regarding the sincerity of the General Assembly's public-safety motivations. (*See* J.A. 3921 (Rep. Fields) ("[T]he motivation behind [§ 18-12-302] is based on what happened in Aurora on July 20th.").) Even the representatives who opposed the magazine-size limit acknowledged that this legislation was aimed at reducing gun violence and, in particular, preventing mass

shootings—a goal that opponents of the legislation shared. (*See* J.A. 4061 (statement of Rep. Waller) ("[T]here isn't a person in this chamber . . . who wants to see horrible tragedies like Sandy Hook and like the Aurora theater shooting happen. None of us, not one of us, wants to see something like that ever happen again.").)

Plaintiffs amici are also incorrect that considering post-enactment evidence would "usurp the legislature's policymaking role." Utah Br. 13-14. The use of post-enactment evidence respects legislative decision-making by ensuring that state policy judgments are not lightly overturned where there is strong evidence available to support them. It also enables courts to meaningfully evaluate challenges to legislation as applied in novel circumstances that a legislature could not reasonably foresee.

### C. Intermediate Scrutiny Does Not Authorize Courts to Second-Guess the Foundation of a Legislature's Policy Judgment.

Although the extensive post-enactment evidence of means-ends fit would be sufficient to support this legislation, substantial evidence was also presented to the General Assembly prior to the legislation's enactment that bears on this inquiry. (*See* J.A. 1781-1782, 1787-1788.) In deliberations regarding § 18-12-302's restriction of large-capacity

31

magazines, legislators received testimony from numerous witnesses (*see, e.g.*, J.A. 3925, 4119 (former federal law-enforcement officer); J.A. 3928, 4134 (police chief)) and heard evidence that large-capacity magazines are used frequently in mass shootings and shootings of law-enforcement officers (J.A. 3929, 3933, 4060, 4075-4076, 4113, 4194). Legislators also considered studies regarding the effects of the similar federal restrictions of large-capacity magazines, which was in effect from 1994 to 2004. (J.A. 4076, 4084-86, 4113, 4194-95.)

The General Assembly similarly considered substantial evidence in support of § 18-12-112. As the district court noted, legislators heard evidence that private transfers of firearms constituted a loophole in existing law that enabled convicted criminals to unlawfully obtain firearms. (J.A. 1787-1788, 4396). Among other things, legislators heard that 40 percent of firearm purchases occurred without a background check and that 80 percent of those who use a handgun in a crime acquired it from a private seller. (J.A. 4396.) Moreover, they considered research showing that jurisdictions that regulate private firearm sales have lower rates of intrastate gun trafficking, fewer women killed with firearms by their intimate partners, and lower suicide rates. (J.A. 4416.)

Intermediate scrutiny does not empower a court to substitute its own judgment for a legislature's regarding the proper evidence to consider in formulating firearm policy. Even in contexts where courts require a showing of pre-enactment evidence, legislators may rely on any evidence that they "reasonably believed to be relevant to the problem" at hand. *City of Renton v. Playtime Theatres, Inc.*, 475 U.S. 41, 51-52 (1986). Moreover, intermediate scrutiny permits a legislature to draw on the experiences of other jurisdictions confronting the same problems and does not require legislators "to conduct new studies or produce evidence independent of that already generated" by other jurisdictions. *Id.*; *see Hutchins*, 188 F.3d at 544 (concluding, in challenge to juvenile curfew, that "it would be folly for any city not to look at experiences of other cities" and that "in drawing conclusions from those experiences, legislatures are not obligated to insist on scientific methodology").

To preserve the States' authority under the Second Amendment to experiment with measures to reduce firearm violence, courts must afford state legislatures discretion to identify risks to public safety and to select appropriate measures to mitigate them. *See Friedman*, 2015

WL 1883498, at *5 ("The central role of representative democracy is no less part of the Constitution than is the Second Amendment: when there is no definitive constitutional rule, matters are left to the legislative process."). Plaintiffs' conception of judicial review would require courts to reweigh those fundamental legislative choices. This Court should decline plaintiffs' invitation to second-guess the General Assembly's decision here to consult and act on the substantial evidence before it.

## CONCLUSION

The district court's judgment should be affirmed.

Dated:   New York, NY
         April 29, 2015

Respectfully submitted,

ERIC T. SCHNEIDERMAN
  *Attorney General of the*
  *State of New York*
Attorney for Amicus Curiae
State of New York

By:   /s/ Anisha S. Dasgupta

BARBARA D. UNDERWOOD
  *Solicitor General*
ANISHA S. DASGUPTA
  *Deputy Solicitor General*
CLAUDE S. PLATTON
  *Assistant Solicitor General*
    *of Counsel*

ANISHA S. DASGUPTA
Deputy Solicitor General

120 Broadway, 25th Floor
New York, NY 10271
(212) 416-8020
anisha.dasgupta@ag.ny.gov

GEORGE JEPSEN
Attorney General
State of Connecticut
55 Elm St.
Hartford, CT 06106

LISA MADIGAN
Attorney General
State of Illinois
100 West Randolph Street
Chicago, Illinois 60601

BRIAN E. FROSH
Attorney General
State of Maryland
200 St. Paul Place, 20th Floor
Baltimore, Maryland 21202

ELLEN F. ROSENBLUM
Attorney General
State of Oregon
1162 Court St. N.E.
Salem, Oregon  97301

KARL A. RACINE
Attorney General
District of Columbia
441 Fourth Street, NW,
Washington, D.C. 20001

DOUGLAS S. CHIN
Attorney General
State of Hawaii
425 Queen Street
Honolulu, Hawaii  96813

THOMAS J. MILLER
Attorney General
State of Iowa
1305 E. Walnut Street
Des Moines, IA 50319

MAURA HEALY
Attorney General
Commonwealth of Massachusetts
One Ashburton Place
Boston, Massachusetts 02108

BOB FERGUSON
Attorney General
State of Washington
1125 Washington Street SE
P.O. Box 40100
Olympia, WA 98504-0100

Reproduced on Recycled Paper

## CERTIFICATE OF COMPLIANCE

Pursuant to Rule 32(a)(7)(C) of the Federal Rules of Appellate Procedure, Anisha S. Dasgupta, an attorney in the Office of the Attorney General of the State of New York, hereby certifies that according to the word count feature of the word processing program used to prepare this brief, the brief contains 6,484 words and complies with the type-volume limitations of Rule 32(a)(7)(B).

   /s/ Anisha S. Dasgupta

    Anisha S. Dasgupta

## CERTIFICATE OF SERVICE

I hereby certify that on April 29, 2015, I served the foregoing brief via the CM/ECF system for the United States Court of Appeals for the Tenth Circuit, which will distribute the brief to all attorneys of record in this case and in the related case of 14-1292:

| | |
|---|---|
| Matthew Grove | matt.grove@state.co.us |
| John T. Lee | jtlee@state.co.us |
| Molly Moats | Molly.Moats@state.co.us |
| Jonathan Fero | jon.fero@state.co.us |
| Kathleen Spalding | kit.spalding@state.co.us |
| Stephanie Scoville | stephanie.scoville@state.co.us |
| LeeAnn Morrill | leeann.morrill@state.co.us |
| Richard Westfall | RWestfall@halewestfall.com |
| Peter Krumholz | PKrumholz@halewestfall.com |
| Douglas Abbott | dabbott@hollandhart.com |
| Marc F. Colin | mcolin@bcjlpc.com |
| Anthony J. Fabian | fabianlaw@qwestoffice.net |
| David B. Kopel | david@i2i.org |

## VIRUS SCAN CERTIFICATION

The digital form of this pleading submitted to the Court was scanned for viruses using McAfee VirusScan Enterprise + AntiSpyware Enterprise software, version 7785.0000 (most recent virus definition created on April 28, 2015), and according to the program, the document is virus free.

**ECF SUBMISSION CERTIFICATION**

The undersigned certifies that this ECF submission is an exact duplicate of the seven hard copies delivered to the clerk's officer pursuant to 10th Cir. R. 31.5.

**PRIVACY REDACTIONS CERTIFICATION**

Privacy redactions were not required on any page of this brief.

  /s/  Anisha S. Dasgupta   

Anisha S. Dasgupta
